Nos. 26-1804, 26-1805

_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT
_____

STATE OF OREGON, STATE OF WASHINGTON,

Plaintiffs – Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in
his official capacity as Secretary of the Department of Homeland Security,
UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S.
SCOTT, in his official capacity as Commissioner of U.S. Customs and Border
Protection, UNITED STATES,

Defendants – Appellants,

_____

BURLAP AND BARREL, INC., BASIC FUN, INC.,

Plaintiffs – Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, UNITED
STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT,
in his official capacity as Commissioner of U.S. Customs and Border
Protection, JAMIESON GREER, in his official capacity as U.S. Trade
Representative, OFFICE OF THE UNITED STATES TRADE
REPRESENTATIVE, DEPARTMENT OF HOMELAND SECURITY,
MARKWAYNE MULLIN, in his official capacity as Secretary of the
Department of Homeland Security,

Defendants – Appellants,

_____

On Appeal from the United States Court of International Trade in
Nos. 1:26-CV-01472-3JP and 1:26-CV-01606-3JP

_____

**STATE PLAINTIFF-APPELLEES' OPPOSITION TO DEFENDANTS'
MOTION FOR A STAY PENDING APPEAL AND AN IMMEDIATE
ADMINISTRATIVE STAY**

_____

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Deputy Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4402
benjamin.gutman@doj.oregon.gov

Attorneys for State of Oregon

(Additional counsel listed on signature page)
_____
_____

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

ARGUMENT ........................................................................................................5

    A.    Defendants are not likely to succeed on appeal, because the President failed to identify any "balance-of-payments deficits" under Section 122. ...........................................................6

        1.    The statutory text and historical context establish that "balance-of-payments deficits" are payment imbalances that threaten reserve assets under a fixed-exchange-rate system. ........................................... 7

        2.    The current-account deficit the President cites does not establish any balance-of-payments deficit, and concluding otherwise would effectively grant the President unfettered discretion to impose Section 122 tariffs. ................................................................. 14

        3.    Defendants' arguments fail................................................. 15

    B.    The CIT's injunction will not irreparably harm defendants. .........17

    C.    The remaining equitable factors weigh against a stay. ..................21

CONCLUSION....................................................................................................24

APPENDIX

**TABLE OF AUTHORITIES**

**Cases Cited**

*Am. Signature, Inc. v. United States*,
    598 F.3d 816 (Fed. Cir. 2010) ..............................................................23

*Azar v. Allina Heath Servs.*,
    587 U.S. 566 (2019) ..............................................................................16

*Bond v. United States*,
564 U.S. 211 (2011) ................................................................22

*Cash v. Collins*,
166 F.4th 1046 (Fed. Cir. 2026) .......................................6, 15

*Guerrero-Lasprilla v. Barr*,
589 U.S. 221 (2020) ................................................................15

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016).....................................................23

*Learning Resources, Inc. v. Trump*,
607 U.S. __, 146 S. Ct. 628 (2026) ........................ 3, 14, 17, 22

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..............................................................6, 16

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025).........................................6, 15

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................. 5, 6, 19, 21

*Pennsylvania v. New Jersey*,
426 U.S. 660 (1976) ................................................................20

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013)...............................................20

*United States v. Oakland Cannabis Buyers' Coop.*,
532 U.S. 483 (2001) ................................................................23

*United States v. Rahimi*,
602 U.S. 680 (2024) ................................................................16

*Winston-Salem/Forsyth Cnty. Bd. of Ed. v. Scott*,
404 U.S. 1221 (1971) .................................................................5

*Yoshida Int'l, Inc. v. United States*,
526 F.2d 560 (C.C.P.A. 1975)...................................................9

## Constitutional and Statutory Provisions

19 U.S.C. § 2132................................................................................1

19 U.S.C. § 2132(a) ........................................................................4, 7

19 U.S.C. § 2132(b) .............................................................................4

19 U.S.C. § 2132(c) .............................................................................7

50 U.S.C. § 1701(a) ............................................................................3

U.S. Const., Art. I, § 8 ........................................................................2

## Other Authorities

Bretton Woods Agreements Act,
Pub. L. No. 79-171, 59 Stat. 1730.........................................................8

Economic Report of the President (February 1971)............................................10

Economic Report of the President (February 1974)............................................11

*In re: Procedures for Entering a Stay in New IEEPA Tariff Cases*, Admin.
Order 25-02 (Dec. 23, 2025) ...................................................19

Janice M. Westerfield,
*A Lower Profile for the U.S. Balance of Payments*, Business Review,
Federal Reserve Bank of Philadelphia (Nov./Dec. 1976) ........................13

President Richard Nixon,
*Address to the Nation Outlining a New Economic Policy: "The Challenge
of Peace"* (Aug. 15, 1971).................................................. 8, 9

Proclamation No. 11012
(Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ....................... 3, 4, 22

Proclamation No. 4074,
36 Fed. Reg. 15,724 (Aug. 17, 1971)......................................................8

*Trends in Int'l Trade of the United States*:
Hrgs. Before the H. Comm. On Ways & Means, 91st Cong. 2710 (1970)
................................................................................10

iii

**STATE PLAINTIFF-APPELLEES' OPPOSITION TO DEFENDANTS'
MOTION FOR A STAY PENDING APPEAL AND AN IMMEDIATE
ADMINISTRATIVE STAY**

———————————

## INTRODUCTION

On the same day that the Supreme Court struck down President Trump's first attempt to unilaterally impose unlawful tariffs, he shifted to a backup theory based on Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132. That statute requires the President to impose import restrictions when necessary to address "balance-of-payments deficits" causing "fundamental international payments problems." Despite Section 122's mandatory language—and the longstanding current-account deficit that the President cited to invoke it— President Trump is the only president *ever* to invoke Section 122 since its enactment half a century ago.

The Court of International Trade (CIT) properly rejected that novel effort. The current-account deficits that the President relied on to invoke Section 122 do not establish "balance-of-payments deficits" within the meaning of the law. In the early 1970s, when Congress enacted Section 122, "balance-of-payments deficits" was a term of art with a specific meaning related to the fixed-exchange-rate monetary system that existed but was in the process of collapsing. Because exchange rates were fixed, international payment imbalances threatened U.S. reserve assets, which had to be drawn upon to

finance the imbalance.  Section 122's "balance-of-payments deficits" thus refers to exchange-rate pressures that put reserve assets at risk in a fixed-rate system.  The CIT correctly concluded that the current-account deficit the President relied on did not establish any "balance-of-payments deficits" within the meaning of Section 122.

Defendants appealed and asked the CIT to stay its judgment, including its permanent injunction as to the three plaintiffs the CIT found to have standing.  All three judges on the CIT panel, including the judge who dissented on the merits, denied Defendants' request for a stay.  B12.

Defendants now ask this Court to stay the injunction, but this Court should also deny defendants' motion.  Defendants have failed to show a likelihood of success on the merits, because the CIT correctly concluded that the President failed to identify any "balance-of-payments deficits" within the meaning of Section 122.  Defendants likewise have failed to show irreparable harm given the narrow scope of the CIT's injunction—applying only to three importers nationwide.  The public interest is served by maintaining that injunction and prohibiting the President's unlawful tariffs.

## BACKGROUND

Congress, not the President, has the "Power to lay and collect Taxes, Duties, Imposts and Excises."  U.S. Const., art. I, § 8.  Nevertheless, shortly

after taking office President Trump unilaterally imposed sweeping tariffs on nearly every country in the world, claiming authority to do so under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701(a). *See Learning Resources, Inc. v. Trump*, 607 U.S. __, 146 S. Ct. 628, 635–36 (2026). Private parties and a coalition of states challenged that authority, and the CIT, this Court, and the Supreme Court all agreed that IEEPA did not confer it. *Id.* at 637 ("[T]he President asserts the independent power to impose tariffs on imports from any country, of any product, at any rate, for any amount of time," but IEEPA "cannot bear such weight").

On the same day the Supreme Court struck down his unlawful IEEPA tariffs, President Trump shifted his legal theory to Section 122 of the Trade Act of 1974. Proclamation No. 11012 (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026). Section 122 provides, in part:

> Whenever fundamental international payments problems require special import measures to restrict imports—
>
> (1) to deal with large and serious United States balance-of-payments deficits * * *
>
> The President shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress)—
>
> (A) a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States * * *

> If the President determines that the imposition of import restrictions under subsection (a) will be contrary to the national interest of the United States, then he may refrain from proclaiming such restrictions and he shall—
>
> > (1) immediately inform Congress of his determination, and
>
> > (2) immediately convene the group of congressional official advisers designated under section 2211(a) of this title and consult with them as to the reasons for such determination.

19 U.S.C. § 2132(a), (b).  In other words, under Section 122, when "large and serious * * * balance-of-payments deficits" create "fundamental international payments problems," the President "shall" impose Section 122 tariffs or "immediately inform Congress" of his decision not to do so.  *Id.*

Since the statute's enactment half a century ago, President Trump is the first President to invoke Section 122 tariffs.  More specifically, the President asserted that "balance-of-payments deficits" within the meaning of Section 122 were present based on four separate but related accounting metrics: (1) the United States' trade deficit, which has existed since the 1970s; (2) a deficit in "primary income"; (3) a deficit in "secondary income"; and (4) a "negative net international investment position."  Proclamation No. 11012; *see also* B26–B28 (discussing those individual metrics).

Private parties and a coalition of states again brought suit, arguing that the President's cited bases for invoking Section 122 did not establish what Congress intended by "balance-of-payments deficits" when it enacted Section

122 in 1974.  The CIT agreed, granting summary judgment and permanently enjoining the Section 122 tariffs.  A60–A61.[1]  Defendants appeal and, after the CIT panel unanimously concluded that a stay was inappropriate, B12, they now seek a stay from this Court.  This Court should deny defendants' motion.

## ARGUMENT

As an "intrusion into the ordinary processes of administration and judicial review," a stay pending appeal is "an exercise of judicial discretion," "not a matter of right, even if irreparable injury might otherwise result."  *Nken v. Holder*, 556 U.S. 418, 427, 433 (2009) (internal quotation marks omitted). Defendants, as the moving parties, bear a "heavy burden" of demonstrating entitlement to this "extraordinary" remedy.  *Winston-Salem/Forsyth Cnty. Bd. of Ed. v. Scott*, 404 U.S. 1221, 1231 (1971).  This Court considers four factors in deciding whether a stay is warranted: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether

---

[1]    The CIT also ruled that only the two private plaintiffs and the State of Washington had standing as importers of record; it dismissed the claims of the remaining states for lack of standing.  A29–A35.  And because the CIT held that the President had failed to invoke any "balance-of-payments deficits" within the meaning of Section 122, the CIT did not reach the plaintiffs' other arguments, that (1) even if the President identified "balance-of-payments deficits," they still did not rise to the level of "fundamental international payments problems," and that (2) the President's tariff exemptions violated Section 122's nondiscrimination provision.  *See* A35, A39 n.25.

the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (internal quotation marks omitted). The first two of those factors "are the most critical," *id.*, but all four weigh against staying the CIT's judgment.

**A.    Defendants are not likely to succeed on appeal, because the President failed to identify any "balance-of-payments deficits" under Section 122.**

The meaning of "balance-of-payments deficits" in the Trade Act of 1974 is a question of statutory interpretation that this Court reviews de novo. *Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–92 (2024)); *see also Loper Bright*, 603 U.S. at 394 ("courts must exercise independent judgment in determining the meaning of statutory provisions"). This Court "employs the traditional tools of statutory construction" to answer that question, examining "the statute's text, structure, and legislative history," and applying "relevant canons of interpretation." *Cash v. Collins*, 166 F.4th 1046, 1050 (Fed. Cir. 2026) (internal quotation marks omitted).

The CIT correctly concluded that none of the economic measures the President identified constitute a balance-of-payments deficit. Instead, understood in historical context, Congress in 1974 used "balance-of-payments

deficits" to refer to pressures on U.S. reserve assets under the collapsing fixed-exchange-rate system of the time. That risk is effectively eliminated under today's floating-exchange-rate system, which explains why no other President has found cause to invoke Section 122 for the last fifty years.

1.    **The statutory text and historical context establish that "balance-of-payments deficits" are payment imbalances that threaten reserve assets under a fixed-exchange-rate system.**

Beginning with the text, there is no dispute in this case that the "balance-of-payments" is an accounting principle that refers to the overall balance across three accounts: current, capital, and financial. Mot. 4. Nor is there any dispute that the overall balance of payments necessarily sums to zero—*i.e.*, includes no deficit or surplus—because balances in the current account are offset by corresponding balances in the capital and financial accounts. Mot. 5. Defendants seize on that to suggest that "balances-of-payments deficits" must mean a deficit in any component of the three accounts, such as the trade deficit (a component of the current account).

But the term is not so elastic. For one thing, Section 122's text itself expressly distinguishes between "balance of payments" and "balance of trade." 19 U.S.C. § 2132(a), (c). Moreover, the historical context confirms that Congress in 1974 intended "balance-of-payments deficits" to mean something

entirely different, which was a product of the international monetary system that existed at the time and differed greatly from the one that exists today.

After World War II, the United States and other allied powers met at Bretton Woods, New Hampshire, to negotiate new international monetary policy. A98–A100; B20. Under the "Bretton Woods" system, the U.S. dollar became the benchmark international currency, with the values of foreign currency fixed or "pegged" to the dollar. Bretton Woods Agreements Act, Pub. L. No. 79-171, 59 Stat. 1730; B19–B25. The value of the U.S. dollar, in turn, was fixed to gold at a rate of $35 per ounce, and the United States pledged to convert dollars into gold at that price. *Id.*

By the 1960s, however, the volume of dollars in worldwide circulation exceeded U.S. gold reserves convertible at $35 per ounce. A101–A102; B23–B25. That problem came to a head in 1971. With a run on the United States' gold reserves looming, President Nixon suspended the convertibility of dollars into gold, implemented wage and price controls, and imposed a temporary ten percent surcharge on all imports. Proclamation No. 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971).

President Nixon made clear that the ten percent tariff was designed to shore up the fixed-exchange-rate system that existed under the Bretton Woods Agreements. President Richard Nixon, *Address to the Nation Outlining a New*

*Economic Policy: "The Challenge of Peace"* (Aug. 15, 1971)[2] (tariff designed to make sure "that American products will not be at a disadvantage because of unfair exchange rates. When the unfair treatment is ended, the import tax will end as well * * * . The time has come for exchange rates to be set straight and for the major nations to compete as equals"). Although an attempt was made to salvage the Bretton Woods system, amidst a skyrocketing market price for gold and rampant speculation against the dollar, by 1973 the Bretton Woods system was in full collapse, and international currency exchange rates "floated" against the dollar according to market conditions. A101–A102; B23–B25. Nevertheless, substantial uncertainty remained as to whether the floating-exchange-rate system would prevail or if, instead, the world would return to fixed exchange rates. B25–B26.

Against that backdrop, Congress enacted Section 122 to define and limit presidential authority to act as President Nixon had. *See Yoshida Int'l, Inc. v. United States*, 526 F.2d 560, 582 n.33 (C.C.P.A. 1975) (affirming legality of President Nixon's temporary tariff but recognizing that future similar action "must, of course, comply" with the requirements of Section 122). And, as the

---

[2] *Available at* https://www.presidency.ucsb.edu/documents/address-the-nation-outlining-new-economic-policy-the-challenge-peace (accessed May 28, 2026).

CIT correctly held, the "balance-of-payments deficits" to which Section 122 referred were the measures that most closely tracked the risk to the United States' reserve assets in that fixed-exchange-rate system. *See* A53 (concluding that Congress intended balance of payments in Section 122 to refer to liquidity balance, basic balance, and official settlements balance).

All contextual evidence points in that direction. A Congressional report published in 1963 discussed "[t]he meaning of the balance-of-payments deficit," explaining that "[t]he deficit, under the official U.S. definition, measures the reduction in U.S. monetary reserve assets (chiefly gold) and the increase in liquid liabilities." B22. "Stated another way," a balance-of-payments deficit, as then understood, "measures the decline, during the period covered, in the U.S. ability to defend the exchange value of the dollar with liquid resources owned by or automatically available to the monetary authorities." *Id.*

Similarly, a Congressional report published in 1970 noted that the liquidity and official-settlements balances both measured "changes in U.S. reserve assets." A43 (citing *Trends in Int'l Trade of the United States*: Hrgs. Before the H. Comm. On Ways & Means, 91st Cong. 2710 (1970)). And President Nixon's 1971 Economic Report recognized that the liquidity balance was "originally intended as a measure of changes in [the U.S.'s] ability to

maintain conversions of dollars into gold at a fixed price ratio" and, for that reason, was "[t]he most commonly used measure of the U.S. payments position." B45.

The Senate Report on the Trade Act of 1974 explicitly identifies the liquidity balance, the basic balance, and official settlements balance as balance-of-payments metrics. B58. And, like Section 122 itself, that report also explicitly distinguishes between the trade balance and the overall balance of payments. B61 ("In 1962, the Nation had a modest trade surplus of approximately $1.1 billion (c.i.f.) and a balance of payments deficit of $2.9 billion (liquidity basis). Ten years later the modest trade surplus had become an $11 billion deficit, and the payments deficit had grown from a bearable $2.9 billion to an intolerable $13.9 billion. Not surprisingly, the dollar had become unwelcome in many of the capitals of the world and underwent a series of devaluations.").

The contextual evidence also confirms that Congress knew that the balance-of-payments problems that Section 122 was designed to address existed only in a fixed-exchange-rate system, not the floating-exchange-rate system that ultimately prevailed. That is so because, in a fixed-exchange-rate system, exchange deficits had to be financed with reserve assets, while in a floating-exchange-rate system, reserve assets are not threatened in that way because the

value of currencies themselves automatically adjust via supply and demand to rebalance the balance of payments. B17–B18. Consistently, the Senate Report expressly recognized that Section 122 was "not likely to be utilized" if a floating-exchange-rate system prevailed. B71. The 1974 Economic Report of the President reached the same conclusion:

> In a world characterized by the managed floating of exchange rates, measurement of the overall balance of payments has become less important. In a fixed exchange rate world, one of the major functions of the overall balance of payments was to signal to policy makers when a given exchange rate had become untenable. To the extent that exchange rates are allowed to adjust automatically in response to payments imbalances, it is no longer necessary to communicate the desirability of an exchange rate adjustment to the policy maker.

B74.

In short, the "balance-of-payments deficits" with which Section 122 is concerned do not arise in the floating-exchange-rate system that has prevailed since Section 122's enactment. B17–B19. Instead, the balance is automatically restored through market-based exchange-rate adjustments:

> when foreign demand for U.S. goods or services or assets falls, signaling a decline in payment inflows to the United States, the market-clearing price of the dollar falls against other currencies, establishing a new exchange rate. The fall in the value of the dollar makes U.S. goods, services, and assets cheaper for foreign residents, who then buy more of them, increasing payment inflows into the United States. The fall in the value of the dollar also makes foreign goods and assets more expensive for U.S. residents and thereby reduces payment outflows from the United States. Consequently, the exchange rate adjusts to reduce payment

outflows and bring them in line to the level of payment inflows. The new exchange rate ensures that the total payments made by the United States to other countries matches the total receipts received by the United States from abroad.

B17–B18. "In other words, floating exchange rates ensure that the balance of payments balances." *Id.*; *see also* B80–B81 (Janice M. Westerfield, *A Lower Profile for the U.S. Balance of Payments*, Business Review, Federal Reserve Bank of Philadelphia 14–15 (Nov./Dec. 1976)[3] ("[W]hereas under fixed rates the U.S. would face a loss of reserve assets when the dollar was threatened, under flexible rates the exchange-rate mechanism itself makes the required adjustment by letting the dollar fall in value* * * . The new international monetary system not only reduces the importance of balance-of-payments measures but also makes the old reporting system obsolete.")).

Taken together, the statutory text and historical context confirm that Section 122's "balance-of-payments deficits" referred to the pressures on U.S. reserve assets in a fixed-exchange-rate system. That meaning cannot be transposed onto the floating-exchange-rate system that has prevailed in the wake of the Nixon shock.

/ / /

---

[3] *Available at* https://www.philadelphiafed.org/-/media/frbp/assets/economy/articles/business-review/1976/br76ndjw.pdf (accessed May 28, 2026).

14

**2.**  **The current-account deficit the President cites does not establish any balance-of-payments deficit, and concluding otherwise would effectively grant the President unfettered discretion to impose Section 122 tariffs.**

Despite Congress's focused intent in referring to "balance-of-payments deficits," the President interprets the statute to allow—indeed, to *require*—tariffs whenever there is any deficit in any component of the overall balance of payments that he deems large and serious.  Mot. 12–16.  Adopting the President's interpretation would confer unfettered discretion to impose Section 122 tariffs, because there almost always will be a deficit in *some* component of the overall balance of payments.  As the CIT correctly explained, "the 'balance of payments' as an accounting principle always nets to zero," so "[t]o the extent that is the case, if the President has the ability to select among the sub-accounts to identify a balance-of-payments deficit, unless every sub-account is balanced, the President would always be able to identify a balance-of-payments deficit." A47.  Like the CIT, this Court should reject that constitutionally dubious construction.  A47–A48; *see Learning Resources*, 146 S. Ct. at 644 ("When Congress grants the power to impose tariffs, it does so clearly and with careful constraints.").

The CIT properly focused, instead, on the issue that Section 122 was enacted to address: the balance-of-payments metrics that measure the exchange-rate pressures that put reserve assets at risk in a fixed-exchange-rate system.

A53.  The CIT correctly concluded that the President failed to identify any balance-of-payments deficits within the meaning of Section 122.  Even if Section 122 balance-of-payments deficits can be measured in ways other than the liquidity, basic, and official settlements balances the CIT identified, that does not change what is ultimately being measured for purposes of Section 122: the risk to U.S. reserve assets in a fixed-exchange-rate system.  The President does not identify any such risk, so his tariffs are unlawful.

### 3.    Defendants' arguments fail.

Defendants fault the CIT for relying on legislative history but cannot refute the conclusion the historical evidence compels: that "balance-of-payments deficits" under Section 122 refers to the pressures that arose in a fixed-exchange-rate system, and which no longer exist in a floating-exchange-rate system.  The CIT did not mistake legislative history for law, Mot. 17, but rather properly relied on contextual evidence to understand Congress's intent in enacting Section 122, *see Mosaic*, 160 F.4th at 1347 (courts may look to legislative purpose in ascertaining a statute's intended meaning); *see also Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 231–34 (2020) (looking to statutory history to interpret statutory provision).

This Court has recognized legislative history as one of the "traditional tools of statutory construction[.]"  *Cash*, 166 F.4th at 1050.  And the Supreme

Court has noted the interpretative value of historical context. *United States v. Rahimi*, 602 U.S. 680, 691 (2024). The broader historical context and the legislative history of Section 122 are particularly probative here, where the meaning suggested by the historical evidence is borne out by the fact no other president has ever invoked Section 122 in the half century since its enactment, despite the mandatory obligation to do so if its triggering conditions are present.

Arguing otherwise, defendants rely solely on *Azar v. Allina Heath Servs.*, 587 U.S. 566, 579 (2019). But there, the asserted interpretation allegedly supported by the "ambiguous" legislative history was "clearly foreclose[d]" by the statutory text. *Id.* at 580. This case is the opposite. The term "balance-of-payments deficits" is undefined by statute, and the historical context clearly illuminates the specific and unique meaning that Congress intended for that term.

Nor is the President's interpretation entitled to deference "within an economically reasonable understanding of" the statutory phrase—that argument just restates the President's claim to unfettered discretion. Mot. 19–20. If the President gets to decide what "balance-of-payments deficits" means, then Section 122 places no limits on his authority to impose its tariffs. Contrary to the defendants' argument, however, "balance-of-payments deficits" is a statutory phrase, and "courts must exercise independent judgment in

determining the meaning of statutory provisions." *Loper Bright*, 603 U.S. at 394. For all the reasons explained, this Court should again reject the President's attempt to find expansive authority in a much more limited delegation of power. *See Learning Resources*, 146 S. Ct. at 644 ("When Congress grants the power to impose tariffs, it does so clearly and with careful constraints.").

Defendants cannot show any strong likelihood of success on appeal.

**B.      The CIT's injunction will not irreparably harm defendants.**

Defendants' claims of irreparable harm are primarily tied to the injunction entered by the CIT. But the CIT's injunction applies only to Washington State agencies and instrumentalities and to two small businesses. Defendants' claims of irreparable injury are thus vastly overblown. Meanwhile, the recent administrative imbroglio surrounding the refund of IEEPA tariffs demonstrates that if plaintiffs are required to continue paying the Section 122 tariffs during the pendency of this appeal, they are likely to face needless burdens in seeking refunds of those amounts.

Reading defendants' motion, one might assume that the CIT enjoined the Section 122 tariffs *in toto*. Administration officials claim that the CIT's order will irreparably harm "the Nation's trade policy," Mot. 22 (citation modified), but those assertions cannot be reconciled with the actual injunction, which is

18

limited to one spice importer, one toy company, and one state government whose state universities pay tariffs directly.  As the CIT correctly recognized, "Defendants' assertions of irreparable harm * * * to the President's ability to conduct trade negotiations, manage foreign affairs, and address the U.S. balance-of-payments position * * * fail to address the limited nature of this injunction."  B6.

Defendants also contend that the "Section 122 tariffs have 'incentivized trading partners to continue implementation by underscoring President Trump's determination to address fundamental imbalances in the global trading system'" with increased tariffs.  Mot. 23.  Trading partners are by now fully aware of the President's commitment to tariffs.  Regardless, it is the CIT's thorough *reasoning*—not the *relief* it ordered—that undermines expectations that the tariffs will continue.  To the extent that the CIT's ruling disrupts those expectations, that is not a result of tariffs not being collected from the State of Washington and two small businesses.  It is the result of the CIT's legal conclusion, and a stay of its injunction would do nothing to change that.

Recognizing the limited immediate effect of the CIT's judgment, defendants argue that unless the judgment is enjoined, non-parties may seek the same relief.  *Id.*  But non-parties could do so regardless of a stay.  And defendants do not claim that other suits have been filed or offer any explanation

of how soon or how broadly relief could be granted in such cases that would meaningfully affect tariff revenue.  *See* B7–B8 (CIT observing that no other cases challenging the imposition of duties in Proclamation No. 11012 have been filed).  Neither do defendants explain why they would be precluded from seeking a stay in later-filed cases if those follow-on cases did have the broad impacts they fear.  Indeed, the CIT stayed follow-on cases after its IEEPA decision.  *In re: Procedures for Entering a Stay in New IEEPA Tariff Cases*, Admin. Order 25-02 (Dec. 23, 2025).[4]  And the CIT remains able and willing to do the same should the need arise from its decision concerning these tariffs.  B8 ("If the court is faced with additional cases challenging the imposition of Section 122 duties pursuant to Proclamation No. 11012, the court will determine whether any specific case management procedures or other forms of relief are required based on the facts at that time.").  Defendants' concerns about follow-on litigation "are purely speculative," B7, and thus cannot satisfy the "irreparable injury" showing required to justify a stay.  *See Nken*, 556 U.S. at 434–35 ("[S]imply showing some possibility of irreparable injury fails to satisfy the second [stay] factor.") (citation modified)).

---

[4]    *Available at* https://www.cit.uscourts.gov/sites/cit/files/Administrative%20Order%2025-02.pdf (accessed May 28, 2026).

Moreover, contrary to defendants' concern that they may never recover the duties that otherwise would have been collected during the 150-day period, Mot. 24, the CIT explained that its judgment does not require immediate refunds outside the ordinary liquidation process, and it does not prevent CBP from using its ordinary liquidation-extension authority to preserve its ability to assess duties if defendants ultimately prevail.  B7 n.8.  As a result, "any concerns about nonpayment are speculative."  B7.  Likewise, defendants rely solely on speculation about the willingness or ability of parties not subject to the CIT's injunction to pay the duties at a future date if they are ultimately upheld, not Washington State's ability to do so.  And defendants' speculative concern about nonpayment must also be weighed against the immediate, non-speculative harm to those who are presently bearing the cost of the unlawful tariffs with little or no hope of refund.

Lastly, defendants complain that the administrative burden of refunding the illegal IEEPA tariffs makes this injunction unfair.  Mot. 25.  But the government cannot "be heard to complain about damage inflicted by its own hand."  *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns").  In any event, defendants

cannot seriously contend that implementing an injunction vis-à-vis three plaintiffs is an unworkable burden.

## C.   The remaining equitable factors weigh against a stay.

A stay would inflict substantial injury on the plaintiffs. Washington would continue to pay tariff-driven costs under a proclamation that the CIT has held unlawful. And because those tariffs expire on July 24, 2026, a stay pending appeal would almost certainly swallow what remains of the statutory period. The practical effect would be to deny Washington meaningful injunctive relief during the only window in which such relief has any value. A stay would reduce the permanent injunction to nothing more than a belated reimbursement remedy.

Nor does delayed reimbursement meaningfully address Washington's injury. Defendants contend that Washington's financial losses during the appeal "could be repaired * * * assuming those tariffs are otherwise refundable." Mot. 25 (italics removed). But the governing standard for this factor asks whether Washington's injury is substantial, not irreparable. *Nken*, 556 U.S. at 434. The refund process for the illegal IEEPA tariffs show that "there may be significant delays from the time the imposition of tariffs are first held unlawful before refunds are effectuated," A58, and "[i]t is difficult to see how continuing to pay unlawful Section 122 duties to the Government only to

wait months, if not years, for any refund would not qualify as substantial injury," B8.  Indeed, a stay would compel Washington, in its sovereign capacity, to continue paying federal exactions that the CIT has deemed unlawful—on the mere prospect of, at best, a delayed refund.  *See Bond v. United States*, 564 U.S. 211, 221 (2011) ("The allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States.").

The public interest also cuts sharply against a stay.  Defendants assert only that the public "would suffer significant policy consequences" absent a stay.  Mot. 25.  But the President "enjoys no inherent authority to impose tariffs during peacetime." *Learning Resources*, 146 S. Ct. at 638.  He invoked Section 122 because Congress—not the Executive—controls the conditions under which temporary surcharges may be imposed.  *See* Proclamation 11012, 91 Fed. Reg. 9339, ¶¶ 3, 5–6, 13 ("I find that fundamental international payments problems within the meaning of section 122 exist * * *and that special measures to restrict imports are required to address those problems, as authorized by section 122.").

By enacting Section 122, Congress determined the circumstances under which extraordinary tariff authority serves the public interest.  And when Congress has made those policy determinations for the public good, courts

sitting in equity "cannot ignore the judgment of Congress, deliberately expressed in legislation." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (internal quotation marks omitted).

Here, the CIT has already held that the President exceeded Section 122's statutory authorization. And courts have repeatedly recognized that there is "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). To the contrary, "[t]he public interest is served by ensuring that governmental bodies comply with the law," not by delaying the effect of a judgment that enforces it. *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). Enforcing the CIT's injunction, rather than suspending it, best advances the public interest that Congress defined.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**CONCLUSION**

The Court should deny a stay.

Respectfully submitted,

**DAN RAYFIELD**
Attorney General
State of Oregon

By: */s/ Benjamin Gutman*
Benjamin Gutman
Deputy Attorney General
Dustin Buehler
Special Counsel
Paul Smith
Solicitor General
Brian Marshall
Adam Holbrook
Jordan R. Silk
Senior Assistant Attorneys General
Department of Justice
1162 Court Street NE
Salem, Oregon  97304
Telephone:  (503) 378-4402
benjamin.gutman@doj.oregon.gov
paul.l.smith@doj.oregon.gov
adam.holbrook@doj.oregon.gov
jordan.r.silk@doj.oregon.gov

Counsel for the State of Oregon

**ROB BONTA**
Attorney General
State of California

By: */s/ Shiwon Choe*
Lara Haddad
Supervising Deputy Attorney General
Shiwon Choe
Carolyn Downs
Samuel Sokolsky
Deputy Attorneys General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-4400
Lara.Haddad@doj.ca.gov
Shiwon.Choe@doj.ca.gov
Carolyn.Downs@doj.ca.gov
Samuel.Sokolsky@doj.ca.gov
Counsel for the State of California

**KRISTIN K. MAYES**
Attorney General
State of Arizona

By: */s/ Joshua D. Bendor*
Joshua D. Bendor
Solicitor General
Syreeta A. Tyrell
Senior Litigation Counsel
Timothy E.D. Horley
Jaylia Yan
Assistant Attorneys General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Joshua.bendor@azag.gov
Syreeta.Tyrell@azag.gov
Timothy.Horley@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov

Counsel for the State of Arizona

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
Chief Counsel for Federal Initiatives
Stephen Thompson
Mark Ladov
Natasha Korgaonkar
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8679
rabia.muqaddam@ag.ny.gov
stephen.thompson@ag.ny.gov
mark.ladov@ag.ny.gov
Natasha.korgaonkar@ag.ny.gov

Counsel for the State of New York

**PHILIP J. WEISER**
Attorney General State of Colorado

By: */s/ Sarah H. Weiss*
Sarah H. Weiss
Senior Assistant Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

Counsel for the State of Colorado

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Ian R Liston*
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Rose Gibson
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8875
Ian.Liston@Delaware.gov

Counsel for the State of Delaware

**OFFICE OF THE GOVERNOR
ex rel. Andy Beshear,** in his official
capacity as Governor of the
Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo
General Counsel
Laura C. Tipton
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
laurac.tipton@ky.gov

Counsel for Governor Andy Beshear

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Michael Skold*
Michael Skold
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.Skold@ct.gov

Counsel for the State of Connecticut

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Sarah A. Hunger*
Jane Elinor Notz
Solicitor General
Sarah A. Hunger
Deputy Solicitor General
Office of the Illinois Attorney
General
115 South LaSalle Street
Chicago, Illinois 60603
Telephone: (312) 814-5202
Sarah.hunger@ilag.gov

Counsel for the State of Illinois

**AARON M. FREY**
Maine Attorney General

By: */s/ Katherine W. Thompson*
Katherine W. Thompson
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov

Counsel for the State of Maine

**ANTHONY G. BROWN**
Attorney General for the State of
Maryland

By: */s/ James C. Luh*
James C. Luh
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.maryland.gov

Counsel for the State of Maryland


**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
Assistant Attorneys General
Michigan Department of Attorney
General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov




Counsel for the State of Michigan


**AARON D. FORD**
Attorney General

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland
Chief of Special Litigation
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov


Counsel for the State of Nevada


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Katherine Dirks*
Katherine Dirks
Chief State Trial Counsel
Office of the Massachusetts Attorney
General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

Counsel for the Commonwealth of
Massachusetts


**KEITH ELLISON**
Attorney General
State of Minnesota

By: */s/ Lindsey E. Middlecamp*
PETER J. FARRELL (#0393071)
Deputy Solicitor General
LINDSEY E. MIDDLECAMP
(#0392589)
Special Counsel
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
Peter.farrell@ag.state.mn.us
Lindsey.middlecamp@ag.state.mn.us




Counsel for the State of Minnesota


**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Lucy I. Sprague*
Lucy I. Sprague
David N. Birch
Deputy Attorneys General
124 Halsey Street, 5th Floor
Newark, New Jersey 07101
(609) 696-5363
Lucy.Sprague@law.njoag.gov


Counsel for the State of New Jersey

**RAUL TORREZ**
Attorney General of New Mexico

By: */s/ Amy Senier*
AMY SENIER
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
505-490-4060
asenier@nmdoj.gov


Counsel for the State of New Mexico


**JOSH SHAPIRO,**
in his official capacity as Governor of
the Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

By: */s/ Jacob B. Boyer*
Jacob B. Boyer
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov


Counsel for Governor Josh Shapiro


**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Ryan P. Kane*
RYAN P. KANE
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov


Counsel for the State of Vermont

**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

By: */s/ Daniel T. Wilkes*
Daniel T. Wilkes
Assistant Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6415
dwilkes@ncdoj.gov


Counsel for the State of North
Carolina


**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Alex Carnevale*
Alex Carnevale
Special Assistant Attorney General
Office of the Attorney General - State
of Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov


Counsel for the State of Rhode Island


**JAY JONES**
Attorney General of Virginia

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge
Solicitor General
202 N. 9th Street
Richmond, Virginia 23219
Tel: (804) 786-2071
Fax: (804) 786-1991
solicitorgeneral@oag.state.va.us


Counsel for the Commonwealth of
Virginia

**NICHOLAS W. BROWN**
Attorney General
State of Washington

By: */s/ Freeman E. Halle*
FREEMAN E. HALLE,
WSBA 61498
TODD SIPE, WSBA 23203
Assistant Attorneys General
Office of the Washington State
Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
freeman.halle@atg.wa.gov
todd.sipe@atg.wa.gov

Counsel for the State of Washington

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Brian P. Keenan*
Brian P. Keenan State Bar #1056525
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
brian.keenan@wisdoj.gov

Counsel for the State of Wisconsin

## STATEMENT OF CONSENT

Pursuant to Federal Circuit Rule 32(g)(3)(B), the undersigned represents that counsel for State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Illinois, Commonwealth of Kentucky, State of Maine, State of Maryland, Commonwealth of Massachusetts, State of Michigan, State of New Jersey, State of Nevada, State of New Mexico, State of New York, State of North Carolina, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, Commonwealth of Virginia, State of Washington, and State of Wisconsin have consented to their signatures on this brief.

DATED:  May 28, 2026

/s/  Benjamin Gutman
_____
BENJAMIN GUTMAN  #160599
Deputy Attorney General
benjamin.gutman@doj.oregon.gov

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,007 words.  This response also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Times New Roman, a proportionally spaced typeface.

DATED:  May 28, 2026

/s/  Benjamin Gutman
_____
BENJAMIN GUTMAN  #160599
Deputy Attorney General
benjamin.gutman@doj.oregon.gov

# APPENDIX

# APPENDIX

Pursuant to Federal Circuit Rule 27, appellee submits the following, as indexed below.

## INDEX

| Document | APP # |
|---|---|
| Opinion and Order Denying Stay (Dkt. 60) | B1 |
| Declaration of Prof. Douglas Irwin (Dkt. 27-6) | B13 |
| Excerpts of 1971 Economic Report of the President | B44 |
| Excerpts of Senate Report No. 93-1298 | B54 |
| Excerpts of 1974 Economic Report of the President | B73 |
| Westerfield, A Lower Profile for the U.S. Balance of Payments | B77 |

Slip Op. 26-53

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| THE STATE OF WASHINGTON,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES, ET AL.,<br><br>Defendants. | Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges<br><br>Court No. 26-01472-3JP |
| BURLAP AND BARREL, INC., ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, ET AL.,<br><br>Defendants. | Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges<br><br>Court No. 26-01606-3JP |

## <u>OPINION AND ORDER</u>

[Denying Defendants' motion for a stay of enforcement of the judgment pending appeal.]

Dated: May 20, 2026

<u>Freeman E. Halle</u>, Assistant Attorney General, Office of the Washington State Attorney General, for Plaintiff The State of Washington.  Also on the brief were <u>Nicholas W. Brown</u>, Attorney General, and <u>Todd Sipe</u>, Assistant Attorney General.

<u>Jeffrey M. Schwab</u>, <u>Reilly W. Stephens</u>, and <u>James McQuaid</u>, Liberty Justice Center, of Austin, TX, for Plaintiffs Burlap and Barrel, Inc., and Basic Fun, Inc.

<u>Claudia Burke</u>, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendants United States, Donald J. Trump, in his official capacity as President of the United States, Department of Homeland Security, Markwayne Mullin, in his official capacity as Secretary of the Department of Homeland Security, United States Customs and Border Protection,

**- B 1 -**

Court Nos. 26-01472 & 26-01606                                                    Page 2

Rodney S. Scott, in his official capacity as Commissioner of United States Customs and Border Protection, the Executive Office of the President, Jamieson Greer, in his official capacity as United States Trade Representative, and the Office of the United States Trade Representative.  Also on the brief were <u>Brett A. Shumate</u>, Assistant Attorney General, <u>Eric J. Hamilton</u>, Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Justin R. Miller</u>, Attorney-In-Charge, International Trade Field Office.

Barnett, Chief Judge: Plaintiffs[1] in these companion cases contested the imposition of duties pursuant to Proclamation No. 11012, *Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems* (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ("Proclamation No. 11012"), which invoked Section 122 of the Trade Act of 1974, 19 U.S.C. § 2312.  *See* Compl. (Mar. 5, 2026), ECF No. 2, Ct. No. 26-01472; Compl. (Mar. 9, 2026), ECF No. 2, Ct. No. 26-01606.  Defendants move for a stay of enforcement of the court's judgment in these cases pending appeal to the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit" or "CAFC").  Mot. for a Stay of Enforcement of J. Pending Appeal ("Defs.' Mot."), ECF No. 53, Ct. No. 26-01472;[2] *see also Oregon v. United States*, Slip Op. 26-47, 2026 WL 1257669 (CIT May

---

[1] Plaintiff The State of Washington in Court No. 26-01472 is referred to as "State Plaintiff."  The plaintiffs in Court No. 26-01606, referred to as "Private Plaintiffs," are Burlap and Barrel, Inc. ("Burlap and Barrel") and Basic Fun, Inc. ("Basic Fun").  The court refers to the State Plaintiff and the Private Plaintiffs collectively as "Plaintiffs."
[2] Defendants attached three declarations to their motion.  *See* Decl. of Amb. Jamieson Lee Greer, U.S. Trade Representative, ECF No. 53-1; Decl. of Howard W. Lutnick, U.S. Sec'y of Commerce, ECF No. 53-2; Decl. of Brandon Lord, ECF No. 53-3.  The motion and declarations are also filed in Court No. 26-01606 at ECF Nos. 42, 42-1–42-3.

Court Nos. 26-01472 & 26-01606                                   Page 3

7, 2026);[3] J., ECF No. 50.[4]  Plaintiffs oppose the motion.  Pl. States' Resp. to Defs.'

Mot. to Stay ("State Pl.'s Resp."), ECF No. 59; Pls.' Resp. in Opp'n to Defs.' Mot. for a

Stay of Enforcement of J. Pending Appeal ("Priv. Pls.' Resp."), ECF No. 47.  For the

following reasons, the court denies the motion.

### BACKGROUND

The court presumes familiarity with the background set forth in *Oregon* and

supplements the background herein as necessary.  On May 7, 2026, the court granted

Plaintiffs' motions for summary judgment with respect to Private Plaintiffs and the State

of Washington.  *Oregon*, 2026 WL 1257669, at *23; *see also id.* at *23–35 (Stanceu, J.,

dissenting).  The court's judgment declared Proclamation No. 11012 "invalid as contrary

to law," permanently enjoined Proclamation No. 11012 "with respect to The State of

Washington (and its Instrumentalities), Burlap and Barrel, Inc., and Basic Fun, Inc. (the

Importer Plaintiffs as defined in the court's accompanying opinion)," and required

Defendants to implement the permanent injunction within five days.  J. at 1–2.  The

court also ordered "Section 122 duties paid by Importer Plaintiffs before this injunction is

fully implemented" to be "refunded with interest as provided by law."  *Id.*

---

[3] Defendants are referred to collectively as "the Government" and otherwise listed in *Oregon*.  In *Oregon*, the court dismissed all state plaintiffs except the State of Washington for lack of Article III standing.  2026 WL 1257669, at *9–11, *23.  While those states signed the response brief, the court does not list them here in light of their dismissal from the action.

[4] Citations to documents filed by State Plaintiff identify the ECF Nos. in Ct. No. 26-01472, and citations to documents filed by Private Plaintiffs identify the ECF Nos. in Ct. No. 26-01606.  For documents filed on both case dockets, the court references the ECF Nos. in Ct. No. 26-01472.

**- B 3 -**

Court Nos. 26-01472 & 26-01606                                              Page 4

Defendants appealed this court's judgment on May 8, 2026. Defs.' Notice of Appeal, ECF No. 51. On May 11, 2026, Defendants filed the instant motion. Defendants also requested an immediate administrative stay and a stay pending conclusion of the appeal from the Federal Circuit. *See* Order from CAFC (May 12, 2026) ("CAFC Admin. Stay"), ECF No. 54 (order from the Federal Circuit docketed herein). The Federal Circuit granted Defendants' "requests for an immediate administrative stay . . . to the extent that the judgment and the permanent injunction entered by the CIT in these cases are temporarily stayed until further notice while this court considers the motions for a stay pending appeal" and set a briefing schedule on the motion, *id.* at 3, which it subsequently revised, Order from CAFC (May 13, 2026), ECF No. 56. This court also set, and subsequently revised, a response deadline for Plaintiffs. Order (May 12, 2026), ECF No. 55; Order (May 13, 2026), ECF No. 57. Plaintiffs timely filed their respective responses. *See* State Pl.'s Resp.; Priv. Pls.' Resp.

### JURISDICTION AND STANDARD OF REVIEW

The court exercises subject-matter jurisdiction pursuant to 28 U.S.C. § 1581(i)(1)(B) (2018 & Supp. II 2022). *See Oregon*, 2026 WL 1257669, at *7. While the court has discretion to stay the enforcement of a judgment pending appeal pursuant to U.S. Court of International Trade ("CIT") Rule 62(d),[5] "[a] stay is an 'intrusion into the

---

[5] Rule 62(d) states, *inter alia*, that "[w]hile an appeal is pending from [a] . . . final judgment that grants . . . an injunction, the court may suspend . . . an injunction on terms for bond or other terms that secure the opposing party's rights." CIT Rule 62(d). The court may not, however, "require a bond, obligation, or other security from the appellant when granting a stay on an appeal by the United States . . . ." CIT Rule 62(e). When "the judgment appealed from is rendered by a three-judge panel, the order [to

ordinary processes of administration and judicial review'" and is "not a matter of right." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citation omitted). When deciding whether to grant the motion, the court considers "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). "The first two considerations 'are the most critical,' and the party requesting a stay bears the burden of showing that the circumstances justify an exercise of the court's discretion." *Transpacific Steel LLC v. United States*, 44 CIT __, __, 474 F. Supp. 3d 1332, 1337 (2020) (quoting *Nken*, 556 U.S. at 433–35).

**DISCUSSION**

I.      **Irreparable Harm[6]**

This court entered an injunction barring the Government from collecting Section 122 duties only from the three successful Importer Plaintiffs and ordered the

---

suspend the injunction] must be made either: (1) by that court sitting in open session; or (2) by the assent of all its judges, as evidenced by their signatures." CIT Rule 62(d).
[6] While the court addresses Defendants' irreparable harm argument for the sake of completeness, the motion could be summarily denied without prejudice based on the absence of harm due to the Federal Circuit's administrative stay. That administrative stay will remain in place pending the appellate court's consideration of the Government's motion. *See* CAFC Admin. Stay at 3 ("The requests for an immediate administrative stay are granted . . . until further notice while this court considers the motions for a stay pending appeal."). Thus, Defendants face no possibility of harm, irreparable or otherwise, unless or until the Federal Circuit denies the Government's motion.

Government to refund any Section 122 duties the Importer Plaintiffs paid before the injunction went into effect.  J. at 1–2.  Defendants' assertions of irreparable harm, broadly framed as harm to the President's ability to conduct trade negotiations, manage foreign affairs, and address the U.S. balance-of-payments position, *see* Defs.' Mot. at 5–7, fail to address the limited nature of this injunction applicable "to one spice importer, one toy company, and one state government whose state universities pay tariffs directly," State Pl.'s Resp. at 4–5.  The Government's reliance on a claimed "intrusion on the President's conduct of foreign affairs," Defs.' Mot. at 5, also fails to acknowledge Congress's constitutional role in the imposition of taxes and duties, *see Oregon*, 2026 WL 1257669, at *2, *12 (citing U.S. Const. art. I, § 8, cl. 1); Priv. Pls.' Resp. at 7, or the Judiciary's role in "protect[ing] Congress's constitutional authority from executive incursion," State Pl.'s Resp. at 4; *see also* U.S. Const. art III, § 1.  On these bases alone, Defendants fail to persuade the court that forgoing the collection of Section 122 duties from the three successful Importer Plaintiffs will cause the Government irreparable harm.[7]

Defendants further argue that even if they prevail on appeal, they may never recover the duties that otherwise would have been collected during the 150-day period of applicability of Proclamation No. 11012.  *See* Defs.' Mot. at 8.  This court's judgment

---

[7] Moreover, as Plaintiffs point out, "a stay would not significantly enhance the President's negotiating position or his leverage" because "foreign counterparts are aware that the tariffs have been held unlawful and may not endure."  Priv. Pls.' Resp. at 9; *see also* State Pl.'s Resp. at 5 (arguing the Government's concerns are not "resolved by a stay" because it is the court's "thorough *reasoning*—not the relief it ordered—that undermines the expectation that the Section 122 tariffs will withstand legal scrutiny").

required U.S. Customs and Border Protection ("CBP") to effectuate the permanent injunction, not the refunds, within five days.  J. at 2.  Refunds in the normal course of liquidation are thus consistent with the Judgment.[8]  Moreover, the court's judgment did not constrain CBP's authority to "extend the 1-year statutory period for liquidation for an additional period not to exceed 1 year" if CBP needs additional information "for the proper appraisement or classification of the merchandise."  19 C.F.R. § 159.12(a)(1)(i).  CBP may extend liquidation for up to three years.  *Id.* § 159.12(e).  Thus, CBP can ensure its ability to collect Section 122 duties if Defendants prevail, and any concerns about nonpayment are speculative.[9]

Defendants next assert that "the injunction would cripple CBP's ability to function at a particularly critical time" given the steps involved in reprogramming its automated system of record for imported merchandise, the anticipated "flood" of additional cases seeking injunctive relief, and the unworkability of extending the time period for the liquidation of millions of entries ultimately subject to Section 122 duties.  Defs.' Mot. at 9–10.  Again, Defendants' concerns are purely speculative.  As of this date, the above-

---

[8] Refunds in the normal course of liquidation obviate Defendants' suggestion that Rule 62(b) and (e) should be read together to permit an automatic stay of the refund portion of the judgment without a bond or other security from the Government.  Defs.' Mot. at 8–9 (citing *Transpacific Steel LLC v. United States*, 840 F. App'x 517 (Fed. Cir. 2020) (Taranto, J. dissenting).  In any event, this court and the *Transpacific* majority rejected that argument.  *Id.* at 518–19 & n.1; *Transpacific Steel LLC*, 474 F. Supp. 3d at 1336–38.  Beyond conclusory assertions, the Government offers no reasons for now adopting a different view.  *See* Defs.' Mot. at 8–9 (pointing to the *Transpacific* dissent without explaining why that view should prevail).
[9] CBP's ability to extend liquidation obviates the need to resolve Defendants' concern about whether the 150-day clock for collecting Section 122 duties would be tolled.  *See* Defs.' Mot. at 7.

captioned cases are the only cases challenging the imposition of duties in Proclamation

No. 11012.  The court will not constrain the relief available to the three successful

Importer Plaintiffs based only on speculation.[10]  If the court is faced with additional

cases challenging the imposition of Section 122 duties pursuant to Proclamation No.

11012, the court will determine whether any specific case management procedures or

other forms of relief are required based on the facts at that time.

## II.     Injury to Importer Plaintiffs

Defendants dismiss the possibility of harm to the three Importer Plaintiffs as mere

delay in obtaining the return of Section 122 duty deposits, arguing that "[t]his harm is, by

definition, not irreparable."  Defs.' Mot. at 11–12.  "Irreparable harm" to Plaintiffs is not

the standard; rather, the court weighs the likelihood of substantial injury to the other

parties to the proceeding, i.e., the Importer Plaintiffs.  *See Hilton*, 481 U.S. at 776.  It is

difficult to see how continuing to pay unlawful Section 122 duties to the Government

only to wait months, if not years, for any refund would not qualify as substantial injury.

Moreover, Defendants fail to address the court's additional reasons for entering a

permanent injunction in the first instance.  *See Oregon*, 2026 WL 1257669, at *21–22.

A stay will compound the losses, such as "lost profits and damage to business

---

[10] The same is true with respect to Defendants' assertion that the injunction "threatens CBP's ongoing efforts to effectuate the Supreme Court's decision" in *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2025), by diverting resources from the refund process for tariffs imposed pursuant to the International Emergency Economic Powers Act ("IEEPA").  Defs.' Mot. at 11.  That argument posits that the court should grant Defendants relief because CBP is busy setting up a system to refund another set of unlawful tariffs.  Defendants disregard the harm to importers that have been required to pay both sets of unlawful duties, only to wait months for a refund.

relationships, investments, and innovation" as a result of the Section 122 tariffs.  *Id.* at

*22; *see also* Priv. Pls.' Resp. at 4.

### III.    Public Interest

Regarding the public interest, Defendants identify the need for the President to

address "threats to the United States' economy, military preparedness, and national

security."  Defs.' Mot. at 12.[11]  For that proposition the Government cites *Winter v.*

*Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008), *see* Defs.' Mot. at 12,

when the Supreme Court concluded that a preliminary injunction burdened "the [U.S.]

Navy's ability to conduct realistic training exercises" with a resulting "adverse impact on

the public interest in national defense," *Winter*, 555 U.S. at 24.  The Government also

cites *PrimeSource Building Products, Inc. v. United States*, 45 CIT __, __, 535 F. Supp.

3d 1327, 1335 (2021).  *See* Defs.' Mot. at 12.  There, the court granted the

Government's motion for a partial stay of the judgment based, in part, on intervening

appellate authority and the need for "due consideration" to the Government's

corresponding "potential claim to the revenue."  *PrimeSource*, 535 F. Supp. 3d at 1335.

Neither circumstance is present here.  Furthermore, "Section 122 is not triggered by

---

[11] In pointing to "the national emergency and national security harms that the tariffs were designed to protect against," Defs.' Mot. at 12, the Government reasserts an argument presented in the litigation involving its duties under IEEPA, *see* Mot. for a Stay of Enforcement of J. Pending Appeal at 9–10, *V.O.S. Selections, Inc. v. United States*, Ct. No. 25-00066 (CIT May 28, 2025), ECF No. 59 (referencing "the national emergency and national security objectives that the tariffs were designed to protect").  The Government, however, does not indicate the national emergency or national security concerns it seeks to raise here.  More importantly, this argument, loosely tied to protecting the public fisc, ignores the limited nature of the permanent injunction.

generalized appeals to 'economic and national security interests,'" Priv. Pls.' Resp. at 7, and as such, these generalized concerns are also not a basis to stay this court's judgment.

Defendants assert that "there is a strong public interest in allowing the Executive Branch to implement administration policies." Defs.' Mot. at 7 (citing *Trump v. Orr*, 146 S. Ct. 44, 46 (2025); *Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025)). *Orr* and *CASA*, however, are distinguishable. *Orr* considered a stay motion in the context of class-wide relief. 146 S. Ct. at 46 (citing *CASA*, 606 U.S. at 831, 861). *CASA* addressed the issue of universal preliminary injunctions. 606 U.S. at 838. The relevant discussion in *CASA*, cited in *Orr*, emphasized the universal nature of the injunctive relief granted by the lower courts, finding irreparable harm from the lower courts' respective entries of a universal injunction "that likely exceed[ed] the authority conferred by the Judiciary Act," distinct from any harm arising from the restraint of an Executive policy. *Id.* at 859–60. In *Oregon*, this court declined to enter a universal injunction and instead granted importer-specific relief. 2026 WL 1257669, at *21–23. Thus, the harms claimed in *CASA* and *Orr* are not present here. Additionally, as previously stated, it is Congress that possesses inherent constitutional authority to impose tariffs, U.S. Const. art. I, § 8, and it is thus "up to Congress, not the [Executive], to decide whether the public interest merits further action" in response to well-intended but unlawful executive action, *Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021) (vacating a stay of a judgment holding unlawful a COVID-era eviction moratorium); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582, 585–86 (1952)

Court Nos. 26-01472 & 26-01606                                            Page 11

(finding an executive action unlawful due to a lack of congressional authorization,

despite the President's finding that the "action was necessary to avert a national

catastrophe").

### IV.    Likelihood of Success on the Merits[12]

Defendants address the likelihood of success on the merits last, Defs.' Mot. at

13–15, even though it is one of the two "most critical," *Nken*, 556 U.S. at 434.  Aside

from recounting arguments that the *Oregon* majority rejected, Defendants contest the

court's reliance on legislative history.  Defs.' Mot. at 14 (arguing "legislative history is not

the law" (quoting *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019))).  However, in

*Azar*, the Supreme Court rejected the Government's reliance on "ambiguous" legislative

history when the statutory text "clearly foreclose[d] the government's position."  587 U.S.

at 580.  Here, the statute does not expressly define "balance-of-payments deficits."

*Oregon*, 2026 WL 1257669, at *13–16.  Thus, Defendants' motion for a stay of

enforcement of the court's judgment is denied.

---

[12] Judge Stanceu does not join in this section of the opinion for the reasons articulated
in his dissent in *Oregon*.  However, Judge Stanceu concurs in the denial of the
government's motion for a stay of enforcement of the judgments pending appeal and
agrees that the other three factors weigh decisively in favor of denying that motion.

Court Nos. 26-01472 & 26-01606                                    Page 12

## CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby **ORDERED** that Defendants' motion

for a stay of enforcement of the judgment pending appeal (ECF No. 53, Ct. No. 26-

01472; ECF No. 42, Ct. No. 26-01606) is **DENIED**.

/s/    Mark A. Barnett
Mark A. Barnett, Chief Judge

/s/    Claire R. Kelly
Claire R. Kelly, Judge

/s/    Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated: May 20, 2026
      New York, New York

**- B 12 -**

# EXHIBIT 6

## DECLARATION OF DOUGLAS A. IRWIN

I, Douglas A. Irwin, declare as follows:

## I.     Qualifications and Methods

### a.  Qualifications

1.      I am a Professor of Economics at Dartmouth College, a position that I have held since 1997.  Since 2013, I have also co-directed the Political Economy Project at Dartmouth.  I am a non-resident Senior Fellow at the Peterson Institute for International Economics. From 2023-2024, I served as the President of the Economic History Association. From 1988 to 1991, I served on the staff of the Division of International Finance at the Board of Governors of the Federal Reserve System in Washington, D.C.

2.      I have published numerous scholarly articles and books on the topic of the history of international trade, among many other international economics-related topics.

3.      My full CV, which sets out my full qualifications and publications, is attached as Exhibit A.

4.      I am being paid $900 an hour for providing my expert opinions in this case.

### b.  Methods

5.      This report was prepared based on my research and experience, reviews of the available evidence in the economics literature, and analysis of various government documents and publicly available data.

## II.    Opinions

6.      Is the United States currently facing a "fundamental international payments problem" or a "balance of payments deficit"? The answer is clearly no. To understand why, we must understand more about the U.S. balance of payments and the exchange rate regime over time.

1

**- B 14 -**

### a. Balance of Payments Accounting

7. The balance of payments is an accounting of all transactions between the United States and the rest of the world.[1] This data is reported quarterly by the Bureau of Economic Analysis at the Department of Commerce.

8. There are three main components to the balance of payments: the current account, the capital account, and the financial account.[2] The current account balance—calculated as exports of goods and services and income receipts minus imports of goods and services and income payments—is widely reported. A narrow version of the current account is the merchandise trade balance, which measures exports and imports of goods. The United States has run a merchandise trade deficit (the value of imports of goods exceeds the value of exports of goods) since the late 1970s.[3] A slightly broader measure is the balance of trade in goods and services. The United States

---

[1] See the official Bureau of Economic Analysis (BEA) website at the U.S. Department of Commerce: https://www.bea.gov/resources/learning-center/what-to-know-international-trade-investment.

For a short primer from the Federal Reserve Bank of St. Louis, see https://www.stlouisfed.org/publications/page-one-economics/2025/oct/what-is-the-balance-of-payments.

[2] As the BEA puts it: https://www.bea.gov/resources/learning-center/what-to-know-international-trade-investment. "The international transactions accounts (also called the balance of payments) are a statistical summary of economic activity between U.S. residents and the residents of other countries, organized into three accounts: the current account, the capital account, and the financial account." It defines them as follows: "The current account records exports and imports of goods and services, income from U.S.-owned assets and investments abroad, and income from foreign-owned assets and investments in the United States. . . .The capital account mainly records capital transfers, such as debt forgiveness and disaster-related insurance settlements. The financial account records investment flows between the United States and other countries. These flows could take the form of U.S. deposits in foreign banks, loans to foreign persons, purchases of foreign stocks and bonds, or funding of foreign affiliates of U.S. multinationals. Similarly, transactions of foreign persons with U.S. banks, in U.S. financial markets, and with U.S. affiliates of foreign multinationals are recorded."

[3] See https://fred.stlouisfed.org/series/BOPBM

runs a surplus on services trade (exporting more than importing) but not enough to offset the merchandise trade deficit.

9.     The capital account mainly records capital transfers, such as debt forgiveness and disaster-related insurance settlements, and tends to be relatively small. The financial account records investment flows between the United States and other countries. These two-ways financial flows are enormous. These flows could take the form of U.S. deposits in foreign banks, loans to foreign entities, purchases of foreign stocks and bonds, or funding of foreign affiliates of U.S. multinationals, as well as foreign deposits in U.S. banks, foreign loans to U.S. entities, foreign purchases of U.S. stocks and bonds, or foreign funding of U.S. businesses. The financial account records trade in assets, such as purchases of stocks and bonds and other financial instruments. These can be short-term investments (liquid assets) or long-term investments (such as setting up a new plant or production facility). The United States is a net recipient of investment from the rest of the world. In other words, the United States has a financial account surplus, selling more assets to the rest of the world than it buys from them.

10.     In the U.S. case, the current account deficit and the financial account surplus essentially offset each other, ensuring that the overall balance of payments "balances."[4] This is no coincidence. Because it is an accounting framework, the balance of payments must always balance: total inflows must equal total outflows.[5] The only question is how. Here is where the exchange rate regime is important.

---

[4] This is because of double entry bookkeeping nature of the balance of payments. See https://www.bea.gov/resources/methodologies/international/pdf/iea-concepts-methods.pdf. Bureau of Economic Analysis, U.S. International Economic Accounts: Concepts and Methods, September 2025.

[5] There are two important caveats here. First, the inflows and outflows are imperfectly measured, and some transactions may not be captured by official statistics. Hence, a line in the balance of

3

### b. Balance of Payments under Floating Rate System

11. The term "balance of payments deficit" is meaningless under a floating exchange rate regime as the United States has had since March 1973. However, as will be explained later, it does have meaning under a fixed exchange rate regime.

12. In a floating rate system, a foreign exchange market exists in which currencies are freely traded against each other. Because there are a large number of buyers and sellers of each currency, the ordinary laws of supply and demand determine prices, in this case the exchange rate. Under floating exchange rates, the value of the dollar against other currencies automatically moves to equate the supply and demand for the dollar. This matching of supply and demand for the dollar ensures that the balance of payments balances. This is because anytime payment inflows to the United States do not match payment outflows from the United States, the value of the dollar on foreign exchange markets automatically adjusts to equate the two.

13. For example, when foreign demand for U.S. goods or services or assets falls, signaling a decline in payment inflows to the United States, the market-clearing price of the dollar falls against other currencies, establishing a new exchange rate. The fall in the value of the dollar makes U.S. goods, services, and assets cheaper for foreign residents, who then buy more of them, increasing payment inflows into the United States. The fall in the value of the dollar also makes foreign goods and assets more expensive for U.S. residents and thereby reduces payment outflows

---

payments called "statistical discrepancy" is used to reconcile an imbalance that appears in the official statistics. See chapter 21 of
https://www.bea.gov/resources/methodologies/international/pdf/iea-concepts-methods.pdf

Second, some dollars leave the United States and do not return but circulate abroad. For example, U.S. dollars are used as currency in Panama and Ecuador, and informally in Argentina and elsewhere. See https://www.stlouisfed.org/on-the-economy/2022/oct/innocent-greenbacks-abroad-us-currency-held-internationally

**- B 17 -**

from the United States. Consequently, the exchange rate adjusts to reduce payment outflows and bring them in line to the level of payment inflows. The new exchange rate ensures that the total payments made by the United States to other countries matches the total receipts received by the United State from abroad. In other words, floating exchange rates ensure that the balance of payments balances.

14.     The fact that the overall balance of payments balances does not mean that every component of the balance of payments is always balanced. The United States has had a current account deficit, in which imports of goods and services exceed exports of goods and services, since the 1980s. However, this does not constitute a balance of payments problem because the current account deficit is matched by a financial account surplus. In other words, the U.S. pays out more to the rest of the world in terms of trade in goods and services but is paid more by the rest of the world than it pays out in terms of purchases of short- and long-term assets and investments.

15.     The following chart illustrates how the current account deficit is matched by a financial account surplus:

**- B 18 -**



Figure 4

**The annual size of the US current account deficit is mirrored by the annual net inflow of foreign investment**
Share of GDP

Sources: "Table 1.1. US International Transactions," International Data, Bureau of Economic Analysis, updated June 20, 2024; and "Table 1.1.5. Gross Domestic Product," National Data, US Bureau of Economic Analysis, updated July 25, 2024.
Notes: Net foreign investment includes direct investment, portfolio investment, and other investment assets. In 1991, the current account balance was a positive $2.9 billion, or 0.05 percent of GDP; GDP = gross domestic product.

Source: https://www.cato.org/sites/cato.org/files/2023-04/policy-analysis-944-link.pdf

16.     In such a case, there is no such thing as a balance of payments deficit or an international payments problem. If the United States had a current account deficit and foreigners abroad did not want to put the dollars back in the United States to buy either goods or assets, the value of the dollar on foreign exchange markets automatically adjusts to equate payments and receipts, income and expenditure, demand and supply. If the current account deficit was not immediately financed by financial inflows from abroad, the value of the dollar would immediately fall on foreign exchange markets. Under floating exchange rates, there is no "balance of payments" problem as this term is usually defined.

### c.  Balance of Payments under Fixed-Rate Exchange Systems

17.     While the term "balance of payments deficit" has no meaning under a flexible exchange rate system, it does have meaning under fixed exchange rates, like the Bretton Woods

6

**- B 19 -**

system, which was in operation from the end of World War II until the early 1970s. In this case, the meaning of a "balance of payments deficit" and "fundamental international payments problems" has to do with government reserves – of either gold or foreign exchange – and the ability of a government to maintain balanced international payments under fixed exchange rates.

18.     The Bretton Woods system dates from a conference in New Hampshire in 1944 to establish the post-World War II international monetary system. The system established a regime of fixed exchange rates in which foreign countries would peg its currency to the U.S. dollar, which was the central node of the system. The U.S. dollar was the reserve currency of the world, the key currency against which other governments fixed the value of their own currency and the currency in which foreign governments held "reserves" (a stockpile) to intervene in the foreign exchange market to ensure that the exchange rate did not change.

19.     Because the price of one currency in terms of another does not change under a fixed exchange rate, the overall balance of payments does not necessarily balance automatically in the absence of government intervention. When international payments (outflows) exceed international receipts (inflows), and the exchange rate does not adjust, the government must make up the difference through its gold or foreign exchange reserves.

20.     This can best be explained through a simple example. Suppose a country has a $100 million current account deficit and receives $100 million in capital inflows. The balance of payments is balanced: the current account deficit is exactly offset by a financial account surplus. But suppose that receipts (capital inflows) fall to $90 million, creating a $10 million shortfall between receipts and expenditures (the current account deficit). Under flexible exchange rates, the value of the currency drops to reduce the current account deficit and increase capital inflows – and the balance of payments is brought into balance once again. Under fixed exchange rates, that

adjustment mechanism is not operative. Instead, the government must make up the $10 million shortfall by selling its gold reserves or its foreign exchange reserves to ensure that the $100 million current account deficit is financed (since only $90 million is financed by capital inflows).

21.     That $10 million would be entered in the balance of payments accounting as an "official reserve transaction." And the size of that figure, which was needed to equate and balance all the private transactions on the current account and financial account, was understood to be the indicator of a balance of payments problem during the Bretton Woods era.[6]

22.     Here is a Congressional report from 1963 which outlines how the balance of payments was understood at the time:

---

[6] Of course, if capital inflows exceeded any current account deficit, the government would be gaining foreign exchange or gold reserves and there would not be a fundamental imbalance that was a "problem."

**- B 21 -**

# PERSPECTIVES ON THE UNITED STATES INTERNATIONAL FINANCIAL POSITION

GERALD A. POLLACK, INTERNATIONAL ECONOMIST, JOINT ECONOMIC COMMITTEE

## I. THE MEANING OF THE BALANCE-OF-PAYMENTS DEFICIT

The U.S. balance of payments has been in deficit every year since 1949, except 1957. The deficits were welcomed in the early postwar years because they helped the rest of the world to rebuild reserves that had been depleted by the distortions of war and the needs of reconstruction. It became apparent after 1958, however, that U.S. deficits were adding dollars to the reserves of other countries at a rate faster than those countries desired. The persistence of U.S. balance-of-payments deficits has, in recent years, caused widespread concern regarding the future international role and stability of the dollar, and the future of the international monetary system. Before considering the elements contributing to this deficit, it is well to begin by examining precisely what is meant by the U.S. balance-of-payments deficit.

The deficit, under the official U.S. definition, measures the reduction in U.S. monetary reserve assets (chiefly gold) and the increase in liquid liabilities. Stated another way, it measures the decline, during the period covered, in the U.S. ability to defend the exchange value of the dollar with liquid resources owned by or automatically available to the monetary authorities.[1] This definition is heavily qualified with respect to the liquid resources it takes into account. But a less qualified definition of the deficit would not be measurable

Source: Joint Economic Committee, "The United States Balance of Payments – Perspectives and Policies," Staff Materials and Other Submissions, Prepared for the Use of the Joint Economic Committee, 88th Congress, 1st Session, November 1963, page 3. Available at: https://www.jec.senate.gov/reports/88th%20Congress/The%20United%20States%20Balance%20of%20Payments%20-%20Perspectives%20and%20Policies%20(247).pdf

9

- B 22 -

23.      Here is how the government presented balance of payments statistics at the time, with focus on the official settlements balance needed to ensure balanced payments.

TABLE I.—U.S. TRADE AND BALANCE-OF-PAYMENTS DEFICITS

[In billions of dollars]

| | U.S. trade position | | | | Trade balance | | Balance of payments | | |
| | Exports (X) | | Imports (M) | | | C.i.f. (M) Excluding foreign aid (X) | | Official settle-ments[3] | Basic balance |
| | Total | Minus foreign aid | F.o.b. | C.i.f.[1] | F.o.b. | | Liquidity[2] | | |
|---|---|---|---|---|---|---|---|---|---|
| 1960 | 19.6 | 17.9 | 15.1 | 16.3 | 4.5 | 1.6 | -3.7 | —3.4 | |
| 1961 | 20.2 | 18.3 | 14.7 | 16.0 | 5.5 | 2.3 | -2.3 | —1.3 | |
| 1962 | 21.0 | 18.7 | 16.5 | 17.8 | 4.5 | 0.9 | -2.9 | —2.7 | |
| 1963 | 22.5 | 19.9 | 17.2 | 18.6 | 5.3 | 1.3 | -2.7 | —1.9 | —0.8[3] |
| 1964 | 25.8 | 23.1 | 18.7 | 20.3 | 7.1 | 2.8 | -2.7 | —1.5 | |
| 1965 | 26.7 | 24.3 | 21.5 | 23.2 | 5.2 | 1.1 | -2.5 | —1.3 | |
| 1966 | 29.5 | 27.0 | 25.6 | 27.7 | 3.9 | —0.7 | -2.2 | .2 | —1.7 |
| 1967 | 31.0 | 28.5 | 26.9 | 28.8 | 4.1 | —.3 | -4.7 | —3.4 | —3.3 |
| 1968 | 34.1 | 31.8 | 33.2 | 35.3 | .9 | —3.5 | -1.6 | —1.6 | —1.4 |
| 1969 | 37.3 | 35.3 | 36.0 | 38.2 | 1.3 | —2.9 | -6.1 | 2.7 | —1.0 |
| 1970 | 42.7 | 40.7 | 40.0 | 42.4 | 2.7 | —1.7 | -4.7 | —10.7 | —3.0 |
| 1971 | 43.5 | 41.7 | 45.6 | 48.3 | —2.1 | —6.6 | -22.7 | —30.5 | —9.6 |
| 1972 | 49.2 | 47.5 | 55.6 | 58.9 | —6.4 | —11.4 | -13.7 | —11.1 | —9.8 |
| 1973[4] | 70.8 | 69.4 | 69.1 | 73.2 | +1.7 | —3.8 | -7.9 | —5.3 | +1.7 |

[1] C.i.f. imports for the years 1960–66 are assumed to be roughly equivalent to 108.3% of f.o.b. imports in accordance with a Bureau of Customs—Tariff Commission—Bureau of Census study based on 1966 arrivals. For the years 1967–73 estimates are based on Bureau of Customs-Bureau of Census studies showing estimated freight and insurance charges to be 6.9 percent (1967), 6.3 percent (1968), 6.1 percent (1969), 6.2 percent (1970), 6.1 percent (1971), and 5.9 percent for 1972 and 1973.

[2] The liquidity and official settlements deficits for 1966–73 excludes SDR allocations.
[3] Annual average.
[4] Estimated on basis of partial data.

Source: U.S. Department of Commerce.

Source: Staff Data and Materials on U.S. Trade and Balance of Payments, Committee on Finance, United States Senate, 93d Congress, 2d Session, February 26, 1974, page 1. Available at: https://www.finance.senate.gov/download/staff-data-and-materials-on-us-trade-and-balance-of-payments

24.      Because government reserves (of gold or foreign exchange) are finite, there is a limit to how long this situation can sustain itself. If this is a continuing situation, the government might at some point run out of gold or foreign exchange reserves. That could force the country to devalue its currency, abandoning the fixed exchange rate. Or, rather than the government drawing

10

down its reserves or devaluing its currency, another way of ensuring the overall balance of payments is balanced is to reduce imports directly via an import tariff.[7]

25.     This leads us to the events of the early 1970s. The Bretton Wood system was not a gold standard system, but the U.S. dollar was supposedly backed by gold reserves. Only foreign central banks, not private investors, had the right to exchange their dollars for U.S. gold. The problem facing the United States in the late 1960s was that foreign official holdings of dollars (i.e., government holdings, usually foreign central banks) far exceeded the gold reserves of the United States. In other words, the United States did not have enough gold to cover all of the dollar liabilities it had with the rest of the world.[8]

26.     The Nixon administration was worried about a run on U.S. gold reserves so, in August 1971, it "closed" the gold window and announced that it would no longer exchange gold for dollars. This did not take the United States off the gold standard, since U.S. monetary policy was not determined by its gold reserves. However, it did end what had been a key feature of the Bretton Woods system, i.e. the ability of foreign government to cash in their dollars for American gold.

27.     Going further, the Nixon administration imposed a 10% across-the-board tariff on imports to pressure other countries (specifically, Japan and Germany) to raise the value of their currency against the dollar. The U.S. government could not by itself "devalue" the dollar with respect to other currencies; it was the reserve currency against which other countries pegged the

---

[7] Such a method was permitted under Article XII of the General Agreement on Tariffs and Trade (GATT), the major post-World War II trade agreement.

[8] See Barry Eichengreen, "From Benign Neglect to Malignant Preoccupation: US Balance of Payments Policy in the 1960s," National Bureau of Economic Research Working Paper No. 7630, http://www.nber.org/papers/w7630.

11

value of their own currency. Consequently, other countries had to be forced to "revalue" their currency against the dollar.

28. These actions were taken because the United States had a balance of payments problem at the time. The United States was spending more on foreign goods and assets than foreigners were purchasing from the United States. Because the foreign exchange value of the dollar could not change under the Bretton Wood system, foreign governments were forced to hold increasing amounts of dollars (increasing their foreign exchange reserves, or their official reserve holdings in the balance of payments). They could no longer exchange those dollars for gold but didn't want to revalue their currency and hurt their exports. Hence, the U.S. nudge with the tariff to force them to revalue their currency.

29. Shortly thereafter, foreign governments agreed to revalue their currencies against the dollar to correct the imbalance in payments. In March 1973, in a shift that later turned out to be permanent (although participants did not know that at the time), Western governments moved further away from the Bretton Woods system by abandoning fixed exchange rates and allowing the value of national currencies to be determined on the market by supply and demand. This ended the old definition of balance of payments difficulties because governments did not need to intervene in foreign exchange markets to keep exchange rates fixed and equate payment inflows and outflows. The floating exchange rate system solved that problem automatically.

30. Section 122 of the Trade Act of 1974, which was drafted beginning in 1973, was designed in a period when the international monetary system was in flux. The United States was in the midst of the transition between the fixed exchange rate regime of the Bretton Woods system and a new system of floating exchange rates. The uncertainty about the international monetary

12

**- B 25 -**

system at this time is reflected in the statute and its language about balance of payments difficulties.

31.     The statute provided limited presidential authority for a future president to act as Nixon had in the case of balance of payments problems. But with the closure of the gold window in August 1971 and the move to flexible exchange rates in March 1973, the fundamental nature of the international monetary system was changing. The statute largely reflected the understanding of the balance of payments under the old Bretton Woods system rather than the new floating exchange rate system.

32.     This is the context in which Section 122 was drafted and enacted. At a time when the international monetary system was undergoing profound changes, it was not clear whether the future held a fixed or floating rate system.

33.     These developments forced the federal government to rethink the nation's balance of payments statistics. A government committee on balance of payments noted (*Survey of Current Business*, June 1976): "the Review Committee for Balance of Payments Statistics recommended in 1965 that the main balance of payments table be organized to focus on the transactions of the monetary authorities, on what is now known as the official reserve transactions balance [ORT], as the most useful starting point for balance of payments analysis." However, with the advent of floating exchange rates, the report now stated (p. 21) that "The majority of the Committee members concluded that the ORT balance was no longer justified for three major reasons," the first being "the advent of generally floating exchange rates."[9]

34.     The discussion here reflects the views of most economists who have studied the matter. For example, Martin Feldstein, a former professor of economics at Harvard University

---

[9] Source: https://fraser.stlouisfed.org/title/survey-current-business-46/june-1976-9661?page=20

**- B 26 -**

who served as chairman of the Council of Economic Advisers in the Reagan Administration, testified before Congress in 1984 on the usefulness of Section 122 in the era of floating rates. He noted: "although we have a trade deficit and a current account deficit, we do not have a balance-of-payments deficit, in the strict sense envisioned in section 122. The technical definition for the balance-of-payments is the rate of accumulation of official reserve assets, including gold. Since net U.S. sales of other assets to foreigners, in other words net private investment in the United States, last year was more than enough to offset our current account deficit, the official U.S. reserves didn't have to be drawn upon. In fact, official U.S. reserve actually increased slightly last year. Thus, in a technical sense, I think the sense appropriate for interpreting section 122, the United States had a balance-of-payments surplus last year. We had a trade deficit, a current account deficit, but we had a balance-of-payments surplus in this official sense."[10]

35.     A related issue is whether the negative net international investment position of the United States constitutes a balance of payments deficit. The negative net investment position simply reflects the fact that foreign entities have more claims on U.S. assets than U.S. entities have claims on foreign assets. This is related to the consistent financial account surpluses (and matching current account deficits) run by the United States, reflecting the fact that foreign demand for U.S. assets is much higher than U.S. demand for foreign assets. The investment position reflects the "stock" of assets being held at home and abroad by foreign entities and is a different, but somewhat related, matter than the balance of payments "flows" every year. The investment position also reflects changes in asset values (such as stock appreciation), which are not payments that flow at all. The investment position reflects the cumulated sum of the financial

---

[10] "Trade Deficit," Hearings Before the Subcommittee on International Trade of the Committee on Finance, United States Senate, 98th Congress, 2nd session, March 23, 1984, p. 48. See https://babel.hathitrust.org/cgi/pt?id=uc1.b5145725&seq=54

14

**- B 27 -**

account surpluses, one component of the overall balance of payments, but is not the balance of payments in itself.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on March 12, 2026, at Hanover, New Hampshire.

Douglas A. Irwin

15

- B 29 -

# EXHIBIT A

March 2026

**Douglas A. Irwin**

Department of Economics
Dartmouth College
Hanover, NH 03755

Office: (603) 646-2942
e-mail: douglas.irwin@dartmouth.edu
www.sites.dartmouth.edu/dirwin

Current Positions:

John French Professor of Economics (2017 - present)
John Sloan Dickey Third Century Professor in the Social Sciences (2012-2017)
Robert E. Maxwell '23 Professor of Arts and Sciences, Dartmouth College (2005-2012)
Professor of Economics, Department of Economics, Dartmouth College, since 1997

Co-Director, Political Economy Project, Dartmouth College, 2013-present

Non-Resident Senior Fellow, Peterson Institute for International Economics, 2018-present
Research Associate, National Bureau of Economic Research, 1997-present

Past Employment:

Associate Professor of Business Economics, Graduate School of Business, University of Chicago, 1994-97
Assistant Professor of Business Economics, Graduate School of Business, University of Chicago, 1991-94
Economist, Division of International Finance, Board of Governors of the Federal Reserve System, 1988-91
Junior Staff Economist, Council of Economic Advisers, Executive Office of the President, 1986-1987

Education:

Columbia University, Ph.D. (Economics, with distinction), 1988
Columbia University, M.A. (Economics), 1985
University of New Hampshire, B.A. (Political Science, Magna cum Laude, Phi Beta Kappa), 1984

Other Professional Appointments:

President, Economic History Association, 2023-24 (president-elect, 2022-23)
Society of Fellows, Economic History Association (2023)
Delegate (Economics), Oxford University Press, 2020-
Visiting Professor of Economics, Booth School of Business, University of Chicago, Fall 2017
Visiting Scholar, Hoover Institution, Stanford University, Winter 2015
Visiting Professor, Leitner Program in International and Comparative Political Economy, Macmillan Center, Yale University, September-October 2011
National Science Foundation Economics Panel, 2010-11
Visiting Scholar, Australian National University, Canberra, Australia, January-April 2005
Chairman, Department of Economics, Dartmouth College, 2002-2004
Visiting Professor of Economics, Massachusetts Institute of Technology, Fall 1999
Faculty Research Fellow, National Bureau of Economic Research, 1994-1997
Visiting Scholar, International Finance Division, Federal Reserve Board, May 1997, April 2000
Consultant, Organization for Economic Cooperation and Development, 1994-1995
Visiting Scholar, Research Department, International Monetary Fund, March 1993, June 2001, April 2004
George J. Stigler Center for the Study of the Economy and the State, University of Chicago, 1992-1997
Junior Research Fellow, Institute for Policy Reform, 1992-1995

**- B 30 -**

Grants and Awards:

Rockefeller Research Grant, Dartmouth College, 2007-08
Fellowship, John Simon Guggenheim Memorial Foundation, 2004-2005 (granted 2002)
Principal Investigator, National Science Foundation grant, 1999-2001, 2001-2003
International Finance Section, Department of Economics, Princeton University, 1988

Invited Lectures:

Maddison Lecture, University of Groningen, The Netherlands (to be scheduled)
Galbraith Lecture, Agricultural and Applied Economics Association, Kansas City, July 2026 (scheduled)
Kuznets Lecture, Economic Growth Center, Yale University, March 2026 (scheduled)
Frank Anton Distinguished Lecture, University of Calgary, March 2026
Fathauer Lecture in Political Economy, University of Arizona, February 2026
Sennholz Lecture, James Madison College, Michigan State University, March 2025
Keynote Address, Globalization: What's Next? Banque de France-CEPR-World Bank-University of Surrey Conference, Paris, France, April 2024
Menard Family Distinguished Speaker Series, North Dakota State University, March 2024
Condliffe Lecture, University of Canterbury, New Zealand, March 2024.
Snape Lecture, Productivity Commission, Melbourne, Australia, February 2024
Arndt Lecture, Australian National University, Canberra, Australia, February 2024.
Keynote Address, IMF-WB-WTO Joint Trade Meeting, October 2023
Clemens Lecture, College of Saint Benedict and Saint John's University, September 2021
Freiberg Economic Institute, Jerusalem, Israel, March 2020
Keynote Address, Queen's University Trade Institute, November 2019
Hayek Lecture, Manhattan Institute, June 2019
Rogge Lecture, Wabash College, September 2018
Invited Address, History of Economics Society Conference, Chicago, IL, June 2018
Stigler Lectures, Booth School of Business, University of Chicago, April 2017
Keynote Address, Seoul Conference on Trade and Industry, Seoul, Korea, November 2016
Distinguished Lecture, Peter T. Paul School of Business, University of New Hampshire, March 2013
Keynote Address, First IMF-WB-WTO Joint Trade Workshop, December 2011
Jepson Lecture, University of Northern Iowa, March 2011
Ohlin Lectures, Stockholm School of Economics, Sweden, September 2010
Max Corden Lecture, University of Melbourne, Australia, July 2009
Clair Wilcox Lecture, Swarthmore College, February 2009
Janus Lecture, Brown University, November 2008
Noel G. Butlin Lecture, Economic History Society of Australia and New Zealand, Sydney, February 2007
Keynote Address, U.S. Court of International Trade, 14th Judicial Conference, New York, November 2006
ANU-Toyota Public Lecture Series, Parliament House, Canberra, Australia, April 2005
Bernard I. Fain Lecture in Economics, Brown University, April 2004

Other Professional Activities:

Board of Advisers, *Open Economies Review*, 2013-
Academic Advisory Board, *Explorations in Economic History*, 2005-
Editorial Board, *World Trade Review*, 2005-
Editorial Board, *Journal of Economic History*, 2008-2011.
Editor, *World Trade Review*, 2005-2008.
Editor, International Trade Statistics, Millennial Edition, *Historical Statistics of the United States*, Cambridge University Press, 2006.
Nominating Committee, American Economic Association, 2004
Program Committee, American Economic Association, 1995, 1998, 2003, 2021
Book Review Editor, *Journal of International Economics*, 1992-96
Member: American Economic Association, Economic History Association, Cliometrics Society

2

**- B 31 -**

Books:

*International Economics,* co-authored with Menzie Chinn. New York: Cambridge University Press, 2025.

*Clashing over Commerce: A History of U.S. Trade Policy*. Chicago: University of Chicago Press, 2017.
- *The Economist*, Best Books of the Year 2017
- *Foreign Affairs*, Best Books of the Year, 2018.
- Co-awarded the Alice Hanson Jones Biennial Prize for the Outstanding Book in North American Economic History, Economic History Association, 2018.
- Awarded the Hayek Book Prize, Manhattan Institute, 2019.
- Translations: Chinese, Japanese.

*Trade Policy Disaster: Lessons from the 1930s*. Cambridge: MIT Press, 2012.
- Translations: Chinese.

*Peddling Protectionism: Smoot-Hawley and the Great Depression*. Princeton: Princeton University Press, 2011.
- Translations: Chinese.

*The Genesis of the GATT*, co-authored with Petros C. Mavroidis and Alan O. Sykes. New York: Cambridge University Press, 2008.

*Free Trade under Fire*. Princeton: Princeton University Press. First edition, 2002. Second edition, 2005. Third edition, 2009. Fourth edition, 2015. Fifth edition, 2020.
- Selected as one of Choice's Outstanding Academic Books of 2003.
- Translations: Chinese, Korean.

*Against the Tide: An Intellectual History of Free Trade*. Princeton: Princeton University Press, 1996.
- Translations: Japanese, Indonesian, Romanian, Chinese, Russian.
- Selected as one of *Choice*'s Outstanding Academic Books of 1996.

*Managed Trade: The Case Against Import Targets*. Washington, D.C.: AEI Press, 1994.

Edited Books:

*Floating Exchange Rates at Fifty,* with Maurice Obstfeld. Washington, D.C.: Peterson Institute for International Economics, April 2024.

*Jacob Viner: Lectures in Economics 301*, with Steven G. Medema. Brunswick, NJ: Transaction, 2013.

*Founding Choices: American Economic Policy in the 1790s*, with Richard Sylla. Chicago: University of Chicago Press and NBER, 2011.

*The Political Economy of Trade Policy: Essays in Honor of Jagdish Bhagwati*, with Robert C. Feenstra and Gene M. Grossman. Cambridge: MIT Press, 1996.

*Trade in the Pre-Modern Era, 1400-1700*, 2 vols. of *The Growth of the World Economy*, N.F.R. Crafts, general editor. Aldershot: Edward Elgar, 1995.

Jagdish Bhagwati, *Political Economy and International Economics*. Cambridge: MIT Press, 1991.

3

**- B 32 -**

Jacob Viner, *Essays on the Intellectual History of Economics*. Princeton: Princeton University Press, 1991.

Articles:

"Trade Policy, Exchange Rates, and the Globalization Surge of the 1990s," *Journal of Economic History* 85 (June 2025): 303-335.

"From Hermit Kingdom to Miracle on the Han: Sources of Policy Change in Korea's Trade Transformation," *KDI Journal of Economic Policy* 47 (May 2025): 1-36.

"Does Trade Reform Promote Economic Growth? A Review of Recent Evidence," *World Bank Research Observer*, 40 (February 2025): 147-84.

"Changing the Trade and Development Consensus: Evidence Building from Little, Bhagwati, Krueger, and Balassa," *History of Political Economy* 56 (October 2024): 775-804.

"Trade Policy and Flexible Exchange Rates." In *Floating at Fifty,* edited by Douglas A. Irwin and Maurice M. Obstfeld. Washington, D.C.: Peterson Institute for International Economics, 2024.

"Trade Policy," In *Oxford Handbook of Historical Political Economy*, edited by Jeffrey Jenkins and Jared Rubin. New York: Oxford University Press, 2024.

"The Bank, the Fund, and the GATT: Which Institution Most Supported Developing Country Trade Reform?" *World Trade Review* 22 (October 2023): 370-381.

"Economic Ideas and Taiwan's Shift to Export Promotion in the 1950s," *The World Economy* 46 (April 2023): 969-990.

"The Trade Reform Wave of 1985-1995," *AEA Papers and Proceedings* 112 (May 2022): 244-251.

"Chicago's Contribution to International Economics," (with Sebastian Edwards), in Robert Cord (ed.), *The Palgrave Companion to Chicago Economics*, Palgrave-Macmillan, 2022.

"The Economic Consequences of Sir Robert Peel: The Repeal of the Corn Laws Revisited," (with Maksym Chepeliev), *Economic Journal* 131 (November 2021): 3322–3337.

"The Rise and Fall of Import Substitution," *World Development* 139 (March 2021): 105306.

"Trade Policy in American Economic History." *Annual Review of Economics* 12 (2020): 23-44.

"Adam Smith's 'Tolerable Administration of Justice' and the Wealth of Nations," *Scottish Journal of Political Economy* 67 (2020): 231-247.

"Tariff Incidence: Evidence from U.S. Sugar Duties, 1890-1930," *National Tax Journal* 72 (September 2019): 599–616.

"Trump's Assault on the Global Trading System: And Why Decoupling from China Changes Everything" (with Chad P. Bown). *Foreign Affairs* 98 (September-October 2019): 125-136.

"The Missing Bretton Woods Debate over Flexible Exchange Rates," in *The Bretton Woods Agreement,* edited by Naomi Lamoreaux and Ian Shapiro. New Haven: Yale University Press, 2019.

4

**- B 33 -**

"The Midway and Beyond: Recent Work on Chicago Economics." *History of Political Economy* 50 (December 2018): 735-776.

"Trade Policy in American Economic History." In *Oxford Handbook of American Economic History,* edited by Lou Cain and Price Fishback. New York: Oxford University Press, 2018.

"The False Promise of Protectionism: Why Trump's Trade Policy Could Backfire." *Foreign Affairs* 96 (May/June 2017): 45-56.

"The GATT's Starting Point: Tariff Levels circa 1947," with Chad P. Bown. In *Assessing the World Trade Organization: Fit for Purpose?,* edited by Manfred Elsig, Bernard Hoekman, and Joost Pauwelyn. New York: Cambridge University Press, 2017.

"The Truth about Trade: What Critics Get Wrong about the Global Economy." *Foreign Affairs* 95 (June/July 2016): 84-95.

"Jacob Viner and Friedman." In *Milton Friedman: Contributions to Economics and Public Policy*, edited by Robert Cord and J. Daniel Hammond. New York: Oxford University Press, 2016.

"Adam Smith and Free Trade." In *The Princeton Guide to Adam Smith*, edited by Ryan P. Hanley. Princeton: Princeton University Press, 2016.

"Free Trade and Multilateralism in Historical Perspective," (with Kevin H. O'Rourke). In *Globalization in an Age of Crisis: Multilateral Economic Cooperation in the Twenty-First Century*, edited by Robert C. Feenstra and Alan M. Taylor. Chicago: University of Chicago Press for the NBER, 2014.

"Who Anticipated the Great Depression? Gustav Cassel versus Keynes and Hayek on the Interwar Gold Standard." *Journal of Money, Credit, and Banking* 46 (February 2014): 199-227.

"The Nixon Shock after 40 Years: The Import Surcharge Revisited." *World Trade Review* 12 (January 2013): 29-66.

"The French Gold Sink and the Great Deflation." *Cato Papers on Public Policy* 2 (2012-13): 3-41.

"Gold Sterilization and the Recession of 1937-38." *Financial History Review* 19 (December 2012): 249-267.

"Revenue or Reciprocity? Founding Feuds over Early U.S. Trade Policy." In *Founding Choices: American Economic Policy in the 1790s*, edited by Douglas A. Irwin and Richard Sylla. Chicago: University of Chicago Press & NBER, 2011.

"The Slide to Protectionism in the Great Depression: Who Succumbed and Why?" (with Barry Eichengreen), *Journal of Economic History* 70 (December 2010): 872-898.

"Trade Restrictiveness and Deadweight Losses from U.S. Tariffs." *American Economic Journal: Economic Policy* 2 (August 2010): 111-133.

"Avoiding 1930s-Style Protectionism: Lessons for Today." In *Effective Crisis Response and Openness: Implications for the Trading System*, edited by Simon J. Evenett, Bernard M. Hoekman, and Olivier Cattaneo. Washington, D.C.: World Bank and Centre for Economic Policy Research, 2009.

"Antebellum Tariff Politics: Regional Coalitions and Shifting Economic Interests," *Journal of Law and Economics* 51 (November 2008): 715-742.

5

"The Antebellum U.S. Iron Industry: Domestic Production and Foreign Competition" (with Joseph H. Davis), *Explorations in Economic History* 45 (July 2008): 254-269.

"A Shackled Hegemon" (with Barry Eichengreen), in *To Lead the World: American Strategy after the Bush Doctrine*, edited by Melvyn Leffler and Jeffrey Legro. New York: Cambridge University Press, 2008.

"Australian Exceptionalism Revisited," *Australian Economic History Review* 47 (November 2007): 217-237.

"Lost Exceptionalism? Comparative Income and Productivity in Australia and the United Kingdom, 1861-1948" (with Stephen N. Broadberry), *Economic Record* 83 (September 2007): 262-274.

· "Real Product and Productivity of Industries since the Nineteenth Century: A Reply to Byan Haig" (with Stephen Broadberry), *Economic Record* 88 (December 2008): 515-516.

"Tariff Incidence in America's Gilded Age," *Journal of Economic History* 67 (September 2007): 582-607.

"Globalization Fatigue or Globalization Backlash?" In Sumner La Croix and Peter A. Petri (eds.), *Challenges to the Global Trading System: Adjustment to Globalization in the Asia Pacific Region*. Oxford: Routledge, 2007.

"The Impact of Federation on Australia's Trade Flows." *Economic Record* 82 (September 2006): 315-324.

"Mercantilism: Power and Plenty through the Lens of Strategic Trade Policy." In Rolf Henriksson and Mats Lundahl (eds.), *Eli Heckscher, Economic History and Economic Theory*. Cambridge: MIT Press, 2006.

"Labor Productivity in the United States and United Kingdom in the Nineteenth Century" (with Stephen N. Broadberry), *Explorations in Economic History* 43 (April 2006): 257-279.

"The Welfare Costs of Autarky: Evidence from the Jeffersonian Embargo, 1807-1809." *Review of International Economics* 13 (September 2005): 631-645.

"The Rise of U.S. Antidumping Activity in Historical Perspective." *The World Economy* 28 (May 2005): 651-668.

"Trade and Globalization," in Michael M. Weinstein (ed.), *Globalization: What's New?* New York: Columbia University Press, 2005.

"Airbus versus Boeing Revisited: International Competition in the Aircraft Market" (with Nina Pavcnik), *Journal of International Economics* 64 (December 2004): 223-245.

"The Aftermath of Hamilton's Report on Manufactures," *Journal of Economic History* 64 (September 2004): 800-821.

"Causing Problems? The WTO Review of Causation and Injury Attribution in U.S. Section 201 Cases," *World Trade Review* 2 (November 2003): 297-325.

· Reprinted in Chad Bown (ed.), *The WTO, Safeguards, and Temporary Protection from Imports*, Cheltenham: Edward Elgar, 2006.

· Reprinted in Alan Sykes (ed.), *The Economics of International Trade Law*, Cheltenham:

6

Edward Elgar, 2011.

"The Optimal Tax on Antebellum Cotton Exports," *Journal of International Economics* 60 (August 2003): 275-291.

"New Estimates of the Average Tariff of the United States, 1790-1820." *Journal of Economic History* 63 (June 2003): 506-513.

"Explaining America's Surge in Manufactured Exports, 1880-1913," *Review of Economics and Statistics* 85 (May 2003): 364-376.

"Does Trade Raise Income? Evidence from the Twentieth Century" (with Marko J. Terviö), *Journal of International Economics* 58 (October 2002): 1-18.

"Reciprocity and the Origins of U.S. Trade Liberalization." In Jagdish Bhagwati (ed.), *Going Alone: The Case for Relaxed Reciprocity in Freeing Trade* (Cambridge: MIT Press, 2002).

"Ohlin versus Stolper-Samuelson?" In Ronald Findlay, Lars Jonung, and Mats Lundahl (eds.), *Bertil Ohlin: A Centennial Celebration, 1899-1999* (Cambridge: MIT Press, 2002).

"Interpreting the Tariff-Growth Correlation of the Late Nineteenth Century," *American Economic Review (Papers and Proceedings)* 91 (May 2002): 165-169.

· Reprinted in *Classical Trade Protectionism, 1815-1914*, edited by Jean-Pierre Dormois and Pedro Lains, London: Routledge, 2006.

"Long Run Trends in World Trade and Income," *World Trade Review* 1 (March 2002): 89-100.

"The Antebellum Tariff on Cotton Textiles Revisited" (with Peter Temin), *Journal of Economic History* 61 (September 2001): 777-798.

"Tariffs and Growth in Late Nineteenth Century America," *The World Economy* 24 (January 2001): 15-30.

"Could the U.S. Iron Industry Have Survived Free Trade After the Civil War?" *Explorations in Economic History* 37 (July 2000): 278-299.

"Did Late Nineteenth Century U.S. Tariffs Promote Infant Industries? Evidence from the Tinplate Industry." *Journal of Economic History* 60 (June 2000): 335-360.

"Is Globalization Today Really Different from Globalization a Hundred Years Ago?" (with Michael Bordo and Barry Eichengreen), *Brookings Trade Forum, 1999* (Washington, D.C.: The Brookings Institution, 1999), pp. 1-50.

· Shorter versions published in *Wirtschaftspolitische Blätter* (Austrian Economic Policy Papers), January 2000, and in *Globalisation and International Trade Liberalization: Continuity and Change*, edited by Martin Richardson (Cheltenham, U.K.: Edward Elgar, 2000).

"Interests, Institutions, and Ideology in Securing Policy Change: The Republican Conversion to Trade Liberalization after Smoot-Hawley" (with Randall S. Kroszner), *Journal of Law and Economics* 42 (October 1999): 643-673.

"Antidumping: The Semiconductor Industry," *Brookings Trade Forum, 1998* (Washington, D.C.: The Brookings Institution, 1998), pp.   173-200.

"Changes in U.S. Tariffs: The Role of Import Prices and Commercial Policies," *American Economic Review* 88 (September 1998): 1015-1026.

"The Smoot-Hawley Tariff: A Quantitative Assessment," *Review of Economics and Statistics* 80 (May 1998): 326-334.

"Higher Tariffs, Lower Revenues? Analyzing the Fiscal Aspects of the 'Great Tariff Debate of 1888,'" *Journal of Economic History* 58 (March 1998): 59-72.

"From Smoot-Hawley to Reciprocal Trade Agreements: Changing the Course of U.S. Trade Policy in the 1930s," in Michael Bordo, Claudia Goldin, and Eugene White (eds.), *The Defining Moment: The Great Depression and the American Economy* (Chicago: University of Chicago Press, 1998).

"The Reciprocity Debate in Parliament," in Andrew Marrison (ed.), *Free Trade and Its Reception, 1815-1860* (London: Routledge, 1998).

"The Representation of Economic Interests in U.S. Semiconductor Trade Policy," in Alan V. Deardorff and Robert M. Stern (eds.), *Constituent Interests and U.S. Trade Policies* (Ann Arbor: University of Michigan Press, 1998).

"The Role of History in Bilateral Trade Flows," (with Barry Eichengreen) in Jeffrey A. Frankel (ed.), *The Regionalization of the World Economy* (Chicago: University of Chicago Press, 1997).

"Log-Rolling and Economic Interests in the Passage of the Smoot-Hawley Tariff," (with Randall S. Kroszner) *Carnegie-Rochester Series on Public Policy*, 45 (December 1996): 173-200.

"Sematech: Purpose and Performance," (with Peter J. Klenow) *Proceedings of the National Academy of Sciences* 93 (November 1996): 12739-42.

"High Tech R&D Subsidies: Estimating the Effects of Sematech," (with Peter J. Klenow) *Journal of International Economics* 40 (May 1996): 323-344.

"The United States in a New Global Economy? A Century's Perspective," *American Economic Review (Papers and Proceedings)* 86 (May 1996): 41-46.

"Industry or Class Cleavages over Trade Policy? Evidence from the British General Election of 1923," in Robert C. Feenstra, Gene M. Grossman, and Douglas A. Irwin (eds.), *The Political Economy of Trade Policy: Essays in Honor of Jagdish Bhagwati* (Cambridge: MIT Press, 1996).

"Trade Politics and the Semiconductor Industry," in Anne O. Krueger (ed.), *The Political Economy of American Trade Policy* (Chicago: University of Chicago Press, 1996).

> · Abbreviated version: "The U.S.-Japan Semiconductor Trade Conflict," in Anne O. Krueger (ed.), *The Political Economy of Trade Protection* (Chicago: University of Chicago Press, 1996).

"The GATT's Contribution to Economic Recovery in Post-War Europe," in Barry Eichengreen (ed.), *Europe's Postwar Growth* (New York: Cambridge University Press, 1995).

> · Reprinted in Kevin O=Rourke (ed.), *The International Trading System, Globalization, and History*, Aldershot: Edward Elgar, 2005.

8

"The GATT in Historical Perspective," *American Economic Review (Papers and Proceedings)* 85 (May 1995): 323-328.

· Reprinted in Kym Anderson and Bernard Hoekman (eds.), *The Global Trading System*, London: Tauris Publishers, 2002.
· Reprinted in John Kirton (ed.), *Global Trade*, Aldershot: Ashgate Publishers, 2009.

"The Lion's Share: Britain's Export Performance Revisited, 1899-1929," *Structural Change and Economic Dynamics* 6 (March 1995): 97-109.

"Trade Blocs, Currency Blocs, and the Reorientation of World Trade in the 1930s," (with Barry Eichengreen) *Journal of International Economics* 38 (February 1995): 1-24.

"Learning-by-Doing Spillovers in the Semiconductor Industry," (with Peter J. Klenow) *Journal of Political Economy* 102 (December 1994): 1200-1227.

· Reprinted in Bernard Yeung and Oxley (eds.), *Structural Change, Industrial Location, and Competitiveness*, Aldershot: Edward Elgar, 1999.
· Reprinted in Daron Acemoglu (ed.), *Recent Developments in Growth Theory*, Aldershot: Edward Elgar, 2004.

"The Political Economy of Free Trade: Voting in the British General Election of 1906," *Journal of Law and Economics* 37 (April 1994): 75-108.

"Multilateral and Bilateral Trade Policies in the World Trading System: An Historical Perspective," in Jaime de Melo and Arvind Panagariya (eds.), *New Dimensions in Regional Integration* (New York: Cambridge University Press, 1993).

· Reprinted in Kym Anderson and Bernard Hoekman (eds.), *The Global Trading System*, London: Tauris Publishers, 2002.
· Reprinted in Kevin O'Rourke (ed.), *The International Trading System, Globalization, and History*, Aldershot: Edward Elgar, 2005.

"Free Trade and Protection in Nineteenth Century Britain and France Revisited: Comment on Nye," *Journal of Economic History* 53 (March 1993): 146-152.

· Reprinted in C. Knick Harley (ed.), *The Integration of the World Economy, 1850-1914*, Vol. 2, Aldershot: Edward Elgar, 1996.
· Reprinted in *Classical Trade Protectionism, 1815-1914*, edited by Jean-Pierre Dormois and Pedro Lains, London: Routledge, 2006.

"Strategic Trade Policy and Mercantilist Trade Rivalries," *American Economic Review (Papers and Proceedings)* 82 (May 1992): 138-143.

"Mercantilism as Strategic Trade Policy: The Anglo-Dutch Rivalry for the East India Trade," *Journal of Political Economy* 99 (December 1991): 1296-1314.

· Reprinted in Kevin O'Rourke (ed.), *The International Trading System, Globalization, and History*, Aldershot: Edward Elgar, 2005.

"Retrospectives: Challenges to Free Trade," *Journal of Economic Perspectives* 5 (Spring 1991): 201-208.

9

**- B 38 -**

"Terms of Trade and Economic Growth in Nineteenth Century Britain," *Bulletin of Economic Research* 43 (January 1991): 93-101.

"Was Britain Immiserized during the Industrial Revolution?" *Explorations in Economic History* 28 (January 1991): 121-124.

"Trade Deficit Announcements, Intervention, and the Dollar," *Economics Letters* 31 (December 1989): 257-263.

"The Political Economy of Agricultural Policy Reform," (with Gordon C. Rausser) *European Review of Agricultural Economics* 15 (Summer 1989): 349-366.

"Political Economy and Peel's Repeal of the Corn Laws," *Economics and Politics* 1 (Spring 1989): 41-59.

    · Reprinted in ed. Cheryl Schonhardt-Bailey (ed.), *The Rise of Free Trade*, Vol. IV: *Free Trade Reappraised: The New Secondary Literature*, London: Routledge, 1997.

"Welfare Effects of British Free Trade: Debate and Evidence from the 1840s," *Journal of Political Economy* 96 (December 1988): 1142-1164.

    · Reprinted in C. Knick Harley (ed.), *The Integration of the World Economy, 1850-1914, Vol. 2*, Aldershot: Edward Elgar, 1996.
    · Reprinted in Cheryl Schonhardt-Bailey (ed.), *The Rise of Free Trade*, Vol. IV: *Free Trade Reappraised: The New Secondary Literature*, London: Routledge, 1997.

"The Return of the Reciprocitarians: U.S. Trade Policy Today," (with Jagdish N. Bhagwati) *The World Economy* 10 (June 1987): 109-130.

    · Reprinted in Kevin O'Rourke (ed.), *The International Trading System, Globalization, and History*, Aldershot: Edward Elgar, 2005.
    · Reprinted in Kym Anderson and Bernard Hoekman (eds.), *The WTO's Core Rules and Disciples*, Aldershott: Edward Elgar, 2005.

Other Writings:

By Invitation: "The Supreme Court tariffs ruling reins in Donald Trump," *The Economist*, February 20, 2026.

"On Life Support: Can the World Trade Organization Be Saved?" with Petros C. Mavroidis, *Milken Institute Review*, May 2025.

By Invitation: "Even Americans Don't Want Trump's Barmy Tariffs," *The Economist*, April 3, 2025.

The Incoherent Case for Tariffs: Trump's Fixation on Economic Coercion Will Subvert His Economic Goals (with Chad P. Bown), *Foreign Affairs*, March 11, 2025, https://www.foreignaffairs.com/united-states/incoherent-case-tariffs-trump

"Trade Theory and Trade Policy: The Work of Max Corden, 1927-2023," VoxEU, October 2023, https://cepr.org/voxeu/columns/trade-theory-and-trade-policy-work-max-corden-1927-2023

10

**- B 39 -**

Comment on Penny Goldberg and Tristan Reed, "Is the global economy deglobalizing? And if so, why? And what is Next?," *Brookings Papers on Economic Activity,* Spring 2023.

"The Return of Industrial Policy," *Finance and Development,* June 2023, pp. 12-14. https://www.imf.org/en/Publications/fandd/issues/2023/06/the-return-of-industrial-policy-douglas-irwin

"Ronald Findlay, 1934-2021," VoxEU, November 2021. https://voxeu.org/article/ronald-findlay-1935-2021

"The Nixon Shock and the Trading System," *The International Economy,* Summer 2021, pp. 32-34.

By Invitation: Corn Laws at 175. With Donald Boudreaux, *The Economist*, June 25, 2021. https://www.economist.com/by-invitation/2021/06/25/donald-boudreaux-and-douglas-irwin-on-free-trade-tips-from-1846

"What Might a Trump Withdrawal from the World Trade Organization Mean for U.S. Tariffs?" (with Chad P. Bown), Peterson Institute for International Economics Policy Brief 18-23. November 2018.

"Does Trump want a trade war? What you need to know about Smoot-Hawley tariffs and the 1930s," with Chad Bown, *Washington Post*, March 21, 2018 https://www.washingtonpost.com/news/monkey-cage/wp/2018/03/21/does-trump-want-a-trade-war-what-you-need-to-know-about-smoot-hawley-tariffs-and-the-1930s/

Interview, *Econ Focus*, Federal Reserve Bank of Richmond, Third quarter 2017. https://www.richmondfed.org/publications/research/econ_focus/2017/q3/interview

"Ricardo and Comparative Advantage at 200," in Simon Evenett (ed.), *Cloth for Wine? The Relevance of Ricardo's Comparative Advantage in the 21st Century,* VoxEU book, December 2017 http://voxeu.org/content/cloth-wine-relevance-ricardo-s-comparative-advantage-21st-century

"Ricardo and Comparative Advantage at 200," April 19, 2017, VoxEu.org. http://voxeu.org/article/ricardo-and-comparative-advantage-200

"Is Globalization in Trouble?" The Economist's Debates, November 2013. http://www.economist.com/debate/overview/262

"Interview with Douglas Irwin," in Simon Bowmaker (editor), *The Art and Practice of Economics Research: Lessons from Leading Minds*. Northhampton, MA: Edward Elgar, 2012.

"Esprit de Currency," *Finance and Development*, June 2011.

"Le France a-t-elle Causé la Grande Dépression?" *Revue Française d'économie* 25 (April 2011): 3-10.

Comment on Anne Krueger, "Trade Liberalization and Growth in Developing Countries," in *Better Living Through Economics*, edited by John J. Siegfried. Cambridge: Harvard University Press, 2010.

"Trade Policy 2008: Great Depression Redux?" In Richard Baldwin and Simon Evenett (eds.). *What World Leaders Must do to Halt the Spread of Protectionism*. VoxEU.org and CEPR, 2008.

"Trade Liberalization: Cordell Hull and the Case for Optimism." Council on Foreign Relations Working Paper, July 31, 2008. Available at: http://www.cfr.org/publication/16873/

"WTO's Difficulties in Light of the GATT's History," with Petros C. Mavroidis, VoxEU, July 29, 2008, http://www.voxeu.org/index.php?q=node/1474

11

Comment on Paul Krugman, "Trade and Wages, Revisited," *Brookings Panel on Economic Activity*, 2008.

Comments on Mark Rosenzweig, "Global Wage Differences and International Student Flows," in *Brookings Trade Forum*, 2006. Washington, D.C.: The Brookings Institution, 2007.

"Comment on 'Shifts in Economic Geography and Their Causes,'" in *The New Economic Geography: Effects and Policy Implications*. Kansas City, MO: Federal Reserve Bank of Kansas City, 2007.

"Historical Aspects of U.S. Trade Policy," *NBER Reporter*, Summer 2006.

Comments on James Markusen, "Modeling the Offshoring of White-Collar Services," in *Brookings Trade Forum, 2005*. Washington, D.C.: The Brookings Institution, 2006.

"Comment on 'Factors Driving Global Economic Integration,'" in *Global Economic Integration: Opportunities and Challenges*. Kansas City, MO: Federal Reserve Bank of Kansas City, 2000.

"The Two Faces of Globalization," *Critical Review* 14 (2001): 11-18.

"Do We Need the WTO?" *Cato Journal* 19 (Winter 2000): 351-357. Reprinted in Ronald A. Cass and Michael S. Knoll (eds.), *International Trade Law* (Aldershot: Ashgate Publishing, 2003).

"Historical Perspectives on U.S. Trade Policy," *NBER Reporter*, Winter 1998/99, pp. 18-20.

"The Future of Free Trade" (with Claude Barfield), *Business Economics* 32 (March 1997): 26-31.

*Three Simple Principles of Trade Policy* (Washington, D.C.: The AEI Press, 1996).

"Free Trade and Customs Unions," in *The Fortune Encyclopedia of Economics*, ed. David R. Henderson (New York: Warner Books, 1993), pp. 530-533.

"Profile: Jagdish Bhagwati," *Review of International Economics* 5 (November 1997): 508-515.

"Introduction" to republication of George J. Stigler, *Price and Distribution Theories: The Formative Period* (New Brunswick, NJ: Transactions Press, 1993).

"Introduction" to Jacob Viner, "The Search for the Ideal Commonwealth," in *Research in the History of Economic Thought and Methodology, Archival Supplement 2*, ed. Warren Samuels (Greenwich, CT: JAI Press, 1991), pp. 111-115.

Newspaper Articles:

"Trump's Blanket Tariffs are a Bridge too Far," with Alan Wm. Wolff, *Wall Street Journal*, November 4, 2025.

"The Canadians are Right About Reagan and Free Trade," *New York Times*, October 29, 2025.

Weekend Interview, "Trump's Tariffs are Unique in History," *Wall Street Journal*, April 11, 2025.

"Reciprocal Tariffs Make No Sense," *Wall Street Journal,* February 13, 2025

12

**- B 41 -**

"Why Does Everyone Suddenly Care about Supply Chains?" (with Chad P. Bown), *New York Times,* October 14, 2021. https://www.nytimes.com/2021/10/14/opinion/supply-chain-america.html

"Globalization in Retreat," *Wall Street Journal,* December 17, 2020.

"Trade Truths will Outlast Trump," *Wall Street Journal,* November 20, 2020.

Weekend Interview, "Why Trump's Protectionism is Futile," *Wall Street Journal*, June 2, 2018.

"Mr. Trump's Traffic Problem." *Wall Street Journal,* December 16, 2017.

"Steve Bannon's Bad History," *Wall Street Journal,* September 9, 2017.

"Trade will Lead to Freedom." *Wall Street Journal*, December 18, 2014.

"The Ultimate Global Antipoverty Program," *Wall Street Journal,* November 3, 2014.

"Why Modern Monetarists are Skeptical about QE3," *Financial Times*, October 16, 2012.

"Return of the Protectionist Illusion," *Wall Street Journal*, July 2, 2012.

"Good-bye Free Trade?," *Wall Street Journal*, October 9, 2010.

"How 'Protectionist' Became an Insult," *Wall Street Journal*, June 18, 2010.

"If We Buy American, No One Else Will," *New York Times*, February 1, 2009.

"Democrats Once Did Free Trade," *Wall Street Journal*, August 2, 2008.

"The GATT at Sixty," *Wall Street Journal*, April 9, 2007.

"Free Trade Frontier," *Wall Street Journal*, November 28, 2005.

"Free Trade Worriers," *Wall Street Journal*, August 9, 2004.

"Outsourcing is Good for America," *Wall Street Journal*, January 28, 2004.

"The World Trade Organization: How Clinton Botched the Seattle Summit," *Wall Street Journal*, December 6, 1999.

"Lamb Tariffs Fleece U.S. Consumers," *Wall Street Journal*, July 12, 1999.

"Free Trade Comes of Age," *Journal of Commerce*, May 24, 1996.

"NAFTA: Nifty, Noxious, or Both?" *Chicago Business*, Winter 1993.

Book Reviews:

*Keynes' Economic Consequences of the Peace after 100 Years: Polemics and Policy*, edited by Patricia Clavin, Giancarlo Corsetti, Maurice Obstfeld, and Adam Tooze. *Finance and Development*, June 2024.

13

Sebastian Edwards, *The Chile Project: The Story of the Chicago Boys and the Downfall of Neoliberalism*, *History of Political Economy,* Autumn 2024.

Nicholas Mulder, *The Economic Weapon: The Rise of Sanctions as a Tool of Modern War*, *World Trade Review,* May 2023.

Nicholas Crafts and Peter Fearon (eds.), *The Great Depression of the 1930s: Lessons for Today*, *Journal of Economic History*, December 2014.

Eric Posner and Alan Sykes, *Economic Foundations of International Law*, *World Trade Review*,　January 2014.

P. Sai-wing Ho, *Rethinking Trade and Commercial Policy Theories: Development Perspectives, History of Political Economy*, Winter 2012.

James Fichter, *So Great a Profit: How the East India Trade Transformed Anglo-American Capitalism, Journal of Economic History*, 2011.

Jagdish Bhagwati, *Termites in the Trading System, New York Sun*, July 21, 2008.

Nitsan Chorev, *Remaking U.S. Trade Policy: From Protectionism to Globalization,* http://www.eh.net, January 2008.

Deepak Lal, *Reviving the Invisible Hand*, *Journal of Economic Literature*, June 2007.

Joseph E. Stiglitz & Andrew Charlton, *Fair Trade for All: How Trade Can Promote Development*, *World Trade Review*, November 2006.

Daniel Lederman, *The Political Economy of Protection: Theory and the Chilean Experience*, http://www.eh.net, January 2006.

Martin Wolf, *Why Globalization Works: The Case for the Global Market Economy*, *Economic Affairs*, December 2004.

Ha-Joon Chang, *Kicking Away the Ladder: Development Strategy in Historical Perspective*, http://www.eh.net, April 2004.

Jagdish Bhagwati, *In Defense of Globalization*, *Finance and Development*, March 2004.

Cynthia C. Northrup and Elaine C. Prange Turney (eds.), *Encyclopedia of Tariffs and Trade in U.S. History*, *Journal of Economic History*, March 2004.

Mike Moore, *A World Without Walls*, *World Trade Review*, July 2003.

Kenneth Dam, *The Rules of the Global Game: A New Look at U.S. International Economic Policymaking*, *Journal of Economic Literature*, March 2003.

Fiona McGillivray, Iain McLean, Robert Pahre, and Cheryl Schonhardt-Bailey, *International Trade and Political Institutions: Instituting Trade in the Long Nineteenth Century*, *World Trade Review*, July 2002.

Andrea Maneschi, *Comparative Advantage in International Trade: A Historical Perspective*, in *Journal of the History of Economic Thought*, December 2000.

14

# Economic Report

# of the President



## Transmitted to the Congress

## February 1971

TOGETHER WITH

### THE ANNUAL REPORT
OF THE

### COUNCIL OF ECONOMIC ADVISERS

UNITED STATES GOVERNMENT PRINTING OFFICE

WASHINGTON : 1971

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $1.50

Digitized for FRASER
http://fraser.stlouisfed.org/
Federal Reserve Bank of St. Louis

B 44 -

LIBRARY

capital movements to differences in national monetary conditions might be somewhat reduced.

While the concern about how the balance of payments is affected by interest-sensitive flows of short-term capital may be exaggerated, it must be recognized that major countries will continue to rely heavily on monetary policy to influence the domestic economy. The management of the resulting flows of short-term capital will therefore continue to occupy monetary and financial authorities.

## THE UNITED STATES IN THE INTERNATIONAL MONETARY SYSTEM

The U.S. dollar plays a number of key roles in the international monetary system. It is widely used to finance private international transactions, even if no American is involved. It is also the currency used by national authorities in their operations in foreign exchange markets, and dollar holdings are an important component of world reserves. Because of its international roles, the dollar further serves as the yardstick by which the values of many free world currencies are measured. As a result, developments in the United States economy and balance of payments, and the attitudes other countries take toward these developments, are of key importance in the smooth functioning of the international monetary system.

### MEASURES OF THE U.S. BALANCE-OF-PAYMENTS POSITION

The measures of our payments balance officially published by the U.S. Government tend to be widely interpreted as indicators of how close to— or far from—the most desirable situation we stand at a given time, even though there is no clear consensus on how the optimum situation is to be defined. A great deal of attention has been devoted to assessing the adequacy of the two overall measures of the payments balance now used. One is the liquidity balance, which is equal to the change in our holdings of international reserve assets less the change in our liquid liabilities to all foreigners, official and private. The second is the official reserve transactions balance, which is equal to the change in our stock of international reserve assets less the change in liquid and certain nonliquid claims on the United States by foreign official monetary institutions. From the search for improved measures has emerged increasing agreement that no one measure can adequately summarize the changes in this country's international financial position.

The most commonly used measure of the U.S. payments position, the liquidity balance, was originally intended as a measure of changes in this country's ability to maintain conversions of dollars into gold at a fixed price ratio. There has been considerable discussion as to whether the statistical presentation of the liquidity balance is the best possible reflection of its underlying concept. This problem was discussed in detail in the 1970 *Economic Report of the President.*

146

**- B 45 -**

Digitized for FRASER
http://fraser.stlouisfed.org/
Federal Reserve Bank of St. Louis

More fundamentally, however, some liquidity deficit will normally arise when a reserve country acts as an international banking center. Foreigners tend to accumulate short-term claims on such a country, and in turn the country may build up a growing net investment in foreign countries at longer term. At the same time, a continuing liquidity deficit means that the ratio of reserves to liquid foreign claims is being lowered. The present situation results partly from the growth of world liquidity which was necessary to accommodate the expansion of world trade and investment over the past two decades—that is, in part it reflects the successes of the international economy. Variations in the volume of our liquid liabilities relative to their reserve backing are therefore not the primary determinant of how desirable the dollar is as a reserve asset.

The U.S. responsibility for converting foreign liquid claims into other reserve assets is limited to the holdings of foreign official institutions. Since the adoption in March 1968 of the two-tier gold system, the possibility of flows of gold from the U.S. reserve stock through foreign official institutions into private hands has been eliminated. As a result, the liquidity balance has lost much of its significance.

In recent years, increasing attention has been focused on the official reserve transactions balance. This balance, with appropriate adjustments, measures the quantity of claims on the United States which foreign authorities have acquired or given up in the process of maintaining the exchange value of their currencies within the prescribed margins. There are considerable difficulties in reading the signals given by the official reserve transactions balance, however. For one thing, it is volatile, exhibiting wide year-to-year swings as shown in Table 33. Moreover, a movement of dollars from foreign private accounts to foreign official accounts will increase the official reserve transactions deficit; movement in the other direction will decrease it. Such movements may in some cases signal shifts in the degree of foreign confidence in the dollar relative to other currencies. In other cases they may simply be due to changes in monetary conditions and interest rates which alter the attractiveness of dollar assets to foreign private holders, quite apart from speculative considerations. Because of the obligation to keep their countries' exchange rates within 1 percent or less of the par value, central banks are essentially passive in such transactions. In still other cases, shifts of dollar holdings between the central bank and commercial banks may represent the deliberate exercise of selective measures designed to reduce or to enlarge published reserves.

For all these reasons, no single concept of the balance will suffice for all purposes. Beyond the liquidity and official reserve transactions balances, at least two other "balance" concepts can be useful. One is the balance on current account or balance on goods, services, and unilateral transfers (both government and private). Such a balance indicates the extent to which our country is currently earning the foreign exchange it needs to carry out its international lending and investment expenditures. Properly adjusted for

147

Digitized for FRASER
http://fraser.stlouisfed.org/
Federal Reserve Bank of St. Louis

TABLE 33.—*U.S. balance of payments, 1961–70*

[Billions of dollars]

| Type of transaction | 1961–65 average | 1966 | 1967 | 1968 | 1969 | 1970 first 3 quarters[1] |
|---|---|---|---|---|---|---|
| Merchandise trade balance | 5.4 | 3.9 | 3.9 | 0.6 | 0.6 | 2.7 |
| Exports | 23.0 | 29.4 | 30.7 | 33.6 | 36.5 | 42.1 |
| Imports | −17.6 | −25.5 | −26.8 | −33.0 | −35.8 | −39.4 |
| Balance on investment income | 3.5 | 4.1 | 4.5 | 4.8 | 4.4 | 4.3 |
| U.S. investments abroad | 4.9 | 6.3 | 6.9 | 7.7 | 8.8 | 9.6 |
| Foreign investments in the United States | −1.3 | −2.1 | −2.4 | −2.9 | −4.5 | −5.3 |
| Balance on other services | −2.5 | −2.7 | −3.2 | −2.9 | −3.1 | −3.1 |
| BALANCE ON GOODS AND SERVICES [2] | 6.5 | 5.3 | 5.2 | 2.5 | 1.9 | 3.9 |
| Unilateral transfers, net; transfers (−) [3] | −2.7 | −2.8 | −3.0 | −2.8 | −2.8 | −2.9 |
| BALANCE ON CURRENT ACCOUNT | 3.8 | 2.5 | 2.2 | −.3 | −.9 | 1.0 |
| Balance on direct private investments | −2.2 | −3.6 | −2.9 | −2.9 | −2.2 | −3.8 |
| U.S. direct investments abroad | −2.2 | −3.7 | −3.1 | −3.2 | −3.1 | −4.8 |
| Foreign direct investments in the United States | .1 | .1 | .3 | .3 | .8 | 1.0 |
| Transactions in securities | −.8 | .4 | .3 | 3.1 | 1.6 | 1.0 |
| Transactions in U.S. long-term assets | −.6 | .2 | (⁴) | .1 | −.1 | −.6 |
| Transactions in U.S. long-term bank liabilities to other than official foreign agencies, and all long-term nonbank liabilities | .1 | .4 | .2 | .8 | .8 | .9 |
| Certain transactions in U.S. Government assets [5] | −1.8 | −2.0 | −2.4 | −2.5 | −2.1 | −1.8 |
| BALANCE ON CURRENT AND LONG-TERM CAPITAL ACCOUNTS [6] | −1.4 | −2.0 | −3.1 | −1.7 | −2.8 | −3.3 |
| Transactions in U.S. short-term assets | −.9 | −.4 | −1.2 | −1.1 | −.6 | −.3 |
| Nonscheduled repayments on U.S. Government credits | 4 | .4 | (⁴) | .2 | −.1 | .3 |
| Long-term bank liabilities to foreign official agencies | (⁴) | .8 | .9 | .5 | −.8 | −.8 |
| Transactions in U.S. short-term nonbank private liabilities, and nonmarketable liabilities of U.S. Government | .5 | .4 | .9 | 2.7 | .2 | .9 |
| Errors and unrecorded transactions | −.9 | −.5 | −1.1 | −.5 | −2.8 | −2.0 |
| Allocations of special drawing rights | | | | | | .9 |
| BALANCE ON LIQUIDITY BASIS | −2.3 | −1.4 | −3.5 | .2 | −7.0 | −4.4 |
| Less: Certain nonliquid liabilities to foreign official agencies | .1 | .8 | 1.3 | 2.3 | −1.0 | −.2 |
| Plus: Foreign private liquid capital, net | .7 | 2.4 | 1.5 | 3.8 | 8.7 | −4.5 |
| BALANCE ON OFFICIAL RESERVE TRANSACTIONS BASIS | −1.8 | .3 | −3.4 | 1.6 | 2.7 | −8.7 |
| *Addendum:* Special financial transactions | .6 | 1.6 | 1.3 | 2.7 | −.6 | .5 |
| BALANCE ON LIQUIDITY BASIS EXCLUDING SPECIAL FINANCIAL TRANSACTIONS AND SDR ALLOCATIONS | −2.9 | −2.9 | −4.8 | −2.6 | −6.4 | −5.8 |

[1] Average of the first 3 quarters at seasonally adjusted annual rates.
[2] Excludes transfers under military grants.
[3] Excludes military grants of goods and services.
[4] Less than $0.05 billion.
[5] Transactions in U.S. Government assets, excluding official reserve assets, net, less nonscheduled repayments on credits (including sales of foreign obligations to foreigners).
[6] One version of the "basic balance" under consideration. Another variant is the "nonmonetary balance" used by the International Monetary Fund.

Note.—Detail will not necessarily add to totals because of rounding.

Source: Department of Commerce.

earnings reinvested abroad, for errors and omissions, and for changes in the valuation of domestic and foreign assets, the current account also indicates

148

Digitized for FRASER
http://fraser.stlouisfed.org/
Federal Reserve Bank of St. Louis

changes in our net international investment position or "net worth," which may well be considered more meaningful than any other measure of changes in the basic strength or weakness of our international financial position. At the end of 1969, for example, our net foreign assets amounted to $67 billion, an increase of $1.5 billion over the total a year earlier.

Another concept, currently being considered for inclusion in the Government's table of balances, is the basic balance. Such a balance would measure our net position on current account plus "nonliquid" or "nonvolatile" capital transactions, treating changes in private liquid assets and liabilities as financing items. The aim underlying the basic balance is to group together those balance-of-payments items which best reflect broad, persistent forces or underlying trends, treating more volatile classes of transactions among the financing items. Because of the difficulties of approximating such a distinction with available statistical data, several variants of the basic balance have been suggested as best reflecting ·the fundamental concept.

The four balances just discussed—the liquidity balance, the official reserve transactions balance, the current account balance, and the balance on current and long-term capital accounts, which is one of several versions of the basic balance currently under consideration—are shown for the past decade in Table 33. Despite their conceptual and statistical differences, all these measures of our payments balance suffer from a common difficulty, namely, that none of them can give more than one side of the picture. The other side, which because of measurement problems does not appear in any presentation of the U.S. balance of payments, is the demand side: the number of dollars foreigners want to add to their reserve stocks in any given year. Rather than the quantity of dollars flowing into foreign hands, it is the difference between this amount and the amount they want to hold, given existing conditions, that would be a true indicator of disequilibrium in the international economic and financial position of the United States.

*The Composition of Reserves*

It is generally thought that, aside from political considerations and questions of confidence, the quantity of dollars foreign authorities want to add to their reserves depends partly on the desired rate of growth of aggregate international reserves and partly on the availability and desirability of alternative sources for increasing reserves. The expansion in the supply of monetary gold has for some time been erratic and insufficient to meet the increasing reserve needs which have accompanied the rapid growth of world trade and capital transactions. Under these circumstances, a steady accretion of foreign exchange, primarily dollars, to world reserves has filled this gap and prevented a general inadequacy of international reserves.

With the IMF's decision to allocate $9.5 billion of Special Drawing Rights to member countries over the 3-year period 1970–72, an important alternative source of new reserves was created. A first allocation of $3.4 billion was made on January 1, 1970, a second allocation of $2.9 billion

149

Digitized for FRASER
http://fraser.stlouisfed.org/
Federal Reserve Bank of St. Louis

was distributed at the beginning of 1971, and a third allocation of $3.0 billion is planned for the beginning of 1972. It is envisaged that SDR's will eventually supplant dollars as the major source of reserve growth, although the SDR allocations for the 1970–72 period were determined with the expectation that dollars and other traditional sources of increases in official reserves would supplement this new reserve "money."

The question of the size of foreign official demand for dollars, however, involves another complication. In addition to wanting growth of reserves, foreign official institutions generally have preferences concerning the composition of their reserve stocks: what proportion will be represented by gold, SDR's, and dollars (as well as, in some cases, smaller amounts of other convertible currencies). In part these preferences may arise from the differing characteristics of the three major reserve assets. The yield, for example, is zero on gold holdings, 1.5 percent on SDR's, and substantially higher on dollar holdings. Also, unlike dollars, SDR's and monetary gold (since the institution of the two-tier gold system) can be transferred only among central banks or other official institutions; they cannot be used for commercial transactions. Much more important, however, is that most industrial countries would apparently like to run some sort of basic balance surplus or a current account surplus with the rest of the world. The demand for reserve dollars, therefore, seems to be affected not only by countries' reserve goals but also by their balance-of-payments goals, measured "net" of new SDR allocations. SDR's help to satisfy the first of these goals but not the second, unless the goals themselves are modified.

The combined growth of official and private foreign demand for dollars determines the equilibrium size of the liquidity deficit of the United States. How much the private component of this demand grows will also depend both on the rate at which nonofficial holders want to increase their aggregate working balances of international currencies and on the desired composition of these balances.

A number of characteristics have made the U.S. dollar particularly suited to its role as the most widely used currency for international transactions. Among them are the scale and efficiency of the American banking system, the size and depth of our capital markets, and the freedom of the dollar both from changes in its foreign-exchange value and from exchange controls affecting foreigners. So far, the development of European capital markets seems to have enhanced rather than reduced the role of the dollar as a vehicle currency, although it is too early to tell what ultimate effect the European Economic Community's proposed movement toward a currency union will have through the decade of the 1970's.

The economic well-being of the United States does not require that foreign demand for dollar balances continue growing at any particular rate. What is important is to distinguish clearly between measured U.S. deficits and the strength or weakness of our international financial position. Throughout most of the 1950's, while the United States had a measured

150

Digitized for FRASER
http://fraser.stlouisfed.org/
Federal Reserve Bank of St. Louis

deficit in its balance of payments nearly every year, there was widespread concern about a worldwide "dollar shortage." This concern suggested that the measured U.S. deficit during those years was below its equilibrium size as determined by the growth of world demand for dollar reserves. The point is that it is essential that consideration of the foreign demand for dollars should temper any use of measured balance-of-payments deficits as the basis for policy decisions affecting our domestic economy or our international economic relationships.

*Balance-of-Payments Goals*

In the present international monetary system, in which the dollar serves as a yardstick, other countries, by selection of their exchange rates, in effect determine the exchange value of the dollar. The balance-of-payments position of the United States, however it is measured, depends therefore not only on the state of our domestic economy and on the economic behavior of our citizens and Government but on the economic performance and policies of other countries, including their decisions about exchange rates. Individual countries take actions that they consider appropriate to their particular circumstances. Collectively, those actions are not always easily reconciled with other countries' statements about the most desirable payments position for the United States. During the 1960's, for example, there were frequent expressions of foreign concern about the size and persistence of the U.S. deficit. Yet the net result of exchange-rate changes by leading industrial countries was a very slight actual appreciation of the dollar—a development which would inevitably have some tendency to weaken our current account balance.

The United States has full responsibility for maintaining a noninflationary expansion of its domestic economy. This responsibility was not met in the latter half of the 1960's, and U.S. performance during this period clearly contributed to the deterioration of our balance of payments. Nevertheless, regardless of our domestic performance, there are no measures which the United States can take to satisfy balance-of-payments demands of various countries if these demands are fundamentally inconsistent. No matter what constraints the Government imposes on the domestic economy, and no matter how many measures it adopts to alter or control individual categories of international transactions, the United States will not be able to abolish its balance-of-payments deficits if most of its major trading partners establish exchange rates and follow other balance-of-payments policies that enable them to run surpluses over and above their SDR allocations.

This problem of the possible inconsistency of balance-of-payments goals cannot, in short, be solved through unilateral policy action by the United States. Instead it requires multilateral action by the members of the International Monetary Fund—the present framework for international monetary relationships among the countries of the free world. One step toward the solution of this problem has already been taken with the establishment

151

Digitized for FRASER
http://fraser.stlouisfed.org/
Federal Reserve Bank of St. Louis

of Special Drawing Rights, international reserves which do not depend on a persistent deficit in the balance of payments of the United States or any other country. The purpose in instituting SDR's and related arrangements with respect to reserve creation is, of course, to provide a situation in which all countries can satisfy their demands for reserve increases simultaneously, so that the reserve center need not be forced into persistent deficit through policies adopted by other countries to run net surpluses in their balance-of-payments transactions.

Ideally, the rate of reserve creation should be neither too small nor too great. If it is too small, at least some countries will find their reserve goals frustrated, and their efforts to prevent the inadequacy of their reserves from imparting deflationary pressures to their domestic economies are likely to lead to increasing restrictions on international transactions and a competitive upward pressure on interest rates. If the rate of reserve creation is too great, the excess liquidity will be a vehicle for transmitting inflationary pressures internationally and will make it more difficult for national authorities to control domestic inflation.

In practice, however, it is not possible to find a rate of creating world reserves that is just right for every country. The objective must be a rate which best reflects an international consensus as to the most desirable trend of reserve growth. Moreover, even with such a consensus, problems would still arise if, as suggested earlier, other countries were to formulate balance-of-payments goals that were inconsistent with their aims regarding the composition of international reserves.

*Exchange Rates*

Because of the possibility that reserve creation and reserve management alone cannot solve the dilemmas just described, interest has recently focused on increased, though limited, flexibility of exchange rates. Changes in official parities have occurred in the past, of course, and have played a role in stabilizing the international monetary system. But the political consequences inherent in exchange-rate decisions have made countries hesitant to undertake such adjustments. As noted earlier, exchange-rate changes by industrial countries in the 1960's resulted in a small net depreciation of these currencies against the dollar, in part perhaps because political inhibitions against exchange-rate changes tend to be stronger in the case of appreciation than in the case of depreciation. To the extent that such an asymmetry exists, its effect is to favor a devaluation against the international standard— the dollar. Opinions about the quantitative significance of this tendency differ, but there is a widespread feeling that modifications which would make exchange-rate changes less politically charged and less likely to lead to speculative disturbances would contribute to the smoother and more effective operation of the existing system.

More frequent and smaller changes in the dollar parities of currencies would reduce the tendency for sizable payments imbalances to build up. This

152

Digitized for FRASER
http://fraser.stlouisfed.org/
Federal Reserve Bank of St. Louis

in itself would be an advantage, but an added advantage would arise insofar as the calculation of the appropriate new par became less critical. With smaller and more frequent changes in par value it would be easier to modify those which turned out to be either inadequate or excessive.

Smaller and more frequent changes in parity would not necessarily involve a change in the present IMF rules, but only a change in the practices which member nations have generally followed. A recent report by the Executive Directors of the IMF notes that the Fund is empowered "to concur in members' proposals for prompter and smaller changes in parities, whenever these are necessary to correct a fundamental disequilibrium."

On two recent occasions the difficulty of identifying an appropriate new par value has led countries to move away from the existing exchange-rate parity without immediately choosing a new one. At the end of September 1969 the German Government closed its foreign exchange markets under the pressure of a large capital inflow. When the markets were reopened several days later, no attempt was made to defend the old parity, thus introducing a period of "transitional float." The mark moved upward on the exchanges, and when a new par value was declared toward the end of October it exceeded the previous one by more than 9 percent. A somewhat different case arose at the end of May 1970 when, in the face of a very strong payments position and domestic inflation, the Canadian Government withdrew its defense of the existing par value; it has not yet declared a new one.

There is also the possibility of introducing greater flexibility by some widening of the margin permitted under the present IMF rules for exchange-rate variation around each country's par value. This margin or "band" is now 1 percent each way. Such an increase in the scope for market-induced movements of exchange rates might have several advantages. By increasing the risk of exchange-rate loss and thereby reducing the sensitivity of some types of short-term capital movements to differing degrees of tightness or ease in national money markets, it would make possible greater independence in national monetary policies. It could also be expected to reduce pressure on official reserves by encouraging stabilizing movements of private funds in cases where payments disturbances are regarded as temporary and self-reversing, and by decreasing the potential profitability of speculative flows based on anticipations of a change in parity. Such potential profitability would be reduced not only because the speculators would lose more if they guessed wrong but because the broader scope for exchange movements within the margins might in some cases reduce the need for actual parity changes.

All of the possible modifications just described are at present under study by the IMF in its consideration of whether amendments to its Articles of Agreement are necessary or desirable to encourage the most effective utilization of exchange-rate policies as a tool of international adjustment. The need is to find modifications of law or practice that will alleviate in the best pos-

153

Digitized for FRASER
http://fraser.stlouisfed.org/
Federal Reserve Bank of St. Louis

sible way the recurring financial strains in the existing system while still maintaining the essential characteristics of a monetary system under which steady and dramatic advances in world trade and prosperity have been achieved.

## ADJUSTMENTS IN INTERNATIONAL TRADE

Improvement in the monetary system has been one of the two major developments in the international economy since World War II. The other is the cooperative effort to dismantle the network of barriers that had obstructed the international exchange of goods and services prior to and during the war. Although many obstacles to trade still exist, gradual tariff reductions have been an important stimulus to the rapid postwar expansion of world trade. A number of international institutions, in particular the General Agreement on Tariffs and Trade (GATT), have been instrumental in reducing the hindrances to freer trade on a multilateral basis. Some problems of adjustment have emerged, however, as international trade has become more important in each country's affairs.

During the 1960's the volume of world trade (excluding that of Communist countries) grew considerably faster than real income in this group of countries, and the relative importance of trade to the American economy has increased as well. For example, the trend rate of growth of real imports of goods and services in the United States during the period 1955–68 was 1.6 times as great as that of real domestic production. In the same period the trend rate of growth of exports in real terms was 1.4 times that of output. Among broad categories of manufacturing industries, sharp increases in penetration by imports were registered in the latter half of the 1960's in apparel, leather goods, electrical machinery, transportation equipment, and other durable goods. The ratio of exports to total output rose significantly in the lumber, electrical machinery, transportation equipment, and primary and fabricated metals industries. Clearly, the growth of U.S. trade has signified not only greater availability of foreign manufactures, but also wider markets for many domestic products.

### U.S. TRADE POLICY

The liberal trade policies followed since World War II have not only expanded our exports and imports but have also contributed to a higher standard of living with a richer choice of products both here and abroad. At the same time, these gains require domestic adjustments in certain industries that grow more slowly, or even contract, as a result of trade liberalization. Despite the overall gains, the problems of adjustment and the natural tendency for an industry to resist foreign competition have brought renewed pressures in recent years to reverse trade liberalization. Pressures have also grown because of protectionist actions by some of our trading partners and because the reduction in our merchandise trade surplus has led to a belief that the United States is now benefiting less from trade.

154

Digitized for FRASER
http://fraser.stlouisfed.org/
Federal Reserve Bank of St. Louis

Calendar No. 1231

| 93D CONGRESS<br>2d Session | SENATE | REPORT<br>No. 93-1298 |
|---|---|---|

# TRADE REFORM ACT OF 1974

REPORT

OF THE

## COMMITTEE ON FINANCE
### UNITED STATES SENATE

TOGETHER WITH ADDITIONAL VIEWS

ON

### H.R. 10710

TO PROMOTE THE DEVELOPMENT OF AN OPEN, NON-DISCRIMINATORY, AND FAIR WORLD ECONOMIC SYSTEM, TO STIMULATE THE ECONOMIC GROWTH OF THE UNITED STATES, AND FOR OTHER PURPOSES



NOVEMBER 26, 1974.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1974

40-894

## II.  GENERAL STATEMENT

The Trade Reform Act of 1974, which the Committee on Finance now reports to the Senate with amendments, coincides with a serious crisis in the domestic and world economies. Twenty months have passed since former President Nixon requested the Congress to provide the Executive with authority to negotiate "a more open and equitable trading world." Events during the past year have severely strained the world's economy, underscoring the need to find cooperative solutions to common domestic and international economic problems. President Ford has renewed the request for enactment of trade reform legislation during the 93d Congress to permit multilateral trade negotiations to proceed. Trade negotiations are urgently needed to promote fairness and equity in the international trading system and to prevent a serious deterioration in the spirit of economic cooperation that is essential for the preservation of economic and political stability in a rapidly changing world.

### U.S. Trade, Balance of Payments Trends

The value of world exports increased from $129.6 billion in 1960 to $575 billion in 1973. Normally, such a four-fold increase would suggest a growing world interdependence and a more efficient utilization of world resources. Unfortunately, however, much of the increasing volume of trade was attributable to inflation and occurred within preferential and discriminatory trading arrangements. For example, among the contracting parties to the General Agreement on Tariffs and Trade (the GATT)—despite their pledge of nondiscrimination as a fundamental principle for achieving trade liberalization—the proportion of imports entering at preferential rates increased from 10 percent in 1955 to 25 percent in 1970, and the proportion will grow significantly with the enlargement of the European Community.

One result of discriminatory trade practices has been a decline in the U.S. share of world trade. While the value of free world exports more than quadrupled between 1960 and 1973, the U.S. share underwent a steady decline from 15.9 percent in 1960, to 14.6 percent in 1965, and to 12.4 percent in 1973, as illustrated by the following table:

(5)

6

## TABLE 1.—WORLD TRADE: EXPORTS [1]

|  | 1960 | 1965 | 1973 |
|---|---|---|---|
| Total (billions of dollars)........... | 129.6 | 188.5 | 575.0 |
| Per country (percentage): |  |  |  |
| United States......................... | 15.9 | 14.6 | 12.4 |
| European Community................. | 32.6 | 34.3 | 36.8 |
| Of which: United Kingdom......... | 8.2 | 7.3 | 5.3 |
| Japan................................ | 3.2 | 4.5 | 6.4 |
| Other Developed Countries......... | 15.0 | 15.4 | 15.8 |
| Less Developed Countries........... | 20.8 | 18.9 | 18.6 |
| Communist Countries................ | 12.5 | 12.3 | [2] 9.9 |
| Of which: |  |  |  |
| China, People's Republic of (P.R.C.)............................ | 1.5 | 1.1 | .5 |
| Soviet Union (U.S.S.R.)........... | 4.3 | 4.4 | 3.7 |
| Other................................ | 6.6 | 6.8 | [2] 5.7 |

[1] Data are f.o.b.
[2] Estimated.

Source: International Economic Report of the President, February 1974. U.S. Department of Commerce.

During the same period, the U.S. share of world imports fluctuated between 12.1 percent in 1960 and 12.4 percent in 1973. (See Table 2.) U.S. imports totalled $73.2 billion in 1973, and were entering at an annual rate of approximately $100 billion during the first half of 1974.

7

## TABLE 2.—WORLD TRADE: IMPORTS [1]

|  | 1960 | 1965 | 1973 |
|---|---|---|---|
| Total (billions of dollars) .......... | 135.8 | 198.7 | 592.0 |
| **Per country (percentage):** | | | |
| United States... ................. | 12.1 | 11.7 | 12.4 |
| European Community................ | 33.2 | 34.8 | 36.5 |
| Of which: United Kingdom........ | 9.6 | 8.1 | 6.6 |
| Japan......................... | 3.3 | 4.1 | 6.5 |
| Other Developed Countries.......... | 17.5 | 18.8 | 17.6 |
| Less Developed Countries............ | 21.8 | 18.9 | 16.3 |
| Communist Countries................ | 12.1 | 11.6 | [2]10.8 |
| Of which: | | | |
| China, People's Republic of (P.R.C.)..................... | 1.5 | .9 | [2].6 |
| Soviet Union (U.S.S.R.)....... | 4.1 | 4.1 | 3.9 |
| Other.......................... | 6.5 | 6.6 | [2]6.3 |

[1] Data are c.i.f.
[2] Estimated.

Source: International Economic Report of the President, February 1974. U.S. Department of Commerce.

The performance of the United States in the world economy throughout much of the postwar period has been marked by persistent trade and payments deficits. The performance since 1960 is shown in Table 3 below. Measured on the most accurate and meaningful basis, which would include the cost of insurance and freight in the value of our imports and exclude the soft-currency and other foreign-aid-financed shipments from the value of our exports, our trade account has been in deficit since 1966. In 1974, our trade deficit, measured on a c.i.f. basis, is running at an annual rate of almost $12 billion. These recent trade deficits have accounted for over one-half of our overall payments deficits, as shown in Table 5.

Government expenditures abroad have also been a large contributor to the deficits in our international accounts. Between 1950 and 1973 *net* government expenditures for both military and economic aid caused a drain of $141.3 billion in our overall international accounts (see Table 4 below), which is about equal to the growth in foreign country monetary reserve assets over this period.

Trade policies cannot be divorced from other important contributions to, or influences on, the U.S. and world economies. This legislation would give the President authority to negotiate structural changes in the world's trading system. It is intended that these negotiations be coordinated with other negotiations involving the burden-sharing of aid and defense costs, monetary reform, and other issues. Trade cannot be adequately dealt with in isolation from other major influences on the world economy.

- B 58 -

8

## TABLE 3.—U.S. TRADE AND BALANCE OF PAYMENTS, 1960-74

[In billions of dollars]

| | U.S. trade position | | | | Trade balance | | Balance of payments | | |
| | Exports (X) | | Imports (M) | | | C.i.f. (M) excluding foreign aid (X) | | Official settle- | Basic balance |
| | Total | Minus foreign aid | F.o.b. | C.i.f.[1] | F.o.b. | | Liquidity [2] | ments [3] | |
|---|---|---|---|---|---|---|---|---|---|
| 1960 | 19.7 | 18.0 | 15.1 | 16.3 | 4.6 | 1.7 | —3.7 | —3.4 | —1.2 |
| 1961 | 20.2 | 18.5 | 14.8 | 16.0 | 5.5 | 2.5 | —2.3 | —1.3 | (3) |
| 1962 | 21.0 | 18.9 | 16.5 | 17.8 | 4.5 | 1.1 | —2.9 | —2.6 | —1.0 |
| 1963 | 22.5 | 20.0 | 17.2 | 18.6 | 5.3 | 1.4 | —2.7 | —1.9 | —1.3 |
| 1964 | 25.8 | 23.1 | 18.7 | 20.3 | 7.1 | 2.8 | —2.7 | —1.5 | —.1 |
| 1965 | 26.7 | 24.3 | 21.4 | 23.2 | 5.3 | 1.1 | —2.5 | —1.3 | —1.8 |
| 1966 | 29.5 | 27.0 | 25.6 | 27.7 | 3.9 | —.7 | —2.2 | .2 | —2.1 |
| 1967 | 31.0 | 28.5 | 26.9 | 28.8 | 4.1 | —.3 | —4.7 | —3.4 | —3.7 |
| 1968 | 34.1 | 31.8 | 33.2 | 35.3 | .8 | —3.5 | —1.6 | —1.6 | —1.9 |
| 1969 | 37.3 | 35.3 | 36.0 | 38.2 | 1.3 | —2.9 | —6.1 | 2.7 | —3.6 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1970 | 42.7 | 40.7 | 40.0 | 42.4 | 2.7 | —1.7 | —3.9 | —9.8 | —3.8 |
| 1971 | 43.5 | 41.7 | 45.6 | 48.3 | —2.0 | —6.6 | —22.0 | —29.8 | —10.6 |
| 1972 | 49.2 | 47.5 | 55.6 | 58.9 | —6.4 | —11.4 | —13.9 | —10.4 | —11.2 |
| 1973 | 70.8 | 69.4 | 69.5 | 73.2 | 1.7 | —3.8 | —7.8 | —5.3 | —.9 |
| 1974: | | | | | | | | | |
| I | 22.4 } | | 21.7 | 23.2 | —.7 } | | —1.0 | 1.1 | 1.7 |
| II | 24.2 } | 45.6 | 25.2 | 27.0 | —.9 } | —4.6 | —6.2 | —4.5 | —2.7 |
| III | 25.0 | 24.7 [5] | 27.1 | 29.0 | —2.1 | —4.3 [5] | ([3]) | ([4]) | ([4]) |

[1] C.i.f. imports for the years 1960–66 are assumed to be roughly equivalent to 108.3 percent of f.o.b. imports in accordance with a Bureau of Customs—Tariff Commission—Bureau of Census study based on 1966 arrivals. For the years 1967–73 estimates are based on Bureau of Customs-Bureau of Census studies showing estimated freight and insurance charges to be 6.9 percent (1967), 6.3 percent (1968), 6.1 percent (1969), 6.2 percent (1970), 6.1 percent (1971), and 5.9 percent for 1972 and 1973.

[2] The liquidity and official settlements deficits for 1966–73 excludes SDR allocations.
[3] Less than $50 million.
[4] Not available.
[5] Partly estimated.

Source: U.S. Department of Commerce.

10

## TABLE 4.—NET U.S. GOVERNMENT AID AND MILITARY EXPENDI-TURES ABROAD, 1950–1974

**(Billion U.S. dollars)**

|  | Military | Foreign aid | Total |
|---|---|---|---|
| 1950 | −0.6 | −3.6 | −4.2 |
| 1951 | −1.3 | −2.9 | −4.2 |
| 1952 | −2.1 | −2.5 | −4.5 |
| 1953 | −2.4 | −2.1 | −4.5 |
| 1954 | −2.5 | −1.6 | −4.1 |
| 1955 | −2.7 | −2.2 | −4.9 |
| 1956 | −2.8 | −2.4 | −5.2 |
| 1957 | −2.8 | −2.6 | −5.4 |
| 1958 | −3.1 | −2.6 | −5.7 |
| 1959 | −2.8 | −2.2 | −5.0 |
| 1960 | −2.8 | −2.6 | −5.4 |
| 1961 | −2.6 | −2.8 | −5.4 |
| 1962 | −2.4 | −2.8 | −5.2 |
| 1963 | −2.3 | −3.1 | −5.4 |
| 1964 | −2.1 | −3.2 | −5.3 |
| 1965 | −2.1 | −3.3 | −5.4 |
| 1966 | −2.9 | −3.4 | −6.3 |
| 1967 | −3.1 | −4.2 | −7.3 |
| 1968 | −3.1 | −3.9 | −7.0 |
| 1969 | −3.3 | −3.6 | −6.9 |
| 1970 | −3.4 | −3.8 | −7.2 |
| 1971 | −2.9 | −4.4 | −7.3 |
| 1972 | −3.5 | −3.5 | −7.0 |
| 1973 | −2.4 | −3.8 | −6.2 |
| 1974 [1] | −2.3 | −4.4 | −6.7 |
| Total | −64.3 | −77.0 | −141.3 |

[1] First half at annual rate.

Source: International Economic Report of the President, February 1974. U.S. Department of Commerce.

11

U.S. trade policy has not been noted for its coherence or consistency. Throughout most of the postwar era, U.S. trade policy has been the orphan of U.S. foreign policy. Too often the Executive has granted trade concessions to accomplish political objectives. Rather than conducting U.S. international economic relations on sound economic and commercial principles, the Executive has used trade and monetary policy in a foreign aid context. An example has been the Executive's unwillingness to enforce U.S. trade statutes in response to foreign unfair trade practices. By pursuing a soft trade policy, by refusing to strike swiftly and surely at foreign unfair trade practices, the Executive has actually fostered the proliferation of barriers to international commerce. The result of this misguided policy has been to permit and even to encourage discriminatory trading arrangements among trading nations.

For many years this country relied on a trade surplus to offset foreign aid, military expenditures abroad, as well as overseas private investment. That surplus, which was never large enough to offset such expenditures, has now disappeared. In 1962, the Nation had a modest trade surplus of approximately $1.1 billion (c.i.f.) and a balance of payments deficit of $2.9 billion (liquidity basis). Ten years later the modest trade surplus had become an $11 billion deficit, and the payments deficit had grown from a bearable $2.9 billion to an intolerable $13.9 billion. Not surprisingly, the dollar had become unwelcome in many of the capitals of the world and underwent a series of devaluations.

In 1973 there was a temporary improvement in U.S. payments and trade balances (largely attributable to grain exports to the Soviet Union which many believe contributed importantly to the 8.8 percent inflation of 1973). Hopes for achieving a reasonable balance in our international accounts this year have been dashed by mounting deficits attributable to the increased cost of oil imports. In 1974, the United States will spend approximately $27 billion on oil imports; by the year's end, the Nation's trade deficit (c.i.f.) will be well over $10 billion.

Throughout the postwar years, the United States has, in effect, premised much of its trade, aid, and monetary policies upon a balance of trade surplus which, in fact, was diminishing and by 1966 had disappeared altogether. The apparent U.S. trade surplus was based on import statistics collected and reported on an f.o.b. (free on board) basis, which excludes the cost of freight and insurance. U.S. export statistics, moreover, are padded with exports that are more in the nature of aid than trade (Public Law 480 exports, for example). Most other industrialized nations and the International Monetary Fund value imports on a c.i.f. (cost, insurance and freight) basis. However, the United States has obscured its true balance of trade position by maintaining statistics on an f.o.b. rather than c.i.f. basis, as shown in the following table:

12

### TABLE 5.—BALANCES OF TRADE: F.O.B. AND C.I.F. AND BALANCE OF PAYMENTS

[In billions of dollars]

| Year | F.o.b. (plus foreign aid shipments) | C.i.f. (minus foreign aid) | Balance of payments (net liquidity) |
|------|------|------|------|
| 1966................... | 3.9 | —0.7 | —2.2 |
| 1967................... | 4.1 | —.3 | —4.7 |
| 1968................. | .8 | —3.5 | —1.6 |
| 1969................. | 1.3 | —2.9 | —6.1 |
| 1970................. | 2.7 | —1.7 | —3.9 |
| 1971................. | —2.0 | —6.6 | —22.0 |
| 1972 ............... | —6.4 | —11.4 | —13.9 |
| 1973............... | +1.3 | —3.8 | —7.8 |
| 1974 (1st 9 months at annual rate)........... | —3.1 | [1]—11.9 | [2]—14.4 |
| 1966-74.......... | +2.6 | —42.8 | —76.5 |

[1] Partly estimated.
[2] January–June at annual rate.

Source: U.S. Department of Commerce.

The table illustrates that although the U.S. Government reported to the American people and to the world a healthy balance of trade surplus of $2.6 billion for the period 1966–74, the country in reality experienced a deficit totaling $42.8 billion. The Special Representative for Trade Negotiations has assured the Committee that it is his intention to conduct future negotiations utilizing c.i.f. statistics. It is the Committee's intention in this legislation to assure that the c.i.f. method of valuing imports be the principal statistical method for all other agencies of the Federal Government as well. It is essential that the United States enter future trade negotiations with an accurate public understanding of its actual trade balance.

### Changes in the Structure of the World Economy

The U.S. and other economies have passed through several phases during the post-World War II era. In the early postwar years, the U.S. economy, which had been relatively unscathed by the ravages of war, was pre-eminent among the economies of the world. The United States accordingly adopted a foreign economic policy to foster the recovery of war-torn nations. This policy of the United States succeeded, and the world's economic landscape underwent permanent change.

During the early 1960's the U.S. economy itself moved from stagnation to respectable growth without significant inflation. Beginning in 1965 an inflationary trend developed which has grown progressively worse. Inflation in the United States has now reached a level unprecedented in peacetime. The causes of the inflation are deep-seated. A series of the largest budget deficits since World War II have been a

factor; on-again, off-again monetary policy has been another. Tight money policies may be highly inflationary *per se.*

Endemic inflation led to extraordinary balance of trade and payments deficits between 1970 and 1972 which in turn created a massive run against the dollar. After the U.S. could no longer maintain a fixed parity between the dollar and gold, the fixed exchange rate structure collapsed on August 15, 1971. Several dollar devaluations have occurred since that date. By making imports more expensive and exports relatively less expensive, the dollar devaluations contributed significantly to the inflationary pressures in the economy, creating shortages of raw materials and leading to the imposition of export controls on these products for which the U.S. enjoys its largest comparative advantage (e.g., soybeans).

As the U.S. economy underwent significant internal changes during the 1960's and early 1970's, the U.S. economic pre-eminence in the world economy declined relative to Western Europe and Japan. The European Community, born in 1958 in the Treaty of Rome, has become the world's largest trading bloc, with exports and imports now exceeding $300 billion. The Community's share of world GNP, world trade and world reserve assets has grown markedly since the 1960's, and this trend has accelerated in the 1970's.

The growth of the Japanese economy has outstripped even that of the European Community. Real growth in Japan grew at the phenomenal rate of 10.5 percent a year for the period of 1960 through 1972, as compared with 5.0 percent in Italy, 4.5 percent in West Germany, 4.1 percent in the United States, and 2.7 percent in the United Kingdom. By almost every economic indicator of growth, Japan has been the world leader. In terms of military or tax burdens, however, Japan is at the bottom of the list. The Achilles heel of the Japanese economy— the overwhelming dependence of Japan on foreign oil—has interrupted Japan's record of remarkable economic growth.

Less-developed countries (LDC's) as a whole progressed fairly well during the 1960's in terms of their economic growth and their balances of trade and payments performance. Between 1960 and 1972, real economic growth in the LDC's averaged over the 5 percent goal set for the "decade of development." By the fall of 1973, these countries had accumulated $40.6 billion in international reserve assets compared to $10 billion in 1960. By the end of this year the international reserve assets of "LDC's" may exceed $100 billion. These overall figures, however, mask wide divergence in performance. Oil-producing "LDC's" are holding western economies at bay through massive price increases. Other LDC's also possessing important natural deposits have been attempting to form their own producers' cartels to obtain a maximum rate of return on their resources. Those LDC's without such strategic resources are facing financial collapse.

## The Energy Challenge

In the recent past, a major cause of inflation has been the rapid rise in energy prices created by the cartel-pricing policies of the OPEC countries. Between October 1973 and January 1974 oil producing countries in the Middle East raised their government oil revenues (taxes and royalties) from about $3.00 per barrel to $7.00 per barrel. Imported petroleum currently costs over $13.00 per barrel. The U.S.

14

oil import bill in 1974 is expected to be over $27 billion, a 300 percent increase over 1973, for virtually the same volume of oil. Net income of the oil producing countries of the Middle East has increased from $4 billion in 1967, to $9 billion in 1972, and to an estimated $60 billion in 1974. World imports of petroleum at present consumption levels will jump from $45 billion in 1973 to about $115 billion in 1974, an increase of $70 billion. Oil exporting countries' revenues will increase in 1974 to nearly $100 billion, three-and-one-half times the 1973 levels. By 1980, it is projected that OPEC countries will control over $500 billion or 70 percent of the world's foreign exchange reserves. This unprecedented transfer of wealth from the oil-consuming countries to the oil-producing countries is severely straining the world's monetary and trading systems, as nations struggle to pay their oil import bills. It is also posing a serious threat to private financial institutions.

Petroleum is the largest single commodity moving in world trade—accounting for approximately one-fifth of the total value of world trade, and its continued dominance is assured because of the cartel-pricing policies of the producing countries. Other producer cartels of lesser, but still significant, economic strength have also been formed. Under these circumstances, it is imperative that the fundamental inequities in the world trading system be corrected in a spirit of international cooperation.

The abruptness of the price increase in petroleum is a primary cause of the present paradox of inflation and recession which burdens the United States and the world economy. The increase in the price of this basic commodity has already been, and will continue to be, reflected in the price of other goods which depend on petroleum as either a direct raw material or as a fuel. Furthermore, the increase in the price of petroleum has put corresponding pressure on the prices of other fuels, raw materials, and finished products so that virtually every sector of the economies of oil consuming nations is affected to some degree. Consequently, as consumers try to maintain their standard of living by shifting their spending patterns, some industries are already facing weakened demand for their products, increasing inventories, production curtailment, reduced profits and job layoffs.

## Why This Bill Is Necessary

Article I, Section 8 of the Constitution vests in the Congress plenary authority to "lay and collect taxes, duties, imposts" and to "regulate commerce with foreign nations." Since 1934, Congress has periodically delegated to the President specific and limited authority to conduct negotiations with other countries for reciprocal tariff and trade concessions. The last major delegation of such authority to the Executive, which expired in 1967, was included in the Trade Expansion Act of 1962. The Trade Reform Act of 1974 proposes a five-year renewal of the President's authority to engage in another round of multilateral trade negotiations.

As passed by the House, the bill represented the largest delegation of trade negotiating authority to the Executive in history. The Finance Committee's amendments seek to establish appropriate and constitutionally-sound guidelines and criteria to govern the exercise of the authority granted by the bill. The intractable nature of modern

15

barriers to trade, both tariff and nontariff, make this grant of extensive negotiating authority to the Executive necessary. The Committee, moreover, fully recognizes that immediate steps must be taken to deal with the severe monetary and trade problems created by the precipitous increase in world energy prices and to avert further dislocations in the world economy.

Twelve years have passed since the Congress enacted the Trade Expansion Act of 1962. A great amount of international economic history has occurred in the intervening years. In the opinion of the Committee, much of that history has been unfavorable to this country, largely because of the antiquated rules of the international trade and monetary systems and the related lack of genuine cooperation and reciprocity in international economic relations.

The Kennedy Round of trade negotiations brought about some of the largest tariff reductions in the history of the United States. Unfortunately, the Kennedy Round did not remedy fundamental inequities in the world trading system. There was no reform of the institutional structure, nor was there any significant progress in dealing with nontariff barriers or distortions of international trade. Our trading partners, most notably the European Community, devised new ways to pursue protectionism, particularly in agriculture.

In recent years, the United States has experienced a series of trade and payments deficits, several dollar devaluations, and a rate of inflation unprecedented in peacetime. The Nation's economy has continued its long, slow drift away from labor intensive industries and toward service industries. Especially significant has been the shift in the structure of U.S. employment (Table 6). In 1960, nearly one-third of our U.S. nonagricultural employment was in manufacturing. Since 1960, however, manufacturing employment has declined steadily to a position where barely one in four workers is gainfully employed in manufacturing. This relative decline in manufacturing employment has been offset by increases in service jobs.

As our Nation's employment in manufacturing has declined relatively, its trade balance in manufacturing has declined absolutely. In 1960 the United States had a trade surplus in manufactured goods of $5.2 billion. By 1973 we had a deficit of $3.4 billion (Table 7). In contrast, West Germany also had a surplus of $5.9 billion in 1960, but by 1973 that surplus had burgeoned to $28.7 billion, and Japan's modest surplus of $2.6 billion in 1960 also exploded into a $23.3 billion surplus by 1973. The Committee expects that these negotiations will seek to provide equal competitive opportunities for exports of U.S. manufactures and agriculture, and that the unwarranted protection afforded to producers in countries with large and persistent balance of trade surpluses will be substantially reduced and, if possible, eliminated.

# TABLE 6.—EMPLOYMENT IN THE UNITED STATES IN NONAGRICULTURAL ESTABLISHMENTS DURING THE POSTWAR ERA 1945-74

[In [millions of persons]

| | Total wage and salary workers | Manufacturing | | Mining | Construc-tion | Transport public utilities | Whole-sale and retail trade | Finance, insur-ance, and real estate | Services | Government | |
| | | Total | Percent of total employ-ment | | | | | | | Federal | State and local |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1945 | 40.4 | 15.5 | 38.4 | 0.8 | 1.1 | 3.9 | 7.3 | 1.5 | 4.2 | 2.8 | 3.1 |
| 1950 | 45.2 | 15.2 | 33.7 | .9 | 2.3 | 4.0 | 9.4 | 1.9 | 5.3 | 1.9 | 4.1 |
| 1955 | 50.7 | 16.9 | 33.3 | .8 | 2.8 | 4.1 | 10.5 | 2.3 | 6.3 | 2.2 | 4.7 |
| 1960 | 54.2 | 16.8 | 31.0 | .7 | 2.9 | 4.0 | 11.4 | 2.7 | 7.4 | 2.3 | 6.1 |
| 1965 | 60.8 | 18.1 | 29.7 | .6 | 3.2 | 4.0 | 12.7 | 3.0 | 9.1 | 2.4 | 7.7 |
| 1970 | 70.6 | 19.4 | 27.4 | .6 | 3.4 | 4.5 | 14.9 | 3.7 | 11.6 | 2.7 | 9.8 |
| 1972 | 72.8 | 18.9 | 26.0 | .6 | 3.5 | 4.5 | 15.7 | 3.9 | 12.3 | 2.6 | 10.6 |
| 1973 | 75.6 | 19.8 | 26.2 | .6 | 3.6 | 4.6 | 16.3 | 4.1 | 12.9 | 2.6 | 11.0 |
| 1974: | | | | | | | | | | | |
| I | 76.8 | 19.9 | 25.9 | .7 | 3.7 | 4.7 | 16.5 | 4.1 | 13.2 | 2.7 | 11.4 |
| II | 77.1 | 20.0 | 25.9 | .7 | 3.6 | 4.7 | 16.6 | 4.1 | 13.4 | 2.7 | 11.4 |
| III ᵖ | 77.1 | 19.9 | 25.8 | .7 | 3.5 | 4.6 | 16.7 | 4.2 | 13.4 | 2.7 | 11.5 |

ᵖ Preliminary.

Source: "Economic Report of the President", February 1974, p. 282; Current Economic Indicators.

16

## TABLE 7.—TRADE BALANCES IN MANUFACTURES (C.I.F. BASIS)

[Dollars in billions]

| Year | United States | EEC Total | EEC Excluding Intra-EEC | Federal Republic of Germany | France | United Kingdom | Japan | Canada[1] |
|---|---|---|---|---|---|---|---|---|
| 1960 | $5.9 | $13.0 | $13.1 | $5.9 | $2.7 | $4.4 | $2.6 | −$1.5 |
| 1966 | 5.1 | 16.9 | 17.0 | 9.0 | 1.6 | 5.4 | 7.0 | −2.1 |
| 1967 | 5.3 | 17.9 | 17.8 | 11.0 | 1.4 | 4.3 | 6.7 | −2.0 |
| 1968 | 3.5 | 18.9 | 18.9 | 11.7 | 1.0 | 3.9 | 8.7 | −1.7 |
| 1969 | 4.1 | 19.4 | 19.7 | 12.3 | .1 | 5.1 | 10.6 | −2.2 |
| 1970 | 3.8 | 21.5 | 21.6 | 13.3 | 1.5 | 5.3 | 12.5 | −1.0 |
| 1971 | .4 | 26.4 | 27.4 | 15.0 | 1.8 | 6.3 | 17.1 | −2.1 |
| 1972 | −3.4 | 39.5 | 30.4 | 17.7 | 3.4 | 5.4 | 20.3 | −5.9 |
| 1973 | −.8 | N.A. | N.A. | 28.7 | 2.3 | 3.7 | 23.3 | −4.9 |

[1] F.o.b. basis.
N.A. Not available.

Source: U.S. Department of Commerce.

- B 67 -

17

18

The Committee recognizes that the United States, by virtue of its strength, must play a major role in leading the world and shaping its economy. The strength of the American economy made it possible for this country to assert such leadership with the expectation and hope that other countries would follow. However, while it is necessary that the United States continue a leadership role, other countries which have gained tremendous financial or economic wealth must do their fair share to insure stability in the world economy. Several major trading countries which have large trade and payments surpluses continue to maintain unjustifiable and unreasonable restrictions on imports and investment even though they enjoy relatively strong economies.

No nation is so insulated from the world economy that it can afford to pursue policies which threaten the stability of the world economy without suffering itself from the resulting chaos. Collective economic security and access to supplies must be primary objectives of these negotiations.

The Trade Reform Act, as reported by the Committee, is intended to be more than a delegation of authority for negotiated reduction in the rates of duty. While a significant authority to reduce tariffs would be provided to insure the flexibility the trade negotiations will require, our foreign trading partners and our negotiators are on notice that the authority must be exercised to obtain full reciprocity and equal competitive opportunities for U.S. commerce. A complete prenegotiation procedure would be provided to avoid substantial duty reductions in import-sensitive industries. U.S. businessmen would be given the same access to the U.S. negotiating team that businessmen in other countries have to theirs.

The basic authority for trade agreements in the Trade Reform Act, however, would be but one part of new trade management tools designed to open a new era of U.S. participation in the world economy. For the first time, an assault on nontariff barriers would be mandated and a constitutionally-sound procedure for Congressional consideration of the resulting agreements is provided. Outmoded international trade rules would be replaced and new codes providing for a fair and equitable access to supplies would be sought. U.S. legislation dealing with unfair trade practices would be strengthened. Reciprocal, nondiscriminatory treatment for commerce between the United States and other industrialized countries would be required; at the same time, those less developed countries which do not discriminate against U.S. commerce or withhold needed materials from the world economy would receive a preferential treatment designed to stimulate their development through trade rather than aid.

The Committee bill provides a new program of community assistance specifically designed to help those communities adversely impacted by trade to adjust to foreign competition.

In short, the Trade Reform Act, as modified by the Committee, is designed to avoid the pitfalls of past trade agreements programs and to give U.S. negotiators the authority needed to deal with a world of proliferating preferential trade blocs, cartels, and disruptive influences.

The United States remains the largest and most accessible market in the world. Despite the claims of our trade partners, U.S. duties,

19

subject to continued reductions under the trade agreement programs, are at the lowest average level of any major industrialized country. The United States accordingly is the world's largest individual market. The value of its foreign imports now exceeds $100 billion annually. America is a trading nation, and it thrives on competition. Given a fair deal, its industry can compete with the world, and be strengthened in that competition.

The Committee, however, believes that the United States can no longer afford to stand by and expose its markets, while other nations shelter their economies—often in violation of international agreements—with variable levies, export subsidies, import equalization fees, border taxes, cartels, discriminatory government procurement practices, import quotas, and a host of other practices which effectively discriminate against U.S. trade and production. The Committee recognizes the responsibilities of the United States, as the world's strongest economy, to provide leadership in the international community. At the same time, however, the Committee recognizes the duty of the Federal Government to adopt policies for the sound growth of the economy and the long-term benefit of the American people. The Committee therefore reports the Trade Reform Act of 1974, having received firm assurances from the Executive Branch that in the forthcoming negotiations, U.S. negotiators will not grant concessions which are not fully reciprocated by foreign concessions of equivalent value to the commerce of the United States.

87

authority expressly delegated under the bill (such as the two-year authority to renegotiate tariff agreements in section 124), would not be subject to attack if the resulting agreement is not expressly approved by Congress, and (2) changes in regulation made pursuant to a Congressional delegation would not need further approval. Several sections of trade law authorize the Executive to prescribe regulations governing their administration and Congress would normally have no interest in approving changes in them. For example 19 U.S.C. 1304 authorizes the Secretary of the Treasury to establish regulations relating to the character of words and phrases or abbreviations acceptable for indicating the country of origin of imported articles.

## BALANCE OF PAYMENTS AUTHORITY

### (Section 122)

*Deficit Authority.*—Under the House bill, the President would be authorized, at his discretion, to impose temporary import surcharges and quantitative restrictions to deal with large and serious U.S. balance of payments deficits. Under the Committee bill, the President would be required to impose import restrictions whenever the U.S. faces large and serious balance of payments deficits. However, the President would be permitted to refrain from imposing import restrictions if he determines that they would be contrary to U.S. national interest. If he did not restrict imports, the President would have to inform the Congress and consult with the members of the Senate Finance and House Ways and Means Committees who are to serve as Congressional Advisors under section 161 of the bill, as to the reasons for his determination.

Under the Committee bill, import restrictions proclaimed by the President would not be in effect for a period longer than 180 days (unless a longer period is authorized by Act of Congress). The Committee also felt that the authority to impose surcharges could, in many instances, be applied selectively—that is with respect to the articles of commerce from such countries which have substantial surpluses and which do not take adequate steps to reduce or eliminate their surpluses. The Committee does not feel that across-the-board application of balance of payments measures would be the fairest or most effective way to restore equilibrium to the world economy, particularly in circumstances in which one or several countries are responsible for the disequilibrium by maintaining large and persistent balance of payments surpluses. The intent of this provision is to create incentives for surplus countries which have disproportionate gains in reserves to take voluntarily effective adjustment action to eliminate their surpluses. There remains under the Articles of Agreement of the International Monetary Fund a much greater pressure on deficit countries to adjust than on surplus countries.

In the new era created by the rapid increase in oil prices, it is likely that most oil-consuming countries will face large balance of payments deficits. It appears that the two steps necessary to restore equilibrium in the world economy and to avoid serious disruption are: (1) a significant reduction in the world price of oil and (2) international monetary cooperation to cope with the immediate transfer of wealth including recycling of "petrodollars." However, circumstances can change rapidly and the Committee deems it necessary that the President have authority to impose surcharges and other import restrictions for

balance of payments reasons even though under present circumstances such authority is not likely to be utilized. The importance of providing such authority is manifest in the light of the recent decision by the United States Customs Court which held that the 10 percent import surcharge imposed temporarily in August of 1971 was without advance authority. If that position is upheld on appeal it could involve a substantial loss of revenue to the U.S. Treasury and windfall gains to those importers who passed on the import surcharge to consumers. While the Committee does not wish to take a position one way or the other on the validity of the 1971 surcharge, it does feel the Executive ought to have explicit statutory authority to impose certain restrictions on imports for balance of payments reasons.

Upon the entering into force of new rules regulating the application of surcharges as a part of reform of international balance-of-payment adjustment procedures, the President would be required to impose any surcharge authorized under this section in conformity with such new international rules.

The use of surcharges for balance-of-payments purposes has gained *de facto* acceptance in the General Agreement on Tariffs and Trade over the years. Major industrialized countries which have resorted to surcharges include France in 1955, Canada in 1962, the United Kingdom in 1968, and Denmark and the United States in 1971. Nonetheless, explicit GATT rules on the use of surcharges have never been adopted. Accordingly, the Committee has provided in subsection 122(d)(4) that it is the sense of the Congress that the President seek modifications in international agreements aimed at allowing the use of surcharges in place of quantitative restrictions and providing rules to govern the use of such surcharges as a balance-of-payments adjustment measure within the context of arrangements for an equitable sharing of balance-of-payments adjustment responsibility among deficit and surplus countries.

Subsection 122(e) would provide that actions taken under this balance-of-payments provision must be applied uniformly to a broad range of imported products. However, the President may exempt certain articles or groups of articles because of the needs of the U.S. economy relating to such factors as the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, and avoiding serious dislocations in the supply of imported goods. In addition, exceptions may be made where import-restricting actions would be unnecessary or ineffective. As indicated in the bill these exceptions are to be uniform as to their application. Examples of situations in which import restricting actions would be unnecessary or ineffective might include, among others, situations where goods are in transit, or situations where commitments for the importation of goods are so far advanced, such as binding contracts, that application of the import restrictions would only result in higher prices for goods to domestic interests. The authority to implement import-restricting measures or to exempt particular products from such measures could not be used for the purpose of protecting individual domestic industries from import competition.

Subsections 122 (f) and (g) would retain the provisions of the House bill dealing with the application of quantitative restrictions under authority of this section, and the authority of the President to suspend, modify or terminate, in whole or in part, any proclamations issued under this section.

89

Subsection 122(h) would prohibit the President from invoking any provision of law authorizing the termination of tariffs concessions as authority for imposing a surcharge on imports into the United States.

*Surplus authority.*—The Committee bill would also delegate to the President authority to reduce temporarily the duty applicable to any article by an amount not more than 5 percent ad valorem and/or to lower the restrictive effect of, or suspend temporarily, any quantitative limitation applicable to any article whenever the President determines that fundamental international payments problems require special import measures to increase imports:

> 1. to deal with a large and persistent U.S. balance of trade surplus (as determined on the basis of including the cost of insurance and freight in the value of imports) as reported by the Bureau of Census, or
>
> 2. to prevent significant depreciation of the dollar in foreign exchange markets.

The Committee felt it important to alter the sections of the House bill which would have provided authority to reduce tariffs and/or suspend quotas whenever there was a finding of a persistent balance of *payments* surplus, because it is possible, indeed likely, that there will be a large influx of short term and long term funds from oil-producing countries which could create a large *payments* surplus while at the same time, the United States may be suffering a large *trade* deficit. In these circumstances, eliminating or reducing barriers to U.S. imports would not be a proper remedy for a U.S. balance of payments surplus induced by an inflow of "petrodollars".

The Committee bill would also require that actions taken under the balance of payments surplus authority must be on a broad product coverage basis and not with respect to one or more particular product. As in the case of the House bill, the President may impose such import measures only for a period of 150 days and may not apply such measures to any article where he determines that such material injury to firms and workers in any domestic industry including agriculture, mining, fishing or commerce. No action shall be taken to impair the national security or which would otherwise be contrary to our national interests.

## Compensation Authority
### (Section 123)

The purpose of section 123 is to provide the President with authority to compensate foreign countries for increases in U.S. tariffs or other import restrictions when the United States has been found obligated to pay such compensation for trade restrictions imposed pursuant to an import relief finding under section 203. In the past, the Executive has used its general negotiating authority to reduce duties for purposes of compensation. Such authority does not presently exist, since the authority to proclaim duty reductions under section 201 of the Trade Expansion Act expired on June 30, 1967.

Subsection (a) would grant to the President discretionary authority, whenever import relief has been granted pursuant to the escape clause, to enter into agreements with foreign countries and to proclaim new concessions in the form of modification or continuation of any existing duty or continuation of any existing duty-free or excise treatment to the extent he determines necessary or appropriate to maintain a general level of reciprocal and mutually advantageous concessions.

# Economic Report

# of the President



## Transmitted to the Congress

## February 1974

TOGETHER WITH

### THE ANNUAL REPORT
OF THE

## COUNCIL OF ECONOMIC ADVISERS

UNITED STATES GOVERNMENT PRINTING OFFICE
WASHINGTON  :  1974

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402. Price $3.05
Stock Number 4000-00305

quarters of 1972. There are two possible reasons for the absence of a decline: First, economic conditions were buoyant throughout the world. Second, most of the outflow occurred in the first quarter, before the major exchange rate adjustments of 1973, and was probably motivated by the anticipation of subsequent exchange rate adjustments.

*The U.S. Balance of Payments in 1973*

In a world characterized by the managed floating of exchange rates, measurement of the overall balance of payments has become less important. In a fixed exchange rate world, one of the major functions of overall measures of the balance of payments was to signal to policy makers when a given exchange rate had become untenable. To the extent that exchange rates are allowed to adjust automatically in response to payments imbalances, it is no longer necessary to communicate the desirability of an exchange rate adjustment to the policy maker. Of course, to the extent that exchange rates remain constrained by official intervention in the foreign exchange market, the balance of payments numbers will continue to indicate when such intervention may need to be relaxed.

The managed floating of exchange rates has changed in particular the analytical meaning of the official reserve transactions balance, which measures the net direction and magnitude of official intervention in the foreign exchange market over a period of time. In other words, it approximately shows the extent to which governments have bought or sold currencies to influence the exchange rate. It also includes government-to-government payments outside the foreign exchange market, but removing these transactions from the foreign exchange market has the same effect as direct intervention. As long as governments kept market exchange rates relatively fixed by buying and selling foreign exchange, the net amount of such official purchases or sales provided an estimate of the net deficit or net surplus of a given currency traded in the market. To the extent that governments no longer attempt to keep market exchange rates from falling below or rising above a fixed level, changes in the net demand or supply of a currency are reflected in a movement of the exchange rate rather than in a net loss or gain of reserves. Since exchange rates were at first fixed and then floating to varying degrees in 1973, changes in market pressures were reflected in part by changes in exchange rates and in part by net changes in international reserves, that is, by the official reserve transactions balance.

As measured by the official reserve transactions balance, the United States had a deficit of $10½ billion in the first quarter, a surplus of $½ billion in the second quarter, and a surplus of $2 billion in the third quarter (Table 52). That is, in the first quarter, governments purchased roughly $10½ billion to keep the dollar higher than it would otherwise have been; in the second quarter, governments more or less allowed the dollar to find its own level in the market; and in the third quarter, governments sold roughly $2 billion, to keep the dollar lower than it would otherwise have been.

193

TABLE 52.—*U.S. balances on international transactions, 1972–73*

[Billions of dollars, seasonally adjusted]

| Type of transaction | First 3 quarters | | 1972 IV | 1973 | | |
|---|---|---|---|---|---|---|
| | 1972 | 1973 | | I | II | III |
| Goods [1] | −5.2 | −0.5 | −1.7 | −1.0 | −0.2 | 0.7 |
| Services | 1.4 | 3.5 | .9 | 1.1 | .9 | 1.4 |
|     Military transactions | −2.7 | −2.1 | −.9 | −.8 | −.7 | −.6 |
|     Investment income [2] | 5.6 | 6.7 | 2.2 | 2.3 | 2.1 | 2.3 |
|     Other | −1.5 | −1.1 | −.5 | −.4 | −.5 | −.3 |
| GOODS AND SERVICES | −3.7 | 3.0 | −.9 | .2 | .7 | 2.1 |
| Unilateral transfers, net [3] | −2.9 | −2.7 | −.9 | −.7 | −1.0 | −.9 |
| CURRENT ACCOUNT | −6.6 | .3 | −1.8 | −.6 | −.4 | 1.2 |
| Long-term capital | −1.7 | .7 | .2 | −.4 | −.2 | 1.3 |
|     U.S. Government [4] | −.8 | −.6 | −.6 | −.3 | .1 | −.4 |
|     Direct investment | −2.6 | −1.7 | −.6 | −1.8 | −.4 | .5 |
|     Other private | 1.7 | 3.0 | 1.4 | 1.7 | .1 | 1.2 |
| CURRENT ACCOUNT AND LONG-TERM CAPITAL | −8.3 | 1.0 | −1.6 | −.9 | −.6 | 2.5 |
| Short-term claims | −1.8 | −4.7 | −1.2 | −3.8 | −.6 | −.3 |
| Short-term liabilities | 2.3 | .5 | 2.6 | −1.8 | 1.1 | 1.2 |
| Errors and unrecorded transactions, net | −1.6 | −4.8 | −1.5 | −3.9 | .4 | −1.4 |
| Allocations of SDR | .5 | ---------- | .2 | ---------- | ---------- | ---------- |
| TOTAL [5] | −8.9 | −8.1 | −1.5 | −10.5 | .3 | 2.1 |

[1] Excludes transfers under military grants.
[2] Includes direct investment fees and royalties.
[3] Excludes military grants of goods and services.
[4] Excludes official reserve transactions and includes transactions in some short-term U.S. Government assets.
[5] Equals official reserve transactions balance.

Note.—Detail may not add to totals because of rounding.

Sources: Department of Commerce, Bureau of Economic Analysis, and Department of the Treasury.

Another commonly used measure of the U.S. balance of payments is the current account and long-term capital balance, or the "basic" balance, as it is sometimes called. This balance is computed by adding up all the recorded transactions in the current and the long-term capital accounts, including unilateral transfers. It attempts to measure the extent to which the "long-term" or "underlying" demand for foreign exchange has exceeded the "long-term" or "underlying" supply of foreign exchange during a given period. If all such transactions were accurately recorded, this balance would also equal the changes in official reserves and the changes in short-term foreign assets of private banks, corporations, and individuals, net of changes in liabilities. Because some transactions may not be measured correctly, however, or may escape measurement altogether, a difference usually exists between recorded basic transactions above the line and recorded changes in reserves and short-term assets below the line. This difference appears as an errors-and-omissions item in the balance of payments statistics.

Deficits and surpluses in the *basic* balance need not necessarily imply any disequilibrium which requires corrective action by the government. To the extent that changes in net private holdings of short-term foreign assets are

194

voluntary, the existence of a surplus or deficit need not imply that it is either undesirable or unsustainable. When such changes are quite large in any one year, however, there is a strong possibility that the change is a temporary response to unusual circumstances, such as differences in interest rates. In these cases, some governments might be inclined to intervene to moderate the exchange rate fluctuations which could result from large shifts in short-term foreign assets.

The U.S. basic balance was in deficit by $1 billion during the first and $½ billion during the second quarter of 1973, while during the third quarter it was in surplus by about $2½ billion. For the 3 quarters, the U.S. basic balance was in surplus by about $1 billion. In other words, Americans in the first 3 quarters of 1973 earned $1 billion more from current account and long-term capital transactions than they spent on similar transactions.

Table 52 also shows that during the first 3 quarters $5 billion in net foreign currency expenditures were not recorded, while recorded short-term private claims on foreigners increased by $4½ billion. These two items were "financed" by the $1 billion current account surplus; a $½ billion net increase in recorded short-term liabilities to private banks, corporations and individuals; and an $8 billion net increase in U.S. liabilities to foreign official institutions.

*The Net Foreign Asset Position*

At the end of 1972 the estimated value of American assets abroad was $200 billion, and the value of American liabilities to foreigners was $150 billion. The $50 billion difference between the two is the estimated net American investment position abroad. The net investment position declined by about $20 billion from 1970 to 1972, but data for the first 3 quarters of 1973 suggest that it probably increased last year.

Changes in the U.S. net asset position are brought about in part by surpluses or deficits in the balance on current account, a balance which includes U.S. transactions in goods and services, as well as unilateral transfers (Table 52). The largest changes occurred in the balance on goods and services. When the United States has a deficit in its trade balance as in 1971 and 1972, it imports more than it pays for with exports, thus increasing American liabilities to foreigners. With a trade surplus, as in the first 3 quarters of 1973, the United States acquires imports and an increase in net assets abroad in return for its exports. One would therefore expect an improvement of the U.S. net asset position during 1973.

The U.S. net asset position is also affected by several kinds of transactions and accounting adjustments that do not appear in the balance of payments. When foreign subsidiaries reinvest their earnings, this increases the value of U.S. assets abroad; and when foreign-owned subsidiaries in the United States reinvest their earnings, this increases U.S. liabilities to foreigners. During 1973, U.S. reinvestment of earnings may have exceeded foreign reinvestment by $4 billion or more, thus adding to the U.S. net asset position. Changes in the valuation of outstanding assets and liabilities, which

195

FEDERAL RESERVE BANK OF PHILADELPHIA

# A Lower Profile for the U.S. Balance of Payments

### By Janice M. Westerfield*

People reacted with surprise last May when the government accepted an advisory panel's recommendation that it stop publishing summary payments balances. Not long ago, the balance of payments was front-page news. Continuing U.S. payments deficits caught the attention of policymakers at the highest levels, and they responded with programs to combat deficits and maintain the value of the dollar—in a word, to prevent devaluation.

Payments imbalances posed a serious threat to international stability when the U.S. and its trading partners bought and sold one another's currencies at fixed exchange rates. But since 1973, when the fixed-rate system was abandoned, deficit and surplus measures no longer mean what they used to. Many economists believe that the payments restrictions of the fixed-rate era, which were intended to reduce deficits, may have outlived their usefulness. And now these restrictions are being eased in the belief that relaxed payments policies will foster economic health in an atmosphere of expanded consumer and investor choice.

## THE BALANCE OF PAYMENTS AND FIXED EXCHANGE RATES

It's usual to define a nation's balance of payments as a record of the transactions its residents have carried on with foreign residents over a period of time. This record follows the principles of double-entry bookkeeping: every credit is balanced by an offsetting debit somewhere on the statement. The credit and debit entries can be grouped into different accounts which bring out distinct features of the payments picture.

A payments balance yardstick often used by policymakers was the balance on current account and long-term capital—the basic balance. This measure was designed to pick out long-term trends in the balance of pay-

---

*Janice M. Westerfield, who joined the bank in 1973 and received her Ph.D. from the University of Pennsylvania the following year, writes frequently on international finance and trade.

11

ments by excluding volatile capital flows. The current account portion of this balance records sales of goods and services as well as remittances and government grants. This account reflects all international transactions except capital movements. It's the mirror image of changes in capital flows (excluding errors and omissions). Thus a deficit in the current account is matched by a surplus of roughly the same size in capital accounts.

Payments balances and the financing of deficits were items of central importance to the international economic system that was established after World War II. Policymakers were very much interested in the stability of this system. Balanced international trade and fixed currency exchange rates both were considered important for achieving stability. But there wasn't much give in the system. Imbalances in international payments threatened to change currency exchange rates and vice versa. A nation that imported more goods and services than it exported had to make up the difference with financing or reserves—whose effect may be to make a currency more available and drive down its value against other currencies. Under the fixed-rate system, however, central banks stepped in to hold a currency's value steady if it threatened to move outside agreed-on limits. Where fundamental changes occurred in a nation's economic circumstances, the monetary authorities were able to set a new official value for that nation's currency in terms of other currencies and gold. But it was expected that the United States, with the cooperation of other countries, would maintain the value of the dollar in terms of gold. U.S. policymakers were faced with a choice: either take domestic measures to keep exchange rates and trade balances in order, or face international pressures to redress imbalances. They reacted by developing a combination of domestic economic policies and exchange controls to correct international financial difficulties.

## WHY DEFICITS WERE TABOO

International currency exchange is a many-sided enterprise, and policymakers had many reasons for trying to avoid deficits. Some were economic, others were political; some had to do with the economy of a single nation, others with the economies of several nations.

**Deficits Drain Off Reserve Assets.** During the late 1950s and 1960s, the U.S. was piling up deficits in its basic balance and other overall balances. Stocks of gold, foreign currencies, and other reserve assets were used to ensure the value of the dollars that were used to cover deficits with trading partners. There was little bodily movement of metals or currency; gold wasn't shipped out of Fort Knox every month. But as time went on and deficits continued, many U.S. dollars—or dollar credits—were accumulated by foreigners. As the foreign dollar holdings grew larger, the willingness to accept still more dollars softened and so the increasing supply of dollars overseas threatened to undercut the value of U.S. currency and upset the fixed-rate system.

The U.S. and its trading partners cooperated to head off sharp movements in currency exchange rates, but they did so at a cost. Foreign central banks bought up excess dollars with their own currencies, and they could present these dollars to the U.S. Treasury for payment in gold. Thus the U.S. lost a lot of its gold to dollar holders in the late 1960s. With no end to balance-of-payments deficits in sight, the threat of a continuing gold loss persuaded the U.S. to suspend its redemption of dollars in 1971. The end of dollar-to-gold convertibility touched off other changes—including the shift from fixed to floating exchange rates—that have altered our outlook on payments deficits.

**U.S. Deficits Produce Resentment Abroad...** During the Vietnam conflict, the U.S. supplied more and more dollars, overloading currency markets. Other nations had to absorb these dollars to avoid revaluing and, under the fixed-exchange-rate system, they usually bought them up with their own currencies. The West German government, for

12

example, had to buy up dollars with marks in order to prevent the mark from gaining in value against the dollar. But pumping more marks into circulation swelled the German money supply; and as the money supply expanded, prices shot up. The German government, stuck with dollars it didn't want and with inflation besides, traced many of its difficulties to U.S. policies. And Germany was not the only nation that blamed its high inflation rates of the late 1960s and early 1970s on the U.S.

**...and at Home.** Many Americans also were unhappy about their country's owing money to foreign creditors, but that's what happens when the payments balance shows a deficit. With deficits piling up year after year, the nation had to borrow continually to finance its spending.

Since the total balance—counting goods and services, capital, and reserve assets—must be zero, dollar outflows in one portion of the statement must be offset by dollar inflows in another. So, for example, if the U.S. has a deficit (net dollar outflow) in the current account, it ordinarily would show a surplus (net dollar inflow) in the capital account, say from foreign purchases of U.S. Treasury securities. And such a net inflow of short-term private capital may mean that the U.S. is borrowing money abroad to tide itself over instead of paying cash on the barrelhead for consumption and investment goods. It's been argued that the U.S. lived beyond its means by running up large international bills this way, especially in the later 1960s, and that neither a nation nor a household can run up a lot of bills without making arrangements to repay its creditors. Without an expansion of national output large enough to liquidate foreign debt as it comes due, a trading country faces the possibility of default and of difficulty in obtaining further credit. Any nation that runs deficits for a prolonged period must gear up to transfer sizable resources to other nations in the future. No wonder international deficit financing goes against the grain of people who don't like to owe anything to anybody.

**Interest Groups Fear Loss of Jobs and Profits.** Some groups oppose payments deficits for reasons peculiar to their own situation. Labor unions, for example, use media spots and billboard advertisements to tell the story of U.S. workers knocked out of jobs by foreign imports. Of course, domestic industries may be vulnerable even in times of surplus; it doesn't take a deficit to imperil workers in an industry that faces stiff foreign competition. But labor groups have lobbied consistently in favor of tariffs, quotas, and international agreements to restrict the influx of foreign-made goods. Policymakers have had to reckon with the likelihood that large deficits would galvanize labor into taking further political action and would revive the country's latent but deep-seated protectionism.

Nor is industry all out for free trade. Industry may oppose deficits for much the same reason as labor—fear of competition from abroad. It's believed in many quarters that budding domestic industries have to be helped along until they're able to compete with established foreign producers in world markets. The infant company is supposed to grow up and throw off its protective blanket after a while, but that isn't always the way it works. Many well-established U.S. industries retain powerful lobbies to keep trade controls that were set up when those industries were just getting off the ground. And American industry is not unique in its protectionist tendencies. Foreign producers often lobby to obtain similar protection from their own governments.

**The Government Responds.** The combination of fixed exchange rates with declining reserve assets, resentment at home and abroad, and pressure from special interest groups led the U.S. to adopt deficit-reducing policies during the 1960s. These policies produced restrictions on long-term foreign investment by American citizens, guidelines for bank lending to foreigners, and ceilings on overseas direct investment—all programs designed to slow capital outflows. In another

13

program, called Operation Twist, policymakers attempted to encourage economic growth by lowering long-term interest rates while raising short-term rates to attract foreign capital. Other measures subsidized export credits with loans at below-market rates and lowered duty-free allowances for tourists bringing home foreign goods. The government increased its preferences for goods from domestic suppliers. Even defense and foreign aid were affected by the balance of payments. The Armed Services Procurement Regulations required military departments to buy munitions at home under the Buy American program despite the higher cost. And receipt of foreign aid was tied to purchase of American goods. Throughout, the government acted to maintain a fixed exchange rate for the dollar.

These initiatives may have held down the size of succeeding deficits. But since they were in basic conflict with an open trade and payments system, they were not without costs of their own. Capital controls restricted profitable U.S. investment abroad. Higher short-term interest rates raised the cost of domestic borrowing at home. Restrictions on the entry of foreign goods narrowed the range of choices for the U.S. consumer at the same time that export subsidies increased his tax burden. And the Buy American program raised the cost of maintaining a defense establishment which already had come under intense public scrutiny for high spending.

Any measures to reduce deficits would have produced costs somewhere, and under fixed rates policymakers wanted deficits kept small to maintain international economic stability. But now fixed exchange rates are gone, and deficit figures no longer mean what they used to. Yet some of the policies linger on.

## EVENTS OUTMODE POLICIES

The system of fixed but adjustable exchange rates came under increasing pressure in the late 1960s and early 1970s. This pressure was reflected in larger movements of speculative capital, tighter payments restrictions, and more frequent changes in currency values. When dollar-to-gold convertibility was suspended in 1971, many countries let their currencies float against the dollar. Exchange rates were fixed again, temporarily, by the Smithsonian Agreement, but new monetary crises facing the British pound and other currencies hastened the evolution toward floating rates. By spring 1973, all of the leading currencies were floating jointly or independently.

Now the dollar is relatively free to rise or fall in value against other currencies. Capital still moves from country to country, and some countries' balances are in surplus while others are in deficit. But whereas under fixed rates the U.S. would face a loss of reserve assets when the dollar was threatened, under flexible rates the exchange-rate mechanism itself makes the required adjustment by letting the dollar fall in value. Nowadays, governments generally avoid trying to fix exchange rates at predetermined levels as they did prior to 1973.[1] Monetary authorities still intervene in the exchange markets, but mostly to quiet temporary disorders rather than to mask underlying economic conditions. Thus the floating-rate system eliminates some of the undesirable repercussions of a deficit over the long haul and reduces the usefulness of some traditional measures of the balance of payments (see Box).

In fact, floating rates actually tend to correct deficits and to move international payments balances back toward equilibrium. Suppose, for example, that the U.S. were to run a large current account deficit for a year or two and the dollar excess were to reduce

---

[1]Even under floating rates currency values are managed to some extent. The most important departure from the floating-rate system as described in the text is the snake—a joint float adopted by several countries of the European Community. Central banks of the snake countries intervene to keep currency-value fluctuations against one another within narrow limits, but they allow their currencies to float jointly against the dollar and other outside currencies.

14

FEDERAL RESERVE BANK OF PHILADELPHIA

BOX

## NEW DEVELOPMENTS ALTER MEANING OF PAYMENTS MEASURES

The new international monetary system not only reduces the importance of balance-of-payments measures but also makes the old reporting system obsolete. Until recently, the major focus of U. S. balance-of-payments policy was on the three overall balances—the basic balance, the net liquidity balance, and the official reserve transactions balance. As the international monetary system moved to floating exchange rates, these overall measures came to be misinterpreted by the public. As a result, the President's Advisory Committee on the Presentation of Balance of Payments Statistics suggested that none of these balances be used to measure international transactions of the U. S. and that the words 'deficit' and 'surplus' be avoided as much as possible in press releases.* Some partial balances, such as the merchandise trade and current account balances, will be listed as memorandum items, but the emphasis has shifted from concentrating on one of the overall balances to analyzing information on several classes of international transactions. Capital transactions, for example, now are grouped so that foreign assets in the United States are broken down into transactions with foreign official institutions and transactions with foreign banks or individuals.

Of the three measures that have been discontinued, the official reserve transactions balance was most closely tailored to the fixed-exchange-rate system. This balance includes merchandise trade, services, and remittances, as well as long-term and short-term capital flows. It indicates the surpluses and deficits arising from all these transactions, which are financed by changes in official reserve assets. (Official reserves include gold, Special Drawing Rights, foreign currencies, and borrowings from the International Monetary Fund). In short, this balance was intended to reflect the extent of official intervention required to maintain fixed exchange rates. A deficit, for instance, was interpreted to mean that foreign countries had intervened to support the dollar. As the system of floating rates evolved, the official reserve transactions balance lost much of its meaning. Exchange market pressures on the dollar now are indicated mainly by changes in exchange rates, not by changes in official reserves. And dollar accumulations by foreign official institutions ordinarily are matters of preference rather than obligation—witness the large investment in dollar assets by oil-producing countries.

The net liquidity balance focused on changes in the international liquidity position of the U. S. It included all transactions except liquid private capital flows, liabilities to foreign official agencies, and official reserve assets. Once thought to measure the potential pressure on U. S. primary reserve assets, it was a way of checking that foreign claims did not become so large that the U. S. would be unable to meet them if they were presented for payment. Since the dollar no longer is convertible into gold, this threat is gone. And there are serious statistical problems in the distinction this balance makes of liquid from nonliquid capital transactions.

The balance on current account and long-term capital (basic balance) was intended to capture stable underlying economic trends. It included merchandise trade, services, remittances, and long-term capital flows. This balance also presented statistical difficulties. Long-term capital flows sometimes have effects quite similar to those of short-term flows. But the arbitrary methods of distinguishing these flows made this balance an unsatisfactory indicator of long-term trends.

*"Report of the Advisory Committee on the Presentation of Balance of Payments Statistics," *Statistical Reporter* 76 (1976), pp. 221-238.

15

the value of U.S. currency. What would happen?

It would take more dollars to buy units of other currencies and commodities priced in other currencies, so the dollar prices of imports would rise and Americans would shift their demand toward domestic goods. At the same time, the foreign currency prices of U.S. goods sold abroad would drop, and foreign consumers would shift their demand toward U.S. goods. After a period of adjustment, the lower dollar value would encourage Americans to buy fewer imports and sell more exports; and both actions would tend to reduce the deficit.

Although floating exchange rates make long periods of payments deficits unlikely, some hefty short-term deficits still may occur. Outside forces, such as sharp rises in foreign commodity prices, could push an importing country into a deficit position for several years. The recent jump in oil prices, for example, played hob with the payments balances of many oil-importing nations. Or deficits could be caused by fundamental internal weaknesses, such as the high domestic inflation rates that are plaguing some nations. Policymakers may well want to take steps that deal with domestic sources of economic weakness. But whether they do or not, the system of flexible exchange rates will lead almost inevitably to currency realignments that tend to reduce deficits and some of their undesirable repercussions.[2]

---

[2]Policymakers in some countries are suggesting that the current system of floating rates has come up short on several counts. They contend that exchange-rate flexibility does not relieve the need to make painful domestic economic adjustments when a country's prices, production, and trade get out of alignment with those of similar countries. They argue that floating rates may have worsened inflation in such countries as Britain and Italy. And they maintain that floating rates may impose costs not only on individual countries but also on the international economic system itself. For a discussion of both sides of this issue see my "Would Fixed Exchange Rates Control Inflation?" *Business Review*, Federal Reserve Bank of Philadelphia, July/August 1976, pp. 3-10.

## EASING UP ON RESTRICTIONS

Though old ideas die hard, many observers of international economic developments now think it better not to direct *ad hoc* policies toward correcting a U.S. payments deficit. The basic strategy under floating rates is for the government to pursue monetary and fiscal policies that it expects will lead to a desired rate of economic growth and acceptable inflation, and it lets the payments balance fall where it may.[3] Current U.S. domestic economic and payments policies have as a goal the stability of the economic system overall. Beyond that, these policies aim toward allowing market forces to play a major role in determining payments positions and exchange rates. Despite some protectionist provisions in the Trade Act of 1974, the main thrust of U.S. trade policy is directed toward establishing and preserving an open trade and payments system.

The limitations on trade and investment that were imposed in the 1960s do not fit well with current U.S. payments policies. Because of this, most controls on capital flows have been removed. The way is open to move further toward dismantling restrictive policies, but this movement probably will be gradual. The U.S. may not be in a position to alter its procurement practices or cut off subsidized export credits, for example, until other nations agree to do the same. And that may take time. In the interim, having restrictions may serve the useful purpose of providing bargaining leverage with other countries.

In sum, the U.S. still seeks economic stability, not only for itself but for all nations. Under the fixed-rate system, stability required the avoidance of payments deficits; but with floating exchange rates, the relative values of currencies constantly readjust to changing international conditions. Therefore deficit and surplus measures don't mean what they used to mean and so they are being deemphasized. Indeed it would be inconsist-

---

[3]See F. Lisle Widman, "U.S. Balance of Payments Policy," *Department of the Treasury News*, May 24, 1976.

16

ent with present developments to tie domestic and foreign economic policy decisions to these figures in the same way as before, ignoring the flexibility of exchange rates and the complexity of international capital movements.



## AVAILABLE UPON REQUEST · · ·

## STUDIES IN SELECTIVE CREDIT POLICIES

edited by
Ira Kaminow
James M. O'Brien

Single copy free. Additional copies $2 each. Requests should be addressed to Studies in Selective Credit Policies, Department of Research, Federal Reserve Bank of Philadelphia, Philadelphia, PA 19106. Checks should be made payable to the Federal Reserve Bank of Philadelphia.

17



S.E.E. is designed for easy understanding and wide distribution. Additional pamphlets will appear at irregular intervals. Multiple copies are available free for distribution by organizations such as businesses, schools, unions, trade organizations, and banks.

Copies are available free of charge. Please address all requests to the Department of Public Services, Federal Reserve Bank of Philadelphia, Philadelphia, Pennsylvania 19106.

18



ORDER FORM

The Philadelphia Fed's Research Department occasionally publishes RESEARCH PAPERS written by staff economists. These papers deal with local, national, and international economics and finance. Most of them are intended for professional researchers and therefore are highly technical.

To order copies, simply mark which ones are desired, detach this order form, place it in an envelope, and send it to the Department of Research, Federal Reserve Bank of Philadelphia, Philadelphia, PA 19106. Your copies will be sent to the address on the mailing label overleaf.

# CURRENTLY IN PRINT

☐ 1. Intradistrict Distribution of School Resources to the Disadvantaged: Evidence for the Courts, Philadelphia School Project by Anita A. Summers and Barbara L. Wolfe

☐ 4. Required Reserve Ratios, Policy Instruments, and Money Stock Control by Ira Kaminow

☐ 5. The Information Value of Demand Equation Residuals: A Further Analysis by James M. O'Brien

☐ 6. Equality of Educational Opportunity Quantified: A Production Function Approach, Philadelphia School Project by Anita A. Summers and Barbara L. Wolfe

☐ 7. Pennsylvania Bank Merger Survey: Summary of Results by Cynthia A. Glassman

☐ 8. Manual on Procedure for Using Census Data to Estimate Block Income, Philadelphia School Project by Anita A. Summers and Barbara L. Wolfe

☐ 9. Block Income Estimates, City of Philadelphia: 1960 and 1970, Philadelphia School Project by Anita A. Summers and Barbara L. Wolfe

☐ 10. Optimal Capital Standards for the Banking Industry by Anthony M. Santomero and Ronald D. Watson

☐ 11. A Unified Model of Consumption, Labor Supply, and Job Search by John J. Seater

☐ 12. Utility Maximization, Aggregate Labor Force Behavior, and the Phillips Curve by John J. Seater

☐ 14. On the Role of Transaction Costs and the Rates of Return on the Demand Deposit Decision by Anthony M. Santomero

☐ 15. Spectral Estimation of Dynamic Econometric Models with Serially Correlated Errors by Nariman Behravesh

☐ 16. Empirical Properties of Foreign Exchange Rates under Fixed and Floating Rate Regimes by Janice Moulton Westerfield

☐ 17. A Model of Vacancy Contacts by Job Searchers by John J. Seater

☐ 18. The Effect of the Local Public Sector on Residential Property Values in San Mateo County, California by Nonna A. Noto



FEDERAL RESERVE BANK of PHILADELPHIA
PHILADELPHIA, PENNSYLVANIA 19106

**business review**
FEDERAL RESERVE BANK
OF PHILADELPHIA
PHILADELPHIA, PA. 19106

BULK RATE
U. S. POSTAGE
**PAID**
Philadelphia, Pa.
Permit No. 138

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2026, I directed the State Plaintiff-Appellees' Opposition to Defendants' Motion for a Stay Pending Appeal and an Immediate Administrative Stay to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Benjamin Gutman
_____
BENJAMIN GUTMAN #160599
Deputy Attorney General
benjamin.gutman@doj.oregon.gov

BG2:kw5/1021400967