Nos. 2026-1804, -1805

---

# In the United States Court of Appeals for the Federal Circuit

---

STATE OF OREGON, STATE OF WASHINGTON,

*Plaintiffs-Appellees*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, *in his official capacity as Secretary of the Department of Homeland Security*, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*, UNITED STATES,

*Defendants-Appellants*

---

Appeal from the United States Court of International Trade in No. 1:26-cv-01472-3JP, Chief Judge Mark A. Barnett, Judge Claire R. Kelly, and Senior Judge Timothy C. Stanceu.

---

BURLAP AND BARREL, INC., BASIC FUN, INC.,

*Plaintiffs-Appellees*

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; UNITED STATES; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as U.S. Trade Representative*; OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE; DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, *in his official capacity as Secretary of the Department of Homeland Security,*

*Defendants-Appellants*

Appeal from the United States Court of International Trade in No. 1:26-cv-01606-3JP, Chief Judge Mark A. Barnett, Judge Claire R. Kelly, and Senior Judge Timothy C. Stanceu.

**Private Plaintiffs' Response in Opposition to Defendants' Emergency Motion for a Stay Pending Appeal**

Jeffrey M. Schwab
Reilly Stephens
James McQuaid
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org

*Counsel for Plaintiffs-Appellees Burlap and Barrel, Inc. and Basic Fun, Inc.*

## Table of Contents

Table of Authorities ............................................................. ii

Introduction .......................................................................1

Legal Standard ..................................................................2

Argument ..........................................................................2

    I.    Defendants have failed to make a strong showing that they are likely to succeed on the merits on appeal. ...................3

    II.    The Government will not suffer irreparable harm ..................13

    III.    Private Plaintiffs will suffer substantial harm if a stay is granted.................................................................19

    IV.    The public interest will be harmed if the stay is granted. ................................................................23

Conclusion........................................................................24

Certificate of Compliance.................................................26

Certificate of Interest......................................................27

# Table of Authorities

## Cases

*Ala. Ass'n of Realtors v. HHS,*
594 U.S. 758 (2021)................................................................14, 23–24

*Am. Signature, Inc. v. United States,*
598 F.3d 816 (Fed. Cir. 2010) .................................................................23

*Biden v. Nebraska,*
600 U.S. 477 (2023)..................................................................................8

*Celsis in Vitro, Inc. v. CellzDirect, Inc.,*
664 F.3d 922 (Fed. Cir. 2012) ................................................................21

*Clark v. Martinez,*
543 U.S. 371 (2005)..................................................................................8

*FCC v. Consumers' Rsch.,*
606 U.S. 656 (2025)..................................................................................8

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006)..................................................................................6

*In re Section 301 Cases,*
524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021) .........................................24

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,*
448 U.S. 607 (1980)..................................................................................8

*J.W. Hampton, Jr. & Co. v. United States,*
276 U.S. 394 (1928)..................................................................................8

*Learning Res., Inc. v. Trump,*
146 S. Ct. 628 (2026).........................................................9, 10, 11, 23

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024)..................................................................................4

*Nken v. Holder,*
556 U.S. 418 (2009)..........................................................................2–3, 16

*Pennsylvania v. New Jersey,*
  426 U.S. 660 (1976)..................................................................................18

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025)..................................................................................14

*Trump v. Orr,*
  146 S. Ct. 44 (2025).................................................................................13

*United States v. U.S. Coin & Currency,*
  401 U.S. 715 (1971).................................................................................13

*V.O.S. Selections, Inc. v. Trump,*
  149 F.4th 1312 (Fed. Cir. 2025)...........................................9–10, 11, 22

*V.O.S. Selections, Inc. v. Trump,*
  772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) .......................................11

*West Virginia v. EPA,*
  597 U.S. 697 (2022)................................................................................. 7

**Constitutional Provision**

U.S. Const. art. I, § 8 .......................................................................9, 14, 23

**Statute**

19 U.S.C. § 2132................................................................................4, 5, 14

**Legislative History**

120 Cong. Rec. 39,505 (1974) ................................................................ 5

H.R. Rep. No. 93-571 .............................................................................. 6

S. Rep. 93-1298 (1974) ........................................................................5, 9

**Administrative Code**

19 C.F.R. § 159.12 ..................................................................................18

**Rule**

USCIT R. 56(f) .......................................................................................12

iii

**Other Authorities**

*In re: Procedures for Entering a Stay in New IEEPA Tariff Cases*, Admin. Order 25-02 (Ct. Int'l Trade Dec. 23, 2025) .............................16

## Introduction

The Court of International Trade (CIT) held that Congress intended a specific meaning to the phrase "balance-of-payments deficits" when it enacted Section 122 of the Trade Act of 1974—a meaning the President ignored in Proclamation No. 11012. Because no qualifying balance-of-payments deficit exists, the tariffs imposed under Section 122 are unlawful, so the CIT enjoined Defendants from collecting them from Plaintiffs Burlap and Barrel, Inc. ("Burlap & Barrel"), Basic Fun, Inc. ("Basic Fun!"), and the State of Washington.[1] Defendants requested that the CIT stay that order pending this appeal, claiming the injunction undermines the President's trade agenda.

The CIT denied the Government's motion to stay. Slip Op. 26-53 ("Stay Op."). It held that the Government made no persuasive showing that it would suffer irreparable harm since the injunction was narrow, applying only to the Importer Plaintiffs. *Id*. at 6–7. The CIT also held

---

[1] This brief refers to plaintiffs in case no. 2026-1805—Burlap & Barrel and Basic Fun, Inc.—as "Private Plaintiffs," and to the plaintiffs in case no. 2026-1804 as the "State Plaintiffs" or "the States." Plaintiffs in both cases will be referred to collectively as "Plaintiffs." Burlap & Barrel, Basic Fun!, and the State of Washington—the parties to whom the CIT's injunction applies—will be referred to as the "Importer Plaintiffs."

1

that a stay would substantially injure importer plaintiffs, who would suffer lost profits and damaged business relationships, investments, and innovation. *Id.* at 8–9. And it held that the public interest did not favor preserving unlawful executive action simply because it reflects the President's preferred policy. *Id.* at 10. Finally, the CIT held that the Government did not make a strong showing that it would succeed on the merits, relying largely on arguments that the CIT had already rejected. *Id.* at 11.

Defendants' motion to stay largely repeats the same arguments set forth in their motion before the CIT and should be denied for the same reasons.

## Legal Standard

A stay depends on four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotation and citation omitted). "The first two factors"—likelihood of success and irreparable

harm—"are the most critical." *Id.* at 434. It is not enough that the chance of success on the merits be better than negligible, and simply showing some possibility of irreparable injury fails to satisfy the second factor. *Id.*

## Argument

All four factors that this Court considers when addressing a motion for a stay pending appeal favor denying the stay. Defendants have not made a strong showing that they are likely to succeed on the merits of this appeal because Section 122 does not give the President the power to impose tariffs simply in response to a trade deficit. Denying a stay will cause no irreparable harm to Defendants, whereas the Importer Plaintiffs will suffer substantial harm if a stay is granted. And granting a stay would harm the public interest.

## I. Defendants have failed to make a strong showing that they are likely to succeed on the merits on appeal.

To show a likelihood of success on appeal, Defendants largely repackage arguments the CIT rejected. Defendants once again argue that the President's interpretation of the phrase "balance-of-payments deficit" leaves room for presidential discretion to which courts should defer. Mot. Stay 12–16. But even though the phrase "causes some

3

confusion," Slip Op. 26-47 at 32 ("Merits Op."), "a court is not somehow relieved of its obligation to independently interpret the statute." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). This case does not involve judicial second-guessing of economic policy. It involves statutory interpretation—specifically, whether Section 122 authorizes tariffs based on the deficits identified in the Proclamation.

Section 122 authorizes the President to impose temporary surcharges only "to deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a)(1). The phrase "balance-of-payments deficit" carried a specific meaning when Congress enacted the statute in 1974. The CIT found that Congress understood that term to refer to deficits measured by "(1) liquidity, (2) official settlements, or (3) basic balance." Merits Op. 33. The Proclamation, however, rests on current account and trade-related measures that are distinct from balance-of-payments deficits within the statutory meaning. Merits Op. 42.

The text of Section 122 distinguishes between "balance-of-payments deficits" in § 2132(a) and "balance-of-trade surpluses" in § 2132(c), 19 U.S.C. § 2132(a)(1), (c)(1), demonstrating that Congress understood the

4

difference between these economic concepts and deployed them deliberately. *See* Merits Op. 32–33. Had Congress wanted to give the President the power to impose tariffs in response to "balance-of-trade deficits"—as the Proclamation claims—then it would have done so explicitly, just like it set forth "balance-of-trade surpluses" in § 2132(c).

Despite Defendants' contention that the CIT "relied on some of the weakest forms of legislative history imaginable," Mot. Stay 17, the legislative history the CIT relied upon is far more robust than Defendants acknowledge. The Senate Report to the Trade Act of 1974 explicitly classifies three measures as "balance of payments"—liquidity, official settlements, and basic balance—while classifying trade balance measures as distinct. Merits Op. 37 (citing S. Rep. 93-1298, at 8 (1974)). The December 1974 Senate Finance Staff Report organizes its data under the same framework. Merits Op. 37. And congressional testimony leading up to enactment consistently discussed balance-of-payments deficits in terms of these three measures. Merits Op. 36 (citing 120 Cong. Rec. 39,505–06 (1974)).

Defendants contend that Congress's decision to omit a definition of "balance of payments" that appeared in earlier draft legislation reflects

an intent to afford presidential discretion. Mot. Stay 18–19 (citing *Hamdan v. Rumsfeld*, 548 U.S. 557, 579–80 (2006)). But the omission of an explicit definition does not mean Congress intended the term to be infinitely elastic. Congress removed the parenthetical because it "felt it was 'not possible to formulate a definition with mathematical exactness,'" H.R. Rep. No. 93-571, at 28–29—not because it intended the President to select any sub-account deficit at will. The legislative record shows Congress understood the term to carry a specific economic meaning even without a statutory definition.

By contrast, Defendants' interpretation of "balance-of-payments deficit" relies on a strained reading of the statutory text and legislative history and has no coherent limiting principle. Defendants assert that courts must defer to the President's interpretation so long as it is "within an economically reasonable understanding of that phrase."[2]

---

[2] Before the CIT, Defendants took a more extreme approach, asserting that "where the President has, in his discretion, found that the necessary statutory preconditions exist, and has taken action directed by those statutory preconditions" the courts have no role of judicial review over that determination. Defs.' Resp. MSJ, ECF No. 16 at 20. According to Defendants, all the courts may do is to make sure that the President's tariff Proclamation fits the limits for the amount and duration of the tariffs set by Section 122. *Id*. at 18.

Mot. Stay 20. And Defendants assert that the term "balance-of-payments deficit" can mean any "deficit of some subset of the overall balance [of payments]." Mot. Stay 14. Defendants also claim that "the overall balance [of payments] is necessarily zero." Mot. Stay 13.

But "if the President has the ability to select among the sub-accounts to identify a balance-of-payments deficit, unless every sub-account is balanced, the President would always be able to identify a balance-of-payments deficit." Merits Op. 39. As the CIT correctly explained, "Section 122 would lack an intelligible principle if this President could simply identify any deficit account, or if the phrase 'balance-of-payments deficits' could change with context." Merits Op. 40 n.33. Defendants' interpretation would transform a narrow emergency delegation into a standing authorization for tariffs—precisely the kind of unheralded power the Supreme Court has cautioned against. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) ("We typically greet assertions of extravagant statutory power over the national economy with skepticism") (cleaned up).

The CIT correctly recognized that Defendants' expansive interpretation of Section 122 raises serious nondelegation concerns.

7

Merits Op. 40. If "balance-of-payments deficit" means whatever deficit the President identifies in any sub-account, then Section 122 ceases to impose any meaningful constraint—and the "intelligible principle" required by the Constitution evaporates. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). The canon of constitutional avoidance therefore compels the narrower reading the CIT adopted. *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005); *see also Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) ("A construction of the statute that avoids [an] open-ended grant" of authority implicating nondelegation "should certainly be favored.").

Defendants invoke the "more limited role" of the nondelegation doctrine "in the national security and foreign policy realms," Mot. Stay 21 (citing *FCC v. Consumers' Rsch.*, 606 U.S. 656, 706 (2025) (Kavanaugh, J., concurring)). But the President cannot exercise powers beyond those Congress delegated merely by invoking foreign affairs or national security. *See, e.g., Biden v. Nebraska*, 600 U.S. 477, 494 (2023) (holding that the Secretary of Education does not have authority to cancel $430 billion of student loan principal under the HEROES Act—a statute enacted to address national security crises—by deeming it

8

necessary in connection with a national emergency). And the tariff power belongs to Congress under Article I, Section 8, not to the President. U.S. Const. art. I, § 8, cl. 1. The Supreme Court has emphasized that "the President enjoys no inherent authority to impose tariffs during peacetime." *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 638 (2026).[3] And "[w]hen Congress grants the power to impose tariffs, it does so clearly and with careful constraints." *Id.* at 644. Those constraints must be enforced, not read away.

Defendants' current interpretation of Section 122 is directly contradicted by their own prior litigation position before this Court. During the IEEPA litigation, Defendants represented to this Court that Section 122 had no "obvious application" where problems "arise from trade deficits, which are conceptually distinct from balance-of-payments deficits." Reply Br. for Appellants, *V.O.S. Selections, Inc. v. Trump*, Fed.

---

[3] Defendants' assertion that "[n]o member of the Court in *Learning Resources* suggested that the construction of statutory authority asserted in that case violated the nondelegation doctrine" does not support its claim that the nondelegation doctrine plays a more limited role in the foreign policy realm. The Court in *Learning Resources* did not address nondelegation because six members of the Court held that the text of IEEPA clearly did not authorize tariffs. There was no need to address whether IEEPA improperly delegated the tariff power to the President. It did not delegate any tariff power to the President at all.

9

Cir. No. 25-1812, Doc. No. 147, at 13. It even cited legislative history to show that a large trade deficit could exist simultaneously with a payments *surplus*. *Id.* at 13–14 (quoting S. Rep. 93-1298, at 89).

Defendants ignore their own contradictory position in the IEEPA litigation and accuse "many of the plaintiffs here" of asserting the position that Section 122 encompasses situations like this. Mot. Stay 16. But *none* of the Importer Plaintiffs who prevailed in the CIT to enjoin the Section 122 tariffs against them—the injunction Defendants' motion seeks to stay—were involved in that IEEPA litigation. Defendants' argument that this Court should stay the CIT's injunction against the Importer Plaintiffs because *other plaintiffs[4]* purportedly took a contradictory position in different litigation is unfounded.

And Defendants' argument that the CIT itself took a contradictory position in the IEEPA litigation is misplaced. Mot. Stay 16. The CIT did not endorse the view that Section 122 permits the President to impose

---

[4] Defendants even go so far as to cite a Brief for Private Respondents before the Supreme Court in *Learning Resources v. Trump*. Mot. Stay 17. But none of those private respondents are parties in this litigation. Defendants apparently seek to hold the Private Plaintiffs in this case accountable for arguments their counsel made on behalf of different clients in different litigation.

tariffs in response to trade deficits generally. Instead, it held that if the President seeks to impose tariffs in response to balance-of-payments concerns, he "must conform with the limits of Section 122." *V.O.S. Selections, Inc. v. Trump*, 772 F. Supp. 3d 1350, 1375 (Ct. Int'l Trade 2025). Even so, the CIT's holding regarding Section 122 in the IEEPA litigation was never affirmed by this Court or the Supreme Court. *See Learning Res.,* 146 S. Ct. 628 (2026); *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025).

It is noteworthy, then, given Defendants' position on Section 122 during the IEEPA litigation, that the President invoked Section 122 only after the Supreme Court invalidated the IEEPA tariffs—on the same day as that Court's opinion—indicating that the President had planned to use Section 122 to impose tariffs if the courts prevented his use of IEEPA. Although Section 122 directs the President to act when large and serious balance-of-payments deficits exist, the President took no action until after his preferred IEEPA tariffs were declared unlawful. That timing strongly suggests that Section 122 is being used as a fallback policy tool—not as a response to a qualifying statutory condition. And historical practice further undermines the President's

11

reading: no prior administration has interpreted Section 122 to authorize tariffs based on a trade deficit.

The Government's reliance on the dissent does not help its likelihood-of-success argument. Judge Stanceu's dissent does not adopt the Government's interpretation of "balance-of-payments deficits" or conclude that the Proclamation was lawful. Rather, the dissent would have denied summary judgment on procedural grounds—arguing the majority should have provided additional notice under USCIT Rule 56(f) before deciding the case on the specific interpretive grounds it adopted. But the majority directly addressed and rejected that concern, finding that both the parties' briefing and oral argument gave Defendants full notice of the statutory interpretation issues the CIT resolved. Merits Op. 44 n.37. The mere existence of a dissent does not establish a serious legal question, particularly where the disagreement concerns a point of procedure rather than the merits. And notably, Judge Stanceu concurred in the CIT's denial of the stay, agreeing that the equitable factors weigh decisively in favor of denying Defendants' motion. Stay Op. 11 n.12.

12

Defendants have not made the strong showing that they are likely to succeed on appeal required to justify a stay.

## II.    The Government will not suffer irreparable harm.

The Government claims it will suffer irreparable harm absent a stay for three reasons: (1) the injunction interferes with the President's policy with foreign affairs implications; (2) refunding tariff duties will cause unrecoverable financial losses; and (3) compliance will impose severe administrative burdens on CBP. *See* Mot. Stay 22–25. None of these arguments establishes irreparable harm.

The Government is not harmed by an injunction preventing it from imposing unlawful tariffs because "[o]f course the government has no legitimate interest in upholding an unconstitutional system." *United States v. U.S. Coin & Currency*, 401 U.S. 715, 726 (1971) (Brennan, J., concurring).

Defendants contend that they are irreparably harmed by an injunction against the President's policy with foreign affairs implications. Mot. Stay 22 (citing *Trump v. Orr*, 146 S. Ct. 44, 46 (2025)). But *Orr* is inapposite. It addressed irreparable harm from a *universal* injunction that "likely exceed[ed] the authority conferred by

13

the Judiciary Act." *Trump v. CASA, Inc.*, 606 U.S. 831, 859–60 (2025). The CIT's injunction, by contrast, is party-specific—limited to two private companies and one state government. Stay Op. 10.

Further, the President has no independent constitutional authority to impose tariffs, regardless of whether he characterizes them as foreign affairs or national security. The existence of policy objectives does not create irreparable harm where the underlying action is unlawful; "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021). The Constitution vests Congress with the exclusive power to lay and collect duties and imposts. U.S. Const. art. I, § 8, cl. 1. Congress delegated that power to the President only under certain limited conditions—specifically, "to deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a)(1). The CIT held that the President's "use of trade and current account deficits to stand in the place of balance-of-payments deficits within the meaning of the statute renders the Proclamation *ultra vires*," and "the tariffs imposed on Plaintiffs are unauthorized by law." Merits Op. 46 (emphasis in original).

14

The Government argues that absent a stay, importers and foreign producers "will have a strong incentive to accelerate shipments into the United States" during the remaining period before the Section 122 tariffs expire, thereby "invit[ing] additional imports during the very period in which the United States is attempting to stabilize its trade position." Mot. Stay 22–23. According to Defendants, "the harm to the Nation's trade policy cannot be repaired later." Mot. Stay 22 (quotations omitted). Beyond ignoring the limited nature of the injunction, Defendants fail to explain why the same acceleration of imports it fears would not occur when the tariffs expire naturally in a matter of weeks. That result would be identical whether the tariffs are enjoined or simply lapse on their own terms; therefore, the Government cannot show irreparable injury from enjoining them now.

Defendants' fear that the injunction will endanger the Government's ability to finance its spending, erode investor confidence in the economy, and distress financial markets is overblown. Mot. Stay 23. But the injunction applies only to the Importer Plaintiffs. Defendants claim that the limited nature of the injunction does not matter because other plaintiffs will seek similar relief. Mot. Stay 23. But a motion for a stay

15

must address the injunction actually issued—not one the Government fears might be issued in other cases. Speculative or hypothetical injuries do not constitute irreparable harm. *Nken*, 556 U.S. at 434–35 (a "possibility" of irreparable injury is insufficient). The CIT correctly declined to "constrain the relief available to the three successful Importer Plaintiffs based only on speculation." Stay Op. 8.

Moreover, non-parties could seek relief regardless of whether a stay is granted. And the Government does not explain why it would be precluded from seeking a stay in later-filed cases if broader impacts actually materialize. Indeed, the CIT stayed follow-on cases after its IEEPA decision. *See In re: Procedures for Entering a Stay in New IEEPA Tariff Cases*, Admin. Order 25-02 (Ct. Int'l Trade Dec. 23, 2025). Having successfully opposed a universal injunction, the Government cannot now rely on the anticipated administrative burden of individual suits as a basis for a stay.

Defendants complain that the injunction, if not stayed, would undermine the progress in negotiations with our trading partners. Mot. Stay 23. Again, this scenario is speculative, *see Nken*, 556 U.S. at 434–35, and it is one of the President's own making. The President cannot

act illegally as a matter of policy convenience, be ordered to stop, and then claim reliance on that same conduct as a basis for equitable relief.

Moreover, a stay would not significantly enhance the President's negotiating position or his leverage. It would not erase the judgment; foreign counterparts are aware that the tariffs have been held unlawful and may not endure. *See* Stay Op. 6, n.7. And the consequences to the President's negotiating position would be much greater if this Court issued a stay and later affirmed the CIT's holding, because U.S. credibility would suffer still greater damage after months of additional negotiations based on an unlawful premise. In any event, the injunction applies only to the Importer Plaintiffs. And Section 122 tariffs only last for 150 days unless extended by Congress—a fact well known to any sophisticated trading partner of the United States.

The Government contends that it will suffer "unrecoverable financial losses" because, even if it prevails on appeal, CBP "may not be able to retroactively collect the outstanding Section 122 duties" due to its continuous bonding formula being insufficient to "cover the full amount of Section 122 duties subsequently assessed." Mot. Stay 24. This claim is difficult to reconcile with the record. The injunction applies to only

17

three Plaintiffs, and the Section 122 tariffs would have expired naturally in a matter of weeks without the injunction. The Government effectively contends that CBP, an agency that processes trillions of dollars in annual trade and tracks millions of import entries, cannot determine what three specific companies imported during a brief window and assess the corresponding duties. And, as the CIT explained, CBP retains the authority to "extend the 1-year statutory period for liquidation for an additional period not to exceed 1 year" and may extend liquidation for up to three years. Stay Op. 7 (quoting 19 C.F.R. § 159.12(a)(1)(i), (e)). CBP can thus ensure its ability to collect Section 122 duties if the Government ultimately prevails, and any concerns about nonpayment are speculative. Stay Op. 7.

The Government also argues that the injunction would "impose severe burdens on CBP," which is "already facing the daunting task of dealing with the aftereffects of the invalidation of the IEEPA tariffs." Mot. Stay 25. But the Government cannot "be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976). CBP's administrative challenges stem from the Government's own pattern of imposing tariffs later held unlawful. The

18

Government cannot use its own delay in refunding previously invalidated IEEPA tariffs as a justification to continue imposing new, separate, and equally unlawful duties.

Moreover, the Government cannot seriously contend that implementing an injunction vis-à-vis three plaintiffs is an unworkable burden. The CIT correctly found that these concerns are "purely speculative," and appropriately refused to constrain relief based on administrative inconveniences of the Government's own making. Stay Op. 7–8.

Defendants' claimed injuries are either speculative or at most administrative inconveniences that do not rise to the level of irreparable harm. Because the Government has no legitimate interest in the continued enforcement of an ultra vires proclamation—and no equitable basis to use such tariffs as diplomatic leverage—this factor weighs heavily against a stay.

## III. Private Plaintiffs will suffer substantial harm if a stay is granted.

Defendants imply that a stay would subject Private Plaintiffs only to monetary harm from paying tariffs, stating that "a stay would not cognizably harm plaintiffs" because "plaintiffs' financial losses from

19

tariffs paid during the appeal *could* be repaired if plaintiffs ultimately prevail." Mot. Stay 25 (emphasis in original). But that characterization ignores both the record and the CIT's decision to grant injunctive relief. The record shows that the harm to Private Plaintiffs caused by the President's unlawful tariffs goes well beyond the mere payment of tariffs. *See* Compl., ECF No. 2, ¶¶ 77–93; Pls.' Mot. Prelim. Inj. and/or Summ. J., ("Pls.' MSJ"), ECF No. 11, at 35–38, Exs. A–B; Pls.' Reply Br. in Support of Prelim. Inj. and Mot. Summ. J., ("Pls.' Reply"), ECF No. 22, at 25–26.

The tariffs will continue to force Plaintiff Burlap & Barrel to reduce investment by scaling back hiring, shipping, and corrugated packaging. Pls.' MSJ 36. They have forced Burlap & Barrel to pause innovation, new product development, new partnerships, and special projects. *Id.* To offset the tariffs, Burlap & Barrel would need to consider price increases, threatening its market position and damaging its reputation with customers. *Id.* at 36–37. These operational disruptions—including inventory shortages, supply chain instability, and the loss of long-term partners and contracts—constitute damages that cannot be undone by a later refund. *Id.* at 37; Pls.' Reply 26.

Similarly, Basic Fun! will be irreparably harmed by the continued imposition of Section 122 tariffs. It cannot raise prices without jeopardizing its market position. Pls.' Reply 26. The tariffs have already reduced its profit margins, increasing its risk of breaching loan covenants, which in turn could trigger costly renegotiation of its financing. Pls.' MSJ 37. Basic Fun! has delayed or canceled potential acquisitions and growth opportunities, stopped hiring, reduced bonuses, and limited new investments. *Id.* These constraints on growth, financing, and operations are not recoverable through a later refund.

These losses—lost business opportunities, reputational damage, and loss of goodwill—are precisely the kind that cannot be addressed by money alone. *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). The CIT recognized as much in granting an injunction rather than merely ordering a refund. Merits Op. 50–51 ("economic harm to Importer Plaintiffs takes several forms" including "lost profits and damage to business relationships, investments, and innovation"). And in denying Defendants' motion for a stay, the CIT found that a "stay will compound [Private Plaintiffs'] losses, such as lost profits and damage to business relationships, investments, and innovation as a

21

result of the Section 122 tariffs." Stay Op. 8–9 (internal quotation omitted). Indeed, "[i]t is difficult to see how continuing to pay unlawful Section 122 duties to the Government only to wait months, if not years, for any refund would not qualify as substantial injury." Stay Op. 8. Defendants' motion does not meaningfully engage with these harms and offers no evidence to rebut Private Plaintiffs' showing of irreparable injury.

Further, there is reason to doubt Defendants' assurance about refunds. In the IEEPA litigation, Defendants secured a stay by assuring this Court that refunds would be available if the tariffs were invalidated. But after the Supreme Court invalidated those tariffs, Defendants sought to delay refunds and indicated that the scope and mechanics of refunds remained unresolved, while CBP represented that it could not immediately implement refund-related relief. *See, e.g.,* Opp. Mot. Immediate Issuance of Mandate at 3, *V.O.S. Selections, Inc. v. Trump*, No. 25-1812 (Fed. Cir.); Defs.' Resp. in Opp'n at 9, *Atmus Filtration, Inc. v. United States*, Ct. No. 26-01259 (Ct. Int'l Trade Mar. 2, 2026). "As that experience shows, . . . there may be significant delays from the time the imposition of tariffs are first held unlawful before

22

refunds are effectuated." Merits Op. 50 n.40. Even after a definitive judicial ruling, refunds may be delayed for months.

A stay would substantially harm Private Plaintiffs. Defendants' suggestion that refunds with interest would fully remedy those harms is incorrect as a matter of law and fact.

## IV.    The public interest will be harmed if the stay is granted.

Defendants do not meaningfully address the public interest factor. Instead, they imply that the Government's interest and the public interest are one and the same. Mot. Stay 25.

"The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). The President has no independent authority to impose tariffs, regardless of how important he believes they might be to national security, the economy, or military preparedness. *See* U.S. Const. art. I, § 8, cl. 1; *Learning Res.*, 146 S. Ct. at 638. "[A]nd it is thus 'up to Congress, not the [Executive], to decide whether the public interest merits further action' in response to well-intended but unlawful

23

executive action." Stay Op. 10 (quoting *Ala. Ass'n of Realtors*, 594 U.S. at 766).

The public interest favors allowing the injunction to take effect. A stay would prolong the very harms the CIT has found warrant injunctive relief. Granting a stay would subject the Importer Plaintiffs—and by extension, American consumers—to higher costs and supply chain instability resulting from an unlawful tax that the CIT has already set aside. A stay would not preserve the status quo; it would perpetuate a state of illegality. The relevant status quo is the legal landscape that existed before the President's *ultra vires* Proclamation. "The issuance of an injunction does not undermine [the public] interest, it merely maintains the status quo," *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1372 (Ct. Int'l Trade 2021). Here, that status quo is the absence of Section 122 tariffs.

## Conclusion

Defendants seek to continue collecting tariffs the CIT has held unlawful based on speculative harm and administrative convenience. Defendants' motion for a stay should be denied. Defendants have not made a strong showing that they are likely to succeed on appeal and

24

will not be irreparably harmed without a stay. Meanwhile, the Private Plaintiffs will be substantially harmed by a stay. And the public interest favors denying the motion for a stay. This Court should deny the motion and lift the administrative stay, allowing the CIT's judgment to go into effect.

Dated: May 28, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
James McQuaid
Liberty Justice Center
7500 Rialto Blvd.
Suite 1-250
Austin, Texas 78735
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org

## Certificate of Compliance

I, Jeffrey M. Schwab, hereby certify that this brief complies with the 5,200-word limitation set forth in Fed. R. App. P. 27(d)(2)(A) because this brief contains 4,800 words. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

Respectfully submitted

Dated: May 28, 2026                    /s/ Jeffrey M. Schwab

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1805

**Short Case Caption** Burlap and Barrel, Inc. v. Trump

**Filing Party/Entity** Plaintiffs-Appellees

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/22/2026

Signature: /s/ Jeffrey M. Schwab

Name: Jeffrey M. Schwab

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Burlap and Barrel, Inc. | Not applicable | None |
| Basic Fun, Inc. | Not applicable | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

28

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable             ☐    Additional pages attached

| | | |
|---|---|---|
| James McQuaid | | |
| Jesse Leon | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable             ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |