# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

THE STATE OF OREGON, THE STATE OF ARIZONA, THE STATE OF CALIFORNIA, THE STATE OF NEW YORK, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF ILLINOIS, THE OFFICE OF THE GOVERNOR *ex rel.* ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky, THE STATE OF MAINE, THE STATE OF MARYLAND, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF NEVADA, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NORTH CAROLINA, JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, THE STATE OF RHODE ISLAND, THE STATE OF VERMONT, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, THE STATE OF WISCONSIN,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, THE UNITED STATES, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner for U.S. Customs and Border Protection,

Defendants-Appellants.

BURLAP AND BARREL, INC., BASIC FUN, INC.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner for U.S. Customs and Border Protection, JAMIESON GREER, in his official capacity as United States Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,

Defendants-Appellants.

On Appeal from the United States Court of International Trade
Nos. 26-1472, -1606, Judges Barnett, Kelly, and Stanceu

## REPLY IN SUPPORT OF EMERGENCY MOTION
## FOR A STAY PENDING APPEAL

BRETT A. SHUMATE

*Signature block continued on inside cover*        *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
DOUGLAS C. DREIER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7264*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4452*

# TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................... 1

I.  The Government Is Likely To Prevail On The Merits ............................ 1

II. The Equitable Factors Favor A Stay ....................................................... 7

CONCLUSION ............................................................................................... 14

CERTIFICATE OF COMPLIANCE

Neither plaintiffs nor the CIT have identified any persuasive basis for denying a stay. The merits of this case lopsidedly favor the government, and denying a stay would harm the government, and the public, more than a stay would harm plaintiffs.

## ARGUMENT

## I. The Government Is Likely To Prevail On The Merits

As our motion explains, the statutory text, context, and history support interpreting "balance-of-payments deficit[]," 19 U.S.C. § 2132(a)(1), to mean "balance-of-payments deficit as determined using an economically reasonable methodology." Plaintiffs do not dispute that "balance-of-payments deficit[]" is a term of art with various economically reasonable meanings. Nor do they dispute that technical terms in statutes are understood to "carry 'technical meaning[s].'" *Van Buren v. United States*, 593 U.S. 374, 388 (2021). Nor do they dispute that the President's proclamation rests on an economically reasonable methodology. The government is therefore likely to prevail.

**1.** Tellingly, plaintiffs cannot agree on any textually sound alternative interpretation. Plaintiffs abandon their argument below that a "balance-of-payments deficit[]" exists only when the *overall* value of the balance is

negative.  That cannot be right because, as the State plaintiffs recognize (Opp. 7), "the overall balance … necessarily sums to zero."

The private plaintiffs embrace the CIT's novel interpretation, one that no plaintiff offered below.  But they offer no sounder rationale; they simply recapitulate (Opp. 5) the CIT's account of legislative history.

The States advance a variation of their argument below.  They now seem to acknowledge that the President could invoke Section 122 if he identifies a "risk to U.S. reserve assets in a fixed-exchange-rate system" (Opp. 15), even if the overall balance of payments is (as always) zero.  But the United States has not used a fixed-exchange-rate system since before the enactment of Section 122.  Mot. 7-8.  At the time of enactment, and since, the dollar's exchange rate has been floating.  The States' interpretation would thus render Section 122 just as much a nullity as the interpretation they offered below.

From the States' perspective, that is a feature rather than a bug.  Their basic theory (Opp. 9, 11-12) is that Congress knew Section 122 would be inoperative in a floating-rate system and enacted it only as a prophylactic in case a fixed-rate system someday returned.

That account is as implausible as it sounds. That is clear from, among other sources, the same paragraph of the Senate Report that the States selectively quote. The States assert that the "Report expressly recognized that Section 122 was 'not likely to be utilized' if a floating-exchange-rate system prevailed." Opp. 12 (quoting B71). But when the Report stated that "under present circumstances [the Section 122(a)] authority is not likely to be utilized" (B70-71), it was not referring to the floating-rate system, which it did not mention. It was referring to the fact that the "large balance of payments deficits" created by a "rapid increase in oil prices" could be addressed by other means, including price declines and "international monetary cooperation." *Id.* And the fact that the Report found it "necessary that the President have authority to impose surcharges and other import restrictions for balance of payments reasons[,] even though under present circumstances such authority [was] not likely to be utilized," *id.*, confirms that Congress *did* expect Section 122 to serve an important function after the floating-rate transition—not, as the States suggest, that Section 122 was meant to be a dead letter from its enactment.

The other legislative-history source on which the States base their theory—a paragraph in the 1974 Economic Report of the President (Opp. 12

(citing B74)) — does no more for them.  That paragraph says that, under a floating-rate system, "measurement of the overall balance of payments" no longer serves the function of "signal[ing] to policy makers when a given exchange rate ha[s] become untenable."  B74.  But it does not say balance-of-payments deficits cannot exist under a floating-rate system; as noted above, the Senate Report says otherwise (B70).  And other contemporaneous evidence makes clear that balance-of-payments measurements were still necessary after the floating-rate transition; they simply served different purposes than before.  *See* A134-135 (discussing a 1975 article published by the Federal Reserve Bank of New York).

Finally, the States' theory ignores the indications (Mot. 14-15) that Congress enacted Section 122 to ensure that future Presidents could respond — even after the floating-rate transition — to problems like ones that had motivated President Nixon's 1971 surcharge.

**2.** Plaintiffs' responses to our interpretation are no more persuasive.

Plaintiffs characterize our motion as "assert[ing] that the term 'balance-of-payments deficit' can mean any 'deficit of some subset of the overall balance.'"  Private Opp. 7-8 (quoting Mot. 14); *see* States' Opp. 7.  That

misreads our motion. Our motion starts (at 14) from the premise that, "[b]ecause a 'balance-of-payments deficit[]' cannot mean a negative value of the overall balance of payments, it must refer to a deficit of some subset of the overall balance." (As noted above, plaintiffs now agree with this point.) But our motion does not stop there; it goes on to explain that "[t]he best reading of the statute is that it allows the President to act in response to circumstances that constitute a 'balance-of-payments deficit' within an economically reasonable understanding of that phrase." Mot. 20.

That is what the President did here. Just a year after Section 122's enactment, an article published by the Federal Reserve Bank of New York—and cited here by the Chair of the President's Council of Economic Advisers (A134-135 & n.13)—explained that there were "seven different measures … in standard use" at the time, one of which, the "merchandise trade balance," was "the most familiar and well-defined." Kuwayama, *Measuring the United States Balance of Payments*, Fed. Res. Bank. N.Y. Monthly Rev., Aug. 1975, at 183, 183-134, *available at* https://perma.cc/BVL8-9GUG; *see id.* at 184-189 (describing all seven). At least four of the seven—merchandise trade, goods and services, current account, and basic balance—are running deficits today. *See* A130-140. And by 1975, the other three were deemed "arbitrary," having

"lost all possible relevance," and "not … useful … for the United States." Kuwayama, *supra*, at 188-189 (discussing net-liquidity, gross-liquidity, and official-settlements balances). The deficits in trade and the current account (mirrored by the basic balance) that the President identified here are thus prototypical balance-of-payments deficits widely recognized when Section 122 was enacted.

Plaintiffs likewise err in suggesting (States' Opp. 7-8; Private Opp. 4-5) that our interpretation conflates trade deficits with balance-of-payments deficits. The President's proclamation does not identify a balance-of-payments deficit as arising solely from a trade deficit; it identifies other components of the problem as well. Mot. 14; *see* Mot. 9 (discussing the proclamation). For that reason, the private plaintiffs err in suggesting (Opp. 9-10) that our position conflicts with anything we said in the IEEPA litigation. And the States do not join the charge of inconsistency—wisely, since their argument plainly conflicts with arguments they made in the IEEPA case (*see* Mot. 16-17).

With those misreadings corrected, plaintiffs' other criticisms fall away. Our interpretation does not "confer unfettered discretion" on the President (States' Opp. 14). It simply allows him to choose from among economically

reasonable methodologies—which is what Congress intended, as our motion explains (at 18-19, 20), and is what the President did here, as explained above. For the same reason, Section 122 provides the guardrails required by the nondelegation doctrine, to the extent it applies here. *See* Mot. 20-21; *contra* Private Opp. 8. And finally, our position comports with the principle that courts are responsible for interpreting statutes. *See* Mot. 20; *contra* Private Opp. 3-4; States' Opp. 16-17. Congress is free to use a technical term of art, impliedly incorporating the term's technical meaning in the statute. Nothing restricts Congress to using only technical terms that have a single, fixed understanding in the field. And courts fulfill their role when they interpret statutes as incorporating technical meanings.

## II.    The Equitable Factors Favor A Stay

Neither the CIT nor plaintiffs have anything more compelling to say about the equities.

**1.** As our motion explains, the injunction would irreparably harm the government, and thus the public interest, for three reasons.

**a.** First, it undermines the government's trade policy by eliminating an important tool for navigating the transition between the IEEPA tariffs and any future trade actions the Administration may take. It also invites

importers and foreign producers to flood the market during any period when the injunction is in force, exacerbating the problems the President sought to address.  Indeed, because the Section 122 tariffs expire on July 24, and there is almost no chance of this Court's resolving the appeal before then, denying a stay would have the dispositive effect of negating the President's exercise of his time-limited authority for roughly a third of the time allowed.

The CIT's response, which plaintiffs regurgitate, was that this argument "fail[s] to address the limited nature of this injunction."  B6.  But other plaintiffs are nearly certain to seek and obtain similar relief.  At least two such complaints have already come in, *see Cleaner's Supply Inc. v. United States*, No. 26-cv-3012 (filed May 25, 2026); *Tarte Cosmetics v. CBP*, No. 26-cv-3022 (filed May 29, 2026), and the only evident reason other importers have not yet sued is that they are waiting to see whether this Court stays the injunction before they devote resources to obtaining immediate follow-on injunctions.  So if this Court denies a stay, the effects of the CIT's injunction are likely to stretch well beyond the three currently affected importers.

Plaintiffs do not dispute the likelihood of follow-on injunctions.  They suggest that this Court should wait to grant a stay until such "broad

impacts" come to pass.  States' Opp. 19; *see* Private Opp. 16.  But a stay is appropriate when "the applicant *will* be irreparably injured" without one, *Nken v. Holder*, 556 U.S. 418, 426 (2009) (emphasis added), not just when the injury has already happened; the point of a stay is to *prevent* the injury.  And as *Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024) (per curiam), *cert. denied*, 145 S. Ct. 2778 (2025), illustrates, courts appropriately consider the "inevitab[ility]" of follow-on suits in assessing the equities of a presently narrow injunction.  *See id.* at 247-248; Mot. 23. Judges need not "'blind'" themselves to what "'[a]ll others can see and understand.'"  *Trump v. Mazars USA, LLP*, 591 U.S. 848, 867 (2020).

The private plaintiffs suggest (Opp. 15) that any adverse consequences of denying a stay would occur regardless when these temporary tariffs expire.  But by then, the government may have invoked other authorities to prevent the harms.  As the Secretary of Commerce has explained, these tariffs are necessary not just to deal with the balance-of-payments deficit in general but to deal specifically with this period of "transition."  A177.

The CIT dismissed the asserted harm to the President's policy prerogatives, reasoning that it "fails to acknowledge Congress's constitutional role in the imposition of taxes and duties," "or the Judiciary's role in 'protect[ing]

Congress's constitutional authority from executive incursion.'" B6. But the question here is not, as in the IEEPA cases, whether Congress has delegated tariff authority to the President. Section 122 undisputedly does so. And as our motion explains, it should be equally clear that Congress wanted the President to have the sort of flexibility in invoking that authority that the CIT denied him. The CIT's injunction thus undermines, rather than protects, Congress's prerogatives.

Finally, plaintiffs argue (States' Opp. 18; Private Opp. 17) that a stay would not ameliorate any harm to U.S. trade policy caused by the CIT's having called the validity of the tariffs into question. But a stay would reflect this Court's view that the CIT is likely to be reversed, and two Cabinet members explain how it would mitigate the harms caused by the injunction. A167-171 (Ambassador Greer); A172-181 (Secretary Lutnick).

**b.** Second, the CIT's order could cause the government unrecoverable financial losses. In denying a stay, the CIT clarified that the order does not require the government to refund previously collected Section 122 tariffs until the point of liquidation, which the government can delay until this litigation concludes. B7. But the government identified a separate harm that the CIT did not address: Should the government prevail, the importers

protected by this or similar injunctions may lack sufficient funds to pay the Section 122 tariffs that the injunctions temporarily relieved them from paying. CBP requires importers to maintain a bond to cover their unpaid bills, among other things, but that bond is "not likely [to] cover the full amount of Section 122 duties." A184-185.

The CIT was silent on this concern, and plaintiffs' oppositions fail to dispel it. While the private plaintiffs characterize the concern as "speculative" (Opp. 18), they fail to offer any assurance—through declarations or otherwise—that they would (or could) pay the tariffs with interest if the government prevails. (Never mind the many other importers that will inevitably file follow-on suits.)

**c.** Finally, the injunction would severely burden CBP as it simultaneously manages IEEPA tariff refunds. A185-186. The CIT's response, again, was that the current injunction is narrow. But the CIT again failed to address the near-certainty of follow-on injunctions, except to say that "[i]f the court is faced with additional cases challenging the imposition of Section 122 duties," it "will determine whether any specific case management procedures or other forms of relief are required based on the facts at that time." B8. That makes little sense. That the denial of a stay will inevitably lead to

burdensome follow-on injunctions is a reason to grant a stay, not a reason to let the inevitable come to pass and consider a stay then.

**2.** Conversely, a stay would not cognizably harm plaintiffs, because—unlike the government's harms from the injunction—plaintiffs' losses from tariffs paid during the appeal *could* be repaired if plaintiffs prevail, assuming the tariffs are otherwise refundable.

The CIT responded with two points, which plaintiffs parrot. First, the CIT opined that "wait[ing] months, if not years, for any refund" of tariffs ultimately held unlawful would constitute "substantial injury" to plaintiffs. B8. But the point of interest accompanying refunds—as Congress provided, 19 U.S.C. § 1505(b)-(c)—is to compensate plaintiffs for that delay.

Second, the CIT suggested that a stay would cause the private plaintiffs to suffer "'lost profits and damage to business relationships, investments, and innovation.'" B8-9; *see* Private Opp. 20-21. But unlike the government, which submitted evidence of the harm it would suffer specifically from allowing the injunction to remain in force during this appeal, plaintiffs submitted no evidence as to their harms from a stay spanning that period (as opposed to their harms from the full duration of the tariffs). In any event, it is unclear how denying a stay would avert the harms that plaintiffs assert,

or how plaintiffs' assertion can be squared with the notion that they would pay the challenged tariffs if they ultimately lose. Plaintiffs apparently do not dispute their obligation to pay if they lose, so they must account for that risk in their operations. And if they do not account for that risk, and are thus left with obligations they cannot satisfy if the government ultimately prevails, then the government will be irreparably harmed by not collecting the tariffs now. In short, plaintiffs cannot have it both ways: Either they want to operate now in a manner inconsistent with the tariffs, leaving them potentially insolvent and unable to pay if they lose; or they would operate now in a manner that assumes they could lose, in which case the stay does not harm them.

## CONCLUSION

This Court should stay the CIT's judgment pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD

*/s/ Daniel Winik*
DANIEL WINIK
SOPHIA SHAMS
DOUGLAS C. DREIER
*Attorneys, Appellate Staff*
*Civil Division, Room 7245*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*Daniel.L.Winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This reply complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(C) because it contains 2,599 words. This reply also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik