**Nos. 2026-1804, -1805, -1928**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

STATE OF OREGON, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF NEW YORK, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, OFFICE OF THE GOVERNOR EX REL. ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WISCONSIN,

*Plaintiffs-Cross-Appellants,*

STATE OF WASHINGTON,

*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, UNITED STATES

*Defendants-Appellants.*

BURLAP AND BARREL, INC., BASIC FUN, INC.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, JAMIESON GREER, in his official capacity as U.S. Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,

*Defendants-Appellants.*

On Appeal from the United States Court of International Trade
Nos. 26-1472, -1606, Judges Barnett, Kelly, and Stanceu

## OPENING BRIEF FOR APPELLANTS

BRETT A. SHUMATE
*Assistant Attorney General*

*Signature block continued
on inside cover*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
DOUGLAS C. DREIER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7213*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2000*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..............................................................................iii

STATEMENT OF RELATED CASES ................................................................ ix

INTRODUCTION .............................................................................................1

STATEMENT OF JURISDICTION ...................................................................3

STATEMENT OF THE ISSUE ..........................................................................4

STATEMENT OF THE CASE...........................................................................4

      A.     Statutory Background.........................................................................4

      B.     Factual Background ..........................................................................10

      C.     Prior Proceedings ............................................................................12

SUMMARY OF ARGUMENT........................................................................15

ARGUMENT...................................................................................................18

Standard of Review .......................................................................................18

I.     The President's Imposition Of Tariffs Is Clearly Lawful Under A
      Proper Understanding Of Section 122.................................................... 19

      A.     The President's Proclamation Identifies A "Balance-of-
            Payments Deficit" Within The Meaning Of Section 122 ............19

            1.     A balance-of-payments deficit can be identified in a
                 variety of economically reasonable ways..........................20

            2.     The challenged proclamation identifies a balance-of-
                 payments deficit under an economically reasonable
                 methodology ...................................................................27

      B.     The CIT Erred In Substituting Its Reading Of The Legislative History For The Text Congress Enacted .......................................32

II.    The Challenged Proclamation Identifies A Balance-of-Payments Deficit Even Under The CIT's Interpretation ......................................... 45

CONCLUSION.............................................................................................52

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Azar v. Allina Health Servs.,*
587 U.S. 566 (2019) ................................................................................... 33

*Bostock v. Clayton County,*
590 U.S. 644 (2020) .............................................................................. 35, 36

*Brogan v. United States,*
522 U.S. 398 (1998) ................................................................................... 41

*Cargo of the Brig Aurora v. United States,*
11 U.S. (7 Cranch) 382 (1813) .................................................................. 44

*Doe v. Chao,*
540 U.S. 614 (2004) ................................................................................... 26

*Drummond v. Southern Co. Servs.,*
177 F.4th 1076 (11th Cir. 2026) ............................................................ 24, 25

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
545 U.S. 546 (2005) ................................................................................... 34

*FCC v. Consumers' Rsch.,*
606 U.S. 656 (2025) .............................................................................. 43, 45

*Federal Energy Admin. v. Algonquin SNG, Inc.,*
426 U.S. 548 (1976) ................................................................................... 43

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.,*
146 S. Ct. 1546 (2026) ...................................................................... 35, 36, 39

*Garland v. Cargill,*
602 U.S. 406 (2024) ................................................................................... 20

*Gundy v. United States,*
588 U.S. 128 (2019) ................................................................................... 44

*Hamdan v. Rumsfeld,*
548 U.S. 557 (2006) ................................................................................... 26

*HMTX Indus. LLC v. United States,*
156 F.4th 1236 (Fed. Cir. 2025) ...................................................... 44

*J.W. Hampton, Jr., & Co. v. United States,*
276 U.S. 394 (1928) ............................................................... 43-44

*Jennings v. Rodriguez,*
583 U.S. 281 (2018) .............................................................. 42, 45

*Learning Res., Inc. v. Trump,*
607 U.S. 229 (2026) ........................................................ 10, 44, 45

*Louisiana Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986) ................................................................... 21

*Maple Leaf Fish Co. v. United States,*
762 F.2d 86 (Fed. Cir. 1985) .................................................... 19

*Marshall Field & Co. v. Clark,*
143 U.S. 649 (1892) ................................................................... 44

*Oman Fasteners, LLC v. United States,*
125 F.4th 1068 (Fed. Cir. 2025) ................................................ 18

*Oncale v. Sundowner Offshore Servs., Inc.,*
523 U.S. 75 (1998) ..................................................................... 35

*Oregon v. Trump,*
2026 WL 1702442 (Fed. Cir. June 11, 2026) ........................ 15, 44

*PrimeSource Bldg. Prods., Inc. v. United States,*
59 F.4th 1255 (Fed. Cir. 2023) ................................................. 44

*Reichert v. Kellogg Co.,*
170 F.4th 473 (6th Cir. 2026) .............................................. 24, 25

*Sale v. Haitian Ctrs. Council, Inc.,*
509 U.S. 155 (1993) ................................................................... 43

*Sigvaris, Inc. v. United States,*
899 F.3d 1308 (Fed. Cir. 2018) ................................................ 18

*Stephens v. U.S. Airways Grp., Inc.*,
   644 F.3d 437 (D.C. Cir. 2011) ................................................. 24-25

*Thor Power Tool Co. v. Commissioner*,
   439 U.S. 522 (1979) ................................................................ 23, 24

*Transpacific Steel LLC v. United States*,
   4 F.4th 1306 (Fed. Cir. 2021) ...................................................... 40

*United States v. Curtiss-Wright Export Corp.*,
   299 U.S. 304 (1936) ...................................................................... 43

*United States v. Hansen*,
   599 U.S. 762 (2023) ...................................................................... 21

*V.O.S. Selections, Inc. v. Trump*,
   149 F.4th 1312 (Fed. Cir. 2025) .................................................. 10

*V.O.S. Selections, Inc. v. United States*,
   772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ......................... 10, 29

*Van Buren v. United States*,
   593 U.S. 374 (2021) ...................................................................... 21

*Vance v. Hegstrom*,
   793 F.2d 1018 (9th Cir. 1986) ................................................. 34-35

*Yoshida Int'l, Inc. v. United States*,
   378 F. Supp. 1155 (Cust. Ct. 1974), *rev'd*,
   526 F.2d 560 (C.C.P.A. 1975) ........................................................ 9

*Zemel v. Rusk*,
   381 U.S. 1 (1965) .......................................................................... 43

**Statutes:**

Trade Act of 1974,
   Pub. L. No. 93-618, 88 Stat. 1978 (1975).........................................9
      19 U.S.C. § 2132(a) ........................................................... 4, 9
      19 U.S.C. § 2132(a)(1) ................................. 2, 4, 15, 16, 19, 27
      19 U.S.C. § 2132(c)(1) .................................................. 9, 26, 31

8 U.S.C. § 1153(b)(5)(D)(ii)(II) ................................................................... 24

12 U.S.C. § 4612(a)(1) ................................................................................ 24

17 U.S.C. § 115(d)(10)(B)(iv)(I) .................................................................. 24

19 U.S.C. § 1677b(f)(1)(A) .......................................................................... 24

28 U.S.C. § 1295(a)(5) ................................................................................... 3

28 U.S.C. § 1581(i)(1)(B) ............................................................................... 3

28 U.S.C. § 1581(i)(1)(D) ............................................................................... 3

42 U.S.C. § 1395x(z)(1) ............................................................................... 24

**Regulatory Materials:**

Exec. Order No. 14257,
    90 Fed. Reg. 15041 (Apr. 7, 2025) ...................................................... 10

Proclamation No. 4074,
    85 Stat. 926 (1971) ............................................................................... 7

Proclamation No. 11012,
    91 Fed. Reg. 9339 (Feb. 25, 2026) ............................... 10, 11, 12, 16, 28, 46, 47

**Legislative Materials:**

114 Cong. Rec. 17717 (1968) ...................................................................... 38

H.R. Rep. No. 93-571 (1973) ............................................................... 27, 39, 40

S. Rep. No. 93-1298 (1974) ................................................................ 1-2, 14, 32, 40

Staff of S. Comm. on Fin., 93d Cong., *Staff Data and Materials
    on U.S. Trade and Balance of Payments* (Comm. Print 1974),
    https://perma.cc/UCE5-Z9M8 .......................................................... 37

*Tariff and Trade Proposals: Hearings Before the H. Comm. on Ways & Means*, 91st Cong. 2710 (1970) ..........................................38

Trade Reform Act of 1973,
    H.R. 6767, 93d Cong. (1973) .................................................................2, 26

**Other Authorities:**

CEA, *Economic Report of the President* (Apr. 2026),
    https://perma.cc/65DY-WE7D ....................................................... 48, 48-49

CEA, *Measuring Balance of Payments Deficits* (July 2026),
    https://perma.cc/GG4E-KZMH ..........................................................50, 51

Edwin L. Dale Jr., *U.S. Trade Deficit First Since 1888*,
    N.Y. Times, Jan. 26, 1972 ..................................................................... 7

*Document 76, Paper Prepared in the Department of the Treasury* (Sept. 10, 1971), *in 3 Foreign Relations of the United States, 1969-1976* (Bruce F. Duncombe ed., 2001),
    https://perma.cc/JTZ8-2KTU .......................................................................8

Poul Høst-Madsen, *What Does It Really Mean? – A Deficit in the Balance of Payments*, 3 Fin. & Dev. 171 (1966) ...............................22, 23

IMF, Annual Report 1952 (1952), https://perma.cc/W8DS-HEE5 ..............29

IMF, IMF External Sector Reports, https://perma.cc/5YQ7-ZUN4 ...........29

Donald S. Kemp, *Balance-of-Payments Concepts – What Do They Really Mean?*, Fed. Rsrv. Bank of St. Louis Rev. 14 (July 1975), https://perma.cc/2AP4-VN8C ...............................................29

Patricia H. Kuwayama, *Measuring the United States Balance of Payments*, Fed. Rsrv. Bank. of N.Y. Monthly Rev. 183 (Aug. 1975), https://perma.cc/BVL8-9GUG ............22, 29, 30, 43

Richard Nixon, *Address to the Nation Outlining a New
  Economic Policy: "The Challenge of Peace*,"
  The Am. Presidency Project (Aug. 15, 1971),
  https://perma.cc/22T2-F645 ..................................................................... 7-8

Richard Nixon, *Special Message to the Congress Proposing
  Trade Reform Legislation*, The Am. Presidency Project
  (Apr. 10, 1973), https://perma.cc/F9MQ-487F........................................8, 9

Off. of the Historian, U.S. Dep't of State, *Paper Prepared
  in the Department of the Treasury* (Sept. 10, 1971),
  https://perma.cc/JTZ8-2KTU ...............................................................31, 40

Antonin Scalia & Bryan Garner, *Reading Law: The
  Interpretation of Legal Texts* (2012)....................................................21

## STATEMENT OF RELATED CASES

No other appeal in or from the present civil action has previously been before this or any other appellate court.  The government is not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

## INTRODUCTION

A divided panel of the Court of International Trade (CIT) invalidated time-limited tariffs imposed by the President under Section 122 of the Trade Act of 1974 to deal with a large and serious balance-of-payments deficit. The CIT did so even though the Supreme Court contemplated that the President might proceed on this path after his tariffs under the International Emergency Economic Powers Act (IEEPA) were invalidated, even though the CIT itself determined in the IEEPA cases that Section 122 would apply in this circumstance, and even though the plaintiffs there — including some of the plaintiffs here — repeatedly argued as much.

The CIT's ruling hinges not on the text Congress actually enacted, but on (1) a definition of the balance of payments included in a prior unenacted version of the bill and (2) the headings in a table in a Senate committee report on the enacted version of the Act:

TABLE 3.—U.S. TRADE AND BALANCE OF PAYMENTS, 1960-74

[In billions of dollars]

| U.S. trade position | | | | Trade balance | | Balance of payments | | |
|---|---|---|---|---|---|---|---|---|
| Exports (X) | | Imports (M) | | | C.i.f. (M) excluding foreign aid (X) | | Official settlements [3] | Basic balance |
| Total | Minus foreign aid | F.o.b. | C.i.f.[1] | F.o.b. | | Liquidity [2] | | |

From the fact that the table includes "[l]iquidity," "[o]fficial settlements," and "[b]asic balance" as subcategories under "[b]alance of payments," S.

Rep. No. 93-1298, at 8 (1974)—and the fact that the latter two were included in the definition of "balance of payments" in the prior unenacted bill, *see* Trade Reform Act of 1973, H.R. 6767, 93d Cong. § 401(b)(1) (1973)—the majority inferred that when Congress authorized tariffs "to deal with large and serious United States balance-of-payments deficits," 19 U.S.C. § 2132(a)(1), it must have been referring only "to deficits in (1) liquidity, (2) official settlements, or (3) basic balance." Appx33; *see* Appx36.

That sort of reasoning has not been recognizable as sound statutory interpretation for decades. It virtually ignores the statutory text and the backdrop against which Congress was acting, both of which make clear that, whatever else a "balance-of-payments deficit[]" might include, it certainly includes the problem the President identified here. And even on its own terms, the majority's interpretation of the legislative history is unpersuasive. As the CIT dissent explains, the history actually shows that "Congress understood … our country's payments balance could be measured in different ways that produce different results," Appx69, and the natural inference from Congress's choice not to define "balance of payments" in Section 122—after a prior version of the legislation had defined it—is that Congress meant to allow the President to choose among reasonable economic methodologies.

In any event, the challenged proclamation would pass muster even under the CIT majority's understanding of Section 122. As the dissent noted, the majority erred in not allowing the government to make that case after it adopted an interpretation of the statute that no party had offered until the CIT judges themselves suggested it at oral argument. Appx81-83. Even if this Court accepts the CIT's interpretation, it should still reverse the judgment on this ground, or at a minimum remand for further proceedings before the CIT.

## STATEMENT OF JURISDICTION

The CIT had jurisdiction because this is a civil action against the federal government "that arises out of any law of the United States providing for … tariffs … on the importation of merchandise for reasons other than the raising of revenue," 28 U.S.C. § 1581(i)(1)(B), or "any law of the United States providing for … administration and enforcement with respect to" such tariffs, *id.* § 1581(i)(1)(D). The CIT entered final judgment on May 7, 2026. Appx114-115. The government filed a timely notice of appeal the next day. Appx258-260; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUE

Whether the CIT erred in concluding that the challenged presidential proclamation failed to identify a balance-of-payments deficit under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132(a)(1).

## STATEMENT OF THE CASE

### A.    Statutory Background

This case concerns Section 122 of the Trade Act of 1974, which authorizes the President to impose tariffs "to deal with large and serious United States balance-of-payments deficits," so long as they do not "exceed 15 percent ad valorem" and do not last for more than "150 days (unless such period is extended by Act of Congress)." 19 U.S.C. § 2132(a).

**1.** The balance of payments is an accounting system that summarizes a country's financial transactions with other countries. Appx98. Under modern accounting methodologies, transactions are tracked in three accounts: current, capital, and financial. Appx144; *see also* Appx100.

The current account tracks (i) revenue from exports, less expenditures on imports; (ii) primary income, comprising investment income and labor compensation from abroad; and (iii) secondary income, comprising unilateral transfers such as insurance payments, foreign aid, and remittances.

Appx225. In other words, it tracks the *current* flow of money into and out of the United States. If the United States sends more money overseas for imports than it receives as revenue for exports, and if that deficit is not counterbalanced by other forms of current income from abroad, like salaries, dividends, and interest paid overseas to U.S. workers and nationals, then the balance of the current account will be negative.

The capital and financial accounts record assets and liabilities as opposed to current monetary flows. The capital account, universally acknowledged to be small relative to the current account, records capital transfers between the United States and foreign countries, such as debt forgiveness, migrants' transfers, and acquisitions and disposals of nonproduced nonfinancial assets. Appx70 n.11; Appx112. The financial account records financial transactions between the United States and foreign countries, including deposits and direct investment. Appx70 n.11. Many components of the financial account are highly liquid and can exhibit volatile behavior, especially in today's economy. Appx234-235.

It is well established in economics, and undisputed here, that the overall balance of payments is necessarily zero. Appx223. If there is a negative balance in the current account (*i.e.*, if the United States is sending more

- 5 -

money overseas than it is receiving from overseas), there must be a correspondingly positive balance in the capital and financial accounts (*i.e.*, foreign countries must be investing more in U.S. assets than the United States is investing in foreign assets).  If the balance of payments does not appear to be zero in figures reported by the government, that is because accounts are constructed "from separate and imperfect data sources."  Appx223.

For that reason, economists use the phrase "balance-of-payments deficit" to refer not to a negative value of the overall balance of payments but to a deficit in a particular subset of transactions that make up the overall balance of payments.  *See, e.g.*, Appx223.  Measuring a balance-of-payments deficit requires choosing which subset is economically relevant for the question at hand.  *See, e.g.*, Appx234-235.

**2.**    Before 1973, the exchange rate of the U.S. dollar was "fixed." Appx229.  Under what was known as the "Bretton Woods" system, Congress set the dollar's value at one thirty-fifth of the value of an ounce of gold. Appx93.  Other countries pegged the value of their currencies to the U.S. dollar.  *Id.*  And, as a corollary to the fixed value of the U.S. dollar, the U.S. government guaranteed that it would buy or sell gold at $35 per ounce. Appx93.

By the 1960s, a surplus of U.S. dollars caused the dollar to become overvalued.  Appx93.  Fearing that the United States did not have enough gold to cover the volume of dollars in worldwide circulation, traders in foreign markets began to sell dollars, resulting in periodic runs on the dollar that in turn exacerbated the crisis.  Appx93-94.  In 1971, the United States recorded a trade deficit for the first time since 1888.  Edwin L. Dale Jr., *U.S. Trade Deficit First Since 1888*, N.Y. Times, Jan. 26, 1972, at 45.

Confronted with this impending disaster, President Nixon suspended the convertibility of the dollar into gold in 1971 and imposed a 10% tariff on certain imports.  Proclamation No. 4074, 85 Stat. 926 (1971).  He determined that a "prolonged decline in the international monetary reserves" of the United States over a number of years had "seriously threatened" its "international competitive position" and potentially impaired its ability to ensure national security.  *Id.* at 926.  And in addressing the Nation regarding the imposition of tariffs, President Nixon explained that America's "trade balance ha[d] eroded over the past 15 years" and that a temporary tariff was necessary to address "the unfair edge … of … foreign competition" and make "the product of American labor … more competitive."  Richard Nixon, *Address to the Nation Outlining a New Economic Policy: "The Challenge of Peace,"*

- 7 -

The Am. Presidency Project (Aug. 15, 1971), https://perma.cc/22T2-F645. The Nixon Administration recognized that the trade deficit was the key driver of the balance-of-payments crisis, stating that "erosion of the merchandise trade position has been a primary element in the unsatisfactory U.S. balance of payments." *See Document 76, Paper Prepared in the Department of the Treasury* (Sept. 10, 1971), *in 3 Foreign Relations of the United States, 1969-1976* (Bruce F. Duncombe ed., 2001), https://perma.cc/JTZ8-2KTU.

After President Nixon took action to address the immediate crisis, a series of international agreements culminated in a March 1973 agreement that ended the Bretton Woods system. Appx94. Since that time, the United States has used a floating exchange rate, under which the value of the dollar is determined in the market through supply and demand, rather than pegged to some other index.

Although the immediate crisis had passed, and the exchange rate was no longer fixed (as it had been at the inception of the crisis), President Nixon—in response to litigation challenging his tariffs—sought explicit statutory authorization for such tariffs in the future. Richard Nixon, *Special Message to the Congress Proposing Trade Reform Legislation*, The Am. Presidency Project (Apr. 10, 1973), https://perma.cc/F9MQ-487F. Specifically, he

"request[ed] more flexible authority to raise or lower import restrictions on a temporary basis to help correct deficits or surpluses in [the Nation's] payments position." *Id.* The need for explicit statutory authority became even clearer after the CIT's predecessor concluded that President Nixon had lacked authority for the tariffs. *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155 (Cust. Ct. 1974), *rev'd*, 526 F.2d 560 (C.C.P.A. 1975).

**3.**     Against this backdrop, Congress enacted the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975), which contained Section 122. As relevant here, Section 122 provides that, "[w]henever fundamental international payments problems require special import measures to restrict imports … to deal with large and serious United States balance-of-payments deficits, … the President shall proclaim, for a period not exceeding 150 days" unless extended by Congress, "a temporary import surcharge, not to exceed 15 percent ad valorem," added onto any existing duties on imported articles. 19 U.S.C. § 2132(a). It also authorizes the President to reduce duties or raise import quotas to "deal with large and persistent United States balance-of-trade surpluses." *Id.* § 2132(c)(1). At Section 122's enactment, as now, the United States had a floating rather than fixed exchange rate system.

- 9 -

### B.    Factual Background

**1.**    In April 2025, President Trump found that "large and persistent annual U.S. goods trade deficits" threatened the Nation.  Exec. Order No. 14257, 90 Fed. Reg. 15041, 15041 (Apr. 7, 2025).  The President acted to, among other things, "rebalance global trade flows" by imposing tariffs on certain "imports from all trading partners," *id.* at 15045, asserting authority to impose those tariffs under IEEPA.

The CIT invalidated those tariffs, including on the ground that because they "respond[ed] to an imbalance in trade," which the CIT described as "a type of balance-of-payments deficit," they needed to be justified "under the narrower, non-emergency authorities in Section 122" rather than IEEPA's broader emergency powers.  *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1375 (Ct. Int'l Trade 2025) (per curiam).  The CIT emphasized that "[t]rade deficits are one of the key balance-of-payment deficits" that Section 122 was meant to address.  *Id.*  This Court and the Supreme Court affirmed.  *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (en banc) (per curiam); *Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026).

**2.**    Immediately after the Supreme Court's decision, President Trump issued Proclamation No. 11012, 91 Fed. Reg. 9339 (Feb. 25, 2026),

- 10 -

which invoked Section 122 as a basis for imposing a temporary import sur-charge on certain articles imported into the United States.  Based on infor-mation and opinions from senior government economists and trade advi-sors, the President determined that "fundamental international payments problems within the meaning of [S]ection 122 exist and that special import measures to restrict imports are required to address these problems."  *Id.* at 9339.  He explained that the "United States runs a trade deficit, does not cur-rently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments, on net, flowing out of the country than into the country."  *Id.* at 9340.  And, relatedly, the President found that all three components of the current account—the balance of trade (revenue from exports less expenditures on imports), primary income (revenue from U.S. capital or labor deployed overseas), and secondary income (transfer payments into the country minus those out of the country)—were negative. *Id.*  He accordingly concluded that "the United States balance-of-payments position, under any reasonable understanding of the term in the context of section 122, is currently a large and serious deficit."  *Id.*

To deal with the large and serious balance-of-payments deficit he had identified, the President imposed a temporary 10% import surcharge on all

- 11 -

articles imported into the United States, with certain exemptions not relevant here. 91 Fed. Reg. at 9340-9341. That surcharge ends July 24, 2026. *Id.* at 9343.

### C.    Prior Proceedings

1.    States and private companies challenged the Section 122 tariffs in two cases. A divided panel of the CIT issued a single opinion in both, with a majority holding that the circumstances described in the President's proclamation do not constitute "balance-of-payments deficits" within the meaning of Section 122.

The CIT began by recognizing, correctly, that only the plaintiffs shown to be importers—Burlap and Barrel, Basic Fun, and the State of Washington—have standing to challenge the tariffs. Appx24-25. For the remaining plaintiffs—States that did not establish that they are importers—the CIT explained that they could not establish standing based on "indirect economic harm[s]" caused by the tariffs' alleged effects on third parties, such as passthrough tariff surcharges resulting from companies increasing their prices to compensate for tariffs, tariff-related increases in the cost of goods and services, or burden and delay caused by tracking changes in tariffs or negotiating prices with vendors and contractors. Appx24.

- 12 -

As to the merits, the CIT reasoned that "balance-of-payments deficits" is a "term of art" and thus "susceptible to a defined meaning." Appx32. Relying entirely on legislative history, the majority concluded that "Congress understood balance-of-payments deficits to refer, at the time, to deficits in (1) liquidity, (2) official settlements, or (3) basic balance." Appx33. The majority's conclusion was based in large part on an earlier version of the legislation, which had characterized "balance of payments" as "measured either on the official reserve transactions basis or by the balance on current account and long-term-capital"—even though, as the majority recognized, the enacted version of Section 122 includes no definition of "balance of payments deficit," and "[a] variety of options for analyzing the balance of payments," not just the measures specified in the original parenthetical definition, "were available to Congress at the time Section 122 was debated and enacted." Appx34, Appx36 & n.30. While the majority acknowledged that Congress ultimately "omitted" the "parenthetical definition of balance of payments" from the enacted version of Section 122, Appx36-37, the majority nonetheless concluded that Congress required the President to look only to the measures listed in the headings of a single table in the Senate Report on the Trade Act of 1974, which included "[l]iquidity," "[o]fficial settlements," and "[b]asic

- 13 -

balance" as subheadings under a "[b]alance of payments" heading. S. Rep. No. 93-1298, at 8. The majority regarded this table as "indicat[ing] what Congress contemplated as the measure of balance of payments." Appx37. The majority placed further reliance on a December 1974 report from the Staff of the Senate Finance Committee—a report prepared wholly by congressional staff—which the majority described as reflecting the views of "the Senate." Appx37 & n.31. The majority described this report as "the clearest indication of the concerns Section 122 was intended to address." Appx38 n.31.

Because the CIT determined that the balance-of-payments deficits identified in the challenged proclamation were based on "current account deficits" and "a large and serious trade deficit" rather than deficits in liquidity, official settlements, or basic balance, the court concluded that the proclamation does not establish a balance-of-payments deficit within the meaning of Section 122 and thus that the tariffs are invalid. Appx42 (quotation marks omitted). The court enjoined the enforcement of the tariffs as to the three plaintiffs with standing. Appx114.

2.    The government immediately appealed the CIT's injunction and sought a stay pending appeal from this Court. Appx258. This Court granted

a stay pending appeal. *Oregon v. Trump*, 2026 WL 1702442, at \*4 (Fed. Cir. June 11, 2026) (per curiam). As particularly relevant here, the stay panel concluded that the government had "made a sufficient showing that it is likely to succeed on the merits," noting that it was "persuaded by the federal government's argument that the CIT majority's interpretation … may be incorrect," and that "the legislative history" both "strongly call[s] into question" the CIT's conclusion and "contains ample support for the federal government's proposed gloss" on the statute. *Id.* at \*2. The stay panel also explained that "[t]here is merit to the federal government's argument that Section 122 already contains the guardrails required by the nondelegation doctrine such that it is not necessary to set out precise 'balance-of-payments deficit[]' measurement methods for the statute to survive challenge." *Id.* (second alteration in original).

## SUMMARY OF ARGUMENT

Section 122, which permits the President to impose tariffs "to deal with large and serious … balance-of-payments deficits," clearly authorizes the tariffs challenged here. 19 U.S.C. § 2132(a)(1). It is common ground that Section 122 authorizes tariffs, that the challenged tariffs do not exceed the magnitude and duration permitted by Section 122, and that to the extent a

"balance-of-payments deficit[]" exists, the challenged tariffs "deal with" it. *Id.* The key remaining dispute is whether the President acted consistently with the statute when he found that, "under any reasonable understanding of the term in the context of section 122," the United States's balance-of-payments position "is currently a large and serious deficit." 91 Fed. Reg. at 9340. The answer is clearly yes.

The term "balance-of-payments deficit[]" is a technical term of art that has always been understood in the field of economics to be subject to calculation in a variety of acceptable ways. Congress incorporated that understanding when it used the term without providing a statutory definition. Congress thus allowed the President to rely on any reasonable economic methodology in determining whether a balance-of-payments deficit exists. And the proclamation challenged here provides ample support for the President's conclusion, outlining multiple ways in which the United States's balance-of-payments position is in a large and serious deficit. The proclamation therefore constitutes a lawful exercise of the President's Section 122 powers.

In concluding otherwise, the CIT majority adopted an interpretation of "balance-of-payments deficit[]" that no party had advanced—an interpretation under which the phrase encompasses only three very specific

- 16 -

methodologies, rather than all economically reasonable methodologies, to identify a balance-of-payments deficit. The majority based that interpretation almost entirely on scattered passages in the legislative history that were not specifically addressing Section 122, including one staff report that was not even the product of a House or Senate committee. The majority's heavy reliance on legislative history conflicts with controlling principles of statutory interpretation. And as the dissent explained, the majority's analysis of legislative history was unpersuasive even on its own terms; it failed to account for parts of the legislative history that undercut its conclusion.

The CIT majority further erred in concluding that a broader construction of Section 122 would raise constitutional concerns under the nondelegation doctrine. To the extent that it applies in this area at all, the nondelegation doctrine is easily satisfied here given Section 122's clear policy aims and express limits on the President's tariff authority.

In any event, even if the CIT's novel interpretation of the statute were correct, the challenged proclamation would still satisfy it—a point the CIT never afforded the government the chance to make. The record shows that "basic balance," the measure on which the CIT majority focused, is closely correlated with the current account. And analysis by the Council of

- 17 -

Economic Advisors (CEA) confirms that even when assessing the basic balance in today's economic environment, that measure reflects a prolonged and serious deficit of the sort identified in the President's proclamation. Thus, even under the CIT's definition, the United States currently has a large and serious balance-of-payments deficit that the President has statutory authority to address. At a minimum, if the Court agrees with the CIT's statutory interpretation but finds the current record insufficient to address whether the proclamation satisfies that interpretation, it should vacate the judgment and remand for further proceedings before the CIT.

## ARGUMENT

### Standard of Review

This Court reviews the CIT's grant and denial of summary judgment de novo, *Sigvaris, Inc. v. United States*, 899 F.3d 1308, 1312 (Fed. Cir. 2018), and reviews the CIT's "grant of an injunction for abuse of discretion," which "may be established by showing that" the CIT "exercised its discretion based on an error of law or clearly erroneous fact findings," *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1084 (Fed. Cir. 2025) (quotation marks omitted). The CIT's determinations "'on questions of law'" are reviewed "without deference." *Oman Fasteners*, 125 F.4th at 1084. "In international trade

- 18 -

controversies … involving the President and foreign affairs," this Court has "often reiterated the very limited role of reviewing courts" and declined "to interpose" absent "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985).

## I.    The President's Imposition Of Tariffs Is Clearly Lawful Under A Proper Understanding Of Section 122

The CIT misconstrued Section 122 and therefore erred in holding the challenged proclamation invalid. The proclamation clearly satisfies a proper interpretation of the statute.

### A.    The President's Proclamation Identifies A "Balance-of-Payments Deficit" Within The Meaning Of Section 122

The question here is whether the circumstances identified in the President's proclamation constitute a "balance-of-payments deficit[]," 19 U.S.C. § 2132(a)(1). As the proclamation recognizes, and as economists have long understood, there are multiple reasonable ways of calculating a balance-of-payments deficit. Whatever other methods might be viable, the statute allows the approach taken here — treating a deficit in the current account, or a deficit in the sum of the current account, the capital account, and the net foreign direct investment — as a balance-of-payments deficit. That is clear

from the text, context, and enactment history of Section 122, which the CIT majority essentially ignored, and even the legislative history, which the majority misread.

### 1. A balance-of-payments deficit can be identified in a variety of economically reasonable ways

Even as it defined other terms in Section 122, Congress did not define the term "balance-of-payments deficits." Indeed, it declined to enact definitional language included in a prior version of the bill. One obvious potential interpretation, based on the plain meaning of the terms, would be "a deficit" (that is, a negative value) in the overall "balance of payments." But as all members of the CIT correctly recognized, that interpretation would render the statute ineffectual because the overall balance is necessarily zero—*i.e.*, never negative. Appx32 n.26; Appx70-71; *see* Appx223. Courts do not interpret statutes to be ineffectual. *See Garland v. Cargill*, 602 U.S. 406, 427 (2024).

So the question is what else the phrase is most naturally read to mean. The only textually sound answer is that because it is a technical term derived from the field of economics, it carries the same meaning—or the same range of acceptable meanings—as in that field. That is a standard way of interpreting technical terms in statutes: "[C]ourts take note of terms that carry

- 20 -

'technical meaning[s]'" when they interpret statutes, and "when a statute, like this one, is 'addressing a … technical subject, a specialized meaning is to be expected.'" *Van Buren v. United States*, 593 U.S. 374, 388, 389 n.7 (2021) (alterations in original; quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012)); *see also United States v. Hansen*, 599 U.S. 762, 774 (2023) ("[W]hen Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." (quotation marks omitted)). For example, in *Louisiana Public Service Commission v. FCC*, the Supreme Court explained that because "'[c]harges,' 'classifications,' and 'practices'" were "terms often used by accountants, regulators, courts, and commentators to denote depreciation treatment," the Court would construe them "in accordance with the rule of construction that technical terms of art should be interpreted by reference to the trade or industry to which they apply." 476 U.S. 355, 371-372 (1986).

In economics, the phrase "balance-of-payments deficit" has always been understood as susceptible to measurement by a range of reasonable methodologies. That is true today, as the Acting Chairman of the CEA explained in a declaration before the CIT. *See* Appx219 (explaining that there

are "various credible methodologies for calculating balance-of-payments deficits"). And it was also true at the time of Section 122's enactment.

Just a year after Section 122's enactment, an article published by the Federal Reserve Bank of New York—cited here in the Chairman's declaration (Appx230 n.13)—explained that there were "seven different measures" of the balance of payments "in standard use" at the time. Patricia H. Kuwayama, *Measuring the United States Balance of Payments*, Fed. Rsrv. Bank. of N.Y. Monthly Rev. 183, 183-184 (Aug. 1975), https://perma.cc/BVL8-9GUG; *see id.* at 184-189 (describing all seven). And just a few years before Section 122's enactment, a journal of the International Monetary Fund published an article to explain "economists' shorthand" about the meaning of the phrase "'a deficit in the balance of payments.'" Poul Høst-Madsen, *What Does It Really Mean? — A Deficit in the Balance of Payments*, 3 Fin. & Dev. 171, 171 (1966). The article explained that the phrase is not "a contradiction in terms"—even though the overall balance "is necessarily zero when the entry for net errors and omissions is included"—because, as "used in public discussion," the phrase refers only to "the balance of a certain selection of transactions." *Id.* (emphasis omitted). "The other transactions," the article explains, are "regarded as 'financing'" a surplus or deficit. *Id.* And the article

observed that there is no single understanding among economists about where to draw "'the line'" between items that "make up the surplus or deficit" and those that "represent the financing of" the surplus or deficit. *Id.* at 171-172.

Thus, the most textually sound reading of the statutory phrase "balance-of-payments deficit" is "balance-of-payments deficit as determined using an economically reasonable methodology." It is not problematic that this definition does not specify a *sole* methodology by which a balance-of-payments deficit must be determined. Congress is free to use in a statute a technical term of art, impliedly incorporating the technical understanding of the term as its meaning in the statute. And no principle of constitutional law, or of statutory interpretation, restricts Congress to using only technical terms that have a single, fixed understanding in the field.

Indeed, it is not unusual for Congress to use terms in this way. Consider, for example, the phrase "generally accepted accounting principles." As the Supreme Court has explained, "[a]ccountants long have recognized that 'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions." *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544 (1979). The

- 23 -

phrase "tolerate[s] a range of 'reasonable' treatments." *Id.* But that has not stopped Congress from using it more than a hundred times across the U.S. Code—for example, specifying that the "minimum capital level" for covered banking enterprises shall be a sum including "2.50 percent of the aggregate on-balance sheet assets of the enterprise, as determined in accordance with generally accepted accounting principles." 12 U.S.C. § 4612(a)(1); *see also, e.g.,* 8 U.S.C. § 1153(b)(5)(D)(ii)(II) (visas); 17 U.S.C. § 115(d)(10)(B)(iv)(I) (copyright); 19 U.S.C. § 1677b(f)(1)(A) (trade); 42 U.S.C. § 1395x(z)(1) (Medicare). Congress did not need to specify a particular accounting methodology to enact those statutes, and courts need not do so in applying them.

Nor is it unusual for Congress to use a technical term that adopts all professionally accepted methodologies with deference to reasonable conclusions based on those methodologies. Take, for example, Congress's use of "actuarial equivalent" in the Employee Retirement Income Security Act of 1974 (ERISA). Because "this 'term of art'" "has long been utilized in actuarial practice," courts "evaluate" it "as it was understood by actuarial scientists when ERISA was enacted." *Reichert v. Kellogg Co.*, 170 F.4th 473, 480 (6th Cir. 2026); *accord Drummond v. Southern Co. Servs.*, 177 F.4th 1076, 1088-1094 (11th Cir. 2026); *Stephens v. U.S. Airways Grp.*, Inc., 644 F.3d 437, 440 (D.C. Cir.

- 24 -

2011) (opinion of Brown, J.).  They accordingly "uphold[] actuaries' chosen assumptions if they are within the scope of professional acceptability" — that is, "reasonable" "in the field of actuarial science."  *Reichert*, 170 F.4th at 483 (quotation marks omitted); *accord Drummond*, 177 F.4th at 1092.  This sort of "deference" is not problematic, even though "reasonableness is a range, not a precise prescription," and even though "different actuaries can come to different conclusions on what the exact best estimates are in each situation." *Reichert*, 170 F.4th at 483; *accord Drummond*, 177 F.4th at 1092.  Thus, Congress can and does incorporate in statutes technical terms that are susceptible to a range of understandings within the technical field.

Although the Court need not look beyond Section 122's text to adopt the interpretation discussed above, it is further supported by the drafting history and legislative history of Section 122.

Start with the drafting history — the way in which the legislation that became Section 122 evolved.  A prior version of the legislation that became Section 122 *did* include a definition of "balance-of-payments deficit[]."  It provided, as relevant, that

> a serious balance-of-payments deficit shall be considered to exist whenever the President determines that—

(A) the balance of payments (as measured either on the official reserve transactions basis or by the balance on current account and long-term capital) has been in substantial deficit over a period of four consecutive calendar quarters, or

(B) the United States has suffered a serious decline in its net international monetary reserve position, or

(C) there has been or threatens to be a significant alteration in the exchange value of the dollar in foreign exchange markets, and

(D) the condition indicated in (A), (B), or (C) is expected to continue in the absence of corrective measures.

Trade Reform Act of 1973, H.R. 6767, 93d Cong. § 401(b)(1). But Congress omitted that definitional language from the final version of the bill, even as it maintained definitions of other terms in Section 122, notably specifying that "balance-of-trade surpluses" must be "determined on the basis of the cost-insurance-freight value of imports, as reported by the Bureau of the Census." 19 U.S.C. § 2132(c)(1). The natural inference from that history is that Congress wanted to leave the President with flexibility to determine the existence of a balance-of-payments deficit without needing to adhere to a single specified methodology. *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-580 (2006); *Doe v. Chao*, 540 U.S. 614, 622 (2004).

The legislative history, to the extent it is relevant, confirms as much. The House Ways and Means Committee report on the legislation that

- 26 -

became Section 122 explained that the Committee had "considered various formulas for defining a serious balance-of-payments deficit" but ultimately determined that it was "not possible to formulate a definition with mathematical exactness." H.R. Rep. No. 93-571, at 28-29 (1973). Rather, the report explains, the Committee envisioned that there would "be an element of judgment on the part of the President in determining the existence of a serious deficit that justifies use of" the power conferred by Section 122. *Id.* at 28.

### 2. The challenged proclamation identifies a balance-of-payments deficit under an economically reasonable methodology

The challenged proclamation plainly identifies a "balance-of-payments deficit" within the proper understanding of Section 122, and the CIT's decision should be reversed on that basis.[1]

The proclamation relies on "different methods of evaluating balance-of-payments deficits" and concludes that "under any of these methods, the United States balance-of-payments position is a large and serious deficit."

---

[1] The proclamation also shows that the deficits are "large and serious," 19 U.S.C. § 2132(a)(1). The CIT majority correctly determined that "there is no serious dispute that whether [balance-of-payments] deficits are 'large and serious is a discretionary determination within the province of the Executive Branch, review of which by the judiciary is impermissible." Appx32. We accordingly do not discuss the "large and serious" requirement in this brief.

91 Fed. Reg. at 9340. Specifically, the proclamation cites the "substantial trade deficit" and negative "balance on goods and services." The proclamation also points to the current-account deficit, which has been exacerbated by "large and persistent trade deficits," and the negative primary income, which "turned negative for the first time since at least 1960 in 2024." *Id.* And the proclamation notes the "atypically large negative net international-investment position of the United States," which "is in an ongoing decline." *Id.* The President therefore determined that "the United States balance-of-payments position, under any reasonable understanding of the term in the context of section 122, is currently a large and serious deficit." *Id.*

It can hardly be disputed that these methodologies are economically reasonable ways of identifying a balance-of-payments deficit. The current account records the flow of money into and out of the country, as discussed above. And a current-account deficit has long been a widely accepted measure of a balance-of-payments deficit in the field of economics. An amicus brief by eminent trade scholars, filed in *Learning Resources*, explained that "the 'current account' dictates the [balance of payments] in the United States." Brief of Trade Scholars in Economics, Politics, and Law as Amicus Curiae in Support of Respondent V.O.S. Selections at 7-10, *Learning Res., Inc.*

- 28 -

*v. Trump*, 607 U.S. 229 (2026) (No. 24-1287), 2025 WL 3035872, at *7-10.  The International Monetary Fund has also long used the current account to assess countries' balance-of-payments positions, including both before and after Section 122's enactment.  *See, e.g.*, IMF, Annual Report 1952, at 38-39 (1952), https://perma.cc/W8DS-HEE5; Kuwayama, *supra*, at 183, 186-187; Donald S. Kemp, *Balance-of-Payments Concepts — What Do They Really Mean?*, Fed. Rsrv. Bank of St. Louis Rev.  14, 19 (July 1975), https://perma.cc/2AP4-VN8C; IMF, IMF External Sector Reports, https://perma.cc/5YQ7-ZUN4 (report "produced annually since 2012" that includes "staff assessments of current accounts and real exchange rates" to analyze "imbalances" in countries' economies).  Even the CIT majority acknowledged that the current account is "relevant to balance-of-payments deficits."  Appx42.  And three other judges of the CIT agreed that "[t]rade deficits are one of the key balance-of-payment deficits" that Section 122 was meant to address.  *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1375 (Ct. Int'l Trade 2025) (per curiam).

Although the current account is clearly a widely accepted measure of a balance-of-payment deficit, there have long been other economically accepted ways of assessing balance-of-payments deficits, and many of those

methodologies also show a deficit today. As discussed above, just a year after Section 122's enactment, an article published by the Federal Reserve Bank of New York—and cited here by the then-Chair of the CEA (Appx230 & n.13)—explained that there were "seven different measures … in standard use" at the time, one of which, the "merchandise trade balance," was "the most familiar and well-defined." Kuwayama, *supra*, at 183-184. At least four of the seven measures—merchandise trade, goods and services, current account, and basic balance—are running deficits today. *See* Appx233-235; *see also infra* pp. 48-51 (further describing basic balance). And by 1975, the other three measures were deemed "arbitrary," having "lost all possible relevance," and "not … useful … for the United States." Kuwayama, *supra*, at 188-189 (discussing net-liquidity, gross-liquidity, and official-settlements balances). The deficits in trade and the current account (mirrored by the basic balance) that the President identified here are thus prototypical balance-of-payments deficits widely recognized when Section 122 was enacted.

Moreover, Section 122's enactment history shows that an imbalance in the current account—arising from a substantial trade deficit and exacerbated by the novel deterioration of the balance on primary income—is exactly the kind of balance-of-payments concern that Congress enacted Section 122 to

allow the President to address.  When declaring the 1971 national emergency and imposing a temporary 10% duty in response to it, the Nixon Administration recognized that the trade deficit (the first since 1888) was "a primary element in the unsatisfactory U.S. balance of payments" and that correcting the balance-of-payments deficit required correcting the trade deficit. Off. of the Historian, U.S. Dep't of State, *Paper Prepared in the Department of the Treasury* (Sept. 10, 1971), https://perma.cc/JTZ8-2KTU.  That crisis was the genesis of Section 122, as discussed above.  *See supra* pp. 6-9.

The CIT observed that Section 122(c) authorizes the President to temporarily reduce duties in response to "balance-of-trade surpluses," and from that drew a negative inference that a balance-of-payments deficit must be different from a balance-of-trade deficit.  Appx32-33 (emphasis omitted; quoting 19 U.S.C. § 2132(c)(1)).  But the reference to "balance-of-trade" in Section 122(c) does not mean that trade imbalances may not be considered in assessing a "balance-of-payments deficit[]."  As the CIT itself acknowledged, the balance of trade is a "component of the current account" and "relevant to balance-of-payments deficits."  Appx42.  And the fact that Congress authorized the President to temporarily increase duties in response to balance-of-*payments* deficits (a term that all agree encompasses a range of

- 31 -

methodologies), but to temporarily decrease duties only in response to bal-ance-of-*trade* surpluses (a much narrower term), simply reflects a congres-sional policy choice to limit the range of circumstances in which duties could be decreased. It would be nonsensical to conclude, as the CIT did here, that Section 122, which was specifically enacted to address trade deficits, does not authorize the President to rely on economically reasonable methodolo-gies for identifying a balance-of-payments deficit based on a serious and per-sistent trade deficit. In any event, the President's proclamation does not identify a balance-of-payments deficit as arising solely from a trade deficit; as discussed above, it identifies other components of the problem as well.

**B.     The CIT Erred In Substituting Its Reading Of The Legis-lative History For The Text Congress Enacted**

Notwithstanding all this, the CIT concluded that Section 122 requires the President to determine the existence of a balance-of-payments deficit solely by reference to the measures listed in the headings of a single table in the Senate Report on the Trade Act of 1974, which included "[l]iquidity," "[o]fficial settlements," and "[b]asic balance" as subheadings under a "[b]alance of payments" heading. S. Rep. No. 93-1298, at 8. The majority regarded this table as "indicat[ing] what Congress contemplated as the

- 32 -

measure of balance of payments." Appx37. The majority also relied on a December 1974 report from the Staff of the Senate Finance Committee—a report prepared wholly by congressional staff, Appx37 & n.31—which the majority described as reflecting the views of "the Senate" and as the "the clearest indication of the concerns Section 122 was intended to address," Appx38 n.31. And because the challenged proclamation does not expressly refer to the three measures the majority believed that Congress may have had in mind when it enacted Section 122, the majority held the proclamation invalid. Appx45-46.

That analysis was gravely erroneous for several reasons.

**1.** To start, the CIT majority relied on legislative history in a manner, and to a degree, irreconcilable with modern principles of statutory interpretation. The Supreme Court has repeatedly emphasized that "'legislative history is not the law.'" *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) (quotation marks omitted). Congress's "authoritative statement is the statutory text, not the legislative history or any other extrinsic material[s]," the latter two of which "have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding

- 33 -

of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

Even as an extrinsic "source[] of insight into legislative understandings," moreover, "legislative history … is vulnerable to two serious criticisms." *Exxon*, 545 U.S. at 568. "First, legislative history is itself often murky, ambiguous, and contradictory," *id.*, as evidenced here by the fact that the CIT majority and dissent disagreed about what Section 122's legislative history reveals, *e.g.*, Appx59. And second, "judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members—or, worse yet, unelected staffers and lobbyists—both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text." *Exxon*, 545 U.S. at 568. That concern is underscored here by the CIT's express reliance on a staff report, which did not even purport to reflect the views of members of Congress (much less both chambers of Congress and the President). Such reports were not treated as relevant indicators of Congress's intentions even when legislative history was more broadly accepted as a tool of statutory interpretation than it is today. *See, e.g.*, *Vance v. Hegstrom*, 793 F.2d 1018, 1025 (9th

- 34 -

Cir. 1986) ("[R]eports prepared by staff personnel of members of Congress … are not statements of what Congress intended[.]").

The CIT majority's reliance on legislative history also reflected a more basic misunderstanding of the enterprise of statutory interpretation. The CIT majority seemed to believe that the objective of its analysis was to discern what Congress was *thinking* of when it authorized the President to address balance-of-payments deficits. *See FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1557 (2026) (rejecting use of legislative reports to "divin[e] how Congress would have wanted courts to resolve the question presented in [a] case"). But even assuming for the sake of argument that Congress was thinking of deficits in one of the three measures included in the tables on which the CIT majority focused, that does not mean the statutory phrase Congress used — "balance-of-payments deficits" — is limited in the same fashion. As the Supreme Court has repeatedly emphasized, "the provisions of our laws" control, not "the principal concerns of our legislators." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *see FS Credit*, 146 S. Ct. at 1557-1559; *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020). For that reason, "the fact that [a statute] has been applied in situations not expressly anticipated by Congress does not demonstrate" the kind

- 35 -

of "ambiguity" that calls for resort to indications of congressional intent; "it simply demonstrates [the] breadth of" the text Congress enacted. *Bostock*, 590 U.S. at 674 (alterations in original; quotation marks omitted).

In short, the CIT's analysis—which amounts to an effort to divine the thoughts of the Members of Congress who passed Section 122—does not remotely resemble sound statutory interpretation. Just last month, the Supreme Court pointedly declined to "revive [its] old-time devotion to legislative history." *FS Credit*, 146 S. Ct. at 1558. In a case where the dissent faulted it "for disregarding the … legislative history" of the statute at issue, the majority answered: "guilty as charged." *Id*. at 1556 n.4. There is no question that the Supreme Court would reject the CIT majority's mode of analysis.

**2.** The majority's analysis of the legislative history is also unpersuasive even on its own terms.

As the dissent notes, the table on which the majority relied so heavily appears in the Senate report on the Trade Act of 1974 many pages before the report's "discussion of Section 122" of the Act, and the report's text does "not discuss[] … how payments balances were to be measured for purposes of Section 122." Appx61-62. Nor does the table the majority identified in the committee staff report, which the majority described as "'the clearest

- 36 -

indication of the concerns Section 122 was intended to address'" (Appx38 n.31), "make[] [any] reference to Section 122." Appx63. And the dissent identifies other evidence in the staff report "that the country's current account balance," on which the challenged proclamation relies, "could have been considered to be a measure of the balance of payments in 1974," Appx63, Appx65, such as a table "titled 'U.S. Current Account Balance'" placed "directly under the heading 'U.S. Balance of Payments Trends,'" Appx64:

### U.S. BALANCE OF PAYMENTS TRENDS *
#### TABLE 22.—U.S. CURRENT ACCOUNT BALANCE [1]
[In billions of U.S. dollars]

| Year | Balance | Year | Balance |
|------|--------|------|--------|
| 1950 | −2.1 | 1962 | 2.5 |
| 1951 | 0.3 | 1963 | 3.2 |
| 1952 | −0.2 | 1964 | 5.8 |
| 1953 | −1.9 | 1965 | 4.3 |
| 1954 | −0.3 | 1966 | 2.3 |
| 1955 | −0.3 | 1967 | 2.1 |
| 1956 | 1.7 | 1968 | −0.4 |
| 1957 | 3.6 | 1969 | −1.0 |
| 1958 | Negl. | 1970 | 0.4 |
| 1959 | −2.1 | 1971 | −2.8 |
| 1960 | 1.8 | 1972 | −8.4 |
| 1961 | 3.1 | 1973 [2] | 2.7 |

[1] Includes merchandise, services, private remittances, and government transfers.
[2] Preliminary.

Staff of S. Comm. on Fin., 93d Cong., *Staff Data and Materials on U.S. Trade and Balance of Payments* 24 (Comm. Print 1974), https://perma.cc/UCE5-Z9M8.

The majority also quoted at length—for most of an entire page of its opinion—from a report introduced into a congressional hearing record as an addendum to the prepared statement of a witness, Dr. Howard S. Piquet. Appx35. The majority fixated on language stating that "[t]he two most usual approaches" for determining a balance-of-payments deficit are "the 'liquidity' concept and the 'official settlements' concept." Appx35 (quoting *Tariff and Trade Proposals: Hearings Before the H. Comm. on Ways & Means*, 91st Cong. 2710 (1970) (statement of Dr. Howard S. Piquet)). But the report makes that statement immediately after leading with the point that a balance-of-payments deficit "can be shown in different ways," Appx35 (quotation marks omitted)—a point more consistent with our interpretation, and the CIT dissent, than with the CIT majority opinion. In any event, the extent of the majority's reliance on the report is baffling, given that it was published not in a peer-reviewed journal of economics, or for that matter any other academic publication, but in an industry publication called *Leather and Shoes*, for which it had been prepared at the behest of the National Footwear Manufacturers Association. *Tariff and Trade Proposals*, *supra*, at 2686; *see* 114 Cong. Rec. 17717, 18267 (1968) (statement of Sen. Edmund S. Muskie) (discussing an earlier version of the same report).

Finally, and most egregiously, the majority ignored far more compelling evidence in the drafting history and legislative history — evidence showing, as the CIT dissent explained, that Congress meant "to afford some degree of discretion to the President as to the method of measurement," Appx59. The majority offered no response to the fact that the House Ways and Means Committee, having "considered various formulas for defining a serious balance-of-payments deficit," ultimately felt unable "to formulate a definition with mathematical exactness." H.R. Rep. No. 93-571, at 28-29. Nor did the majority explain why, if Congress meant to specify a single methodology for determining a balance-of-payments deficit, Congress would have omitted a definition of "balance-of-payments deficit" that had appeared in an earlier version of the bill, while retaining definitions of other terms. *See supra* pp. 25-26. In short, the majority's analysis would have been weak enough had it focused on the *only* available history — but it is much worse because it overlooks other, more reliable indicia of Congress's intentions. It deserves to be Exhibit A for the "classic criticism of using legislative history": that "it is the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends," *FS Credit*, 146 S. Ct. at 1557 (quotation marks omitted).

**3.** The majority's invalidation of this particular proclamation also improperly fails to account for the backdrop against which Congress enacted Section 122. *See, e.g.*, *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1324 (Fed. Cir. 2021) (analyzing the "legal and historical backdrop against which Congress legislated" (quotation marks omitted)).

When declaring the 1971 national emergency and imposing a temporary 10% duty in response to it, the Nixon Administration recognized that the trade deficit (the first since 1888) was "a primary element in the unsatisfactory U.S. balance of payments" and that correcting the balance-of-payments deficit required correcting the trade deficit. *Paper Prepared in the Department of the Treasury, supra.* That crisis was the genesis of Section 122, as discussed above. *See supra* pp. 6-9. Indeed, the committee reports on Section 122 repeatedly cite the trade deficit as a key reason it was needed. *See, e.g.*, H.R. Rep. No. 93-571, at 13, 29; S. Rep. No. 93-1298, at 7. There should accordingly have been no doubt—regardless of what else might constitute a "balance-of-payments deficit" within the meaning of the statute—that this phrase encompasses an imbalance in the current account arising from a substantial trade deficit, when combined with a deterioration of the balance on primary income.

Of course, courts do not "restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy," *Brogan v. United States*, 522 U.S. 398, 403 (1998), but where the text readily applies to that "particular evil," *id.*, a statute should not be construed as failing to address it. The fact that the CIT's interpretation does so is one more strike against it.

4.      Finally, the CIT majority offered no persuasive rationale for rejecting the government's interpretation of Section 122.

a.      The majority appeared to believe that it had to read into Section 122 a single economic methodology for determining the existence of a balance-of-payments deficit, or else it would be abnegating the judicial responsibility "'to say what the law is,'" Appx46 n.38 (quotation marks omitted). But as discussed above, the phrase "balance-of-payments deficit[]" is a term of art with a range of accepted meanings in economics.  For that reason, the best *legal* interpretation of the phrase "balance-of-payments deficit[]" is "balance-of-payments deficit as determined using an economically reasonable methodology."  Congress did not need to specify, and courts do not need to determine, a particular economic methodology the President must use.

As the CIT dissent explained, that is a perfectly sensible understanding of how Congress would have expected this statute to work.  "Congress

- 41 -

understood in 1974, and long before 1974, that our country's payments balance could be measured in different ways that produce different results." Appx69. And Congress wanted to give the President flexibility to address "genuine concerns over the economic condition of the country," Appx68, recognizing that those concerns might take different forms in the future than they did in 1975.

**b.**   The majority also opined that allowing the President flexibility to choose among methodologies for determining a balance-of-payments deficit would raise a concern under the nondelegation doctrine, implicating the canon of constitutional avoidance. Appx40-41. But that concern was unfounded. There is no "serious doubt" as to Section 122's constitutionality, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).

The majority's concern flowed from the premise that "the President would always be able to identify a balance-of-payments deficit" if he could simply "select among the sub-accounts" of the balance of payments. Appx39. But that is not what our interpretation of the statute would allow: As discussed above, our interpretation would allow the President to invoke Section 122 only if he determines the existence of a balance-of-payments deficit by an economically reasonable methodology, such as one of the methods

- 42 -

the New York Federal Reserve Bank described as being "in standard use" around the time Section 122 was enacted. Kuwayama, *supra*, at 183.

In any event, the nondelegation doctrine plays a "more limited role" in the "national security and foreign policy realms" than in the domestic arena. *FCC v. Consumers' Rsch.*, 606 U.S. 656, 706 (2025) (Kavanaugh, J., concurring). When Congress delegates "authority over matters of foreign affairs," it "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). That is because "the President has unique responsibility" in the field of "foreign … affairs," *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993), such that when Congress enacts "legislation which is to be made effective through negotiation and inquiry within the international field," it must afford the President "a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).

The Supreme Court has thus long approved broad delegations to the President of authority to regulate international trade, including through tariffs. *See, e.g.*, *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 558-560 (1976); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 409

- 43 -

(1928); *Marshall Field & Co. v. Clark*, 143 U.S. 649, 690-694 (1892); *Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 387-388 (1813); *see also Gundy v. United States*, 588 U.S. 128, 158-159 (2019) (Gorsuch, J., dissenting). So has this Court. *See, e.g., PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1263 (Fed. Cir. 2023) (concluding that Section 232 of the Trade Expansion Act of 1962 "easily" satisfied the nondelegation doctrine (quotation marks omitted)); *HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1254 (Fed. Cir. 2025) (finding the intelligible-principle standard satisfied for Section 307(a)(1)(C) of the Trade Act of 1974). And no Member of the Court in *Learning Resources, Inc. v. Trump* suggested that the construction of statutory authority asserted in that case violated the nondelegation doctrine. *See generally* 607 U.S. 299, 244 (2026).

Even if the domestic version of the nondelegation doctrine were applicable, that standard is still "not demanding," *Gundy*, 588 U.S. at 146, and Section 122 would easily pass muster. *See Oregon*, 2026 WL 1702442, at *2 (noting "[t]here is merit to the federal government's argument that Section 122 already contains the guardrails required by the nondelegation doctrine such that it is not necessary to set out precise 'balance-of-payments deficit[]' measurement methods for the statute to survive challenge"). Congress set

forth both "the general policy" and "the boundaries of [the] delegated authority" — allowing "both the courts and the public [to] ascertain whether the [executive]' has followed the law," *Consumers' Rsch.*, 606 U.S. at 673 (second alteration in original; quotation marks omitted) — by allowing the President to determine the existence of a balance-of-payments deficit using an economically reasonable methodology and by setting caps on the size and duration of the tariffs.  As the Supreme Court recognized in *Learning Resources*, Section 122 is a "clear and limited delegation[]."  607 U.S. at 244.

Regardless, the "canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Jennings*, 583 U.S. at 296 (quotation marks omitted).  And here there is no genuine ambiguity in Section 122's text that could be informed by the avoidance canon.  Cherry-picking legislative history is not "ordinary textual analysis" that can create ambiguity to supplant the best reading of the text.

## II.  The Challenged Proclamation Identifies A Balance-of-Payments Deficit Even Under The CIT's Interpretation

As discussed above, the CIT's decision should be reversed because the challenged proclamation identifies a "balance-of-payments deficit" within

the proper understanding of Section 122—namely, a deficit in both the trade balance and the current-account balance, either of which is a long-accepted measure of the balance of payments.  But the Court should also reverse even if it accepts the CIT's erroneous construction of the statute, because the circumstances identified by the proclamation constitute a "balance-of-payments deficit" even under that construction.

That is because the circumstances identified in the proclamation also establish a deficit in the "basic balance," which the CIT identified as one of the acceptable methods for calculating a balance-of-payment deficit, Appx33.  As the dissenting CIT judge recognized, there was no basis for the CIT majority to conclude "that the [President's] advisors did not also consider whether the balance-of-payments deficit would be large and serious according to the basic balance method."  Appx76; *see also* 91 Fed. Reg. at 9340 (confirming a large and serious deficit "under any reasonable understanding of" balance-of-payments position).

The basic balance, used as one measure of the balance of payments at the time of Section 122's enactment, "combined the current account and long-term capital, and served as a gauge for the imbalance between 'underlying' long-term demand and supply of foreign exchange."  Appx225-226.

The purpose of this methodology for determining a balance-of-payments deficit was to "capture only durable trends," while "exclud[ing] short-term and volatile capital flows." Appx228.

Beginning in the 1970s, the basic balance was no longer generally modeled, because changes in the financial market rendered the distinction between long-term and short-term capital increasingly arbitrary and "obsolete." Appx70. But the basic balance can still be approximated by determining what parts of the financial account can be reasonably isolated and are sufficiently durable to warrant inclusion. The basic balance can be most closely approximated today as the sum of the current account, the capital account, and net foreign direct investment. This is a calculation that excludes assets in the financial account that "can exhibit high degrees of liquidity and volatile flows." Appx234. As the Acting Chairman of the CEA explained to the CIT, the sum of the current account, the capital account, and net foreign direct investment is a large deficit. Appx235. Thus, the President's identification of a large and serious deficit "under any reasonable understanding of" the United States's balance-of-payments position, based on his advisors' analysis of "different methods" using "calculations based on

- 47 -

current-account statistics," 91 Fed. Reg. at 9340, also identified a deficit in the basic balance.

In any event, as demonstrated in the figure below, the basic balance and the current account have always tracked each other closely:

**Figure 2: Basic Balance & Current Account, % of GNP**

*Given data estimates as of 1974*

Appx227. That close correlation reflects the fact that, as the CEA's 2026 Economic Report of the President confirms, the current account largely dictates the basic balance. CEA, *Economic Report of the President* (Apr. 2026), https://perma.cc/65DY-WE7D. That report shows a large current-account deficit over the past half century. *Id.* at 438, tbl. B-57. It also shows values of the net capital account over a similar time span, and those values are consistently minimal relative to the size of the current account. *Id.* at 397, tbl. B-

19.  It therefore makes sense that the basic balance—historically, the sum of the current account and long-term capital—would be overwhelmingly driven by the current account.  Thus, when the President cited a large and persistent negative current account balance, he identified a basic-balance deficit as well.

The CIT failed even to consider whether the challenged proclamation identifies circumstances that demonstrate a negative basic balance.  Indeed, it failed to give the government an opportunity to address that issue.  As explained, neither party raised the extremely narrow definition of "balance-of-payments deficit[]" that the CIT ultimately adopted.  Thus, the government had no opportunity to argue that the proclamation also establishes a negative basic balance that satisfies the CIT's narrow definition.  But for the reasons explained above, the proclamation's identification of a large and persistent current-account deficit also establishes a deficit in the basic balance and thus meets the CIT's narrow definition of "balance-of-payments deficit."  Thus, even if the Court agrees with the CIT's interpretation of the statute, it should reverse the CIT's judgment invalidating the challenged proclamation.

- 49 -

At a minimum, if the Court agrees with the CIT's novel interpretation of Section 122 and believes the current record is insufficient to resolve the basic-balance issue, it should vacate the judgment and remand for the CIT to address whether the proclamation identifies a deficit in the basic balance. The CEA has recently produced a thorough analysis bearing on that question, consistent with the points articulated above. CEA, *Measuring Balance of Payments Deficits* (July 2026), https://perma.cc/GG4E-KZMH. Confirming the Acting CEA Chairman's declaration before the CIT, the CEA analysis explains that the basic balance "was a construct that combined the current account with long-term capital flows" and was "intend[ed] to isolate the persistent, structural component of a country's external position from short-term or speculative financial movements." *Id.* at 2. The "basic balance was abandoned," the CEA notes, "not because what it was seeking to measure ceased to matter" but because of the "increasingly arbitrary nature of separating short- and long-term assets by maturity and marketability" and because it became "increasingly difficult to distinguish between transactions in liquid and illiquid assets" given the "evolving financial markets and capital mobility." *Id.* (quotation marks omitted). The CEA explains that "any attempt to recreate the basic balance today," without the aforementioned

- 50 -

"measurement problems," would include "the current-account balance, the capital-account balance (which will be small in comparison), and net [foreign direct investment]." *Id.* at 3, 5. The CEA analysis shows that this formulation of the basic balance, which "captur[es] the original intent of the basic balance," reflects "a prolonged period in deficit." *Id.* at 7.

For all the reasons discussed above, the record is sufficient for the Court to conclude without the need for a remand that the challenged proclamation identifies a "balance-of-payments deficit[]" even under the CIT's narrow definition. But if the Court adopts the CIT's novel interpretation, and finds the current record insufficient to determine whether the challenged proclamation is consistent with that interpretation, it should at a minimum remand so that the CIT can address that question in the first instance.

## CONCLUSION

The CIT's judgment should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
DANIEL WINIK

 */s/ Sophia Shams*
SOPHIA SHAMS
DOUGLAS C. DREIER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7213*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2000*
  *sophia.shams@usdoj.gov*

- 52 -

**ADDENDUM**

# TABLE OF CONTENTS

19 U.S.C. § 2132 ...................................................................................................A1

**19 U.S.C. § 2132**

**§ 2132. Balance-of-payments authority**

**(a) Presidential proclamations of temporary import surcharges and temporary limitations on imports through quotas in situations of fundamental international payments problems**

Whenever fundamental international payments problems require special import measures to restrict imports—

(1) to deal with large and serious United States balance-of-payments deficits.

(2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or

(3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium,

the President shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress)—

(A) a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States;

(B) temporary limitations through the use of quotas on the importation of articles into the United States; or

(C) both a temporary import surcharge described in subparagraph (A) and temporary limitations described in subparagraph (B).

The authority delegated under subparagraph (B) (and so much of subparagraph (C) as relates to subparagraph (B)) may be exercised (i) only if international trade or monetary agreements to which the United States is a party permit the imposition of quotas as a balance-of-payments measure, and (ii) only to the extent that the fundamental imbalance cannot be dealt with effectively by a surcharge proclaimed pursuant to subparagraph (A) or (C). Any temporary import surcharge proclaimed pursuant to subparagraph (A) or (C) shall be treated as a regular customs duty.

…

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 32(b)(1) because it contains 10,222 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Sophia Shams*
Sophia Shams