**Nos. 2026-1804, -1805, -1928**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

STATE OF OREGON, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF NEW YORK, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, OFFICE OF THE GOVERNOR EX REL. ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WISCONSIN,

*Plaintiffs-Cross-Appellants,*

STATE OF WASHINGTON,

*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, UNITED STATES

*Defendants-Appellants.*

---

BURLAP AND BARREL, INC., BASIC FUN, INC.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, JAMIESON GREER, in his official capacity as U.S. Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,

*Defendants-Appellants.*

---

On Appeal from the United States Court of International Trade
Nos. 26-1472, -1606, Judges Barnett, Kelly, and Stanceu

---

### OPENING BRIEF FOR APPELLANTS

---

BRETT A. SHUMATE
*Assistant Attorney General*

*Signature block continued
on inside cover*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
DOUGLAS C. DREIER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7213*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2000*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..............................................................................iii

STATEMENT OF RELATED CASES ............................................................ ix

INTRODUCTION ............................................................................................1

STATEMENT OF JURISDICTION ................................................................3

STATEMENT OF THE ISSUE .......................................................................4

STATEMENT OF THE CASE..........................................................................4

     A.    Statutory Background.........................................................................4

     B.    Factual Background ........................................................................10

     C.    Prior Proceedings ...........................................................................12

SUMMARY OF ARGUMENT.......................................................................15

ARGUMENT...................................................................................................18

Standard of Review .......................................................................................18

I.    The President's Imposition Of Tariffs Is Clearly Lawful Under A Proper Understanding Of Section 122 ..................................................... 19

     A.    The President's Proclamation Identifies A "Balance-of-Payments Deficit" Within The Meaning Of Section 122 ............19

           1.    A balance-of-payments deficit can be identified in a variety of economically reasonable ways...........................20

           2.    The challenged proclamation identifies a balance-of-payments deficit under an economically reasonable methodology ..................................................................27

B.     The CIT Erred In Substituting Its Reading Of The Legislative History For The Text Congress Enacted ......................................32

II.    The Challenged Proclamation Identifies A Balance-of-Payments Deficit Even Under The CIT's Interpretation ......................................... 45

CONCLUSION ...............................................................................................52

ADDENDUM

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Azar v. Allina Health Servs.*,
  587 U.S. 566 (2019) ..................................................................... 33

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ................................................................ 35, 36

*Brogan v. United States*,
  522 U.S. 398 (1998) ..................................................................... 41

*Cargo of the Brig Aurora v. United States*,
  11 U.S. (7 Cranch) 382 (1813) ................................................... 44

*Doe v. Chao*,
  540 U.S. 614 (2004) ..................................................................... 26

*Drummond v. Southern Co. Servs.*,
  177 F.4th 1076 (11th Cir. 2026) ............................................ 24, 25

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
  545 U.S. 546 (2005) ..................................................................... 34

*FCC v. Consumers' Rsch.*,
  606 U.S. 656 (2025) ................................................................ 43, 45

*Federal Energy Admin. v. Algonquin SNG, Inc.*,
  426 U.S. 548 (1976) ..................................................................... 43

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*,
  146 S. Ct. 1546 (2026) ...................................................... 35, 36, 39

*Garland v. Cargill*,
  602 U.S. 406 (2024) ..................................................................... 20

*Gundy v. United States*,
  588 U.S. 128 (2019) ..................................................................... 44

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006) ..................................................................... 26

*HMTX Indus. LLC v. United States*,
   156 F.4th 1236 (Fed. Cir. 2025) ................................................................ 44

*J.W. Hampton, Jr., & Co. v. United States*,
   276 U.S. 394 (1928) ..................................................................... 43-44

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ........................................................................ 42, 45

*Learning Res., Inc. v. Trump*,
   607 U.S. 229 (2026) ............................................................. 10, 44, 45

*Louisiana Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) .............................................................................. 21

*Maple Leaf Fish Co. v. United States*,
   762 F.2d 86 (Fed. Cir. 1985) ............................................................... 19

*Marshall Field & Co. v. Clark*,
   143 U.S. 649 (1892) .............................................................................. 44

*Oman Fasteners, LLC v. United States*,
   125 F.4th 1068 (Fed. Cir. 2025) ......................................................... 18

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998) ................................................................................ 35

*Oregon v. Trump*,
   2026 WL 1702442 (Fed. Cir. June 11, 2026) ............................... 15, 44

*PrimeSource Bldg. Prods., Inc. v. United States*,
   59 F.4th 1255 (Fed. Cir. 2023) ........................................................... 44

*Reichert v. Kellogg Co.*,
   170 F.4th 473 (6th Cir. 2026) ....................................................... 24, 25

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993) .............................................................................. 43

*Sigvaris, Inc. v. United States*,
   899 F.3d 1308 (Fed. Cir. 2018) ........................................................... 18

*Stephens v. U.S. Airways Grp., Inc.*,
 644 F.3d 437 (D.C. Cir. 2011) ...................................................... 24-25

*Thor Power Tool Co. v. Commissioner*,
 439 U.S. 522 (1979) ...................................................................... 23, 24

*Transpacific Steel LLC v. United States*,
 4 F.4th 1306 (Fed. Cir. 2021) ............................................................ 40

*United States v. Curtiss-Wright Export Corp.*,
 299 U.S. 304 (1936) ........................................................................... 43

*United States v. Hansen*,
 599 U.S. 762 (2023) ........................................................................... 21

*V.O.S. Selections, Inc. v. Trump*,
 149 F.4th 1312 (Fed. Cir. 2025) ........................................................ 10

*V.O.S. Selections, Inc. v. United States*,
 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ............................... 10, 29

*Van Buren v. United States*,
 593 U.S. 374 (2021) ........................................................................... 21

*Vance v. Hegstrom*,
 793 F.2d 1018 (9th Cir. 1986) ..................................................... 34-35

*Yoshida Int'l, Inc. v. United States*,
 378 F. Supp. 1155 (Cust. Ct. 1974), *rev'd*,
 526 F.2d 560 (C.C.P.A. 1975) ............................................................. 9

*Zemel v. Rusk*,
 381 U.S. 1 (1965) ............................................................................... 43

**Statutes:**

Trade Act of 1974,
 Pub. L. No. 93-618, 88 Stat. 1978 (1975) ..............................................9
  19 U.S.C. § 2132(a) .................................................................... 4, 9
  19 U.S.C. § 2132(a)(1) ............................................. 2, 4, 15, 16, 19, 27
  19 U.S.C. § 2132(c)(1) ................................................... 9, 26, 31

8 U.S.C. § 1153(b)(5)(D)(ii)(II) ................................................................ 24

12 U.S.C. § 4612(a)(1) ............................................................................ 24

17 U.S.C. § 115(d)(10)(B)(iv)(I) ............................................................... 24

19 U.S.C. § 1677b(f)(1)(A) ...................................................................... 24

28 U.S.C. § 1295(a)(5) .............................................................................. 3

28 U.S.C. § 1581(i)(1)(B) .......................................................................... 3

28 U.S.C. § 1581(i)(1)(D) .......................................................................... 3

42 U.S.C. § 1395x(z)(1) .......................................................................... 24

**Regulatory Materials:**

Exec. Order No. 14257,
   90 Fed. Reg. 15041 (Apr. 7, 2025) ...................................................... 10

Proclamation No. 4074,
   85 Stat. 926 (1971) ............................................................................... 7

Proclamation No. 11012,
   91 Fed. Reg. 9339 (Feb. 25, 2026) ............................. 10, 11, 12, 16, 28, 46, 47

**Legislative Materials:**

114 Cong. Rec. 17717 (1968) ..............................................................38

H.R. Rep. No. 93-571 (1973) .....................................................27, 39, 40

S. Rep. No. 93-1298 (1974) .............................................. 1-2, 14, 32, 40

Staff of S. Comm. on Fin., 93d Cong., *Staff Data and Materials
   on U.S. Trade and Balance of Payments* (Comm. Print 1974),
   https://perma.cc/UCE5-Z9M8 .......................................................37

*Tariff and Trade Proposals: Hearings Before the H. Comm. on Ways & Means*, 91st Cong. 2710 (1970) ...........................................38

Trade Reform Act of 1973,
  H.R. 6767, 93d Cong. (1973) ................................................................2, 26

**Other Authorities:**

CEA, *Economic Report of the President* (Apr. 2026),
  https://perma.cc/65DY-WE7D ....................................................... 48, 48-49

CEA, *Measuring Balance of Payments Deficits* (July 2026),
  https://perma.cc/GG4E-KZMH ..........................................................50, 51

Edwin L. Dale Jr., *U.S. Trade Deficit First Since 1888*,
  N.Y. Times, Jan. 26, 1972 ....................................................................... 7

*Document 76, Paper Prepared in the Department of the Treasury* (Sept. 10, 1971), *in 3 Foreign Relations of the United States, 1969-1976* (Bruce F. Duncombe ed., 2001),
  https://perma.cc/JTZ8-2KTU .......................................................................8

Poul Høst-Madsen, *What Does It Really Mean? – A Deficit in the Balance of Payments*, 3 Fin. & Dev. 171 (1966) ...............................22, 23

IMF, Annual Report 1952 (1952), https://perma.cc/W8DS-HEE5 ..............29

IMF, IMF External Sector Reports, https://perma.cc/5YQ7-ZUN4 ...........29

Donald S. Kemp, *Balance-of-Payments Concepts – What Do They Really Mean?*, Fed. Rsrv. Bank of St. Louis Rev. 14 (July 1975), https://perma.cc/2AP4-VN8C ...............................................29

Patricia H. Kuwayama, *Measuring the United States Balance of Payments*, Fed. Rsrv. Bank. of N.Y. Monthly Rev. 183 (Aug. 1975), https://perma.cc/BVL8-9GUG ............22, 29, 30, 43

Richard Nixon, *Address to the Nation Outlining a New
    Economic Policy: "The Challenge of Peace,"*
    The Am. Presidency Project (Aug. 15, 1971),
    https://perma.cc/22T2-F645 ................................................................ 7-8

Richard Nixon, *Special Message to the Congress Proposing
    Trade Reform Legislation*, The Am. Presidency Project
    (Apr. 10, 1973), https://perma.cc/F9MQ-487F........................................8, 9

Off. of the Historian, U.S. Dep't of State, *Paper Prepared
    in the Department of the Treasury* (Sept. 10, 1971),
    https://perma.cc/JTZ8-2KTU ............................................................31, 40

Antonin Scalia & Bryan Garner, *Reading Law: The
    Interpretation of Legal Texts* (2012)..................................................21

**STATEMENT OF RELATED CASES**

No other appeal in or from the present civil action has previously been before this or any other appellate court.  The government is not aware of any related cases within the meaning of Federal Circuit Rule 47.5(b).

**INTRODUCTION**

A divided panel of the Court of International Trade (CIT) invalidated time-limited tariffs imposed by the President under Section 122 of the Trade Act of 1974 to deal with a large and serious balance-of-payments deficit. The CIT did so even though the Supreme Court contemplated that the President might proceed on this path after his tariffs under the International Emergency Economic Powers Act (IEEPA) were invalidated, even though the CIT itself determined in the IEEPA cases that Section 122 would apply in this circumstance, and even though the plaintiffs there—including some of the plaintiffs here—repeatedly argued as much.

The CIT's ruling hinges not on the text Congress actually enacted, but on (1) a definition of the balance of payments included in a prior unenacted version of the bill and (2) the headings in a table in a Senate committee report on the enacted version of the Act:

TABLE 3.—U.S. TRADE AND BALANCE OF PAYMENTS, 1960-74

[In billions of dollars]

| U.S. trade position | | | | Trade balance | | Balance of payments | | |
|---|---|---|---|---|---|---|---|---|
| Exports (X) | | Imports (M) | | | C.i.f. (M) excluding foreign aid (X) | | Official settle- | Basic |
| Total | Minus foreign aid | F.o.b. | C.i.f.[1] | F.o.b. | | Liquidity[2] | ments[3] | balance |

From the fact that the table includes "[l]iquidity," "[o]fficial settlements," and "[b]asic balance" as subcategories under "[b]alance of payments," S.

Rep. No. 93-1298, at 8 (1974)—and the fact that the latter two were included in the definition of "balance of payments" in the prior unenacted bill, *see* Trade Reform Act of 1973, H.R. 6767, 93d Cong. § 401(b)(1) (1973)—the majority inferred that when Congress authorized tariffs "to deal with large and serious United States balance-of-payments deficits," 19 U.S.C. § 2132(a)(1), it must have been referring only "to deficits in (1) liquidity, (2) official settlements, or (3) basic balance." Appx33; *see* Appx36.

That sort of reasoning has not been recognizable as sound statutory interpretation for decades. It virtually ignores the statutory text and the backdrop against which Congress was acting, both of which make clear that, whatever else a "balance-of-payments deficit[]" might include, it certainly includes the problem the President identified here. And even on its own terms, the majority's interpretation of the legislative history is unpersuasive. As the CIT dissent explains, the history actually shows that "Congress understood … our country's payments balance could be measured in different ways that produce different results," Appx69, and the natural inference from Congress's choice not to define "balance of payments" in Section 122—after a prior version of the legislation had defined it—is that Congress meant to allow the President to choose among reasonable economic methodologies.

- 2 -

In any event, the challenged proclamation would pass muster even under the CIT majority's understanding of Section 122. As the dissent noted, the majority erred in not allowing the government to make that case after it adopted an interpretation of the statute that no party had offered until the CIT judges themselves suggested it at oral argument. Appx81-83. Even if this Court accepts the CIT's interpretation, it should still reverse the judgment on this ground, or at a minimum remand for further proceedings before the CIT.

## STATEMENT OF JURISDICTION

The CIT had jurisdiction because this is a civil action against the federal government "that arises out of any law of the United States providing for … tariffs … on the importation of merchandise for reasons other than the raising of revenue," 28 U.S.C. § 1581(i)(1)(B), or "any law of the United States providing for … administration and enforcement with respect to" such tariffs, *id.* § 1581(i)(1)(D). The CIT entered final judgment on May 7, 2026. Appx114-115. The government filed a timely notice of appeal the next day. Appx258-260; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUE

Whether the CIT erred in concluding that the challenged presidential proclamation failed to identify a balance-of-payments deficit under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132(a)(1).

## STATEMENT OF THE CASE

### A.    Statutory Background

This case concerns Section 122 of the Trade Act of 1974, which authorizes the President to impose tariffs "to deal with large and serious United States balance-of-payments deficits," so long as they do not "exceed 15 percent ad valorem" and do not last for more than "150 days (unless such period is extended by Act of Congress)."  19 U.S.C. § 2132(a).

1.    The balance of payments is an accounting system that summarizes a country's financial transactions with other countries.  Appx98.  Under modern accounting methodologies, transactions are tracked in three accounts: current, capital, and financial.  Appx144; *see also* Appx100.

The current account tracks (i) revenue from exports, less expenditures on imports; (ii) primary income, comprising investment income and labor compensation from abroad; and (iii) secondary income, comprising unilateral transfers such as insurance payments, foreign aid, and remittances.

Appx225.  In other words, it tracks the *current* flow of money into and out of the United States.  If the United States sends more money overseas for imports than it receives as revenue for exports, and if that deficit is not counterbalanced by other forms of current income from abroad, like salaries, dividends, and interest paid overseas to U.S. workers and nationals, then the balance of the current account will be negative.

The capital and financial accounts record assets and liabilities as opposed to current monetary flows.  The capital account, universally acknowledged to be small relative to the current account, records capital transfers between the United States and foreign countries, such as debt forgiveness, migrants' transfers, and acquisitions and disposals of nonproduced nonfinancial assets.  Appx70 n.11; Appx112.  The financial account records financial transactions between the United States and foreign countries, including deposits and direct investment.  Appx70 n.11.  Many components of the financial account are highly liquid and can exhibit volatile behavior, especially in today's economy.  Appx234-235.

It is well established in economics, and undisputed here, that the overall balance of payments is necessarily zero.  Appx223.  If there is a negative balance in the current account (*i.e.*, if the United States is sending more

- 5 -

money overseas than it is receiving from overseas), there must be a correspondingly positive balance in the capital and financial accounts (*i.e.*, foreign countries must be investing more in U.S. assets than the United States is investing in foreign assets). If the balance of payments does not appear to be zero in figures reported by the government, that is because accounts are constructed "from separate and imperfect data sources." Appx223.

For that reason, economists use the phrase "balance-of-payments deficit" to refer not to a negative value of the overall balance of payments but to a deficit in a particular subset of transactions that make up the overall balance of payments. *See, e.g.*, Appx223. Measuring a balance-of-payments deficit requires choosing which subset is economically relevant for the question at hand. *See, e.g.*, Appx234-235.

**2.** Before 1973, the exchange rate of the U.S. dollar was "fixed." Appx229. Under what was known as the "Bretton Woods" system, Congress set the dollar's value at one thirty-fifth of the value of an ounce of gold. Appx93. Other countries pegged the value of their currencies to the U.S. dollar. *Id.* And, as a corollary to the fixed value of the U.S. dollar, the U.S. government guaranteed that it would buy or sell gold at $35 per ounce. Appx93.

By the 1960s, a surplus of U.S. dollars caused the dollar to become overvalued.  Appx93.  Fearing that the United States did not have enough gold to cover the volume of dollars in worldwide circulation, traders in foreign markets began to sell dollars, resulting in periodic runs on the dollar that in turn exacerbated the crisis.  Appx93-94.  In 1971, the United States recorded a trade deficit for the first time since 1888.  Edwin L. Dale Jr., *U.S. Trade Deficit First Since 1888*, N.Y. Times, Jan. 26, 1972, at 45.

Confronted with this impending disaster, President Nixon suspended the convertibility of the dollar into gold in 1971 and imposed a 10% tariff on certain imports.  Proclamation No. 4074, 85 Stat. 926 (1971).  He determined that a "prolonged decline in the international monetary reserves" of the United States over a number of years had "seriously threatened" its "international competitive position" and potentially impaired its ability to ensure national security.  *Id.* at 926.  And in addressing the Nation regarding the imposition of tariffs, President Nixon explained that America's "trade balance ha[d] eroded over the past 15 years" and that a temporary tariff was necessary to address "the unfair edge … of … foreign competition" and make "the product of American labor … more competitive."  Richard Nixon, *Address to the Nation Outlining a New Economic Policy: "The Challenge of Peace,"*

- 7 -

The Am. Presidency Project (Aug. 15, 1971), https://perma.cc/22T2-F645. The Nixon Administration recognized that the trade deficit was the key driver of the balance-of-payments crisis, stating that "erosion of the merchandise trade position has been a primary element in the unsatisfactory U.S. balance of payments." *See Document 76, Paper Prepared in the Department of the Treasury* (Sept. 10, 1971), *in 3 Foreign Relations of the United States, 1969-1976* (Bruce F. Duncombe ed., 2001), https://perma.cc/JTZ8-2KTU.

After President Nixon took action to address the immediate crisis, a series of international agreements culminated in a March 1973 agreement that ended the Bretton Woods system. Appx94. Since that time, the United States has used a floating exchange rate, under which the value of the dollar is determined in the market through supply and demand, rather than pegged to some other index.

Although the immediate crisis had passed, and the exchange rate was no longer fixed (as it had been at the inception of the crisis), President Nixon—in response to litigation challenging his tariffs—sought explicit statutory authorization for such tariffs in the future. Richard Nixon, *Special Message to the Congress Proposing Trade Reform Legislation*, The Am. Presidency Project (Apr. 10, 1973), https://perma.cc/F9MQ-487F. Specifically, he

"request[ed] more flexible authority to raise or lower import restrictions on a temporary basis to help correct deficits or surpluses in [the Nation's] payments position." *Id.* The need for explicit statutory authority became even clearer after the CIT's predecessor concluded that President Nixon had lacked authority for the tariffs. *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155 (Cust. Ct. 1974), *rev'd*, 526 F.2d 560 (C.C.P.A. 1975).

**3.** Against this backdrop, Congress enacted the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975), which contained Section 122. As relevant here, Section 122 provides that, "[w]henever fundamental international payments problems require special import measures to restrict imports … to deal with large and serious United States balance-of-payments deficits, … the President shall proclaim, for a period not exceeding 150 days" unless extended by Congress, "a temporary import surcharge, not to exceed 15 percent ad valorem," added onto any existing duties on imported articles. 19 U.S.C. § 2132(a). It also authorizes the President to reduce duties or raise import quotas to "deal with large and persistent United States balance-of-trade surpluses." *Id.* § 2132(c)(1). At Section 122's enactment, as now, the United States had a floating rather than fixed exchange rate system.

- 9 -

## B.    Factual Background

1.    In April 2025, President Trump found that "large and persistent annual U.S. goods trade deficits" threatened the Nation.  Exec. Order No. 14257, 90 Fed. Reg. 15041, 15041 (Apr. 7, 2025).  The President acted to, among other things, "rebalance global trade flows" by imposing tariffs on certain "imports from all trading partners," *id.* at 15045, asserting authority to impose those tariffs under IEEPA.

The CIT invalidated those tariffs, including on the ground that because they "respond[ed] to an imbalance in trade," which the CIT described as "a type of balance-of-payments deficit," they needed to be justified "under the narrower, non-emergency authorities in Section 122" rather than IEEPA's broader emergency powers.  *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1375 (Ct. Int'l Trade 2025) (per curiam).  The CIT emphasized that "[t]rade deficits are one of the key balance-of-payment deficits" that Section 122 was meant to address.  *Id.*  This Court and the Supreme Court affirmed.  *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (en banc) (per curiam); *Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026).

2.    Immediately after the Supreme Court's decision, President Trump issued Proclamation No. 11012, 91 Fed. Reg. 9339 (Feb. 25, 2026),

which invoked Section 122 as a basis for imposing a temporary import surcharge on certain articles imported into the United States. Based on information and opinions from senior government economists and trade advisors, the President determined that "fundamental international payments problems within the meaning of [S]ection 122 exist and that special import measures to restrict imports are required to address these problems." *Id.* at 9339. He explained that the "United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments, on net, flowing out of the country than into the country." *Id.* at 9340. And, relatedly, the President found that all three components of the current account—the balance of trade (revenue from exports less expenditures on imports), primary income (revenue from U.S. capital or labor deployed overseas), and secondary income (transfer payments into the country minus those out of the country)—were negative. *Id.* He accordingly concluded that "the United States balance-of-payments position, under any reasonable understanding of the term in the context of section 122, is currently a large and serious deficit." *Id.*

To deal with the large and serious balance-of-payments deficit he had identified, the President imposed a temporary 10% import surcharge on all

- 11 -

articles imported into the United States, with certain exemptions not relevant here. 91 Fed. Reg. at 9340-9341. That surcharge ends July 24, 2026. *Id.* at 9343.

## C.    Prior Proceedings

1.    States and private companies challenged the Section 122 tariffs in two cases. A divided panel of the CIT issued a single opinion in both, with a majority holding that the circumstances described in the President's proclamation do not constitute "balance-of-payments deficits" within the meaning of Section 122.

The CIT began by recognizing, correctly, that only the plaintiffs shown to be importers—Burlap and Barrel, Basic Fun, and the State of Washington—have standing to challenge the tariffs. Appx24-25. For the remaining plaintiffs—States that did not establish that they are importers—the CIT explained that they could not establish standing based on "indirect economic harm[s]" caused by the tariffs' alleged effects on third parties, such as passthrough tariff surcharges resulting from companies increasing their prices to compensate for tariffs, tariff-related increases in the cost of goods and services, or burden and delay caused by tracking changes in tariffs or negotiating prices with vendors and contractors. Appx24.

- 12 -

As to the merits, the CIT reasoned that "balance-of-payments deficits" is a "term of art" and thus "susceptible to a defined meaning." Appx32. Relying entirely on legislative history, the majority concluded that "Congress understood balance-of-payments deficits to refer, at the time, to deficits in (1) liquidity, (2) official settlements, or (3) basic balance." Appx33. The majority's conclusion was based in large part on an earlier version of the legislation, which had characterized "balance of payments" as "measured either on the official reserve transactions basis or by the balance on current account and long-term-capital"—even though, as the majority recognized, the enacted version of Section 122 includes no definition of "balance of payments deficit," and "[a] variety of options for analyzing the balance of payments," not just the measures specified in the original parenthetical definition, "were available to Congress at the time Section 122 was debated and enacted." Appx34, Appx36 & n.30. While the majority acknowledged that Congress ultimately "omitted" the "parenthetical definition of balance of payments" from the enacted version of Section 122, Appx36-37, the majority nonetheless concluded that Congress required the President to look only to the measures listed in the headings of a single table in the Senate Report on the Trade Act of 1974, which included "[l]iquidity," "[o]fficial settlements," and "[b]asic

- 13 -

balance" as subheadings under a "[b]alance of payments" heading. S. Rep. No. 93-1298, at 8. The majority regarded this table as "indicat[ing] what Congress contemplated as the measure of balance of payments." Appx37. The majority placed further reliance on a December 1974 report from the Staff of the Senate Finance Committee—a report prepared wholly by congressional staff—which the majority described as reflecting the views of "the Senate." Appx37 & n.31. The majority described this report as "the clearest indication of the concerns Section 122 was intended to address." Appx38 n.31.

Because the CIT determined that the balance-of-payments deficits identified in the challenged proclamation were based on "current account deficits" and "a large and serious trade deficit" rather than deficits in liquidity, official settlements, or basic balance, the court concluded that the proclamation does not establish a balance-of-payments deficit within the meaning of Section 122 and thus that the tariffs are invalid. Appx42 (quotation marks omitted). The court enjoined the enforcement of the tariffs as to the three plaintiffs with standing. Appx114.

**2.** The government immediately appealed the CIT's injunction and sought a stay pending appeal from this Court. Appx258. This Court granted

a stay pending appeal. *Oregon v. Trump*, 2026 WL 1702442, at *4 (Fed. Cir. June 11, 2026) (per curiam). As particularly relevant here, the stay panel concluded that the government had "made a sufficient showing that it is likely to succeed on the merits," noting that it was "persuaded by the federal government's argument that the CIT majority's interpretation … may be incorrect," and that "the legislative history" both "strongly call[s] into question" the CIT's conclusion and "contains ample support for the federal government's proposed gloss" on the statute. *Id.* at *2. The stay panel also explained that "[t]here is merit to the federal government's argument that Section 122 already contains the guardrails required by the nondelegation doctrine such that it is not necessary to set out precise 'balance-of-payments deficit[]' measurement methods for the statute to survive challenge." *Id.* (second alteration in original).

## SUMMARY OF ARGUMENT

Section 122, which permits the President to impose tariffs "to deal with large and serious … balance-of-payments deficits," clearly authorizes the tariffs challenged here. 19 U.S.C. § 2132(a)(1). It is common ground that Section 122 authorizes tariffs, that the challenged tariffs do not exceed the magnitude and duration permitted by Section 122, and that to the extent a

"balance-of-payments deficit[]" exists, the challenged tariffs "deal with" it. *Id.* The key remaining dispute is whether the President acted consistently with the statute when he found that, "under any reasonable understanding of the term in the context of section 122," the United States's balance-of-payments position "is currently a large and serious deficit." 91 Fed. Reg. at 9340. The answer is clearly yes.

The term "balance-of-payments deficit[]" is a technical term of art that has always been understood in the field of economics to be subject to calculation in a variety of acceptable ways. Congress incorporated that understanding when it used the term without providing a statutory definition. Congress thus allowed the President to rely on any reasonable economic methodology in determining whether a balance-of-payments deficit exists. And the proclamation challenged here provides ample support for the President's conclusion, outlining multiple ways in which the United States's balance-of-payments position is in a large and serious deficit. The proclamation therefore constitutes a lawful exercise of the President's Section 122 powers.

In concluding otherwise, the CIT majority adopted an interpretation of "balance-of-payments deficit[]" that no party had advanced—an interpretation under which the phrase encompasses only three very specific

- 16 -

methodologies, rather than all economically reasonable methodologies, to identify a balance-of-payments deficit. The majority based that interpretation almost entirely on scattered passages in the legislative history that were not specifically addressing Section 122, including one staff report that was not even the product of a House or Senate committee. The majority's heavy reliance on legislative history conflicts with controlling principles of statutory interpretation. And as the dissent explained, the majority's analysis of legislative history was unpersuasive even on its own terms; it failed to account for parts of the legislative history that undercut its conclusion.

The CIT majority further erred in concluding that a broader construction of Section 122 would raise constitutional concerns under the nondelegation doctrine. To the extent that it applies in this area at all, the nondelegation doctrine is easily satisfied here given Section 122's clear policy aims and express limits on the President's tariff authority.

In any event, even if the CIT's novel interpretation of the statute were correct, the challenged proclamation would still satisfy it—a point the CIT never afforded the government the chance to make. The record shows that "basic balance," the measure on which the CIT majority focused, is closely correlated with the current account. And analysis by the Council of

- 17 -

Economic Advisors (CEA) confirms that even when assessing the basic balance in today's economic environment, that measure reflects a prolonged and serious deficit of the sort identified in the President's proclamation. Thus, even under the CIT's definition, the United States currently has a large and serious balance-of-payments deficit that the President has statutory authority to address. At a minimum, if the Court agrees with the CIT's statutory interpretation but finds the current record insufficient to address whether the proclamation satisfies that interpretation, it should vacate the judgment and remand for further proceedings before the CIT.

## ARGUMENT

### Standard of Review

This Court reviews the CIT's grant and denial of summary judgment de novo, *Sigvaris, Inc. v. United States*, 899 F.3d 1308, 1312 (Fed. Cir. 2018), and reviews the CIT's "grant of an injunction for abuse of discretion," which "may be established by showing that" the CIT "exercised its discretion based on an error of law or clearly erroneous fact findings," *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1084 (Fed. Cir. 2025) (quotation marks omitted). The CIT's determinations "'on questions of law'" are reviewed "without deference." *Oman Fasteners*, 125 F.4th at 1084. "In international trade

controversies … involving the President and foreign affairs," this Court has "often reiterated the very limited role of reviewing courts" and declined "to interpose" absent "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985).

## I. The President's Imposition Of Tariffs Is Clearly Lawful Under A Proper Understanding Of Section 122

The CIT misconstrued Section 122 and therefore erred in holding the challenged proclamation invalid. The proclamation clearly satisfies a proper interpretation of the statute.

### A. The President's Proclamation Identifies A "Balance-of-Payments Deficit" Within The Meaning Of Section 122

The question here is whether the circumstances identified in the President's proclamation constitute a "balance-of-payments deficit[]," 19 U.S.C. § 2132(a)(1). As the proclamation recognizes, and as economists have long understood, there are multiple reasonable ways of calculating a balance-of-payments deficit. Whatever other methods might be viable, the statute allows the approach taken here—treating a deficit in the current account, or a deficit in the sum of the current account, the capital account, and the net foreign direct investment—as a balance-of-payments deficit. That is clear

from the text, context, and enactment history of Section 122, which the CIT

majority essentially ignored, and even the legislative history, which the majority misread.

### 1. A balance-of-payments deficit can be identified in a variety of economically reasonable ways

Even as it defined other terms in Section 122, Congress did not define

the term "balance-of-payments deficits." Indeed, it declined to enact definitional language included in a prior version of the bill. One obvious potential

interpretation, based on the plain meaning of the terms, would be "a deficit"

(that is, a negative value) in the overall "balance of payments." But as all

members of the CIT correctly recognized, that interpretation would render

the statute ineffectual because the overall balance is necessarily zero—*i.e.*,

never negative. Appx32 n.26; Appx70-71; *see* Appx223. Courts do not inter-

pret statutes to be ineffectual. *See Garland v. Cargill*, 602 U.S. 406, 427 (2024).

So the question is what else the phrase is most naturally read to mean.

The only textually sound answer is that because it is a technical term derived

from the field of economics, it carries the same meaning—or the same range

of acceptable meanings—as in that field. That is a standard way of interpret-

ing technical terms in statutes: "[C]ourts take note of terms that carry

- 20 -

'technical meaning[s]'" when they interpret statutes, and "when a statute, like this one, is 'addressing a … technical subject, a specialized meaning is to be expected.'" *Van Buren v. United States*, 593 U.S. 374, 388, 389 n.7 (2021) (alterations in original; quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012)); *see also United States v. Hansen*, 599 U.S. 762, 774 (2023) ("[W]hen Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." (quotation marks omitted)). For example, in *Louisiana Public Service Commission v. FCC*, the Supreme Court explained that because "'[c]harges,' 'classifications,' and 'practices'" were "terms often used by accountants, regulators, courts, and commentators to denote depreciation treatment," the Court would construe them "in accordance with the rule of construction that technical terms of art should be interpreted by reference to the trade or industry to which they apply." 476 U.S. 355, 371-372 (1986).

In economics, the phrase "balance-of-payments deficit" has always been understood as susceptible to measurement by a range of reasonable methodologies. That is true today, as the Acting Chairman of the CEA explained in a declaration before the CIT. *See* Appx219 (explaining that there

are "various credible methodologies for calculating balance-of-payments deficits"). And it was also true at the time of Section 122's enactment.

Just a year after Section 122's enactment, an article published by the Federal Reserve Bank of New York—cited here in the Chairman's declaration (Appx230 n.13)—explained that there were "seven different measures" of the balance of payments "in standard use" at the time. Patricia H. Kuwayama, *Measuring the United States Balance of Payments*, Fed. Rsrv. Bank. of N.Y. Monthly Rev. 183, 183-184 (Aug. 1975), https://perma.cc/BVL8-9GUG; *see id.* at 184-189 (describing all seven). And just a few years before Section 122's enactment, a journal of the International Monetary Fund published an article to explain "economists' shorthand" about the meaning of the phrase "'a deficit in the balance of payments.'" Poul Høst-Madsen, *What Does It Really Mean? – A Deficit in the Balance of Payments*, 3 Fin. & Dev. 171, 171 (1966). The article explained that the phrase is not "a contradiction in terms"—even though the overall balance "is necessarily zero when the entry for net errors and omissions is included"—because, as "used in public discussion," the phrase refers only to "the balance of a certain selection of transactions." *Id.* (emphasis omitted). "The other transactions," the article explains, are "regarded as 'financing'" a surplus or deficit. *Id.* And the article

observed that there is no single understanding among economists about where to draw "'the line'" between items that "make up the surplus or deficit" and those that "represent the financing of" the surplus or deficit. *Id.* at 171-172.

Thus, the most textually sound reading of the statutory phrase "balance-of-payments deficit" is "balance-of-payments deficit as determined using an economically reasonable methodology." It is not problematic that this definition does not specify a *sole* methodology by which a balance-of-payments deficit must be determined. Congress is free to use in a statute a technical term of art, impliedly incorporating the technical understanding of the term as its meaning in the statute. And no principle of constitutional law, or of statutory interpretation, restricts Congress to using only technical terms that have a single, fixed understanding in the field.

Indeed, it is not unusual for Congress to use terms in this way. Consider, for example, the phrase "generally accepted accounting principles." As the Supreme Court has explained, "[a]ccountants long have recognized that 'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions." *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544 (1979). The

- 23 -

phrase "tolerate[s] a range of 'reasonable' treatments." *Id.* But that has not stopped Congress from using it more than a hundred times across the U.S. Code—for example, specifying that the "minimum capital level" for covered banking enterprises shall be a sum including "2.50 percent of the aggregate on-balance sheet assets of the enterprise, as determined in accordance with generally accepted accounting principles." 12 U.S.C. § 4612(a)(1); *see also, e.g.,* 8 U.S.C. § 1153(b)(5)(D)(ii)(II) (visas); 17 U.S.C. § 115(d)(10)(B)(iv)(I) (copyright); 19 U.S.C. § 1677b(f)(1)(A) (trade); 42 U.S.C. § 1395x(z)(1) (Medicare). Congress did not need to specify a particular accounting methodology to enact those statutes, and courts need not do so in applying them.

Nor is it unusual for Congress to use a technical term that adopts all professionally accepted methodologies with deference to reasonable conclusions based on those methodologies. Take, for example, Congress's use of "actuarial equivalent" in the Employee Retirement Income Security Act of 1974 (ERISA). Because "this 'term of art'" "has long been utilized in actuarial practice," courts "evaluate" it "as it was understood by actuarial scientists when ERISA was enacted." *Reichert v. Kellogg Co.*, 170 F.4th 473, 480 (6th Cir. 2026); *accord Drummond v. Southern Co. Servs.*, 177 F.4th 1076, 1088-1094 (11th Cir. 2026); *Stephens v. U.S. Airways Grp.*, Inc., 644 F.3d 437, 440 (D.C. Cir.

2011) (opinion of Brown, J.).  They accordingly "uphold[] actuaries' chosen assumptions if they are within the scope of professional acceptability" — that is, "reasonable" "in the field of actuarial science."  *Reichert*, 170 F.4th at 483 (quotation marks omitted); *accord Drummond*, 177 F.4th at 1092.  This sort of "deference" is not problematic, even though "reasonableness is a range, not a precise prescription," and even though "different actuaries can come to different conclusions on what the exact best estimates are in each situation." *Reichert*, 170 F.4th at 483; *accord Drummond*, 177 F.4th at 1092.  Thus, Congress can and does incorporate in statutes technical terms that are susceptible to a range of understandings within the technical field.

Although the Court need not look beyond Section 122's text to adopt the interpretation discussed above, it is further supported by the drafting history and legislative history of Section 122.

Start with the drafting history — the way in which the legislation that became Section 122 evolved.  A prior version of the legislation that became Section 122 *did* include a definition of "balance-of-payments deficit[]."  It provided, as relevant, that

> a serious balance-of-payments deficit shall be considered to exist whenever the President determines that—

- 25 -

(A) the balance of payments (as measured either on the official reserve transactions basis or by the balance on current account and long-term capital) has been in substantial deficit over a period of four consecutive calendar quarters, or

(B) the United States has suffered a serious decline in its net international monetary reserve position, or

(C) there has been or threatens to be a significant alteration in the exchange value of the dollar in foreign exchange markets, and

(D) the condition indicated in (A), (B), or (C) is expected to continue in the absence of corrective measures.

Trade Reform Act of 1973, H.R. 6767, 93d Cong. § 401(b)(1). But Congress omitted that definitional language from the final version of the bill, even as it maintained definitions of other terms in Section 122, notably specifying that "balance-of-trade surpluses" must be "determined on the basis of the cost-insurance-freight value of imports, as reported by the Bureau of the Census." 19 U.S.C. § 2132(c)(1). The natural inference from that history is that Congress wanted to leave the President with flexibility to determine the existence of a balance-of-payments deficit without needing to adhere to a single specified methodology. *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-580 (2006); *Doe v. Chao*, 540 U.S. 614, 622 (2004).

The legislative history, to the extent it is relevant, confirms as much. The House Ways and Means Committee report on the legislation that

became Section 122 explained that the Committee had "considered various formulas for defining a serious balance-of-payments deficit" but ultimately determined that it was "not possible to formulate a definition with mathematical exactness." H.R. Rep. No. 93-571, at 28-29 (1973). Rather, the report explains, the Committee envisioned that there would "be an element of judgment on the part of the President in determining the existence of a serious deficit that justifies use of" the power conferred by Section 122. *Id.* at 28.

### 2. The challenged proclamation identifies a balance-of-payments deficit under an economically reasonable methodology

The challenged proclamation plainly identifies a "balance-of-payments deficit" within the proper understanding of Section 122, and the CIT's decision should be reversed on that basis.[1]

The proclamation relies on "different methods of evaluating balance-of-payments deficits" and concludes that "under any of these methods, the United States balance-of-payments position is a large and serious deficit."

---

[1] The proclamation also shows that the deficits are "large and serious," 19 U.S.C. § 2132(a)(1). The CIT majority correctly determined that "there is no serious dispute that whether [balance-of-payments] deficits are 'large and serious is a discretionary determination within the province of the Executive Branch, review of which by the judiciary is impermissible." Appx32. We accordingly do not discuss the "large and serious" requirement in this brief.

91 Fed. Reg. at 9340. Specifically, the proclamation cites the "substantial trade deficit" and negative "balance on goods and services." The proclamation also points to the current-account deficit, which has been exacerbated by "large and persistent trade deficits," and the negative primary income, which "turned negative for the first time since at least 1960 in 2024." *Id.* And the proclamation notes the "atypically large negative net international-investment position of the United States," which "is in an ongoing decline." *Id.* The President therefore determined that "the United States balance-of-payments position, under any reasonable understanding of the term in the context of section 122, is currently a large and serious deficit." *Id.*

It can hardly be disputed that these methodologies are economically reasonable ways of identifying a balance-of-payments deficit. The current account records the flow of money into and out of the country, as discussed above. And a current-account deficit has long been a widely accepted measure of a balance-of-payments deficit in the field of economics. An amicus brief by eminent trade scholars, filed in *Learning Resources*, explained that "the 'current account' dictates the [balance of payments] in the United States." Brief of Trade Scholars in Economics, Politics, and Law as Amicus Curiae in Support of Respondent V.O.S. Selections at 7-10, *Learning Res., Inc.*

- 28 -

*v. Trump*, 607 U.S. 229 (2026) (No. 24-1287), 2025 WL 3035872, at *7-10. The International Monetary Fund has also long used the current account to assess countries' balance-of-payments positions, including both before and after Section 122's enactment. *See, e.g.*, IMF, Annual Report 1952, at 38-39 (1952), https://perma.cc/W8DS-HEE5; Kuwayama, *supra*, at 183, 186-187; Donald S. Kemp, *Balance-of-Payments Concepts — What Do They Really Mean?*, Fed. Rsrv. Bank of St. Louis Rev. 14, 19 (July 1975), https://perma.cc/2AP4-VN8C; IMF, IMF External Sector Reports, https://perma.cc/5YQ7-ZUN4 (report "produced annually since 2012" that includes "staff assessments of current accounts and real exchange rates" to analyze "imbalances" in countries' economies). Even the CIT majority acknowledged that the current account is "relevant to balance-of-payments deficits." Appx42. And three other judges of the CIT agreed that "[t]rade deficits are one of the key balance-of-payment deficits" that Section 122 was meant to address. *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1375 (Ct. Int'l Trade 2025) (per curiam).

Although the current account is clearly a widely accepted measure of a balance-of-payment deficit, there have long been other economically accepted ways of assessing balance-of-payments deficits, and many of those

methodologies also show a deficit today. As discussed above, just a year after Section 122's enactment, an article published by the Federal Reserve Bank of New York—and cited here by the then-Chair of the CEA (Appx230 & n.13)—explained that there were "seven different measures … in standard use" at the time, one of which, the "merchandise trade balance," was "the most familiar and well-defined." Kuwayama, *supra*, at 183-184. At least four of the seven measures—merchandise trade, goods and services, current account, and basic balance—are running deficits today. *See* Appx233-235; *see also infra* pp. 48-51 (further describing basic balance). And by 1975, the other three measures were deemed "arbitrary," having "lost all possible relevance," and "not … useful … for the United States." Kuwayama, *supra*, at 188-189 (discussing net-liquidity, gross-liquidity, and official-settlements balances). The deficits in trade and the current account (mirrored by the basic balance) that the President identified here are thus prototypical balance-of-payments deficits widely recognized when Section 122 was enacted.

Moreover, Section 122's enactment history shows that an imbalance in the current account—arising from a substantial trade deficit and exacerbated by the novel deterioration of the balance on primary income—is exactly the kind of balance-of-payments concern that Congress enacted Section 122 to

allow the President to address. When declaring the 1971 national emergency and imposing a temporary 10% duty in response to it, the Nixon Administration recognized that the trade deficit (the first since 1888) was "a primary element in the unsatisfactory U.S. balance of payments" and that correcting the balance-of-payments deficit required correcting the trade deficit. Off. of the Historian, U.S. Dep't of State, *Paper Prepared in the Department of the Treasury* (Sept. 10, 1971), https://perma.cc/JTZ8-2KTU. That crisis was the genesis of Section 122, as discussed above. *See supra* pp. 6-9.

The CIT observed that Section 122(c) authorizes the President to temporarily reduce duties in response to "balance-of-trade surpluses," and from that drew a negative inference that a balance-of-payments deficit must be different from a balance-of-trade deficit. Appx32-33 (emphasis omitted; quoting 19 U.S.C. § 2132(c)(1)). But the reference to "balance-of-trade" in Section 122(c) does not mean that trade imbalances may not be considered in assessing a "balance-of-payments deficit[]." As the CIT itself acknowledged, the balance of trade is a "component of the current account" and "relevant to balance-of-payments deficits." Appx42. And the fact that Congress authorized the President to temporarily increase duties in response to balance-of-*payments* deficits (a term that all agree encompasses a range of

- 31 -

methodologies), but to temporarily decrease duties only in response to balance-of-*trade* surpluses (a much narrower term), simply reflects a congressional policy choice to limit the range of circumstances in which duties could be decreased. It would be nonsensical to conclude, as the CIT did here, that Section 122, which was specifically enacted to address trade deficits, does not authorize the President to rely on economically reasonable methodologies for identifying a balance-of-payments deficit based on a serious and persistent trade deficit. In any event, the President's proclamation does not identify a balance-of-payments deficit as arising solely from a trade deficit; as discussed above, it identifies other components of the problem as well.

### B. The CIT Erred In Substituting Its Reading Of The Legislative History For The Text Congress Enacted

Notwithstanding all this, the CIT concluded that Section 122 requires the President to determine the existence of a balance-of-payments deficit solely by reference to the measures listed in the headings of a single table in the Senate Report on the Trade Act of 1974, which included "[l]iquidity," "[o]fficial settlements," and "[b]asic balance" as subheadings under a "[b]alance of payments" heading. S. Rep. No. 93-1298, at 8. The majority regarded this table as "indicat[ing] what Congress contemplated as the

measure of balance of payments." Appx37. The majority also relied on a December 1974 report from the Staff of the Senate Finance Committee — a report prepared wholly by congressional staff, Appx37 & n.31 — which the majority described as reflecting the views of "the Senate" and as the "the clearest indication of the concerns Section 122 was intended to address," Appx38 n.31. And because the challenged proclamation does not expressly refer to the three measures the majority believed that Congress may have had in mind when it enacted Section 122, the majority held the proclamation invalid. Appx45-46.

That analysis was gravely erroneous for several reasons.

**1.** To start, the CIT majority relied on legislative history in a manner, and to a degree, irreconcilable with modern principles of statutory interpretation. The Supreme Court has repeatedly emphasized that "'legislative history is not the law.'" *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) (quotation marks omitted). Congress's "authoritative statement is the statutory text, not the legislative history or any other extrinsic material[s]," the latter two of which "have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding

- 33 -

of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

Even as an extrinsic "source[] of insight into legislative understandings," moreover, "legislative history … is vulnerable to two serious criticisms." *Exxon*, 545 U.S. at 568. "First, legislative history is itself often murky, ambiguous, and contradictory," *id.*, as evidenced here by the fact that the CIT majority and dissent disagreed about what Section 122's legislative history reveals, *e.g.*, Appx59. And second, "judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members — or, worse yet, unelected staffers and lobbyists — both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text." *Exxon*, 545 U.S. at 568. That concern is underscored here by the CIT's express reliance on a staff report, which did not even purport to reflect the views of members of Congress (much less both chambers of Congress and the President). Such reports were not treated as relevant indicators of Congress's intentions even when legislative history was more broadly accepted as a tool of statutory interpretation than it is today. *See, e.g., Vance v. Hegstrom*, 793 F.2d 1018, 1025 (9th

Cir. 1986) ("[R]eports prepared by staff personnel of members of Congress … are not statements of what Congress intended[.]").

The CIT majority's reliance on legislative history also reflected a more basic misunderstanding of the enterprise of statutory interpretation. The CIT majority seemed to believe that the objective of its analysis was to discern what Congress was *thinking* of when it authorized the President to address balance-of-payments deficits. *See FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1557 (2026) (rejecting use of legislative reports to "divin[e] how Congress would have wanted courts to resolve the question presented in [a] case"). But even assuming for the sake of argument that Congress was thinking of deficits in one of the three measures included in the tables on which the CIT majority focused, that does not mean the statutory phrase Congress used—"balance-of-payments deficits"—is limited in the same fashion. As the Supreme Court has repeatedly emphasized, "the provisions of our laws" control, not "the principal concerns of our legislators." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *see FS Credit*, 146 S. Ct. at 1557-1559; *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020). For that reason, "the fact that [a statute] has been applied in situations not expressly anticipated by Congress does not demonstrate" the kind

of "ambiguity" that calls for resort to indications of congressional intent; "it simply demonstrates [the] breadth of" the text Congress enacted. *Bostock*, 590 U.S. at 674 (alterations in original; quotation marks omitted).

In short, the CIT's analysis—which amounts to an effort to divine the thoughts of the Members of Congress who passed Section 122—does not remotely resemble sound statutory interpretation. Just last month, the Supreme Court pointedly declined to "revive [its] old-time devotion to legislative history." *FS Credit*, 146 S. Ct. at 1558. In a case where the dissent faulted it "for disregarding the … legislative history" of the statute at issue, the majority answered: "guilty as charged." *Id.* at 1556 n.4. There is no question that the Supreme Court would reject the CIT majority's mode of analysis.

**2.** The majority's analysis of the legislative history is also unpersuasive even on its own terms.

As the dissent notes, the table on which the majority relied so heavily appears in the Senate report on the Trade Act of 1974 many pages before the report's "discussion of Section 122" of the Act, and the report's text does "not discuss[] … how payments balances were to be measured for purposes of Section 122." Appx61-62. Nor does the table the majority identified in the committee staff report, which the majority described as "'the clearest

indication of the concerns Section 122 was intended to address'" (Appx38 n.31), "make[] [any] reference to Section 122." Appx63. And the dissent identifies other evidence in the staff report "that the country's current account balance," on which the challenged proclamation relies, "could have been considered to be a measure of the balance of payments in 1974," Appx63, Appx65, such as a table "titled 'U.S. Current Account Balance'" placed "directly under the heading 'U.S. Balance of Payments Trends,'" Appx64:

### U.S. BALANCE OF PAYMENTS TRENDS *
### TABLE 22.—U.S. CURRENT ACCOUNT BALANCE [1]
[In billions of U.S. dollars]

| Year | Balance | Year | Balance |
|------|---------|------|---------|
| 1950 | −2.1 | 1962 | 2.5 |
| 1951 | 0.3 | 1963 | 3.2 |
| 1952 | −0.2 | 1964 | 5.8 |
| 1953 | −1.9 | 1965 | 4.3 |
| 1954 | −0.3 | 1966 | 2.3 |
| 1955 | −0.3 | 1967 | 2.1 |
| 1956 | 1.7 | 1968 | −0.4 |
| 1957 | 3.6 | 1969 | −1.0 |
| 1958 | Negl. | 1970 | 0.4 |
| 1959 | −2.1 | 1971 | −2.8 |
| 1960 | 1.8 | 1972 | −8.4 |
| 1961 | 3.1 | 1973 [2] | 2.7 |

[1] Includes merchandise, services, private remittances, and government transfers.
[2] Preliminary.

Staff of S. Comm. on Fin., 93d Cong., *Staff Data and Materials on U.S. Trade and Balance of Payments* 24 (Comm. Print 1974), https://perma.cc/UCE5-Z9M8.

The majority also quoted at length—for most of an entire page of its opinion—from a report introduced into a congressional hearing record as an addendum to the prepared statement of a witness, Dr. Howard S. Piquet. Appx35. The majority fixated on language stating that "[t]he two most usual approaches" for determining a balance-of-payments deficit are "the 'liquidity' concept and the 'official settlements' concept." Appx35 (quoting *Tariff and Trade Proposals: Hearings Before the H. Comm. on Ways & Means*, 91st Cong. 2710 (1970) (statement of Dr. Howard S. Piquet)). But the report makes that statement immediately after leading with the point that a balance-of-payments deficit "can be shown in different ways," Appx35 (quotation marks omitted)—a point more consistent with our interpretation, and the CIT dissent, than with the CIT majority opinion. In any event, the extent of the majority's reliance on the report is baffling, given that it was published not in a peer-reviewed journal of economics, or for that matter any other academic publication, but in an industry publication called *Leather and Shoes*, for which it had been prepared at the behest of the National Footwear Manufacturers Association. *Tariff and Trade Proposals*, *supra*, at 2686; *see* 114 Cong. Rec. 17717, 18267 (1968) (statement of Sen. Edmund S. Muskie) (discussing an earlier version of the same report).

Finally, and most egregiously, the majority ignored far more compelling evidence in the drafting history and legislative history—evidence showing, as the CIT dissent explained, that Congress meant "to afford some degree of discretion to the President as to the method of measurement," Appx59. The majority offered no response to the fact that the House Ways and Means Committee, having "considered various formulas for defining a serious balance-of-payments deficit," ultimately felt unable "to formulate a definition with mathematical exactness." H.R. Rep. No. 93-571, at 28-29. Nor did the majority explain why, if Congress meant to specify a single methodology for determining a balance-of-payments deficit, Congress would have omitted a definition of "balance-of-payments deficit" that had appeared in an earlier version of the bill, while retaining definitions of other terms. *See supra* pp. 25-26. In short, the majority's analysis would have been weak enough had it focused on the *only* available history—but it is much worse because it overlooks other, more reliable indicia of Congress's intentions. It deserves to be Exhibit A for the "classic criticism of using legislative history": that "it is the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends," *FS Credit*, 146 S. Ct. at 1557 (quotation marks omitted).

- 39 -

**3.** The majority's invalidation of this particular proclamation also improperly fails to account for the backdrop against which Congress enacted Section 122. *See, e.g.*, *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1324 (Fed. Cir. 2021) (analyzing the "legal and historical backdrop against which Congress legislated" (quotation marks omitted)).

When declaring the 1971 national emergency and imposing a temporary 10% duty in response to it, the Nixon Administration recognized that the trade deficit (the first since 1888) was "a primary element in the unsatisfactory U.S. balance of payments" and that correcting the balance-of-payments deficit required correcting the trade deficit. *Paper Prepared in the Department of the Treasury*, *supra*. That crisis was the genesis of Section 122, as discussed above. *See supra* pp. 6-9. Indeed, the committee reports on Section 122 repeatedly cite the trade deficit as a key reason it was needed. *See, e.g.*, H.R. Rep. No. 93-571, at 13, 29; S. Rep. No. 93-1298, at 7. There should accordingly have been no doubt—regardless of what else might constitute a "balance-of-payments deficit" within the meaning of the statute—that this phrase encompasses an imbalance in the current account arising from a substantial trade deficit, when combined with a deterioration of the balance on primary income.

- 40 -

Of course, courts do not "restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy," *Brogan v. United States*, 522 U.S. 398, 403 (1998), but where the text readily applies to that "particular evil," *id.*, a statute should not be construed as failing to address it. The fact that the CIT's interpretation does so is one more strike against it.

4.     Finally, the CIT majority offered no persuasive rationale for rejecting the government's interpretation of Section 122.

a.     The majority appeared to believe that it had to read into Section 122 a single economic methodology for determining the existence of a balance-of-payments deficit, or else it would be abnegating the judicial responsibility "'to say what the law is,'" Appx46 n.38 (quotation marks omitted). But as discussed above, the phrase "balance-of-payments deficit[]" is a term of art with a range of accepted meanings in economics. For that reason, the best *legal* interpretation of the phrase "balance-of-payments deficit[]" is "balance-of-payments deficit as determined using an economically reasonable methodology." Congress did not need to specify, and courts do not need to determine, a particular economic methodology the President must use.

As the CIT dissent explained, that is a perfectly sensible understanding of how Congress would have expected this statute to work. "Congress

- 41 -

understood in 1974, and long before 1974, that our country's payments balance could be measured in different ways that produce different results." Appx69. And Congress wanted to give the President flexibility to address "genuine concerns over the economic condition of the country," Appx68, recognizing that those concerns might take different forms in the future than they did in 1975.

**b.** The majority also opined that allowing the President flexibility to choose among methodologies for determining a balance-of-payments deficit would raise a concern under the nondelegation doctrine, implicating the canon of constitutional avoidance. Appx40-41. But that concern was unfounded. There is no "serious doubt" as to Section 122's constitutionality, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).

The majority's concern flowed from the premise that "the President would always be able to identify a balance-of-payments deficit" if he could simply "select among the sub-accounts" of the balance of payments. Appx39. But that is not what our interpretation of the statute would allow: As discussed above, our interpretation would allow the President to invoke Section 122 only if he determines the existence of a balance-of-payments deficit by an economically reasonable methodology, such as one of the methods

- 42 -

the New York Federal Reserve Bank described as being "in standard use" around the time Section 122 was enacted.  Kuwayama, *supra*, at 183.

In any event, the nondelegation doctrine plays a "more limited role" in the "national security and foreign policy realms" than in the domestic arena.  *FCC v. Consumers' Rsch.*, 606 U.S. 656, 706 (2025) (Kavanaugh, J., concurring).  When Congress delegates "authority over matters of foreign affairs," it "must of necessity paint with a brush broader than that it customarily wields in domestic areas."  *Zemel v. Rusk*, 381 U.S. 1, 17 (1965).  That is because "the President has unique responsibility" in the field of "foreign … affairs," *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993), such that when Congress enacts "legislation which is to be made effective through negotiation and inquiry within the international field," it must afford the President "a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936).

The Supreme Court has thus long approved broad delegations to the President of authority to regulate international trade, including through tariffs.  *See, e.g.*, *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 558-560 (1976); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 409

- 43 -

(1928); *Marshall Field & Co. v. Clark*, 143 U.S. 649, 690-694 (1892); *Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 387-388 (1813); *see also Gundy v. United States*, 588 U.S. 128, 158-159 (2019) (Gorsuch, J., dissenting). So has this Court. *See, e.g., PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1263 (Fed. Cir. 2023) (concluding that Section 232 of the Trade Expansion Act of 1962 "easily" satisfied the nondelegation doctrine (quotation marks omitted)); *HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1254 (Fed. Cir. 2025) (finding the intelligible-principle standard satisfied for Section 307(a)(1)(C) of the Trade Act of 1974). And no Member of the Court in *Learning Resources, Inc. v. Trump* suggested that the construction of statutory authority asserted in that case violated the nondelegation doctrine. *See generally* 607 U.S. 299, 244 (2026).

Even if the domestic version of the nondelegation doctrine were applicable, that standard is still "not demanding," *Gundy*, 588 U.S. at 146, and Section 122 would easily pass muster. *See Oregon*, 2026 WL 1702442, at *2 (noting "[t]here is merit to the federal government's argument that Section 122 already contains the guardrails required by the nondelegation doctrine such that it is not necessary to set out precise 'balance-of-payments deficit[]' measurement methods for the statute to survive challenge"). Congress set

forth both "the general policy" and "the boundaries of [the] delegated authority" — allowing "both the courts and the public [to] ascertain whether the [executive]' has followed the law," *Consumers' Rsch.*, 606 U.S. at 673 (second alteration in original; quotation marks omitted) — by allowing the President to determine the existence of a balance-of-payments deficit using an economically reasonable methodology and by setting caps on the size and duration of the tariffs. As the Supreme Court recognized in *Learning Resources*, Section 122 is a "clear and limited delegation[]." 607 U.S. at 244.

Regardless, the "canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Jennings*, 583 U.S. at 296 (quotation marks omitted). And here there is no genuine ambiguity in Section 122's text that could be informed by the avoidance canon. Cherry-picking legislative history is not "ordinary textual analysis" that can create ambiguity to supplant the best reading of the text.

## II.   The Challenged Proclamation Identifies A Balance-of-Payments Deficit Even Under The CIT's Interpretation

As discussed above, the CIT's decision should be reversed because the challenged proclamation identifies a "balance-of-payments deficit" within

- 45 -

the proper understanding of Section 122 — namely, a deficit in both the trade balance and the current-account balance, either of which is a long-accepted measure of the balance of payments. But the Court should also reverse even if it accepts the CIT's erroneous construction of the statute, because the circumstances identified by the proclamation constitute a "balance-of-payments deficit" even under that construction.

That is because the circumstances identified in the proclamation also establish a deficit in the "basic balance," which the CIT identified as one of the acceptable methods for calculating a balance-of-payment deficit, Appx33. As the dissenting CIT judge recognized, there was no basis for the CIT majority to conclude "that the [President's] advisors did not also consider whether the balance-of-payments deficit would be large and serious according to the basic balance method." Appx76; *see also* 91 Fed. Reg. at 9340 (confirming a large and serious deficit "under any reasonable understanding of" balance-of-payments position).

The basic balance, used as one measure of the balance of payments at the time of Section 122's enactment, "combined the current account and long-term capital, and served as a gauge for the imbalance between 'underlying' long-term demand and supply of foreign exchange." Appx225-226.

- 46 -

The purpose of this methodology for determining a balance-of-payments deficit was to "capture only durable trends," while "exclud[ing] short-term and volatile capital flows." Appx228.

Beginning in the 1970s, the basic balance was no longer generally modeled, because changes in the financial market rendered the distinction between long-term and short-term capital increasingly arbitrary and "obsolete." Appx70. But the basic balance can still be approximated by determining what parts of the financial account can be reasonably isolated and are sufficiently durable to warrant inclusion. The basic balance can be most closely approximated today as the sum of the current account, the capital account, and net foreign direct investment. This is a calculation that excludes assets in the financial account that "can exhibit high degrees of liquidity and volatile flows." Appx234. As the Acting Chairman of the CEA explained to the CIT, the sum of the current account, the capital account, and net foreign direct investment is a large deficit. Appx235. Thus, the President's identification of a large and serious deficit "under any reasonable understanding of" the United States's balance-of-payments position, based on his advisors' analysis of "different methods" using "calculations based on

- 47 -

current-account statistics," 91 Fed. Reg. at 9340, also identified a deficit in

the basic balance.

In any event, as demonstrated in the figure below, the basic balance

and the current account have always tracked each other closely:

**Figure 2: Basic Balance & Current Account, % of GNP**

*Given data estimates as of 1974*

Appx227.  That close correlation reflects the fact that, as the CEA's 2026 Eco-

nomic Report of the President confirms, the current account largely dictates

the basic balance.   CEA, *Economic Report of the President* (Apr. 2026),

https://perma.cc/65DY-WE7D.  That report shows a large current-account

deficit over the past half century.  *Id.* at 438, tbl. B-57.  It also shows values

of the net capital account over a similar time span, and those values are con-

sistently minimal relative to the size of the current account.  *Id.* at 397, tbl. B-

- 48 -

19. It therefore makes sense that the basic balance—historically, the sum of the current account and long-term capital—would be overwhelmingly driven by the current account. Thus, when the President cited a large and persistent negative current account balance, he identified a basic-balance deficit as well.

The CIT failed even to consider whether the challenged proclamation identifies circumstances that demonstrate a negative basic balance. Indeed, it failed to give the government an opportunity to address that issue. As explained, neither party raised the extremely narrow definition of "balance-of-payments deficit[]" that the CIT ultimately adopted. Thus, the government had no opportunity to argue that the proclamation also establishes a negative basic balance that satisfies the CIT's narrow definition. But for the reasons explained above, the proclamation's identification of a large and persistent current-account deficit also establishes a deficit in the basic balance and thus meets the CIT's narrow definition of "balance-of-payments deficit." Thus, even if the Court agrees with the CIT's interpretation of the statute, it should reverse the CIT's judgment invalidating the challenged proclamation.

- 49 -

At a minimum, if the Court agrees with the CIT's novel interpretation of Section 122 and believes the current record is insufficient to resolve the basic-balance issue, it should vacate the judgment and remand for the CIT to address whether the proclamation identifies a deficit in the basic balance. The CEA has recently produced a thorough analysis bearing on that question, consistent with the points articulated above. CEA, *Measuring Balance of Payments Deficits* (July 2026), https://perma.cc/GG4E-KZMH. Confirming the Acting CEA Chairman's declaration before the CIT, the CEA analysis explains that the basic balance "was a construct that combined the current account with long-term capital flows" and was "intend[ed] to isolate the persistent, structural component of a country's external position from short-term or speculative financial movements." *Id.* at 2. The "basic balance was abandoned," the CEA notes, "not because what it was seeking to measure ceased to matter" but because of the "increasingly arbitrary nature of separating short- and long-term assets by maturity and marketability" and became "increasingly difficult to distinguish between transactions in liquid and illiquid assets" given the "evolving financial markets and capital mobility." *Id.* (quotation marks omitted). The CEA explains that "any attempt to recreate the basic balance today," without the aforementioned

"measurement problems," would include "the current-account balance, the capital-account balance (which will be small in comparison), and net [foreign direct investment]." *Id.* at 3, 5. The CEA analysis shows that this formulation of the basic balance, which "captur[es] the original intent of the basic balance," reflects "a prolonged period in deficit." *Id.* at 7.

For all the reasons discussed above, the record is sufficient for the Court to conclude without the need for a remand that the challenged proclamation identifies a "balance-of-payments deficit[]" even under the CIT's narrow definition. But if the Court adopts the CIT's novel interpretation, and finds the current record insufficient to determine whether the challenged proclamation is consistent with that interpretation, it should at a minimum remand so that the CIT can address that question in the first instance.

## CONCLUSION

The CIT's judgment should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. MCARTHUR
   *Deputy Assistant Attorney General*

BRAD HINSHELWOOD
DANIEL WINIK

*/s/ Sophia Shams*

SOPHIA SHAMS
DOUGLAS C. DREIER
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7213*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-2000*
   *sophia.shams@usdoj.gov*

**ADDENDUM**

# TABLE OF CONTENTS

19 U.S.C. § 2132 ..............................................................................A1

**19 U.S.C. § 2132**

**§ 2132. Balance-of-payments authority**

**(a) Presidential proclamations of temporary import surcharges and temporary limitations on imports through quotas in situations of fundamental international payments problems**

Whenever fundamental international payments problems require special import measures to restrict imports —

(1) to deal with large and serious United States balance-of-payments deficits.

(2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or

(3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium,

the President shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress) —

(A) a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States;

(B) temporary limitations through the use of quotas on the importation of articles into the United States; or

(C) both a temporary import surcharge described in subparagraph (A) and temporary limitations described in subparagraph (B).

The authority delegated under subparagraph (B) (and so much of subparagraph (C) as relates to subparagraph (B)) may be exercised (i) only if international trade or monetary agreements to which the United States is a party permit the imposition of quotas as a balance-of-payments measure, and (ii) only to the extent that the fundamental imbalance cannot be dealt with effectively by a surcharge proclaimed pursuant to subparagraph (A) or (C). Any temporary import surcharge proclaimed pursuant to subparagraph (A) or (C) shall be treated as a regular customs duty.

…

- A1 -

Slip Op. 26-47

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| THE STATE OF OREGON, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, ET AL., <br><br> Defendants. | Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges <br><br> Court No. 26-01472-3JP |
| BURLAP AND BARREL, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, ET AL., <br><br> Defendants. | Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges <br><br> Court No. 26-01606-3JP |

**OPINION AND ORDER**

[Granting Plaintiffs' motions for summary judgment and entering a permanent injunction for The State of Washington, Burlap and Barrel, Inc., and Basic Fun, Inc.; dismissing the claims of The State of Oregon, The State of Arizona, The State of California, The State of New York, The State of Colorado, The State of Connecticut, The State of Delaware, The State of Illinois, Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, The State of Maine, The State of Maryland, The Commonwealth of Massachusetts, The State of Michigan, The State of New Jersey, The State of Minnesota, The State of Nevada, The State of New Mexico, The State of North Carolina, Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania, The State of Rhode Island, The State of Vermont, The Commonwealth of Virginia, and The State of Wisconsin, for lack of standing; denying as moot Plaintiffs' alternative motions for preliminary injunction.]

Dated: May 7, 2026

Brian S. Marshall, Senior Assistant Attorney General, Oregon Department of Justice, of Portland, Or., argued for Plaintiffs The State of Oregon, The State of Arizona, The State

- Appx1 -

of California, The State of New York, The State of Colorado, The State of Connecticut, The State of Delaware, The State of Illinois, Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky, The State of Maine, The State of Maryland, The Commonwealth of Massachusetts, The State of Michigan, The State of Minnesota, The State of Nevada, The State of New Jersey, The State of New Mexico, The State of North Carolina, Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania, The State of Rhode Island, The State of Vermont, The Commonwealth of Virginia, The State of Washington, and The State of Wisconsin.  Also on the brief for The State of Oregon were: Dan Rayfield, Attorney General, Benjamin Gutman, Deputy Attorney General, Dustin Buehler, Special Counsel, and Leanne Hartmann, Samuel Kubernick, and Brian Collins, Senior Assistant Attorneys General; for The State of Arizona: Kristin K. Mayes, Attorney General, Joshua D. Bendor, Solicitor General, Syreeta A. Tyrell, Senior Litigation Counsel, and Timothy E.D. Horley and Jaylia Yan, Assistant Attorneys General; for The State of California: Rob Bonta, Attorney General, Lara Haddad, Supervising Deputy Attorney General, and Shiwon Choe, Carolyn Downs, and Samuel Sokolsky, Deputy Attorneys General; for The State of New York: Letitia James, Attorney General, Rabia Muqaddam, Chief Counsel for Federal Initiatives, and Stephen Thompson, Mark Ladov, Natasha Korgaonkar, Special Counsel; for The State of Colorado: Philip J. Weiser, Attorney General, and Sarah H. Weiss, Senior Assistant Attorney General; for The State of Connecticut: William Tong, Attorney General, and Michael Skold, Solicitor General; for The State of Delaware: Kathleen Jennings, Attorney General, Ian R. Liston, Director of Impact Litigation, Vanessa L. Kassab, Deputy Attorney General, and Rose Gibson, Assistant Attorney General; for The State of Illinois: Kwame Raoul, Attorney General, Cara Hendrickson, Executive Deputy Attorney General, and Gretchen Helfrich, Deputy Chief, Special Litigation Bureau; for the Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky: S. Travis Mayo, General Counsel, and Laura C. Tipton, Deputy General Counsel; for The State of Maine: Aaron M. Frey, Attorney General, and Katherine W. Thompson, Special Counsel; for The State of Maryland: Anthony G. Brown, Attorney General, and James C. Luh, Senior Assistant Attorney General; for The Commonwealth of Massachusetts: Andrea J. Campbell, Attorney General, and Katherine Dirks, Chief State Trial Counsel; for The State of Michigan: Dana Nessel, Attorney General, and Neil Giovanatti, Assistant Attorney General; for The State of Minnesota: Keith Ellison, Attorney General, Peter J. Farrell, Deputy Solicitor General, and Lindsey E. Middlecamp, Special Counsel; for The State of Nevada: Aaron D. Ford, Attorney General, and K. Brunetti Ireland, Chief of Special Litigation; for The State of New Jersey, Jennifer Davenport, Attorney General, and Lucy I. Sprague and David N. Birch, Deputy Attorneys General; for The State of New Mexico: Raúl Torrez, Attorney General, and Amy Senier, Senior Counsel; for The State of North Carolina: Jeff Jackson, Attorney General, Laura Howard, Chief Deputy Attorney General, and Daniel T. Wilkes, Assistant Deputy Attorney General; for Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania: Jennifer

Selber, General Counsel, and Jacob B. Boyer, Deputy General Counsel; for The State of Rhode Island: Peter F. Neronha, Attorney General, and Alex Carnevale, Special Assistant Attorney General; for The State of Vermont: Charity R. Clark, Attorney General, and Ryan P. Kane, Deputy Solicitor General; for The Commonwealth of Virginia: Jay Jones, Attorney General, and Tillman J. Breckenridge, Solicitor General; for The State of Washington: Nicholas W. Brown, Attorney General, and Freeman E. Halle and Todd Sipe, Assistant Attorneys General; for The State of Wisconsin: Joshua L. Kaul, Attorney General, and Brian P. Keenan, Assistant Attorney General.

Jeffrey M. Schwab, Liberty Justice Center, of Austin, TX, argued for Plaintiffs Burlap and Barrel, Inc., and Basic Fun, Inc. Also on the brief were Reilly W. Stephens and James McQuaid.

Brett A. Shumate, Assistant Attorney General, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendants United States, Donald J. Trump, in his official capacity as President of the United States, Department of Homeland Security, Markwayne Mullin, in his official capacity as Secretary of the Department of Homeland Security, United States Customs and Border Protection, Rodney S. Scott, in his official capacity as Commissioner of United States Customs and Border Protection, the Executive Office of the President, Jamieson Greer, in his official capacity as United States Trade Representative, and the Office of the United States Trade Representative. Also on the brief were Eric J. Hamilton, Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Commercial Litigation Branch, Claudia Burke, Deputy Director, Commercial Litigation Branch, Justin R. Miller, Attorney-In-Charge, International Trade Field Office, Sosun Bae, Senior Trial Counsel, and Collin T. Mathias, Blake W. Cowman, Catherine M. Yang, and Mathias Rabinovitch, Trial Attorneys.

J. Marc Wheat, Advancing American Freedom, of Washington, DC, for Amici Curiae Advancing American Freedom, et al.

Ilya Somin, of Arlington, VA, and Joshua A. Claybourn, Jackson Kelly PLLC, of Evansville, IN, for Amici Curiae Cato Institute and Ilya Somin.

Adam G. Unikowsky, Aaron R. Cooper, Nikita Lalwani, and Debbie L. Berman, of Jenner & Block LLP, of New York, NY, and Chicago, IL, for Amici Curiae Economists.

     Barnett and Kelly, Judges: Plaintiffs[1] in these companion cases contest the

imposition of duties pursuant to Proclamation No. 11012, Imposing a Temporary Import

---

[1] The plaintiffs in Court No. 26-01472, referred to as "State Plaintiffs," are The State of Oregon, The State of Arizona, The State of California, The State of New York, The

Surcharge to Address Fundamental International Payments Problems (Feb. 20, 2026),

91 Fed. Reg. 9339 (Feb. 25, 2026) ("Proclamation No. 11012") invoking Section 122 of

the Trade Act of 1974, 19 U.S.C. § 2312.  Compl. (Mar. 5, 2026) ("State Compl."), ECF

No. 2, Ct. No. 26-01472; Compl. (Mar. 9, 2026) ("Priv. Compl."), ECF No. 2, Ct. No. 26-

01606.[2]  Before the court are Plaintiffs' motions for summary judgment.  Pl. States' Mot.

for Summ. J., and, in the Alt., for a Prelim. Inj. (Mar. 13, 2026) ECF No. 25, and Pl.

States' Mem. of Law in Supp. of Mot. for Summ. J., and, in the Alt., for a Prelim. Inj.

(Mar. 13, 2026) ("State Pls.' Mem."), ECF No. 25; Pls.' Mot. for Prelim. Inj. and/or

Summ. J. for Permanent Inj. (Mar. 13, 2026), ECF No. 11, and Mem. in Supp. of Pls.'

Mot. for Prelim. Inj. and/or Summ. J. for Permanent Inj. (Mar. 13, 2026) ("Priv. Pls.'

Mem."), ECF No. 11.  Defendants[3] ("the Government") filed a single combined

---

State of Colorado, The State of Connecticut, The State of Delaware, The State of
Illinois, Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor
of the Commonwealth of Kentucky, The State of Maine, The State of Maryland, The
Commonwealth of Massachusetts, The State of Michigan, The State of Minnesota, The
State of Nevada, The State of New Jersey, The State of New Mexico, The State of
North Carolina, Josh Shapiro, in his official capacity as Governor of the Commonwealth
of Pennsylvania, The State of Rhode Island, The State of Vermont, The Commonwealth
of Virginia, The State of Washington, and The State of Wisconsin.  The plaintiffs in
Court No. 26-01606, referred to as "Private Plaintiffs," are Burlap and Barrel, Inc.
("Burlap and Barrel") and Basic Fun, Inc. ("Basic Fun").  The court refers to the State
Plaintiffs and the Private Plaintiffs collectively as "Plaintiffs."
[2] Citations to documents filed by State Plaintiffs identify the ECF No. in Ct. No. 26-
001472, and citations to documents filed by Private Plaintiffs identify the ECF No. in Ct.
No. 26-001606.  For documents filed on both case dockets, the court references the
ECF No. in Ct. No. 26-01472.
[3] Named Defendants are the United States, Donald J. Trump, in his official capacity as
President of the United States, United States Department of Homeland Security,
Markwayne Mullin, in his official capacity as Secretary of the Department of Homeland
Security, United States Customs and Border Protection, and Rodney S. Scott, in his
official capacity as Commissioner of United States Customs and Border Protection, see

- Appx4 -

opposition brief in response to both motions.  Defs.' Resp. in Opp'n to Mots. For Prelim. Inj. and Summ. J. (Apr. 3, 2026) ("Defs.' Resp."), ECF No. 35.  Plaintiffs filed replies.  Pl. States' Reply in Supp. of Mot. for Summ. J., and, in the Alt., for a Prelim. Inj. (Apr. 7, 2026) ("State Pls.' Reply"), ECF No. 37; Pls.' Reply Br. in Supp. of Their Mot. for Prelim. Inj. and/or Summ. J. for Permanent Inj. (Apr. 7, 2026) ("Priv. Pls.' Reply"), ECF No. 22.

For the reasons discussed herein, the court grants summary judgment for Private Plaintiffs and The State of Washington and enters a permanent injunction for those importer Plaintiffs.  The court dismisses without prejudice the claims of the remaining non-importer Plaintiffs.  The court denies as moot Plaintiffs' motions for a preliminary injunction.

## BACKGROUND

I.      **Section 122 of the Trade Act of 1974**

Article I, Section 8 of the U.S. Constitution vests Congress with the "Power To lay and collect Taxes, Duties, Imposts and Excises."  U.S. Const. art. I, § 8, cl. 1.  Section 122 of the Trade Act of 1974 constitutes a congressional delegation of some of that authority to the President.  Titled "Balance-of-Payments Authority," Section 122 empowers the President of the United States to impose temporary surcharges up to 15 percent <u>ad valorem</u> when fundamental international payment problems exist.  Section 122 of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978, 1987–89 (1974)

---

Summons (Mar. 5, 2026), ECF No. 1, Ct. No. 26-01472, as well as the Executive Office of the President, Jamieson Greer, in his official capacity as United States Trade Representative, and the Office of the United States Trade Representative, <u>see</u> Summons (Mar. 9, 2026), ECF No. 1, Ct. No. 26-01606.

Court Nos. 26-01472 & 26-01606                                          Page 6

(codified at 19 U.S.C. § 2132)).[4]  The statute provides (with bold emphasis on the

provisions relevant to Proclamation No. 11012):

> (a) **Whenever fundamental international payments problems require special import measures to restrict imports**—
>> (1) **to deal with large and serious United States balance-of-payments deficits**[,]
>> (2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or
>> (3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium,
>
> **the President shall proclaim, for a period not exceeding 150 days** (unless such period is extended by Act of Congress)—
>> (A) **a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States**;
>> (B) temporary limitations through the use of quotas on the importation of articles into the United States; or
>> (C) both a temporary import surcharge described in subparagraph (A) and temporary limitations described in subparagraph (B) . . . .
>
> (b) If the President determines that the imposition of import restrictions under subsection (a) will be contrary to the national interest of the United States, then he may refrain from proclaiming such restrictions and he shall—
>> (1) immediately inform Congress of his determination, and
>> (2) immediately convene the group of congressional official advisers designated under section 2211(a) of this title [section 161(a) in the Trade Act of 1974] and consult with them as to the reasons for such determination.
>
> (c) Whenever the President determines that fundamental international payments problems require special import measures to increase imports—

---

[4] Because Congress has not enacted Title 19 into positive law, the version of section 122 contained in the Statutes at Large governs to the extent there is a conflict between the public law and the U.S. Code.  For ease of reference, however, the court cites to 19 U.S.C. § 2132, showing, when necessary, any alterations to or differences from the Trade Act of 1974.  One such conflict, for example, is evident in Section 122(a)(1), which contains a comma at the end of that clause, while 19 U.S.C. § 2132(a)(1) contains a period.  Compare Trade Act of 1974, § 122, 88 Stat. at 1987 (comma), with 19 U.S.C. § 2132(a)(1) (1976) (period), and 19 U.S.C. § 2132(a)(1) (2018) (period).

> (1) to deal with large and persistent United States balance-of-trade surpluses, as determined on the basis of the cost-insurance-freight value of imports, as reported by the Bureau of the Census, or
> (2) to prevent significant appreciation of the dollar in foreign exchange markets,

the President is authorized to proclaim, for a period of 150 days (unless such period is extended by Act of Congress)—

> (A) a temporary reduction (of not more than 5 percent ad valorem) in the rate of duty on any article; and
> (B) a temporary increase in the value or quantity of articles which may be imported under any import restriction, or a temporary suspension of any import restriction . . . .

(d)     (1) Import restricting actions proclaimed pursuant to subsection (a) **shall be applied consistently with the principle of nondiscriminatory treatment** . . . .

        (2) Notwithstanding paragraph (1), if the President determines that the purposes of this section will best be served by action against one or more countries having large or persistent balance-of-payments surpluses, he may exempt all other countries from such action . . . .

(e) Import restricting actions proclaimed pursuant to subsection (a) shall be of **broad and uniform application with respect to product coverage except where the President determines, consistently with the purposes of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy**.  Such exceptions shall be limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors . . . .

19 U.S.C. § 2132(a)–(e) (emphases added).

## II.     Historical Background Prior to Enactment of Section 122

Congress enacted Section 122 in response to a particular set of economic circumstances.  During the immediate aftermath of World War II, the United States and other nations undertook negotiations to develop the contours of a future international monetary and economic system.  See The Office of the Historian, Bretton Woods-

GATT, 1941-1947, U.S. Dep't of State, https://history.state.gov/milestones/1937-1945/bretton-woods (last visited May 6, 2026).  The negotiations resulted in the inauguration of the Bretton Woods international monetary system and, simultaneously, the creation of the International Monetary Fund and the World Bank.  See id.; Articles of Agreement of the Int'l Monetary Fund, Dec. 27, 1945, 60 Stat. 1401, 2 U.N.T.S. 39 ("Bretton Woods Agreements"); see also Bretton Woods Agreements Act, Pub. L. No. 79-171, 59 Stat. 512 (1945) (codified as amended at 22 U.S.C. §§ 286–286x) (implementing the Bretton Woods Agreements domestically).  Under the Bretton Woods system, the values of foreign currencies were fixed to the value of the U.S. dollar, the value of which was expressed in terms of gold at a rate of $35 per ounce, the so-called "gold standard."  Bretton Woods Agreements, Art. IV, Sec. 1(a); Proclamation No. 2072, 48 Stat. 1730 (Jan. 31, 1934); see also Gold Reserve Act of 1934, Pub. L. No. 73-87, 48 Stat. 337 (1934) (delegating authority to the President to fix the value of the U.S. dollar in relation to gold).

The Bretton Woods system was under increasing strain by the 1960s when the volume of U.S. dollars in worldwide circulation exceeded domestic gold reserves redeemable at fixed value, leading to periodic runs on the dollar in foreign exchange markets.  See The Office of the Historian, Nixon and the End of the Bretton Woods System, 1971-1973, U.S. Dep't of State, https://history.state.gov/milestones/1969-1976/nixon-shock (last visited May 6, 2026).  In August 1971, President Richard M. Nixon directed the suspension of the dollar's international convertibility into gold, imposed a series of domestic economic measures including wage and price controls,

and instituted a 10 percent "surcharge" on all imports into the United States in response to the nation's deteriorating "balance of payments position."  Proclamation No. 4074, Imposition of Suppl. Duty for Balance of Payments Purposes (Aug. 15, 1971), 36 Fed. Reg. 15724 (Aug. 17, 1971).  In December 1971, the Group of Ten ("G-10") countries agreed to a new set of fixed exchange rates that would devalue the dollar in the Smithsonian Agreement.  See Nixon and the End of the Bretton Woods System, 1971-1973.  But by early 1973, speculative pressures in global financial markets led to a further devaluation of the dollar, and the G-10 economies reached a new agreement whereby a group of European Community countries would jointly "float" their currencies against the dollar.  See id.  This marked the end of the Bretton Woods system of fixed exchange rates.  See id.  Later in 1973, after the outbreak of the Arab-Israeli War, members of the Organization of Petroleum Exporting States ("OPEC") imposed an oil embargo against the United States, further straining the U.S. economy and creating external financial pressures with respect to foreign oil-producing countries.  See The Office of the Historian, Oil Embargo, 1973-1974, U.S. Dep't of State, https://history.state.gov/milestones/1969-1976/oil-embargo (last visited May 6, 2026).

The United States Customs Court, the predecessor to the United States Court of International Trade ("CIT"), heard a challenge to the 10 percent Nixon surcharge in 1974.  See Yoshida Int'l, Inc. v. United States (Yoshida I), 73 Cust. Ct. 1, 378 F. Supp. 1155 (1974).  Despite not being cited in the underlying Proclamation imposing the surcharge, the Government argued that the President's actions were lawful pursuant to the Trading with the Enemy Act ("TWEA"), a 1917 wartime powers statute.  See id., 378

- Appx9 -

F. Supp. at 1157.  The Customs Court disagreed, holding that the surcharge exceeded the limited emergency authority delegated to the President by TWEA.  Id., 378 F. Supp. at 1172, 1175–76 ("The delegation of such an unrestrained and unbridled authority to lay duties, indeed, might well be deemed an abdication by the Congress of its constitutional power to regulate foreign commerce.").  The United States Court of Customs and Patent Appeals, the predecessor to the United States Court of Appeals for the Federal Circuit, reversed the Customs Court's decision, holding that the surcharge was "within the power constitutionally delegated" to the President by TWEA and reasoning that "[t]hough such a broad grant may be considered unwise, or even dangerous, should it come into the hands of an unscrupulous, rampant President, willing to declare an emergency when none exists, the wisdom of a congressional delegation is not for us to decide."  United States v. Yoshida Int'l. Inc. (Yoshida II), 63 CCPA 15, 36, 526 F. 2d 560, 583–84 (1975) (footnote omitted).

It was against this backdrop that Congress acted to explicitly delegate tariff authority to the President, to be used in response to particular and exceptional economic conditions, under Section 122 of the Trade Act of 1974.  After almost two years of debate, and while the appeal of Yoshida I was pending, Congress enacted Section 122 in January 1975.  See Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1979 (1975).  The Yoshida II court explicitly observed that "[a] surcharge imposed after Jan. 3, 1975 must, of course, comply with the statute now governing such action," i.e., Section 122, and expressed no view "regarding the existence of authority

**- Appx10 -**

for Proclamation 4074 in 1971, from the specific grant of the surcharge authority spelled out in the Trade Act of 1974."  63 C.C.P.A. at 34 n.33, 526 F.2d at 582 n.33.

### III.     Proclamation No. 11012

Pursuant to authority claimed under Section 122, on February 20, 2026, the President announced a 10 percent ad valorem duty on "all articles imported into the United States," with specified exceptions.  Proclamation No. 11012, cl. 1; ¶ 14 (exceptions).  The duty went into effect at 12:01 a.m. EST on February 24, 2026, and is set to remain in effect until 12:01 a.m. EST on July 24, 2026, unless "suspended, modified, or terminated on an earlier date" or "extended by an Act of Congress."  Id., cl. 7.  To implement the increased duty rates, Proclamation No. 11012 modified subchapter III of chapter 99 of the Harmonized Tariff Schedule of the United States ("HTSUS") to add new subheadings under HTSUS heading 9903.  Id., Annex I.

The Proclamation begins by explaining that, "[s]ometimes, the United States faces fundamental international payments problems, such as large and serious balance-of-payments deficits, an imminent and significant depreciation of its currency in foreign exchange markets, or an international balance-of-payments disequilibrium."  Id. ¶ 1. According to the President, "[t]hese problems can, among other things, endanger the ability of the United States to finance its spending, erode investor confidence in the economy, and distress the financial markets."  Id.  The President's "senior officials [informed him] that fundamental international payments problems within the meaning of section 122 exist and that special import measures to restrict imports are required to address these problems."  Id. ¶ 5.  That determination was made "under any reasonable

understanding of the term in the context of section 122." Id. ¶ 6. The President's "advisors have studied different methods of evaluating balance-of-payments deficits, including calculations based on current-account statistics" and in their view, "under any of these methods, the United States balance-of-payments position is a large and serious deficit." Id.

The President made several findings to support the invocation of section 122. First, "the United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments, on net, flowing out of the country than into the country." Id. ¶ 7; see also id. ¶ 8 ("[T]he United States runs a substantial trade deficit" that "contributes to the fundamental international payments problems facing the United States.").[5] Second, "the annual balance on the United States primary income turned negative for the first time since at least 1960 in 2024" and "in 2024, the United States maintained a current account deficit of 4.0 percent of gross domestic product (GDP)." Id. ¶ 9. Third, "the net international-investment position of the United States is in an ongoing decline" and "at the end of 2024, the net international-investment position . . . , as a share of GDP, was negative 90 percent." Id. ¶ 10. According to the President, "[b]ecause the current account is one of the primary drivers of changes in the net international-investment position, the atypically large negative net international-investment position of the United States shows that the

---

[5] "The large, persistent, and serious annual United States goods trade deficit has grown by over 40 percent in the past 5 years alone, reaching $1.2 trillion in 2024. In 2025, the United States goods trade deficit remained at approximately $1.2 trillion." Proclamation No. 11012 ¶ 8.

United States balance-of-payments deficit is large and serious." Id.  Lastly, "the balance on secondary income of the United States has been persistently in a deficit since the 1960s." Id. ¶ 11.  In sum, the President identified deficits in trade, primary income, secondary income, and the current account, and a negative net international-investment position, to support the tariff imposition.  See id. ¶¶ 7–11.

The President thus concluded, on the advice of his advisors, that "an import surcharge in the form of ad valorem duties is required to address these fundamental international payments problems" and "deal with the large and serious United States balance-of-payments deficit." Id. ¶ 12.  That action notwithstanding, the President listed multiple exceptions based on "the needs of the United States economy." Id. ¶ 14; see also id. ¶ 14(a)–(m) (the excepted articles).  The President based the exceptions on his determinations regarding "(1) the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, the avoidance of serious dislocations in the supply of imported goods, or other similar factors; or (2) the fact that the surcharge would be unnecessary or ineffective in carrying out the purposes of section 122." Id. ¶ 15.[6]

---

[6] Proclamation No. 11012 does not apply to goods "that (i) were loaded onto a vessel at the port of loading and in transit on the final mode of transit prior to entry into the United States, before 12:01 a.m. eastern standard time on February 24, 2026; and (ii) are entered for consumption, or withdrawn from warehouse for consumption, before 12:01 a.m. eastern standard time, February 28, 2026." Proclamation No. 11012 ¶ 15(2).

**- Appx13 -**

### IV.    U.S. Customs and Border Protection CSMS # 67844987

On February 23, 2026, U.S. Customs and Border Protection ("CBP") issued guidance to the trade community regarding the application of Section 122 duties pursuant to Proclamation No. 11012.  See State Compl., Ex. 2, ECF No. 2-2 ("Cargo Systems Messaging Service (CSMS) # 64844987 – Imposing Temporary Section 122 Duties," or "CSMS # 64844987").  CSMS # 64844987 set forth the HTSUS classifications for imported articles subject to the additional duties and for the exemptions.  Id.  CSMS # 64844987 also provided guidance regarding articles classifiable under Chapter 98 of the HTSUS, articles admitted into a U.S. foreign trade zone, drawback, and classification sequencing in entry summaries.  Id.

### V.    Procedural History

Plaintiffs filed their respective complaints in March 2026.  State Compl. (filed Mar. 5, 2026); Priv. Compl. (filed Mar. 9, 2026).  State Plaintiffs consist of 24 sovereign states, represented by various state officials.  State Compl. ¶¶ 25–48.  Burlap and Barrel "is a New York-based spice company and ecommerce business," that "imports single origin spices from at least 22 countries."  Priv. Compl. ¶ 10.  Basic Fun is a Florida-based toy company that "imports components and finished toy products from China" and "designs, markets, and sells toys and games . . . to American consumers." Id. ¶ 11.

Following a status conference, see Docket Entry, ECF No. 23, Ct. No. 26-01472, and upon consultation with parties to both actions, the court granted in part and denied in part the State Plaintiffs' motion for expedited treatment of their case and entered a

Court Nos. 26-01472 & 26-01606                                     Page 15

scheduling order, see Scheduling Order (Mar. 12, 2026), ECF No. 24.  The parties filed

their respective briefs, and the Government filed an Answer to the complaints,

consistent with the deadlines in the scheduling order.[7]  See State Pls.' Mem.; Priv. Pls.'

Mem.; Defs.' Resp.; State Pls.' Reply; Priv. Pls.' Reply; Answer [State Compl.] (Apr. 3,

2026), ECF No. 34; Answer [Priv. Compl.] (Apr. 3, 2026), ECF No. 15.   The court held

oral argument on April 10, 2026.  Docket Entry, ECF No. 46; see also Oral Arg.,

https://www.cit.uscourts.gov/ audio-recordings-select-public-court-proceedings.

## JURISDICTION

The court has statutory subject matter jurisdiction pursuant to 28 U.S.C. § 1581(i)

(2018 & Supp. II 2022).  Section 1581(i) grants the court

> exclusive jurisdiction of any civil action commenced against the United
> States, its agencies, or its officers, that arises out of any law of the United
> States providing for—
> (A) revenue from imports or tonnage;
> (B) tariffs, duties, fees, or other taxes on the importation of
> merchandise for reasons other than the raising of revenue;
> (C) embargoes or other quantitative restrictions on the importation
> of merchandise for reasons other than the protection of the public
> health or safety; or

---

[7] Consistent with the agreement of all Parties, these cases proceeded on motions for summary judgment by Plaintiffs.  The dissent contends that Plaintiffs have failed to show the absence of a genuine dispute as to any material fact, and that granting of summary judgment is therefore not appropriate here.  Dissent Op. at 30–31.  To support this view, the dissent relies on Plaintiffs' argument "that in today's economic environment it is impossible for large and serious balance-of-payments deficits to exist," id. at 30.  But this argument hinges entirely on the definition of "balance-of-payments deficits," which is a legal issue for the court to resolve.  The Parties' assertions regarding certain contemporary Bureau of Economic Analysis ("BEA") measurements, see id. at 26 n.16, are, moreover, only relevant insofar as they might inform the court's interpretation of "balance-of-payments deficits."  Thus, the disputes between the Parties are properly characterized as questions of law, not of material fact.

(D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)-(h) of this section.

Id. § 1581(i)(1). These cases fall within section 1581(i)(1)(B), "tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue." Id. § 1581(i)(1)(b). For purposes of 28 U.S.C. § 1581(i), a challenge to presidential action imposing tariffs, duties, or other import restrictions arises under a law providing for those measures. See Luggage & Leather Goods Mfrs. of Am., Inc. v. United States, 588 F. Supp. 1413, 1419–21 (1984); U.S. Cane Sugar Refiners' Ass'n v. Block, 544 F. Supp. 883, 886 (1982), aff'd, 683 F.2d 399 (C.C.P.A. 1982).[8]

## STANDARD OF REVIEW

We necessarily interpret the statute in question to discern the extent of the delegated authority, which is a question of law. See Marbury v. Madison, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); Loper Bright Enters. v. Raimondo, 603 U.S. 369, 386 (2024). Beyond that, we are not empowered to review the factual determinations committed to the President's exercise of his discretion. Silfab Solar, Inc. v. United States, 892 F.3d 1340,

---

[8] Although 28 U.S.C. § 1581(i) does not permit suit directly against the President, the court retains jurisdiction over suits against subordinate officials responsible for implementing the President's directives. Corus Grp. PLC v. ITC, 352 F.3d 1351, 1359 (Fed. Cir. 2003) (explaining that, although the President is not an "officer" within the meaning of section 1581(i), claims challenging implementation of presidential action may proceed against the officials charged with administering that action); USP Holdings, Inc. v. United States, 36 F.4th 1359, 1366 (Fed. Cir. 2022) (reaffirming that section 1581(i) does not authorize suits against the President directly, but permits suits against subordinate officials responsible for carrying out the President's proclamation).

**- Appx16 -**

1349 (Fed. Cir. 2018) ("In particular, courts have repeatedly confirmed that, where the statute authorizes a Presidential 'determination,' the courts have no authority to look behind that determination to see if it is supported by the record." (citing United States v. George S. Bush & Co., 310 U.S. 371, 379 (1940)); Motion Sys., Inc. v. United States, 437 F.3d 1356, 1360 (2006) (en banc) (citing George S. Bush & Co., 310 U.S. at 379). We determine what Congress has committed to the President's discretion. Loper Bright, 603 U.S. at 386. And we "determine whether the President "clear[ly] misconstru[ed]" his statutory authority. USP Holdings, Inc. v. United States, 36 F.4th 1359, 1365–66 (Fed. Cir. 2022) (citing Corus Grp., 352 F.3d at 1356); Motions Sys., 437 F.3d at 1361 (explaining that courts may consider whether "the President has violated an explicit statutory mandate"). We do not review claims that the President exceeded statutory authority according to a standard of review set forth in the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), the President not being an agency within the meaning of the APA. Franklin v. Mass., 505 U.S. 788, 796, 801 (1992). In considering Plaintiffs' summary judgment motions, we will "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT Rule 56(a).

## DISCUSSION

### I. Standing

#### A. Legal Framework

"Article III of the Constitution grants the Judicial Branch authority to adjudicate 'Cases' and 'Controversies.'" Already, LLC v. Nike, Inc., 568 U.S. 85, 90 (2013). "That

limitation requires those who invoke the power of a federal court to demonstrate standing." Id. Thus, whether a plaintiff has Article III standing is a "threshold" inquiry. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998). "[A]n 'actual controversy,'" and, thus, standing, "must exist not only 'at the time the complaint is filed,' but through 'all stages' of the litigation." Already, LLC, 568 U.S. at 90–91 (quoting Alvarez v. Smith, 558 U.S. 87, 92 (2009)).

"To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (internal quotation marks omitted); see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–561 (1992). For an injury to be imminent it must be "certainly impending," or there must be "a substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (internal quotation marks omitted); see also Mass. v. Mellon, 262 U.S. 447, 488 (1923) (a plaintiff must show, inter alia, "that he has sustained or is immediately in danger of sustaining some direct injury"). Accordingly, "[a]llegations of possible future injury are not sufficient." Clapper, 568 U.S. at 409 (internal quotation marks omitted) (emphasis added) (alteration in original).

When standing is based on "the government's allegedly unlawful regulation . . . of someone else, . . . causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." Defs. of Wildlife, 504 U.S. at 562. In that case, "it becomes the burden of the plaintiff to adduce facts showing that those choices have

been or will be made in such manner as to produce causation and permit redressability

of injury."  Id.  "Plaintiffs cannot rely on speculation about the unfettered choices made

by independent actors not before the courts."  Clapper, 568 U.S. at 415 (internal

quotation marks and citation omitted).

### B. Parties' Contentions[9]

State Plaintiffs contend they have standing to sue as "direct importers of tariffed

goods" or as non-importer plaintiffs suffering "pecuniary harms" traceable to the

challenged tariffs under a theory of "economic logic."  State Pls.' Mem. at 33–34

(quoting V.O.S. Selections, Inc. v. United States, 49 CIT __, __, 772 F. Supp. 3d 1350,

1367 (2025), aff'd in part, vacated in part, 149 F.4th 1312 (Fed. Cir. 2025), aff'd sub

---

[9] In light of the expedited briefing schedule, the court treats Defendants' response to State Plaintiffs' summary judgment motion as a "'suggestion'" of lack of standing with respect to non-importer plaintiff states and conducts an inquiry into that question.  See Indium Corp. of America v. Semi–Alloys, Inc., 781 F.2d 879, 883–84 (Fed. Cir. 1985) (explaining that it is appropriate for a trial court to treat a "motion for summary judgment as a 'suggestion' of lack of subject matter jurisdiction and conduct[] an inquiry into the question of declaratory judgment jurisdiction"); Lockheed Martin Corp. v. United States, 50 Fed. Cl. 550, 553 (2001) ("Regardless of how the Government designates its jurisdictional challenge, the [c]ourt is required to inquire sua sponte whenever a doubt arises as to the existence of federal jurisdiction." (quoting Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278 (1977))).  Out of an abundance of caution, the court also considers the standing of importer plaintiffs.  Consideration of evidence extrinsic to the complaint is permissible to establish "predicate jurisdictional facts." Cedars–Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993)).  Plaintiffs submitted declarations supporting the allegations of standing in their complaints.  For State Plaintiffs, see Decl. of Rabia Muqaddam, Exs. 5–28, ECF Nos. 27, 27-7 through 27-28 (individual declarations of State Plaintiffs).  For Private Plaintiffs, see Decl. of Ethan Frisch, ECF No. 11 (on behalf of Burlap and Barrel) ("Frisch Decl."); Decl. of Jay Foreman, ECF No. 11 (on behalf of Basic Fun) ("Foreman Decl.").  Defendants do not contest Plaintiffs' allegations or declarations of fact with respect to standing or seek discovery on standing pursuant to USCIT Rule 56(d) before the court reaches the merits of Plaintiffs' claims.

**- Appx19 -**

nom., <u>Learning Res., Inc. v. Trump</u>, 146 S. Ct. 628 (2026)); <u>see also</u> State Compl. ¶¶ 95–99; State Pls.' Reply at 17–18.[10]

Private Plaintiffs allege standing as importers. Priv. Compl. ¶¶ 10–11. Burlap and Barrel avers it "currently has three shipments scheduled to arrive in the next few weeks on which it will have to pay the tariffs imposed by the Section 122 Proclamation." Priv. Pls.' Mem. at 12 (citing Frisch Decl. ¶ 15). Basic Fun asserts it "has approximately 104 shipping containers of toys and components scheduled to arrive in the United States during the 150-day tariff period." <u>Id.</u> at 14 (citing Foreman Decl. ¶ 7).

The Government concedes standing with respect to the State of Washington and Private Plaintiffs based on information from CBP indicating that all three plaintiffs have imported goods subject to Section 122 duties. Defs.' Resp. at 69 n.23, 73 n.24. The Government contests the standing of the remaining State Plaintiffs "because they do not allege that they have been—or will soon be—required to pay duties under Section 122." <u>Id.</u> at 72. The Government contends that non-importer State Plaintiffs seek standing instead as "purchasers who allegedly paid increased costs to third-party importers based on IEEPA duties and . . . expect to do the same for Section 122 duties." <u>Id.</u> at 73. Such claims are "too attenuated," the Government argues, amounting to "no more

---

[10] In <u>Learning Resources</u>, the U.S. Supreme Court held the President's invocation of the International Emergency Economic Powers Act ("IEEPA") to issue a series of Executive Orders imposing tariffs to be unlawful. 148 S. Ct. at 635–36, 646. The Court issued its decision on February 20, 2026, the same day that President Trump signed Proclamation No. 11012.

than allegations of possible future injury" that fail to demonstrate causation.  Id. at 74–75.

## C. Analysis

### 1. Importer Plaintiffs Have Standing

The standing inquiry for Private Plaintiffs and the State of Washington (collectively, "Importer Plaintiffs") is straightforward.  "[W]hen the plaintiff is himself an object of the [challenged government] action[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."  Defs. of Wildlife, 504 U.S. at 561–62.  "[A]n importer's allegation that it pays unlawful U.S. duties typically would satisfy constitutional standing requirements."  V.O.S. Selections, 772 F. Supp. 3d at 1369 (internal quotation marks and citation omitted).  While standing must be assessed from the outset of the actions, it is enough for Importer Plaintiffs to show that, at the time of filing their respective complaints, payment of Section 122 duties was "certainly impending" or there was "a substantial risk" that such payment "will occur."  See Susan B. Anthony List, 573 U.S. at 158.

Importer Plaintiffs readily meet the imminent injury requirement.  The State of Washington submitted a declaration by the Executive Director of Procurement Services for the University of Washington ("UW"), a public research institution.[11]  Decl. of Ray

---

[11] Harm to a "public instrumentality" of a State harms the State.  Biden v. Nebraska, 600 U.S. 477, 490 (2023) ("The plan's harm to MOHELA is also a harm to Missouri. MOHELA is a 'public instrumentality' of the State.").

**- Appx21 -**

Hsu, ECF No. 27-26 ("Hsu Decl."). Mr. Hsu declared that UW imports "products directly from overseas and pays the applicable duties directly to the United States government through its customs broker." Id. ¶ 5. Mr. Hsu averred that, in 2024, "UW accepted ninety-three shipments via its customs broker and paid a total of $18,199.37 in duties"; "[i]n 2025, the university accepted 130 shipments and paid a total of $1,019,104.44 in duties"; and "[a]s of the end of February 2026," UW has "accepted 23 shipments and paid a total of $34,107.83 in duties." Id. While these earlier duties "were based on the President's invocation of IEEPA,"[12] Mr. Hsu expects that UW "will purchase similar goods" subject to Section 122 duties before July 24, 2026. Id. ¶ 7. Mr. Hsu's declaration shows that UW accepts several shipments each month, which is sufficient to demonstrate that, in early March 2026, payment of Section 122 duties was "certainly impending."[13]

Private Plaintiffs import merchandise directly from overseas. Burlap and Barrel provided a declaration by its co-founder and co-CEO, Ethan Frisch. Frisch Decl. ¶ 2. Mr. Frisch declared that as of March 9, 2026, Burlap and Barrel had "three shipments scheduled to arrive in the next few weeks on which it will have to pay Section 122 tariffs." Id. ¶ 15; see also id. at 7 (noting the date). Those "imports are valued at

---

[12] The first IEEPA duties went into effect on February 4, 2025, and were issued pursuant to Executive Order 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025). See V.O.S. Selections, 772 F. Supp. 3d at 1362–63.

[13] This finding is supported by, but does not turn on, Defendants' assertion that UW has made at least one Section 122 duty payment. Defs.' Resp. at 73 n.24. Additionally, the standing of the State of Washington does not depend on UW's allegations regarding indirect harm. See Hsu Decl. ¶ 6.

**- Appx22 -**

Court Nos. 26-01472 & 26-01606                                         Page 23

$172,732" with an "expected tariff" payment in the amount of "$17,273." Id. ¶ 15. Mr.

Frisch further averred that for the 150-day duration of the Section 122 tariffs, Burlap and

Barrel expects to "pay $60,000 in Section 122 tariffs." Id. ¶ 17. Basic Fun submitted a

declaration by its CEO, Jay Foreman. Foreman Decl. ¶ 2. Mr. Foreman declared that

Basic Fun "has approximately 104 shipping containers of toys and toy components

scheduled to arrive in the United States during the upcoming 150-day period covered by

the Section 122 tariffs," on which it expects to pay "approximately $690,000 in tariffs."

Id. ¶¶ 7–8. Like UW, Private Plaintiffs have demonstrated standing based on imminent,

if not actual, liability for payment of Section 122 duties.

There being no question with respect to causation of the Importer Plaintiffs'

respective injuries or the court's ability to redress those injuries, Importer Plaintiffs have

standing to challenge the imposition of Section 122 duties pursuant to Proclamation No.

11012. Because "at least one plaintiff has standing, the suit may proceed." Nebraska,

600 U.S. at 489.

### 2. Non-Importer State Plaintiffs Lack Standing

It is not necessary to address the standing of the remaining State Plaintiffs

(collectively, "Non-Importer State Plaintiffs") to establish the existence of a case or

controversy before the court. See id. It is, however, necessary to examine their

standing to inform the scope of any relief the court may find appropriate: the Non-

Importer State Plaintiffs seek a universal injunction to remedy indirect harm they claim

to suffer. State Pls.' Mem. at 34, 41–43; State Pls.' Reply at 20 ("[B]ecause only

importers of record have a clear refund remedy, an injunction is necessary to stop the

States from paying hundreds of millions *indirectly* due to the Section 122 tariffs.") (emphasis added).[14]  Whether the court has authority to issue universal injunctive relief is, at present, an open question.  See V.O.S. Selections, 149 F.4th at 1339 (vacating the CIT's entry of a permanent injunction and remanding for reconsideration after the U.S. Supreme Court's intervening decision in Trump v. CASA, Inc., 606 U.S. 831 (2025)).[15]  In this case, however, the court does not need to reach this question because the Non-Importer State Plaintiffs fail to demonstrate an injury-in-fact, and therefore, lack Article III standing.

Non-Importer State Plaintiffs allege one or more of the following types of indirect economic harm: (1) passthrough tariff surcharges, (2) tariff-related increases in the cost of goods and services, and (3) burden and delay in the States' ability to carry out administrative duties.  See State Pls.' Mem. at 19–20, 34; see also, e.g., Decl. of Elizabeth Papadopoulos ¶¶ 5–8, ECF No. 27-24 (Oregon) ("Papadopoulos Decl."); Decl. of Jenifer Johnson ¶¶ 7–9, ECF No. 27-13 (Illinois); Decl. of Jeanette Moy ¶¶ 10–11, ECF No. 27-21 (New York); Decl. of Mark Raymond ¶¶ 5, 10–12, ECF No. 27-12 (Connecticut); Decl. of Jared Ambrosier ¶¶ 6, 11–13, ECF No. 27-17 (Michigan).[16]

---

[14] The States have not identified the importer/vendors from which they purchase goods subject to the Section 122 tariffs.  Nevertheless, given the number of State Plaintiffs, the breadth of their economic activity, and the wide scope of the Section 122 tariffs, any injunction on the collection of Section 122 tariffs would have to be universal to be practicable and to have practical effect for the Non-Importer State Plaintiffs.

[15] Learning Resources mooted any need for the CIT to reconsider the V.O.S. injunction. See Learning Res., 146 S. Ct. 628 (2026).

[16] Non-Importer State Plaintiffs do not allege third party standing.  See, e.g., Powers v. Ohio, 499 U.S. 400, 410–11 (1991) (criteria for third party standing includes injury to the litigant, "a close relation to the third party," and "some hindrance to the third party's

Court Nos. 26-01472 & 26-01606                                    Page 25

"Monetary costs are of course an injury."  Diamond Alt. Energy, LLC v. EPA, 606 U.S.
100, 111 (2025) (quoting United States v. Texas, 599 U.S. 670, 676 (2023)).  And
Plaintiffs may "fairly employ economic logic" to establish injury-in-fact.  Canadian
Lumber Trade All. v. United States, 517 F.3d 1319, 1333 (Fed. Cir. 2008); see also
V.O.S. Selections, 772 F. Supp. 3d at 1368 ("To suffer an economic injury from a tariff it
is not necessary to incur direct liability to Customs, or even to directly import an article
of dutiable merchandise.").[17]  But "[w]hen . . . a plaintiff's asserted injury arises from the
government's allegedly unlawful regulation (or lack of regulation) of someone else, . . .
standing is not precluded, but it is ordinarily substantially more difficult to establish."
Defs. of Wildlife, 504 U.S. at 562.[18]

_____

ability to protect his or her own interests") (citing Singleton v. Wulff, 428 U.S. 106, 112–
16 (1976)).

[17] In Canadian Lumber, the U.S. Court of Appeals for the Federal Circuit affirmed the
CIT's reliance on "the doctrine of 'competitor standing'" to find that certain Canadian
producers had standing to challenge distributions of money to U.S. producers pursuant
to the "Continued Dumping and Subsidy Offset Act," also known as the "Byrd
Amendment."  517 F.3d at 1332–34.  That doctrine uses "economic logic to conclude
that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that
increases competition or aids the plaintiff's competitors."  Id. at 1332.  While that case
was "not a textbook candidate for 'competitor standing,'" the Federal Circuit found it
"quite rational to infer that Customs, by distributing money to an entity that aims to take
away market share from Canadian wheat and has already been somewhat successful in
that effort, is likely to inflict further economic injury on the Canadian [producers]."  Id. at
1334.  Nevertheless, as the Federal Circuit later observed, the "findings of standing in
Canadian Lumber and the other 'competitor standing' cases are applications of the
standing requirement that the disputed action must pose a nonspeculative threat to a
concrete interest of the challenger."  AVX Corp. v. Presidio Components, Inc., 923 F.3d
1357, 1364 (Fed. Cir. 2019).

[18] In the case of indirect injury, causation and redressability are typically more difficult to
establish.  See, e.g., Murthy v. Mo., 603 U.S. 43 (2024).  In Murthy, the Supreme Court
noted the "bedrock principle that a federal court cannot redress injury that results from
the independent action of some third party not before the court." 603 U.S. at 57 (internal

**- Appx25 -**

None of the Non-Importer State Plaintiffs identify actual indirect harm resulting from Section 122 duties. Instead, Non-Importer State Plaintiffs urge the court to find imminent injury-in-fact based on their respective experiences with IEEPA duties. See State Pls.' Reply at 17–18 ("As Plaintiffs' experience with IEEPA demonstrated, sometimes these tariff costs are passed through directly to purchasers, while in other instances the price increase is less direct."); see also, e.g., Papadopoulos Decl. ¶ 9 ("While the tariffs Fleet Services paid in the past were based on the President['s] invocation of IEEPA, I expect that Fleet Services will purchase similar goods before July 24, 2026, that would be subject to tariffs under the Section 122 Proclamation."). The speculative nature of the Non-Importer State Plaintiffs' injury distinguishes this case from V.O.S. Selections. See V.O.S. Selections, 772 F. Supp. 3d at 1367 ("The businesses that bring the V.O.S. action . . . allege and aver that they have suffered (and will continue to suffer) economic injuries as a result of the Worldwide and Retaliatory Tariffs.") (footnote omitted).[19] While "'imminence' is concededly a somewhat elastic

_____

quotation marks and citation omitted) (emphasis added). The relevant inquiry is whether third parties will "react in predictable ways." Id. Thus, the Supreme Court has "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." Id. (quoting Clapper, 568 U.S. at 413).

[19] State Plaintiffs assert that "[e]ven the dissenting opinion in the Federal Circuit 'agree[d] with the majority's decision on jurisdiction and standing.'" State Pls.' Reply at 18 n.7 (quoting V.O.S. Selections, 149 F.4th at 1348–49) (Taranto, J., dissenting)) (second alteration in original). State Plaintiffs appear to imply that the Federal Circuit majority affirmed the standing of non-importers in that case and agreement with that affirmance by the dissent. The V.O.S. majority did not, however, directly address the standing of non-importers and as previously noted, vacated and remanded the CIT's sole remedy for those plaintiffs. V.O.S. Selections, 149 F.4th at 1340. The V.O.S. dissenters, moreover, also characterized their position somewhat differently, and

concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." Defs. of Wildlife, 504 U.S. at 564 n.2 (internal quotation marks and citation omitted). While the attenuation of their alleged harm varies, they are, nevertheless, mere "[a]llegations of possible future injury." See Clapper, 568 U.S. at 409 (internal quotation marks omitted) (alteration in original).[20] Accordingly, the Non-Importer State Plaintiffs lack Article III standing. The court will dismiss without prejudice all claims by Non-Importer State Plaintiffs.

## II.      Section 122: Balance-of-Payments Deficits

### A. Parties' Contentions

State Plaintiffs contend that the President lacked authority to invoke Section 122 because large and serious balance-of-payments deficits cannot occur in a floating exchange rate monetary system. State Pls.' Mem. at 6–7, 15–16, 25. They argue that the Proclamation unlawfully redefines the statutory term "balance-of-payments deficits" to mean "current account deficits" and that the tariffs are not applied consistent with the principle of nondiscrimination as required by Section 122. Id. at 25–32; State Pls.' Reply at 5–11. State Plaintiffs further argue that CBP's enforcement exceeds statutory

---

perhaps more accurately, as agreeing with the majority "that enough plaintiffs had constitutional standing in order for the lawfulness of the reciprocal and trafficking tariffs to be adjudicated." Id. at 1357 (Taranto, J., dissenting). Accordingly, V.O.S. does not help settle the question of non-importer standing in this case.

[20] Because the court concludes that Non-Importer State Plaintiffs have failed to demonstrate any imminent, non-speculative injury, the court need not, and therefore does not, address the Government's argument that those plaintiffs also lack prudential standing. See Defs.' Resp. at 77–79.

authority.  State Pls.' Mem. at 32–33.  Private Plaintiffs similarly argue that balance-of-payments deficits cannot occur in a floating exchange rate system, that Section 122 does not authorize the challenged tariffs, that Congress did not clearly confer such sweeping authority, and that any contrary reading would raise a nondelegation problem.  Priv. Pls.' Mem. at 16–35.

Because the Bretton Woods system had already ended by the time of Section 122's enactment, Defendants argue, Plaintiffs' interpretation would mean that Congress passed a statute that was "already useless at the time of its enactment," in contravention of the presumption against ineffectiveness that courts must apply when interpreting statutes.  Defs.' Resp. at 32–33.  Defendants further argue that the tariffs imposed by the President's Proclamation are lawful because Section 122 provides the President with the discretion to determine when a large and serious balance-of-payments deficit exists, and that the President has correctly made such a finding based on the U.S. current account deficit, trade deficit, primary income, and net international-investment position.  Id. at 38–41.

### B.  Analysis

In Section 122 of the Trade Act of 1974, Congress authorizes, indeed requires, that the President proclaim temporary import restrictions[21] when certain conditions

---

[21] The restrictions available to the President include either a temporary import surcharge or temporary limitations through the use of quotas.  The only restriction at issue here is an import surcharge, i.e., tariff.  19 U.S.C. § 2132(a).

exist.[22]  19 U.S.C. § 2132(a).  This case turns on the meaning of Section 122 and whether the President asserted the existence of the conditions required by the statute in order to lawfully proclaim the import surcharges.[23]  As discussed further below, the President's Proclamation fails to assert that those required conditions have been satisfied.  See generally Proclamation No. 11012.

"The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises."  U.S. Const. art. I, § 8, cl. 1.  The power to tax includes the power to impose tariffs.  Learning Res., 146 S. Ct. at 638 (citing Gibbons v. Ogden, 22 U.S. 1, 201 (1824)).  Congress may delegate and has delegated the power to impose tariffs to the

---

[22] Subsection (b) provides the President the discretion to forego import restrictions otherwise required under subsection (a) if he "determines that the imposition of import restrictions under subsection (a) will be contrary to the national interest of the United States." 19 U.S.C. § 2132(b).  In such a case, "he may refrain from proclaiming such restrictions and he shall—(1) immediately inform Congress of his determination, and (2) immediately convene the group of congressional official advisers designated under [19 U.S.C. § 2211(a)] and consult with them as to the reasons for such determination."  Id.
[23] State Plaintiffs appended a statement of undisputed material facts to their motion. See Pls.' Statement of Undisputed Material Facts, ECF No. 26.  The statement contains various "facts" about Proclamation No. 11012, past nonuse of Section 122, and harm to State Plaintiffs.  Id. ¶¶ 1–5, 17–24.  The statement also asserts as "facts" State Plaintiffs' views on the meaning of balance of payments, id. ¶¶ 6–15, and the claimed impossibility of a "large and serious" balance-of-payments deficit in a floating-rate system, id. ¶ 16.  But, as State Plaintiffs acknowledge, "[t]his is a statutory interpretation case."  State Pls.' Reply at 2; see also id. (stating "the question is one of statutory interpretation, not of fact-finding," and "[t]hat is the role Plaintiffs ask the [c]ourt to play here").  The court need not parse State Plaintiffs' statement of facts to exclude irrelevant facts or legal conclusions.  The standard of review here is clear: we interpret the statute in question but do not make factual determinations committed to the President's discretion.  Marbury, 5 U.S. at 177; Loper Bright, 603 U.S. at 386; Silfab Solar, 892 F.3d at 1348–49.  Put simply, we are empowered to decide what "balance-of-payments deficits" means for purposes of Section 122(a)(1) and whether the Proclamation asserts the existence of such deficits within the meaning of the statute.  This case may thus be resolved on summary judgment.  USCIT Rule 56(a).

President under several specifically conditioned statutes.  See, e.g., Trade Expansion

Act of 1962, § 232, 19 U.S.C. § 1862 (providing for presidential action to adjust imports

when the Secretary of Commerce finds that an article is being imported under such

circumstances as to threaten to impair national security); Trade Act of 1974, § 301, 19

U.S.C. § 2411 (providing for trade action when the U.S. Trade Representative

determines that a foreign country's conduct is unjustifiable, unreasonable, or

discriminatory and burdens or restricts United States commerce).

"When Congress grants the power to impose tariffs, it does so clearly and with

careful constraints."  Learning Res., 146 S. Ct. at 644.  Separation of powers concerns

thus require the court to carefully parse those constraints and give them full effect,

because "the President enjoys no inherent authority to impose tariffs during peacetime."

Id. at 638; see also id. at 639 ("'[B]oth separation of powers principles and a practical

understanding of legislative intent' suggested Congress would not have delegated

'highly consequential power' through ambiguous language." (plurality opinion) (alteration

in original) (quoting West Virginia v. EPA, 597 U.S. 697, 723–24 (2022)));[24] see also

---

[24] While Chief Justice Roberts and Justices Gorsuch and Barrett relied on the major questions doctrine, Justice Kagan, joined by Justices Sotomayor and Jackson, found that the "ordinary tools of statutory interpretation" allowed them to arrive at the same result.  Learning Res., 146 S. Ct. at 674 (Kagan, J., concurring in part and concurring in the judgment).  While the court here utilizes those ordinary tools of statutory interpretation to establish the parameters of Section 122, the importance of the proper interpretation of that provision is informed by the separation of powers principles and a clear understanding of the legislative intent that informed the delegation of this tariff authority to the Executive Branch.

- **Appx30** -

Little v. Barreme, 2 Cranch 170, 178–79 (1804) (Executive actions are subject to the

limitations set forth by Congress).

Section 122 provides, in pertinent part:

Whenever fundamental international payments problems require special import measures to restrict imports—

(1) to deal with large and serious United States balance-of-payments deficits[,]
(2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or
(3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium,

the President shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress)—

(A) a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States . . . .

19 U.S.C. § 2132(a).

The court begins with the words of the statute.[25]  The parties do not dispute that

in order to proclaim import surcharges pursuant to Section 122, there must be large and

serious United States balance-of-payments deficits.  State Pls.' Mem. at 22; Priv. Pls.'

Mem. at 28; Defs.' Resp. at 16.  Similarly, assuming there are balance-of-payments

---

[25] The statute contains several phrases about which the parties do not agree, including "fundamental international payments problems" and "balance-of-payments deficits."  Not only do the parties disagree about the meaning of these phrases, but they also disagree about whether they are independent phrases or if "balance-of-payments deficits" is simply one of several enumerated "fundamental international payments problems."  See State Pls.' Mem. at 23; Priv. Pls.' Mem. at 19; Defs.' Resp. at 42.  While the grammatical structure of Section 122(a) suggests that "fundamental international payments problems" are an independent requirement to proclaim import surcharges pursuant to Section 122, the court need not reach this issue.

deficits, there is no serious dispute that whether such deficits are "large and serious" is a discretionary determination within the province of the Executive Branch, review of which by the judiciary is impermissible. See Dalton v. Specter, 511 U.S. 462, 477 (1994) ("Where a statute . . . commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available."). However, the term "balance-of-payments deficits" is indicative of a term of art, susceptible to a defined meaning, and subject to objective measure within the traditional means of judicial review.[26]

It is clear that Congress was aware of the differences in the words it chose. Congress adopted "balance-of-payments deficits" as an issue to be addressed in Section 122(a) while it employed the phrase "balance-of-trade surpluses" in Section 122(c). 19 U.S.C. § 2312(a)(1), (c)(1) (emphases added). That distinction does not end the inquiry because neither the President in Proclamation No. 11012 nor Defendants before us conflate entirely those terms. See Proclamation No. 11012 ¶ 7; Defs.' Resp. at 37. The different terms indicate, however, that Congress intended a specific

---

[26] Indeed, the term "balance-of-payments deficit" causes some confusion. Balance of payments is an accounting term and as both parties point out, the balance of payments always balances by definition; it nets to zero. State Pls.' Mem. at 26–27 n.6; Defs.' Resp. at 5, 25. The phrase balance-of-payments deficits, thus, points to a negative component of that analysis. The Government argues that in today's world, the current account is the proper component for identifying a balance-of-payments deficit. Defs.' Resp. at 23–28. Problematically for the Government, and as discussed herein, Congress in 1974 identified the settlement, liquidity, and basic balance deficits as "balance-of-payments deficits." See, e.g., Staff of S. Fin. Comm., 93d Cong., Tables and Statistical Material on U.S. Balance of Trade and Balance of Payments ("Staff of S. Fin. Comm. Dec. 1974") Table 1 (Comm. Print Dec. 1974).

meaning through the words it chose when crafting Section 122(a) and, thus, conferred a specific authority on the President.  Having concluded that "balance-of-payments deficits" is capable of definition, it is incumbent on the court to discern that definition. See Marbury, 5 U.S. at 177.[27]

The legislative history of the Trade Act of 1974 reveals that Congress understood balance-of-payments deficits to refer, at the time, to deficits in (1) liquidity, (2) official settlements, or (3) basic balance.  For over two years, Congress carefully reviewed and revised legislative proposals in the context of dynamic international economic events. As discussed above, the statute was enacted at a time of great uncertainty for the future of the international monetary system.  As the bill was being debated in Congress, it was unknown whether the collapse of the Smithsonian Agreement and the end of fixed exchange rates in 1973 would mark a definitive end to the Bretton Woods system, or whether the U.S. and other countries would one day return to the gold standard.  See,

---

[27] Loper Bright confirms that courts have the responsibility of interpreting statutes even when the statutes are ambiguous:

> The Framers appreciated that the laws judges would necessarily apply in resolving those disputes would not always be clear.  Cognizant of the limits of human language and foresight, they anticipated that "[a]ll new laws, though penned with the greatest technical skill, and passed on the fullest and most mature deliberation," would be "more or less obscure and equivocal, until their meaning" was settled "by a series of particular discussions and adjudications."

603 U.S. at 384–85 (quoting The Federalist No. 37, p. 236 (J. Cooke ed. 1961) (J. Madison)) (alteration in original).  There is no dispute that Proclamation No. 11012 represents the first Presidential invocation of Section 122(a) since its enactment roughly 50 years ago.  See State Pls.' Mem. at 28; Defs.' Resp. at 40.  Thus, this case presents the first opportunity for the court to interpret the statute's relevant terms.  Accordingly, the legislative history surrounding congressional deliberation of Section 122 is instructive.

e.g., 119 Cong. Rec. 40,568 (1973) (statement of Rep. Henry S. Reuss) ("If the United States continues to let the dollar float in exchange markets, as we are wisely doing now, the exercise of [Section 122] authority would prevent the deterioration or appreciation of the external value of the dollar that would be necessary to eliminate a balance-of-payments deficit or surplus, as the case may be.  On the other hand, if we should ever revert to a fixed exchange rate parity for the dollar, the time limit proposed of 150 days would be much too short to allow a reversal in basic economic conditions sufficient to restore a satisfactory balance-of-payments equilibrium.").  Both the international economic challenges and questions about the limits of Presidential authority informed congressional consideration of this legislation.[28]

Early versions of the legislation contained standards for measuring the balance-of-payments deficit and applying the threshold for enabling Presidential authority to take action.  Specifically, H.R. 6767 would have provided that a serious balance-of-payments deficit existed when the President determined that "the balance of payments (as measured either on the official reserve transactions basis or by the balance on current account and long-term-capital) has been in substantial deficit over a period of four consecutive calendar quarters."  Trade Reform Act of 1973, H.R. 6767, 93d Cong.

---

[28] The Trade Act of 1974 was enacted on January 3, 1975, Pub. L. No. 93-618, 88 Stat. 1978, after the 10 percent Nixon surcharge had already been invalidated by the Customs Court, see Yoshida I, 378 F. Supp. at 1175–76, but before the reversal of that judgment on appeal, see Yoshida II, 526 F. 2d at 584.  The 1973–1974 OPEC embargo only further complicated the United States's economic and monetary position.  See Oil Embargo, 1973-1974.  Both the international economic challenges and questions about the limits of Presidential authority informed congressional consideration of this legislation.

§ 401(b)(1)(A) (1973).[29]  Thus, in debating an earlier version of this legislation,

Congress specifically identified settlement deficits and basic balance deficits as two

possible balance-of-payments deficits.

Similarly, early analyses of balance-of-payments deficits focused on the liquidity,

official settlements, and basic balance concepts:

> The overall-balance-of-payments deficit (or surplus) can be shown in different ways.  The two most usual approaches, both of which are shown in the official figures of the U.S. Department of Commerce, are known as the "liquidity" concept and the "official settlements" concept.
>
> The balance, computed on the liquidity basis, is measured by changes in U.S. official reserve assets and in liquid liabilities to all foreigners.  It includes as liabilities, which are a potential drain on U.S. monetary reserves, all short-term liabilities to foreigners, private as well as those payable to foreign monetary authorities, it does not include U.S. private short-term holdings as an offsetting asset entry, however, on the theory that the U.S. Government exercises no direct control over them and therefore cannot mobilize them in support of the dollar in an emergency.
>
> The balance, computed on the official settlements basis, is measured by changes in U.S. official reserve assets, together with changes in liquid and certain nonliquid liabilities to foreign official agencies.  Under this concept foreign short-term capital inflows are included, as are U.S. short-term outward capital flows, as regular transactions.  According to this concept, the large inflows of foreign commercial bank funds in recent years have represented predominantly market-oriented business phenomena.

See Trends in Int'l Trade of the United States: Hr'gs Before the H. Comm. on Ways &

Means, 91st Cong. 2710 (1970) (statement of Dr. Howard S. Piquet); see also H.R.

Rep. No. 91-1435, at 12 (1970) (discussing liquidity and official settlements deficits).

---

[29] The balance on current account and long-term capital constitute what is also known as the "basic balance."  See Council of Econ. Advisers, Exec. Office of the President, Econ. Report of the President 194 (1974).

Later-in-time analyses are consistent with this approach. See The Trade Reform Act of 1973, Hr'gs on H.R. 10710 Before the S. Comm. on Fin. ("H.R. 10710 Hr'gs"), 93d Cong., pt. 1, at 2, 221, 365–66; pt. 2, at 480, 661; pt. 4, at 1468–69; pt. 5, at 2080 (1974) (discussing or showing deficit in terms of "basic balance," "liquidity basis," or "official reserve transactions"); 120 Cong. Rec. 39,505, 39,521 (1974) (statements of Sen. Long and Sen. Hartke) ("In 1962, the Nation had . . . a balance of payments deficit of $2.9 billion—liquidity basis. Ten years later . . . the payments deficit had grown from a bearable $2.9 billion to an intolerable $13.9 billion."); 120 Cong. Rec. 39,506 (1974) ("Table 7 U.S. Trade and Balance of Payments, 1960–74," showing "Balance of payments" identifying possible deficits in "liquidity," "official settlements," and "basic balance").[30]

Both the parenthetical definition of balance of payments and the measurement over four consecutive quarters proposed in H.R. 6767 were omitted from H.R. 10710. As the legislative history indicates, in lieu of the four quarters time period, Congress inserted the "large and serious" requirement to circumscribe the President's authority all while allowing for adequate flexibility to respond to a delimited set of particular

---

[30] A variety of options for analyzing the balance of payments were available to Congress at the time Section 122 was debated and enacted. See H.R.10710 Hr'gs, Part 2 at 684–90 (App. C, Staff of S. Fin. Comm., 93d Cong., Staff Data and Materials on U.S. Trade and Balance of Payments Tables 22–23, 30 (Comm. Print Feb. 1974), showing tables displaying annual figures for "Current Account Balance" and "Basic Balance" under the header "U.S. Balance of Payments Trends," as well as "US Balance of Payments Summary by Area," including measures across various categories); H.R. 10710 Hr'gs, Part 6 at 2555 ("[Int'l Econ. Policy Assoc. (IEPA)] Balance-of-Payments Summary, 1969-73").

Court Nos. 26-01472 & 26-01606                                    Page 37

economic and monetary challenges.  See H.R. Rep. No. 93-571, at 28–29 (1973) ("The

[House] [C]ommittee [on Ways and Means] considered various formulas for defining a

serious balance-of-payments deficit, including a specific formulation based on the

existence of a substantial deficit over a certain period of time, but the committee feels

that it is not possible to formulate a definition with mathematical exactness.

Nevertheless, the committee does not intend that a small or even a large balance-of-

payments deficit of short duration would warrant the exercise of the authority under this

section."); S. Rep. No. 93-1298, at 87–88 (1974) ("[C]ircumstances can change rapidly

and the [Senate] Committee [on Finance] deems it necessary that the President have

authority to impose surcharges and other import restrictions for balance of payments

reasons even though under present circumstances such authority is not likely to be

utilized.").  While Congress did not replace the parenthetical definition of balance of

payments, the legislative history indicates what Congress contemplated as the measure

of balance of payments.  Specifically, the Senate Report to the Trade Act of 1974

("Senate Report") refers to the three types of balance-of-payments deficits, namely (1)

liquidity, (2) official settlements, and (3) basic balance, discussed in other parts of the

legislative history.  S. Rep. 93-1298, at 8 (Table 3); see also Staff of S. Fin. Comm. Dec.

1974, Table 1.[31]

---

[31] The December 1974 Senate Finance Staff Report contains a wealth of statistical
information regarding trade and balance of payments, much of which appears to have
been summarized in Table 1.  Under the heading "U.S. Trade and Balance-of-Payments
Deficits," Table 1 lists "U.S. trade position," "Trade balance," and "Balance of
payments," with data from 1960 through 1973 and partial data for 1974. See Staff of S.
Fin. Comm. Dec. 1974, Table 1.  As noted, the balance of payments data is categorized

Court Nos. 26-01472 & 26-01606                                      Page 38

      The Government's own Declaration acknowledges some of these 1974

measures, stating:

> Multiple measures capture related aspects of a country's [balance-of-payments ("BOP")] deficit, and official statistics during the 1970s also reported broader measures than the current account. For example, the "official reserve transactions balance" tracked the net disposition of dollars by the federal government in order to manage the foreign exchange value of the dollar. Another common contemporaneous measure was the "basic balance" . . ., which combined the current account and long-term capital, and served as a gauge for the imbalance between "underlying" long-term demand and supply of foreign exchange. . . .

> According to the CEA's review of historical records, the basic balance was a common, broader measure of BOP deficits during the 1970s. The underlying intent of the basic balance, according to BEA, was to capture "[…] long term trends in the balance of payments by segregating volatile capital flows and placing them below the line."

---

based on liquidity, official settlements, and basic balance. Id. Those categories are mostly, but not always, in deficit. The report contains 31 total tables. See generally id. In addition to trade-related information (Tables 2 to 21 and 31), the report summarizes the U.S. current account balance (Table 22) and U.S. basic balance (Table 23); contains several U.S. basic balance trends regarding merchandise, services, military and foreign aid, and private capital (Tables 24 to 27); lists the U.S. basic balance by area (Tables 28 and 29); and summarizes the U.S. balance of payments by area (Table 30). Id., Tables 2–29. Table 30 contains balances for goods and services, current account, basic balance, net liquidity, and official settlements. Id., Table 30. But just as the balance on goods and services is contained in the current account balance, so too is the current account balance subsumed within the basic balance. Compare id., Table 22 (U.S. current account balance) and id., Table 28 (U.S. basic balance by area, 1973), with id. Table 30; see also Econ. Report of the President 194 (1974) (defining basic balance to include the current account). But the Senate included only "Liquidity," "Official settlements," and "Basic balance" in Table 1, titled "U.S. Trade and-Balance-of-Payments Deficits," and that is thus the clearest indication of the concerns Section 122 was intended to address. Staff of S. Fin. Comm. Dec. 1974, Table 1.

Decl. of Pierre Yared (Council of Economic Advisors) ("Yared Decl.") ¶¶ 25, 27, ECF

No. 35-1 (third alteration in original).[32]

Despite acknowledging differences in the 1974 measures of the balance of payments as compared to modern measures, id. ¶¶ 27, 37–40, the Government seeks to defend the Proclamation by arguing that "balance-of-payments deficits" is a malleable phrase, see Defs.' Resp. at 32 n.12 ("[W]hat qualifies as a [balance-of-payments deficit] may depend on the facts of the day." (quoting Wisconsin Cent. Ltd v. United States, 585 U.S. 274, 284 (2018) (alteration in original))).  However, the Government's suggestion that what constitutes "balance-of-payments deficits" may change proves too much.  See Yared Decl. ¶ 37 ("While the concept of current account has largely remained the same since the 1970s, there is no single measure of the long-term capital account (the other main component of basic balance), and BEA no longer reports all the components needed to exactly replicate the basic balance.").  As previously noted, the "balance of payments" as an accounting principle always nets to zero.  See State Pls.' Mem. at 26–27 n.6; Defs.' Resp. at 5, 25; Yared Decl. ¶ 10.  To the extent that is the case, if the President has the ability to select among the sub-accounts to identify a balance-of-payments deficit, unless every sub-account is balanced, the President would always be able to identify a balance-of-payments deficit.

---

[32] The Yared Declaration later posits that the failings of the basic balance as a metric likely led BEA to discontinue its presentation of the basic balance in 1976.  Yared Decl. ¶¶ 27, 35.

Such an expansive reading of the statute would raise a non-delegation issue, which in turn would prompt a constitutional question.[33]  See Priv. Pls.' Mem at 28. "[T]he canon of constitutional avoidance" provides that, when one of two statutory interpretations would raise a constitutional question, "the other should prevail."  Clark v. Martinez, 543 U.S. 371, 380–81 (2005); see also Mistretta v. United States, 488 U.S. 361, 373 n.7 (1989) (stating that the Court employs the nondelegation principle to interpret statutory text and give "narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional"); Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607, 646 (1980) (stating that "[a] construction of the statute that avoids [an] open-ended grant" of authority that would implicate the non-delegation doctrine "should certainly be favored"); Fisherman's Harvest, Inc. v. PBS & J, 490 F. 3d 1371, 1377 (Fed. Cir. 2007) ("The canon of constitutional avoidance in statutory interpretation implies that a plausible construction of [a statute] that does not raise . . . constitutional doubts gives better effect to congressional intent.").  The Government's

_____

[33] Defendants argue that "the balance-of-payment's current account [is] the only reasonable measure of a balance-of-payment deficit."  Defs.' Resp. at 3; see also Yared Decl. ¶¶ 8, 13.  This argument lacks support in either the statute's text or legislative history.  Defendants' position is the President has discretion to identify any actionable deficit for purposes of Section 122(a)(1).  See Defs.' Resp. at 20.  But Section 122 would lack an intelligible principle if the President could simply identify any deficit account, or if the phrase "balance-of-payments deficits" could change with context.  Further, Defendants reject the view that the phrase "fundamental international payments problems" constrains the President at all.  See Defs.' Resp. at 41–44.  While the court need not resolve the Parties' positions on this issue, the court cannot accept Defendants' interpretation that disclaims the existence of any meaningful intelligible principle in either "fundamental international payments problems" or "balance-of-payment deficits."

Court Nos. 26-01472 & 26-01606                                    Page 41

preferred interpretation of the statute must therefore be disfavored.  See N.L.R.B. v.

Jones & Laughlin Steel Corp., 301 U.S. 1, 30 (1937) ("[A]s between two possible

interpretations of a statute, by one of which it would be unconstitutional and by the other

valid, our plain duty is to adopt that which will save the act.  Even to avoid a serious

doubt the rule is the same.") (emphasis added).

     Further, the legislative history chronicles a series of efforts to carefully cabin

Presidential discretion.  See Hr'g on H.R. 10710 Before the H. Rules Comm., 93d Cong.

84 (1973) (statement of Hon. Al Ullman) ("[I]n place of unlimited authority to modify

import restraints in face of large and persistent balance of payments deficits or

surpluses, the bill provides temporary and limited authority for the President to take

action."); Staffs of the H. Comm. on Ways and Means and the S. Comm. on Fin., 93d

Cong., Summary of Senate Amendments to H.R. 10710 Trade Act of 1974 6 (Comm.

Print 1974) ("[Amendments 42–43] [m]ake[] the House bill authority to deal with deficit

balance-of-payments situations mandatory, rather than discretionary, unless the

President determines and informs the Congress that imposing import restrictions would

be contrary to the national interest."); Staffs of the S. Comm. on Fin. and H. Comm. on

Ways and Means, 93d Cong., Summary of the Provisions of H.R. 10710 4 (Comm. Print

1974) (stating that "[t]he Act directs the President to proclaim . . . import surcharges . . .

as may be necessary to deal with large and serious U.S. balance of payments deficits"

(emphasis added)).  Ultimately, the Senate Report, leading up to the enactment of

Section 122, explicitly classifies three figures as measures of the "balance of payments"

(liquidity, official settlements, and basic balance) while classifying two measures of the

**- Appx41 -**

Court Nos. 26-01472 & 26-01606                                    Page 42

"trade balance" as distinct. S. Rep. 93-1298, at 8; see also Staff of S. Fin. Comm. Dec. 1974, Table 1.

Rather than identifying "balance-of-payments deficits" as that term was intended in 1974, the Proclamation relies upon current account deficits, and a discussion of "a large and serious trade deficit." Proclamation No. 11012 ¶ 6; see also id. ¶ 7 (referring to deficits concerning the balance of goods and services as well as the balances on primary income and secondary income, all of which are part of the current account); id. ¶ 8 (noting the trade deficit). Although the current account (and the balance of trade as a component of the current account) are relevant to balance-of-payments deficits, they are distinct, and the statute recognizes the distinction. Compare 19 U.S.C. § 2132(a)(1) ("large and serious United States balance-of-payments deficits"), with 19 U.S.C. § 2132(c)(1) ("large and persistent United States balance-of-trade surpluses"). Indeed, the Government's Declaration plainly acknowledges that the Proclamation does not rely upon the metrics used to measure balance-of-payments deficits discussed at the time of enactment:

> During the 1970s, economists leveraged multiple metrics to analyze different aspects of BOP deficits. More expansive measures than the current account typically included other components of the BOP accounting framework involving relatively durable transactions—those that were long-term and illiquid—and excluded flows of payment and other liquid, money-like instruments that are recorded in the financial account. In developing candidate alternative BOP deficit measures to the current account, CEA accounted for the evolution of financial markets since the 1970s, which have substantially increased the liquidity of many assets (e.g., equities).

> Figure 5 shows CEA's most expansive candidate BOP deficit measure for the purposes of Section 122: the current account plus the

> capital account plus net FDI.  This measure excludes most assets in the financial account, as in modern-day financial markets they can exhibit high degrees of liquidity and volatile flows, akin to broad financial flow.  However, even this measure is likely too inclusive.  As acknowledged by the BEA in 1976 "[…] even some components of direct investment, can be quite volatile."  This suggests that a representation of the BOP deficit more aligned to Section 122 would reflect only the most durable components of FDI.  As illustrated by Figure 5, CEA's most expansive candidate measure is more volatile than the current account balance, but presents the same qualitative story: a prolonged period in deficit.

Yared Decl. ¶¶ 43–44 (alteration in original) (citation omitted).  The Declaration explains the Proclamation's reliance on the current account deficit as a function of the United States' shift from a fixed exchange rate to a floating exchange rate in great detail.[34]  Id. ¶¶ 28–36.  The narrative woven by the Declaration attempts to characterize the Senate's explicit references to (1) liquidity, (2) official settlements, and (3) the basic balance as concepts that must be reinterpreted today to take account of the fact that "BEA no longer reports all the components needed to exactly replicate the basic balance" as well as changes that have occurred in the long-term capital markets.[35]  Id. ¶¶ 37–40.  Thus, the Yared Declaration asserts that, given the "context of the modern economy and financial markets, . . . the balance of the current account within the BOP

---

[34] While the Yared Declaration is distinct from the President's Proclamation and not expressly relied upon therein, throughout the Proclamation, the President states that he was "informed" by senior officials and advisors in arriving at his factual findings.  Proclamation No. 11012 ¶¶ 4–13.  The court's references to the Yared Declaration are not dependent upon whether Mr. Yared was among the unnamed senior officials or advisors in the Proclamation.

[35] The Declaration explains its resort to measurements beyond those considered by Congress in 1974.  See, e.g., Yared Decl. ¶ 38 (noting that "[w]hat can be construed as non-volatile, long-term capital has changed materially since the 1970s").

accounting framework is the most appropriate measure of BOP deficits for the purposes of Section 122." Id. ¶ 13.[36]

Both Plaintiffs and Defendants overstate the consequences of the United States' transition from a fixed exchange rate system to a floating exchange rate system. Plaintiffs argue that because the United States floats its currency, large and serious balance-of-payments deficits cannot occur. State Pls.' Mem. at 2–3; Priv. Pls.' Mem. at 21–22. Defendants argue that Plaintiffs' position means Section 122 was "a nullity since the day it was enacted." Defs.' Resp. at 40, see also id. at 35. Both Plaintiffs and Defendants miss the mark. Whether it is possible to measure balance-of-payments deficits by settlements, liquidity, or basic balance today is not our concern;[37] rather,

---

[36] Notably, in the next paragraph, the Yared Declaration acknowledges "trade deficits are conceptually distinct from balance-of-payments deficits." Id. ¶ 14.

[37] At Oral Argument, the Government conceded that the way in which a balance-of-payments deficit is measured today is different from how a balance-of-payments deficit was measured in 1974; namely, that basic balance and liquidity are no longer considered relevant or material measures. Oral Arg. at 1:35:00–1:38:00, 1:52:00–1:55:00 (approximate time stamps from the recording). Defendants' discussion of these alternatives during Oral Argument and in their brief makes clear they had notice of and understood the statutory interpretation grounds raised in Plaintiffs' motions for Summary Judgment. See Defs.' Resp. at 26 (arguing the Government's interpretation is supported by "statutory context and legislative history"); id. at 31 (arguing the President's "interpretation is not a clear misconstruction of Section 122" that requires judicial review of his actions); see also State Pls.' Mem. at 22–23, 25–27 (arguing the preconditions for Section 122 duties were not satisfied); Priv. Pls.' Mem. at 16–23 (similar). Thus, we disagree with the dissent that our resolution of this issue triggers the provisions of Rule 56(f) governing "Judgment Independent of the Motion," specifically, the requirement for "notice and a reasonable time to respond" before "grant[ing] the motion on grounds not raised by a party." USCIT Rule 56(f)(2); see also Dissent Op. at 24–30. Plainly, the grounds the Plaintiffs advanced and of which Defendants had notice necessarily require the court to interpret the meaning of "balance-of-payments deficits" for purposes of Section 122. See Loper Bright, 603 U.S. at 394 (stating that "courts

when interpreting the statute, we must determine the meaning of "balance-of-payments deficits" at the time Congress enacted the statute and whether the President identified balance-of-payments deficits within that meaning—regardless of how the BEA measures such deficits today.  The meaning of this term is readily ascertainable when looking at how the Senate explicitly reported balance-of-payment deficits.  S. Rep. 93-1298 at 8; Staff of S. Fin. Comm. Dec. 1974, Table 1.

Thus, what is relevant is what Congress meant by "balance-of-payments deficits" in 1974, and what Congress meant can be determined based on what it reported at the time of enactment, namely the balance-of-payments deficits as measured by liquidity, official settlements and the basic balance.  Even if it is unlikely that "large and serious balance-of-payments deficits" within the meaning of Section 122 could occur today in light of the floating exchange rate system, the other provisions of Section 122 remain operative.  See 19 U.S.C. § 2132(a)(2)–(h).  Under those provisions, the President would be empowered to act "to prevent an imminent and significant depreciation of the dollar" or "to cooperate with other countries in correcting an international balance-of-payments disequilibrium."  See id. § 2132(a)(2)–(3).

Accepting as true every factual statement in Proclamation No. 11012, the surcharge imposed by the Proclamation rests on the existence of a large trade deficit, a current account deficit, a negative net international investment position, and a deficit on the balance on primary and secondary income (which are part of the current account).

---

must exercise independent judgment in determining the meaning of statutory provisions").

Court Nos. 26-01472 & 26-01606                                    Page 46

Proclamation No. 11012 ¶¶ 7–11.  The Proclamation asserts that "the United States

runs a trade deficit, does not currently make a net income from the capital and labor that

it deploys abroad, and experiences more transfer payments, on net, flowing out of the

country than into the country."  Id. ¶ 7.  Nowhere does Proclamation No. 11012 identify

balance-of-payments deficits within the meaning of Section 122 as it was enacted in

1974.  See generally Proclamation No. 11012.

Because the Proclamation's use of trade and current account deficits to stand in

the place of balance-of-payment deficits within the meaning of the statute renders the

Proclamation ultra vires, the court need not reach the arguments of whether Section

122 requires the identification of "fundamental international payments problems" or

whether the exemptions provided in the Proclamation are lawful.  See Trump v. Hawaii,

585 U.S. 667, 703 (2018) (requiring a "facially legitimate and bona fide" reason for

Executive action (citation omitted)).  Proclamation No. 11012 is invalid, and the tariffs

imposed on Plaintiffs are unauthorized by law.[38]

---

[38] We have considered the arguments presented by the dissent and are not convinced
by them.  The dissent finds the legislative history too limited to give meaning to the term
"balance-of-payments deficits."  However, the dissent provides no affirmative alternative
meaning to this critical statutory term that the President invokes as the basis of the
Proclamation.  Indeed, the dissent concludes that one cannot or should not ascribe
meaning to "balance-of-payments deficit" absent express statutory language defining
the term.  To the contrary, as we have discussed, "[i]t is emphatically the province and
duty of the judicial department to say what the law is.  Those who apply the rule to
particular cases, must of necessity expound and interpret that rule."  Marbury, 5 U.S. at
177.  Thus, the court's role is to define statutory terms in order to determine whether the
President acted within his congressional grant of authority.  See id.; USP Holdings, 36
F.4th at 1365–66.  Rather than define balance-of-payments deficits for purposes of
Section 122, the dissent accepts the Defendants' claim that they may choose the
economic statistics or sub-accounts of the balance-of-payments based on what is

**- Appx46 -**

### III.    CSMS # 67844987

#### A. Parties' Contentions

State Plaintiffs seek judicial review of CBP's Cargo Systems Messaging Service # 67844987 as a final agency action pursuant to the APA.  State Pls.' Mem. at 32–33. They suggest, however, that Proclamation No. 11012 and CSMS # 67844987 stand or fall together, contending that because CSMS # 67844987 "violates the requirement[s] of Section 122, it is "in excess of statutory jurisdiction, authority, or limitations."  Id. at 33 (quoting 5 U.S.C. § 706(2)(C)).  State Plaintiffs argue the court should "stay, vacate, and set aside CSMS # 67844987, which implements the Section 122 Proclamation."  Id.

The Government contends that CSMS # 64844987 is not an agency action for purposes of the APA, let alone a final agency action.  Defs.' Resp. at 66–67.  The Government relies on Maple Leaf Marketing, Inc. v. United States, 45 CIT __, __, 528 F. Supp. 3d 1365, 1378–79 (2021) (dismissing a claim for APA review of CSMS guidance). Id. at 66–67.

In reply, State Plaintiffs argue that CSMS # 64844987 is a final agency action because it "creates requirements related to documentation and entering data and provides for 'drawback'—provisions not contained within the Proclamation."  State Pls.' Reply at 19.

---

available at present.  See Defs.' Resp. at 32 n.12.  As we discuss above, we cannot accept that view as a matter of statutory interpretation because doing so would require us to determine whether there is any intelligible principle behind such an open-ended delegation that would save it from constitutional scrutiny—a challenge the dissent dismisses as a "straw man."  Dissent Op. at 18.

### B. Analysis

"[F]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review."  5 U.S.C. § 704.  An "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  Id. § 551(13).  For an agency action to be final, two requirements must be met.  Bennett v. Spear, 520 U.S. 154, 177–78 (1997).  First, the agency's action "must mark the 'consummation' of the agency's decisionmaking process."  Id. (citations omitted).  Second, the agency action "must be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'"  Id. at 178 (citations omitted).

State Plaintiffs' moving brief provides no substantive rationale for treating CSMS # 67844987 as an agency action, final or otherwise, for purposes of the APA.  See State Pls.' Mem. at 32–33.  They seek to remedy this omission in their reply brief, arguing that CSMS # 67844987 is a final agency action, State Pls.' Reply at 19, but their efforts are unavailing.  Arguments raised for the first time in a reply are forfeited.  See Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1375 n.4 (Fed. Cir. 2005).  Additionally, even in reply, State Plaintiffs do not address Defendants' argument that a CSMS message is not an "agency action" at all.  See Defs.' Resp. at 66 (citing Maple Leaf Mktg., 528 F. Supp. 3d at 1378–79).  Lastly, State Plaintiffs assert, in a conclusory fashion, that CBP's guidance regarding documentation, data entry, and drawback creates rights or obligations from which legal consequences flow.  State Pls.' Reply at 19.  The court will not "do counsel's work" of constructing the argument that may or may

not support the desired conclusion.  See Home Prods. Int'l, Inc. v. United States, 36 CIT

665, 673, 837 F. Supp. 2d 1294, 1301 (2012) (quoting United States v. Zannino, 895

F.2d 1, 17 (1st Cir. 1990)).

Accordingly, State Plaintiffs' arguments regarding CSMS # 67844987 do not

present independent grounds to set aside implementation of Proclamation No. 11012.

## IV.     Remedy

Plaintiffs seek a permanent injunction, State Pls.' Mem. at 35–41; Priv. Pls.'

Mem. at 35–40, while the Government argues that Plaintiffs are not entitled to one,

Defs.' Resp. at 68–72.  The State of Washington (through its instrumentalities) and

Private Plaintiffs, i.e., collectively, Importer Plaintiffs, have satisfied the requirements for

permanent injunctive relief.

A permanent injunction does not necessarily follow from success on the merits.

V.O.S. Selections, 149 F.4th at 1339.  A plaintiff seeking permanent injunctive relief

must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at
> law, such as monetary damages, are inadequate to compensate for that
> injury; (3) that, considering the balance of hardships between the plaintiff
> and defendant, a remedy in equity is warranted; and (4) that the public
> interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).[39]   The court considers

whether Importer Plaintiffs have satisfied these eBay factors.

---

[39] The standard for a permanent injunction "is essentially the same as" the standard for
a preliminary injunction except that a plaintiff must establish "actual success" on the
merits rather than "a likelihood of success."  Amoco Prod. Co. v. Vill. of Gambell, AK,
480 U.S. 531, 546 n.12 (1987).  That being said, the Government's arguments against

The court considers the first and second factors together.  Importer Plaintiffs have paid, and, absent injunctive relief, will continue to pay Section 122 duties that the court has held to be unlawful.  While Defendants "do not contest the [c]ourt's authority to order reliquidation" of entries subject to Section 122 duties made by prevailing plaintiffs following a final, unappealable decision on the merits, Defs.' Resp. at 69; see also id. at 71, Defendants do not explain why they should be permitted to continue the unlawful collection of Section 122 duties from Importer Plaintiffs for the duration of the imposition of such duties.  The Government, in effect, seeks the benefit of a stay of the court's judgment without showing its entitlement to one or otherwise responding to the substance of the Plaintiffs' arguments.  See USCIT Rule 62(c)–(d).[40]

Additionally, economic harm to Importer Plaintiffs takes several forms.  "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."  Celsis In Vitro, Inc. v. CellzDirect, Inc.,

---

injunctive relief appear to assume the court will decide the motion in a preliminary posture.  See Defs.' Resp. at 68 (arguing Plaintiffs have not shown they will incur harm "before the Court can decide the case on the merits") (emphasis added); id. at 69 (arguing Plaintiffs have not shown they will incur harm "while the Court considers their simultaneous motion for summary judgment") (emphasis added).  The Government's arguments regarding harm to Plaintiffs do not address the scenario in which the court considers injunctive relief concurrent with summary judgment.

[40] The court acknowledges the good faith efforts made by the Government to work towards the refund of unlawfully collected IEEPA duties.  See generally, Atmus Filtration, Inc. v. United States, Court No. 26-01259 (CIT Apr. 1, 2026), ECF No. 52 (court order summarizing CBP's progress on developing the functionality that will permit CBP to make the required refunds of duties imposed without legal basis under IEEPA); Euro-Notions Florida, Inc. V. United States, Court No. 25-0595 (CIT Apr. 14, 2026), ECF No. 19 (court order providing update on CBP's progress).  As that experience shows, however, there may be significant delays from the time the imposition of tariffs are first held unlawful before refunds are effectuated.

664 F.3d 922, 930 (Fed. Cir. 2012); see also Oman Fasteners, LLC v. United States, 125 F.4th 1068, 1089 (Fed. Cir. 2025) ("[L]ayoffs and damage to goodwill . . . are independently sufficient to establish irreparable harm."). Private Plaintiffs aver that they have suffered or will suffer lost profits and damage to business relationships, investments, and innovation on account of these tariffs. Frisch Decl. ¶¶ 12–13, 18; Foreman Decl. ¶¶ 20–21. Granting a permanent injunction would also help to prevent these harms.

Finally, considering the balance of hardships, a remedy in equity is warranted, and the public interest would be served by a permanent injunction. The third and fourth elements "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). "The public interest is served by ensuring that governmental bodies comply with the law." Am. Signature, Inc. v. United States, 598 F.3d 816, 830 (Fed. Cir. 2010). The Government's arguments on these elements are grounded in the reasons provided for the Section 122 duties. See Defs.' Resp. at 71 ("The President has identified that the balance-of-payments deficits significantly harm[] U.S. national interests . . . ."); id. at 72 (arguing an injunction would "intru[de] on the President's conduct of foreign affairs and efforts to . . . address the rapidly deteriorating balance-of-payments position of the United States"). These reasons are unpersuasive. Enjoining unlawful conduct is in the public interest.

The balance of equities favors granting Importer Plaintiffs permanent injunctive relief. The court need not decide whether the CIT is authorized, post-CASA, 606 U.S. at 831, to issue universal injunctive relief because such relief is not merited here. The

court finds standing in this case only with respect to Importer Plaintiffs, and those plaintiffs may be made whole by an injunction specific to them and refunds, with interest as provided by law, for any Section 122 duties paid before the injunction takes effect.[41] Private Plaintiffs make no specific arguments for a universal injunction. See generally Priv. Pls.' Mem. at 35–40; Priv. Pls.' Reply at 25–28.[42] While State Plaintiffs do, State Pls.' Mem. at 41–43, their arguments appear to assume the court will find standing for all State-parties, inclusive of the non-importing, purchaser States, which is not the case. And while the one State with standing, the State of Washington, avers harm from the indirect cost of tariffs passed on by resellers, Hsu Decl. ¶ 6, the potential for increased costs to one plaintiff is not an appropriate basis for the imposition of a universal injunction. Accordingly, the court declines to enter a universal injunction.

## CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that State Plaintiffs' motion for summary judgment (ECF No. 25, Ct. No. 26-01472) is **GRANTED** only with respect to Plaintiff The State of Washington; it is further

---

[41] While State Plaintiffs suggest that a non-universal injunction would violate the Uniformity Clause because it "would create disparate tax protocols based on geography," State Pls.' Mem. at 42, this argument overlooks that State Plaintiffs seek relief as importers (or purchasers) of goods making entry at potentially any port in the country. Thus, the court is not imposing any geographic limitation on Section 122 tariff treatment for the Importer Plaintiffs entitled to relief.
[42] Private Plaintiffs do, however, assert that "the economic impact from these tariffs is widespread." Priv. Pls.' Reply at 27.

Court Nos. 26-01472 & 26-01606                                             Page 53

**ORDERED** that all claims by State Plaintiffs other than Plaintiff The State of

Washington are **DISMISSED** for lack of standing; it is further

**ORDERED** that Private Plaintiffs' motion for summary judgment (ECF No. 11, Ct.

No. 26-01606) is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' alternative motions for a preliminary injunction are

**DENIED AS MOOT**.

Judgment will be entered accordingly.

/s/  Mark A. Barnett
Mark A. Barnett, Chief Judge

/s/  Claire R. Kelly
Claire R. Kelly, Judge


Dated: May 7, 2026
  New York, New York

Stanceu, Judge, dissenting: I respectfully dissent because I disagree with the majority's interpretation of Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132 ("Section 122"). Further, I believe it was error to grant summary judgments *sua sponte* in favor of the plaintiffs with standing without following the procedure USCIT Rule 56(f) requires. I would have denied both summary judgment motions and provided the parties "notice and a reasonable time to respond" according to the Rule 56(f) procedure.

I.

At various times in the nation's history, and in various ways, Congress has delegated to the President the power to alter the tariff treatment of goods imported into the United States. Some statutes delegating this power expressly allow the President, subject to various conditions or procedures, to increase or decrease duties on imported foreign merchandise.[1] Section 122 is such a statute. In specific circumstances, it empowers the President to restrict imports by temporarily imposing or increasing duties or quotas or, alternatively, to increase imports by temporarily reducing duties or relaxing quotas. In either case, the President is delegated authority to make a

---

[1] In contrast, in at least one statute, Congress delegated to the President the constitutional power to regulate importation without delegating the power to impose duties on imported goods. *See Learning Resources, Inc. v. Trump*, 607 U.S. --, 146 S. Ct. 628 (2026).

- Appx54 -

determination based on his own findings as to specified economic conditions in the United States.

Our review in cases such as this one, which challenge a President's exercise of delegated legislative authority, is limited and deferential. In deciding whether the President acted within such authority, we are not empowered to review the factual findings by which he concluded the action was necessary or appropriate. *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940) ("It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review." (citations omitted)); *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1349 (Fed. Cir. 2018); *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985); *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984) ("The President's findings of fact and the motivations for his action are not subject to review.") (citing *George S. Bush & Co.*, 310 U.S. at 379–80; *United States Cane Sugar Refiners' Ass'n v. Block*, 683 F.2d 399, 404 (CCPA 1982); *Aimcee Wholesale Corp. v. United States*, 468 F.2d 202, 206 (CCPA 1972)).

II.

In delegating to the President the authority to restrict imports, Section 122(a)(1) does not limit the term "balance-of-payments deficits" to measurements of our

country's balance of payments that are computed according to "liquidity," "official settlements," or "basic balance." No reference to those methods of measurement, nor any other definition of the term "balance-of-payments," appears in Section 122 or related provisions of the Trade Act of 1974, and the legislative history does not support the majority's interpretation of the statutory term.

I begin my consideration of the majority's statutory interpretation by deciding what Congress could *not* have meant when it referred to our country's balance of payments in Section 122(a)(1). First, it was not adopting the Black's Law Dictionary definition of the term, which defined balance of payments as synonymous with the balance of trade.[2] We know this because Section 122 refers to our country's payments balance in subsection (a) and its trade balance in subsection (c), indicating that it intended to distinguish between these two concepts.

Second, we can say confidently that Congress did not mean for the balance of payments to be something that was to be measured only according to "official settlements" or "basic balance." As the majority notes, an early version of what was to become Section 122 was contained in H.R. 6767, which provided that "a serious balance-of-payments deficit existed when the President determined that 'the balance of payments (as measured either on the official reserve transactions basis or by the balance

---

[2] "Balance of payments (1844) The difference between what a country spends buying goods and services from abroad and what it earns selling goods and services abroad." Black's Law Dictionary (11th Ed. 2019).

on current account and long-term-capital) has been in substantial deficit over a period

of four consecutive calendar quarters.'" *Opinion of the Majority* ("*Majority Op.*") at 34

(quoting Trade Reform Act of 1973, H.R. 6767, 93d Cong. § 401(b)(1)(A) (1973)). By the

terms it used, that version defined a "balance of payments" as one measured on an

official settlements basis ("official reserve transactions") or according to what was

known as basic balance ("balance on current account and long-term-capital"). As the

majority notes, the House version that was considered in the Senate, H.R. 10710, deleted

the parenthetical definition of balance of payments and the four-quarters measurement

and added the "large and serious" qualification. *Majority Op.* at 36-37.

It is at this point that the majority and I part company. We disagree specifically

as to the significance of the deletion of the language that had appeared in the

parenthetical in H.R. 6767. The majority's interpretation is, in effect, that in drafting

what would become Section 122(a)(1) in the House and Senate and adopting a final

version, Congress first deleted the parenthetical but then reverted to the previous

concept of confining the meaning of "balance-of-payments deficits" to deficits measured

according to official settlements or basic balance, but with the change of adding a third

measure, which was the liquidity basis. This raises the question of why, if that was the

intent, neither chamber restored the parenthetical or added another reference to specific

measurement methods. The reasonable conclusion I can draw from the change from

H.R. 6767 to H.R. 10710 is that neither the House Ways and Means Committee nor the

- **Appx57** -

Senate Finance Committee, in formulating what was enacted as Section 122(a)(1), had such an intent.

The majority quotes an explanatory sentence from the House Report on the Trade Act of 1974 ("House Report"), as follows: "The [House] [C]ommittee [on Ways and Means] considered various formulas for defining a serious balance-of-payments deficit, including a specific formulation based on the existence of a substantial deficit over a certain period of time, but the committee feels that it is not possible to formulate a definition with mathematical exactness." *Id.* at 37 (quoting H.R. Rep. No. 93-571, at 28-29 (1973)). Following the approach taken in the final House bill, the Senate did not include in its version a definition of "balance of payments" or a temporal reference such as the four-quarters reference, and no such definition or reference was included in Section 122 as ultimately enacted.[3]

The majority acknowledges that "Congress did not replace the parenthetical definition of balance of payments" but nevertheless proceeds to conclude that the "legislative history indicates what Congress contemplated as the measure of balance of payments," which the majority views as being confined to the liquidity, official settlements, or basic balance measures. *Majority Op.* at 37. I see no convincing

---

[3] In contrast, Congress included in Section 122(c) a required measurement of balance-of-trade surpluses, which are to be "determined on the basis of the cost-insurance-freight value of imports, as reported by the Bureau of the Census." 19 U.S.C. § 2132(c)(1).

Court Nos. 26-01472 & 26-01606                                    Page 6

indication in the legislative history that Congress intended to define "balance of
payments" as something that was to be measured in only those three ways for purposes
of Section 122(a)(1).

The House Report conveys the opposite intent in explaining why the references
to two measurement methods (i.e., official settlements and basic balance) were omitted
from the bill. In the sentence the majority quotes, the House Ways and Means
Committee reported that it decided against a specific "formulation" or "definition." *See
id.* at 37 (quoting H.R. Rep. No. 93-571, at 28-29). In the preceding sentence, the House
Report also demonstrated the intent to afford some degree of discretion to the President
as to the method of measurement. H.R. Rep. No. 93-571, at 28 ("The committee
recognizes that there will be an element of judgment on the part of the President in
determining the existence of a serious deficit that justifies use of this authority."). The
majority apparently would interpret both sentences from the House Report to mean
only that Congress intended to leave to the President's discretion what would constitute
the size or seriousness of balance-of-payments deficits but not the choice of
measurement method. Were that the case, it would be reasonable to expect that the
change from H.R. 6767 to H.R. 10710 would have omitted only the four-quarters
measurement from the text and retained, in some form, a definition of the means of
measurement. But the change omitted both the four-quarters reference and the defined
means of measurement, and the Senate did not restore either of them.

The majority's opinion concludes that "[w]hile Congress did not replace the parenthetical definition of balance of payments, the legislative history indicates what Congress contemplated as the measure of the balance of payments." *Majority Op.* at 37. In my view, what Congress signaled by deciding not to replace the parenthetical definition in H.R. 6767 speaks directly to the statutory interpretation issue before us. It signaled that the drafters in the House and Senate decided against specifying a particular measurement method or methods for balance-of-payments deficits. What the majority instead identifies as indicative legislative history consists of a statistical table in a report of the Senate Finance Committee and certain other statistical tables in Finance Committee staff reports. The majority concludes from these tables that Congress intended that liquidity, official settlements, and basic balance would be the exclusive measures of the payments balance for purposes of Section 122(a)(1). *Id.* The majority reasons that "[s]pecifically, the Senate Report to the Trade Act of 1974 ("Senate Report") refers to the three types of balance-of-payments deficits, namely (1) liquidity, (2) official settlements, and (3) basic balance, discussed in other parts of the legislative history." *Id.* (citing S. Rep. No. 93-1298, at 8 (Table 3)).

The Senate Report "refers to the three types of balance of payments deficits" in the sense that all three measures the majority identifies are headings in "Table 3" in that report, which presents statistics, in billions of dollars, on merchandise trade ("U.S. trade position"), "Trade balance," and "Balance of payments." S. Rep. No. 93-1298, at 8-9

(Table 3). The accompanying text, which does not refer to Section 122, discloses the actual purpose for which the Senate Finance Committee included Table 3 in the Report: "The performance of the United States in the world economy throughout much of the postwar period has been marked by persistent trade and payments deficits. The performance since 1960 is shown in Table 3 below." *Id.* at 7.

The Senate Report presents "Table 5" several pages after Table 3. *See id.* at 12 (Table 5). Table 5 compares the trade balance (apparently, the merchandise trade balance) with the balance of payments for the years 1966 through the first nine months of 1974, but it presents payments balance statistics only on the liquidity basis, not official settlements or basic balance. The accompanying text shows the purpose for the inclusion of Table 5 was the Committee's concern about the effect trade deficits were having on the balance of payments as well as the importance of measuring the merchandise trade balance on a c.i.f. (cost, insurance and freight) rather than an f.o.b. (free on board) basis. Noting that "our trade account has been in deficit since 1966," the Committee stated that "[t]hese recent trade deficits have accounted for over one-half of our overall payments deficits, as shown in Table 5." *Id.* at 7.

It logically can be presumed from the placement of Tables 3 and 5 within the Senate Report, and in particular from the text accompanying each, that Tables 3 and 5 were included in the report to illustrate the points being made in the accompanying text on pages 7 to 12 of the report. But it is a leap of logic to presume that these tables were

Court Nos. 26-01472 & 26-01606                                        Page 9

placed in the text of the report to address an issue not discussed in the text, which is

how payments balances were to be measured for purposes of Section 122. The

discussion of Section 122 occurs much later in the Senate Report, at pages 87-89. That

discussion, like the discussion earlier in the Senate Report, does not address the

question of how a balance-of-payments deficit is to be measured for purposes of the

Section 122(a)(1) authority.

In addition to relying on Table 3 of the Senate Report, the majority also cites a

December 1974 staff report prepared for the Senate Finance Committee that contains a

table presenting balance-of-payments statistics according to liquidity, settlements, and

basic balance. *Majority Op.* at 37 & 37 n.31 (citing Staff Report of S. Fin. Comm., 93d

Cong., Tables and Statistical Material on U.S. Balance of Trade and Balance of Payments

Table 1 (Comm. Print Dec. 1974)) ("December 1974 staff report"). Table 1 in the

December 1974 staff report is essentially identical to Table 3 in the Senate Report (with a

slight change to the title). It is one thing to say that the Senate Finance Committee

understood that the payments balance could be measured for Section 122(a)(1) purposes

according to liquidity, official settlements, and basic balance. It is quite another to say,

based on the headings in Table 3 and in the same table in the December 1974 staff

report, that the Committee intended that it would be impermissible for deficits in the

country's payments balance to be measured in any other way for the application of

Section 122(a)(1), particularly in light of the absence of any text in the report so

**- Appx62 -**

indicating and the deletion from H.R. 10710 of the parenthetical definition that

appeared in H.R. 6767.

The majority concludes that the presenting of statistics on the payments balance

according to liquidity, official settlements, and basic balance in Table 1 of the December

1974 staff report (which is a nearly identical version of Table 3 in the Senate Report) "is

thus the clearest indication of the concerns Section 122 was intended to address."

*Majority Op.* at 38 n.31. I find this conclusion unconvincing, for two reasons. First,

Table 1 makes no reference to Section 122. Second, Table 30 in the December 1974 staff

report, which the majority also cites, *id.*, in presenting data on the U.S. balance of

payments by area, presents global and area data in the last two superior headings, the

first of which is labeled "Balance on current account" and the second of which is labeled

"Basic balance." December 1974 staff report at 36-37. This placement could suggest that

both the current account balance and the basic balance were considered to be measures

of the payments balance. Table 30 also presents data (globally only, not by area) on

"Net liquidity balance" and "Official settlements balance." *Id.*

The staff report prepared for the Senate Finance Committee dated February 26,

1974, which the majority cites, *Majority Op.* at 36 n.30, also indicates that the country's

current account balance could have been considered to be a measure of the balance of

payments in 1974. *See* Staff Data and Materials on U.S. Trade and Balance of Payments,

Staff Report of S. Fin. Comm., 93d Cong. (Comm. Print Feb. 26, 1974) ("February 26,

1974 staff report").[4]  This staff report sets forth as Table 1 a table that is essentially

identical to Table 1 in the December staff report and Table 3 in the Senate Report.[5]  But

notably, the February 26, 1974 staff report also includes a table ("Table 22"), titled "U.S.

Current Account Balance," that it places directly under the heading "U.S. Balance of

Payment Trends.*"[6]  February 26, 1974 staff report at 24.  Table 22 presents current

---

[4] The information presented in the February 26, 1974 staff report appears to have been statistically updated and condensed to formulate the December 1974 staff report. Both versions are official Committee Prints.  The February staff report contains 39 tables, and the December staff report contains 31, with many tables in common (including Table 30), and is further condensed for the December staff report by the deletion of 9 charts.

[5] There are some variations in some of the reported data, apparently due to statistical updates.

[6] In footnote 1, Table 22 describes what "U.S. Current Account Balance" includes in terms essentially consistent with common definitions of the current account today: "Includes merchandise, services, [together, the trade balance] private remittances [primary income], and government transfers [included in secondary income]."  It is not clear to what the asterisk in the heading refers.
   Defendants define the "current account" balance as "the net position of (i) goods trade, (ii) services trade, (iii) primary income, and (iv) secondary income."  Decl. of Pierre Yared (Acting Chairman, Council of Economic Advisors) ¶ 24, Court No. 26-01472, ECF No. 35-1 ("Yared Decl.").
   A Glossary maintained by the Bureau of Economic Analysis, U.S. Department of Commerce ("BEA") defines "Current account (international)" as: "Record of transactions in goods, services, income, and unilateral current transfers between residents and nonresidents."  *See Current Account (International)*, BEA Glossary (last accessed May 6, 2026) https://bea.gov/help/glossary/current-account-international.  It is apparent from the terms used that the references to transactions in goods and services constitute the trade balance, "income" refers to primary income, and "unilateral transfers" refer to secondary income.

*Footnote Continued*

- Appx64 -

account balances for the years 1960 through 1973 (preliminary). The next table, Table 23, is titled "U.S. basic balance" and lists the basic balance for those same years. *Id.* The placement of these two tables immediately beneath a heading referring to U.S. balance of payments trends is an indication that these two measurements—current account balance and basic balance—may both have been considered to be measurements of the balance of payments. Following are tables on the merchandise trade balance (Table 24), the services trade balance (Table 25), military and foreign aid (Table 25), and the private capital account (Table 26).

The February 26, 1974 staff report contains another indication that the current account balance could have been considered to be a measure of the balance of payments in 1974. The report presents, on one page (page 45), four charts, in the form of line graphs, all of which pertain to the general subject of the balance of payments: "U.S. net liquidity and official settlements balance" (shown on the same graph, Figure 13), "U.S. current account balance" (Figure 14), and "U.S. basic balance" (included under heading for Figure 14 and shown in the table of contents as Figure 15). February 26, 1974 staff report at 45. Thus, page 45 and the table of contents, *id.* at IV, place the chart on current account balance after the chart for liquidity and official settlements and immediately

---

Defendants define primary and secondary income in this way: "Primary income consists of international investment income and labor compensation, while secondary income reflects unilateral transfers (e.g. insurance payments, foreign aid, remittances)." Yared Decl. ¶ 24.

before the chart on basic balance. Figures 14 and 15 have as the horizontal axis the

years 1950 through 1973 (the last year shown as "est." [estimated]). *Id*. at 45. Current

account balance is described on the chart as "Including merchandise, investment

income, services, military, and transfers." *Id*. A notation on the U.S. current account

chart reads "Best measure of U.S. international competitive position." *Id*. It shows

deficits and surpluses for 1950-69 and a sharp drop beginning in 1970-71 to below

negative $8 billion in 1972, followed by a rapid increase to a surplus for estimated 1973.

*Id*. A notation on the following chart, "U.S. basic balance," reads "Best measure of

persistent features in U.S. payments position" and shows deficits for all years from 1950

to 1972 except for the 1973 estimate, which shows a rapid rise to a surplus, after a sharp

drop in 1970 to a low below negative $9 billion in 1972. *Id*. This chart states, "Adds

long-term capital movements to current account balance." *Id*. The "Source" for all four

charts on page 45 is given as "Council on International Economic Policy Annual Report,

February 1974." *Id*.

In summary, the mere references to the three methods of measuring payments

balances in Table 3 of the Senate Report, a table also presented in the Senate Finance

Committee staff reports, are far too slender a reed to support the weight of a conclusion

by this Court that Congress intended for "balance-of-payments deficits" to be measured

for Section 122(a)(1) purposes only according to liquidity, official settlements, and basic

balance. The other tables and charts discussed above cast further doubt on that

conclusion. Had Congress intended to limit measurement to liquidity, official settlements, and basic balance for purposes of Section 122(a)(1), one would expect to see a definition to that effect in Section 122, as there was in H.R. 6767, or at least discussion in the text of the Senate or House Report signifying that these were the only permissible methods of measurement. The deletion of the parenthetical from H.R. 6767 and the accompanying explanation in the House Report, which rejected the idea of specifying what measures would be permissible, are contrary to any supposition that the President was required to adhere to those three measurement methods in restricting imports according to Section 122(a)(1). The specific issue of whether Congress intended the balance of payments to have been measurable according to the balance on current account likewise is not addressed in the text of the House and Senate reports. But the February 26, 1974 staff report and the December 1974 staff report indicate that it could have been a possibility, and I see no indication that Congress intended for it *not* to be used. We should not draw conclusions about legislative intent from what we do not know.

From the reference in subsection (a) of Section 122 to the payments balance and the reference in subsection (c) to the trade balance, the majority opinion reasons that "[a]lthough the current account (and the balance of trade as a component of the current account) are relevant to balance-of-payments deficits, they are distinct, and the statute recognizes the distinction." *Majority Op.* at 42. This statement draws an unwarranted

conclusion from the statutory text. The statute distinguishes the payments balance from the trade balance by using both terms, but it does not distinguish the payments balance from the current account balance, an entity the statute does not mention. We safely can conclude, nevertheless, that Congress, in mentioning the payments balance in subsection (a), intended to refer to a broader measure than the one to which it referred in subsection (c).[7]

Nothing in the statute or the legislative history of Section 122 suggests that Congress adopted a "frozen in time" approach to statistical measurement such that the President's authority under Section 122 would expire should the Commerce Department's Bureau of Economic Analysis ("BEA"), the agency charged with maintaining our country's economic statistics, change the way it measures and calculates them. The House and Senate Reports reveal that in enacting Section 122 Congress was motivated by genuine concerns over the economic condition of the country and wanted the President to have for the future some specified, limited authority to restrict (or, in a situation described in subsection (c), increase) imports into the United States.[8] The legislative history does not support the plaintiffs' view that this

---

[7] The majority, who describe the trade balance as a component of the current account balance, *Majority Op.* at 42, agrees with defendants that the current account balance is a broader measure than the trade balance.

[8] The majority opines in *dicta* that "the grammatical structure of Section 122(a) suggests that 'fundamental international payments problems' are an independent

*Footnote Continued*

authority was not intended to be used after the transition from the Bretton Woods

system to floating exchange rates and was included in the statute only to allow for the

possibility that the United States and its trading partners would return to a fixed-rate

international arrangement.[9]

Congress understood in 1974, and long before 1974, that our country's payments

balance could be measured in different ways that produce different results. *See*

Subcomm. on Econ. Stats., Joint Econ. Comm., 89th Cong., 1st Sess., *The Balance of*

*Payments Statistics of the United States*, at 2 (Comm. Print 1965) (Reporting conclusions of

the "Review Committee for Balance-of-Payment Statistics" and stating that ". . . we

agree with the Review Committee that 'no simple number can adequately describe the

international payments position of this country at any time.'"). The three methods

_____

requirement" for Presidential action under Section 122(a)(1), i.e., a requirement that is in addition to large and serious balance-of-payments deficits. *Majority Op.* at 31 n.25. The Senate Report refutes a view that large and serious balance-of-payments deficits, standing alone, are insufficient to support an import restriction. *See* S. Rep. No. 93-1298, at 87 ("Under the Committee bill, the President would be required to impose import restrictions whenever the U.S. faces large and serious balance-of-payments deficits.").

[9] The statement of Rep. Henry Reuss the majority quotes makes this point. *Majority Op.* at 34 (quoting 119 Cong. Rec. 40,568 (1973)) (concluding that under floating exchange rates the Section 122 authority would achieve limited adjustments of the exchange rate of the dollar). The possible measurement of the payments balance by the basic balance method is another indication, as this is a broad measurement which, like the current account balance, is based on the economy as a whole and is not confined to the balance on government-held monetary reserves, as is the official settlements measurement.

Court Nos. 26-01472 & 26-01606                                    Page 17

identified in Table 3 of the Senate Report illustrate that there is more than one method,

while the text of that report does not say that these are the only acceptable methods.

The three statistical methods for measuring the payments balance the majority

cites are obsolete.  The BEA today measures the balance of payments according to a

method that, as the BEA instructs, is intended to result in a sum of zero.[10]  That method

calculates the payments balance by summing the current account balance with the

balances on the capital and financial accounts.[11]  By definition, a payments balance

measured according to a method that in principle produces a zero balance cannot

---

[10] *See* Amanda Geiger, *What is the Balance of Payments?*, Fed. Rsrv. Bank of St. Louis (last accessed May 6, 2026) https://www.stlouisfed.org/publications/page-one-economics/2025/oct/what-is-the-balance-of-payments.

[11] The majority opinion recognizes that the BEA's measurement of the balance of payments "as an accounting principle always nets to zero." *Majority Op.* at 39.  The BEA Glossary defines "Balance of payments" as "Record of transactions between U.S. residents and foreign residents during a given time period.  Includes transactions in goods, services, income, assets, and liabilities.  It is broken down into the current accounts (international), capital accounts (international), and financial accounts (international)." *Balance of Payments*, BEA Glossary (last accessed May 6, 2026) https://bea.gov/help/glossary/balance-payments.  It defines "Capital account (international)" as "Record of capital transfers between U.S. residents and foreign residents, such as debt forgiveness and migrants' transfers, and acquisitions and disposals of nonproduced nonfinancial assets between residents and nonresidents." *Capital Account (international)*, BEA Glossary (last accessed May 6, 2026) https://bea.gov/help/glossary/capital-account-international.  It defines "Financial account (international)" as "Record of transactions between U.S. residents and foreign residents resulting in changes in the level of international claims or liabilities, such as in deposits, ownership of portfolio investment securities, and direct investments." *Financial Account (international)*, BEA Glossary (last accessed May 6, 2026) www.bea.gov/help/glossary/financial-account-international.

amount to a "fundamental international payments problem" within the meaning of Section 122. Congress, therefore, meant something else in referring to the balance of payments in Section 122(a)(1).

The majority reasons that the obsolescence of methods of measuring the payments deficit is of no concern, *Majority Op.* at 44, while also concluding that "to lawfully proclaim the import surcharges" authorized by Section 122(a)(1) the President must use those obsolete methods to assert "the existence of the conditions required by the statute," *id.* at 29. According to this reasoning, the BEA in effect can repeal Section 122(a)(1) by changing how it measures the balance of payments. That could not have been the legislative intent.

Characterizing defendants' position as one in which "the President has discretion to identify any actionable deficit for purposes of Section 122(a)(1)," the majority reasons that "Section 122 would lack an intelligible principle if the President could simply identify any deficit account," *id.* at 40 n.33, and that "[s]uch an expansive reading of the statute would raise a non-delegation issue," *id.* at 40. This reasoning sets up a straw man. Recognizing the need to measure a balance-of-payments deficit by a *"reasonable understanding of the term in the context of section 122,"* Proclamation 11012 ("the Proclamation") does not "simply identify any deficit account." *Proclamation 11012*, (Feb. 20, 2026), 91 Fed. Reg. 9,339 (Exec. Office of the President Feb. 25, 2026) ("*Proclamation*") ¶ 6 (emphasis added). The Proclamation addresses, in considerable detail based on

official BEA statistics, various metrics pertaining to the payments balance that involve statistical measures of developments over the last several years.[12] Among them is a "staggering" current account deficit that reached four percent of gross domestic product ("GDP") in 2024, was two percent of GDP during 2013-2019, and was larger in 2024 than in 2019-2023, *id.* ¶ 9, and an historically unprecedented U.S. net international investment position at the end of 2024 that was negative 90 percent of GDP and that the

_____

[12] Stated in summary form, the Proclamation makes the following factual findings:

> Fundamental international payments problems exist that significantly harm U.S. national interests, including economic and national security interests. *Proclamation* ¶ 13. "The large, persistent, and serious" goods trade deficit of $1.2 trillion in 2024 and approximately $1.2 trillion in 2025 "has grown by 40 percent in the past 5 years alone" and "contributes to the fundamental international payments problems facing the United States." *Id.* ¶ 8. Beginning in 2024, the "primary income" balance turned negative for the first time since at least 1960 and therefore no longer served as a counterweight to the trade deficit in the current account and no longer served as a "stabilizing force for the United States balance-of-payments position even in the face of large and persistent trade deficits." *Id.* ¶ 9. The balance on secondary income has long been in deficit. *Id.* ¶ 11. The balance-of-payments position is now a "large and serious balance-of-payments deficit." *Id.* ¶ 13. The "ongoing decline" in the U.S. net international-investment position shows that the U.S. balance-of-payments deficit is large and serious, in that the current account is a "primary driver" of changes in the net U.S. international-investment position, which reached 90 percent of gross domestic product ("GDP") in 2024. *Id.* ¶ 10. The "staggering" current account deficit, which reached 4 percent of GDP in 2024, was almost double that of 2019-2023 and the largest since 2008. *Id.* ¶ 9.

President found to be affected significantly by the current account and indicative of the large and serious balance of payments deficit, *id.* ¶ 10.

For the reasons I have discussed, I conclude that the majority errs, first, in its interpretation of the legislative history in holding that the President cannot invoke subsection (a)(1) unless he identifies a payments deficit measured according to liquidity, official settlements, or basic balance and, second, in holding that Congress expressly foreclosed the possibility of the President's using current account deficits as the basis for action under subsection (a)(1) by referring to the payments balance in subsection (a) and the trade balance in subsection (c).

## III.

The basic balance measurement of the payments balance, in use in 1974, was calculated directly from the current account balance: it summed the current account balance, positive or negative, with the balance on long-term capital, positive or negative. *See Majority Op.* at 32 n.26, 35 n.29. Under the majority's approach, this Court would sustain the Proclamation had it identified a large and serious balance-of-payments deficit calculated according to a basic balance measurement. At the same time, the majority regard the issue of whether a balance-of-payments deficit according to basic balance (or liquidity or official settlements) exists or could be measured to exist today as one that is beyond the concern of this Court. *Majority Op.* at 44 ("Whether it is

possible to measure balance-of-payments deficits by settlements, liquidity, or basic balance today is not our concern."). But on that issue, I have a concern.

The basic balance and the BEA's contemporary measurement of the balance of payments have a feature in common: both include the current account balance. The basic balance sums the current account balance with only a long-term capital balance while the contemporary BEA measurement endeavors to sum the current account balance with the entire capital account and financial account balances.[13] The State plaintiffs, citing BEA and World Bank Group data, acknowledge that under the contemporary BEA measurement of the payments balance the current account is "balanced" principally by the surplus on the financial account, the capital account being much smaller.[14] The Proclamation cites the enormity of the current account deficit in

---

[13] The BEA uses this measurement of the payments balance with the objective that the balance will be zero (but apparently difficulties in measuring the capital account and financial account balances are the reason why the calculated balance of payments typically results in "discrepancy" deficits). *See* Geiger, *supra* note 10.

[14] The State plaintiffs acknowledge that the capital account "tends to be rather small" and that "the two-way financial flows" measured by the financial account are "enormous." Pl. States' Mot. for Summary J., and, in the Alternative, for Permanent Inj. 6 (Mar. 13, 2026) Ct. No. 26-04172, ECF No. 25 (citing Decl. of Douglas A. Irwin (Prof. of Economics, Dartmouth College) ¶ 9, ECF No. 27-6; BEA, *International Trade and Investment*). They cite World Bank Group data estimating the 2024 U.S. financial account position as a surplus of approximately $1.13 trillion, *id.* at 17 (footnote omitted), which would balance the entire 2024 current account deficit ($1.13 trillion as reported by the BEA). The basic balance measurement of the payments balance was defined to sum the current account balance with a balance on certain capital flows (long-term capital) but does not include the balance on the financial account.

2024 (i.e., four percent of GDP). *Proclamation* ¶ 9. It would be questionable as a factual matter, and indeed presumptuous, to speculate that a long-term capital account balance—even if it could be measured accurately today, and defendants offer an expert opinion that it cannot[15]—when not combined with the financial account balance, could be positive at so enormous a magnitude as to offset the enormously negative current account balance such that the balance of payments as it would be measured by basic balance is not a large and serious deficit.

Defendants offer the expert opinion that the current account balance, even if combined with the capital account balance, still would be a large and serious balance-of-payments deficit. Decl. of Pierre Yared (Acting Chairman, Council of Economic Advisors) ¶ 15, Ct. No. 26-01472, ECF No. 35-1 ("Yared Decl."). My point is not that we necessarily must accept this expert opinion as an established fact for purposes of ruling on the pending summary judgment motions. But the statistics maintained by the BEA, and the World Bank Group measurement of the financial account as provided to us by the State plaintiffs, show the enormous effect that the 2024 deficit on current account would have had on the balance of payments that year, whether measured by the contemporary BEA method or as measured by basic balance. It also demonstrates to me

---

[15] As the majority mentions, defendants offer expert opinion that today "there is no single measure of the long-term capital account (the other main component of the basic balance)." *Majority Op.* at 39 (quoting Yared Decl. ¶ 37).

another reason why this Court should not invalidate the Proclamation for failure to include, for example, an actual numerical calculation of the balance-of-payments deficit according to a basic balance measurement. There being no official BEA statistic of the payments balance as measured by basic balance, or, specifically, as measured by a sum of the current account balance and a long-term capital balance, any such numerical calculation would not be an official government statistic.

We are not experts in international macroeconomics matters and should hesitate to question whether it was reasonable for the President to rely on official BEA government statistics rather than a calculation of his own that may have been acceptable to the majority but would have had no official status. The Proclamation instead relies on advice the President's advisors provided after studying "different methods of evaluating balance-of-payments deficits." *Proclamation* ¶ 6. That advice was that the balance-of-payments deficit is large and serious "under any of these methods." *Id*. The Proclamation states that the advisors considered different methods of measuring our country's "balance-of-payments position[] under any reasonable understanding of the term in the context of section 122," which Congress enacted more than a half century ago. *Id*. The current account is mentioned as only one of the methods considered. Given the limitations on our judicial role, we are not in a position to presume that the advisors did not also consider whether the balance-of-payments deficit would be large and serious according to the basic balance method.

In summary, we should not conclude that the absence from the Proclamation of a basic balance measurement of the payments balance, in particular, is a ground upon which to invalidate the Proclamation. Instead, the Proclamation relies on BEA statistics to support the President's finding that the balance-of-payments deficit is, by any reasonable measure within the meaning of Section 122, large and serious. *See id.* ¶¶ 6, 7, 9, 10, 13. We do not have the expertise to reach the conclusion the majority reaches, and the limits of our judicial role strongly caution against it. *See George S. Bush & Co.*, 310 U.S. at 379-80. For this reason as well, I disagree with the majority's position, *Majority Op.* at 45-46, that the President acted *ultra vires* because he did not identify a balance-of-payments deficit determined according to basic balance or one of the other two measurements listed in Table 3 of the Senate Report.

IV.

I turn now to the two summary judgment motions pending before us. As I explain below, I would have denied both summary judgment motions and held in abeyance any ruling on whether the Proclamation should or should not be invalidated, pending our conducting the procedure required by USCIT Rule 56(f). We have before us no cross-motion for summary judgment by defendants, *see* Rule 56(f)(1), and Rule 56(f) requires us to refrain from *sua sponte* granting summary judgment either on grounds not raised by a party (Rule 56(f)(2)), or after identifying for the parties material

facts that may not be in dispute (Rule 56(f)(3)), without first providing notice and a reasonable time to respond.

USCIT Rule 56(f)(1) sets forth a procedure that applies where, as here, a party opposing a summary judgment motion does not make a cross-motion for summary judgment. In that situation, the rule protects the procedural rights of a movant. Rule 56(f)(2) safeguards the rights of a nonmovant, providing as follows: "*Judgment Independent of the Motion*. After giving notice and a reasonable time to respond, the court may: . . . (2) grant the motion on grounds not raised by a party." Rule 56(f)(3) also serves the objective of affording procedural fairness to the parties.

The majority grants summary judgments to the State of Washington and the importer plaintiffs without following the "notice and reasonable time to respond" procedure of Rule 56(f)(2) or (f)(3). The majority's opinion grants summary judgments based on two grounds. First, it holds that there are no material facts in dispute. *Majority Op.* at 29 n.23. Then, it holds that plaintiffs with standing are entitled to summary judgment as a matter of law on the ground that the Proclamation is *ultra vires* because it does not identify "balance-of-payments deficits" measured according to liquidity, official settlements, or basic balance. *Id.* at 45-46. As to both holdings, the parties were not given notice that the court was contemplating grants of summary judgments on these grounds, which no party raised in seeking summary judgment, and

on which the court did not allow the parties "notice and a reasonable time to respond" as Rule 56(f) required in the procedural posture of these two cases.

With respect to the first ground, we can discern from the summary judgment motions that both groups of plaintiffs would have us reach a general, factual conclusion that they would have us consider to be beyond genuine dispute. That conclusion is, in summary, that balance-of-payments deficits of concern to Congress in late 1974 may have been large and serious when measured according to the contemporary BEA definition, but any balance-of-payments deficits existing amidst today's system of floating exchange rates are zero or negligible when measured according to that same definition. Defendants dispute this general conclusion.[16] In granting summary judgments based on the majority's implicit conclusion that this factual dispute is not on a material issue, *see id.* at 29 n.23, the majority opinion grants summary judgments on a ground no plaintiff raised in a brief on which summary judgment was sought.

_____

[16] Disagreeing with plaintiffs' factual allegations, and pointing to the country's current account deficits, defendants argue that, as the President found, "the United States faces a large and serious balance-of-payments deficit." Defs.' Resp. in Opp'n to Mots. for Prelim. Inj. and Summary J. 14 (Apr. 3, 2026) Ct. No. 26-01472, ECF No. 35, Ct. No. 26-01606, ECF. No. 16 ("Defs.' Resp."). Defendants dispute plaintiffs' allegation that the balance-of-payments deficit is nonexistent or statistically insignificant. Defendants disagree that the contemporary BEA measurement is applicable to the issue these cases present. *Id.* at 30 (arguing that the BEA measurement always balances to zero regardless of whether the country has a fixed or floating currency and citing Yared Decl. ¶ 21).

With regard to the second ground on which the majority grants summary judgment motions, i.e., the majority's interpretation of the term "balance-of-payments deficits" as used in Section 122(a)(1), the majority held that the President, in order to restrict imports under Section 122(a)(1), would have had to identify a balance-of-payments deficit that was measured on a basic balance, liquidity, or official settlements basis. This also was a ground no plaintiff raised in its brief seeking summary judgment. Both groups of plaintiffs claimed that the Proclamation must be invalidated, but they supported this claim essentially on the ground that no balance-of-payments deficits within the meaning of Section 122(a)(1) exist, or can exist, because of the nation's economic condition and, specifically, because of the absence of a system of fixed exchange rates. In this way, plaintiffs' summary judgment motions raised the issue of whether, due to today's economic environment, the President has any authority to restrict imports under Section 122(a)(1) and answered that question in the negative. Deciding that there are no material facts in dispute and that plaintiffs are entitled to judgment on an issue of law, i.e., the majority's view on an issue of statutory interpretation, the majority's opinion never reached that factual issue.

Because a movant seeking summary judgment must meet the two-part burden of showing the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law, the requirement for notice and a reasonable time to respond imposed by Rule 56(f) is intended to ensure procedural fairness for a

nonmovant with respect to both parts of that burden. The objective of fairness is plainly implicated where, as here, a court is granting summary judgments based not only on the issue of whether the parties' factual disagreement pertains to a material fact but also on the issue of what Congress meant when referring in Section 122(a)(1) to our country's balance-of-payments deficits. As to the latter, plaintiffs and defendants disagree on the statutory interpretation of that term, but the majority adopts a definition no party advocated. Plaintiffs argued for the contemporary definition of the term as applied by the BEA, while defendants argued that the most reasonable measure of the payments balance is the current account balance. Rejecting both positions, the majority holds that only measurements of the payments balance by basic balance, liquidity, or official settlements conform to the definition it applies to the adjective "balance-of-payments" as used to modify the term "deficits" in Section 122(a)(1).

The procedure of Rule 56(f) is particularly important for our decisions on the summary judgment motions before us. Had the parties been given notice and a reasonable time to respond to the grounds upon which the majority ultimately decided these cases, the court might have had the benefit of their arguments as to whether confining the President's discretion to the use of liquidity, official settlements, or basic balance as measures of the payments balance is the correct interpretation of Section 122(a)(1). As discussed above, the majority reaches its conclusion based on Table 3 as presented in the Senate Report and in the staff reports. No party had notice that the

court would rely solely on those sources of legislative history in reaching its conclusion, and specifically, defendants were not provided "a reasonable time to respond," USCIT R. 56(f), with arguments as to why the majority's statutory interpretation might not be correct.

While it might be argued that the parties had the opportunity at oral argument to address the grounds on which the majority grants summary judgments, the oral argument did not provide "notice and a reasonable time to respond" as required by Rule 56(f). Satisfying that procedural requirement is not optional on the part of this Court, and in this case it would have ensured procedural fairness. *See, e.g., Oldham v. O.K. Farms, Inc.*, 871 F.3d 1147, 1150-51 (10th Cir. 2017) (Fed. R. Civ. P. 56(f)(2) required notice and a "reasonable time to consider the court's *sua sponte* theory and to develop the legal and factual arguments to dispute it."); 10A Wright & Miller, Fed. Prac. & Proc. Civ. § 2720.1 (4th ed.) (". . . if the court determines to enter summary judgment on a ground not presented or argued by the parties, the failure to give the losing party an opportunity to defend against that ground provides a ground for reversal.").

Therefore, even if I were to agree on the merits of the majority's decision to grant summary judgments in favor of the plaintiffs with standing (and I do not agree), I still would not have granted summary judgments at this time. Instead, I would have given the parties notice of possible grounds that the parties have not raised and upon which

- Appx82 -

the court was considering granting summary judgment, affording them the opportunity to submit additional briefing, as I believe Rule 56(f) requires.[17]

Also, I do not agree that any plaintiff, as of yet, has met its two-part burden of showing the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. In my view, no plaintiff has shown that the fact they would have us accept, and upon which they base their summary judgment motions, i.e., that in today's economic environment it is impossible for large and serious balance-of-payments deficits to exist, is an indisputable fact. We cannot presume to know whether changes in the long-term trends of the payments balance may be attributed as much to the change in the BEA measurement methodology as to the early-1970s transition to a floating-rate currency. Plaintiffs' failure to show the absence of a genuine dispute as to any material fact by itself requires that we deny both summary judgment motions.[18] In

_____

[17] If the majority had considered the procedure of USCIT Rule 56(f) too time consuming in light of plaintiffs' motions for a preliminary injunction and concluded, *inter alia*, that some plaintiffs had shown irreparable harm and a likelihood of success on the merits, an alternative would have been the majority's ordering, without my concurrence, a preliminary injunction against the collection of duties.

[18] I recognize that defendants did not follow the procedure specified in USCIT Rule 56.3 (and that the importer plaintiffs, in moving for summary judgment, did not do so either). In view of the court's discretion in applying that rule, I do not see these procedural irregularities as grounds for our ruling on the summary judgment motions, one way or the other. Regardless, we would not be in a position to deem plaintiffs' alleged fact to be admitted on the basis of Rule 56.3 if we were to decide that this fact is contrary to a fact upon which the President based his decision to restrict imports, which we are not empowered to review.

addition, I conclude that no plaintiff has demonstrated, as of yet, that it is entitled to judgment as a matter of law. Under the procedure by which I would have decided these cases, I would have allowed the parties the opportunity to address the issue of whether plaintiffs, after being denied summary judgment on the grounds they asserted in their motions, nevertheless are entitled to summary judgment on some other ground, and the issue of whether, instead, defendants should be awarded summary judgment as nonmovants.

V.

I now address the views expressed in the majority's opinion at 46 n.38 by clarifying the reasons why I am dissenting. I dissent because the majority: (1) enters summary judgments for plaintiffs according to a definition of "balance-of-payments" that lacks any convincing support in the legislative history and according to the majority's concluding, without support in the statutory language, that Section 122 expressly distinguishes the current account balance, which Section 122 does not mention, from the payments balance; (2) prejudices the defendants by failing to follow the procedure required by USCIT Rule 56(f); and (3) overlooks that plaintiffs, as of yet, have failed to meet a burden of showing that there is no genuine dispute as to any material fact or a burden of showing that they are entitled to judgments as a matter of law.

- Appx84 -

Court Nos. 26-01472 & 26-01606                                                                Page 32

Defining "balance-of-payments" as used in Section 122(a)(1) to mean our

country's payments balance as measured only on the bases of liquidity, settlements, or

basic balance, the majority characterizes my dissent as finding "the legislative history

too limited to give meaning to the term "balance-of-payments deficits" and providing

"no affirmative alternative meaning to this critical statutory term that the President

invokes as the basis of the Proclamation." *Majority Op.* at 46 n.38. What I find "too

limited" is not the legislative history but the majority's analysis of it. For example,

I regard the deletion of the parenthetical from H.R. 6767 as indicative legislative history.

I disagree with the majority's statement that "the dissent concludes that one cannot or

should not ascribe meaning to 'balance-of-payments deficit' absent express statutory

language defining the term." *Id.* I reach no such conclusion, and I do not disagree with

the majority's view that the meaning of a term not defined in a statute can be

ascertained from legislative history.

The majority is correct that at this point in the litigation I do not offer my own

interpretation of the term "balance-of-payments" as used in Section 122(a)(1). Doing so

is not necessary to expressing my opinion that the majority misinterprets the text of the

statute and the legislative history and, for this reason and others, errs in entering

summary judgment for some of the plaintiffs.[19]

---

[19] While I am not prepared to define the term "balance of payments" at this point
in the litigation, I conclude that were we to attempt to invalidate the Proclamation solely

*Footnote Continued*

A court could interpret "balance-of-payments" to have a definite meaning while also deciding that Congress did not intend to confine the President's discretion to any particular means of measurement. This would not necessarily mean that the President would be free to restrict imports under Section 122(a)(1) according to any definition of the balance of payments he might contemplate. A court might conclude as an "intelligible principle," for example, that the President's use of measurement methods necessarily would be limited to those that can be shown to have gained acceptance in the relevant fields of economics. I do not offer this as a definition of the term, for I would have wanted informed briefing from the parties before venturing to decide the statutory interpretation issue the majority raises. Because the majority decided this issue without following the USCIT Rule 56(f) procedure, we did not have the benefit of such informed briefing. As acknowledged in *Learning Resources, Inc. v. Trump*, 607 U.S. at --, 146 S. Ct. at 646, as justices "we claim no special competence in matters of economics or foreign affairs." As judges of this Court, we shouldn't either.

---

on the ground that the Proclamation does not define that term or the statutory term "large and serious balance-of-payments deficits" beyond what it states, we would lack the authority to do so. The Proclamation is not a treatise or a judicial opinion. No principle of which I am aware required it to engage in a discussion of statutory interpretation. And because the President is not a government agency for purposes of the Administrative Procedure Act ("APA"), we lack the authority to review the Proclamation according to the "arbitrary, capricious" standard of review set forth in the APA, 5 U.S.C. § 706. *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992).

The majority asserts, further, that "[r]ather than define balance-of-payments deficits for purposes of Section 122, the dissent accepts Defendants' claim that they may choose the economic statistics or sub-accounts of the balance-of-payments based on what is available at present." *Majority Op.* at 46 n.38. I do not reach the question of whether what the majority describes as a claim by defendants is correct. I take no position on it other than to conclude that, as characterized by the majority, it is not a correct interpretation either of the Proclamation or what is before us in these cases.

The Proclamation is not based on the argument the majority attributes to the defendants.[20] As discussed previously, it instead rests upon multiple findings of fact by the President that our country's balance of payments is in serious deficit by any reasonable measure of that term as used in Section 122. *See, e.g., Proclamation* ¶¶ 6, 7, 9, 10, 13. The immediate issue before us is whether or not to grant the summary judgment motions seeking to invalidate the Proclamation, not whether every argument defendants advance in support of the Proclamation is correct.

---

[20] As to "sub-accounts," the majority might be referring to the three sub-accounts of the payments balance as defined today by the BEA, a measurement that the majority and I apparently agree is not what could have been meant by the term "balance-of-payments" as used in Section 122(a)(1). As discussed previously, I do not conclude, as the majority does, that Congress necessarily believed that the current account balance was not usable as a measurement or indication of the payments balance. This, too, is an issue that informed briefing may have elucidated.

- Appx87 -

The majority also appears to presume that I would sustain the Proclamation

based on my supposed acceptance of what they characterize as defendants' position.

I consider it premature to decide whether we should sustain or invalidate the

Proclamation. Instead, for the reasons I offer, I would have denied both summary

judgment motions and, to ensure procedural fairness, followed the procedure USCIT

Rule 56(f) requires in this situation.

VI.

In summary, the cases before us require us to proceed cautiously, with the

requisite degree of judicial restraint and with the objective of ensuring procedural

fairness to all parties.

For the reasons I present in the foregoing, I would not exercise the judicial power

to enter summary judgments that invalidate the Proclamation and enjoin its operation.

Instead, I would deny both summary judgment motions and proceed according to

USCIT Rule 56(f).

/s/   Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated: May 7, 2026
New York, New York

**- Appx88 -**

**Web Pages Cited in the Opinion**



**MILESTONES: 1937–1945**

> **NOTE TO READERS**
> "Milestones in the History of U.S. Foreign Relations" has been retired and is no longer maintained. For more information, please see the full notice.

# Bretton Woods-GATT, 1941–1947

During and immediately after the Second World War, the United States, the United Kingdom, and other allied nations engaged in a series of negotiations to establish the rules for the postwar international economy. The result was the creation of the International Monetary Fund and the World Bank at the July 1944 Bretton Woods Conference and the signing of the General Agreement on Tariffs and Trade at an international conference in Geneva in October 1947.



*Harry Dexter White and John Maynard Keynes at the inaugural meeting of the International Monetary Fund's Board of Governors, March 8, 1946. (International Monetary Fund)*

The lessons drawn by U.S. policymakers from the interwar period informed their approach to the postwar global economy. President Franklin D. Roosevelt and officials such as Secretary of State Cordell Hull were adherents of the Wilsonian belief that free trade promoted not just prosperity, but also peace. The experience of the 1930s certainly suggested as much. The policies adopted by governments to combat the Great Depression—high tariffs, competitive currency devaluations, discriminatory trading blocs—helped destabilize the international environment without improving the economic situation. This experience led leaders throughout the anti-Axis United Nations alliance to conclude that economic cooperation was the only way to achieve both peace and prosperity, at home and abroad.

**- Appx90 -**

Case 2:601804-3 JPSC Document 73 4 Page 157 of 5 07/29/2026 3 of 8

This vision was articulated in the Atlantic Charter, issued by Roosevelt and British Prime Minister Winston Churchill at the conclusion of the August 1941 Atlantic Conference. The Charter's fourth point committed the United States and the United Kingdom "to further the enjoyment by all States, great or small, victor or vanquished, of access, on equal terms, to the trade and to the raw materials of the world which are needed for their economic prosperity," while its fifth point expressed their commitment to "the fullest collaboration between all nations in the economic field with the object of securing, for all, improved labor standards, economic advancement and social security." The two countries elaborated upon these principles in Article VII of their February 1942 agreement on lend-lease aid. In that article, the United Kingdom agreed that in return for U.S. lend-lease assistance, it would cooperate with the United States in devising measures to expand "production, employment, and the exchange and consumption of goods," to eliminate "all forms of discriminatory treatment in international commerce," to reduce barriers to trade, and generally to achieve the goals laid out in the Atlantic Charter.

By early 1942, U.S. and British officials began preparing proposals that would foster economic stability and prosperity in the postwar world. Harry Dexter White, Special Assistant to the U.S. Secretary of the Treasury, and John Maynard Keynes, an advisor to the British Treasury, each drafted plans creating organizations that would provide financial assistance to countries experiencing short-term balance of payments deficits; this assistance was meant to ensure that such countries did not adopt protectionist or predatory economic policies to improve their balance of payments position. While both plans envisioned a world of fixed exchange rates, believed to be more conducive to the expansion of international trade than floating exchange rates, they differed in several significant respects. As a result, from 1942 until 1944, bilateral and multilateral meetings of allied financial experts were held in order to settle upon a common approach. Agreement was finally reached at the July 1944 United Nations Monetary and Financial Conference, a gathering of delegates from 44 nations that met in Bretton Woods, New Hampshire. The two major accomplishments of the Bretton Woods conference were the creation of the International Monetary Fund (IMF) and the International Bank for Reconstruction and Development (IBRD), commonly known as the World Bank. The IMF was charged with overseeing a system of fixed exchange rates centered on the U.S. dollar and gold, serving as a forum for consultation and cooperation and a provider of short-term financial assistance to countries experiencing temporary deficits in their balance of payments. The IBRD was responsible for providing financial assistance for the reconstruction of war-ravaged nations and the economic development of less developed countries. In July 1945, Congress passed the Bretton Woods Agreements Act, authorizing U.S. entry into the IMF and World Bank, and the two organizations officially came into existence five months later. The fixed exchange rate system established at Bretton Woods endured for the better part of three decades; only after the exchange crises of August 1971, when President Richard M. Nixon suspended the dollar's convertibility into gold, and February/March 1973 did floating exchange rates become the norm for the major industrialized democracies.

Agreement on international trade proved more difficult to achieve. One of the most contentious issues was the system of preferential tariffs established among the members of the British Commonwealth in 1932, whereby trade within the Commonwealth was subject to lower tariffs than trade between the Commonwealth nations and the rest of the world. U.S. officials such as Cordell Hull opposed imperial preferences on both ideological and practical grounds—the United Kingdom and Canada, both members of the system, were the United States' two largest trading partners—and called for their abolition; however, many U.K. and other Commonwealth officials favored keeping the preferences, at least until the United States agreed to reduce the high Smoot–Hawley tariffs set in 1930. After more than four years of negotiations on this and other issues—such as the rules that would govern tariff negotiations and the structure of a proposed new organization to oversee international trade—agreement was finally reached in 1947. Twenty-three nations meeting in

- Appx91 -

Geneva from April to October 1947 concluded the first postwar round of tariff negotiations, leading to reductions in tariffs and imperial preferences, as well as a draft charter for a new institution, the International Trade Organization (ITO). Participants also signed the General Agreement on Tariffs and Trade (GATT), designed not only to implement the agreed tariff cuts but to serve as an interim codification of the rules governing commercial relations among its signatories until the ITO was created. In November 1947, the United Nations Conference on Trade and Employment convened in Havana to consider the draft ITO charter; four months of negotiations later, the representatives of 53 countries signed the finished charter in March 1948. However, strong opposition in the U.S. Congress meant that the ITO never came into existence. Instead, it was the GATT that governed postwar international trade relations for almost fifty years. Under the GATT's aegis, eight rounds of trade negotiations resulted in significant tariff reductions among its members before it was superseded by the World Trade Organization in 1995.

- Appx92 -



**MILESTONES: 1969–1976**

---

**NOTE TO READERS**

"Milestones in the History of U.S. Foreign Relations" has been retired and is no longer maintained. For more information, please see the full notice.

---

# Nixon and the End of the Bretton Woods System, 1971–1973

On August 15, 1971, President Richard M. Nixon announced his New Economic Policy, a program "to create a new prosperity without war." Known colloquially as the "Nixon shock," the initiative marked the beginning of the end for the Bretton Woods system of fixed exchange rates established at the end of World War II.



*Secretary of the Treasury John Connally on the day that President Richard Nixon announced his New Economic Policy, August 15, 1971. (Nixon Presidential Library)*

Under the Bretton Woods system, the external values of foreign currencies were fixed in relation to the U.S. dollar, whose value was in turn expressed in gold at the congressionally-set price of $35 per ounce. By the 1960s, a surplus of U.S. dollars caused by foreign aid, military spending, and foreign investment threatened this system, as the United States did not have enough gold to cover the volume of dollars in worldwide circulation at the rate of $35 per ounce; as a result, the dollar was overvalued. Presidents John F. Kennedy and Lyndon B. Johnson adopted a series of measures to support the dollar and sustain Bretton Woods: foreign investment disincentives; restrictions on foreign lending; efforts to stem the

**- Appx93 -**

Case: 26-1804-3JD Document: 73 Page: 160 Filed: 07/29/2026 of 8

official outflow of dollars; international monetary reform; and cooperation with other countries. Nothing worked. Meanwhile, traders in foreign exchange markets, believing that the dollar's overvaluation would one day compel the U.S. government to devalue it, proved increasingly inclined to sell dollars. This resulted in periodic runs on the dollar.

It was just such a run on the dollar, along with mounting evidence that the overvalued dollar was undermining the nation's foreign trading position, which prompted President Richard M. Nixon to act. On August 13, 1971, Nixon convened a meeting of his top economic advisers, including Secretary of the Treasury John Connally and Office of Management and Budget Director George Shultz, at the Camp David presidential retreat to consider a program of action. Notably absent from the meeting were Secretary of State William Rogers and President's Assistant for National Security Affairs Henry Kissinger. After two days of talks, on the evening of August 15, Nixon announced his New Economic Policy in an address to the nation on "The Challenge of Peace." Asserting that progress in bringing an end to U.S. involvement in the war in Vietnam meant that it was time for Americans to turn their minds to the challenges of a post-Vietnam world, Nixon identified a three-fold task: "We must create more and better jobs; we must stop the rise in the cost of living; we must protect the dollar from the attacks of international money speculators." To achieve the first two goals, he proposed tax cuts and a 90-day freeze on prices and wages; to achieve the third, Nixon directed the suspension of the dollar's convertibility into gold. He also ordered that an extra 10 percent tariff be levied on all dutiable imports; like the suspension of the dollar's gold convertibility, this measure was intended to induce the United States' major trading partners to adjust the value of their currencies upward and the level of their trade barriers downward so as to allow for more imports from the United States.

A success at home, Nixon's speech shocked many abroad, who saw it as an act of worrisome unilateralism; the assertive manner in which Connally conducted the ensuing exchange rate negotiations with his foreign counterparts did little to allay such concerns. Nevertheless, after months of negotiations, the Group of Ten (G–10) industrialized democracies agreed to a new set of fixed exchange rates centered on a devalued dollar in the December 1971 Smithsonian Agreement. Although characterized by Nixon as "the most significant monetary agreement in the history of the world," the exchange rates established in the Smithsonian Agreement did not last long. Fifteen months later, in February 1973, speculative market pressure led to a further devaluation of the dollar and another set of exchange parities. Several weeks later, the dollar was yet again subjected to heavy pressure in financial markets; however, this time there would be no attempt to shore up Bretton Woods. In March 1973, the G–10 approved an arrangement wherein six members of the European Community tied their currencies together and jointly floated against the U.S. dollar, a decision that effectively signaled the abandonment of the Bretton Woods fixed exchange rate system in favor of the current system of floating exchange rates.

- Appx94 -



**MILESTONES: 1969–1976**

> **NOTE TO READERS**
>
> "Milestones in the History of U.S. Foreign Relations" has been retired and is no longer maintained. For more information, please see <u>the full notice</u>.

# Oil Embargo, 1973–1974

During the 1973 Arab-Israeli War, Arab members of the Organization of Petroleum Exporting Countries (OPEC) imposed an embargo against the United States in retaliation for the U.S. decision to re-supply the Israeli military and to gain leverage in the post-war peace negotiations. Arab OPEC members also extended the embargo to other countries that supported Israel including the Netherlands, Portugal, and South Africa. The embargo both banned petroleum exports to the targeted nations and introduced cuts in oil production. Several years of negotiations between oil-producing nations and oil companies had already destabilized a decades-old pricing system, which exacerbated the embargo's effects.



*Cars wait in long lines during the gas shortage. (Library of Congress Prints and Photographs Division, U.S. News & World Report Magazine Photograph Collection, Warren K. Leffler)*

The 1973 Oil Embargo acutely strained a U.S. economy that had grown increasingly dependent on foreign oil. The efforts of President Richard M. Nixon's administration to end the embargo signaled a complex shift in the global financial balance of power to oil-producing states and triggered a slew of U.S. attempts to address the foreign policy challenges emanating from long-term dependence on foreign oil.

By 1973, OPEC had demanded that foreign oil corporations increase prices and cede greater shares of revenue to their local subsidiaries. In April, the Nixon administration announced a new energy strategy to boost domestic production to reduce U.S. vulnerability to oil imports and ease the strain of nationwide fuel shortages. That vulnerability would become overtly clear in the fall of that year.

**- Appx95 -**

The onset of the embargo contributed to an upward spiral in oil prices with global implications. The price of oil per barrel first doubled, then quadrupled, imposing skyrocketing costs on consumers and structural challenges to the stability of whole national economies. Since the embargo coincided with a devaluation of the dollar, a global recession seemed imminent. U.S. allies in Europe and Japan had stockpiled oil supplies, and thereby secured for themselves a short-term cushion, but the long-term possibility of high oil prices and recession precipitated a rift within the Atlantic Alliance. European nations and Japan found themselves in the uncomfortable position of needing U.S. assistance to secure energy sources, even as they sought to disassociate themselves from U.S. Middle East policy. The United States, which faced a growing dependence on oil consumption and dwindling domestic reserves, found itself more reliant on imported oil than ever before, having to negotiate an end to the embargo under harsh domestic economic circumstances that served to diminish its international leverage. To complicate matters, the embargo's organizers linked its end to successful U.S. efforts to bring about peace between Israel and its Arab neighbors.

Partly in response to these developments, on November 7 the Nixon administration announced Project Independence to promote domestic energy independence. It also engaged in intensive diplomatic efforts among its allies, promoting a consumers' union that would provide strategic depth and a consumers' cartel to control oil pricing. Both of these efforts were only partially successful.

President Nixon and Secretary of State Henry Kissinger recognized the constraints inherent in peace talks to end the war that were coupled with negotiations with Arab OPEC members to end the embargo and increase production. But they also recognized the linkage between the issues in the minds of Arab leaders. The Nixon administration began parallel negotiations with key oil producers to end the embargo, and with Egypt, Syria, and Israel to arrange an Israeli pullout from the Sinai and the Golan Heights. Initial discussions between Kissinger and Arab leaders began in November 1973 and culminated with the First Egyptian-Israeli Disengagement Agreement on January 18, 1974. Though a finalized peace deal failed to materialize, the prospect of a negotiated end to hostilities between Israel and Syria proved sufficient to convince the relevant parties to lift the embargo in March 1974.

The embargo laid bare one of the foremost challenges confronting U.S. policy in the Middle East, that of balancing the contradictory demands of unflinching support for Israel and the preservation of close ties to the Arab oil–producing monarchies. The strains on U.S. bilateral relations with Saudi Arabia revealed the difficulty of reconciling those demands. The U.S. response to the events of 1973–1974 also clarified the need to reconcile U.S. support for Israel to counterbalance Soviet influence in the Arab world with both foreign and domestic economic policies.

The full impact of the embargo, including high inflation and stagnation in oil importers, resulted from a complex set of factors beyond the proximate actions taken by the Arab members of OPEC. The declining leverage of the U.S. and European oil corporations (the "Seven Sisters") that had hitherto stabilized the global oil market, the erosion of excess capacity of East Texas oil fields, and the recent decision to allow the U.S. dollar to float freely in the international exchange all played a role in exacerbating the crisis. Once the broader impact of these factors set in throughout the United States, it triggered new measures beyond the April and November 1973 efforts that focused on energy conservation and development of domestic energy sources. These measures included the creation of the Strategic Petroleum Reserve, a national 55-mile-per-hour speed limit on U.S. highways, and later, President Gerald R. Ford's administration's imposition of fuel economy standards. It also prompted the creation of the International Energy Agency proposed by Kissinger.

- Appx96 -

Case 1:23-cv-... Document 49 Filed 05/02/26 Page of 17

**<u>Web Pages Cited in the Opinion</u>**



Home  >  Publications  >  Page One Economics

# What Is the Balance of Payments?

October 01, 2025
By  Amanda Geiger

SHARE THIS PAGE:  f  X  in  ✉  🖨  🔗

A lot of attention is paid to the importing and exporting of goods and services, but there are other types of economic transactions between countries that trade with each other. Countries need a way to record not just the movement of goods and services between trading partners, but also the debit and credit of other financial transactions and investments.

## Enter the Balance of Payments

The **balance of payments** is an accounting system; it is a summary of all the transactions involving goods, services, and investment between one country and all other countries over a given time. Any transaction that causes money to flow into a country is a credit to balance payments accounts, and any transaction that causes money to flow out is a debit.

Trade involves the movement of goods and services, but there are also many other transactions recorded in balance of payments accounts. Transactions between countries can be divided into three general categories: exports and imports, capital transfer receipts and payments, and financial assets and liabilities, as shown in the graphic below.

- Appx98 -



Financial liabilities
Capital transfer payments
Payment for imports

Payment for exports
Capital transfer receipts
Financial assets

■ FEDERAL RESERVE BANK OF ST. LOUIS

When money is received by the U.S. it is recorded as a credit in the balance of payments. When money leaves the U.S. as payment it is recorded as a debit in the balance of payments.

Capital transfer receipts and payments are capital (money or assets) that are transferred from one country to another. For example, a capital transfer can be the interest you receive on a savings account balance at a foreign bank or the money sent to someone in another country as a gift. Financial assets and liabilities refer to borrowing and lending in foreign markets. For example, you purchase stock on a foreign stock exchange or take out a loan from a foreign bank.

## Examples of Transactions Recorded in the Balance of Payments

| Exports | Capital transfer receipts | Financial assets |
|---|---|---|
| Resources, goods, and services produced domestically but sold abroad | • Interest received<br>• Remittances received | • Buying stock<br>• Buying bonds<br>• Making a deposit in a bank account |
| Imports | Capital transfer payments | Financial liabilities |

NOTE: Income earned on foreign assets (such as interest and dividends) is recorded in the current account, while the purchase or sale of the assets themselves is recorded in the financial account.

- Appx99 -

| Resources, goods, and services produced abroad but sold domestically | • Interest paid <br> • Remittances paid | • Taking out a loan <br> • Issuing bonds |
|---|---|---|

NOTE: Income earned on foreign assets (such as interest and dividends) is recorded in the current account, while the purchase or sale of the assets themselves is recorded in the financial account.

---

## Is Balance of Trade Different from Balance of Payments?

While the balance of payments is a record of the flow of money used to make all international sales and purchases, the **balance of trade** refers to "net exports," or the amount of goods and services sold abroad minus the purchases of goods and services from other countries. The balance of trade is just one part of the balance of payments. In the table above, the balance of trade would be the total of only the first column, while the balance of payments would include all three columns.

The transaction categories in the table are divided into two broad accounts: the current account and the capital and financial account. The current account is the section of a country's balance of payments that records its exports and imports of goods and services, its net investment income, and its net transfers. (Note that the table is a sample of the types of transactions recorded in the balance of payments and is not a complete list.) The capital and financial account is the section of a country's balance of payments that records movements of capital into and out of a country. Balance of payments is a form of double-entry accounting, meaning every credit has a corresponding debit. In other words, current account + capital and financial account = 0.

To learn more about the balance of trade and how it is recorded in balance of payments accounts, read this *Page One Economics* article on international trade.

## Why Does the Balance of Payments Equal Zero?

As an accounting principle, a buy (debit) for one country is a sell (credit) for another. In a closed system, as shown in the above graphic, the money must be accounted for as either a credit or a debit. There is no money "leakage" between trading partners. This is an extension of the **circular flow model** in which an expenditure for one person becomes income for the other person.

Let's look at an example. Country A purchases a good from Country B. Country B must now decide what to do with the currency it receives for the sale of the good to Country A. Country B could do one of the following:

1. Hold the currency as a cash reserve.

2. Use the currency to purchase something from Country A or invest in a financial asset in

**- Appx100 -**

Country A.

3. Exchange the currency on the foreign exchange market for a different currency.

Most of the time, a country will choose the above option 2 and use the foreign currency it receives to make investments or other purchases from the original country. In our example, this would mean Country B receives funds for a good it sells to Country A but then uses the same currency to purchase a financial asset, such as a bond, from Country A. When this is done, there is an inflow in financial capital to Country A. So, while you might have a trade deficit in goods and services (current account), it is often offset by a surplus in financial transactions (capital and financial account). In our example, this would mean Country A has a debit for the purchase of a good from Country B, but then has a credit when Country B invests in a financial asset in Country A.

We can see this play out when we look at the U.S. balance of payments in the FRED graph below. You'll notice that the total financial inflows—everything above the zero line—is mirrored in the financial outflows—everything below the zero line. While not all catagories of transactions are perfectly mirrored, the totals are generally symmetrical.



- Appx101 -

Case Case: 26-1804-3JF Document 73 49 Page: Filed 168 05/06/26 07/29/2026 of 17

SOURCE: U.S. Balance of Payments, U.S. Bureau of Economic Analysis via FRED, Federal Reserve Bank of St. Louis, accessed August 26, 2025.

---

To learn more about the U.S. balance of payments, read this FRED Blog from July 2025.

## Conclusion

Balance of payments is a valuable tool used to assess how a country interacts in world markets. By exploring the different categories of transactions, we can learn a lot about a country's economy and its relationships with trading partners. The balance of payments may be a challenging concept at first, but if we keep in mind that an expenditure for one person becomes income for someone else, it is much easier to understand how this accounting system attempts to track a country's global transactions as a series of credits and debits.

- Appx102 -

## Glossary

## References



## Teacher Resources

Preview the *Reading Q&A* version of this essay on the Federal Reserve Education website (FRE.org). Then, log in or create an account to download the content for your online classroom.

**Preview the Reading Q&A**

## ABOUT THE AUTHOR



**Amanda Geiger**

Amanda is a St. Louis Fed senior economic education specialist with an M.A. in economics and entrepreneurship. She previously served as an AP Macroeconomics exam reader and table leader.

**Related Topics**

**Trade**

**- Appx103 -**

**Cite This Article**

## Subscribe to Page One Economics

These essays from our education specialists cover economic and personal finance basics. Special versions are available for classroom use. Views expressed are not necessarily those of the St. Louis Fed or Federal Reserve System.

Email Us

-Media Inquiries

-Economic Education

**FOLLOW US**

**SIGN UP FOR EMAIL ALERTS**

Receive updates in your inbox as soon as new content is published.

Sign Up

**QUICK LINKS**

About Us

Legal Information

Contact Us

— **Appx104** —

Privacy Policy

Careers

Doing Business with the Fed

Events

FRB Services & FedNow

Visiting the St. Louis Fed

Economy Museum

- Appx105 -

Home (/)  |  Help (/help)  |  Glossary (/help/glossary)  |  Financial account (international)

# Financial account (international)

## Glossary

### A-Z:

- Any - ⌄

**Search Glossary term:**

Apply

Record of transactions between U.S. residents (/help/glossary/us-residents) and foreign residents (/help/glossary/foreign-residents) resulting in changes in the level of international claims or liabilities, such as in deposits, ownership of portfolio investment securities, and direct investment (/help/glossary/direct-investment).

Related Terms
Balance of payments (/help/glossary/balance-payments)
Capital account (international) (/help/glossary/capital-account-international)
Current account (international) (/help/glossary/current-account-international)

Download Acrobat Reader (http://get.adobe.com/reader/)

Page last modified on 4/13/18

**Bureau of Economic Analysis**  4600 Silver Hill Road • Suitland, MD 20746

Contact Us (/contact-us)

Working at BEA (/about/working-at-bea)

Frequently Asked Questions (/help/faq)

- Appx106 -

## Our Policies (/about/policies-and-information)

## Privacy (/privacy)

Commitment to Scientific Integrity (/statement-commitment-scientific-integrity-principal-statistical-agencies)

Data Dissemination Practices (/about/policies-and-information/data-dissemination)

Open Data (/open-data)

USA.gov (https://www.usa.gov/)

Business USA (https://business.usa.gov)

No FEAR Act (https://www.commerce.gov/cr/reports-and-resources/no-fear-act)

FOIA (https://www.commerce.gov/opog)

U.S. Department of Commerce (https://www.commerce.gov/)

Emergency Status (https://apps.bea.gov/status/)

The BEA Wire | BEA's Official Blog (/news/blog)

News Release Feed (RSS) (https://apps.bea.gov/rss/rss.xml)

Sign up for Email Notifications (/_subscribe/)

(https://
www.linkedin.com/
company/
bureau(https://
(https:// www.youtube.com/
x.com/ channel/www.instagram.com/
bea_news)(UCP9DD4beua.gov)UivA6Yb5w)

- Appx107 -

Home (/)   |   Help (/help)   |   Glossary (/help/glossary)   |   Current account (international)

# Current account (international)

## Glossary

**A-Z:**

| - Any - ⌄ |
|---|

**Search Glossary term:**

| |
|---|

[ Apply ]

Record of transactions in goods, services (/help/glossary/services), income, and unilateral current transfers (/help/glossary/unilateral-current-transfers) between residents and nonresidents.

Related Terms
Balance of payments (/index.php/help/glossary/balance-payments)
Capital account (international) (/index.php/help/glossary/capital-account-international)
Financial account (international) (/index.php/help/glossary/financial-account-international)

Download Acrobat Reader (http://get.adobe.com/reader/)

Page last modified on 4/13/18

## Bureau of Economic Analysis   4600 Silver Hill Road • Suitland, MD 20746

Contact Us (/contact-us)

Working at BEA (/about/working-at-bea)

Frequently Asked Questions (/help/faq)

Our Policies (/about/policies-and-information)

Privacy (/privacy)

- Appx108 -

Commitment to Scientific Integrity (/statement-commitment-scientific-integrity-principal-statistical-agencies)

Data Dissemination Practices (/about/policies-and-information/data-dissemination)

Open Data (/open-data)

USA.gov (https://www.usa.gov/)

Business USA (https://business.usa.gov)

No FEAR Act (https://www.commerce.gov/cr/reports-and-resources/no-fear-act)

FOIA (https://www.commerce.gov/opog)

U.S. Department of Commerce (https://www.commerce.gov/)

Emergency Status (https://apps.bea.gov/status/)

The BEA Wire | BEA's Official Blog (/news/blog)

News Release Feed (RSS) (https://apps.bea.gov/rss/rss.xml)

Sign up for Email Notifications (/_subscribe/)

(https://www.linkedin.com/company/bureau-of-economic-(https://x.com/(https://www.youtube.com/channel/UCGR9QD1x_z__duUivA6Yb5w)

**- Appx109 -**

Home (/)  |  Help (/help)  |  Glossary (/help/glossary)  |  Balance of payments

# Balance of payments

## Glossary

**A-Z:**

- Any -

**Search Glossary term:**

Apply

Record of transactions between U.S. residents (/help/glossary/us-residents) and foreign residents (/help/glossary/foreign-residents) during a given time period. Includes transactions in goods, services (/help/glossary/services), income, assets, and liabilities. It is broken down into the current accounts (international), capital accounts (international) (/help/glossary/capital-account-international), and financial accounts (international) (/help/glossary/financial-account-international).

Download Acrobat Reader (http://get.adobe.com/reader/)

Page last modified on 4/11/18

**Bureau of Economic Analysis**  4600 Silver Hill Road • Suitland, MD 20746

Contact Us (/contact-us)

Working at BEA (/about/working-at-bea)

Frequently Asked Questions (/help/faq)

Our Policies (/about/policies-and-information)

- Appx110 -

## Privacy (/privacy)

Commitment to Scientific Integrity (/statement-commitment-scientific-integrity-principal-statistical-agencies)

Data Dissemination Practices (/about/policies-and-information/data-dissemination)

Open Data (/open-data)

USA.gov (https://www.usa.gov/)

Business USA (https://business.usa.gov)

No FEAR Act (https://www.commerce.gov/cr/reports-and-resources/no-fear-act)

FOIA (https://www.commerce.gov/opog)

U.S. Department of Commerce (https://www.commerce.gov/)

Emergency Status (https://apps.bea.gov/status/)

The BEA Wire | BEA's Official Blog (/news/blog)

News Release Feed (RSS) (https://apps.bea.gov/rss/rss.xml)

Sign up for Email Notifications (/_subscribe/)

(https://
www.linkedin.com/
company/
bureau(https://
(https:// www.youtube.com/
x.com/econdmirrel/www.instagram.com/
bea_news)s)(SLP9DD4bea3gov)UivA6Yb5w)

- **Appx111** -

Home (/)  |  Help (/help)  |  Glossary (/help/glossary)  |  Capital account (international)

# Capital account (international)

## Glossary

**A-Z:**

- Any - ⌄

**Search Glossary term:**

Apply

Record of capital transfers between U.S. residents (/help/glossary/us-residents) and foreign residents (/help/glossary/foreign-residents), such as debt forgiveness and migrants' transfers, and acquisitions and disposals of nonproduced nonfinancial assets between residents and nonresidents.

Related Terms
Balance of payments (/help/glossary/balance-payments)
Current account (international) (/help/glossary/current-account-international)
Financial account (international) (/help/glossary/financial-account-international)

Download Acrobat Reader (http://get.adobe.com/reader/)
Page last modified on 4/13/18

**Bureau of Economic Analysis**   4600 Silver Hill Road • Suitland, MD 20746

Contact Us (/contact-us)

Working at BEA (/about/working-at-bea)

Frequently Asked Questions (/help/faq)

- Appx112 -

## Our Policies (/about/policies-and-information)

## Privacy (/privacy)

Commitment to Scientific Integrity (/statement-commitment-scientific-integrity-principal-statistical-agencies)

Data Dissemination Practices (/about/policies-and-information/data-dissemination)

Open Data (/open-data)

USA.gov (https://www.usa.gov/)

Business USA (https://business.usa.gov)

No FEAR Act (https://www.commerce.gov/cr/reports-and-resources/no-fear-act)

FOIA (https://www.commerce.gov/opog)

U.S. Department of Commerce (https://www.commerce.gov/)

Emergency Status (https://apps.bea.gov/status/)

The BEA Wire | BEA's Official Blog (/news/blog)

News Release Feed (RSS) (https://apps.bea.gov/rss/rss.xml)

Sign up for Email Notifications (/_subscribe/)

(https://
www.linkedin.com/
company/
bureau(https://
(https:// www.youtubepso/h/
x.com/ond main www.instagrcebookm/
bea_newspis_ USDBeaea/gov)UivA6Yb5w)

- Appx113 -

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| THE STATE OF OREGON, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, ET AL., <br><br> Defendants. | Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges <br><br> Court No. 26-01472-3JP |
| BURLAP AND BARREL, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, ET AL., <br><br> Defendants. | Before: Mark A. Barnett, Claire R. Kelly, and Timothy C. Stanceu, Judges <br><br> Court No. 26-01606-3JP |

**JUDGMENT**

This case having been duly submitted for decision, and the court, after due deliberation, having rendered an opinion; now, in conformity with that opinion it is hereby

**ORDERED** that Proclamation No. 11012 (Feb. 20, 2026), <u>Imposing a Temporary Import Surcharge To Address Fundamental International Payments Problems</u>, 91 Fed. Reg. 9,339 (Feb. 25, 2026), is declared to be invalid as contrary to law; it is further

**ORDERED** that Proclamation No. 11012 is permanently enjoined with respect to The State of Washington (and its Instrumentalities), Burlap and Barrel, Inc., and Basic Fun, Inc. (the Importer Plaintiffs as defined in the court's accompanying opinion); it is further

Court Nos. 26-01472 & 26-01606                                    Page 2

      **ORDERED** that Defendants shall implement the above-described permanent

injunction within 5 days; it is further

      **ORDERED** that Section 122 duties paid by Importer Plaintiffs before this

injunction is fully implemented shall be refunded with interest as provided by law; and it

is further

      **ORDERED** that each party shall bear its own costs.


                             /s/      Mark A. Barnett
                             Mark A. Barnett, Chief Judge

                             /s/      Claire R. Kelly
                             Claire R. Kelly, Judge


Dated: <u>May 7, 2026</u>
      New York, New York

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 32(b)(1) because it contains 10,222 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Sophia Shams*
Sophia Shams