Nos. 26-1804, 26-1805 and 26-1928

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

STATE OF OREGON, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF NEW YORK, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, OFFICE OF THE GOVERNOR EX REL. ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WISCONSIN,

Plaintiffs – Cross – Appellants,

STATE OF WASHINGTON,

Plaintiff – Appellee,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, UNITED STATES,

Defendants – Appellants,

BURLAP AND BARREL, INC., BASIC FUN, INC.,

Plaintiffs – Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, JAMIESON GREER, in his official capacity as U.S. Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,

Defendants – Appellants,

On Appeal from the United States Court of International Trade in
Nos. 1:26-CV-01472-3JP and 1:26-CV-01606-3JP

# ANSWERING BRIEF FOR STATE APPELLEES AND CROSS-APPELLANTS

BENJAMIN GUTMAN
Deputy Attorney General

*Signature block continued on inside cover*

DAN RAYFIELD
Attorney General
BENJAMIN GUTMAN
Deputy Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4402
benjamin.gutman@doj.oregon.gov

Attorneys for State of Oregon

(Additional counsel listed on signature page)

# TABLE OF CONTENTS


STATEMENT OF RELATED CASES ....... 1

INTRODUCTION ....... 1

JURISDICTIONAL STATEMENT FOR CROSS-APPEAL ....... 3

STATEMENT OF THE ISSUES ....... 3

STATEMENT OF THE CASE ....... 4

A. Section 122 authorizes the President to impose limited tariffs to "deal with" "balance-of-payments deficits" that result from "fundamental international payments problems." ....... 4

1. In the 1960s, the Bretton Woods system of fixed exchange rates gave rise to concerns about balance-of-payments deficits. ....... 4

2. In 1971, in response to balance-of-payments deficits, President Nixon effectively suspended the fixed-exchange-rate system. ....... 8

3. Congress enacted Section 122 as part of the Trade Act of 1974. ....... 9

4. Congress eventually formally ended the gold standard. ....... 10

B. After the courts struck down his first attempt to impose worldwide tariffs, the President invoked Section 122 to achieve the same result ....... 11

C. The CIT held that the President had not identified any balance-of-payments deficits justifying Section 122 tariffs. ....... 12

SUMMARY OF THE ARGUMENT ....... 14

STANDARD OF REVIEW ....... 17

ARGUMENT ....... 19

I. The CIT correctly held that Section 122 does not authorize the tariffs that the President imposed. ....... 19

A. The President's Proclamation does not identify any "balance-of-payments deficits" within the meaning of Section 122 ..... 19

1. Statutory text, in historical context, shows that "balance-of-payments deficits" are measures of risk to reserve assets in a fixed-exchange-rate system. ..... 20

2. Legislative history confirms that "balance-of-payments deficits" carries that specific meaning. ..... 25

3. In today's floating-exchange-rate system, deficits in the current account or its subcomponents do not measure a risk to reserve assets. ..... 29

B. The President's Proclamation does not identify any "fundamental international payments problems" within the meaning of Section 122. ..... 33

C. Defendants' belated attempt to invoke the basic balance to justify the tariffs fails. ..... 36

II. The CIT erred by dismissing the claims of the States other than Washington for lack of Article III standing. ..... 38

A. The States demonstrated, based on purchasing patterns and past tariff experience, that they were likely to be harmed by the Section 122 tariffs. ..... 40

B. Commonsense economic realities and real-world historical practice reinforce the States' likelihood of injury. ..... 43

CONCLUSION ..... 46

# TABLE OF AUTHORITIES

## Cases Cited

*Abramski v. United States*,
573 U.S. 169 (2014) ....................21

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) ....................27

*Biden v. Nebraska*,
600 U.S. 477 (2023) ....................39

*Bostock v. Clayton County, Georgia*,
590 U.S. 644 (2020) ....................21

*Canadian Lumber Trade All. v. United States*,
517 F.3d 1319 (Fed. Cir. 2008) .................... 18, 44, 45

*Cash v. Collins*,
166 F.4th 1046 (Fed. Cir. 2026) .................... 17, 27

*Center for Biological Diversity v. EPA*,
168 F.4th 1164 (9th Cir. 2026) ....................45

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) ....................40

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................43

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) .................... 38, 39, 40, 43, 45

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) .................... 39, 43

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824) ....................4

*Glaxo Grp. Ltd. v. TorPharm, Inc.*,
153 F.3d 1366 (Fed. Cir. 1998) ....................18

*Guerrero-Lasprilla v. Barr*,
589 U.S. 221 (2020) ....................21

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026) .................... 11, 33

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......................................................................... 17, 18

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1985)..................................................................18

*McGirt v. Oklahoma*,
591 U.S. 894 (2020) ..............................................................................21

*Me. Cmty. Health Options v. United States*,
590 U.S. 296 (2020) ..............................................................................31

*Merck Sharp & Dohme B.V. v. Aurobindo Pharma USA, Inc.*,
130 F.4th 1363 (Fed. Cir. 2025)..............................................................17

*Metro. Area EMS Auth. v. Sec. of Veterans Affairs*,
122 F.4th 1339 (Fed. Cir. 2024)..............................................................30

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025)........................................................ 17, 18

*Murthy v. Missouri*,
603 U.S. 43 (2024) ................................................................................46

*Nutricia N. Am., Inc. v. United States*,
159 F.4th 1344 (Fed. Cir. 2025)..............................................................35

*Obsidian Solutions Grp., LLC v. United States*,
54 F.4th 1371 (2022) ..............................................................................17

*Pulsifer v. United States*,
601 U.S. 124 (2024) ..............................................................................30

*Rubicon Real Est. Holdings, LLC v. City of Pontiac, Michigan*,
179 F.4th 431 (6th Cir. 2026)..................................................................45

*Sanho Corp. v. Kaijet Tech. Int'l Ltd., Inc.*,
108 F.4th 1376 (Fed. Cir. 2024)..............................................................30

*Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*,
918 F.3d 1355 (Fed. Cir. 2019)...............................................................39

*Solar Energy Indus. Ass'n v. United States*,
111 F.4th 1349 (Fed. Cir. 2024)..............................................................18

*United States v. Rahimi*,
602 U.S. 680 (2024) ..............................................................................21

*United States v. Yoshida Int'l, Inc.*,
526 F.2d 560 (C.C.P.A. 1975)...................................................................8

*United States v. Yoshida, Int'l, Inc.*,
378 F. Supp. 1155 (Cust. Ct. 1974),
*rev'd*, 526 F.2d 560 (C.C.P.A. 1975) ............................................ 8, 9, 10

*V.O.S. Selections, Inc. v. Trump*,
149 F.4th 1312 (Fed. Cir. 2025),
*aff'd sub nom. Learning Res., Inc. v. Trump*,
607 US 229, 146 S. Ct. 628, 224 L. Ed. 2d 51 (2026) ............................34

*Women's Res. Centers, Inc. v. Davenport*, 608 U.S. —,
146 S. Ct. 1114, 224 L. Ed. 2d 672 (2026) ............................................43

## Constitutional and Statutory Provisions

19 U.S.C. § 2132........................................................................................1, 4

19 U.S.C. § 2132(a) ............................................................................ 10, 19, 30, 33

19 U.S.C. § 2132(a)(1).................................................................................33

19 U.S.C. § 2132(a)(2).................................................................................35

19 U.S.C. § 2132(b) ........................................................................... 10, 19

19 U.S.C. § 2132(c) ...................................................................................30

28 U.S.C. § 1295(a)(5).....................................................................................3

28 U.S.C. § 1581(i)(1)(B).................................................................................3

28 U.S.C. § 1581(i)(1)(D).................................................................................3

50 U.S.C. § 1701(a) ...................................................................................11

U.S. Const., Art. I, § 8 ......................................................................................4

## Administrative Rules

Federal Circuit Rule 47.5..................................................................................1

## Other Authorities

93 Cong. (Apr. 10, 1973) .....35

BEA, *U.S. International Economic Accounts: Concepts and Methods* 7 (2025) .....37

Bretton Woods Agreements Act, Pub. L. No. 79-171, 59 Stat. 512 .....5

Congressional Rsch. Serv., *Section 122 of the Trade Act of 1974* (Apr. 9, 2026), https://www.congress.gov/crs-product/IF13199 .....11

Economic Report of the President (1962) .....5, 6

Economic Report of the President (1966) .....23

Economic Report of the President (1972) .....31

Economic Report of the President (1973) .....31

Economic Report of the President (1974) .....26

Fed. R. App. P. 4(a)(1)(B) .....3

Federal Reserve Bank of St. Louis, *Review* (March 1961) .....5, 6

Federal Reserve Bank of St. Louis, *Review* (March 1964) ..... 22, 32

H.R. 10710, 93d Cong. (1973) .....30

H.R. Rep No. 6767, § 401(a) .....35

Joint Economic Committee, Subcommittee on Economic Statistics, *The Balance of Payments Statistics of the United States* (1965) .....7

Memorandum from Sec'y of Treasury William Simon to President Gerald Ford (Jan. 13, 1976) .....10

Office of Business Economics, *Survey of Current Business* (June 1961) .....6

Office of Business Economics, *Survey of Current Business* (June 1971) .....7

Patricia Kuwayama, *Measuring the United States Balance of Payments*, Monthly Review, Federal Reserve Bank of New York (Aug. 1975) .....24

Press Release, United States Dept. of Commerce, Aug. 15, 1973 ..... 23, 27

Proclamation No. 11012, 91 Fed. Reg. 9339 (Feb. 25, 2026) ..... 12, 30

Proclamation No. 4074,
Fed. Reg. 15 (Aug. 17, 1971) ........................................................ 8

Pub. L. No. 94-564, § 6, 90 Stat. 2660, 2661 (1976) ........................................ 10

S. Rep. No. 93-1298 ........................................................ 26, 31

S. Rep. No. 94-1148 (1976) ........................................................ 9

Trade Act of 1974,
Pub. L. No. 93-618, § 122, 88 Stat. 1987 (1975) .................................... 35

Trade Reform Act of 1973,
H.R. 6767, 93d Cong. § 401(b)(1)(A) (1973) ........................................ 28

## ANSWERING BRIEF FOR STATE APPELLEES AND CROSS-APPELLANTS

---

## STATEMENT OF RELATED CASES

No other appeal in or from this civil action has previously been before this or any other appellate court. The States are not aware of any related cases within the meaning of Federal Circuit Rule 47.5.

## INTRODUCTION

After the federal courts rebuffed the President's first attempt to impose tariffs on all of the country's trading partners, he sought to reimpose those tariffs under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132. Section 122, a provision never previously invoked, authorizes the President to impose limited tariffs to address "balance-of-payments deficits" when "fundamental international payments problems require special import measures to restrict imports." The Court of International Trade (CIT) correctly ruled that the President failed to identify any "balance-of-payments deficits" within the meaning of that statute, although it erroneously concluded that all States except Washington lacked standing.

The term "balance-of-payments deficits" may be unfamiliar today, but it had a widely understood meaning in the fixed-exchange-rate monetary system of the years leading up to the Trade Act of 1974. In that system, the United States had to fund international payments deficits with reserve assets—mainly

gold—to maintain the fixed value of the dollar. "Balance-of-payments deficits" referred to deficits that put reserve assets at risk in a fixed-exchange-rate monetary system. Each of the official measures of those deficits in the 1970s—liquidity, official settlements, and basic balance—aimed to quantify the risk to the nation's gold reserves from imbalances in the flow of currency across borders. Congress enacted Section 122 specifically to give the President authority to use tariffs to prevent a run on the nation's gold reserves.

The international community abandoned that system in the mid-1970s. Today, there is no pressure on the nation's reserve assets, because the United States is not required to defend the value of the dollar against other currencies or to convert dollars to gold at a fixed rate. There are no "fundamental international payments problems" or "balance-of-payments deficits" within the meaning of Section 122. The President's attempt to redefine those terms—to mean deficits in trade, the current account, or other specific components of international payments—is ahistorical and would turn a narrow delegation of Congress's constitutional authority to set tariffs into essentially unbounded power for the President to do as he likes.

## JURISDICTIONAL STATEMENT FOR CROSS-APPEAL

Although the CIT correctly held that the challenged tariffs were invalid, it erred in dismissing the claims of some of the state plaintiffs for lack of Article III standing. Those States cross-appeal that dismissal.

The CIT had jurisdiction over this action. 28 U.S.C. § 1581(i)(1)(B), (1)(D) (conferring exclusive jurisdiction over "any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . (B) tariffs . . . on the importation of merchandise for reasons other than the raising of revenue" and "(D) administration and enforcement with respect to" such tariffs). The CIT entered final judgment on May 7, 2026. Appx114–15. The state plaintiffs filed a timely notice of appeal on June 9, 2026. Doc. No. 64; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUES

1. Did the CIT correctly conclude that the President's challenged Proclamation failed to identify any "balance-of-payments deficits" within the meaning of Section 122 of the Trade Act of 1974?

2. Does the challenged Proclamation fail to identify any "fundamental international payments problems [that] require special import measures to restrict imports" under Section 122?

3. Did the CIT err by dismissing the claims of the state plaintiffs other than Washington for lack of Article III standing?

## STATEMENT OF THE CASE

### A. Section 122 authorizes the President to impose limited tariffs to "deal with" "balance-of-payments deficits" that result from "fundamental international payments problems."

The Constitution gives Congress—not the President—exclusive "Power To lay and collect Taxes, Duties, Imposts and Excises" and "To regulate Commerce with foreign Nations." U.S. Const., art. I, § 8. Tariffs are taxes on imports—and for all practical purposes, taxes on Americans who import goods from overseas. *See Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201 (1824) ("the act of laying 'duties or imposts on imports' . . . is considered as a branch of the taxing power").

On some matters related to tariffs, Congress has authorized the President to act under specific circumstances. One such authorization is the provision at issue here: Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132. Congress enacted Section 122 against the backdrop of economic events in the 1960s and early 1970s, and those events help explain Section 122's provisions.

#### 1. In the 1960s, the Bretton Woods system of fixed exchange rates gave rise to concerns about balance-of-payments deficits.

From the 1940s to the 1970s, the international community adhered to a monetary system—the "Bretton Woods" system of fixed-exchange rates—that

differed substantially from the system in place today. Appx90–92, 149. Under that fixed-rate system, the value of the U.S. dollar was fixed at $35 per ounce of gold, and the values of foreign currencies were pegged to the dollar. Bretton Woods Agreements Act, Pub. L. No. 79-171, 59 Stat. 512; Appx148–54.

Those fixed exchange rates could give rise to international deficits—”balance-of-payment deficits”—that the federal government would be obligated to pay to foreigners out of the nation’s gold reserves. That is because “when U.S. payments exceed[ed] U.S. receipts, the difference [was] generally reflected in acquisition of dollars” held by foreigners, and “if held by foreign governments or central banks” could “be converted into gold.” Federal Reserve Bank of St. Louis, *Review* 2 (March 1961).[1] That is, “if international payments happened to exceed receipts in any year” the “deficit had to be met from our large gold reserves.” Economic Report of the President 144–45 (1962).[2] “The sum of the net increase in foreign-held dollar assets and the net transfer of gold to foreign ownership [was] the measure of the *balance-of-payments ‘deficit’* for

---

[1] *Available at* https://fraser.stlouisfed.org/title/review-federal-reserve-bank-st-louis-820/march-1961-24333 (accessed Aug. 31, 2026).

[2] *Available at* https://fraser.stlouisfed.org/title/economic-report-president-45/1962-8133 (accessed Aug. 31, 2026).

the United States[.]" Federal Reserve Bank of St. Louis, *Review* 2 (March 1961) (emphasis added).

By the 1960s, the volume of dollars in worldwide circulation began to exceed U.S. gold reserves convertible at $35 per ounce, and the market price for gold rose above it—meaning that foreign monetary authorities could use dollars to buy U.S. gold at a discounted rate and then sell it at the higher price on the open market. Appx93–94, 152–54. "[P]ersistent *payments deficits* and gold losses" therefore "made it necessary for the U.S. Government to give greater attention to the net financial outcome of its transactions, and those of its citizens, with the rest of the world." Economic Report of the President 144–45 (1962) (emphasis added).

Through the 1960s and early 1970s the federal government adopted several official economic measures of the "balance-of-payments deficit" to monitor the risk to gold reserves. The first such measure was the "liquidity balance." Office of Business Economics, *Survey of Current Business* 10 (June 1961)[3] (providing that measurement). The liquidity balance measured

---

[3] *Available at* https://fraser.stlouisfed.org/title/survey-current-business-46/june-1961-9622 (accessed Aug. 31, 2026). The *Survey of Current Business* is the journal of record for the Department of Commerce's Bureau of Economic Analysis, which was known as the Office of Business Economics before 1972.

changes in U.S. reserve assets against changes in liquid U.S. liabilities to all foreigners, public and private. Joint Economic Committee, Subcommittee on Economic Statistics, *The Balance of Payments Statistics of the United States* 2 (1965) ("1965 Subcommittee Report").[4] The goal was to measure "the decline, during the period covered, in the U.S. ability to defend the exchange value of the dollar with liquid resources owned by or automatically available to the monetary authorities." Appx 151 (1963 Congressional report). The government later shifted to another measure, the "official settlements balance" or "official reserve transactions balance," which attempted to focus more narrowly on dollars held by foreign monetary authorities and therefore convertible into gold at a fixed price. 1965 Subcommittee Report at 2. Finally, in 1971, the federal government also began reporting the "basic balance" as a measure of balance of payments. Office of Business Economics, *Survey of Current Business* 24 (June 1971).[5] The basic balance comprised the current account plus long-term capital transactions and flows of U.S. and foreign government capital other than changes in U.S. official reserve holdings and

---

[4] *Available at* https://catalog.hathitrust.org/Record/001740366 (accessed Aug. 31, 2026).

[5] *Available at* https://fraser.stlouisfed.org/title/survey-current-business-46/june-1971-9806 (accessed Aug. 31, 2026).

foreign official reserve holdings in the United States. *Id.* The basic balance was "intended as a rough indicator of long-term trends in the U.S. balance of payments." *Id.*

**2. In 1971, in response to balance-of-payments deficits, President Nixon effectively suspended the fixed-exchange-rate system.**

The balance-of-payments deficits in that era led to periodic "runs" on the dollar. Appx93–94. Those problems came to a head in 1971, when "[t]he nation suffered under an exceptionally severe and worsening balance of payments deficit." *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 567 (C.C.P.A. 1975). "The gold reserve backing of the U.S. dollar had dropped" over $7 billion, and the balance-of-payments deficit measured by the official reserve transactions balance "amounted to $22 billion (annual rate) during the first quarter of 1971." *Id.* at 567, 567 n.3. With another run on the United States' gold reserves looming, President Nixon suspended the convertibility of dollars into gold, implemented wage and price controls, and imposed a temporary ten-percent tariff on all imports. Proclamation No. 4074, 36 Fed. Reg. 15, 724 (Aug. 17, 1971); Appx93–94.

President Nixon's tariffs were challenged in the courts. *See United States v. Yoshida, Int'l, Inc.*, 378 F. Supp. 1155 (Cust. Ct. 1974), *rev'd*, 526 F.2d 560 (C.C.P.A. 1975). The CIT's predecessor invalidated those tariffs, holding that they were not authorized by law. *Yoshida*, 378 F. Supp. at 1167–68.

Meanwhile, the Bretton Woods system of fixed exchange rates was collapsing. Later in 1971, Western nations agreed to a new set of exchange rates that devalued the dollar. Appx94. In 1973, Western governments agreed to allow currencies to float against one another within a wider range than the Bretton Woods system had allowed. Appx94, 154; S. Rep. No. 94-1148, at 3 (1976).

**3. Congress enacted Section 122 as part of the Trade Act of 1974.**

Soon after the trial court's decision in *Yoshida,* Congress granted the President specific authority to impose tariffs if similar circumstances were to arise again. Section 122 provided, in pertinent part:

> Whenever *fundamental international payments problems require special import measures to restrict imports*—
>
> (1) to deal with *large and serious United States balance-of-payments deficits* . . .
>
> The President shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress)—
>
> (A) a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States . . . .
>
> If the President determines that the imposition of import restrictions under subsection (a) will be contrary to the national interest of the United States, then he may refrain from proclaiming such restrictions and he shall—
>
> (1) immediately inform Congress of his determination, and

> (2) immediately convene the group of congressional official advisers designated under section 2211(a) of this title and consult with them as to the reasons for such determination.

19 U.S.C. § 2132(a), (b) (emphases added). Therefore, under Section 122 the President is required to impose tariffs under very specific and limited circumstances or "immediately inform Congress" of his decision not to. *Id.* Those circumstances are when "large and serious . . . balance-of-payments deficits" create "fundamental international payments problems" that "require special import measures to restrict imports." *Id.*

**4. Congress eventually formally ended the gold standard.**

After Congress enacted the Trade Act of 1974, this Court's predecessor upheld President Nixon's 1971 tariffs, in large part due to their limited nature and the fact that any similar future action "must, of course, comply with" Section 122. *Yoshida*, 526 F.2d at 577–78, 582 n.33, 583–84.

The Bretton Woods system finally came to a formal end in 1976, when Congress repealed the law (still part of the U.S. Code despite President Nixon's actions in 1971) fixing the value of the dollar against gold. Pub. L. No. 94-564, § 6, 90 Stat. 2660, 2661 (1976); Memorandum from Sec'y of Treasury William Simon to President Gerald Ford (Jan. 13, 1976)[6]; *see also* Appx155 (noting that

---

[6] *Available at* https://history.state.gov/historicaldocuments/frus1969-76v31/d128 (accessed Aug. 31, 2026).

in 1974, "it was not clear whether the future held a fixed or floating rate system").

In the five decades after the Trade Act of 1974, no President ever invoked Section 122 to impose tariffs or informed Congress of a determination not to impose tariffs under that provision. *See* Congressional Rsch. Serv., *Section 122 of the Trade Act of 1974* (Apr. 9, 2026).[7]

### B. After the courts struck down his first attempt to impose worldwide tariffs, the President invoked Section 122 to achieve the same result.

Shortly after taking office for the second time, the President unilaterally imposed sweeping tariffs on nearly every country in the world, citing "'large and persistent' trade deficits." *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 237 (2026). He claimed authority to do so under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701(a). *Id.* Private parties and a coalition of States challenged those tariffs, and the CIT, this Court, and the Supreme Court all agreed that IEEPA did not grant the executive such sweeping tariff authority. *See id.* at 240 ("[T]he President asserts the independent power to impose tariffs on imports from any country, of any

---

[7] *Available at* https://www.congress.gov/crs-product/IF13199 (accessed Aug. 31, 2026).

product, at any rate, for any amount of time," but IEEPA "cannot bear such weight.").[8]

On the same day the Supreme Court struck down the IEEPA tariffs, the President reimposed a similar set of worldwide tariffs under Section 122. Proclamation No. 11012 (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026). The President's Proclamation asserts that the United States' trade deficit and other deficits in the "current account" constituted "balance-of-payments deficits" within the meaning of Section 122.

### C. The CIT held that the President had not identified any balance-of-payments deficits justifying Section 122 tariffs.

Private parties and a coalition of States again brought suit, challenging the legal authority for the President's unilateral tariffs. State plaintiffs are twenty-four sovereign States that both import products from overseas directly and purchase goods and supplies imported by others. Appx128–42, Appx158–216.

The CIT granted summary judgment in plaintiffs' favor, concluding that the President's Proclamation fails to identify any "balance-of-payments deficits" within the meaning of Section 122. In particular, the CIT noted that,

---

[8] In the IEEPA litigation, the parties discussed whether Section 122 would authorize the tariffs at issue, but that issue was not decided on appeal.

when Congress enacted Section 122 in 1974, the official government measures of balance-of-payments deficits were the "liquidity balance," the "official settlements balance," and the "basic balance," and the President's Proclamation does not identify any deficit in any of those balances to justify his Section 122 tariffs. Appx45–46. The CIT also recognized that the parties disputed whether the President had identified any "fundamental international payments problems" within the meaning of Section 122 but declined to reach that issue. Appx31, n.25; *see also* Appx27 (noting but declining to resolve the state plaintiffs' argument that the President's tariff exemptions violated Section 122's nondiscrimination provision).

Judge Stanceu dissented, primarily taking issue with the majority's focus on the liquidity, official settlements, and basic balances as the exclusive measures of balance-of-payments deficits under Section 122. Appx54–56. Judge Stanceu viewed that conclusion as one which no party had urged on summary judgment, and he would accordingly have denied both parties' summary judgment motions. Appx77.

The CIT also separately ruled that the private plaintiffs and the State of Washington had standing to pursue the challenge based on their status as direct importers. Appx21–23. The CIT accordingly entered a permanent injunction

preventing the federal government from collecting Section 122 tariffs as to those parties. Appx49.

But the CIT held that the remaining state plaintiffs lacked Article III standing. Appx23–27. It concluded that the non-importer States' expectation of economic harm due to the Section 122 tariffs was too "speculative" to confer standing. Appx26. The court accordingly dismissed those parties' claims. Appx53. The CIT did not address the States' expert declaration from an economist at the University of Michigan, who calculated that the state plaintiffs would pay an additional $748 million per year due to the tariffs.

Defendants appealed the CIT's ruling invalidating the Section 122 tariffs, and state plaintiffs cross-appealed the CIT's standing ruling. This court subsequently granted defendants' motion to stay the CIT's judgment and injunction pending appeal.

## SUMMARY OF THE ARGUMENT

I. The CIT correctly held that Section 122 does not authorize the tariffs imposed by the President's Proclamation.

First, as the CIT held, the Proclamation fails to identify any "balance-of-payments deficits" within the meaning of Section 122. Statutory text and history show that "balance-of-payments deficits" are measures of risk to United States reserve assets in a fixed-exchange-rate monetary system like the one in

place before the 1970s. At various times, the federal government reported three official measures of balance-of-payments deficits—liquidity, official settlements, and the basic balance—but all of them measured the risk to reserve assets, chiefly gold. That was the understood meaning of "balance-of-payments deficits" in 1974. By contrast, the trade deficit, the current-account deficit, and the other metrics cited in the Proclamation do not measure a risk to the nation's reserve assets. Indeed, in the floating-exchange-rate system that prevails today, market forces automatically adjust currency values without the use of gold reserves.

Second, the Proclamation does not identify any "fundamental international payments problems" that require "special import measures to restrict imports" within the meaning of Section 122. Whatever deficits may exist, those deficits are not the same as *payments* problems. Since the end of the Bretton Woods system, the United States no longer has an obligation to convert dollars held by foreign central banks to gold. Thus, no fundamental international payments problems have arisen, and even if they had, special import measures would not be required given automatic exchange-rate adjustments in today's floating-rate system.

Finally, this Court should reject defendants' belated attempt, raised for the first time on appeal, to rely on a deficit in the basic balance to justify the

Section 122 tariffs. In the current floating-exchange-rate system, the basic balance no longer has the meaning it once had as a metric of balance-of-payments deficits in a fixed-exchange-rate system. The method for calculating the basic balance has also changed significantly since 1974 and is now fundamentally different from the basic balance that was employed at the time of Section 122's enactment. Defendants' invocation of the basic balance still does not constitute a balance-of-payments deficit within the meaning of Section 122.

II. The CIT erred in concluding that the downstream injuries asserted by the dismissed state plaintiffs were "too speculative" to establish Article III standing. Article III does not demand certainty; it requires a likely, concrete injury that is fairly traceable to the challenged conduct and redressable by a favorable ruling. The States met that standard. They provided unrebutted state-specific declarations attesting to predictable price increases due to the Section 122 tariffs and further harm to state budgets, contracts, and administrative operations. Corroborating those declarations, they also presented an uncontested expert economic analysis detailing the additional price increases the Section 122 tariffs were likely to cause.

There was nothing speculative about the inference that the Section 122 tariffs would harm state plaintiffs. Those harms follow from basic economic logic—confirmed by the States' uncontested economist—that importers

typically pass through tariff costs at nearly a one-to-one rate. The States' recent experience under the unlawful IEEPA tariffs provided further confirmation of that practice in action, and of the additional administrative burdens tariffs invariably create. Because the States demonstrated predictable price effects and substantial administrative injuries that an injunction would have redressed, they satisfied all three elements of Article III standing.

## STANDARD OF REVIEW

The meaning of a statute poses a question of law that this Court reviews *de novo*. *Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391–92 (2024)). "When tasked with interpreting a statute," this Court "exhaust[s] all traditional tools of interpretation to determine its meaning." *Obsidian Solutions Grp., LLC v. United States*, 54 F.4th 1371, 1374 (2022). Those tools include "the whole statutory text, considering the purpose and context," as well as pertinent legislative history. *Merck Sharp & Dohme B.V. v. Aurobindo Pharma USA, Inc.*, 130 F.4th 1363, 1368 (Fed. Cir. 2025); *see also Cash v. Collins*, 166 F.4th 1046, 1050 (Fed. Cir. 2026) (legislative history is one of the "traditional tools

of statutory construction”); *see also Mosaic*, 160 F.4th at 1347 (courts may look to legislative purpose in ascertaining statute’s meaning).[9]

This Court may affirm the CIT’s judgment “on any ground the law and the record will support so long as that ground would not expand the relief granted.” *Glaxo Grp. Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 1371 (Fed. Cir. 1998). This Court “may choose to decide the issue even if not passed on by the trial court.” *Id.*

This Court reviews the CIT’s Article III standing determination *de novo* while reviewing any disputed subsidiary findings for clear error. *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1330–31 (Fed. Cir. 2008). As defendants did not contest the States’ allegations or declarations of fact with respect to standing, Appx19 n.9, the cross-appeal concerns only the application of law to undisputed facts.

[9] Defendants are wrong to suggest that the President’s interpretations of statutory terms warrants deference under *Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985); App. Br. 18–19. That interpretation of *Maple Leaf* cannot be squared with *Loper Bright*, 603 U.S. at 400, which observed that courts have an “obligation to independently interpret” statutes. *See Solar Energy Indus. Ass’n v. United States*, 111 F.4th 1349, 1357–58 (Fed. Cir. 2024) (noting without resolving the open question of whether *Maple Leaf* remains good law).

## ARGUMENT

### I. The CIT correctly held that Section 122 does not authorize the tariffs that the President imposed.

Under Section 122, whenever "fundamental international payments problems" require "special import measures" to deal with "large and serious United States balance-of-payments deficits," the President "shall" impose Section 122 tariffs or "immediately inform Congress" of his decision not to do so. 19 U.S.C. § 2132(a), (b). The President imposed the tariffs at issue here to deal with deficits in the current account—primarily trade deficits. But as the CIT correctly held, current-account deficits are not "balance-of-payments deficits" as Section 122 uses that term. Nor are they "fundamental international payments problems." For either reason, this Court should affirm.

#### A. The President's Proclamation does not identify any "balance-of-payments deficits" within the meaning of Section 122.

All parties agree that "balance of payments" is a term of art, and that "the overall balance of payments" among the current, capital, and financial accounts "is necessarily zero" because "a negative balance in the current account" must be offset by "a correspondingly positive balance in the capital and financial accounts." App. Br. 5–6. For that reason, and as Judge Stanceu recognized below, "Congress [must have] meant something else in referring to the balance of payments in Section 122(a)(1)." Appx71. The core dispute in this case is what Congress meant.

Defendants below argued that “balance-of-payments deficits” means deficits “in the current account, which is driven and dominated by the trade deficit.” Doc. 35, at 26. On appeal they have abandoned that position and instead argue that it means “balance-of-payments deficit as determined using an economically reasonable methodology.” App. Br. 23. But that circular definition elides the key question: economically reasonable methodology to measure what?

That question is answered by careful attention to the text and historical context in which Section 122 was enacted. That text and history show that in 1974 “balance-of-payments deficits” had a settled meaning that related to risks to reserve assets—risks that, today, have nothing to do with current-account deficits.

#### 1. Statutory text, in historical context, shows that “balance-of-payments deficits” are measures of risk to reserve assets in a fixed-exchange-rate system.

The term “balance-of-payments deficits” is not familiar in today’s political or economic discourse. But it was certainly known in the 1960s and 1970s. In the fixed-exchange-rate monetary system of that era, it had a widely understood meaning related to risks to reserve assets. It is no longer meaningful in the floating-exchange-rate system that prevails today.

Statutory interpretation ascertains meaning by examining the text "not in a vacuum, but with reference to the statutory context, structure, history, and purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014). And "[b]ecause the law's ordinary meaning at the time of enactment usually governs," courts "must be sensitive to the possibility a statutory term that means one thing today or in one context might have meant something else at the time of its adoption or might mean something different in another context." *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 674–75 (2020). For that reason, "contemporaneous usages" can "shed light on the meaning of the language in question at the time of enactment." *McGirt v. Oklahoma*, 591 U.S. 894, 913–14 (2020); *see also United States v. Rahimi*, 602 U.S. 680, 691 (2024) (emphasizing the interpretive value of historical context); *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 231–34 (2020) (looking to statutory history to interpret provision).

Under the Bretton Woods fixed-exchange-rate system, policymakers used the phrase "balance-of-payments deficits" to refer to the problem that President Nixon had sought to address: international payments imbalances that put gold reserves at risk in a fixed-exchange-rate system. *See supra* at 4–10; *see also*

*e.g.*, Federal Reserve Bank of St. Louis, *Review* 2 (March 1961)[10] ("The sum of the net increase in foreign-held dollar assets and the net transfer of gold to foreign ownership [was] the measure of the balance-of-payments 'deficit' for the United States."). Congress defined and limited presidential authority to address *that* problem in Section 122, using "balance-of-payments deficits" according to its widely understood meaning at the time—"changes in the ability of a nation to maintain the external value of its currency in the face of potential and actual demands by holders of its currency for gold or other currencies." Federal Reserve Bank of St. Louis, *Review* 7 (March 1964).[11]

Likewise, the official government metrics for balance-of-payments deficits—the liquidity and official settlements balances and, later, the basic balance—sought to measure that risk to reserve assets in a fixed-exchange-rate system. Indeed, whereas the official settlements balance in a fixed-exchange-rate system would be in deficit given "increases in U.S. liabilities to foreign official reserve agencies and/or declines in U.S. official reserve assets," in a floating-rate system "adverse exchange market pressures on the dollar would be

---

[10] *Available at* https://fraser.stlouisfed.org/title/review-federal-reserve-bank-st-louis-820/march-1961-24333 (accessed Aug. 31, 2026).

[11] *Available at* https://fraser.stlouisfed.org/title/review-federal-reserve-bank-st-louis-820/march-1964-24356 (accessed Aug. 31, 2026).

reflected in a depreciation of the exchange rate of the dollar vis-à-vis other currencies and the official reserve transactions balance would be zero." Press Release, United States Dept. of Commerce, Aug. 15, 1973.[12] "All definitions of the balance of payments surplus or deficit relate to changes in a country's reserve assets." Economic Report of the President 162 (1966).[13]

The historical evidence defendants cite does not undermine, but rather confirms, that understanding. App. Br. 22, 29. Those materials recognize that "the crucial balance-of-payments concept" in a fixed-exchange-rate system was the effect on the domestic money supply caused by foreign monetary institutions' accumulation of dollars convertible into United States reserve assets. Donald S. Kemp, *Balance-of-Payments Concepts—What Do They Really Mean?*, Federal Reserve Bank of St. Louis Review, 15–16 (July 1975)[14]; App. Br. 29. Defendants' materials explain:

> One of the principal uses of balance-of-payments measures is to evaluate changes in underlying conditions which may alter the equilibrium value of a country's exchange rate. In the Bretton Woods system of fixed but adjustable par values, this meant an

---

[12] *Available at* https://fraser.stlouisfed.org/files/docs/publications/bea/newsreleases/bea_newsreleases_19730815_b.pdf (accessed Aug. 31, 2026)

[13] *Available at* https://fraser.stlouisfed.org/title/economic-report-president-45/1966-8137 (accessed Aug. 31, 2026).

[14] *Available at* https://perma.cc/2AP4-VN8C (accessed Aug. 31, 2026).

> attempt to identify cases of 'fundamental disequilibrium, [which] could lead to the changing of the value of the national currency relative to gold or foreign currencies[.]

Patricia Kuwayama, *Measuring the United States Balance of Payments*, Monthly Review, Federal Reserve Bank of New York 183, 189–90 (Aug. 1975). That mirrors plaintiffs' position and the historical understanding that, "[u]nder a system of freely floating exchange rates" "the balance of payments (on a money-account basis) is always in equilibrium (total imports equal total exports) and there are no money supply changes associated with foreign transactions." Kemp at 16. In that case, "the adjustment to the disparity between the supply of and demand for money is accomplished by changes in domestic prices and exchange rates." *Id*.

In short, "balance-of-payments deficits" meant deficits that put reserve assets at risk by allowing foreign countries to force the United States to convert their dollar holdings to gold. The fact that such balance-of-payments deficits do not arise in a floating-exchange-rate system does not mean that Congress enacted a meaningless statute. In 1974, there was substantial uncertainty as to whether fixed- or floating-exchange rates would ultimately prevail. Appx154–55. Section 122 itself reflects that uncertainty: Section 122(a)(1) addresses the problem in a fixed-exchange-rate context, granting the President authority to address "large and serious United States balance-of-payments deficits," and

Section 122(a)(2) addresses the problem in a floating-exchange-rate context, granting the President authority to impose limited tariffs "to prevent an imminent and significant depreciation of the dollar in foreign exchange markets." *See* Kemp at 21–22 ("Under freely floating exchange rates there are no meaningful balance-of-payments concepts, because in this case international transactions have no impact on the money supply . . . . In a world of freely floating exchange rates, changing pressures on the dollar are captured by movements in the exchange rate and not by some theoretically and empirically meaningless balances.").

If global economic reality has diminished the significance of Section 122(a)(1), that is no basis to change the meaning of its terms. Even if historical circumstances have rendered Section 122(a)(1) obsolete, no authority supports defendants' implicit invitation for the judiciary to breathe new life into it by giving the statutory language a different meaning than it had when enacted.

**2. Legislative history confirms that "balance-of-payments deficits" carries that specific meaning.**

In enacting Section 122, Congress had the same understanding of "balance-of-payments deficits" as discussed in the foregoing authorities. A 1963 Congressional report discussed "[t]he meaning of the balance-of-payments deficit," explaining that "[t]he deficit, under the official U.S. definition, measured the reduction in U.S. monetary reserve assets (chiefly

gold) and the increase in liquid liabilities." Appx151. "Stated another way," a balance-of-payments deficit, as then understood, "measured the decline, during the period covered, in the U.S. ability to defend the exchange value of the dollar with liquid resources owned by or automatically available to the monetary authorities." *Id.* Similarly, a Congressional report published in 1970 noted that the liquidity and official-settlements balances both measured "changes in U.S. reserve assets." Appx35. Given that history, it is unsurprising that the Senate Report on the Trade Act of 1974 itself explicitly identified the liquidity, official settlements, and basic balances—the three official measures of balance-of-payments deficits—as the relevant metrics. S. Rep. No. 93-1298, at 8.

Congress and other policymakers also understood that the balance-of-payments problems that Section 122 was enacted to address were likely to be less significant in a floating-exchange-rate system, where market forces adjust currency values to restore balance, rather than values remaining fixed and imbalances putting reserve assets at risk. *See* S. Rep. No. 93-1298, at 87–88 (recognizing that Section 122 was "not likely to be utilized" if a floating-exchange-rate system prevailed); *accord* Economic Report of the President 193 (1974)[15] (recognizing that "measurement of the overall balance of payments"

---

[15] *Available at* https://fraser.stlouisfed.org/title/economic-report-president-45/1974-8145 (accessed Aug. 31, 2026).

was "less important" in a floating-exchange-rate system because that system obviated the need "to signal to policy makers when a given exchange rate had become untenable"; instead, "exchange rates are allowed to adjust automatically in response to payments imbalances"); Press Release, United States Dept. of Commerce, Aug. 15, 1973[16] (recognizing that, although official settlements balance was a primary balance-of-payments deficit metric in a fixed-exchange-rate system, in a floating-exchange-rate system the official settlements balance "would be zero").

The CIT did not, as defendants contend, improperly rely on "scattered passages in the legislative history" to support its conclusion. App. Br. 17, 32–39. Legislative history is one of the "traditional tools of statutory construction." *Cash*, 166 F.4th at 1050. *Azar v. Allina Health Servs.* is not to the contrary, because there the asserted interpretation allegedly supported by the "ambiguous" legislative history was "clearly foreclose[d]" by the statutory text. 587 U.S. 566, 579–80 (2019). Here, by contrast, the statutory text employs a specialized phrase, "balance-of-payments deficits," and the legislative history

---

[16] *Available at* https://fraser.stlouisfed.org/files/docs/publications/bea/newsreleases/bea_newsreleases_19730815_b.pdf (accessed Aug. 31, 2026)

confirms that Congress used that phrase as it was commonly understood at the time.

It is defendants who misread the legislative history. They seek support in the fact that Congress chose not to enact a more specific definition of "balance-of-payments deficits," but that argument commits the very error defendants accuse the CIT of committing—overreliance on snippets of legislative history. The proposed standard would have defined a "serious balance-of-payments deficit" as existing when "the balance of payments (as measured either on the official reserve transactions basis or by the balance on current account and long-term capital) has been in substantial deficit over a period of four consecutive calendar quarters." Trade Reform Act of 1973, H.R. 6767, 93d Cong. § 401(b)(1)(A) (1973). Defendants seem to assume that because Congress chose not to enact that specific definition of balance-of-payments deficits, it must have meant to leave the President discretion to adopt any definition. App. Br. 39. But Congress may have discarded the definition for any number of reasons—such as whether "four consecutive calendar quarters" was the correct time period—and not due to disagreement about what "balance-of-payments deficits" meant. Indeed, the proposed definition is one more piece of contemporaneous evidence that balance-of-payments deficits were measured by the official settlements balance, which was specifically directed at

monitoring the risk to United States reserve assets in the fixed-exchange-rate system posed by foreign monetary institutions demanding conversion of dollar into gold at a fixed rate.

The exclusion of any specific measure of balance-of-payments deficits does not, as defendants contend, mean that the President gets to decide what a balance-of-payments deficit is. Instead, as the historical discussion above makes clear, although the risk to reserve assets could be measured in a variety of ways, all of them measure *risk to reserve assets*. Thus, the removal of a definition explicitly citing the official settlements balance or the basic balance does not change the fact that "balance-of-payments deficits" within the meaning of Section 122 referred to measures of risk to reserve assets, regardless of the specific metric.

**3. In today's floating-exchange-rate system, deficits in the current account or its subcomponents do not measure a risk to reserve assets.**

The President's Proclamation fails to identify any balance-of-payments deficits justifying Section 122 tariffs under a proper understanding of the statute.

The Proclamation relies primarily on the trade deficit, a part of the "current account," as well as other aspects of the current account, including

"primary income" and "secondary income." 91 Fed. Reg. at 9340.[17] But Section 122's text makes clear that the balance of payments is distinct from the balance of trade by using "balance-of-*trade* surpluses" as a counterpart to "balance-of-*payments* deficits" in parallel provisions. 19 U.S.C. § 2132(a), (c) (emphasis added); *see Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("[D]ifferent terms usually have different meanings," particularly when the terms at issue are ones "with some heft and distinctiveness"); *accord Metro. Area EMS Auth. v. Sec. of Veterans Affairs*, 122 F.4th 1339, 1345 (Fed. Cir. 2024) (citing *Sanho Corp. v. Kaijet Tech. Int'l Ltd., Inc.*, 108 F.4th 1376, 1382 (Fed. Cir. 2024)) ("We understand" differences in statutory wording "to mean Congress in fact intended two different things.").

That distinction between "trade" and "payments" is intentional. Early versions of what became Section 122 used "balance-of-payments" in both subsections with "deficits" and "surpluses," respectively. *See* H.R. 10710, 93d Cong. (1973) (as introduced by House Oct. 3, 1973). Congress affirmatively changed subsection (c) to "balance-of-*trade* surpluses" while leaving subsection (a) as "balance-of-*payments* deficits." Where, as here, "Congress includes

[17] The proclamation also mentions a negative "net international-investment position," 91 Fed. Reg. at 9340, which is not part of the current account and is not a measure of payments at all.

particular language in one section of a statute but omits it in another, Congress intended a difference in meaning." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 314 (2020) (quotation marks omitted).

The legislative history draws that same distinction between trade surplus or deficits and balance-of-payments surpluses or deficits. *See* S. Rep. 93-1298 at 11 ("In 1962, the Nation had a modest trade surplus of approximately $1.1 billion (c.i.f.) and a balance of payments deficit of $2.9 billion (liquidity basis). Ten years later the modest trade surplus had become an $11 billion deficit, and the payments deficit had grown from a bearable $2.9 billion to an intolerable $13.9 billion."); *id.* at 89 (distinguishing between a "*payments* surplus" (or deficit) versus a "*trade* deficit" (or surplus)) (emphasis in original); *see also, e.g.*, Economic Report of the President 154 (1972) (distinguishing between current-account deficits and balance-of-payments deficits); Economic Report of the President 113 (1973) (same). And so do defendant's own sources; they expressly refute the proposition that the trade balance or other deficits in the current account establish balance-of-payments deficits within the meaning of Section 122. Kemp at 19 (explaining that current account balance could not give meaningful information about balance-of-payments deficits because "it alone tells us very little about the impact of international transactions on domestic economic activity").

More fundamentally, however, none of the metrics on which the Proclamation relies identify deficits that put United States reserve assets at risk, as necessary to show “balance-of-payments deficits” under Section 122. Instead, defendants argue that, since the overall balance of payments, as an accounting matter, nets to zero, the President may employ “any reasonable economic methodology” to identify a deficit justifying Section 122 tariffs. App. Br. 16. As the CIT correctly concluded, however, that argument divorces the statutory phrase from its historical context and attempts to fill the vacuum of meaning with executive discretion. The historical evidence also expressly refutes it:

> [E]ven though a nation’s balance of payments is continually in balance from an accounting viewpoint, the underlying economic relationships between that nation and others may be of an unsustainable character. It is in this latter sense that a ‘deficit’ or ‘surplus’ in the balance of payments may be a meaningful concept as part of an evaluation of the problems related to balance payments. In this sense, the implication is that market forces or policy measures will ultimately have to be brought to bear on the underlying character of the balance of payments if the external value of the nation’s currency is to be maintained.

Federal Reserve Bank of St. Louis, *Review* 6–7 (March 1964).[18]

---

[18] *Available at* https://fraser.stlouisfed.org/title/review-federal-reserve-bank-st-louis-820/march-1964-24356 (accessed Aug. 31, 2026).

Indeed, since the statute's enactment half a century ago, President Trump is the first President to conclude that "balance-of-payments deficits" exist to justify Section 122 tariffs—even though Section 122 is *mandatory* and *requires* the President to impose tariffs if balance-of-payments deficits exist or explain to Congress why not. 19 U.S.C. § 2132(a)(1). As the Supreme Court explained in invalidating the President's first attempt to unilaterally impose tariffs, "the fact that no President has ever found such power . . . is strong evidence that it does not exist." *Learning Resources*, 607 U.S. at 250.

### B. The President's Proclamation does not identify any "fundamental international payments problems" within the meaning of Section 122.

The current-account deficits that the Proclamation cites also do not satisfy Section 122's other statutory prerequisite: that the balance-of-payments deficits result from "fundamental international payments problems" that "require special import measures to restrict imports." 19 U.S.C. § 2132(a). Although the CIT did not reach that question, it is an alternative ground for affirmance and, in any event, it reinforces the meaning of "balance-of-payments deficits" discussed above.

As the history discussed above shows, Congress in 1974 was concerned with giving the President a tool to address an international monetary crisis, like the one that precipitated President Nixon's 1971 actions to protect the nation's

gold reserves. Congress limited the President's authority to that situation by adding the prefatory language to Section 122(a) requiring a "fundamental international payments problem[]" as a prerequisite.

A trade deficit or other deficit in the current account is not a *payments* problem. As four judges of this Court explained in the IEEPA tariffs case—and no other judge disagreed—the statutory term "fundamental international payments problems" means problems with reserve assets and the like, not trade deficits:

> Such problems concern the payments (financial, cash) side of the accounting statement, which involves the *reserves of currencies (or their substitutes like gold)* and the operation of foreign-exchange markets that determine the ability of persons from one country to acquire another country's currency needed to make the foreign purchases or investments reflected in the current and capital accounts.

*V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1373 (Fed. Cir. 2025) (Taranto, J., dissenting) (emphasis added), *aff'd sub nom. Learning Res., Inc. v. Trump*, 607 US 229, 146 S. Ct. 628, 224 L. Ed. 2d 51 (2026). "That is the nature of the problem underlying" President Nixon's actions, and Section 122 was tailored to that subset of problems. *Id.*

Defendants' primary response below was that "balance-of-payments deficits" are by definition "fundamental international payments problems," so the latter phrase adds nothing to Section 122's requirements. Doc. 35, at 41–44.

That interpretation runs afoul of the canon against surplusage. *Nutricia N. Am., Inc. v. United States*, 159 F.4th 1344, 1354 (Fed. Cir. 2025) (noting that the canon "prefers interpretations that give effect to every clause and word of a provision") (cleaned up). It also is hard to square with the legislative history, because Congress deliberately added the "fundamental international payments problems" precondition—which was not in the initial bill—to the final version. *Compare* H.R. 6767, § 401(a), 93 Cong. (Apr. 10, 1973), *with* Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1987 (1975).

But even if defendants' interpretation were right about how Section 122's clauses relate to one another, it would provide yet more support for the argument made above: that "balance-of-payments deficits" are limited to deficits that reflect risks to reserve assets. Only those deficits would constitute a payments problem. As explained above, in a fixed-exchange-rate system, fundamental international payments problems manifest as risks to the reserve assets that must be used to keep the dollar's value constant. In a floating-exchange-rate system, by contrast, those problems manifest as a significant depreciation of the dollar against other currencies—another circumstance that Section 122 covers. 19 U.S.C. § 2132(a)(2). Section 122's reference to payments problems thus reinforces that "balance-of-payments deficits" refers to a specific kind of deficit related to the risk to the nation's gold reserves. In

today's floating-exchange-rate system, no such problem exists, and Section 122 does not apply.

### C. Defendants' belated attempt to invoke the basic balance to justify the tariffs fails.

Finally, defendants attempt to salvage the President's Proclamation by asserting a novel argument not raised below: that a basic-balance deficit justifies the Section 122 tariffs even under the CIT's analysis. App. Br. 46. Defendants did not oppose summary judgment on that ground, but it fails in any event for either of two reasons.

First, for all the reasons explained above, the basic balance is relevant only to the extent that it measures the risk to reserve assets in a fixed-exchange-rate monetary system. Section 122's "balance-of-payments deficits" refers to that risk to reserve assets, not simply to a deficit in the basic balance itself. Thus, even if defendants were correct that the basic balance would show a large and serious deficit in the present day, that still would fail to establish a "balance-of-payments deficit" within the meaning of Section 122 because the basic balance today does not meaningfully measure any risk to reserve assets.

Second, defendants have not shown that there is a basic-balance deficit as that term was used in 1974. At that time, the balance of payments was "presented in just the current account and the capital account." BEA, *U.S.*

*International Economic Accounts: Concepts and Methods* 7 (2025).[19] In the late 1990s, however, "[t]he current account was redefined by removing capital transfers and transactions in non-produced nonfinancial assets to the new capital account," and "[t]he previous capital account became the new financial account." *Id.* In other words, what constituted the "capital account" in the 1970s is now part of the "financial account." As a result, the "basic balance" as it would have been understood in the 1970s is not the current account plus components of the (modern-day) capital account; rather, recreating the basic balance would entail identifying the long-term capital transactions within the (modern-day) *financial* account, which is what used to be in the capital account when Section 122 was enacted. In short, a basic-balance deficit in the present day does not establish a basic-balance deficit within the meaning of Section 122.

For all the foregoing reasons, the CIT correctly concluded that the President's Proclamation does not identify any balance-of-payments deficits within the meaning of Section 122. This Court should affirm its judgment invalidating the President's Section 122 tariffs.

---

[19] *Available at* https://www.bea.gov/resources/methodologies/international/pdf/iea-concepts-methods.pdf (accessed Aug. 31, 2026)

## II. The CIT erred by dismissing the claims of the States other than Washington for lack of Article III standing.

Although it correctly ruled that the Section 122 tariffs were unlawful, the CIT erred by limiting relief to Washington and the two private plaintiffs. Appx21–27. The CIT found Article III standing for Washington because the University of Washington, as a direct importer of goods, faced direct and imminent liability for Section 122 duties. Appx21–22.[20] As to the remaining States, it correctly recognized that "it is not necessary to incur direct liability to Customs, or even to directly import an article of dutiable merchandise" to suffer an economic injury from tariffs. Appx25 (internal quotations omitted). Yet it then dismissed those States' claims after concluding that the States' downstream harms—tariff pass-through costs and administrative burdens—were too speculative. Appx24–27. That conclusion was incorrect.

Article III standing requires a "personal stake" in the dispute, meaning plaintiffs "must answer a basic question: 'What's it to you?'" *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025) (internal quotations omitted). To answer that question, a plaintiff "must have already suffered or be imminently threatened with a concrete, particularized injury, that is fairly

---

[20] Although defendants conceded Washington's standing, the CIT disclaimed reliance on that concession as the basis for its ruling. Appx22, n.13.

traceable to the challenged conduct, and that is likely to be redressed by a favorable court ruling." *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 918 F.3d 1355, 1364 (Fed. Cir. 2019). An impending injury need not be *certain* to occur; a party seeking standing must demonstrate only that the injury is "*likely* to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (emphasis added); *accord Diamond*, 606 U.S. at 112.[21]

Here, the States established their personal stake in this lawsuit. Through uncontested declarations, they described imminent, predictable downstream injury flowing from the unlawful tariffs: increased costs of goods and serious administrative burdens associated with adjusting procurement systems, contracts, and budgets to account for the unlawful tariffs. Those predictable economic harms supported by unrebutted economic analysis easily satisfy Article III's personal-stake requirement for each State.

---

[21] As the CIT correctly observed, given that Washington indisputably had Article III standing, the standing of the remaining States affected only the scope of relief, not the court's subject-matter jurisdiction. Appx23; *Biden v. Nebraska*, 600 U.S. 477, 489 (2023) ("If at least one plaintiff has standing, the suit may proceed.").

### A. The States demonstrated, based on purchasing patterns and past tariff experience, that they were likely to be harmed by the Section 122 tariffs.

The States submitted significant and undisputed evidence demonstrating that the Section 122 tariffs were likely to cause them imminent harm. They established, first, that direct importers would likely pass through the vast majority of the Section 122 tariff costs to the States as purchasers. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (emphasizing that "a loss of even a small amount of money is ordinarily an 'injury.'"); *accord Diamond*, 606 U.S. at 114 ("Even one dollar of additional revenue" would satisfy redressability component (internal quotations omitted)). Relying on several studies, the States' economist explained without contradiction that recent tariff experience "strongly supports the conclusion that higher tariffs increase the costs of imported goods to the end customer on close to a one-to-one basis." Appx133, ¶ 9 (Decl. of Professor Hines).

As to the state plaintiffs, specifically, Professor Hines described how "[t]ariffs *directly affect* the prices paid by state governments" for both imported goods and goods produced domestically that incorporate imported components. Appx137, ¶ 14 (emphasis added). Using various government data for each state plaintiff, he concluded that "[t]he prices of goods that [the state plaintiffs] purchase directly or indirectly from other countries will rise as a result of [the

Section 122] tariffs, requiring greater budgetary outlay to finance ongoing activities." Appx142, ¶ 22; Appx134–35, 138, ¶¶ 11–12, 17. Based on federal data from the Census of Governments, he calculated that the annual purchases of the plaintiff states included $37.4 billion in imports. Appx134–38, ¶¶ 11–17. And he estimated that 10-percent Section 122 tariffs would increase the state plaintiffs' direct purchasing costs by approximately $748 million per year. Appx140, ¶ 19. Defendants offered no evidence to rebut those calculations.

The States corroborated that predictable economic impact with their own declarations explaining their experience with tariffs. Relying on their recent experience with IEEPA tariffs, they explained how vendors responded to those tariffs by imposing contractual adjustments for existing purchase orders and increasing prices for new purchases. *E.g.*, Appx159–60 (describing how IEEPA tariffs caused "nearly immediate increases in costs"); Appx176–77 (IEEPA tariffs resulted in increased prices of computer goods); Appx187–89 (describing IEEPA-related contract adjustments and cost increases); Appx195–96 (same); Appx215–16 (same); Appx211–12 (identifying over $1.2 million in tariff surcharges associated with recent and anticipated purchases).[22] Based on

---

[22] Given the commonality of the States' injuries—and the fact that the declarations generally articulate the same types of harm—the States included only a representative sample of State-specific declarations in the Joint

*Footnote continued…*

their experience under the IEEPA tariffs and their anticipated forthcoming purchases of goods covered by the Section 122 tariffs, the States' declarants testified that the Section 122 tariffs would likely result in similar cost increases. *E.g.*, Appx160, 176, 187–89, 195, 213, 216. That evidence alone suffices to establish Article III standing. Again, defendants did not rebut any of that evidence.

And direct price increases were not the only injury the States identified. The Section 122 tariffs—and tariff volatility more generally—make it difficult for States to predict procurement costs and prepare legally required budgets, as the States' declarants attested. *E.g.*, Appx159–60, 162–63, 173–74, 177–78, 185, 192–93. Tariffs impose a host of additional administrative burdens, requiring the States to review vendor price-increase requests, amend contracts, track tariff effects, monitor grants, negotiate revised prices, and re-solicit contracts. *E.g.*, Appx161, 172–73, 177–78, 196. Tariffs also produce broader fiscal harms—slowing economic growth and raising inflation—that ultimately reduce income- and sales-tax revenues and the real value of state welfare payments, "requiring additional government expenditures simply to keep beneficiaries whole." Appx140–41, 178. Taken together, this unrefuted

Appendix to avoid unnecessary length. The remaining declarations are available at Doc. No. 27, Exhibits 7 through 28.

evidence more than establishes the concrete and imminent injuries necessary for Article III standing.

### B. Commonsense economic realities and real-world historical practice reinforce the States' likelihood of injury.

The States' factual record—based on their extensive and recent history navigating increased tariffs—accords with established precedent recognizing that predictable downstream economic effects can establish Article III injury. The Supreme Court, for instance, has recognized that government regulation directed towards one entity "may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers." *Hippocratic Med.*, 602 U.S. at 384. When third-party behavior is involved in that chain—for instance, importers deciding whether to pass through tariff charges—a plaintiff must show merely "that third parties will *likely* react in predictable ways." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (emphasis added). That showing can be based on "commonsense inferences . . . including inferences about 'third party behavior.'" *Women's Res. Centers, Inc. v. Davenport*, 608 U.S. —, 146 S. Ct. 1114, 1125, 224 L. Ed. 2d 672 (2026) (quoting *Diamond*, 606 U.S. at 116)).

In *Diamond*, for instance, the EPA argued that fuel producers lacked standing to challenge California's regulations requiring automakers to build more electric and fewer gas-powered vehicles. 606 U.S. at 109–10. The

Supreme Court disagreed, holding that "commonsense economic principles" made it likely that reducing gas-powered vehicles would financially harm fuel producers even though the regulations did not apply to them directly. *Id*. at 116–17. The Court likewise rejected the EPA's claim that, given increased customer demand for electric vehicles, third-party automakers would not make more gas-powered cars even if the regulations were invalidated. *Id*. at 118. Relying again on "commonsense economic inferences" and record evidence, the Court concluded that automakers were "likely (not certainly, but likely)" to make more gas-powered cars with the regulations invalidated. *Id*. at 118.

Like the Supreme Court, this Court has relied on commonsense and logical inferences to find standing based on predictable downstream harm. In *Canadian Lumber Trade Alliance v. United States*, for instance, it held that Canadian producers had standing to challenge government actions that conferred advantages on U.S. rival market participants because "economic logic" demonstrated that those advantages made it likely that Canadian producers would suffer economic injury. 517 F.3d 1319, 1332–33 (Fed. Cir. 2008).

Other circuits have applied the same commonsense, economically grounded approach. The Sixth Circuit, in *Rubicon Real Est. Holdings, LLC v. City of Pontiac, Michigan*, held that a landlord had standing to challenge

governmental interference with a tenant's license to operate a business at the landlord's property because the interference "will predictably cause 'downstream' 'economic injuries' to the landlord"—loss of rent. 179 F.4th 431, 444 (6th Cir. 2026) (quoting *Diamond*, 606 U.S. at 115–19). And the Ninth Circuit, in *Center for Biological Diversity v. EPA*, reasoned that an environmental group had standing to challenge *nonbinding* EPA recommendations because the plaintiff demonstrated, through historical practice and regulatory incentives, that third-party States would likely adopt those recommendations, which would harm the environmental group. 168 F.4th 1164, 1178 (9th Cir. 2026). Each of those decisions found standing using basic economic and commonsense inferences to predict likely downstream behavior or injury, even where third-party behavior was involved.

Indeed, the CIT agreed with those legal principles. Defendants mistakenly characterize the CIT ruling as concluding that non-importer purchasers of tariffed goods cannot establish standing. App. Br. 12. But the CIT recognized that plaintiffs asserting Article III standing "may 'fairly employ economic logic' to establish injury-in-fact." Appx25 (quoting *Canadian Lumber*, 517 F.3d at 1333). And it further acknowledged that, where third-party behavior is involved, "[t]he relevant inquiry is whether third parties will

'react in predictable ways.'" Appx26 n.3 (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)).

The CIT erred, however, by concluding that the non-importer States failed to show a likelihood of injury under that framework. As the States' evidence demonstrated, the notion that vendors would pass along at least some Section 122 tariff costs to the States (or that the States would suffer other downstream harms) was not speculative; it was predictable and likely based on commonsense economic principles, undisputed expert testimony, and recent tariff experience. The States thus established a likely, impending injury; that the challenged tariffs would cause it; and that an injunction would prevent it. Together with the commonsense economic principles that courts routinely apply, the States' evidence readily satisfies Article III.

If this Court concludes that the CIT erred in dismissing the States' claims based on lack of Article III standing, it should reverse that portion of the order and remand. On remand, the CIT can determine—now that the Section 122 tariffs have expired—what claims remain live and what relief, if any, is available to each State, including those that are importers of record.

## CONCLUSION

This court should affirm the CIT's judgment invalidating the President's Section 122 tariffs, reverse the portion of the CIT's judgment dismissing the

States' claims for lack of standing, and remand the case to the CIT to fashion appropriate relief for all parties.

Respectfully submitted,

**DAN RAYFIELD**
Attorney General
State of Oregon

By: */s/ Benjamin Gutman*
Benjamin Gutman
Deputy Attorney General
Dustin Buehler
Special Counsel
Paul Smith
Solicitor General
Brian Marshall
Adam Holbrook
Jordan R. Silk
Senior Assistant Attorneys General
Department of Justice
1162 Court Street NE
Salem, Oregon 97304
Telephone: (503) 378-4402
benjamin.gutman@doj.oregon.gov
paul.l.smith@doj.oregon.gov
adam.holbrook@doj.oregon.gov
jordan.r.silk@doj.oregon.gov

Counsel for the State of Oregon

**KRISTIN K. MAYES**
Attorney General
State of Arizona

By: */s/ Joshua D. Bendor*
Joshua D. Bendor
Solicitor General
Syreeta A. Tyrell
Senior Litigation Counsel
Timothy E.D. Horley
Jaylia Yan
Assistant Attorneys General
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Joshua.bendor@azag.gov
Syreeta.Tyrell@azag.gov
Timothy.Horley@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov

Counsel for the State of Arizona

**ROB BONTA**
Attorney General
State of California

By: */s/ Shiwon Choe*
Lara Haddad
Supervising Deputy Attorney General
Shiwon Choe
Carolyn Downs
Samuel Sokolsky
Deputy Attorneys General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-4400
Lara.Haddad@doj.ca.gov
Shiwon.Choe@doj.ca.gov
Carolyn.Downs@doj.ca.gov
Samuel.Sokolsky@doj.ca.gov
Counsel for the State of California

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
Chief Counsel for Federal Initiatives
Stephen Thompson
Mark Ladov
Natasha Korgaonkar
Special Counsel
28 Liberty St.
New York, NY 10005
(212) 416-8679
rabia.muqaddam@ag.ny.gov
stephen.thompson@ag.ny.gov
mark.ladov@ag.ny.gov
Natasha.korgaonkar@ag.ny.gov

Counsel for the State of New York

**PHILIP J. WEISER**
Attorney General State of Colorado

By: */s/ Sarah H. Weiss*
Sarah H. Weiss
Senior Assistant Attorney General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

Counsel for the State of Colorado

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Michael Skold*
Michael Skold
Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.Skold@ct.gov

Counsel for the State of Connecticut

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Ian R Liston*
Ian R. Liston
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8875
Ian.Liston@Delaware.gov

Counsel for the State of Delaware

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Sarah A. Hunger*
Jane Elinor Notz
Solicitor General
Sarah A. Hunger
Deputy Solicitor General
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
Telephone: (312) 814-5202
Sarah.hunger@ilag.gov

Counsel for the State of Illinois

**OFFICE OF THE GOVERNOR ex rel. Andy Beshear,** in his official capacity as Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo
General Counsel
Laura C. Tipton
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
laurac.tipton@ky.gov

Counsel for Governor Andy Beshear

**AARON M. FREY**
Maine Attorney General

By: */s/ Katherine W. Thompson*
Katherine W. Thompson
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov

Counsel for the State of Maine

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ James C. Luh*
James C. Luh
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.maryland.gov

Counsel for the State of Maryland

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Katherine Dirks*
Katherine Dirks
Chief State Trial Counsel
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

Counsel for the Commonwealth of Massachusetts

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

Counsel for the State of Michigan

**KEITH ELLISON**
Attorney General
State of Minnesota

By: */s/ Lindsey E. Middlecamp*
PETER J. FARRELL (#0393071)
Deputy Solicitor General
LINDSEY E. MIDDLECAMP (#0392589)
Special Counsel
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
Peter.farrell@ag.state.mn.us
Lindsey.middlecamp@ag.state.mn.us

Counsel for the State of Minnesota

**AARON D. FORD**
Attorney General of Nevada

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland
Chief of Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

Counsel for the State of Nevada

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ David N. Birch*
David N. Birch
Deputy Attorney General
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 900-0622
David.Birch@law.njoag.gov

Counsel for the State of New Jersey

**RAUL TORREZ**
Attorney General of New Mexico

By: *<u>/s/ Amy Senier</u>*
AMY SENIER
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
505-490-4060
asenier@nmdoj.gov

Counsel for the State of New Mexico

**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

By: *<u>/s/ Daniel T. Wilkes</u>*
Daniel T. Wilkes
Assistant Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6415
dwilkes@ncdoj.gov

Counsel for the State of North Carolina

**JOSH SHAPIRO,**
in his official capacity as Governor of the Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

By: *<u>/s/ Jacob B. Boyer</u>*
Jacob B. Boyer
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

Counsel for Governor Josh Shapiro

**PETER F. NERONHA**
Attorney General of Rhode Island

By: *<u>/s/ Alex Carnevale</u>*
Alex Carnevale
Special Assistant Attorney General
Office of the Attorney General - State of Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov

Counsel for the State of Rhode Island

**CHARITY R. CLARK**
Attorney General of Vermont

By: *<u>/s/ Ryan P. Kane</u>*
RYAN P. KANE
Deputy Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

Counsel for the State of Vermont

**JAY JONES**
Attorney General of Virginia

By: *<u>/s/ Tillman J. Breckenridge</u>*
Tillman J. Breckenridge
Solicitor General
202 N. 9th Street
Richmond, Virginia 23219
Tel: (804) 786-2071
Fax: (804) 786-1991
solicitorgeneral@oag.state.va.us

Counsel for the Commonwealth of Virginia

**NICHOLAS W. BROWN**
Attorney General
State of Washington

By: */s/ Todd Sipe*
Todd Sipe, WSBA 23203
Assistant Attorneys General
Office of the Washington State
Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
freeman.halle@atg.wa.gov
todd.sipe@atg.wa.gov

Counsel for the State of Washington

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Brian P. Keenan*
Brian P. Keenan State Bar #1056525
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
brian.keenan@wisdoj.gov

Counsel for the State of Wisconsin

## STATEMENT OF CONSENT

Pursuant to Federal Circuit Rule 32(g)(3)(B), the undersigned represents that counsel for State of Arizona, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Illinois, Commonwealth of Kentucky, State of Maine, State of Maryland, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of New Jersey, State of Nevada, State of New Mexico, State of New York, State of North Carolina, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, Commonwealth of Virginia, State of Washington, and State of Wisconsin have consented to their signatures on this brief.

DATED: August 31, 2026

/s/ Benjamin Gutman

BENJAMIN GUTMAN #160599
Deputy Attorney General
benjamin.gutman@doj.oregon.gov

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 9,611 words. This response also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Times New Roman, a proportionally spaced typeface.

DATED: August 31, 2026

/s/ Benjamin Gutman
BENJAMIN GUTMAN #160599
Deputy Attorney General
benjamin.gutman@doj.oregon.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2026, I directed the Answering Brief of Appellees to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the forgoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Eric D. McArthur
Deputy Assistant Attorney General
United States Department of Justice
Appellate Staff, Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Brett Shumate
Assistant Attorney General
United States Department of Justice
Commercial Litigation Branch, Civil Division
PO Box 480
Ben Franklin Station
Washington, DC 20044

/s/ Benjamin Gutman

BENJAMIN GUTMAN #160599
Deputy Attorney General
benjamin.gutman@doj.oregon.gov

BG2:kw5/1028889157