Nos. 26-1804, -1805, -1928

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

BURLAP AND BARREL, INC.; BASIC FUN, INC.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States,* EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection,* JAMIESON GREER, *in his official capacity as U.S. Trade Representative*, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, *in his official capacity as Secretary of the Department of Homeland Security*,

Defendants-Appellants

Appeal from the United States Court of International Trade
Nos. 26-1472, -1606, Judges Barnett, Kelly, and Stanceu

**Appellees' Brief**

Jeffrey Schwab
Reilly Stephens
James McQuaid
LIBERTY JUSTICE CENTER
1629 K Street N.W., Suite 300
Washington, D.C. 20006
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org

*Counsel for Plaintiffs-Appellees*

## Certificate of Interest

Counsel for Plaintiffs-Appellees hereby certifies the following:

1. Represented Entities. The full names of every party represented are:

**Basic Fun, Inc.**

**Burlap and Barrel, Inc.**

2. Real Parties in Interest.

**Not applicable.**

3. Parent Corporations and Stockholders. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

**None**.

4. Legal Representatives. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

**Jeffrey M. Schwab, Liberty Justice Center**

**Reilly Stephens, Liberty Justice Center**

**James McQuaid, Liberty Justice Center**

5. Related Cases. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeals:

**Not applicable.**

6. Any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees) is as follows:

**Not applicable.**

Dated: August 31, 2026

/s/ Jeffrey M. Schwab
Jeffrey M. Schwab
*Counsel for Plaintiffs-Appellees*

# Table of Contents

**Page**


Certificate of Interest ........ i

Table of Authorities ........ vi

Introduction and Summary of the Argument ........ 1

Statement of Issues ........ 3

Statement of the Case ........ 4

A. Constitutional and statutory background ........ 4

B. *Learning Resources* and the President's response ........ 10

C. The Plaintiffs ........ 13

D. Proceedings below ........ 18

Standard of Review ........ 21

Argument ........ 21

I. The Proclamation's tariffs exceed the authority conferred by Section 122. ........ 21

A. The Proclamation does not invoke a balance-of-payments deficit as Section 122 requires. ........ 23

1. When Congress enacted Section 122 the term "balance-of-payments deficits" had a settled meaning distinct from a trade deficit. ........ 24

a. "Balance-of-payments deficits" is not an open-ended term tolerating any economically reasonable methodology ........ 28

b. The government's interpretation would leave the statutory trigger without a meaningful limit. ........ 32

2. The statutory background and legislative history confirm that Congress enacted Section 122 to address the loss of U.S. monetary reserves under a fixed-exchange-rate system. ........ 34

a. The Nixon shock confirms that Congress was responding to a gold-reserve drain, not a trade deficit. ....... 34
b. The removal of H.R. 6767's definition of "balance-of-payments deficit" gave the President flexibility on magnitude, not on measurement concept. ....... 36
c. The legislative history confirms that Congress consistently treated the balance of payments and trade balance as distinct. ....... 38
d. The government's attacks on the CIT's use of legislative history do not withstand scrutiny. ....... 41
3. The Proclamation's own text confirms that it rests on a trade deficit, not a balance-of-payments deficit. ....... 42
4. The government's alternative argument that a current-account deficit also establishes a basic-balance deficit does not save the Proclamation. ....... 44
a. The Proclamation never identified or calculated a deficit in the basic balance. ....... 44
b. The government's modern approximation of the basic balance is not the measure Congress understood when enacting Section 122. ....... 45
c. The CEA analysis is not properly before this Court and, in any event, does not establish a deficit in the basic balance ....... 47
5. The Proclamation's timing reveals that it is a response to an adverse judicial ruling, not a genuine monetary emergency. ....... 50
6. The proceedings in *V.O.S. Selections* refute rather than support the government's position. ....... 52
B. Section 122 independently requires a fundamental international payments problem that the Proclamation fails to establish. ....... 54
1. A balance-of-payments deficit does not itself establish a fundamental international payments problem. ....... 54

2. The trade imbalances cited in the Proclamation do not create a fundamental international payments problem under a floating-rate system.....56

C. The Proclamation's country and product exceptions independently violate Section 122's uniformity and nondiscrimination requirements.....58

1. Section 122 requires nondiscriminatory and uniform application subject to narrow exceptions supported by specific findings.....58

2. The Proclamation's exceptions were copied from the invalidated IEEPA regime and are not justified under Section 122's standards.....60

3. The Proclamation's unlawful exceptions cannot be severed.....62

II. The government's expansive interpretation violates the canons of constitutional avoidance, the major questions doctrine, and nondelegation.....63

A. The claimed authority implicates the major questions doctrine and requires a clear statement from Congress.....63

B. The government's open-ended construction lacks an intelligible principle and would render Section 122 an unconstitutional delegation.....68

Conclusion.....73

Certificate of Compliance.....75

## Table of Authorities

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935) .......... 68

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) .......... 65, 66

*Anhydrides & Chems., Inc. v. United States*,
130 F.3d 1481 (Fed. Cir. 1997) .......... 28

*Aspects Furniture Int'l, Inc. v. United States*,
42 F.4th 1366 (Fed. Cir. 2022) .......... 21

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 65

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) .......... 51

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020) .......... 61

*Doe v. Chao*,
540 U.S. 614 (2004) .......... 48

*Drummond v. Southern Co. Servs.*,
177 F.4th 1076 (11th Cir. 2026) .......... 41

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) .......... 71

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 63

*Gundy v. United States*,
588 U.S. 128 (2019) .......... 70, 71

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006) .......... 37

*Hirabayashi v. United States*,
320 U.S. 81 (1943) .......... 73

*Hyatt v. Kappos*,
625 F.3d 1320 (Fed. Cir. 2010) .......... 54, 58

*Indus. Union Dep't, AFL-CIO v. API,*
448 U.S. 607 (1980) .......... 65–66

*King v. Burwell*,
576 U.S. 473 (2015) .......... 41

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) .......... 11, 21, 50, 53, 66, 67, 71, 72

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1985) .......... 21

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999) .......... 62

*NFIB v. OSHA*,
595 U.S. 109 (2022) .......... 65

*Oman Fasteners, LLC v. United States*,
125 F.4th 1068 (Fed. Cir. 2025) .......... 21

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935) .......... 68, 71

*Paul v. United States*,
140 S. Ct. 342 (2019) .......... 70

*PrimeSource Bldg. Prods., Inc. v. United States*,
59 F.4th 1255 (Fed. Cir. 2023) .......... 21

*Reichert v. Kellogg Co.*,
170 F.4th 473 (6th Cir. 2026) .......... 29

*Russello v. United States*,
464 U.S. 16 (1983) .......... 26

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) .......... 57, 59, 73

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943) .......... 73

*Toro Co. v. White Consol. Indus., Inc.*,
266 F.3d 1367 (Fed. Cir. 2001) .......... 53

*United States v. Wigglesworth*,
28 F.Cas. 595 (C.C.D. Mass. 1842) .......... 40

*United States v. Yoshida Int'l, Inc.*,
526 F.2d 560 (C.C.P.A. 1975) .......... 7, 35

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014) .......... 63–64

*V.O.S. Selections v. United States*,
850 Fed. App'x 789 (Fed. Cir. 2025) .......... 52, 53

*V.O.S. Selections, Inc. v. Trump*,
772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) .......... 52, 53

*West Virginia v. Environmental Protection Agency*,
597 U.S. 697 (2022) .......... 65

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......... 69

*Wisconsin Central Ltd. v. United States*,
585 U.S. 274 (2018) .......... 24, 41, 58

*Yakus v. United States*,
321 U.S. 414 (1944) .......... 70, 71

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 50

**Statutes**

19 U.S.C. § 1862 .... 67

19 U.S.C. § 2132 .... 8, 9, 11, 22, 26, 50, 54, 58–61, 63

19 U.S.C. § 2251 .... 67

19 U.S.C. § 2411 .... 67

19 U.S.C. § 2481 .... 9, 22, 58

22 U.S.C. § 286e-5 .... 36

**Other Authorities**

119 Cong. Rec. H40,506 (daily ed. Dec. 10, 1973) .... 39, 57

Advisory Committee on the Presentation of Balance of Payments Statistics, 56 *Survey of Current Business* 18 (June 1976) .... 48

Council of Econ. Advisers, *Econ. Report of the President* (1974) .... 25–26

Council of Econ. Advisers, *Measuring Balance of Payments Deficits* (July 2026) .... 49

Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 21, 2026, at 9:59 a.m. ET) .... 13

Donald S. Kemp, *Balance-of-Payments Concepts—What Do They Really Mean?*, Fed. Reserve Bank of St. Louis Rev., July 1975 .... 30–31

Edward J. Lopez & Jon Murphy, *Deconstructing the Council of Economic Advisers' Balance of Payments Report*, Independent Inst. (Aug. 27, 2026) .... 31

Erica York & Alex Durante, "Tariff Tracker: Impact of Trump Tariffs & Trade War by the Numbers," Tax Foundation, February 23, 2026 .... 64, 68

GATT art. XII(2), Oct. 30, 1947, 61 Stat. A-3, T.I.A.S. No. 1700 .... 32, 36

H.R. Rep. No. 93-571 (1973) .... 33, 37

*Hearings Before the Subcomm. on Int'l Exchange and Payments of the Joint Econ. Comm.*, 89th Cong., pt. 2, (1965) ............................25

Janice M. Westerfield, *A Lower Profile for the U.S. Balance of Payments*, Fed. Reserve Bank of Phil. Bus. Rev., Nov./Dec. 1976 ..................................................................................40

Janice M. Westerfield, *Would Fixed Exchange Rates Solve Our Problems?*, Bus. Rev. (Fed. Reserve Bank of Phila.), Nov.–Dec. 1976 ..................................................................................31

Johannes Fritz, *The Section 122 Exemption Structure, Explained*, Global Trade Alert (Feb. 23, 2026) ..............................60–61

Joint Economic Committee, 88th Cong., *The United States Balance of Payments—Perspectives and Policies* (1963)......................25

Mary Amiti, et. al, "Who Is Paying for the 2025 U.S. Tariffs?", Federal Reserve Bank of New York, February 12, 2026 .....................64

*Milton Friedman & Robert V. Roosa, The Balance of Payments: Free Versus Fixed Exchange Rates* (1967) ..........................................57

Nixon Special Message, 1973 Pub. Papers 282 (Apr. 10, 1973) .......35–36

Patricia H. Kuwayama, *Measuring the United States Balance of Payments*, Fed. Rsrv. Bank. of N.Y. Monthly Rev. 183 (Aug. 1975)................................................................ 29, 30, 46, 48, 49

*Recent Changes in Monetary Policy and Balance-of Payments Problems: Hearings Before the H. Comm. on Banking & Currency*, 88th Cong., 2d Sess. 235 (1964) ...........................................5

Robert L. Hetzel, *Launch of the Bretton Woods System* (Fed. Reserve History, Nov. 22, 2013) ............................................................5

S. Rep. No. 93-1298 (1974)............................................... 6, 35, 38, 41, 52

*Scalia & Garner, Reading Law* (2012) ..................................................55

Staff of S. Fin. Comm., 93d Cong., Tables and Statistical Material on U.S. Balance of Trade and Balance of Payments (Comm. Print 1974) .... 38

*The Bretton Woods Agreements* (Naomi Lamoreaux & Ian Shapiro eds., 2019) .... 6, 7

*Trade Deficit and the Economy: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. on Finance*, 98th Cong. 165 (1984) .... 39

Trade Reform Act of 1973, H.R. 6767, 93d Cong. (1973) .... 37

*Trends in Int'l Trade of the United States: Hearings Before the H. Comm. on Ways & Means*, 91st Cong. 2710 (1970) .... 25

U.S Customs and Border Protection, *CSMS # 67844987 – Imposing Temporary Section 122 Duties* (Feb. 23, 2026) .... 13

U.S. Bureau of Econ. Analysis, *Net Exports of Goods and Services*, Fed. Reserve Bank of St. Louis .... 6, 35

U.S. Bureau of Econ. Analysis, *Table 1.1.5, Gross Domestic Product* .... 40

U.S. Census Bureau, *U.S. Trade in Goods and Services—Balance of Payments (BOP) Basis* .... 40

William Deese et al., *The Economic Effects of Significant U.S. Import Restraints: Sixth Update 2009*, U.S. Int'l Trade Comm'n, Pub. 4094 (2009) .... 4

**Regulations**

90 Fed. Reg. 15041 (April 7, 2025) .... 10

Proclamation No. 11012, 91 Fed. Reg. 9339 (Feb. 25, 2026) ... 2, 3, 11, 12, 20–23, 40, 42–44, 47, 50, 51, 54, 56, 58, 59, 60–63, 73

Proclamation No. 4074, 85 Stat. 926 (1971) .... 6

**Constitutional Provisions**

U.S. Const. art. I ........................................................................ 4, 21, 65

## Introduction and Summary of the Argument

The moment the Supreme Court invalidated the administration's worldwide IEEPA tariffs, the President invoked Section 122 of the Trade Act of 1974 to reimpose the exact same 10 percent tariffs, with the exact same country and product exemptions. The label changed; the policy did not.

Under our Constitution, the power to lay tariffs and regulate foreign commerce belongs exclusively to Congress. The President possesses no inherent peacetime tariff authority, and Section 122 provides none for this action.

Section 122 was enacted as emergency authority for a specific monetary crisis inherent in a fixed-exchange-rate system: when a sustained balance-of-payments deficit drains the Nation's official monetary reserves and threatens its ability to meet its international obligations.

To address that specific danger, Congress authorized temporary import surcharges but strictly limited their use. When "fundamental international payments problems" require special import measures to deal with "large and serious United States balance-of-payments

deficits," Section 122 authorizes temporary duties, not to exceed 15 percent ad valorem. Any such duties must be applied "consistently with the principle of nondiscriminatory treatment" and maintain "broad and uniform application."

Proclamation 11012 meets none of these limits. It does not identify any large and serious balance-of-payments deficits; instead, it treats ordinary trade and current-account deficits as statutory triggers. It demonstrates no fundamental international payments problems. And it abandons statutory uniformity and nondiscrimination altogether, carving out favored countries and copying product exemptions wholesale from the unlawful IEEPA tariff regime.

The government's interpretation would give the President an extraordinary power: the ability to impose worldwide tariffs whenever he chooses an economically acceptable way to describe a deficit. That is precisely the sort of unheralded authority the Major Questions Doctrine forbids courts to infer. And if the statute truly supplied no more limitation than the government claims, it would delegate core legislative power without an intelligible principle in violation of the nondelegation doctrine.

Section 122 is a targeted emergency measure, not a general tariff statute. Because Proclamation 11012 exceeds both the statute's purpose and its limits, the Court should affirm the judgment of the Court of International Trade.

## Statement of Issues

1. Whether Proclamation 11012 exceeds the authority conferred by Section 122 of the Trade Act of 1974 because ordinary trade deficits do not satisfy the statute's balance-of-payments triggers, and its selective exemptions violate statutory uniformity and nondiscrimination requirements.

2. Whether the President's claim of unheralded authority to impose worldwide tariffs under Section 122 presents a major question of vast economic and political significance unsupported by a clear statement from Congress.

3. Whether reading Section 122 to confer standardless, unilateral authority to impose worldwide tariffs would violate the nondelegation doctrine, requiring this Court to reject that expansive interpretation under the canon of constitutional avoidance.

## Statement of the Case

### A. Constitutional and statutory background

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. art. I. Those legislative powers include both the "Power To lay and collect Taxes, Duties, Imposts and Excises," which must be "uniform throughout the United States," and the power "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8. Further, to ensure that laws taxing the American people are subject to maximum political accountability, the Constitution provides that "[a]ll Bills for raising Revenue shall originate in the House of Representatives." *Id.* § 7.

Historically, "tariff changes were viewed as entirely the domain of Congress." William Deese et al., *The Economic Effects of Significant U.S. Import Restraints: Sixth Update 2009*, U.S. Int'l Trade Comm'n, Pub. 4094, at 65 (2009). Those changes often provoked highly charged disputes, from the debates over Henry Clay's American System in the 1830s, to the McKinley tariffs of the 1890s, to the Smoot-Hawley Tariff Act of 1930—all resolved in Congress, never by unilateral executive action.

Under the post-World War II Bretton Woods monetary system, foreign currencies were pegged to the U.S. dollar at fixed exchange rates, and the United States committed to convert dollars held by foreign central banks into gold at $35 per ounce. Robert L. Hetzel, *Launch of the Bretton Woods System* (Fed. Reserve History, Nov. 22, 2013).[1] This fixed-rate structure created a systematic vulnerability: if foreign holdings of dollars exceeded demand for U.S. goods and services, foreign governments could redeem those surplus dollars for gold, depleting U.S. monetary reserves and threatening the nation's ability to honor its convertibility commitments. *See Recent Changes in Monetary Policy and Balance-of-Payments Problems: Hearings Before the H. Comm. on Banking & Currency*, 88th Cong., 2d Sess. 235 (1964).

That exact problem occurred in the early 1970s. The United States pushed a lot of dollars into the world economy to pay for, among other things, the Vietnam War and domestic programs like President Johnson's "Great Society," fueling a large and persistent deficit in the balance of payments. As foreign countries started redeeming these

---

[1] Available at https://www.federalreservehistory.org/essays/bretton-woods-launched.

dollars for gold, U.S. gold reserves began dwindling. *The Bretton Woods Agreements* 132 (Naomi Lamoreaux & Ian Shapiro eds., 2019) (By August 1971, "the United States held less than ten thousand metric tons of gold, less than half of what it once had"). From 1960 through 1973, the balance of payments ran a sustained deficit in almost every year under all three official BEA measures. S. Rep. No. 93-1298, at 8 (Table 3) (1974). Yet the trade balance remained in surplus from 1960 through 1971, dipped briefly negative only in 1972, and returned to surplus in 1973. U.S. Bureau of Econ. Analysis, *Net Exports of Goods and Services*, Fed. Reserve Bank of St. Louis.[2]

In 1971, President Richard Nixon suspended the conversion of dollars into gold and imposed, among other policies, temporary tariffs to mitigate the effects of that crisis—the "Nixon shock," Proclamation No. 4074, 85 Stat. 926 (1971). Nixon's tariffs were controversial—it was not at all clear where he claimed such authority. The predecessor to the CIT in fact found those tariffs unlawful but was overturned by the predecessor of the Federal Circuit, which found the Nixon tariffs

---

[2] Available at https://fred.stlouisfed.org/series/NETEXP

acceptable under the Trading With the Enemy Act of 1917. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975).

After the Nixon shock, world leaders tried to save the fixed-rate system, meeting at the Smithsonian Institution in Washington, D.C., where they agreed that the U.S. would peg the dollar to gold at $38 per ounce (albeit without a gold conversion option), other countries would adjust their exchange rates to new fixed values to the dollar, and exchange rates were allowed a margin of fluctuation based on the new dollar value. *The Bretton Woods Agreements* at 136. But the Smithsonian Agreement didn't last long. In February 1973, the U.S. devalued the dollar again, raising the price of gold to $42.22 per ounce. *Id.* at 136–38. As a result, by the end of that year, many signatories to the Smithsonian Agreement stopped pegging their currencies to the dollar and let them float—meaning the exchange rate to dollars of those currencies was determined by the market. *Id.* at 138. Thus, the world economy began operating under a floating exchange rate system.

Still, at that time, the United States had not abandoned the idea of a fixed exchange rate system, and many did not believe that a fixed exchange rate system would be permanently abandoned and the

floating exchange rate system would continue to operate as the global monetary system.

As a result, Congress was concerned about the possibility of future large and persistent United States balance-of-payments deficits that might undermine a fixed-exchange-rate monetary system. Congress responded in 1974 by enacting Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, authorizing temporary import surcharges like those President Nixon had imposed—but only under strict limitations.

Section 122 is titled "Balance-of-payments authority," and permits the President to impose "temporary import surcharges and temporary limitations on imports through quotas in situations of fundamental international payment problems." 19 U.S.C. § 2132(a). Under Section 122, the President may impose tariffs for 150 days (unless such period is extended by an Act of Congress) *only* where "fundamental international payments problems require special import measures to restrict imports" (1) "to deal with large and serious United States balance-of-payments deficits;" (2) "to prevent an imminent and significant depreciation of the dollar in foreign exchange markets;" or

(3) "to cooperate with other countries in correcting an international balance-of-payments disequilibrium." *Id.*

A tariff imposed under Section 122 must be "a temporary surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States . . . ." *Id.* The surcharge must be imposed "consistently with the principle of nondiscriminatory treatment." 19 U.S.C. § 2132(d). "Nondiscriminatory treatment" is defined as "trade treatment based on normal trade relations (known under international law as most-favored-nation treatment)." 19 U.S.C. § 2481(9). There is a limited exception to this nondiscrimination principle: if "the President determines that the purposes of this section will best be served by action against one or more countries having large or persistent balance-of-payments surpluses, he may exempt all other countries from such action." 19 U.S.C. § 2132(d)(2).

Similarly, tariffs under Section 122 must have "broad and uniform application with respect to product coverage . . . ." 19 U.S.C. § 2132(e). A limited exception again applies "where the President determines, consistently with the purposes of this section, that certain articles

should not be subject to import restricting actions because of the needs of the United States economy." *Id.* But, product exceptions "shall be limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors." *Id.* As if to underscore the limits of the authority granted by the statute, Section 122 stresses that "[n]either the authorization of import restricting actions nor the determination of exceptions with respect to product coverage shall be made for the purpose of protecting individual domestic industries from competition." *Id.*

### B. *Learning Resources* and the President's response

On April 2, 2025, President Trump issued Executive Order 14257, entitled "Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits" (the "Liberation Day Order"). 90 Fed. Reg. 15041 (Apr. 7, 2025). That Order imposed sweeping new tariffs: a global 10 percent ad valorem duty on "all imports from trading partners," regardless of whether those countries impose tariffs on U.S. products, the rates at which they do so, or the existence of any governing trade

agreements. *Id.* at 15045. It also imposed much higher tariff rates—ranging from 11 to 50 percent—on 57 countries. *Id.* at 15049–50.

These tariffs were held unlawful by the Court of International Trade and by this Court and ultimately struck down by the Supreme Court. *Learning Res., Inc. v. Trump*, 607 U.S. 229, 241 (2026). Immediately thereafter, the President issued Proclamation 11012, *Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems* (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ("Section 122 Proclamation"). Claiming authority under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, the President imposed a 10 percent surcharge on goods imported into the United States—the same amount as the global reciprocal tariff imposed under the original Liberation Day Order.

The Section 122 Proclamation asserts that "the United States faces fundamental international payments problems, such as large and serious balance-of-payments deficits, an imminent and significant depreciation of its currency in foreign exchange markets, or an international balance-of-payments disequilibrium." 91 Fed. Reg. 9339, ¶ 1 (Feb. 20, 2026). The President further states that "senior officials

have informed me that fundamental international payments problems within the meaning of section 122 exist and that special import measures to restrict imports are required to address these problems." *Id.* ¶ 5. "[T]he United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments out, on net, flowing out of the country than into the country." *Id.* ¶ 7.

The Section 122 Proclamation imposes the tariffs for 150 days, the maximum duration allowed by the statute, which can be extended only by an Act of Congress. The Proclamation includes two Annexes detailing which categories of imports the new tariffs apply to, as well as a variety of exempted products. Annex II consists of 76 pages of products exempted from the Proclamation's tariffs, including aircraft components, citrus juice, automobile components, semiconductors, and acai. There are also exemptions for various countries including Canada, Mexico, Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua.

The day after the Section 122 Proclamation, the President announced via social media post[3] that he intended to increase the tariff rate to 15 percent, the maximum allowed by the statute. But the rate was never changed. The 10 percent tariffs went into effect on February 24, 2026, and remained in effect until they expired on July 24, 2026.[4]

### C. The Plaintiffs

Plaintiffs are two small businesses that have paid substantial tariffs and suffered related harms to their businesses.

Plaintiff Burlap and Barrel, Inc. ("Burlap & Barrel") imports unique spices grown naturally and sustainably from at least twenty-two countries including Afghanistan, Argentina, Barbados, Canada, Colombia, Costa Rica, Ethiopia, France, Grenada, Guatemala, Hungary, India, Indonesia, Mexico, Nepal, Nigeria, Peru, Spain, Sri Lanka, Tanzania, Turkey, and Vietnam. Appx247, 249. The company's mission

---

[3] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 21, 2026, at 9:59 a.m. ET), https://truthsocial.com/@realDonaldTrump/posts/116109447886304328

[4] U.S Customs and Border Protection, *CSMS # 67844987 – Imposing Temporary Section 122 Duties* (Feb. 23, 2026) (available at https://content.govdelivery.com/bulletins/gd/USDHSCBP-40b3b7b?wgt_ref=USDHSCBP_WIDGET_2)

is to end inequality and exploitation in the spice industry by building supply chains that are equitable, transparent, and traceable. Appx247.

To do this, Burlap & Barrel connects spice farmers around the world to U.S. consumers, helping smallholder farmers generate a larger share of their products' value, and establishing long-term, mutually beneficial partnerships with suppliers. *Id.* By sourcing directly from small farms, Burlap & Barrel eliminates the cost of unnecessary intermediaries, meaning that farmers can make up to ten times more than the commodity price for their products, even while offering top quality spices to American consumers at accessible prices. *Id.*

While some of the spices Burlap & Barrel sells are produced domestically, and others—like cinnamon, black peppercorns, and vanilla—are listed as exempt products on Annex II of the Section 122 Proclamation, many spice plants can only be found or cultivated in specific climates or regions around the world due to climate and geography. Appx248–250. Burlap & Barrel also imports unique heirloom varieties of spices that cannot be grown domestically, like purple stripe garlic from Vietnam, flowering hyssop thyme from Turkey, and unique herbs from Provence, France. Appx250. There are

unique international varietals of many spices considered staples of American cuisine such as garlic, rosemary, and thyme, all of which are subject to the Section 122 tariffs. Appx248–49.

Burlap & Barrel cannot avoid the tariffs by switching to U.S.-grown alternatives. As a direct-to-consumer business, Burlap & Barrel's customers seek out unique international varieties that are not available domestically. Appx250.

The company refrained from passing on the cost of the IEEPA tariffs to its customers, eating the cost itself. But by driving up costs, the Section 122 tariffs forced Burlap & Barrel to reduce investment in the United States by scaling back hiring, shipping, and the production of corrugated packaging. Appx250–51. These tariffs have forced the company to pause spending on innovation, halting new product development, new partnerships with restaurants and celebrity chefs, and special projects like a much-requested spice advent calendar. Appx251. While Burlap & Barrel has held the line for many staple spices at less than $10 per unit, it was forced to weigh price increases—a move that would have violated its longstanding commitment to

keeping necessary grocery ingredients accessible at a cost of only pennies per serving. *Id.*

At the time this case was filed, Burlap & Barrel had shipments scheduled to arrive at the Port of New York and New Jersey and the Port of Baltimore on which it paid Section 122 tariffs, and it continued paying tariffs throughout the 150-day period. Appx251.

The tariffs have already impacted Burlap & Barrel's business through lost profits, higher shipping costs, cash flow issues, inventory fluctuations due to supply chain uncertainty, and lost customers, partners, and contracts due to inventory shortages. Appx251–52. Although the surcharge has expired, its financial effects remain, including the loss of working capital represented by duties the government continues to retain.

Plaintiff Basic Fun, Inc. ("Basic Fun!") designs, markets, and sells toys and games, including classic brands such as Tonka®, Care Bears®, Lincoln Logs®, Lite-Brite®, and other well-known children's products through major retailers like Walmart, Target, and Amazon. Appx254. The Florida-based company employs approximately 105 people in the United States, and imports from China the components and finished

products necessary to manufacture and distribute its toys to retailers across the United States. Appx254.

Less than 10 percent of toys purchased in the United States are manufactured domestically. Appx255. The U.S. lacks the supplier network, labor force, and manufacturing infrastructure to support large-scale domestic production of toys and the industry relies on a highly specialized supply chain concentrated overseas. Appx255. Basic Fun! relies on this global supply chain to manufacture toys efficiently and safely because the suppliers, testing facilities, and manufacturing capabilities necessary to produce these products are not reasonably available domestically. Appx255.

Because Basic Fun! sells its products to large retailers with substantial bargaining power, the company is often unable to raise prices to offset tariff costs, meaning that tariffs significantly reduce its profit margins. Appx256. In some instances, Basic Fun! must continue filling retailers' orders even when tariffs eliminate the company's profit on those sales to maintain its position with major retailers and keep its products on shelves. Appx256. Because tariffs can change suddenly and unpredictably, Basic Fun! has difficulty determining the appropriate

prices for its products when negotiating with retailers months in advance, planning its business operations, and forecasting earnings. Appx256.

At the time this case was filed, Basic Fun! had approximately 104 shipping containers of toys and components scheduled to arrive during the 150-day tariff period, on all of which it paid Section 122 tariffs. Appx254.

Because Basic Fun! cannot make reliable financial projections, it has had to delay or cancel potential acquisitions and growth opportunities, freeze hiring, reduce bonuses, and limit new investments into its business. Appx257. In addition, reduced earnings due to the tariffs affect the company's financing. The company is at greater risk of breaching loan covenants, which could require renegotiation of financing terms at a higher cost to Basic Fun!. Appx257.

### D. Proceedings below

On March 9, 2026, Plaintiffs filed this lawsuit (No. 26-01606-3JP) in the Court of International Trade (CIT) challenging the President's authority to issue the Section 122 tariffs. This case was consolidated with the State Plaintiffs' case (No. 26-1472-3JP). On May 7, 2026, a

three-judge panel of the court granted Plaintiffs' motion for summary judgment. Appx1–113. In the same opinion, the court granted summary judgment to the State of Washington and dismissed without prejudice the claims of the remaining States. Appx5.

The CIT first held that Importer Plaintiffs have standing "based on imminent, if not actual, liability for payment of Section 122 duties." Appx23. The government does not challenge that holding on appeal.

On the merits, the CIT observed that "[t]his case turns on the meaning of Section 122 and whether the President asserted the existence of the conditions required by the statute in order to lawfully proclaim the import surcharges." Appx29. The CIT found that "the term 'balance-of-payments deficits' is indicative of a term of art, susceptible to a defined meaning, and subject to objective measure." Appx32. Relying on the legislative history of the Trade Act of 1974, the CIT determined that "Congress understood balance-of-payments deficits to refer, at the time, to deficits in (1) liquidity, (2) official settlements, or (3) basic balance." Appx33. The CIT further noted that "the legislative history chronicles a series of efforts to carefully cabin Presidential discretion." Appx41. "Ultimately, the Senate Report, leading up to the

enactment of Section 122, explicitly classifies three figures as measures of the 'balance of payments' (liquidity, official settlements, and basic balance) while classifying two measures of the 'trade balance' as distinct." Appx41–42.

The CIT further agreed that the government's "expansive" reading of Section 122 "would raise a non-delegation issue, which in turn would prompt a constitutional question." Appx40. Therefore, under the canon of constitutional avoidance, "[t]he Government's preferred interpretation of the statute must . . . be disfavored." Appx40–41.

Finding that "Nowhere does Proclamation No. 11012 identify balance-of-payments deficits within the meaning of Section 122," the CIT held that the Proclamation is "invalid, and the tariffs imposed on Plaintiffs are unauthorized by law." Appx46. Finally, the CIT found that "universal injunctive relief" is "not merited here" because "those plaintiffs" with standing "may be made whole by an injunction specific to them and refunds, with interest as provided by law." Appx51–52.

The government appealed and filed a motion for a stay pending appeal. This Court granted the government's motion to stay pending appeal.

## Standard of Review

This Court reviews a grant of summary judgment by the Court of International Trade de novo, giving "great weight" to its "informed opinion." *Aspects Furniture Int'l, Inc. v. United States*, 42 F.4th 1366, 1369 (Fed. Cir. 2022). This Court reviews the grant of an injunction for abuse of discretion, which is established if the Court of International Trade relied on an error of law or clearly erroneous findings of fact. *Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1084 (Fed. Cir. 2025). Whether the President acted within the authority delegated to him is a question of statutory interpretation that this Court decides de novo. *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1262 (Fed. Cir. 2023) (citing *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985)).

## Argument

### I. The Proclamation's tariffs exceed the authority conferred by Section 122.

Congress holds the powers to "lay and collect Taxes, Duties, Imposts and Excises," and "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cls. 1, 3. The President "enjoys no inherent authority to impose tariffs during peacetime." *Learning Res., Inc. v. Trump*, 607

U.S. 229, 241 (2026). He may exercise such authority only where Congress has clearly delegated it and only within the prescribed limits. *Id.* at 251 ("When Congress grants the power to impose tariffs, it does so clearly and with careful constraints.").

Section 122 of the Trade Act of 1974 provides a narrow emergency power, available only when "fundamental international payments problems require special import measures to restrict imports . . . to deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a)(1). Any resulting surcharge must "be applied consistently with the principle of nondiscriminatory treatment," 19 U.S.C. § 2132(d), meaning "trade treatment based on normal trade relations (known under international law as most-favored-nation treatment)," 19 U.S.C. § 2481(9), and must be "of broad and uniform application with respect to product coverage," 19 U.S.C. § 2132(e). Those conditions are the substantive limits Congress placed on what would otherwise be an unconstitutional delegation of legislative tariff power.

The Proclamation satisfies none of these conditions. The United States does not face a balance-of-payments deficit as that term was

understood when Congress enacted Section 122, and the Proclamation's own text makes that plain. Even if a balance-of-payments deficit were established, the Proclamation fails to demonstrate the predicate condition of a fundamental international payments problem. And even if those first two conditions were satisfied, the Proclamation's sweeping country and product exemptions—copied wholesale from the IEEPA tariff regime the Supreme Court invalidated the same day the Proclamation was issued—violate Section 122's mandatory uniformity and nondiscrimination requirements. Any one of these failures is independently sufficient to affirm the judgment below.

### A. The Proclamation does not invoke a balance-of-payments deficit as Section 122 requires.

The statutory text, legislative history, historical and economic context, and the government's own prior admissions all lead to the same conclusion: the Proclamation's justification—relying on "a large and

serious trade deficit," 91 Fed. Reg. 9339, ¶¶ 6–8 (Feb. 20, 2026)—is not a balance-of-payments deficit, as required by Section 122.

### 1. When Congress enacted Section 122 the term "balance-of-payments deficits" had a settled meaning distinct from a trade deficit.

Statutory interpretation begins with the text, understood to carry the meaning it had at the time of enactment. *Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 284 (2018). In 1974, "balance of payments" was a precise term of art in international monetary economics. A nation's balance of payments encompasses all economic transactions between its residents and the rest of the world. Because these transactions are recorded in a double-entry accounting system, the accounts always net to zero in the aggregate. What economists and policymakers of that era called a balance-of-payments deficit referred to something specific: the gap that remained after private trade and private capital flows were netted—a gap the government had to cover by drawing down its official monetary reserves, principally gold, or by increasing its liquid liabilities to foreign central banks. The 1963 Joint Economic Committee report explained that the balance-of-payments deficit under "the official U.S. definition . . . measures the reduction in

U.S. . . . monetary reserve assets (chiefly gold) and the increase in liquid liabilities." Joint Economic Committee, 88th Cong., *The United States Balance of Payments—Perspectives and Policies* 3 (1963). This was a measure of government financing shortfall—a drain on reserve assets—not of commercial imbalance. A later Joint Economic Committee hearing stated the same principle plainly: "[a] country's balance-of-payments surplus was its accumulation of officially held international reserves, while its deficit is its loss of reserves." *Hearings Before the Subcomm. on Int'l Exchange and Payments of the Joint Econ. Comm.*, 89th Cong., pt. 2, at 455 (1965).

Three principal measures of this concept were in use when Congress enacted Section 122: (1) the *liquidity balance*, which tracked changes in U.S. official reserve assets and liquid liabilities to all foreigners; (2) the *official settlements balance*, which measured changes in reserves together with changes in liquid liabilities to foreign official agencies; and (3) the *basic balance*, which combined the current account with long-term capital flows. *See Trends in Int'l Trade of the United States: Hearings Before the H. Comm. on Ways & Means*, 91st Cong. 2710 (1970) (statement of Dr. Howard S. Piquet); Council of Econ. Advisers,

*Econ. Report of the President* 194 (1974). Despite their technical differences, each measure tracked the same underlying condition: whether the United States faced an obligation to settle its international accounts through official reserve expenditure—gold outflows or accumulating liabilities to foreign central banks—rather than through private market transactions.

A trade deficit is categorically different. It records only whether the value of goods or services a country imports exceeds what it exports. Neither a trade deficit nor a current-account deficit measures a drain on official reserves; they record imbalances in commercial flows that are financed through private capital markets. Congress recognized the distinction and gave it formal expression. Section 122(a)(1) authorizes action to address "large and serious United States balance-of-payments deficits." Section 122(c) separately authorizes action to address "large and persistent United States balance-of-trade surpluses." 19 U.S.C. § 2132(a)(1), (c)(1). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely." *Russello v. United States*, 464 U.S. 16, 23 (1983). Congress

used "balance-of-payments" in subsection (a)(1) and "balance-of-trade" in subsection (c)(1) because they represent distinct economic phenomena. Under the government's interpretation, Congress used two distinct established terms of art in the same statutory subsection to describe the same thing.

The government argues this merely reflects a congressional policy choice to narrow the trigger for reducing duties, without implying anything about what "balance-of-payments deficits" means. Appellants' Br. 31–32. But the textual inference runs directly contrary to the government's position. The deliberate use of "balance-of-payments deficits" rather than "trade deficit" or "current account deficit" in subsection (a)(1) means those lesser conditions are not triggers. Had Congress intended to authorize action against trade deficits, it knew precisely how to do so.

The canon of construction governing tariff statutes reinforces this conclusion. Because a tariff is a tax, its authorizing language is "not to [be] extend[ed] . . . by implication, beyond the clear import of the language used," and "[i]n every case . . . of doubt, such statutes are construed most strongly against the government, and in favor of the

subjects or citizens, because burdens are not to be imposed, nor presumed to be imposed, beyond what the statutes expressly and clearly import." *Anhydrides & Chems., Inc. v. United States*, 130 F.3d 1481, 1485 (Fed. Cir. 1997) (quoting *United States v. Wigglesworth*, 28 F. Cas. 595, 596–97 (C.C.D. Mass. 1842)). Congress did not supply clear and express words authorizing the President to impose tariffs to address a trade deficit; it supplied words authorizing action to address a balance-of-payments deficit. Those words must be taken to mean what they said.

**a. "Balance-of-payments deficits" is not an open-ended term tolerating any economically reasonable methodology.**

The government's principal argument is that "balance-of-payments deficits" is a technical term in economics incorporating any methodology economists consider reasonable. Appellants' Br. 20–23. This argument mistakes breadth in economic usage for statutory indeterminacy.

The government draws an analogy to "generally accepted accounting principles" (GAAP), arguing that just as Congress uses accounting terms tolerating a range of acceptable professional treatments, it used "balance-of-payments deficits" to tolerate any economically reasonable

methodology. Appellants' Br. 23–24. The analogy is inapt. "Generally accepted accounting principles" is explicitly and by definition open-ended—it refers to an evolving body of professional standards developed by standard-setting bodies precisely because Congress could not enumerate every acceptable treatment in statute. Congress did not use "balance-of-payments deficits" the same way. It used a term that had a specific operational meaning in 1974: an outflow of official reserves or accumulation of official liabilities.

The government also analogizes to actuarial methodologies under ERISA, where courts ask only whether an actuary's methodology falls within the range of professional practice. Appellants' Br. 24–25 (citing *Reichert v. Kellogg Co.*, 170 F.4th 473 (6th Cir. 2026); *Drummond v. Southern Co. Servs.*, 177 F.4th 1076 (11th Cir. 2026)). But ERISA explicitly grants actuaries the discretion to exercise "actuarial judgment" using methodology "generally accepted by the actuarial profession." That language itself defines the standard as professionally determined. Section 122 contains no comparable grant to economists.

The government's own authority undermines its position. It relies on Patricia Kuwayama's 1975 Federal Reserve Bank of New York article,

which identified "seven different measures in standard use" around the time of Section 122's enactment. Appellants' Br. 22–23. But Kuwayama did not endorse all seven as equally valid: she identified three—net liquidity, gross liquidity, and official settlements—as having "lost all possible relevance" and being "not useful for the United States" by 1975. Those three are precisely the measures that captured the drain on official monetary reserves that Congress was addressing. Because the government's own cited authority distinguished valid from invalid measures, Kuwayama cannot support the claim that "balance-of-payments deficits" incorporates any methodology the President chooses.

The other Federal Reserve authority the government cites cuts equally against it. Donald S. Kemp of the Federal Reserve Bank of St. Louis concluded that fixed-rate balance-of-payments measures had become "completely obsolete as a result of the switch" to floating rates, warning that using the current account as a balance-of-payments proxy had "led to undue concern on the part of policymakers, inducing costly recommendations for trade restrictions . . . to solve balance-of-payments and exchange rate 'problems' which simply do not exist." Donald S. Kemp, *Balance-of-Payments Concepts—What Do They Really Mean?*,

Fed. Reserve Bank of St. Louis Rev., July 1975, at 14–15. Contemporaneous Philadelphia Fed analysis agreed that balance of payments focused strictly "on the three overall balances—the basic balance, the net liquidity balance, and the official reserve transactions balance," which floating rates rendered "obsolete." Janice M. Westerfield, *Would Fixed Exchange Rates Solve Our Problems?*, Bus. Rev. (Fed. Reserve Bank of Phila.), Nov.–Dec. 1976, at 11, 15.[5] These Federal Reserve authorities—including the only two the government cites—directly contradict the government's position. *See* Edward J. Lopez & Jon Murphy, *Deconstructing the Council of Economic Advisers' Balance of Payments Report*, Independent Inst. (Aug. 27, 2026)[6] (documenting that the government's primary cited sources contradict its claims).

The government's reliance on a contemporaneous International Monetary Fund article is similarly misplaced. *See* Appellants' Br. 22–23 (citing Poul Høst-Madsen, *What Does It Really Mean?—A Deficit in the*

---

[5] Available at https://fraser.stlouisfed.org/title/business-review-federal-reserve-bank-philadelphia-5580/november-december-1976-557571?page=11

[6] Available at https://www.independent.org/article/2026/08/27/cea-balance-of-payments-report/

*Balance of Payments*, 3 Fin. & Dev. 171, 171 (1966)). Høst-Madsen explains that economists disagreed about exactly how to draw the line when measuring the loss of monetary reserves—not that a measure with no drain on gold or foreign currency holdings could qualify as a balance-of-payments deficit.

The government's own international practice supports Appellees' interpretation. The United States continues to file balance-of-payments safeguard notifications with the World Trade Organization under GATT Article XII, which conditions such measures on a "serious decline in [the nation's] monetary reserves." GATT art. XII(2), Oct. 30, 1947, 61 Stat. A-3, A-31, T.I.A.S. No. 1700. If the government's position were correct—that "balance-of-payments deficits" encompasses any trade or current-account deficit—those WTO filings would rest on the wrong standard.

**b. The government's interpretation would leave the statutory trigger without a meaningful limit.**

The government's interpretation would give the President authority to invoke Section 122 whenever an economically reasonable measure of the balance of payments shows a deficit. The CIT correctly recognized that under this reasoning, "the President would always be able to identify a balance-of-payments deficit" because he could "select among

the sub-accounts" until he found a negative one. Appx39. A statutory condition that is always satisfiable is no condition at all.

The government responds that its standard requires the chosen methodology to be "economically reasonable." Appellants' Br. 42. But the government identifies the merchandise-trade balance, goods-and-services balance, current account, and basic balance as economically accepted measures, and says that each is currently in deficit. *Id.* at 30. The United States has run a current-account deficit in nearly every year since Section 122's enactment. If a current-account deficit were sufficient to invoke Section 122, the President would have possessed perpetual emergency tariff authority for 50 years. That cannot be what Congress intended when it enacted a narrowly tailored emergency measure and explained that "the committee does not intend that a small or even a large balance-of-payments deficit of short duration would warrant the exercise of the authority." H.R. Rep. No. 93-571, at 28–29 (1973).

### 2. The statutory background and legislative history confirm that Congress enacted Section 122 to address the loss of U.S. monetary reserves under a fixed-exchange-rate system.

Congress drafted Section 122 against the backdrop of the Bretton Woods monetary system—a fixed-exchange-rate regime in which the dollar was pegged to gold at $35 per ounce. Under that system, when private trade and investment flows were insufficient to balance a country's external accounts, the government had to settle the difference using official monetary reserves. A persistent outflow of gold reserves signaled that the country could no longer sustain the fixed exchange rate and risked a monetary collapse. That was a balance-of-payments deficit: not merely a negative trade balance, but a drain on the liquid assets the government needed to honor its obligations to foreign central banks.

#### a. The Nixon shock confirms that Congress was responding to a gold-reserve drain, not a trade deficit.

The triggering emergency for Section 122 was the "Nixon shock" of August 1971, when President Nixon suspended dollar-gold convertibility and imposed a temporary 10 percent import surcharge to relieve the drain on U.S. gold reserves. The government argues that because the administration cited the trade deficit as "a primary element

in the unsatisfactory U.S. balance of payments," Section 122 must encompass trade deficits. Appellants' Br. 31, 40. But that a 1971 political statement used "trade deficit" loosely does not mean Section 122's technical term "balance-of-payments deficit" carries the same meaning. And the underlying claim is itself historically dubious: The small trade deficit in the second quarter of 1971—before the August 15 Nixon shock—could not plausibly have been a "primary element" of a balance-of-payments crisis that had developed over years in which the United States generally ran trade surpluses. U.S. Bureau of Econ. Analysis, *Net Exports of Goods and Services*, Fed. Reserve Bank of St. Louis. The crisis that triggered action—and that Congress enacted Section 122 to address going forward—was the reserve drain itself, not a trade deficit. *See* S. Rep. No. 93-1298, at 188 (1974); *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 582 n.33 (C.C.P.A. 1975).

Congress legislated during a period of genuine monetary uncertainty, not a world permanently committed to floating rates. The Bretton Woods gold window had closed in August 1971, but fixed exchange rates were reestablished under the Smithsonian Agreement in December 1971 and persisted until early 1973. Nixon Special Message, 1973 Pub.

Papers 282, 287 (Apr. 10, 1973); 22 U.S.C. § 286e-5; GATT Article XII(2) (defining balance-of-payments measures by reference to a "serious decline in monetary reserves"). Section 122 was designed as contingency authority for that unsettled monetary era—not as a tool for a world of permanent floating rates.

Under the floating-rate system that currently exists, a trade deficit does not drain gold reserves. Foreign exporters receive dollars, which they reinvest in U.S. assets, hold as reserves, or exchange in foreign exchange markets, causing the dollar to adjust in value—none of which requires the U.S. government to expend official reserves. If Congress had wanted to authorize tariffs to address trade deficits generally, it could have said so.

**b. The removal of H.R. 6767's definition of "balance-of-payments deficit" gave the President flexibility on magnitude, not on measurement concept.**

An early version of the bill, H.R. 6767, defined serious balance-of-payments deficits as measured by "the official reserve transactions basis or . . . the balance on current account and long-term capital"—identifying the official reserve transactions balance and the basic balance as the relevant measures, not the current account standing

alone. Trade Reform Act of 1973, H.R. 6767, 93d Cong. § 401(b)(1)(A) (1973). The government argues that Congress's later deletion of this definition shows it meant to leave the President free to select any economically reasonable measurement methodology. Appellants' Br. 25–26 (citing *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006); *Doe v. Chao*, 540 U.S. 614 (2004)). The drafting history does not bear that reading.

The House Ways and Means Committee explained that it dropped the formula because "it is not possible to formulate a definition with mathematical exactness" while cautioning that it did "not intend that a small or even a large balance-of-payments deficit of short duration would warrant" the exercise of Section 122(a)(1). H.R. Rep. No. 93-571, at 28–29 (1973). The Committee replaced the formula with a qualitative threshold—"large and serious"—and reserved to the President only "an element of judgment" about magnitude, not discretion to redefine the underlying concept. *Id.*

If anything, the deletion of a definition that explicitly required the current account to be paired with long-term capital cuts against the government's reading that Section 122 is authorized based on the current account alone. *See* Appellants' Br. 25–26, 30.

### c. The legislative history confirms that Congress consistently treated the balance of payments and trade balance as distinct.

Table 3 of the Senate Finance Committee Report lists "Trade balance" and "Balance of payments" as two separate data series from 1960 to 1974. S. Rep. No. 93-1298, at 8 (Table 3) (1974). The December 1974 Senate Finance Committee Staff Report organizes balance-of-payments data into columns for liquidity, official settlements, and basic balance—excluding the trade balance and current account from the "Balance of payments" heading. Staff of S. Fin. Comm., 93d Cong., Tables and Statistical Material on U.S. Balance of Trade and Balance of Payments, Table 1 (Comm. Print 1974). The government's own affirmative evidence, by contrast, is a different table in that same report—titled "U.S. Current Account Balance" and placed under the general heading "U.S. Balance of Payments Trends." Appellants' Br. 37–38. That a current-account table appears under a broad descriptive heading does not make the current account the statutory measure; the report's own dedicated balance-of-payments table shows otherwise. The government also ignores what those two tables actually show. Table 3 shows persistent balance-of-payments deficits for most years leading up

to the 1971 Nixon shock, while the government's preferred table shows the current account in surplus in most of those years. Because the crisis precipitating Section 122 involved balance-of-payments deficits alongside trade surpluses, Congress could not have understood the two terms as interchangeable. Rather, Congress made clear that Section 122 authority "cannot be used for the purpose of protecting individual domestic industries from import competition," 119 Cong. Rec. H40,506 (daily ed. Dec. 10, 1973)—confirming that Section 122 was emergency authority to address a specific macroeconomic payments crisis, not a general tariff tool.

This understanding held for decades. In 1984, when asked whether Section 122 could be invoked to address a persistent trade deficit, Council of Economic Advisers Chairman Martin Feldstein said no: "[A]lthough we have a trade deficit and a current account deficit, we do not have a balance-of-payments deficit, in the strict sense envisioned in section 122. The technical definition for the balance-of-payments is the rate of accumulation of official reserve assets, including gold." *Trade Deficit and the Economy: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. on Finance*, 98th Cong. 165 (1984). Feldstein reached that

conclusion in 1984, when the United States recorded its then-largest annual trade deficit—a deficit comparable, relative to the size of the economy, to those the Proclamation cites. *See* U.S. Census Bureau, *U.S. Trade in Goods and Services—Balance of Payments (BOP) Basis* (showing annual goods-trade balances)[7]; U.S. Bureau of Econ. Analysis, *Table 1.1.5, Gross Domestic Product* (showing annual GDP)[8]; Proclamation No. 11012, 91 Fed. Reg. 9339, ¶¶ 6–8. And when the Bureau of Economic Analysis discontinued reporting the liquidity, official settlements, and basic balance measures in 1976, it was because floating rates had eliminated the reserve pressures those measures tracked, not bureaucratic convenience. Janice M. Westerfield, *A Lower Profile for the U.S. Balance of Payments*, Fed. Reserve Bank of Phil. Bus. Rev., Nov./Dec. 1976, at 16–17 (explaining that "[u]nder the fixed-rate system, stability required the avoidance of payments deficits; but with floating exchange rates, the relative values of currencies constantly readjust to changing international conditions. Therefore,

---

[7] Available at https://www.census.gov/foreign-trade/statistics/historical/gands.pdf

[8] Available at https://apps.bea.gov/iTable/?reqid=19&step=2&isuri=1&categories=survey

deficit and surplus measures don't mean what they used to mean and so they are being deemphasized."). The Senate Finance Committee itself anticipated that "under present circumstances such authority is not likely to be utilized." S. Rep. No. 93-1298, at 87–88 (1974). If changed economic conditions have made the reserve deficit trigger dormant, the remedy lies with Congress, not executive overreach. *Wisconsin Central*, 585 U.S. at 284.

#### d. The government's attacks on the CIT's use of legislative history do not withstand scrutiny.

The government faults the CIT for relying on committee reports to divine congressional intent rather than to illuminate textual meaning. Appellants' Br. 33–36.

But the CIT used legislative history only to confirm the meaning of "balance-of-payments deficits"—a wholly appropriate use of extrinsic evidence. *See King v. Burwell*, 576 U.S. 473, 492 (2015). Using contemporaneous materials to understand what that term meant when Congress employed it is not "using legislative history to override text"—it is standard statutory interpretation.

The government's own conduct undercuts its criticism. Its affirmative case rests on a table from the same Finance Committee

Staff Report it elsewhere dismisses as unreliable evidence of congressional intent. Appellants' Br. 34–35, 37–38.

The government also faults the CIT's reliance on the Piquet report as an "industry publication." Appellants' Br. 38–39. But that Piquet report was submitted to the House Ways and Means Committee as part of the official hearing record on the Trade Act of 1974. Whatever its provenance, it was before Congress when it enacted Section 122.

**3. The Proclamation's own text confirms that it rests on a trade deficit, not a balance-of-payments deficit.**

The Proclamation makes clear that the President acted on a trade deficit, not a balance-of-payments deficit. Its recitals identify a "trade deficit" in goods, deficits in the "balance on goods and services," and deficits in "primary income" and "secondary income" accounts—all components of the current account. 91 Fed. Reg. 9339, ¶¶ 6–8. Nowhere does the Proclamation claim that the United States faced what Congress targeted: an unsustainable drain on official monetary reserves through gold outflows or mounting liabilities to foreign central banks.

The government argues that because the balance of payments is recorded in a double-entry accounting system that always balances to zero, "balance-of-payments deficits" must mean deficits in some subset

of transactions. Under the government's theory, the President has discretion to select any economically reasonable measure for that subset, including the current account. Appellants' Br. 5, 20–21. That argument confuses bookkeeping rules with the statute. Double-entry accounting always forces external accounts to balance on paper, but that mechanical rule does not tell us what deficit Congress meant. Congress enacted Section 122 to address an actual monetary problem—an outflow of official reserves needed to settle international accounts—not a commercial gap in trade or current-account transactions.

The government's own expert confirms this distinction: "trade deficits are conceptually distinct from balance-of-payments deficits." Yared Decl. ¶ 14, Appx219–20.

The Proclamation also cites the United States' negative net international investment position—the fact that U.S. residents owe more to foreigners than they are owed. 91 Fed. Reg. 9339, ¶ 8. But the net international investment position is a stock measure of accumulated past capital flows, not a current-period balance-of-payments flow. It is not a balance-of-payments measure under any of the recognized frameworks. A negative net investment position reflects the fact that

the United States has attracted net capital inflows over many decades—the mirror image of a trade deficit—not an indicator of a balance-of-payments crisis in the statutory sense.

### 4. The government's alternative argument that a current-account deficit also establishes a basic-balance deficit does not save the Proclamation.

The government argues in the alternative that even under the CIT's narrow interpretation—which identifies the basic balance as one of the permissible measures—the Proclamation satisfies that standard because the basic balance and the current account have "always tracked each other closely." Appellants' Br. 45–51. This argument fails for three independent reasons.

#### a. The Proclamation never identified or calculated a deficit in the basic balance.

The Proclamation does not mention the basic balance, does not attempt to calculate a deficit in the basic balance, and does not cite any analysis of the basic balance. Its stated basis was a trade deficit and a deficit in the current account. 91 Fed. Reg. 9339, ¶¶ 6–8.

Recognizing this omission, the government argues that because the basic balance and the current account moved together historically, the Proclamation's current-account findings necessarily establish a deficit

in the basic balance. Appellants' Br. 47–49. That is precisely the kind of post-hoc rationalization that courts may not credit. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 21 (2020); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (agency action must be upheld, if at all, on the basis of the reasons the agency itself gave). A court cannot substitute the government's litigation theory—that the basic balance and the current account historically moved in tandem—for the findings the President never made.

**b. The government's modern approximation of the basic balance is not the measure Congress understood when enacting Section 122.**

The government argues that the basic balance can be "approximated today" as the sum of the current account, the capital account, and net foreign direct investment, and that this approximation produces a large deficit. Appellants' Br. 47. But the government concedes that the basic balance has not been formally calculated or reported since the 1970s because the distinction between long-term and short-term capital flows became "increasingly arbitrary and obsolete." *Id.*

The government's own expert admitted that "BEA no longer reports all the components needed to exactly replicate the basic balance," Yared

Decl. ¶ 37, Appx231, and that "even this measure is likely too inclusive," *id.* ¶ 44, Appx234. The deficiency is concrete: Kuwayama's 1975 paper—the government's own primary cited authority—defined the long-term capital component of the basic balance as four categories: U.S. Government capital, direct investment, private portfolio investments, and all long-term private loans. The government's approximation captures only direct investment, and only partially, omitting the other three entirely. The government cannot reconstruct the basic balance by omitting three of its four defining categories.

Kuwayama drew the obvious conclusion: "[T]he search in our present statistics for a reliable net basic balance that will consistently illuminate the underlying balance-of-payments situation of the United States is doomed to disappointment." Kuwayama, *supra*, at 194. The government cites Kuwayama to support its methodology, but she called that search doomed. The government cannot convert an admittedly failed methodology into a statutory standard.

**c. The CEA analysis is not properly before this Court and, in any event, does not establish a deficit in the basic balance.**

The government invokes a July 2026 Council of Economic Advisers (CEA) analysis primarily to ask this Court to vacate and remand for the CIT to decide whether the Proclamation establishes a deficit in the basic balance. Appellants' Br. 50–51. A remand is unwarranted. The Proclamation contains no mention of the basic balance, no calculation of it, and no finding that a deficit in the basic balance existed. The CIT cannot uphold the Proclamation on a factual or economic theory the President never articulated. *Chenery*, 332 U.S. at 196.

The CEA analysis is also outside the record, published in July 2026, two months after the CIT entered judgment. The government itself describes it as "recently produced" and invokes it only in the remand context. Appellants' Br. 50. Moreover, it relies on data from 2024—more than a year before the Proclamation—which cannot establish whether a deficit existed in February 2026.

And on the merits, the CEA analysis fails. Its central premise is that the 1976 BEA reforms validated the current account as the modern balance-of-payments summary measure. That is the opposite of what

occurred. The Advisory Committee recommended eliminating all single summary balances because “any balance which is recognized as being seriously deficient should not be published, and that a multiplicity of flawed balances would tend to cause public confusion.” Advisory Committee on the Presentation of Balance of Payments Statistics, 56 *Survey of Current Business* 18, 22 (June 1976). The Advisory Committee recommended that BEA publish *no* single overall balance, on the ground that a meaningful picture of U.S. international transactions required “analyzing several, if not all, transaction categories rather than concentrating on one or even several overall balances.” It retained the current account only as a memorandum item specifically to diminish emphasis on it as a summary indicator, not to elevate it into a statutory standard.

The CEA analysis also misreads Kuwayama. The CEA says that “the New York Fed posited” that balance-of-payments flows might be measured by “the sum of the current account and capital account.” *Measuring Balance of Payments Deficits* 3. Its cited source says something materially different. Kuwayama wrote that “[p]erhaps all that should be attempted is to add the current-account and United

States Government capital items together," because those were "the only measured flow categories that can be regarded as largely interest insensitive." Kuwayama, supra, at 194. United States Government capital items are a limited category of official transactions, not the capital account that the CEA invokes.

The CEA's attempt to use foreign direct investment to approximate long-term capital creates an unresolvable dilemma. Because modern foreign direct investment is volatile, CEA concedes that it has "no credible way . . . of isolating the non-volatile components of FDI with a reasonable degree of accuracy." Council of Econ. Advisers, *Measuring Balance of Payments Deficits*, at 5–6 (July 2026). If foreign direct investment is large enough to affect the calculation, it injects the exact short-term volatility the basic balance was designed to exclude. If it is not large enough to affect the calculation, the reconstruction collapses into the current account, merely relabeling a deficit in the current account as a deficit in the basic balance.

### 5. The Proclamation's timing reveals that it is a response to an adverse judicial ruling, not a genuine monetary emergency.

For over 50 years following Section 122's enactment, no President invoked it despite the United States running persistent trade deficits throughout that period. Under the government's current theory, every President had grounds to do so at any time during the last half-century. That consistent non-use, across 12 administrations, is evidence that executive branch lawyers, economists, and policymakers uniformly understood Section 122 not to authorize tariffs against ordinary trade imbalances. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Jackson, J., concurring) (executive non-use of an alleged power is strong evidence against the claim of such power).

The existence of a genuine emergency—a "fundamental international payments problem" requiring "special import measures"—is a statutory predicate, not a formality. 19 U.S.C. § 2132(a)(1). The timing of the Proclamation cannot be reconciled with any such emergency.

The Proclamation was issued on February 20, 2026—the same day the Supreme Court decided *Learning Resources* and invalidated the IEEPA tariffs. The rate was identical to the struck-down IEEPA base

rate: 10 percent. No monetary event occurred on February 20, 2026, that did not equally exist on February 19, 2026. No sudden deterioration in the balance of payments, no run on the dollar, and no collapse of U.S. monetary reserves triggered the Proclamation. The only thing that changed on February 20, 2026, was that the government's prior tariff authority was eliminated by the Supreme Court. That a statutory "emergency" materializes on the precise day a different tariff authority is invalidated—at the identical rate, against the identical set of countries—is not a coincidence. It is an admission that the underlying policy objective did not change; only the legal label did.

Genuine emergency measures are reactive to monetary conditions, not to litigation outcomes. Section 122's emergency design reflects Congress's expectation that the authority would be deployed in response to acute monetary conditions that arise, are addressed, and resolve. A proclamation issued the moment a court ruling creates a legal need for it is not a response to an emergency; it is a response to a legal setback. Courts are not obligated to accept that characterization at face value. *See Dep't of Commerce v. New York*, 588 U.S. 752, 780–81 (2019).

### 6. The proceedings in *V.O.S. Selections* refute rather than support the government's position.

Just last year, the government represented to this Court that Section 122 has "no obvious application" where concerns "arise from trade deficits, which are conceptually distinct from balance-of-payments deficits." Reply Br. for Appellants at 13, *V.O.S. Selections, Inc. v. Trump*, No. 25-1812 (Fed. Cir. July 18, 2025). The government even cited Senate Finance Committee language for the proposition that a large trade deficit could exist simultaneously with a payments surplus. *See* S. Rep. No. 93-1298, at 89 (1974). Those representations were made in the government's own litigation interest to explain why it was using IEEPA rather than Section 122 to impose tariffs. The only thing that has changed since then is that this Court and the Supreme Court found the Administration's IEEPA tariffs unlawful.

Now, in an about-face, the government relies on the Court of International Trade's discussion in *V.O.S. Selections, Inc. v. Trump*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025), for the proposition that "'[trade] deficits are one of the key balance-of-payment deficits'" that Section 122 was meant to address. Appellants' Br. 29 (quoting *V.O.S. Selections*, 772 F. Supp. 3d at 1375).

But the CIT's discussion of Section 122's potential scope in *V.O.S. Selections* was dictum. The CIT resolved that case by holding that IEEPA provides no tariff authority whatsoever; its passing reference to Section 122 was merely part of a comparison illustrating that Congress imposes strict limits when it delegates tariff powers. 772 F. Supp. 3d at 1375. Statements not necessary to the decision are not binding on this Court. *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001).

Further, no party in *V.O.S. Selections* argued that trade deficits are equivalent to the balance-of-payments deficits that Section 122 was meant to address, nor was any evidence of Section 122's meaning provided in that litigation. The issue was simply not before the CIT.

That non-binding discussion was in any event never affirmed: this Court and the Supreme Court resolved *V.O.S. Selections* on the ground that IEEPA provides no tariff authority at all, *see Learning Res.*, 607 U.S. at 255; *V.O.S. Selections v. United States*, 850 Fed. App'x 789 (Fed. Cir. 2025), without reaching the Section 122 question.

### B. Section 122 independently requires a fundamental international payments problem that the Proclamation fails to establish.

The CIT resolved this case solely on the balance-of-payments deficit ground and declined to reach this independent basis for affirmance. Appx46. This Court may affirm on any ground supported by the record. *Hyatt v. Kappos*, 625 F.3d 1320, 1335 (Fed. Cir. 2010).

#### 1. A balance-of-payments deficit does not itself establish a fundamental international payments problem.

Section 122 provides authority "[w]henever fundamental international payments problems require special import measures to restrict imports—(1) to deal with large and serious United States balance-of-payments deficits, (2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or (3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium." 19 U.S.C. § 2132(a). The clause "fundamental international payments problems require special import measures to restrict imports" is a unifying predicate; subsections (1) through (3) specify the types of conditions that may give rise to such a problem.

The government argued below that a "large and serious balance-of-payments deficit" is itself a "subset" of a fundamental international payments problem, collapsing the two requirements into one. That reading violates the surplusage canon. *See Scalia & Garner, Reading Law* 174 (2012). If a balance-of-payments deficit were inherently a fundamental international payments problem, Congress would have had no reason to include the predicate clause separately. The ordinary meaning of "fundamental international payments problem" confirms this: a "payments problem" refers to a difficulty in making or sustaining payments on international obligations—not merely the presence of a negative balance in a component account. The modifier "fundamental" requires that the problem be serious and systemic, reaching to the foundations of the nation's capacity to satisfy its external obligations.

The government's accounting-identity premise creates a further, internal contradiction. The government argues that because the balance of payments always nets to zero as an accounting matter, an "overall" balance-of-payments deficit is conceptually impossible, so "balance-of-payments deficits" must mean deficits in some sub-account. Appellants' Br. 20, 28. But if the overall balance always nets to zero, then a deficit

in the trade account or current account is always offset by a surplus elsewhere. That means no residual monetary obligation remains unmet, and therefore no "fundamental international payments problems" can exist to justify "special import measures to restrict imports"—Section 122's predicate requirement.

**2. The trade imbalances cited in the Proclamation do not create a fundamental international payments problem under a floating-rate system.**

The United States has run a trade deficit in goods in nearly every year since Section 122's enactment. In not one of those 50 years has any administration suggested it was facing a "fundamental international payments problem." The Proclamation describes a chronic commercial imbalance, not an acute payments crisis.

Even if trade imbalances were relevant to Section 122—which they are not—they do not create fundamental international payments problems under the floating-rate system in place since the early 1970s. When the United States imports more than it exports, private capital inflows finance the gap and the exchange rate adjusts. No government reserve expenditure is required, and no threat to the nation's ability to honor its international obligations arises.

The contrast with the Bretton Woods era is stark. Under a fixed-rate regime, when private flows were insufficient to balance the external accounts, the exchange rate could not adjust; the government had to expend gold reserves or borrow from foreign central banks. A sustained drain on reserves threatened the nation's ability to honor its gold convertibility obligations—precisely the crisis of 1971. Under today's floating-rate system, no such crisis exists or is threatened. As economists recognized before Section 122 was even enacted, floating exchange rates "completely eliminate[] the balance-of-payments problem." *Milton Friedman & Robert V. Roosa, The Balance of Payments: Free Versus Fixed Exchange Rates* 15 (1967). Representative Henry Reuss made the same point in the 1973 House debate on Section 122: if the United States "continues to let the dollar float in exchange markets, . . . the exercise of [Section 122] authority would prevent the deterioration or appreciation of the external value of the dollar that would be necessary to eliminate a balance-of-payments deficit or surplus." 119 Cong. Rec. 40,568 (1973) (statement of Rep. Reuss). And as Chairman Feldstein testified in 1984, the shift to floating exchange rates had rendered Section 122's emergency clause effectively dormant

because "the government no longer needed to 'finance' a deficit through reserves." *Trade Deficit Hearing* at 165.

If the floating-rate system has made Section 122's trigger conditions rare or inapplicable, the appropriate remedy is for Congress to update the statute—not for the President to redefine its terms. *Wisconsin Central*, 585 U.S. at 284.

### C. The Proclamation's country and product exceptions independently violate Section 122's uniformity and nondiscrimination requirements.

This Court may also affirm on this independent ground, *see Hyatt*, 625 F.3d at 1335, which the CIT similarly declined to reach, Appx46.

#### 1. Section 122 requires nondiscriminatory and uniform application subject to narrow exceptions supported by specific findings.

Any restrictions proclaimed under Section 122 "shall be applied consistently with the principle of nondiscriminatory treatment." 19 U.S.C. § 2132(d). "Nondiscriminatory treatment" is a defined term in the Trade Act of 1974: it means "trade treatment based on normal trade relations (known under international law as most-favored-nation treatment)." 19 U.S.C. § 2481(9). A most-favored-nation tariff must be applied at the same rate to imports from all trading partners. Section 122 authorizes no country-specific exemptions. Section 122(d)(2)

provides one narrow exception: the President may exempt other countries and act only against "one or more countries having large or persistent balance-of-payments surpluses." 19 U.S.C. § 2132(d)(2). The Proclamation inverts that exception: it applies a surcharge to all countries and adds rates on countries with bilateral trade deficits from the U.S. perspective. That is not what the exception authorizes.

Any restrictions "shall be of broad and uniform application with respect to product coverage." 19 U.S.C. § 2132(e). The text of the statute expressly provides that "[n]either the authorization of import restricting actions nor the determination of exceptions with respect to product coverage shall be made for the purpose of protecting individual domestic industries from competition." *Id.* Each exception must be grounded in a finding that imports of the excepted article are necessary to the U.S. economy—unavailability of domestic supply, necessary importation of raw materials, avoiding serious supply dislocations, or closely analogous factors. *Id.*

These requirements reflect the logic of a genuine balance-of-payments tariff. A balance-of-payments crisis is a macroeconomic condition affecting the nation's overall external accounts. The

appropriate response is a broad, uniform surcharge operating across the board. Country- and product-specific targeting serves trade-leverage and industry-protection objectives—precisely what Section 122 prohibits.

### 2. The Proclamation's exceptions were copied from the invalidated IEEPA regime and are not justified under Section 122's standards.

The Proclamation exempts imports from Canada, Mexico, and several other trading partners from the 10 percent surcharge. Proclamation No. 11012, Annex I. These exemptions cannot be reconciled with § 2132(d)'s most-favored-nation requirement. Nor do they fit within § 2132(d)(2), which permits the President to act only against "one or more countries having large or persistent balance-of-payments surpluses," not to exempt favored trading partners.

The Proclamation's Annex II lists approximately 76 pages of product-category exemptions. Roughly 1,100 product codes were carried over directly from the invalidated IEEPA tariff regime—a regime premised on a national security emergency declared under a wholly different statute. *See* Johannes Fritz, *The Section 122 Exemption Structure,*

*Explained*, Global Trade Alert (Feb. 23, 2026). The only substantive addition was 11 product codes for drones.

The Proclamation makes no individual findings connecting any exemption to § 2132(e)'s enumerated criteria. Any attempt to supply those missing findings through post-hoc declarations submitted during the CIT litigation cannot cure the Proclamation's facial deficiency. Under well-settled principles of judicial review, an agency or executive officer must defend its action on the reasons given at the time of the action—not those constructed during litigation. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 21 (2020). The Proclamation itself contains no Section 122(e) analysis—no finding, for any of the 1,100 carried-over product codes, that the excepted article is unavailable domestically, necessary as a raw material, or otherwise within the statute's enumerated criteria. A declaration filed in litigation is not a substitute for that finding.

The structure of the Proclamation confirms it is a trade-policy instrument, not a monetary corrective. A genuine balance-of-payments surcharge is a blunt instrument: it raises the price of all imports to

dampen aggregate import demand and reduce reserve outflows. It does not need to be calibrated by country or product, because the goal is aggregate correction, not bilateral leverage. Seventy-six pages of product exemptions copied from a prior trade-policy instrument—with no Section 122 analysis—are the antithesis of a genuine balance-of-payments measure.

#### 3. The Proclamation's unlawful exceptions cannot be severed.

Severability of an executive order depends on whether the valid portions can stand independently and, more importantly, whether the President would have issued them without the invalid portions. *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999). Here, the Proclamation's tariff rates and its exception regime are two halves of a single, integrated policy judgment. Severing the exceptions would impose on importers a tariff regime the President himself determined was inappropriate—one that taxes goods the President determined should remain exempt and imports from countries he determined should be excused.

The Proclamation's severability clause does not alter this analysis. A severability clause creates a presumption, not an irrebuttable rule.

*Mille Lacs*, 526 U.S. at 191. The exemptions are not peripheral to the Proclamation; they define the precise scope of the tariff's application and embody the President's judgment about which imports may be burdened without harm to the U.S. economy. Because those exemptions are unlawful under §§ 2132(d) and (e), the Proclamation as a whole cannot stand.

## II. The government's expansive interpretation violates the canons of constitutional avoidance, the major questions doctrine, and nondelegation.

Under the canon of constitutional avoidance, courts must reject statutory constructions that raise serious constitutional doubts if another plausible reading is available. Even if Section 122 were ambiguous, the government's expansive reading must be rejected because it violates both the major questions doctrine and the nondelegation doctrine.

### A. The claimed authority implicates the major questions doctrine and requires a clear statement from Congress.

The Supreme Court has reaffirmed that courts should not lightly presume congressional intent to implicitly delegate decisions of major economic or political significance to agencies or the Executive. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *Utility*

*Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (plurality) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.").

These tariffs are of unprecedented significance. The new Section 122 tariffs are projected to apply to $1.2 trillion, or 34 percent, of annual imports, and between $200 and $600 additional tax burden per U.S. household. Erica York & Alex Durante, *Tariff Tracker: Impact of Trump Tariffs & Trade War by the Numbers*, Tax Found. (Feb. 23, 2026).[9] The Federal Reserve estimates that U.S. businesses and consumers absorbed approximately 90 percent of the cost of the IEEPA tariffs. Mary Amiti et al., "Who Is Paying for the 2025 U.S. Tariffs?," Federal Reserve Bank of New York (Feb. 12, 2026).[10] There is no reason to believe the incidence of the new Section 122 tariffs will be any different.

---

[9] Available at https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/

[10] Available at https://libertystreeteconomics.newyorkfed.org/2026/02/who-is-paying-for-the-2025-u-s-tariffs/

These impacts are at least as large as recent executive actions that the Supreme Court has found to be "major questions" requiring a clear statement by Congress to authorize executive discretion. *See, e.g., Biden v. Nebraska*, 600 U.S. 477 (2023) (approximately $400 billion in student loan forgiveness); *West Virginia v. Environmental Protection Agency*, 597 U.S. 697 (2022) (EPA authority to restructure nation's electricity-generation mix); *NFIB v. OSHA*, 595 U.S. 109 (2022) (pandemic-era vaccination mandate for workers employed by firms with 100 or more employees); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (temporary pandemic-era nationwide eviction moratorium).

And this is an instance where the President is claiming to exercise a core, enumerated legislative power; under our Constitution, Congress holds the powers to "lay and collect taxes, duties, imposts and excises," and "[t]o regulate commerce with foreign nations." U.S. Const. art. I, § 8, cls. 1, 3. The President can therefore exercise such authority *only* if it is in fact delegated to him by the legislature. But in "the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the Secretary the unprecedented power over American industry that would result from the Government's view." *Indus. Union*

*Dep't*, *AFL-CIO v. API,* 448 U.S. 607, 645 (1980) (plurality opinion); *see also Learning Res., Inc. v. Trump*, 607 U.S. 229, 241 (2026) ("The Government thus concedes, as it must, that the President enjoys no inherent authority to impose tariffs during peacetime.").

In *Alabama Association of Realtors*, the Supreme Court explained that the Centers for Disease Control and Prevention could not unilaterally grant itself control of the nation's housing market by issuing a nationwide eviction moratorium. Such sweeping authority must come, if at all, from Congress. *Ala. Ass'n of Realtors*, 594 U.S. at 760. There, as here, the government's reading of the statute was far too permissive, contending that the statute gave it "broad authority to take whatever measures it deem[ed] necessary to control the spread of COVID-19." *Id.* at 763. "It strains credulity to believe that this statute grants the [President] the sweeping authority that [he] asserts." *Id.* at 760.

Here, the President has attempted to reimpose his global 10 percent (and potentially 15 percent) tariffs to reduce the trade deficit that concerns him. But Congress strictly limited the power granted in Section 122—the authority to impose up to a 15 percent tariff on

imports from around the world—to a specific circumstance that does not exist now and, under current economic conditions, effectively cannot arise. To fit Section 122, Defendants are forced to recast a trade deficit as a balance-of-payments crisis. The two, however, are not the same and do not even strongly correlate.

As the Supreme Court recognized, in each portion of the United States Code where Congress has delegated tariff authority to the President, Congress has placed strict limitations on the exercise of that authority. *Learning Res.*, 607 U.S. at 231; *see* 19 U.S.C. § 1862 (providing a framework under which the President can adjust duties and import restrictions for "safeguarding national security," including a full administrative process in which the Secretary of Commerce, in consultation with the Secretary of Defense, investigates and makes a formal report to the President, who determines whether to act on that report, and provision for specific forms of congressional oversight); 19 U.S.C. § 2411 (providing a framework for imposing tariffs when some trading partner is breaking the rules); 19 U.S.C. § 2251 (authorizing the President to protect specific domestic industries by imposing tariffs "which the President determines will facilitate efforts by the domestic

industry to make a positive adjustment to import competition and provide greater economic and social benefits than costs"). Section 122 is no different—it only grants the President this authority "to deal with large and serious United States balance-of-payments deficits," not to combat trade deficits. Indeed, the prior IEEPA tariff regime, which the President seeks to maintain by this proclamation, actually *increased* the trade deficit in goods rather than decreasing it. York & Durante, *supra* ("the goods deficit actually increased by $25.5 billion year over year.").

### B. The government's open-ended construction lacks an intelligible principle and would render Section 122 an unconstitutional delegation.

If Section 122 truly conferred the sweeping and unreviewable authority Defendants claim, the government's interpretation would run afoul of the nondelegation doctrine. The Court below found that "[s]uch an expansive reading of the statute would raise a non-delegation issue, which in turn would prompt a constitutional question." Appx40. A power so broad would constitute a "sweeping delegation of legislative power" of the kind rejected in previous Supreme Court cases. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 539 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).

Defendants interpret Section 122 to allow the President to impose immediate worldwide tariffs to combat a balance-of-payments deficit that does not exist, delegating to the executive plenary power to singlehandedly upend the entire global economy, void treaty obligations Congress has ratified, and leave the public in a perpetual state of chaos and uncertainty. This interpretation would render Section 122 at least the equivalent of the delegations the Supreme Court previously invalidated as unconstitutional—"one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001). If the standards laid down by Congress to limit this authority can be interpreted this capriciously, then they represent no intelligible principle to cabin the President's discretion.

The government's best run at an intelligible principle limiting the President is "only if he determines the existence of a balance-of-payments deficit by an economically reasonable methodology." Appellants' Br. 42. This is not in fact a standard they can meet—as the

panel majority below explained, the administration has not presented an economically reasonable methodology in this case. *See* Appx44–46; But even if they had, the principle articulated would not provide any real limit: they are careful *not* to limit it, by their phrasing to, say, the economic understandings contemporary to the enactment of Section 122. Rather, their "limit" is *any* action taken for which there is *any* economic methodology that could justify it. That is no limit at all.

The basic requirement that derives from the Supreme Court's cases is that "Congress must set forth standards sufficiently definite and precise to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed." *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting) (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944)). The onus is on Congress to "expressly and specifically decide the major policy question itself and delegate to the agency the authority to regulate and enforce." *Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement respecting denial of certiorari). Congress cannot "merely announce vague aspirations and then assign others the responsibility of

adopting legislation to realize its goals." *Gundy*, 588 U.S. at 153 (Gorsuch, J., dissenting).

Our constitutional structure requires that each congressional enactment "furnish[ ] a declaration of policy or a standard of action." *Panama Ref. Co.*, 293 U.S. at 416. It falls to Congress, and Congress alone, to "establish primary standards, devolving upon others the duty to carry out the declared legislative policy." *Id.* at 426. Courts, therefore, must reject regimes in which they find "an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus*, 321 U.S. at 426. The President's assertion of authority here has no meaningful limiting standards, essentially enabling him to impose any tariff rate he wants on any country at any time, for virtually any reason.

Nor is there any foreign-affairs exemption to apply here. To support such an exemption, the government cites Justice Kavanaugh's nonprecedential concurrence in *FCC v. Consumers' Rsch.*, 606 U.S. 656, 706 (2025)—a proposition no other justice in the majority in *Learning Resources* embraced. And of course, the *Learning Resources* majority

found no special scope of presidential authority under IEEPA—and the government has provided no compelling reason why Section 122 implicates foreign affairs concerns that IEEPA did not. Even if some such special presidential power exists, it would not apply here for the same reason it did not apply in IEEPA: tariffs are taxes paid domestically by Americans, and that domestic effect on American citizens with rights takes this case out of any special treatment one might otherwise give issues touching foreign affairs. Nor is the reference in *Learning Resources* to various statutes, including Section 122, being "clear and limited" a defense of the government's actions here. 607 U.S. at 244. It is not a defense to point to the limited nature of a statute when the government is refusing to honor those limitations—the Supreme Court's dicta on this point assumed an executive that is in fact following the statute.

The President's claim of authority here is even more troubling than other delegations the courts have considered. Many of those prior examples were at least subject to an administrative process: there was notice, comments were heard, and time was taken to consider the merits of the proposal. But here the President operated under no such

encumbrances and imposed tariffs by proclamation that went into effect almost immediately.

Delegating this sort of unreviewable, free-ranging discretion to the Executive with no oversight endangers our economy, and ultimately the liberty guaranteed to each of us as citizens, as past failures to uphold these principles should remind us. *See, e.g.*, *Hirabayashi v. United States*, 320 U.S. 81, 104 (1943) (approving the delegation of authority to military commanders to impose curfews on citizens of Japanese descent).

This Court should therefore reject the government's expansive reading under the canon of constitutional avoidance, or alternatively hold that the sweeping, standardless tariff power claimed by the government constitutes an unconstitutional delegation of legislative authority.

## Conclusion

For the foregoing reasons, Plaintiffs-Appellees respectfully request that this Court affirm the judgment and permanent injunction of the Court of International Trade declaring Proclamation 11012 unlawful, dissolve this Court's stay pending appeal, and order the refund of all

Section 122 duties paid by Plaintiffs-Appellees, together with interest as provided by law.

Dated: August 31, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
James McQuaid
Liberty Justice Center
1629 K Street N.W., Suite 300
Washington, D.C. 20006
512-481-4400
jschwab@ljc.org
rstephens@ljc.org
jmcquaid@ljc.org

*Counsel for Plaintiffs-Appellees*

## Certificate of Compliance

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2), this brief contains13,317 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: August 31, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab
Jeffrey M. Schwab
*Counsel for Plaintiffs-Appellees*