Nos. 2026-1804, -1805, -1928

# IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

STATE OF OREGON, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF NEW YORK, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, OFFICE OF THE GOVERNOR EX REL. ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WISCONSIN,

Plaintiffs-Cross-Appellants,

STATE OF WASHINGTON,

Plaintiff-Appellee

v.

DONALD J. TRUMP, in his official capacity as President of the United States, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, UNITED STATES

Defendants-Appellants.

---

BURLAP AND BARREL, INC., BASIC FUN, INC.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, JAMIESON GREER, in his official capacity as U.S. Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,

Defendants-Appellants.

---

On Appeal from the United States Court of International Trade
Nos. 26-1472, -1606, Judges Barnett, Kelly, and Stanceu

---

# CORRECTED BRIEF AMICI CURIAE OF ECONOMISTS IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

Holger Spamann
1525 Massachusetts Avenue
Cambridge, MA 02138
(617) 496-6710

Aaron R. Cooper
Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

Debbie L. Berman
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

Counsel for *Amici Curiae* Economists

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1804, 26-1805, 26-1928

**Short Case Caption** State of Oregon et al. v. Trump et al.

**Filing Party/Entity** Economists

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/15/2026

Signature: /s/ Aaron R. Cooper

Name: Aaron R. Cooper

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Stan Veuger | | |
| Olugbenga Ajilore | | |
| Alan J. Auerbach | | |
| Robert J. Barro | | |
| Andrew G. Biggs | | |
| Emily Blanchard | | |
| Alan Blinder | | |
| Michael D. Bordo | | |
| Donald J. Boudreaux | | |
| Alex Brill | | |
| Daniel Bunn | | |

☑ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

Represented parties, con't:

James C. Capretta
Steve Cicala
Kimberly Clausing
Heidi Crebo-Rediker
Steven J. Davis
Mihir A. Desai
Karen Dynan
Douglas Elmendorf
Jeffry Frieden
Jason Furman
Samuel Gregg
Kyle Handley
Ben Harris
David R. Henderson
Douglas Holtz-Eakin
Simon Johnson
Steven B. Kamin
Mary E. Lovely
Philip A. Luck
N. Gregory Mankiw
Marc Melitz
Jeffrey Miron
Marc-Andreas Muendler
Brent Neiman
Stephen O'Connell
Kyle Pomerleau
Douglas A. Rediker
Jay C. Shambaugh
Mark Sobel
Michael R. Strain
Laura D. Tyson
Alan D. Viard
Mark J. Warshawsky
Janet Yellen
Erica York
Owen Zidar

## TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... ii

INTERESTS OF AMICI CURIAE .......... 1

SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 5

I. "Large and serious United States balance-of-payments deficits" are impossible in today's system of floating exchange rates. .......... 5

   A. "Balance-of-payments deficits" refer to the bygone era of fixed exchange rates .......... 6

   B. The government confuses two meanings of the term "balance of payments" .......... 13

   C. With floating exchange rates, no balance-of-payments imbalance can be "large and serious" .......... 22

II. The United States does not face "fundamental international payments problems." .......... 25

III. The government's interpretation would grant it unconstrained authority to impose worldwide tariffs .......... 28

IV. The tariffs had vast economic and political significance .......... 31

CONCLUSION .......... 35

## TABLE OF AUTHORITIES

### Cases

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) .......... 32

*King v. Burwell*,
576 U.S. 473 (2015) .......... 34

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026) .......... 2, 35

*United States v. Yoshida Int'l, Inc.*,
526 F.2d 560 (C.C.P.A. 1975) .......... 10

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 35

*V.O.S. Selections, Inc. v. Trump*,
149 F.4th 1312 (Fed. Cir. 2025) .......... 2, 25

*Yoshida Int'l, Inc. v. United States*,
378 F. Supp. 1155 (Cust. Ct. 1974) .......... 10

### Treaties

General Agreement on Tariffs and Trade, art. XII, Oct. 30, 1947,
61 Stat. A-11, 55 U.N.T.S. 194 .......... 10, 11, 24

### Statutes

19 U.S.C. § 2132(a) .......... passim

19 U.S.C. § 2132(a)(1) .......... 3, 22

19 U.S.C. § 2132(a)(1)-(3) .......... 2

19 U.S.C. § 2132(c)(1) .......... 23

An Act to provide for amendment of the Bretton Woods Agreements Act, Pub. L. No. 94-564, 90 Stat. 2660 (1976) ............... 11

**Legislative Materials**

S. Rep. No. 93-1298, 1974 U.S.C.C.A.N. 7186 (1974) ............................. 9

*Trade Deficit: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. on Fin.*, 98th Cong. 57 (1984) .................................. 6, 24

**Other Authorities**

Bd. of Governors of the Fed. Rsrv. Sys., Memorandum of Discussion (May 11, 1971), https://www.federalreserve.gov/monetarypolicy/files/fomcmod 19710511.pdf ......................................................................... 10

Carol Bertaut et al., *The International Role of the U.S. Dollar – 2025 Edition*, The Federal Reserve (July 18, 2025), https://www.federalreserve.gov/econres/notes/feds-notes/the-international-role-of-the-u-s-dollar-2025-edition-20250718.html ................................................................... 26, 27

CNBC, *CNBC Transcript: U.S. Treasury Secretary Scott Bessent Speaks with CNBC's Brian Sullivan on "Squawk Box" Today* (Mar. 16, 2026), https://www.cnbc.com/2026/03/16/cnbc-transcript-us-treasury-secretary-scott-bessent-speaks-with-cnbcs-brian-sullivan-on-squawk-box-today.html ................................................ 33

Douglas A. Irwin, *Three Simple Principles of Trade Policy* (1996) ................................................................................. 32

Economic Report of the President 1973 ................................................. 9

Int'l Monetary Fund, Annual Report 1952 (1952), https://perma.cc/W8DS-HEE5 .......................................................... 17

Int'l Monetary Fund, *Balance of Payments (BOP)*, https://data.imf.org/en/datasets/IMF.STA:BOP (last visited Apr. 6, 2026) .......... 14

Jeffrey E. Garten, *Three Days at Camp David: How a Secret Meeting in 1971 Transformed the Global Economy* 180 (2021) .......... 12

Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates*, First Lecture (1967) .......... 12

N. Gregory Mankiw, *Principles of Economics* (7th ed. 2015) .......... 32

Patricia H. Kuwayama, *Measuring the United States Balance of Payments*, Fed. Rsrv. Bank of N.Y. Monthly Rev. 183 (Aug. 1975), https://perma.cc/BVL8-9GUG .......... 16, 19, 21

Paul Krugman, *A Model of Balance-of-Payments Crises*, 11 J. MONEY, CREDIT, & BANKING 311 (1979) .......... 8

Paul Samuelson, *Economics* 714 (9th ed. 1973) .......... 8

Poul Høst-Madsen, *What Does It Really Mean?: A Deficit in the Balance of Payments*, 3 FIN. & DEV. 171 (1966) .......... 18, 19

Poul Høst-Madsen, *What Does It Really Mean?—A Deficit in the Balance of Payments*, 3 Fin. & Dev. 171 (1966) .......... 17

Press Release, Office of the U.S. Trade Representative, *Ambassador Greer Issues Statement on Supreme Court IEEPA Decision* (Feb. 20, 2026), https://ustr.gov/about/policy-offices/press-office/press-releases/2026/february/ambassador-greer-issues-statement-supreme-court-ieepa-decision .......... 33

Proclamation No. 11012, 91 Fed. Reg. 9339 (Feb. 20, 2026) .......... 2, 5, 32

Reply Brief for Appellants, *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (Nos. 2025-1812, -1813), 2025 WL 2083367 .......... 13

Thomas Brosy et al., *How the Supreme Court's IEEPA Ruling and New Section 122 Tariffs Reshape Costs Across Industries*, Tax Policy Center (Mar. 10, 2026), https://taxpolicycenter.org/taxvox/how-supreme-courts-ieepa-ruling-and-new-section-122-tariffs-reshape-costs-across-industries .......... 34

U.S. Bureau of Economic Analysis, International Data: Table 1.1. U.S. International Transactions (June 24, 2026), https://apps.bea.gov/itable/?reqid=62&step=1&_gl=1*1n9k5np*_ga*MjA5ODYwMTI1My4xNzg2NDY4NTMz*_ga_J4698JNNFT*czE3ODY5MTgzODgkbzckZzAkdDE3ODY5MTgzODgkajYwJGwwJGgw#eyJhcHBpZCI6NjIsInN0ZXBzIjpbMSwyLDYsNl0sImRhdGEiOltbIlByb2R1Y3QiLCIxIl0sWyJUYWJsZUxpc3QiLCIxIl0sWyJGaWx0ZXJfIzEiLFsiMCJdXSxbIkZpbHRlcl8jMiIsWyIwIl1dLFsiRmlsdGVyXyMzIixbIjAiXV0sWyJGaWx0ZXJfIzQiLFsiMCJdXSxbIkZpbHRlcl8jNSIsWyIwIl1dXX0= .......... 10, 31

U.S. Bureau of Economic Analysis, *U.S. International Trade in Goods and Services, December and Annual 2025* (Feb. 19, 2026), https://www.bea.gov/news/2026/us-international-trade-goods-and-services-december-and-annual-2025 .......... 26

U.S. Customs and Border Protection, *Trade Statistics*, https://www.cbp.gov/newsroom/stats/trade (last visited Sept. 2, 2026) .......... 31

All parties consent to the filing of this brief.

## INTEREST OF AMICI CURIAE[1]

*Amici curiae* are professional economists at leading universities and public policy research organizations who have dedicated their professional lives to understanding international economics.[2] Many have put their expertise to use in public service for the federal government. *Amici* have an interest in ensuring that the fundamentals of international economics are correctly represented in this litigation.

## SUMMARY OF ARGUMENT

Plaintiffs challenge the 10 percent ad valorem tariffs that President Trump imposed on February 20, 2026, under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132(a), and that expired on July 24, 2026. Section 122 authorizes the President to proclaim temporary duties or quotas "[w]henever fundamental international payments problems require special import measures to restrict imports" for any of three enumerated purposes: to address "large and serious United States

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* state that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than *amici* and their counsel contributed money that was intended to fund preparing or submitting this brief.
[2] A complete list of Amici is included in Appendix A, attached hereto.

balance-of-payments deficits," to prevent "imminent and significant depreciation of the dollar in foreign exchange markets," and/or to cooperate with other countries to correct "an international balance-of-payments disequilibrium[.]" 19 U.S.C. § 2132(a)(1)-(3). In imposing the tariffs at issue here, the President relied on the first of these purposes, proclaiming: "Specifically, my advisors have determined that an import surcharge in the form of *ad valorem* duties is *required to deal with large and serious United States balance-of-payments deficits*." Proclamation No. 11012, 91 Fed. Reg. 9339 ¶ 5 (Feb. 20, 2026) ("Proclamation") (emphasis added); *see also id.* ¶¶ 8, 13.

For the President to invoke authority under Section 122 in the way that he has, two separate conditions must be met. First, per the cited statutory standard, the tariffs must be required to deal with "large and serious United States balance-of-payments deficits." *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1372 (Fed. Cir. 2025) (Taranto, J., dissenting), *aff'd sub nom. Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026). Second, the statute imposes "the necessary threshold condition" of the existence of "fundamental international payments problems." *Id.* (quoting 19 U.S.C. § 2132(a)).

Neither required condition was met here. Section 122 was enacted in the early 1970s, when the United States was operating under the Bretton Woods system of fixed exchange rates. The term "large and serious United States balance-of-payments deficits" takes specific meaning from that time. 19 U.S.C. § 2132(a)(1). Under that fixed exchange rate system, a balance-of-payments deficit reflected an acute drain on U.S. gold and currency reserves that threatened the country's ability to meet its international obligations. But now, under the floating exchange rate system the United States has maintained for more than fifty years, exchange rates adjust automatically to correct payment imbalances, making the reserve-drain emergency Section 122 was designed to address structurally impossible — and therefore legally impossible. Moreover, the United States does not face fundamental international payments problems, as it is able to pay for its imports and meet its debt obligations. As such, the Proclamation fails to satisfy either statutory condition: the United States cannot run a "large and serious United States balance-of-payments deficit" because, in today's system of floating exchange rates, they are no longer possible; and the United States does not have a "fundamental international payments problem[]"

because the United States has consistently been able to meet its payment obligations. 19 U.S.C. § 2132(a). The government's contrary position is that any of a lengthy list of international accounting numbers qualifies as a balance-of-payments deficit; that the president has the sole authority to deem these deficits large and serious; and that the deficits imply the existence of a fundamental international payments problem merely because the President says so. Taken to its logical conclusion, this would give the President unconstrained authority to impose high worldwide tariffs, albeit temporary ones, at any time, because at least one of these accounting numbers has been negative ever since the statute's enactment, and this is unlikely to change in the future.

Finally, the President's universal tariffs have had vast consequences for the U.S. economy and hence implicate the major questions doctrine. These sweeping tariffs, which applied to goods that entered the United States from nearly all trading partners, have had major budgetary, allocative, and distributive effects across the country. Section 122 does not contain a heretofore unnoticed authority for the President to impose those dramatic consequences based merely on the President's say-so.

## ARGUMENT

### I. "Large And Serious United States Balance-Of-Payments Deficits" Are Impossible In Today's System Of Floating Exchange Rates.

As the first of two conditions, Section 122 of the Trade Act allows the President to issue tariffs to deal with "large and serious United States balance-of-payments deficits," which the President cites in the Proclamation for the 10 percent tariffs. *See* Proclamation ¶ 5; *see also* 19 U.S.C. § 2132(a)(1). These balance-of-payments deficits were conceivable when the Trade Act was passed in the 1970s. But, as explained in subsection I.A, in today's system of floating exchange rates, they are no longer possible. The government's contrary position conflates the economic concept of a balance-of-payments deficit with a much broader set of deficits calculated from the accounting statement known as the Balance of Payments (capitalized throughout when used in this sense), as Amici clarify in subsection I.B. In any event, as Amici explain in subsection I.C, even if the statutory term "balance-of-payments deficits" were open to the government's broader interpretation, none of these other deficits could meet the statutory qualifier "large and serious" as required by Section 122.

### A. "Balance-of-payments deficits" has a technical meaning in a system of fixed exchange rates: the rate of accumulation of official reserve assets including gold

In long-established economic parlance, the term "balance-of-payments deficits" carries a specific technical meaning under the bygone era of fixed exchange rates and the gold standard. Today, without such fixed exchange rates and gold standard, the United States simply cannot have "large and serious balance-of-payments deficits."

As the Chairman of the Council of Economic Advisers under President Reagan, Martin Feldstein, told the Senate Finance Committee in 1984, "[t]he technical definition for the balance of payments is the rate of accumulation of official reserve assets," including gold. *Trade Deficit: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. on Fin.*, 98th Cong. 57 (1984) (statement of Dr. Martin Feldstein, Chairman, Council of Economic Advisers). Thus, a balance of payments *deficit* means the reduction in a country's reserve assets, including gold. Feldstein explicitly contradistinguished "balance-of-payments deficits" from "a trade deficit and a current account deficit." *Cf. id.* ("Although we have a trade deficit and a current account deficit, we do not have,

technically speaking, a balance-of-payments deficit of the type envisioned in section 122.").

To understand this concern with reserves and gold, one needs to situate Section 122 in its historical context of fixed exchange rates and the gold standard. When Section 122 was signed into law in 1975, the Bretton Woods system, which came into effect in 1945, was still in place. Under the Bretton Woods system, the dollar[3] was pegged to gold at the price of $35 per ounce, and other currencies were pegged to the dollar. That is, the exchange rates between the dollar and gold, and between the dollar and other currencies, were fixed, and foreign governments could exchange dollars for gold at the U.S. Treasury at the fixed price. The U.S. Treasury could maintain the fixed exchange rate by trading its own holdings of currency reserves and gold for the U.S. dollar.

This design of the Bretton Woods system made it vulnerable to balance-of-payments deficits. A country's central bank could honor exchange requests at fixed exchange rates only for so long as it had currency reserves and gold available to exchange. When a country ran balance-of-payments deficits, its reserve assets declined. At some point,

[3] All references to the dollar are to the United States dollar.

its currency reserves and gold would be exhausted. At that point, the central bank would no longer be able to support the fixed value of its currency. As the Nobel Laureate Paul Krugman explained in his seminal 1979 paper on balance-of-payments crises, "When the government is no longer able to defend a fixed parity because of the constraints on its actions, there is a 'crisis' in the balance of payments." Paul Krugman, *A Model of Balance-of-Payments Crises*, 11 J. MONEY, CREDIT, & BANKING 311, 311 (1979).

The United States was especially vulnerable due to the special role of the dollar as the world's premier transaction and reserve currency. By the late 1960s, more dollars were circulating internationally than the U.S. Treasury could convert to gold at the peg. At the same time, the dollar was overvalued: its pegged value was greater than it would have been had the market prices of the dollar and gold floated freely against each other. As the Nobel Laureate Paul Samuelson explained in the 1973 edition of the leading economics textbook of the era, this "[c]hronic overvaluation of [the] dollar caused [a] hemorrhage of gold and reserves, [a] soaring balance-of-payments deficit." Paul Samuelson, *Economics* 714 (9th ed. 1973).

Feldstein's definition above accords with the use of the term "balance-of-payments deficits" by Congress, the President, the Federal Reserve, and a predecessor of this court at or around the passage of the Trade Act of 1974. When Congress passed Section 122 in 1974, it stated that: "In 1962, the Nation had a modest trade surplus of approximately $1.1 billion (c.i.f.) and a balance of payments deficit of $2.9 billion (liquidity basis)." S. Rep. No. 93-1298, 1974 U.S.C.C.A.N. 7186 at 7193 (1974). President Nixon around that time contrasted "a record deficit" in "the U.S. balance of payments" and "[t]he overall balance-of-payments position of the United States" with "[t]he trade and current account deficits of the United States." *Cf.* Economic Report of the President 1973, at 113. The Federal Open Market Committee described "[t]he overall balance of payments deficit in the first four months of 1971" as "exceptionally large" even while the U.S. trade balance and current account balance were positive.[4] *Cf.* Bd. of Governors of the Fed. Rsrv.

---

[4] The balance of trade and the current account balance were both positive in the first quarter of 1971. U.S. Bureau of Economic Analysis, International Data: Table 1.1. U.S. International Transactions (June 24, 2026),
https://apps.bea.gov/itable/?reqid=62&step=1&_gl=1*1n9k5np*_ga*MjA5ODYwMTI1My4xNzg2NDY4NTMz*_ga_J4698JNNFT*czE3ODY5MTgzODgkbzckZzAkdDE3ODY5MTgzODgkajYwJGwwJGgw#eyJhcHBpZ

Sys., Memorandum of Discussion 93 (May 11, 1971), https://www.federalreserve.gov/monetarypolicy/files/fomcmod19710511.pdf. The U.S. Court of Customs and Patent Appeals wrote in 1975: "During the summer of 1971, the United States … suffered under an exceptionally severe and worsening balance of payments deficit. The gold reserve backing of the U.S. dollar had dropped from $17.8 billion in 1960 to less than $10.4 billion in June of 1971…." *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 567 (C.C.P.A. 1975).[5] *Cf.* also Article XII of the General Agreement on Tariffs and Trade (tying "balance of payments," the subject of the provision according to its paragraph 1, to "a serious

---

CI6NjIsInN0ZXBzIjpbMSwyLDYsNl0sImRhdGEiOltbIlByb2R1Y3QiLCIxIl0sWyJUYWJsZUxpc3QiLCIxIl0sWyJGaWx0ZXJfIzEiLFsiMCJdXSxbIkZpbHRlcl8jMiIsWyIwIl1dLFsiRmlsdGVyXyMzIixbIjAiXV0sWyJGaWx0ZXJfIzQiLFsiMCJdXSxbIkZpbHRlcl8jNSIsWyIwIl1dXX0= (lines 30-32).

[5] The C.C.P.A.'s *Yoshida* opinion is particularly probative because it concerned the very litigation that triggered the adoption of Section 122. It overturned a decision of the Customs Court that declared unlawful a surcharge that President Nixon had imposed when he suspended convertibility, ending the guarantee that foreign governments and central banks could exchange their dollar holdings for gold at a fixed price. *See Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155 (Cust. Ct. 1974). Section 122(a) of the Trade Act was drafted after the Customs Court opinion but before the appeal, aiming to insulate such actions from litigation.

decline in its monetary reserves" or "very low monetary reserves" in its paragraph 2).[6]

The Bretton Woods system was abolished in 1976 through the Jamaica Accords — and along with that, the possibility that there could be a "balance-of-payments deficit" as used in Section 122. Indeed, it was precisely the U.S. balance-of-payments deficits just described that precipitated the end of Bretton Woods. In 1971, the United States ended its commitment to exchange dollars for gold, followed in 1976 by the formal end of the Bretton Woods system, when President Ford signed into law the Bretton Woods Agreements Act. An Act to provide for amendment of the Bretton Woods Agreements Act, Pub. L. No. 94-564, 90 Stat. 2660 (1976). Section 122, which was signed into law a year before that, therefore served three purposes: first, it addressed any ongoing risk from the existing system, pending reform; second, even though the Bretton Woods system was being reformed, there was not yet an agreement on what the new international monetary regime would be, and, therefore, the new system could have contained the same issues as the Bretton

[6] General Agreement on Tariffs and Trade, art. XII, Oct. 30, 1947, 61 Stat. A-11, 55 U.N.T.S. 194 ("GATT").

Woods system; and third, it was still possible that the Bretton Woods system could be reinstituted at some later point.[7]

What ultimately was agreed upon was a system of floating exchange rates that currently shapes international finance and under which "large and serious United States balance-of-payments deficits" cannot exist. Floating exchange rates mean that the prices of currencies are not fixed, neither to each other nor to gold, but adjust according to supply and demand. As the Nobel Laureate Milton Friedman had explained in 1967, "a system of floating exchange rates completely eliminates the balance-of-payments problem—just as in a free market there cannot be a surplus or a shortage in the sense of eager sellers unable to find buyers or eager buyers unable to find sellers. The price may fluctuate but there cannot be a deficit or a surplus threatening an exchange crisis." Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates*, First Lecture 15 (1967).

---

[7] In the early 1970s, legislators and other policymakers genuinely believed "the idea that, sometime in the future, after its balance-of-payments goals were achieved, the United States would restore, at some price ratio, a dollar–gold link." One observer described this as "everyone's unspoken assumption" in 1971. Jeffrey E. Garten, *Three Days at Camp David: How a Secret Meeting in 1971 Transformed the Global Economy* 180 (2021).

Put differently, absent convertibility, currency markets cannot threaten U.S. gold reserves. That is where the United States now finds itself: in a situation where there is no fixed exchange rate to sustain and no gold conversion to fear, and where it does not make sense to speak of serious balance-of-payments deficits.

### B. The government confuses two different "balance of payments" concepts.

When litigating President Trump's prior round of tariffs in 2025, the statutory meaning of "balance-of-payments deficit" (as just described in subsection A) —in particular, that it is *not* the trade deficit— was clear to the government. For example, the government noted in its reply brief that: "Section 122 … does [not] have any obvious application here, where the concerns the President identified in declaring an emergency arise from trade deficits, which are conceptually distinct from balance-of-payments deficits." *See* Reply Brief for Appellants at 13, *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (Nos. 2025-1812, -1813), 2025 WL 2083367.

Now, however, the government substitutes a different concept whose name shares the first three words ("balance of payments") but carries an entirely different meaning. As explained above, "balance-of-

payments deficit" had a technical meaning: the reduction in a country's reserves of foreign currencies and gold. By contrast, the government now refers to the Balance of Payments—capitalized here to distinguish it from the aforementioned economic concept. The Balance of Payments is a government accounting statement. To be more precise, the Balance of Payments is "a statistical statement that summarizes transactions between residents and nonresidents during a period." Int'l Monetary Fund, *Balance of Payments (BOP)*, https://data.imf.org/en/datasets/IMF.STA:BOP (last visited Apr. 6, 2026). It is compiled as a double-entry system. This means every transaction generates an offsetting credit and debit, and the accounts sum to zero apart from measurement error. It is conventionally divided into three accounts, each with its subaccounts. The "current account" records trade in goods and services, primary income (compensation of employees and investment income, such as interest and dividends), and secondary income (transfers such as remittances and foreign aid). The "capital account," small in most countries, records capital transfers and transactions in nonproduced, nonfinancial assets. The "financial account" records transactions in foreign assets and liabilities, grouped into direct

investment, portfolio investment, financial derivatives, other investment (loans, deposits, trade credit), and reserve assets held by the central bank. In a system of fixed exchange rates, negative entries in this last subaccount — reserve assets held by the central bank — reflect a balance-of-payments deficit as discussed above in I.A.

The organizing identity for the Balance of Payments accounting statement is that the current account plus the capital account equals the financial account (plus a residual line called "net errors and omissions" that reflects discrepancies from incomplete or inconsistent source data). Compilation standards are set by the International Monetary Fund's (IMF) Balance of Payments and International Investment Position Manual; in the United States, the Balance of Payments accounts are produced by the Bureau of Economic Analysis. Data are drawn from customs records, surveys of firms and financial institutions, and banking system reports.

The government now argues that just about any negative intermediate balance on this accounting statement qualifies as a "balance-of-payments deficit." For example, the government approvingly mentions as candidates for a balance of payments deficit "'trade deficit,'"

"'balance on goods and services,'" "primary income," and "merchandise trade, goods and services, current account, and basic balance." Appellants Br. at 39, 41. But that is about as sensible as arguing that any intermediate balance on a company's income statement (e.g., revenue; gross margin) is accounting income.

As the government acknowledges even now, as an accounting statement, the Balance of Payments necessarily balances. Appellants Br. at 5. There thus cannot be an aggregate "Balance of Payments deficit" in this sense of the three words (again using capitalization to emphasize that we are referencing the accounting statement).

The government instead picks and chooses some individual entries from the Balance of Payments accounting statement: the current account balance, the balance on primary income, etc. These are line items of the Balance of Payments, much like "revenue" or "cost of goods sold" are line items of a company's accounting statement.

In support of this approach, the government cites Patricia H. Kuwayama, *Measuring the United States Balance of Payments*, Fed. Rsrv. Bank of N.Y. Monthly Rev. 183 (Aug. 1975), https://perma.cc/BVL8-9GUG; and Poul Høst-Madsen, *What Does It Really Mean?: A Deficit in*

*the Balance of Payments*, 3 FIN. & DEV. 171 (1966). Appellants Br. at 22. The government also asserts that "[t]he International Monetary Fund has also long used the current account to assess countries' balance-of-payments positions, ... *See, e.g.*, IMF, Annual Report 1952, at 38-39 (1952)[.]" Appellants Br. at 29. Upon careful reading, however, these economic sources do not confirm the government's position; they undermine it.

The IMF, in the passage cited by the government, was concerned with "the concept of 'temporary assistance in financing balance of payments deficits on current account *for monetary stabilization operations*.'" Int'l Monetary Fund, Annual Report 1952, at 38-39 (1952), https://perma.cc/W8DS-HEE5 (emphasis added; citation omitted). The reference to the "current account" here merely means that the origin of the balance of payments deficit was in the current account as opposed to the capital account, and *not* that a current account deficit *is* a balance-of-payments deficit. To the contrary, it is clear from this passage that in the IMF's parlance, "balance of payments deficit" relates to monetary problems.

Høst-Madsen, writing in 1966, explained that "so-called overall surplus or deficit does not … represent the balance of all items in the balance of payments (which is necessarily zero when the entry for net errors and omissions is included), but only the balance of a certain selection of transactions. The other transactions are, as it were, excluded from the balance of payments proper and regarded as 'financing' it. … all the items of the balance of payments are divided into those 'above the line' which make up the surplus or deficit, and those 'below the line,' which represent the financing of the positive or negative over-all balance. Transactions recorded below the line thus characteristically represent the reaction of the financial authorities to a number of (as it were) spontaneous movements…." Høst-Madsen, *supra*, 3 FIN. & DEV. 171, 171-172. Høst-Madsen explains that distinguishing between "financing," which sits below the line, and other transactions can be tricky. Nonetheless, he concluded that "[f]or many and perhaps most countries, changes in gold and foreign exchange reserves, together with financing through the Fund, constitute the main, or even the only, component of what can reasonably be regarded as the financing of the balance of payments below the line." *Id.* at 173. The only possible additions that

Høst-Madsen discusses are "change in the foreign exchange holdings of" "commercial banks" "where a country exercises strict control over [their] foreign operations" (*id.* at 173-174) and "some other important transactions which clearly function in the same way as reserves in financing surpluses or deficits … the most conspicuous case of [which] has been perhaps the bilateral assistance extended to the United Kingdom under swap or similar arrangements during periods of crisis" (*id.* at 174). While acknowledging that "[s]ometimes, and in particular in Europe," a balance-of-payments deficit "is identified with" the current account balance, Høst-Madsen explicitly rejects this approach. *Id.* at 173. Høst-Madsen thus undermines rather than supports the government's contrary position. Appellants Br. at 30.

Kuwayama, for her part, uses the terms "balance-of-payments deficit" and "balance-of-payments surplus" each exactly once, and exactly in the sense that we have explained above in subsection A. Kuwayama, *supra*, at 191 ("When a balance-of-payments surplus results in an increase in international reserve assets of a country, this adds to the domestic monetary base. … In the case of a balance-of-payments deficit resulting in a reserve loss, the opposite sequence occurs."). She mentions

"balance of payments" many times more and discusses various "balance[s]" that could be calculated from it, as befits a major accounting system. Nowhere, however, does she equate these other balances calculated from the Balance of Payments with a "balance-of-payments deficit" or a "balance-of-payments surplus."

The government's contrary assertion relies on misleading quotes from her article. For example, the government writes that "there have long been other economically accepted ways of assessing balance-of-payments deficits" and then quotes Kuwayama as "explain[ing] that there were 'seven different measures … in standard use' at the time, one of which, the 'merchandise trade balance,' was 'the most familiar and well-defined.'" Appellants Br. at 29-30.[8] Read in context, however, Kuwayama was not "explaining" a measure of "balance-of-payments

[8] The full quote from the government's brief is as follows: "Although the current account is clearly a widely accepted measure of a balance-of-payment deficit, there have long been other economically accepted ways of assessing balance-of-payments deficits, and many of those methodologies also show a deficit today. As discussed above, just a year after Section 122's enactment, an article published by the Federal Reserve Bank of New York—and cited here by the then-Chair of the CEA (Appx230 & n.13)—explained that there were 'seven different measures … in standard use' at the time, one of which, the 'merchandise trade balance,' was 'the most familiar and well-defined.' Kuwayama, *supra*, at 183-184."

deficits" but rather a part of the international accounting system: "The balance of merchandise trade is probably the most familiar and well-defined of all payments concepts." Kuwayama, *supra*, at 184. She is describing here one of multiple balances one can calculate from numbers reported in the Balance of Payments, not the overall balance of payments.

In general, the government's position — based on its erroneous readings of others' statements — collapses the critical distinction between two fundamentally different concepts. For example, the government is — in a limited sense — correct that the current account is "relevant to balance-of-payments deficits." Appellants Br. at 29 (quoting Appx42). After all, the current account is one item in a system of accounts, the Balance of Payments, that under a system of fixed exchange rates delivers the balance of payments as its bottom line. But that an item in the system of accounts can add or subtract to the bottom line does not mean it is synonymous with the bottom line, just as a corporation's sales revenue or cost of goods sold does not conceptually or mathematically equal its profits.

### C. With floating exchange rates, no balance-of-payments imbalance can be "large and serious."

Even if the term "balance-of-payments deficits" in isolation could be interpreted to refer to any intermediate imbalance in the Balance of Payments, the government still cannot satisfy the Section 122 requirement that any balance of payments deficit must be "large and serious." 19 U.S.C. § 2132(a)(1). And, the seriousness must relate to the "fundamental international payments problems" that "require special import measures to restrict imports to deal with large and serious United States balance-of-payments deficits." *Id.* In today's regime of floating exchange rates, no imbalance can meet that criterion.

The only balance that could ever meet this criterion—before the advent of floating exchange rates—was the overall balance, that is, the outflow of gold and reserves that we identified, *supra* Section I.A, as the true meaning of "balance-of-payments deficit." Under fixed exchange rates, an outflow of gold and reserves could quickly bring down the entire exchange rate regime, as explained there. No intermediate balance of the Balance of Payments is immediately linked to such serious consequences. In contrast, and because the trade balance could not by itself trigger such consequences, the statute does not use the term "serious" when referring

to the trade balance of the Balance of Payments ("large and *persistent* United States balance-of-trade surpluses . . . ." *Id.* § 2132(c)(1) (emphasis added)).

In today's regime of floating exchange rates, not even a "balance-of-payments deficit" thus defined can be "serious" within the meaning of Section 122. Take the government's argument that "the circumstances identified in the proclamation also establish a deficit in the 'basic balance,' which the Court of International Trade identified as one of the acceptable methods for calculating a balance-of-payment deficit[.]" Appellants Br. at 46. Under a system of fixed exchange rates, a deficit in the basic balance could be serious. The measure was constructed, as the government itself says, to "capture only durable trends" while excluding short-term and volatile flows, Appellants Br. at 47 (quoting Appx228). If durable transactions generated a persistent deficit, that would eventually exhaust the stock of reserves, and the approach of that stock toward exhaustion forced devaluation, exchange controls, or abandonment of the parity. That is why Krugman defined a payments crisis as the moment "[w]hen the government is no longer able to defend a fixed parity because of the constraints on its actions…." Krugman,

*supra*, at 311. And it is why Article XII of the GATT, the international-law provision alongside which Congress legislated, conditions import restrictions on the level or rate of decline of reserves. GATT art. XII(2)(a).

But the United States under floating exchange rates no longer faces the relevant constraint of having to deploy finite resources to defend "a fixed parity." No finite stock of gold or reserves is being drawn down, and the deficits the Proclamation identifies do not compel the United States to do anything at all. As Feldstein put it, "[w]e will have a trade deficit, we will have a current account deficit; but there is no reason to think that we will be drawing down U.S. reserves or selling off our gold stock, and therefore we don't have the balance-of-payments deficit that is required as a condition for triggering section 122." Trade Deficit Hearing, *supra*, at 6. Just as in the 1980s when Feldstein was testifying, today there is no danger of the United States perilously drawing down its reserves or selling its gold stock to settle its external obligations. The government's insistence that these deficits have existed for many years (Appellants Br. at 48, 51) underscores this. This persistence is, if anything, a demonstration that the deficits are not "large and serious" in the relevant sense.

Because the reference to "large and serious balance-of-payments deficits" in Section 122 cannot apply to the United States today, the President cannot find statutory authority to issue the Proclamation under Section 122 of the Trade Act.

## II. The United States Does Not Face "Fundamental International Payments Problems."

As to the second and threshold condition, the United States does not face "fundamental international payments problems." *V.O.S. Selections, Inc.*, 149 F.4th at 1372 (Taranto, J., dissenting) (quoting 19 U.S.C. § 2132(a)).

As an initial matter, the Proclamation fails to define or identify any "fundamental international payments problems" that would justify Section 122 tariffs.

In any event, such problems do not exist. Broadly speaking, "fundamental international payments problems" can be faced by a country either in *current* transactions (if it is unable to pay for imports of goods and services taking place today) or with respect to *past* transactions (if it is unable to fulfill existing obligations to pay interest and principal on debt held by foreigners). The United States faces neither problem today.

First, there is no evidence of an international payments problem with respect to current transactions. In fact, imports of goods and services into the United States were greater in 2025 than in any prior year, and the same was true in 2024.[9] As the government acknowledges, the United States has for decades now been able to pay for imports of goods and services well beyond its exports of goods and services.

Nor is this likely to change. The dollar is "overwhelmingly the world's most frequently used currency in global trade." Carol Bertaut et al., *The International Role of the U.S. Dollar – 2025 Edition*, The Federal Reserve (July 18, 2025), https://www.federalreserve.gov/econres/notes/feds-notes/the-international-role-of-the-u-s-dollar-2025-edition-20250718.html. The United States has ready access to the dollar because it issues the currency.

Second, with respect to past transactions, the United States also does not face any fundamental international payments problems. There is ample demand for U.S. debt as is evident from its borrowing costs

[9] U.S. Bureau of Economic Analysis, *U.S. International Trade in Goods and Services, December and Annual 2025* (Feb. 19, 2026), https://www.bea.gov/news/2026/us-international-trade-goods-and-services-december-and-annual-2025.

despite record-high levels of debt issuance. This is also unlikely to change, as the dollar retains dominant roles in official foreign exchange reserves, international payments, foreign-currency debt issuance, and foreign-currency banking claims and liabilities. *Id.* Indeed, the most important example of the second form of international payments problems in the context of Section 122 involves currency that can be exchanged for gold or a different asset the country cannot costlessly produce. As discussed with respect to the balance-of-payments problems, this is the international payments problem that was front of mind for the legislators who drafted and enacted Section 122. Currency is a form of debt — a liability of the issuing government — and in a system of managed or fixed exchange rates, the issuing government sometimes commits to exchanging it for gold or a different asset. But this is not so in today's system of floating exchange rates.

Generally, a country can encounter fundamental international payments problems if its currency is not accepted by trading partners and international financiers or if it operates a system of fixed or managed exchange rates. The United States is not in either situation — today, dollars are accepted for payment all over the world, even without the

backing of gold or another precious commodity. The "necessary threshold condition" of fundamental international payments problems is thus not met for the President to issue the tariffs under Section 122.

## III. The Government's Interpretation Would Grant It Unconstrained Authority To Impose Worldwide Tariffs.

While we believe that the statutory text settles the matter, as explained above, we also wish to draw attention to the consequences of accepting the government's position against the background of international economic accounting measures. In short, accepting the government's interpretation of Section 122 would grant the President arbitrary authority to implement tariffs up to 15 percent at any time, for up to 150 days. This is because some of the accounting balances the government claims represent the "balance of payments" will practically always be in deficit, even while the government disavows any other limitations on the President's authority under Section 122.

Starting with the lack of other limitations, the government explicitly disavows the courts' authority to review whether deficits are "large and serious." *See* Appellants Br. at 27 n.1 ("The CIT majority correctly determined that 'there is no serious dispute that whether [balance-of-payments] deficits are 'large and serious' is a discretionary

determination within the province of the Executive Branch, review of which by the judiciary is impermissible.' Appx32. We accordingly do not discuss the 'large and serious' requirement in this brief."). And as we have already remarked above, the government does not even discuss the statute's language of "fundamental international payments problems," thus implicitly disavowing that restraint as well. The upshot is that once the President purports to find a "balance-of-payments deficit," the President can (or as a matter of law, shall) "proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress)—(A) a temporary import surcharge, not to exceed 15 percent ad valorem[.]" 19 U.S.C. § 2132(a).

Turning then to balance-of-payments deficits: by the government's interpretation, they are virtually guaranteed to exist at any moment. That is because, as Amici have explained, the government conflates "balance of payments" with intermediate balances that can be found in the Balance of Payments accounting statement (*supra* I.B). The accounting statement always balances to zero. That means that for any "surplus," there must be an offsetting "deficit" somewhere. Because there will always be a surplus in some account, it follows that there will always

be some deficit. While the government does not take this capacious position explicitly, it gestures in this direction and does not articulate a limiting principle.

The government also avers that the balance of payments is "susceptible to measurement by a range of reasonable methodologies." Appellants Br. at 21. In its attempt to flesh out which methodologies are acceptable, the government approvingly cites Kuwayama's enumeration of seven concepts in the Balance of Payments accounting statement. Appellants Br. at 30. The government states that "[a]t least four of the seven measures—merchandise trade, goods and services, current account, and basic balance—are running deficits today," and the other measures have been rendered obsolete. Appellants Br. at 30. Setting aside the basic balance, which the Bureau of Economic Analysis no longer tracks, Appx39, at least one of the three measures the government lists has been in deficit in every year since 1976, and all three of them—the goods trade balance, the goods and services trade balance, and the

current account balance—have been in deficit for 46 years in the 50-year period from 1976 to 2025.[10]

Thus, using the measures that the government now proffers, the United States has been running a continuous balance-of-payments deficit every year since the Jamaica Accords ended the Bretton Woods system and cemented floating exchange rates as the centerpiece of the international monetary regime. As the Court of International Trade noted, "the Government's suggestion that what constitutes 'balance-of-payments deficits' may change proves too much." Appx39. Under this interpretation, every U.S. president for the past five decades would have had the unilateral authority to impose worldwide 15 percent tariffs at any time.

## IV. The Tariffs Have Had Vast Economic And Political Significance.

The Section 122 tariffs raised some $35 billion in the 150 days during which they were in effect.[11] The Supreme Court recently deemed

[10] The merchandise trade balance and the goods and services balance have been in deficit every year since 1976. The current account has been in deficit all but four years since 1976. U.S. Bureau of Economic Analysis, International Data: Table 1.1. U.S. International Transactions (June 24, 2026).

[11] U.S. Customs and Border Protection, *Trade Statistics*, https://www.cbp.gov/newsroom/stats/trade (last visited Sept. 2, 2026).

a policy with an economic impact of nearly $50 billion to be of "vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (quotation marks omitted). The impact of the tariffs is similar in revenue terms alone, but the tariffs' economic consequences extend well beyond their revenue implications.

Most importantly, tariffs reduce and redirect total trade flows, both imports and exports. Douglas A. Irwin, *Three Simple Principles of Trade Policy* 2-9 (1996); N. Gregory Mankiw, *Principles of Economics* 143 (7th ed. 2015). Indeed, that was the President's avowed goal. For example, the Proclamation partly addressed the "goods trade deficit." Proclamation ¶ 8. High-ranking government officials have stated that relocating production and reconfiguring supply chains are paramount objectives of the President's tariffs. For instance, Secretary of the Treasury Scott Bessent, commenting on "the change from IEEPA to the 122s" reaffirmed

---

Customs and Border Protection reports that $31.06 billion of Section 122 duties were assessed through July 5, 2026. This is 88 percent of the 150-day window during which the Section 122 tariffs were in effect. Dividing $31.06 billion by 0.88 returns roughly $35 billion.

that "the ultimate purpose of tariffs is to re-shore production."[12] U.S. Trade Representative Jamieson Greer likewise said that the Section 122 tariffs were among the actions the President took "to ensure continuity in reaching [the overall tariff program's] goals," which "include reducing the U.S. global trade deficit in goods, reversing the lack of reciprocity by our foreign trading partners, and incentivizing the reshoring of production to the United States."[13]

Reducing aggregate and/or sectoral trade deficits and spurring shifts in production, however, necessarily require changing trade patterns. The exchanges that did not happen while the tariffs were in effect were in many cases permanently destroyed and with that the gains that would have accrued to the parties involved. By "affecting the price of [many goods] for millions of people," the tariffs at issue prompted

---

[12] CNBC, *CNBC Transcript: U.S. Treasury Secretary Scott Bessent Speaks with CNBC's Brian Sullivan on "Squawk Box" Today* (Mar. 16, 2026), https://www.cnbc.com/2026/03/16/cnbc-transcript-us-treasury-secretary-scott-bessent-speaks-with-cnbcs-brian-sullivan-on-squawk-box-today.html.

[13] Press Release, Office of the U.S. Trade Representative, *Ambassador Greer Issues Statement on Supreme Court IEEPA Decision* (Feb. 20, 2026), https://ustr.gov/about/policy-offices/press-office/press-releases/2026/february/ambassador-greer-issues-statement-supreme-court-ieepa-decision.

consumers and firms to alter their purchasing patterns across a wide range of industries.[14] *King v. Burwell*, 576 U.S. 473, 485 (2015). American households purchased inferior or more expensive consumption goods, and firms were forced to shift to combinations of inputs and make production, investment, and hiring decisions that they would not have chosen in the absence of the tariffs.

Much trade is the result of long-term planning and investment, with which the tariffs have interfered. Some importers looked for new suppliers, and some exporters signed contracts with new customers, while the tariffs were in effect. Once these new suppliers are part of the firms' commercial networks, going back to their original business partners will frequently involve switching costs, effectively locking businesses into suboptimal supply chains permanently. Some firms secured exemptions for their imports, gaining a temporary advantage over their competitors that may well translate into a permanent improvement in their market position.

---

[14] Thomas Brosy et al., *How the Supreme Court's IEEPA Ruling and New Section 122 Tariffs Reshape Costs Across Industries*, Tax Policy Center (Mar. 10, 2026), https://taxpolicycenter.org/taxvox/how-supreme-courts-ieepa-ruling-and-new-section-122-tariffs-reshape-costs-across-industries.

Finally, the imposition of tariffs will have created liquidity problems for some households and firms — problems which can extend to reduced credit scores, evictions, defaults on loans, or even bankruptcy.

In sum, as Chief Justice Roberts reasoned for the majority in *Learning Resources*, the President's "assertion … of broad 'statutory power over the national economy'" was "'extravagant' by any measure." 607 U.S. 229, 246 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). So too here. For all the above reasons, the tariffs at issue were of major economic and political significance.

## V. CONCLUSION

Because the President did not and cannot satisfy the economic conditions requisite to rely on Section 122 of the Trade Act of 1974, the Court should affirm.

Dated September 15, 2026

Respectfully submitted,

Holger Spamann
1525 Massachusetts Avenue
Cambridge, MA 02138
(617) 496-6710

*/s/ Aaron R. Cooper*
Aaron R. Cooper
Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

Debbie L. Berman

JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

Counsel for *Amici Curiae* Economists

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September, 2026, I caused the foregoing corrected brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system, which caused a copy of the foregoing to be delivered by electronic means to counsel of record.

/s/ *Aaron R. Cooper*

## CERTIFICATE OF COMPLIANCE

This corrected brief complies with the type-face volume limitation of Fed. Cir. R. 21(e) because the brief contains 6,712 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office Word 360 in 14-point Century Font.

Dated: September 15, 2026 Respectfully submitted,

/s/ *Aaron R. Cooper*

## APPENDIX A: SIGNATORIES

Stan Veuger is Senior Fellow at the American Enterprise Institute.

Olugbenga Ajilore is Chief Economist at the Center on Budget and Policy Priorities. He served as Senior Advisor in the Office of the Undersecretary for Rural Development at the United States Department of Agriculture from 2021 to 2025.

Alan J. Auerbach is Professor of the Graduate School and Robert D. Burch Professor of Economics and Law, Emeritus, at the University of California, Berkeley. He served as Deputy Chief of Staff of the Joint Committee on Taxation in 1992.

Robert J. Barro is Paul M. Warburg Professor of Economics at Harvard University.

Andrew G. Biggs is Senior Fellow at the American Enterprise Institute and serves as Member of the Financial Oversight and Management

Board for Puerto Rico. He served as Principal Deputy Commissioner and in other senior positions at the Social Security Administration from 2003 to 2007.

Emily Blanchard is Associate Professor at the Tuck School of Business at Dartmouth College. She served as Chief Economist at the Department of State from 2022 to 2023.

Alan Blinder is Gordon S. Rentschler Memorial Professor of Economics and Public Affairs at Princeton University. He served as Vice Chairman of the Board of Governors of the Federal Reserve System from 1994 to 1996 and as Member of the Council of Economic Advisers from 1993 to 1994.

Michael D. Bordo is Distinguished Professor Emeritus at Rutgers University, Distinguished Visiting Fellow at the Hoover Institution at Stanford University, and Distinguished Visitor at the Griswold Center for Economic Policy Studies at Princeton University.

Donald J. Boudreaux is Professor of Economics at George Mason University, Martha and Nelson Getchell Chair for the Study of Free Market Capitalism and Senior Fellow with the F.A. Hayek Program for Advanced Study in Philosophy, Politics, and Economics at the Mercatus Center at George Mason University, and Adjunct Scholar at the Cato Institute.

Alex Brill is Senior Fellow at the American Enterprise Institute. He served as Policy Director and Chief Economist of the House Ways and Means Committee from 2002 to 2007, and as Staff Economist at the Council of Economic Advisers from 2001 to 2002.

Daniel Bunn is President and CEO of the Tax Foundation. He worked as Senior Policy Advisor to the Senate's Joint Economic Committee and on the policy staff for Senators Mike Lee and Tim Scott from 2013 to 2018.

James C. Capretta is Senior Fellow and the Milton Friedman Chair at the American Enterprise Institute. He served as Associate Director for

Human Resource Programs at the Office of Management and Budget from 2001 to 2004.

Steve Cicala is Associate Professor of Economics at Tufts University.

Kimberly Clausing holds the Eric M. Zolt Chair in Tax Law and Policy at the UCLA School of Law and is nonresident Senior Fellow at the Peterson Institute for International Economics. She served as Deputy Assistant Secretary of the Treasury for Tax Analysis from 2021 to 2022.

Heidi Crebo-Rediker is Senior Fellow at the Council on Foreign Relations. She served as Chief Economist at the Department of State from 2012 to 2013, and as Chief of International Finance and Economics for the Senate Committee on Foreign Relations from 2009 to 2012.

Steven J. Davis is Thomas W. and Susan B. Ford Senior Fellow and Director of Research at the Hoover Institution at Stanford University, and Senior Fellow at the Stanford Institute for Economic Policy Research.

Mihir A. Desai is Mizuho Financial Group Professor of Finance at Harvard Business School and Professor of Law at Harvard Law School.

Karen Dynan is Professor of the Practice of Economic Policy at Harvard University, and nonresident Senior Fellow at the Peterson Institute for International Economics. She served as Assistant Secretary of the Treasury for Economic Policy from 2013 to 2017.

Douglas Elmendorf is Professor of Public Policy at Harvard University's Kennedy School of Government. He served as Director of the Congressional Budget Office from 2009 to 2015.

Jeffry Frieden is Professor of International and Public Affairs and Political Science at Columbia University.

Jason Furman is Aetna Professor of the Practice of Economic Policy jointly at the Harvard Kennedy School and the Department of Economics at Harvard University, and nonresident Senior Fellow at the Peterson

Institute for International Economics. He served as Chair of the Council of Economic Advisers from 2013 to 2017.

Samuel Gregg is President and Friedrich Hayek Chair in Economics and Economic History at the American Institute for Economic Research.

Kyle Handley is Professor of Economics, Rafael and Marina Pastor Chancellor's Endowed GPS Faculty Fellow, and Director of the Center for Commerce and Diplomacy at the University of California, San Diego's School of Global Policy and Strategy, and Adjunct Scholar at the Cato Institute.

Ben Harris is Vice President and Director of Economic Studies at the Brookings Institution, where he also holds the Bruce and Virginia MacLaury Chair. He served as Assistant Secretary for Economic Policy and Chief Economist at the Department of the Treasury from 2021 to 2023, as Chief Economist and Economic Adviser to the Vice President from 2014 to 2017, and as Senior Economist at the Council of Economic Advisers from 2011 to 2013.

David R. Henderson is Research Fellow at the Hoover Institution at Stanford University. He served as Senior Economist at the White House's Council of Economic Advisers from 1982 to 1984.

Douglas Holtz-Eakin is President of the American Action Forum. He was Director of the Congressional Budget Office from 2003 to 2005 and served as Chief Economist of the Council of Economic Advisers from 2001 to 2002.

Simon Johnson is Ronald A. Kurtz (1954) Professor of Entrepreneurship at the MIT Sloan School of Management. He served as Chief Economist of the International Monetary Fund from 2007 to 2008. He received the Nobel Prize in Economics in 2024.

Steven B. Kamin is Senior Fellow at the American Enterprise Institute. He was Director of the Division of International Finance at the Board of Governors of the Federal Reserve System from 2011 to 2020.

Mary E. Lovely is Anthony M. Solomon Senior Fellow at the Peterson Institute for International Economics and Professor Emerita of Economics at Syracuse University's Maxwell School of Citizenship and Public Affairs.

Philip A. Luck is Director of the Economics Program and Scholl Chair in International Business at the Center for Strategic and International Studies. He served as the Deputy Chief Economist at the Department of State from 2022 to 2025.

N. Gregory Mankiw is Robert M. Beren Professor of Economics at Harvard University. He served as Chair of the Council of Economic Advisers from 2003 to 2005.

Marc Melitz is David A. Wells Professor of Political Economy at Harvard University.

Jeffrey Miron is Senior Lecturer and Director of Graduate and Undergraduate Studies in the Department of Economics at Harvard University, and Vice President for Research at the Cato Institute.

Marc-Andreas Muendler is Professor of Economics and Founding Director of the Globalization and Prosperity Lab at the University of California, San Diego.

Brent Neiman is Edward Eagle Brown Professor of Economics at the University of Chicago Booth School of Business. He served as Counselor to the Secretary of the Treasury and as Deputy Under Secretary of the Treasury for International Finance from 2022 to 2025.

Stephen O'Connell is Gil and Frank Mustin Professor of Economics at Swarthmore College. He served as Chief Economist at the United States Agency for International Development from 2014 to 2015.

Kyle Pomerleau is Senior Fellow at the American Enterprise Institute.

Douglas A. Rediker is nonresident Senior Fellow at the Brookings Institution, and Managing Partner at International Capital Strategies. He represented the United States on the Executive Board of the International Monetary Fund from 2010 to 2012.

Jay C. Shambaugh is Professor of Economics and International Affairs George Washington University and nonresident Senior Fellow at the Brookings Institution. He served as Under Secretary of the Treasury for International Affairs from 2022 to 2025, as Member of the White House's Council of Economic Advisers from 2015 to 2017, as Chief Economist from 2010 to 2011, and as Senior Economist from 2009 to 2010.

Mark Sobel is U.S. Chairman at the Official Monetary and Financial Institutions Forum. He served as United States Representative at the International Monetary Fund from 2015 to 2018 and as Deputy Assistant Secretary of the Treasury for International Monetary and Financial Policy from 2000 to 2015.

Michael R. Strain is Director of Economic Policy Studies and Paul F. Oreffice Senior Fellow in Political Economy at the American Enterprise Institute, and Professor of Practice in the McCourt School of Public Policy at Georgetown University.

Laura D. Tyson is Distinguished Professor of the Graduate School at the Haas School of Business, University of California, Berkeley. She served as Chair of the National Economic Council from 1995 to 1996 and as Chair of the Council of Economic Advisers from 1993 to 1995.

Alan D. Viard is Senior Fellow Emeritus at the American Enterprise Institute. He served as Visiting Scholar at the U.S. Department of the Treasury's Office of Tax Analysis in 2005, and as Senior Economist at the White House's Council of Economic Advisers from 2003 to 2004.

Mark J. Warshawsky is Senior Fellow and Wilson H. Taylor Chair in Health Care and Retirement Policy at the American Enterprise Institute. He served as Assistant Secretary of the Treasury for Economic Policy from 2004 to 2006.

Janet Yellen is Distinguished Fellow in Residence at the Brookings Institution. She served as Secretary of the Treasury from 2021 to 2025, as Chair of the Board of Governors of the Federal Reserve System from 2014 to 2018, as President of the Federal Reserve Bank of San Francisco from 2004 to 2010, and as Chair of the Council of Economic Advisers from 1997 to 1999.

Erica York is Vice President of Federal Tax Policy at the Tax Foundation.

Owen Zidar is Professor of Economics and Public Affairs at Princeton University. He served as Staff Economist at the Council of Economic Advisers from 2010 to 2011.