**Nos. 2026-1804, -1805, -1928**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

STATE OF OREGON, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF NEW YORK, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, OFFICE OF THE GOVERNOR EX REL. ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WISCONSIN,
*Plaintiffs - Cross - Appellants*

STATE OF WASHINGTON
*Plaintiff - Appellee*
v.
DONALD J. TRUMP, in his official capacity as President of the United States, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, UNITED STATES,
*Defendants – Appellants*
(for Continuation of Caption See Next Page)

---

On Appeal from the United States Court of International Trade in Nos. Nos. 26-1742, -1606, Judges Barnett, Kelly, and Stanceu

---

# CORRECTED BRIEF OF AMICI CURIAE CATO INSTITUTE AND ILYA SOMIN IN SUPPORT PLAINTIFFS-APPELLEES AND AFFIRMANCE

Ilya Somin
Professor of Law
Antonin Scalia Law School
George Mason University
3301 Fairfax Drive.
Arlington, VA 22201
(703) 993-8069
lsomin@gmu.edu

Daniel W. Wolff
Alexander Schaefer
Crowell & Moring LLP
600 Fifth Street, NW
Washington, DC 20001
(202) 624-2500
dwolff@crowell.com
aschaefer@crowell.com

BURLAP AND BARREL, INC., BASIC FUN, INC.,
*Plaintiffs – Appellees*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, JAMIESON GREER, in his official capacity as U.S. Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,
*Defendants – Appellants*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1804

**Short Case Caption** State of Oregon v. Trump

**Filing Party/Entity** CATO Institute; Ilya Somin

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/08/2026

Signature: /s/ Daniel W. Wolff

Name: Daniel W. Wolff

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Cato Institute | | |
| Ilya Somin | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS


INTEREST OF *AMICI CURIAE* .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 2

I. SECTION 122 CAN ONLY BE INVOKED IN CIRCUMSTANCES THAT CANNOT EXIST UNDER A FLEXIBLE EXCHANGE RATE REGIME. .......... 5

II. THE MAJOR QUESTIONS DOCTRINE REQUIRES INVALIDATION OF THESE SECTION 122 TARIFFS. .......... 12

- A. The Section 122 tariffs raise a major question. .......... 13
- B. Tariffs are not exempt from the major questions doctrine by virtue of being "foreign affairs" issues. .......... 22

III. IF SECTION 122 GRANTS THE PRESIDENT THE AUTHORITY HE CLAIMS HERE, IT WOULD BE AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER TO THE EXECUTIVE. .......... 25

- A. The Section 122 tariffs violate the nondelegation doctrine. .......... 26
- B. Tariff delegations are not exempt from nondelegation constraints on the grounds that they are "foreign affairs" issues. .......... 31
- C. The constitutional avoidance canon requires interpreting Section 122 to avoid a sweeping delegation of tariff authority that raises constitutional problems. .......... 33

CONCLUSION .......... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758 (2021) .................... 12, 16, 23

*Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335 (Ct. Int'l Trade 2019) .................... 26

*Am. Power & Light Co. v. SEC*, 329 U.S. 90 (1946) .................... 26

*Biden v. Nebraska*, 600 U.S. 477 (2023) .................... 22, 23

*FCC v. Consumers' Research*, 606 U.S. 656 (2025) .................... *passim*

*Food & Drug Admin. v. Brown & Williamson*, 529 U.S. 159 (2000) .................... 3, 12

*Gibbons v. Ogden*, 22 U.S. 1 (1824) .................... 27

*Gundy v. United States*, 588 U.S. 128 (2019) .................... 31

*HMTX Indus. v. United States*, 156 F.4th 1236 (Fed. Cir. 2025) .................... 21

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928) .................... 26, 33

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) .................... 5, 33

*Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026) .................... *passim*

*Merritt v. Welsh*,
104 U.S. 694 (1881) .......... 22

*Mistretta v. United States*,
488 U.S. 361 (1989) .......... 25, 29

*Nat'l Fed'n of Indep. Bus. ("NFIB") v. Dep't of Lab.*,
595 U.S. 109 (2022) .......... 16, 20

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .......... 33, 34

*Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div. of Dep't of Lab.*,
312 U.S. 126 (1941) .......... 27

*Oregon v. United States*,
2026 WL 1257669 (Ct. Int'l Trade May 7, 2026), *appeal docketed*, No. 26-1804 (Fed. Cir. May 8, 2026) .......... *passim*

*The Grasping Hand: Kelo v. City of New London and the Limits of Eminent Domain*
(rev. ed. 2016) .......... 2

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 3, 12

*V.O.S. Selections v. Trump*,
149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom. Learning Res.*, 607 U.S. 229 (2026) .......... *passim*

*V.O.S. Selections v. Trump*,
772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025), *aff'd*, 149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom. Learning Res. v. Trump*, 607 U.S. 229 (2026) .......... 10, 11, 20, 26

*Wayman v. Southard*,
23 U.S. 1 (1825) .......... 29, 30

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 17, 24

*Whitman v. Am. Trucking Ass'ns, Inc.*,
531 U.S. 457 (2001) .......... 28

**Statutes**

19 U.S.C. § 2132(a) .......... *passim*

20 U.S.C. § 1098bb(a)(1) .......... 23

42 U.S.C. § 264(a) .......... 23

**Other Authorities**

91 Fed. Reg. 9340 (Feb. 25, 2026) .......... 8

Andreas Freytag & Phil Levy, *The Trade Balance and Winning at Trade*, Cato Inst. Oct. 3, 2024, https://www.cato.org/publications/trade-balance-winning-trade .......... 9

*Cato Sup. Ct. Rev.* 69 (2022) .......... 16

Comm. for a Responsible Fed. Budget, *How Much Will Trump's New 10% (or 15%) Tariffs Raise?* (Mar. 4, 2026) .......... 13

Cong. Rsch. Serv., *Introduction to U.S. Economy: Trade Deficit* 1 (June 30, 2025) .......... 15

Curtis A. Bradley & Jack L. Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 *U. Pa. L. Rev.* 1743 (2024) .......... 32

*Democracy and Political Ignorance: Why Smaller Government is Smarter* (2d ed. 2016) .......... 1

Edward J. Lopez & Jon Murphy, *Deconstructing the Council of Economic Advisers' Balance of Payments Report*, *Indep. Inst.* (Aug. 27, 2026) .......... 8

Erica York & Alex Durante, *Tracking the Impact of the Trump Tariffs & Trade War*, *Tax Found.* (Aug. 2026) .......... 13

*The Federalist* No. 48 (J. Madison) .................................................. 25, 27

*Free to Move: Foot Voting, Migration, and Political Freedom* (rev. ed. 2022), .................................................................................... 1

Ilan Wurman, *Nondelegation at the Founding*, 130 *Yale L.J.* 1490 (2021) ................................................................................ 30

Ilya Somin, *A Major Question of Power: The Vaccine Mandate Cases and the Limits of Executive Authority*, 2021-22 .............................................................................. 16, 20

Ilya Somin, *A Takings Clause Lawsuit Against the CDC Eviction Moratorium*, *Reason* (Aug. 3, 2021) ...................................... 16

Ilya Somin, *How the Supreme Court Spared America*, *Atlantic* (Feb. 21, 2026) ......................................................... 24

2 Margaret Garritsen De Vries, *The International Monetary Fund, 1972-78: Cooperation on Trial* ch. 37 (1996) .............................. 8

Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates* 15 (1967) ..................... 6

Off. of the Dir. of Nat'l Intel., *National Intelligence Estimate: Economic and National Security Implications of the COVID-19 Pandemic Through 2026* (Apr. 2022) ................................ 23

Phillip W. Magness & Marc Wheat, *No, Mr. President, Section 122 Tariffs Won't Work Either*, *Nat'l Rev.* (Mar. 2, 2026) ................................................................................... 7

Scott Lincicome & Nathan Miller, *The White House Still Can't Grasp That Americans Pay US Tariffs*, *Cato Inst.* (Feb. 19, 2026) ................................................................................ 24

Stan Veuger & Clark Packard, *Trump's New Tariffs Are Also Illegal*, *Foreign Pol'y* (Feb. 26, 2026) ..................................................... 7

Yale Budget Lab, *State of Tariffs* (Feb. 21, 2026) ................................... 14

## INTEREST OF *AMICI CURIAE*[*]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files amicus briefs in state and federal courts. This case interests Cato because of its significance to the constitutional separation of powers and its potential impact on free trade and the U.S. economy.

Ilya Somin is Professor of Law at the Antonin Scalia Law School at George Mason University, Visiting Professor of Law at the University of Virginia School of Law, B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute, and the author of numerous works on constitutional law and related issues, including *Free to Move: Foot*

[*]Amici curiae state that no counsel for any party authored this brief in whole or in part. No person, aside from amici curiae, their members, or their counsel made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to this brief.

*Voting, Migration, and Political Freedom* (rev. ed. 2022), *Democracy and Political Ignorance: Why Smaller Government is Smarter* (2d ed. 2016), and *The Grasping Hand: Kelo v. City of New London and the Limits of Eminent Domain* (rev. ed. 2016). His briefs and writings have been cited in decisions by the United States Supreme Court, lower federal courts, state supreme courts, and the Supreme Court of Israel. His writings helped inspire *V.O.S. Selections v. Trump*, the case that led to the invalidation of the IEEPA tariffs, and he served as co-counsel for the plaintiffs in that case throughout the litigation in the Court of International Trade, the Federal Circuit, and the Supreme Court.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Since the Supreme Court invalidated the massive International Emergency Economic Powers Act (IEEPA) tariffs in *Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026), the President has sought to effect a similar usurpation of congressional tariff authority by using Section 122 of the Trade Act of 1974 to impose 10 percent tariffs on imports from almost all our trading partners. This imposition is just as illegal as the last, and for many of the same reasons. The Court of International Trade (CIT) rightly ruled against it. *Oregon v. United States*, 2026 WL 1257669

(Ct. Int'l Trade May 7, 2026), *appeal docketed*, No. 26-1804 (Fed. Cir. May 8, 2026).

Part I explains why Section 122 cannot be used in current circumstances. The statute permits tariffs for no more than 150 days, and only in response to "fundamental international payments problems" that cause "large and serious United States balance-of-payments deficits" or "an imminent and significant depreciation of the dollar," or that make tariffs necessary to cooperate with other countries in addressing an "international balance-of-payments disequilibrium." 19 U.S.C. § 2132(a). Those conditions cannot exist in the flexible exchange rate regime in place today.

In Part II, amici explain why, if there is any ambiguity about whether Section 122 authorizes the massive tariffs the administration has imposed, the major questions doctrine (MQD) requires resolving that ambiguity against Appellants. The doctrine requires Congress to "speak clearly" when it assigns to the executive "decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *Food & Drug Admin. v. Brown & Williamson*, 529 U.S. 159 (2000)). The new Section 122 tariffs burden the economy as much as

or more than many policies the Supreme Court has invalidated on major questions grounds. Nor, as *Learning Resources* teaches, is the tariff power exempt from major questions scrutiny on the supposed ground that it is a "foreign affairs" authority of the President. The doctrine also counts against giving the administration a blank check to determine whether the preconditions for invoking Section 122 exist.

Part III shows that, if Section 122 did grant the President the power he claims, it would violate the nondelegation doctrine, which constrains transfers of legislative power to the executive. "[T]he core Congressional power to impose taxes such as tariffs is vested exclusively in the legislative branch by the Constitution[.]" *V.O.S. Selections v. Trump*, 149 F.4th 1312, 1332 (Fed. Cir. 2025), *aff'd sub nom. Learning Res.*, 607 U.S. 229 (2026). If Appellants' reading of Section 122 is correct, the President could declare a balance-of-payments crisis at almost any time and impose 15 percent tariffs on any imports from any country, circumventing the 150-day limit by declaring a new balance-of-payments problem whenever earlier tariffs expire. Such a sweeping delegation of a core congressional power would flout the rule that Congress cannot make "boundless" delegations of the power to tax, and the rule that "[t]he 'guidance' needed

is greater when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue." *FCC v. Consumers' Research*, 606 U.S. 656, 680 (2025) (quoting U.S. Const. art. 1, § 1). At the very least, the constitutional questions this claimed delegation raises are enough to trigger the constitutional avoidance canon, which requires courts to "shun an interpretation that raises serious constitutional doubts." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018).

## I. SECTION 122 CAN ONLY BE INVOKED IN CIRCUMSTANCES THAT CANNOT EXIST UNDER A FLEXIBLE EXCHANGE RATE REGIME.

Section 122 can only be invoked when there are "fundamental international payments problems" that cause "large and serious United States balance-of-payments deficits" or "an imminent and significant depreciation of the dollar," or that make tariffs necessary to cooperate with other countries in addressing an "international balance-of-payments disequilibrium." 19 U.S.C. § 2132(a). Invoking Section 122 therefore requires the presence of "fundamental international payments problems" plus one of three further conditions those problems cause. Those circumstances do not and cannot exist today.

"Fundamental international payment problems" and balance-of-payments deficits can only arise in a fixed exchange-rate system, like the one in place when the United States took part in the Bretton Woods regime of fixed rates backed by U.S. gold reserves. Under that system, the United States could run short of currency reserves when demand for dollars at the fixed rate rose, or short of gold reserves when holders rushed to exchange dollars for gold. Since the end of the gold-exchange system in 1971 and the shift to floating exchange rates in 1973, those problems have disappeared. The U.S. government no longer promises to exchange dollars for gold, and any increase in demand for dollars moves the exchange rate toward a new equilibrium. As Nobel Prize-winning monetary economist Milton Friedman explained in 1967, "a system of floating exchange rates completely eliminates the balance-of-payments problem. The [currency] price may fluctuate but there cannot be a deficit or a surplus threatening an exchange crisis." Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates* 15 (1967).

Even if balance-of-payments issues can still somehow arise today, the statutory text reaches only "*fundamental* international payments

problems" that cause "*large and serious* United States balance-of-payments deficits." 19 U.S.C. § 2132(a) (emphasis added). Problems on that scale cannot occur in the absence of a fixed exchange rate mechanism. An "imminent and significant depreciation of the dollar" can potentially still occur. *Id.* But the statute permits tariffs only for depreciations caused by "fundamental international payments problems." *Id.* Those problems arise only in fixed exchange rate regimes. The same point applies to the use of tariffs to cooperate with other countries in addressing an "international balance-of-payments disequilibrium." *Id.* In any event, the President has not invoked the dollar depreciation and international cooperation rationales in this case.

When Congress drafted Section 122 in 1973–74 and when it was signed into law in 1975, nobody knew whether the new flexible exchange-rate system would last. President Richard Nixon and many in Congress expected a fixed exchange rate regime to return, and Congress wrote Section 122 for that contingency. *See* Phillip W. Magness & Marc Wheat, *No, Mr. President, Section 122 Tariffs Won't Work Either*, *Nat'l Rev.* (Mar. 2, 2026), https://www.nationalreview.com/2026/03/no-mr-president-section-122-tariffs-wont-work-either/ (recounting this history); Stan

Veuger & Clark Packard, *Trump's New Tariffs Are Also Illegal*, *Foreign Pol'y* (Feb. 26, 2026), https://foreignpolicy.com/2026/02/26/trump-tariffs-supreme-court-section-122-ilegal/ (same). Negotiations over restoring fixed exchange rates—at least in some form—continued until the 1976 Jamaica Agreement. *See* 2 Margaret Garritsen De Vries, *The International Monetary Fund, 1972–78: Cooperation on Trial* ch. 37 (1996) (providing an overview of this history).

The President's Proclamation invoking Section 122 claims he is authorized to do so because "the United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments out, on net, flowing out of the country than into the country." Proclamation No. 11012, 91 Fed. Reg. 9340 (Feb. 25, 2026). But trade deficits and net outflows of "transfer payments" are not fundamental balance-of-payments problems, nor do they amount to balance-of-payments deficits. *Cf.* Edward J. Lopez & Jon Murphy, *Deconstructing the Council of Economic Advisers' Balance of Payments Report*, *Indep. Inst.* (Aug. 27, 2026), https://www.independent.org/article/2026/08/27/cea-balance-of-payments-report/ (explaining why current account trade deficits cannot

measure balance-of-payments deficits). In most situations, they are not a problem at all, much less the cause of a balance of payments crisis. See Andreas Freytag & Phil Levy, *The Trade Balance and Winning at Trade*, Cato Inst. Oct. 3, 2024, https://www.cato.org/publications/trade-balance-winning-trade (explaining why trade deficits are generally not harmful). They cannot, then, be the basis for invoking Section 122. In the IEEPA litigation, Appellants themselves emphasized that trade deficits "are conceptually distinct from balance-of-payments deficits," and thus that Section 122 has no "obvious application" to the authority the President sought to use to combat trade deficits under IEEPA. Appellants' Reply Br. at 13–14, *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025).

For these and other reasons, the CIT was right to conclude that Appellants' Section 122 tariffs were illegal because "[r]ather than identifying 'balance-of-payments deficits' as that term was intended in 1974, the [President's] Proclamation relies upon current account deficits, and a discussion of 'a large and serious trade deficit.'" *Oregon*, 2026 WL 1257669, at *18. (Proclamation No. 111012 ¶ 6) "Although the current account (and the balance of trade as a component of the current account)

are relevant to balance-of-payments deficits, they are distinct, and the statute recognizes the distinction." *Id.*

The CIT's decision in *V.O.S. Selections* does not support a contrary ruling. There the court noted that "[t]he President's imposition of the Worldwide and Retaliatory Tariffs responds to an imbalance in trade—a type of balance-of-payments deficit—and thus falls under the narrower, non-emergency authorities in Section 122." *V.O.S. Selections v. Trump*, 772 F. Supp. 3d 1350, 1375 (Ct. Int'l Trade 2025), *aff'd*, 149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom. Learning Res. v. Trump*, 607 U.S. 229 (2026). But the court did not hold that Section 122 grants the President unlimited power to impose 15 percent tariffs in response to any trade deficit whatsoever. He may do so only when trade deficits arise from "fundamental international payments problems" that cause "large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a). Under a fixed exchange rate regime, a trade deficit might deepen a balance-of-payments deficit by draining the dollar reserves available in the United States. The government could "fix" that problem by printing more dollars, but doing so would stoke inflation. No such problem can arise under a flexible exchange rate regime. So while Section 122 can

reach trade deficits in some situations, as the court noted, those situations do not exist today.

In any event, the CIT's statement that Section 122 can be used to address trade deficits was dictum not holding.. The court ruled that the major questions and nondelegation doctrines precluded any decision in favor the administration's interpretation of IEEPA, and held that "any interpretation of IEEPA that delegates unlimited tariff authority is unconstitutional." *V.O.S. Selections*, 772 F. Supp. 3d at 1372. That conclusion holds however far Section 122 might authorize tariffs to counter trade deficits. Neither this Court nor the Supreme Court relied on Section 122 in their decisions upholding the CIT's decision. *See V.O.S. Selections*, 149 F.4th at 1332–34 (resting on the major questions doctrine); *Learning Resources*, 607 U.S. at 238–43 (holding that IEEPA does not authorize tariffs at all).

Appellees' brief covers these questions about the reach of Section 122 in greater detail. Amici emphasize only that, at the very least, grave doubt surrounds whether Section 122 authorizes sweeping tariffs in present circumstances.

## II. THE MAJOR QUESTIONS DOCTRINE REQUIRES INVALIDATION OF THESE SECTION 122 TARIFFS.

The major questions doctrine requires Congress to "speak clearly" when it assigns to the executive "decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp.*, 573 U.S. at 324 (quoting *Brown & Williamson*, 529 U.S. at 159); *see also Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (the Supreme Court "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance") (internal quotation marks and citation omitted); *Brown & Williamson Tobacco Corp.*, 529 U.S. at 1590 (holding that Congress cannot be assumed to have implicitly delegated the power to regulate "a significant portion of the American economy" because "Congress could not have intended to delegate a decision of such economic and political significance" without saying so). *Id.* at 160.

As this Court held in *V.O.S. Selections*, the major questions doctrine applies to delegations of tariff authority, and "when Congress delegates this power in the first instance, it does so clearly and unambiguously." *V.O.S. Selections*, 149 F.4th at 1332. It ruled that "[t]he Government's interpretation of IEEPA as providing the President power to impose

unlimited tariffs . . . runs afoul of the major questions doctrine." *Id.* at 1334. That conclusion is reinforced by the fact that "tariffs are a core Congressional power." *Id.* at 1335.

Notably, Appellants never address the major questions doctrine in their opening brief. They apparently have no answer to it.

### A. The Section 122 tariffs raise a major question.

Congress, at the very least, did not clearly indicate that Section 122 can be used to impose tariffs outside the context of balance-of-payments problems that arise only under a fixed exchange regime. *See supra* Part I. Given the magnitude of the authority the President claims, the major questions doctrine applies.

The Section 122 tariffs are comparable in magnitude to previous actions the Supreme Court has declared present major questions. The Tax Foundation estimates that they raised some $21 billion in new taxes from Americans in 2026. Erica York & Alex Durante, *Tracking the Impact of the Trump Tariffs & Trade War*, *Tax Found.* (Aug. 2026), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war. Other estimates run higher. *See, e.g.*, Comm. for a Responsible Fed. Budget, *How Much Will Trump's New 10% (or 15%) Tariffs Raise?* (Mar.

4, 2026), https://www.crfb.org/blogs/how-much-will-trumps-new-10-or-15-tariffs-raise (estimating that a 10 percent rate would raise $35 billion over 150 days). Neither figure counts the costs borne by consumers, investors, and others. All told, apart from the IEEPA tariffs the Supreme Court struck down, these tariffs produced the highest average U.S. tariff schedule since 1936, when the Smoot-Hawley tariffs that deepened the Great Depression were still in force. *See* Yale Budget Lab, *State of Tariffs* (Feb. 21, 2026), https://budgetlab.yale.edu/research/state-tariffs-february-21-2026.

Moreover, these estimates assume the tariffs will not be renewed now that the initial 150-day period has expired. But if courts accept Appellants' claim that Section 122 tariffs may issue whenever a trade deficit exists, and that the executive deserves sweeping deference in invoking Section 122, the President can reimpose the tariffs as soon as each 150-day period runs out. *See* Appellants' Br. at 23–25 (demanding deference to any minimally "reasonable" methodology Appellants may choose for calculating balance-of-payments deficits); *id.* at 28–32 (claiming current account trade deficits qualify as balance-of-payments deficits). Trade deficits are ubiquitous, and the United States has run one

every year since 1976. Cong. Rsch. Serv., *Introduction to U.S. Economy: Trade Deficit* 1 (June 30, 2025). If a trade deficit can trigger Section 122, and the President is entitled to deference on whether "fundamental international balance of payments problems" and balance-of-payments deficits exist, the authority can be invoked at virtually any time, and the 150-day limit is no limitation at all. Appellants compound the problem by insisting that the President may use any "reasonable" methodology he likes (Appellants' Br. at 28–32), which lets him switch methodologies whenever convenient and renew Section 122 tariffs at will. As the CIT noted, "if the President has the ability to select among the sub-accounts [of the balance of payments] to identify a balance-of-payments deficit, unless every sub-account is balanced, the President would always be able to identify a balance-of-payments deficit." *Oregon*, 2026 WL 1257669, at *17. The true magnitude of the power claimed thus reaches far beyond the revenue collected during the initial invocation of Section 122.

On its own, the collection of tariffs during the initial 150-day period on the grounds presented raises a major question on par with those identified in recent Supreme Court decisions. For example, the Court ruled that a temporary nationwide eviction moratorium ostensibly

imposed to combat the spread of Covid-19 qualified as a major question. *Ala. Ass'n of Realtors*, 594 U.S. at 758. The National Apartment Association estimated that the moratorium cost property owners some $26 billion. *See* Ilya Somin, *A Takings Clause Lawsuit Against the CDC Eviction Moratorium*, *Reason* (Aug. 3, 2021), https://reason.com/volokh/2021/08/03/a-takings-clause-lawsuit-against-the-cdc-eviction-moratorium. That figure is comparable to, and probably a little smaller than, the taxes the Section 122 tariffs will impose over 150 days.

The Court likewise found a major question in a nationwide COVID-19 vaccination mandate for employers of 100 or more workers, even though the cost of getting vaccinated by that time was low. *See Nat'l Fed'n of Indep. Bus. ("NFIB") v. Dep't of Lab.*, 595 U.S. 109, 109 (2022); *cf.* Ilya Somin, *A Major Question of Power: The Vaccine Mandate Cases and the Limits of Executive Authority*, 2021–22 *Cato Sup. Ct. Rev.* 69, 75–76 (2022) (explaining that vaccination was readily available to workers, for free, by the time the mandate issued). Like the OSHA vaccination mandate, which reached some 84 million workers, *see NFIB*, 595 U.S. at 118–19, the Section 122 tariffs impose costs on tens of millions of

Americans, and those costs far exceed the price of a vaccination. *See* Yale Budget Lab, *supra* (estimating that 10 percent Section 122 tariffs would cost the average household $618 to $781 if they expire in 150 days, and more if extended).

In *West Virginia v. EPA*, 597 U.S. 697 (2022), the Court held that the EPA's claim of authority to regulate greenhouse gas emissions raised a major question even though the agency had no specific regulatory plan underway. The key factor was the magnitude of the authority claimed, not the specific details of how the means used in a particular case. What matters is that the executive laid claim to a "highly consequential power," even where it is not clear how much of that power it will to use in any given instance. *Id.* at 724. Appellants' position here would let the President use Section 122 to impose massive tariffs whenever a trade deficit exists, and perhaps whenever he claims a balance-of-payments deficit of any kind, whether or not one actually exists.

This Court held that the IEEPA tariffs ran afoul of the major questions doctrine in part because they were "both 'unheralded' and 'transformative.'" *V.O.S. Selections*, 149 F.4th at 1334 (quoting *West Virginia*, 597 U.S. at 722, 724). Three Justices of the Supreme Court

reached the same conclusion. *Learning Resources*, 607 U.S. at 231 (Roberts, C.J.) (emphasizing the "transformative" impact of the authority claimed and the fact that no President had ever used IEEPA to impose tariffs).

The Section 122 tariffs are similarly unheralded and transformative. Section 122 has never before been used at all, much less in a setting so far removed from the fixed exchange rate system it was written to address. *See* Part I, *supra*. As Chief Justice Roberts noted, "[i]t is . . . telling that in IEEPA's half century of existence, no President has invoked the statute to impose *any* tariffs—let alone tariffs of this magnitude and scope." *Learning Resources*, 607 U.S. at 231 (Roberts, C.J.) (quotation omitted). The same is true of Section 122, which in more than half a century has never been used to impose tariffs at all, let alone tariffs on imports from almost all our trading partners.

Section 122, unlike IEEPA, does authorize tariffs in some circumstances. But no President has used previously it, because everyone assumed it reached only circumstances remote from those that can exist under a flexible exchange rate. As Chief Justice Roberts emphasized in *Learning Resources*, "[w]hen Congress has delegated its tariff powers, it

has done so in explicit terms, and subject to strict limits." *Id.* at 243. Those "strict limits" would vanish if courts read Section 122 to permit massive tariffs outside the narrow context of balance-of-payments problems that arise under a fixed exchange rate regime.

The power the President claims is undoubtedly large enough to be "transformative": it would enable him to impose 15 percent tariffs on any imports from any nation for 150 days virtually any time he wishes. And, as noted, he could reimpose them as soon as each period expired.

The fact that Section 122, unlike IEEPA, permits tariffs in some situations does not obviate application of the major questions doctrine. The question is not only whether Congress granted some tariff authority, but the scope of that authority. It matters whether Section 122 authorizes tariffs only in the unusual circumstances that arise under fixed exchange rate regimes, or whenever a trade deficit appears or the President claims a balance-of-payments has arisen. In *V.O.S. Selections*, both this Court and the CIT held that the major questions doctrine required invalidation of the IEEPA tariffs because of the magnitude of the authority claimed, though both declined to decide whether IEEPA might authorize tariffs in

some narrower set of circumstances. *V.O.S. Selections*, 149 F.4th at 1332–34; *V.O.S. Selections*, 772 F. Supp. 3d at 1372.

Similarly, in *NFIB*, the Supreme Court held that OSHA's vaccination mandate covering 84 million workers ran afoul of the major questions doctrine even though the statute in question might well permit narrower mandates. As the Court noted, "[w]here the virus poses a special danger because of the particular features of an employee's job or workplace, targeted regulations are plainly permissible." *NFIB*, 595 U.S. at 119; *cf*. Somin, *A Major Question of Power*, *supra*, at 82–83 (discussing this aspect of the ruling). But the doctrine still barred "OSHA's indiscriminate approach." *Id.*

The major questions doctrine also forecloses broad deference to the President on whether the preconditions for invoking Section 122 exist. The statute refers those preconditions as objective facts existing in the world, not as proclamations or assertions by the President. If the President can simply declare that "fundamental international payments problems" causing "large and serious United States balance-of-payments deficits" exist, and courts must accept his claims without question, the the statute becomes a blank check that, at the very least, is not clearly

stated in the text. This Court's recent decision upholding expansions of earlier Section 301 tariffs against a challenge resting in part on the major questions doctrine reinforces the point. *HMTX Indus. v. United States*, 156 F.4th 1236, 1236 (Fed. Cir. 2025). There the Court held that that an expansion Section 301 tariffs on certain Chinese imports did not run afoul of the major questions doctrine because the modifications "do not involve a transformation of USTR's regulatory authority. USTR has modified its own unchallenged and statutorily permissible original action in this case[.]" *Id.* at 1255. By contrast, the unprecedented imposition of massive tariffs on nearly all U.S. trading partners is undeniably transformative.

This Court distinguished *HMTX* from *V.O.S. Selections*, where the major questions doctrine applied because "the government had never previously claimed powers of th[at] magnitude" under the relevant statute. *Id.* (quoting *V.O.S. Selections*, 149 F.4th at 1336). The tariffs in the present case, by contrast, are of a magnitude never previously claimed under Section 122, which has never been used to impose tariffs at all.

### B. Tariffs are not exempt from the major questions doctrine by virtue of being "foreign affairs" issues.

Appellants cannot evade application of the major questions doctrine by claiming that tariffs are a matter of foreign affairs. *See* Appellants' Br. at 46–47 (making this claim). No general foreign affairs exception to the doctrine exists. And even if one did, tariffs are not purely a foreign affairs matter, because first and foremost they are taxes on Americans.

As noted, this Court has held that the major questions doctrine applies to tariffs. *V.O.S. Selections*, 149 F.4th at 1332–34. In *Learning Resources*, three Justices in the majority likewise held that the doctrine applies to tariffs and that no "foreign affairs" exception applies to the tariff power. *Learning Resources*, 607 U.S. at 247–48. Chief Justice Roberts noted that "the President and Congress *do not* 'enjoy concurrent constitutional authority' to impose tariffs during peacetime," and emphasized that "[t]he Framers gave that power to 'Congress alone'—notwithstanding the obvious foreign affairs implications of tariffs." *Id.* at 248 (quoting *Merritt v. Welsh*, 104 U.S. 694, 700 (1881)).

The Supreme Court has repeatedly applied the major questions doctrine to policies with significant foreign affairs implications. In *Biden v. Nebraska*, 600 U.S. 477 (2023), it invalidated a claim of authority to

forgive student loans under a national emergency declaration based on the 2003 HEROES Act, legislation enacted largely to address war and foreign policy emergencies. *See id.* at 494 (noting that "[t]he HEROES Act authorizes the Secretary to 'waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [Education Act] as the Secretary deems necessary in connection with a war or other military operation or national emergency.'" (quoting 20 U.S.C. § 1098bb(a)(1)).

In *Alabama Association of Realtors*, the Court applied the major questions doctrine to invalidate a nationwide eviction moratorium intended to curb the spread of COVID-19, even though the statute authorized measures against the "spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 594 U.S. at 761 (quoting 42 U.S.C. § 264(a)). The possibility that the moratorium might curb the spread of COVID-19 "from foreign countries" did not prevent application of the major questions doctrine. Moreover, the widespread death and economic disruption caused by the pandemic plainly impacted U.S. foreign policy and national security. *See* Off. of the Dir. of Nat'l Intel.,

*National Intelligence Estimate: Economic and National Security Implications of the COVID-19 Pandemic Through 2026* (Apr. 2022), https://www.dni.gov/files/ODNI/documents/assessments/NIE-Economic_and_National_Securtiy_Implications_of_the_COVID-19_Pandemic_Through_2026.pdf (outlining the foreign policy implications in detail). That did not prevent the Supreme Court from applying the major questions doctrine. Similarly, in *West Virginia*, the Court held that an assertion of power to impose environmental regulations aimed at climate change qualified as a major question, despite climate change posing an international problem and implicating foreign affairs. *West Virginia*, 597 U.S. at 723–32.

In addition, tariffs are not purely, or even primarily, matters of foreign affairs. They are taxes imposed on Americans. Studies consistently find that American businesses and consumers paid 90 percent or more of the cost of the President's IEEPA tariffs. *See* Ilya Somin, *How the Supreme Court Spared America*, *Atlantic* (Feb. 21, 2026), https://www.theatlantic.com/ideas/2026/02/tariffs-trump-supreme-court/686093/ (citing multiple studies); Scott Lincicome & Nathan Miller, *The White House Still Can't Grasp That Americans Pay US Tariffs*, *Cato*

*Inst.* (Feb. 19, 2026), https://www.cato.org/blog/white-house-still-cant-grasp-americans-pay-us-tariffs (same). The Section 122 tariffs are unlikely to be any different..

"Recognizing the taxing power's unique importance, and having just fought a revolution motivated in large part by 'taxation without representation,' the Framers gave Congress 'alone . . . access to the pockets of the people.'" *Learning Resources*, 607 U.S. at 241 (quoting *The Federalist* No. 48 (J. Madison)). The tariff power therefore cannot be considered no pure "foreign affairs" authority exempt from the major questions doctrine.

## III. IF SECTION 122 GRANTS THE PRESIDENT THE AUTHORITY HE CLAIMS HERE, IT WOULD BE AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER TO THE EXECUTIVE.

If this Court concludes that Section 122 grants the President power to impose the tariffs at issue in this case, it must invalidate the statute under the nondelegation doctrine. The nondelegation doctrine rests on the separation of powers underlying our tripartite system of Government. *Mistretta v. United States*, 488 U.S. 361, 371 (1989). "Supreme Court jurisprudence, from the early days of the Republic, evinces affirmation of the principle that the separation of powers must be respected and that

the legislative power over trade cannot be abdicated or transferred to the Executive." *Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335, 1347 (Ct. Int'l Trade 2019) (Katzmann, J., dubitante). The CIT rightly held that Appellants' "expansive reading of the statute would raise a non-delegation issue, which in turn would prompt a constitutional question." *Oregon*, 2026 WL 1257669, at *17. In *V.O.S. Selections*, the CIT also applied the nondelegation doctrine to the IEEPA tariffs, emphasizing that "[t]he separation of powers is always relevant to delegations of power between the branches." 772 F. Supp. 3d at 1372.

### A. The Section 122 tariffs violate the nondelegation doctrine.

The Supreme Court has long held that the nondelegation doctrine requires Congress to supply an "intelligible principle" to constrain executive discretion. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). "[I]n examining a statute for the requisite intelligible principle, we have generally assessed whether Congress has made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *Consumers' Research*, 606 U.S. at 673 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) (alteration in original)). Congress must also "provide[] sufficient

standards to enable both 'the courts and the public [to] ascertain whether the agency' has followed the law." *Consumers' Research*, 606 U.S. at 673 (quoting *Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div. of Dep't of Lab.*, 312 U.S. 126, 144 (1941)).

It is especially important to constrain delegations of tariff authority. "The power to impose tariffs is 'very clear[ly] . . . a branch of the taxing power'" and the Framers of the Constitution "[r]ecogniz[ed] the taxing power's unique importance, having just fought a revolution motivated in large part by 'taxation without representation.'" *Learning Resources*, 607 U.S. at 241 (Roberts, C.J.) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 201 (1824)). The Framers therefore ensured that only the legislature would have "access to the pockets of the people." *The Federalist* No. 48 (J. Madison). As the Supreme Court emphasized in *Learning Resources*, 607 U.S. at 240, Alexander Hamilton wrote in the Federalist Papers that the power to tax was "the most important of the authorities proposed to be conferred upon the Union." *The Federalist* No. 33 (A. Hamilton).

Just last year, in *FCC v. Consumers' Research*, the Supreme Court held that a delegation of authority to impose taxes or fees must have a

"floor" and a "ceiling," and that the degree of "guidance" required from Congress is greater "when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue." *Consumers' Research*, 606 U.S. at 681 (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 475 (2001)). The power to impose 15 percent tariffs on imports from all our trading partners is unquestionably one that massively affects the "entire national economy." Appellants' permissive interpretation of the law would allow the President to impose those rates at almost any time. *See supra* § II.A. This problem is exacerbated by Appellants' insistence that the President may pick and choose among different methodologies for determining what counts as a balance-of-payments deficit makes matters worse. *See* Appellants' Br. at 28–32. What qualifies as a "fundamental international payments problem" or a "large and serious United States balance-of-payments deficit" may seem like a technical issue. But the question has sweeping implications for the entire economy and thus cannot be left to the President to supply the answer with no meaningful constraints on his discretion.

Section 122 does limit tariff rates to 15 percent, creating a ceiling. 19 U.S.C. § 2132(a). But *Consumers' Research* emphasizes that even a

fixed numerical ceiling is not constraining enough if it leaves the executive with what amounts to "boundless power." A hard $5 trillion limit on the "contributions" the FCC could levy would not suffice, the Court explained, because "[t]he purpose of the nondelegation doctrine is to enforce limits on the 'degree of policy judgment that can be left to those executing or applying the law,'" and "[t]he anywhere-up-to-$5-trillion tax statute would not do that[.]" *Consumers' Research*, 606 U.S. at 680 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)). Such a permissive limit violates nondelegation constraints because it "effectively leaves [the] agency with boundless power." *Id.* If the President may use Section 122 to impose 15 percent tariffs whenever a trade deficit exists or he otherwise claims a balance-of-payments problem, he wields nearly boundless tariff authority—enough to levy trillions of dollars in taxes on Americans—and no effective limit remains on the "degree of policy judgment" he exercises. *Id.*

The sweeping power Appellants claim violates any plausible theory of the nondelegation doctrine. In a well-known 1825 decision, Chief Justice John Marshall held that Congress cannot delegate power over "important subjects." *Wayman v. Southard*, 23 U.S. 1, 43 (1825); *see also*

Ilan Wurman, *Nondelegation at the Founding*, 130 *Yale L.J.* 1490 (2021) (defending this approach to nondelegation). Although "the line has not been exactly drawn which separates those important subjects which must be entirely regulated by the legislature itself from those of less interest," the power to impose 15 percent tariffs on products from every nation in the world obviously qualifies as an "important subject[]." *Wayman*, 23 U.S. at 43. And as noted earlier, Appellants' interpretation of the statute would give the President nearly unlimited discretion to imposes any tariff rate between a negligible amount and 15 percent, at almost any time. *See supra* § II.A.

As already noted, modern precedent requires an "intelligible principle," but also insists that delegations of the taxing power must have clear, stringent limits, especially when the policy in question will affect the "entire national economy." *Consumers' Research*, 606 U.S. at 673, 680 (internal quotation marks and citation omitted). Appellants' interpretation of Section 122 fails that requirement.

Justice Gorsuch has posited that nondelegation requires Congress to "make[] ... the policy decisions when regulating private conduct," leaving the executive to "fill up the details" and engage in appropriate

fact-finding. *Gundy v. United States*, 588 U.S. 128, 157 (2019) (Gorsuch, J., concurring) (internal quotation marks and citation omitted). Sweeping authority to impose 15 percent tariffs on imports from any nation at almost any time clearly is a delegation of power over "private conduct" that goes far beyond filling in details or fact-finding.

### B. Tariff delegations are not exempt from nondelegation constraints on the grounds that they are "foreign affairs" issues.

Just as claimed delegations of tariff authority are not exempt from the major questions doctrine because they touch "foreign affairs," they are not exempt from ordinary constitutional constraints on delegation, whatever Appellants say. Appellants' Br. at 43–44. Many of the reasons tariffs are not exempt from the major questions doctrine also apply here. Most notably, tariffs are not pure foreign affairs powers: they are taxes on Americans. While they affect foreign nations, too, the same is true of policies enacted under many other congressional powers. As Justice Gorsuch noted in his concurrence in *Learning Resources*, such powers "include not only the power to impose tariffs, . . . but also the power to establish uniform rules of naturalization, . . . appropriate money for armies, . . . and define and punish offenses against the law of nations[.]"

*Learning Res.*, 607 U.S. at 286 (Gorsuch, J., concurring). If powers that touch on foreign affairs are largely exempt from nondelegation constraints, "all these legislative powers and more could be passed wholesale to the executive branch in a few loose statutory terms, no matter what domestic ramifications might follow." *Id.*

Furthermore, tariffs are part of the "core congressional power of the purse," over which the President has no inherent authority of his own. *Id.* at 243 (Roberts, C.J.). That distinguishes tariff delegations from delegations in areas where the President does have his own inherent powers. *See id.* at 286 (Gorsuch, J., concurring) (emphasizing this distinction); *V.O.S. Selections*, 149 F.4th at 1346 (Cunningham, J., concurring) (distinguishing tariffs from the "traditionally executive embargo authority" on this basis); *cf.* Curtis A. Bradley & Jack L. Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 *U. Pa. L. Rev.* 1743, 1788–89 (2024) (explaining that "the President has no independent constitutional authority over international commerce" and therefore "a simple categorical determination that an area involves foreign affairs or national security cannot by itself suffice to address delegation concerns" when it comes to statutes governing

foreign trade). And "the idea that tariff delegations are subject to a lower non-delegation standard is incompatible with [the Supreme Court's ruling in] *J.W. Hampton*, which addressed a tariff statute while creating the intelligible principle standard." *V.O.S. Selections*, 149 F.4th at 1346 (Cunningham, J., concurring) (citing *J.W. Hampton*, 276 U.S. at 409).

### C. The constitutional avoidance canon requires interpreting Section 122 to avoid a sweeping delegation of tariff authority that raises constitutional problems.

"Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings*, 583 U.S. at 286. "The question is not whether" the saving construction "is the most natural statutory interpretation"—"only whether it is a 'fairly possible'" one. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012) (citation omitted). The severe nondelegation concerns raised by the government's sweeping interpretation of Section 122 are undeniably sufficient to trigger the avoidance canon.

The Court can avoid the constitutional problem by limiting Section 122 to the circumstances outlined in the text: balance-of-payments

problems of a kind that can only arise under a fixed exchange rate regime. *See supra* Part I. An interpretation of Section 122 is undeniably at least "fairly possible." *Sebelius*, 567 U.S. at 563. Nothing more is needed to trigger the avoidance canon.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the Court of International Trade.

Respectfully submitted,


/s/ Daniel W. Wolff
Daniel W. Wolff
Alexander Schaefer
Crowell & Moring LLP
600 Fifth Street, NW
Washington, DC 20001
(202) 624-2500
dwolff@crowell.com
aschaefer@crowell.com

Ilya Somin
Professor of Law
Antonin Scalia Law School George
Mason University
3301 Fairfax Drive.
Arlington, VA 22201
(703) 993-8069
lsomin@gmu.ed


Dated: September 18, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 26-1804

**Short Case Caption:** State of Oregon v. Trump

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 6475 words.
- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: September 18, 2026

Signature: /s/ Daniel W. Wolff

Name: Daniel W. Wolff

Save for Filing