**Nos. 2026-1804, -1805, -1928**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

STATE OF OREGON, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF NEW YORK, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, OFFICE OF THE GOVERNOR EX REL. ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WISCONSIN,

Plaintiffs-Cross-Appellants,

STATE OF WASHINGTON,

Plaintiff-Appellee,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, UNITED STATES,

Defendants-Appellants.

---

BURLAP AND BARREL, INC., BASIC FUN, INC.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, EXECUTIVE OFFICE OF THE PRESIDENT, UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection, JAMIESON GREER, in his official capacity as U.S. Trade Representative, OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, DEPARTMENT OF HOMELAND SECURITY, MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security,

Defendants-Appellants.

---

On Appeal from the United States Court of International Trade
Nos. 26-1472, -1606, Judges Barnett, Kelly, and Stanceu

---

## RESPONSE AND REPLY BRIEF FOR APPELLANTS

---

JONATHAN D. GUYNN
*Acting Assistant Attorney General*

*Signature block continued on inside cover*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
DANIEL WINIK
SOPHIA SHAMS
DOUGLAS C. DREIER
*Attorneys, Appellate Staff*
*Civil Division, Room 7213*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2000*

## TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

STATEMENT OF THE ISSUE ON CROSS-APPEAL .......... 2

ARGUMENT .......... 2

I. The Proclamation Identifies A Balance-Of-Payments Deficit Under Section 122 .......... 2

A. Balance-Of-Payments Deficits May Be Assessed In Accordance With An Economically Reasonable Methodology .......... 4

B. Plaintiffs' Contrary Arguments Are Unavailing .......... 13

II. The State Plaintiffs That Did Not Pay The Section 122 Tariffs Lack Standing To Challenge Them .......... 35

CONCLUSION .......... 43

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**


*Alabama Ass'n of Realtors v. Department of Health & Hum. Servs.*,
594 U.S. 758 (2021) .......... 7

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) .......... 40

*Barnes v. United States*,
788 F. Supp. 3d 1309 (Ct. Int'l Trade 2025) .......... 37

*Bostock v. Clayton County*,
590 U.S. 644 (2020) .......... 19

*Bowe v. United States*,
607 U.S. 13 (2026) .......... 23

*Canadian Lumber Trade All. v. United States*,
517 F.3d 1319 (Fed. Cir. 2008) .......... 40, 40-41

*Center for Biological Diversity v. EPA*,
168 F.4th 1164 (9th Cir. 2026) .......... 41

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 10, 25, 31, 32

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) .......... 40

*Doe v. Chao*,
540 U.S. 614 (2004) .......... 10

*Dubin v. United States*,
599 U.S. 110 (2023) .......... 27

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 35, 36, 38, 40, 42

*Fort Stewart Schs. v. Federal Lab. Rels. Auth.*,
495 U.S. 641 (1990) .......... 29

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)....................................................................................33

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*,
608 U.S. 608 (2026)........................................................................8, 9, 16

*Garland v. Cargill*,
602 U.S. 406 (2024)....................................................................................15

*Gundy v. United States*,
588 U.S. 128 (2019)......................................................................................6

*Hamdan v. Rumsfeld*,
548 U.S. 557 (2006)....................................................................................10

*HMTX Indus. LLC v. United States*,
156 F.4th 1236 (Fed. Cir. 2025), *cert. denied*,
146 S. Ct. 2729 (2026)...........................................................................6, 7, 8

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025)....................................................................................19

*Learning Res., Inc. v. Trump*,
607 U.S. 229 (2026)..............................................................................7, 25

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................................................................................18

*Louisiana Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986)......................................................................................5

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)....................................................................................35

*Maryland v. U.S. Dep't of Agric.*,
151 F.4th 197 (4th Cir. 2025)....................................................................40

*MD/DC/DE Broads. Ass'n v. FCC*,
236 F.3d 13 (D.C. Cir. 2001)...............................................................30, 31

*Motions Sys. Corp. v. Bush*,
437 F.3d 1356 (Fed. Cir. 2006) .......... 31

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 38

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998) .......... 19

*PrimeSource Bldg. Prods., Inc. v. United States*,
59 F.4th 1255 (Fed. Cir. 2023) .......... 32

*Rack Room Shoes v. United States*,
718 F.3d 1370 (Fed. Cir. 2013) .......... 36, 37

*Rimini St., Inc. v. Oracle USA, Inc.*,
586 U.S. 334 (2019) .......... 28-29

*Rubicon Real Estate Holdings, LLC v. City of Pontiac*,
179 F.4th 431 (6th Cir. 2026), *cert. denied*,
No. 26-359, 2026 WL 3383917 (U.S. Nov. 9, 2026) .......... 41

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 35

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) .......... 38-39

*Thor Power Tool Co. v. Commissioner*,
439 U.S. 522 (1979) .......... 5

*Totes-Isotoner Corp. v. United States*,
594 F.3d 1346 (Fed. Cir. 2010) .......... 36-37, 37

*Trump v. California*,
609 U.S. 1032 (2026) .......... 38

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 32

*United States v. Castleman*,
572 U.S. 157 (2014) ... 15

*United States v. Hayes*,
555 U.S. 415 (2009) ... 15

*United States v. Texas*,
599 U.S. 670 (2023) ... 38, 39

*V.O.S. Selections, Inc. v. Trump*,
149 F.4th 1312 (Fed. Cir. 2025) ... 7

*Washington v. FDA*,
108 F.4th 1163 (9th Cir. 2024) ... 39

*West Virginia v. EPA*,
597 U.S. 697 (2022) ... 8

**Statutes:**

Small Business Innovation Development Act of 1982,
Pub. L. No. 97-219, 96 Stat. 217 ... 17

Trade Act of 1974,
Pub. L. No. 93-618, 88 Stat. 1978 (1975) ... 27
19 U.S.C. § 2132(a) ... 7, 24
19 U.S.C. § 2132(a)(1) ... 6
19 U.S.C. § 2132(d)(1) ... 33, 34
19 U.S.C. § 2132(d)(2) ... 35
19 U.S.C. § 2132(e) ... 31, 33
19 U.S.C. § 2481(9) ... 34

**Regulatory Material:**

Proclamation No. 11012,
91 Fed. Reg. 9339 (Feb. 20, 2026) ... 2-3, 10, 24, 30, 32

**Legislative Materials:**

S. Rep. No. 93-1298 (1974) .......... 16, 17

*Tariff and Trade Proposals: Hearings Before the H. Comm. on Ways & Means*, 91st Cong. 2710 (1970) .......... 4

**Other Authorities:**

George H.W. Bush, *Declaration of Cartagena*, The Am. Presidency Project (Feb. 15, 1990), https://perma.cc/29HJ-LW4Y; .......... 18

CEA, *Measuring Balance of Payments Deficits* (July 2026), https://perma.cc/GG4E-KZMH .......... 11, 12

William J. Clinton, *Joint Summit Statement by the Presidents of the United States and Ukraine*, The Am. Presidency Project (Nov. 22, 1994), https://perma.cc/BT56-JAJZ .......... 18

Gerald Ford, *Message to the Congress Transmitting Final Report on the Balance of Payments Deficit Incurred Under the North Atlantic Treaty*, The Am. Presidency Project (May 27, 1975), https://perma.cc/2LLH-KUF2 .......... 18

Gerald Ford, *Remarks at the Oklahoma State Fair in Oklahoma City*, The Am. Presidency Project (Sep. 19, 1975), https://perma.cc/9VZB-86SJ .......... 18

*Fundamental*, The American College Dictionary (Clarence L. Barnart ed., 1970) .......... 25

*Fundamental*, Webster's New Collegiate Dictionary (8th ed. 1981) .......... 25

Donald S. Kemp, *Balance-of-Payments Concepts – What Do They Really Mean?*, Fed. Rsrv. Bank of St. Louis Rev. (July 1975), https://perma.cc/2AP4-VN8C .......... 22

Patricia H. Kuwayama, *Measuring the United States Balance of Payments*, Fed. Rsrv. Bank. of N.Y. Monthly Rev. 183 (Aug. 1975), https://perma.cc/BVL8-9GUG .................... 4-5, 12, 20, 21, 22

Off. of the Historian, U.S. Dep't of State, *Paper Prepared in the Department of the Treasury* (Sep. 10, 1971), https://perma.cc/JTZ8-2KTU ........................................................ 14

Ronald Reagan Presidential Libr. & Museum, *Radio Address to the Nation on the Caribbean Basin Initiative* (Dec. 4, 1982), https://perma.cc/GQ2M-85YB .................................................. 18-19

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ........................................................ 28

Janice M. Westerfield, *A Lower Profile for the U.S. Balance of Payments*, Fed. Rsrv. Bank of Phila. Bus. Rev., Nov.-Dec. 1976, https://perma.cc/FY6C-FKFJ ............................. 14, 22, 23

## INTRODUCTION

Before the CIT, plaintiffs argued that Section 122 applies only if the overall balance of payments is negative—a situation that can never occur, since all agree that the overall balance is always zero. Plaintiffs now claim instead that Congress enacted Section 122 as a prophylactic measure in case one day the United States returned to a failed, discarded economic system. They believe that the President can identify a balance-of-payments deficit under Section 122 only if the United States returns to a fixed-exchange-rate monetary system and only if reserve assets are put at risk.

This alternative theory—which bears no resemblance to the theory adopted by the CIT—is no more persuasive than plaintiffs' original account. As our opening brief explains, Congress enacted Section 122 to provide President Nixon and future Presidents with a meaningful tool to combat large and serious balance-of-payments deficits, which Congress recognized as an existential threat to the American economy. Like plaintiffs' original theory, the interpretation they now offer would render Section 122 a nullity, both at its enactment and at every moment since, because the United States has had a floating-rate exchange system for that entire time. Courts do not interpret statutes that way.

The State plaintiffs further err in arguing that they had standing to challenge the Section 122 tariffs even if they did not pay those tariffs. The CIT correctly held that non-importer States lacked standing. As this Court has previously explained, importers have standing to challenge tariffs that they paid, but purchasers do not have standing based on alleged downstream effects of tariffs. The non-importer States here allege that they suffered downstream economic consequences from the challenged tariffs, but those sorts of harms are too speculative, and the connection between them and the challenged tariffs is too attenuated, to support standing.

## STATEMENT OF THE ISSUE ON CROSS-APPEAL

The issue presented by the cross-appeal is whether States that did not pay tariffs have standing to challenge those tariffs.

## ARGUMENT

### I. The Proclamation Identifies A Balance-Of-Payments Deficit Under Section 122

As we have explained, the Proclamation properly "treat[s] a deficit in the current account, or a deficit in the sum of the current account, the capital account, and the net foreign direct investment," "as a balance-of-payments deficit." Gov't Br. 19; *see* Proclamation No. 11012, 91 Fed. Reg. 9339, 9340

(Feb. 20, 2026). These are economically reasonable methodologies for identifying a balance-of-payments deficit.

Plaintiffs do not contest the central point in our opening brief: that the statutory phrase "balance-of-payments deficit" incorporates the economic understanding of that term of art. Plaintiffs simply disagree with the economics literature that we have identified as encompassing the measurement methods employed by the President. Plaintiffs contend that the statutory phrase must instead be understood as limited to "deficits that put reserve assets at risk in a fixed-exchange-rate monetary system." *Oregon* Br. 2; *see Burlap & Barrel* Br. 26. In other words, plaintiffs read "balance-of-payments deficit" in Section 122 as limited to the context of a fixed-exchange rate system—a system that did not exist at the time of Section 122's enactment and does not exist in our economy today.

Plaintiffs' alternative theory is wrong. Nothing in the text or history of Section 122 suggests defining "balance-of-payments deficit" in this limited way. And plaintiffs' proposed reading, if adopted, would mean that Section 122 has been a dead letter since its enactment nearly two years after the United States had jettisoned the fixed-exchange-rate system. Plaintiffs

offer no sound basis for reading the statute as a nullity when enacted and since.

### A. Balance-Of-Payments Deficits May Be Assessed In Accordance With An Economically Reasonable Methodology

1. The President may assess a balance-of-payments deficit under Section 122 according to any economically reasonable methodology. The private plaintiffs argue (Br. 28, 30) that this definition is too "open-ended" as it would "incorporate[] any methodology the President chooses," but that misstates the government's position. Our position is not that *any* methodology may be used to measure a balance-of-payments deficit, but that only *economically reasonable* methodologies may be used.

This understanding of the statutory phrase follows naturally from the fact that many different approaches to calculating balance-of-payments deficits were in common use when Section 122 was enacted, as recognized in the publication on which so much of the CIT's analysis depended. *See* Appx35 ("The overall-balance-of-payments deficit (or surplus) can be shown in different ways." (quoting *Tariff and Trade Proposals: Hearings Before the H. Comm. on Ways & Means*, 91st Cong. 2710 (1970) (statement of Dr. Howard S. Piquet))); *see also* Patricia H. Kuwayama, *Measuring the United States Balance*

*of Payments*, Fed. Rsrv. Bank. of N.Y. Monthly Rev. 183, 184-189 (Aug. 1975), https://perma.cc/BVL8-9GUG (describing in detail seven such definitions, one of which is the "balance on current account," and also acknowledging certain "less standard balances").

As we explained, it is not uncommon for Congress to use technical terms of art in this way, and when Congress does so, courts routinely construe the term of art as it is understood in the relevant field. For example, our opening brief noted that in *Louisiana Public Service Commission v. FCC*, 476 U.S. 355 (1986), the Supreme Court determined that certain "technical terms of art" used in a statute should be understood to "embrace depreciation" because the terms were "often used" that way in the relevant field. *Id.* at 371-372. Indeed, the Supreme Court has explained that this approach is appropriate even when the technical understanding of a term "tolerate[s] a range of 'reasonable' treatments." *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544 (1979). Plaintiffs offer no response to these precedents.

The nondelegation concern raised by the private plaintiffs is unfounded. As we have explained, the nondelegation doctrine applies with less force in the context of foreign affairs, *see* Gov't Br. 43, and in any event, Section 122 satisfies even the domestic version of the nondelegation standard

by setting forth a policy and placing enforceable boundaries on the delegated power, *see* Gov't Br. 43-45 (collecting authorities). This Court recently rejected a nondelegation challenge to another provision of the Trade Act of 1974. *HMTX Indus. LLC v. United States*, 156 F.4th 1236, 1254 (Fed. Cir. 2025), *cert. denied*, 146 S. Ct. 2729 (2026). As the Court explained, the nondelegation standard "is 'not demanding,'" and "broad delegations 'to regulate in the public interest' or as 'requisite to protect the public health' have been upheld." *Id.* (quoting *Gundy v. United States*, 588 U.S. 128, 146 (2019)). Congress's delegation of the power to impose tariffs to address "large and serious United States balance-of-payments deficits," 19 U.S.C. § 2132(a)(1), provides at least as much guidance as the statutes at issue in cases like *HMTX* and *Gundy*. Plaintiffs fail even to mention, much less address, *HMTX*.

The private plaintiffs further err (Br. 63-68) in arguing that the major-questions doctrine counsels against our reading of Section 122. As an initial matter, plaintiffs misunderstand the function of the doctrine. The Supreme Court has invoked the major-questions doctrine in determining whether a particular *type* of action falls within an agency's statutory power. In *Learning Resources, Inc. v. Trump*, for example, the Supreme Court held that tariffs were not among the types of actions the President may take under IEEPA,

607 U.S. 229, 248-249 (2026); and in *Alabama Ass'n of Realtors v. HHS*, the Court held that an eviction moratorium was not among the types of actions the Centers for Disease Control and Prevention could take under the Public Health Service Act, 594 U.S. 758, 763-764 (2021).

Here, by contrast, there is no serious question that Section 122, which expressly allows a "temporary import surcharge … in the form of duties," authorizes the President to impose tariffs. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1325 (Fed. Cir. 2025) (en banc) (per curiam) ("Section 122 of the Trade Act gave the President the authority to impose, for up to 150 days, import quotas and/or a temporary import surcharge of up to 15 percent 'to deal with large and serious United States balance-of-payments deficits,' 'to prevent an imminent and significant depreciation of the dollar in foreign exchange markets,' or 'to cooperate with other countries in correcting an international balance-of-payments disequilibrium.'" (quoting 19 U.S.C. § 2132(a))). That makes this case like *HMTX*, where this Court concluded that the statute provided sufficiently "'clear congressional authorization'" to justify the imposition of the challenged tariffs, 156 F.4th at 1255 (quoting *V.O.S. Selections*, 149 F.4th at 1336). "Such 'clear congressional authorization' for the challenged action means that this cannot be a major questions

case." *Id.* (quoting *West Virginia v. EPA*, 597 U.S. 697, 724 (2022)). The major-questions doctrine does not bear on whether the particular set of tariffs authorized here falls within the scope of a statute that plainly authorizes tariffs; that is an ordinary question of statutory interpretation.

2. Plaintiffs do not seriously defend the CIT's understanding of "balance-of-payments deficit[]," which is wrong for the reasons explained in our opening brief. In any event, the Proclamation identifies a deficit in the basic balance and thus a "balance-of-payments deficit[]" under the CIT's unduly narrow definition of the term.

i. As we have explained (Br. 33-45), the CIT's narrow understanding of "balance-of-payments deficit[]," as limited to three specific measurements, rests entirely on legislative history and language from a prior version of Section 122 that Congress ultimately omitted from the enacted version of the statute. Such efforts to "revive [courts'] old-time devotion to legislative history" cannot stand. *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 608 U.S. 608, 624 (2026).

Plaintiffs do not seriously defend the CIT's definition; nor do they contest that legislative history may not be used to supplant statutory text. Instead, plaintiffs reimagine the CIT's decision below as merely using

legislative history to "confirm[]" the meaning of "balance-of-payments deficit[]" in Section 122. *Oregon* Br. 28; *see Burlap & Barrel* Br. 41. But that is not what the CIT majority's decision does. Instead, the majority's decision starts and ends with legislative history.

Plaintiffs also do not meaningfully contest that the CIT majority adopted a skewed and selective view of the legislative history, underscoring the "classic criticism of using legislative history": "that it is 'the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends,'" *FS Credit*, 608 U.S. at 621. Plaintiffs merely accuse the government of "misread[ing] the legislative history" in the other direction. *Oregon* Br. 28. But plaintiffs do not actually rebut the legislative history identified in the government's brief (at 26, 42), namely the portions reflecting Congress's intent to give the President flexibility in the economic approach by which to determine whether there is a large and serious balance-of-payments deficit.

Plaintiffs fare no better in their attempt to undermine Congress's decision to omit from Section 122 the precise limitations on "balance-of-payments deficit[]" that the CIT read into the statute. The Supreme Court has recognized that "Congress' rejection of the very language that would have

achieved" some outcome "weighs heavily against" reading a statute to achieve the same outcome. *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-580 (2006); *see Doe v. Chao*, 540 U.S. 614, 622 (2004).

ii. In any event, there is a large and serious balance-of-payments deficit even under the CIT's definition. As our opening brief explained (at 45-51), the circumstances identified in the Proclamation establish a deficit in the basic balance. The Proclamation plainly identifies a deficit in the current account, 91 Fed. Reg. at 9340, which has historically been closely related to, Appx237, and thus serves as a reasonable proxy for, the basic balance.

Plaintiffs do not seriously dispute that the basic balance is negative. Instead, plaintiffs contend that, because the Proclamation does not specifically refer to the negative basic balance, it cannot be upheld on that basis. *Burlap & Barrel* Br. 47. But the President's explanations for exercising authority that Congress has vested in him are not held to the standards of reasoning that apply to agency action under the Administrative Procedure Act (APA). *See, e.g.*, *Dalton v. Specter*, 511 U.S. 462, 470 (1994). That principle applies with particular force here, where there is good reason for the President not to have referred specifically to the basic balance, as it has long been abandoned as a means for assessing a balance-of-payments deficit. Plaintiffs' efforts to

superimpose an express-statement requirement in this context are thus unavailing; what matters is not whether the Proclamation expressly uses the term "basic balance" but whether the circumstances identified in the Proclamation reflect a negative basic balance. As we have explained, they plainly do.

Although plaintiffs take issue with the Council of Economic Advisers' (CEA) attempt to replicate the basic balance, their arguments are wrong and in any event inconsequential, given that plaintiffs do not (and could not) actually question that the basic balance is negative. The CEA acknowledged that the relevant agency "no longer reports all the components needed to exactly replicate the basic balance," and that changes to financial markets since the collapse of the Bretton Woods system have altered the composition of "long-term capital," but explained that it is nonetheless possible to approximate the basic balance today. CEA, *Measuring Balance of Payments Deficits* 4, 8 (July 2026), https://perma.cc/GG4E-KZMH. The CEA did so by using the current-account balance, the (small) capital-account balance, and net foreign direct investment. *Id.* at 5.

The private plaintiffs wrongly assert (Br. 46) that the CEA's replication of the basic balance omits three of the four components of the basic balance.

"[A]ll four of these measures are currently in deficit." CEA, *supra*, at 8. While the CEA's 2026 report and Kuwayama's 1975 report define these components slightly differently, "[t]he idea of the 'basic balance' is to separate the underlying structural developments in international payments from distorting short-term movements." Kuwayama, *supra*, at 187. That is precisely what the CEA's replication of the basic balance has achieved. CEA, *supra*, at 8.

Plaintiffs equally miss the mark in pointing to the CEA's noting of caveats regarding its assessment of the basic balance. The fact that the CEA acknowledged the difficulties in calculating the basic balance does not mean its analysis is erroneous; if anything, the CEA's acknowledgement of the difficulties in calculating the basic balance reinforces the seriousness of its analysis. And it certainly does not show that a presidential finding of a large and serious balance-of-payments deficit should be supplanted by a court—especially where there is clear economic literature demonstrating a deficit in the basic balance and plaintiffs have not offered any evidence to the contrary.

In any event, as noted above, plaintiffs do not contend that any of the CEA's purported errors was material, because they do not (and could not) argue that the basic balance is positive. Nor do they dispute that if the

President identified a balance-of-payments deficit, that deficit is "large and serious." Appx32 ("[T]here is no serious dispute that whether such deficits are 'large and serious' is a discretionary determination within the province of the Executive Branch, review of which by the judiciary is impermissible.").

**B. Plaintiffs' Contrary Arguments Are Unavailing**

1. Instead of defending the CIT's interpretation that "balance-of-payments deficits" must be measured in three specific ways, or defending their original definition of such deficits as requiring an impossibility of accounting, plaintiffs now primarily contend that this Court should read "balance-of-payments deficits" to refer only to "deficits that put reserve assets at risk in a fixed-exchange-rate monetary system." *Oregon* Br. 2; *see Burlap & Barrel* Br. 26. This interpretation, which the CIT did not embrace, Appx44, has no basis in the statutory text. And it would defy basic principles of statutory interpretation, because it would mean Section 122 has been a dead letter at its enactment and every moment since. *See* Gov't Br. 8-9 (explaining the historical context prompting Section 122's enactment); Appx94.

According to plaintiffs, Section 122 was enacted specifically to address "the problem that President Nixon had sought to address: international payments imbalances that put gold reserves at risk in a fixed-exchange-rate

system." *Oregon* Br. 21. But as the private plaintiffs acknowledge (Br. 35-36), the United States had abandoned a fixed-exchange-rate monetary system in March 1973, almost two years before Section 122 was enacted in January 1975.[1] Appx229. It would make no sense for Congress to have enacted a statute to address an economic situation that no one expected would ever recur. Instead, Congress's enactment of Section 122 is best understood as addressing the "primary element in the unsatisfactory U.S. balance of payments" that led President Nixon to seek to impose tariffs: the trade deficit. Off. of the Historian, U.S. Dep't of State, *Paper Prepared in the Department of the Treasury* (Sep. 10, 1971), https://perma.cc/JTZ8-2KTU.

The Supreme Court has rejected interpretations under which a statute would have been even *largely* ineffectual—much less fully ineffectual, as

---

[1] The State Plaintiffs' novel efforts (at 10-11) to rewrite history and extend Bretton Woods are inconsistent with fact and with their prior representations to the contrary. *See* Plaintiff States' Motion for Summary Judgment, and, in the Alternative, for a Preliminary Injunction at 10, *Oregon v. Trump*, No. 26-01472 (Ct. Int'l Trade Mar. 13, 2026), Dkt. 25 ("By March 1973, the Bretton Woods system had effectively collapsed, with nearly all major currencies floating against the dollar."); *see also* Janice M. Westerfield, *A Lower Profile for the U.S. Balance of Payments*, Fed. Rsrv. Bank of Phila. Bus. Rev., Nov.-Dec. 1976, at 11, https://perma.cc/FY6C-FKFJ (noting that "since 1973," "the fixed-rate system was abandoned"). Even the CIT majority recognized "the end of fixed exchange rates in 1973." Appx33.

under plaintiffs' interpretation—at the time of its enactment. *See United States v. Castleman*, 572 U.S. 157, 167 (2014) (rejecting an interpretation partly on the ground that it would have rendered the statute "ineffectual in at least 10 States—home to nearly 30 percent of the Nation's population—at the time of its enactment" (footnote omitted)); *United States v. Hayes*, 555 U.S. 415, 427 (2009) (similar, as to the same provision). That reasoning follows from the more basic and "commonsense proposition 'that Congress presumably does not enact useless laws.'" *Garland v. Cargill*, 602 U.S. 406, 427 (2024) (quotation marks omitted). Here, plaintiffs' interpretation would render Section 122 not just mostly but utterly useless both at its enactment and at every moment since. Such an unorthodox interpretation would require, at a minimum, uncommonly strong supporting evidence.

Plaintiffs' problem is not just that they lack uncommonly strong evidence, but that the only evidence they can muster is tellingly weak. Like the CIT, plaintiffs lean heavily on legislative history. But as we have explained (Br. 33-35), legislative history has little role in modern statutory interpretation, which focuses on the text of the statute rather than the imagined intentions of those who enacted it. Plaintiffs offer no basis to rely on legislative history despite the Supreme Court's repeated warnings against doing so.

*See, e.g.*, *FS Credit*, 608 U.S. at 621-624. Much less do they explain how legislative history, the thinnest of interpretive reeds, could possibly carry their heavy burden to show that Section 122 was a nullity both at its enactment and at every moment since.

In any event, even the legislative history does not support plaintiffs. The Senate Report that both sets of plaintiffs rely on to urge that Congress intended Section 122 not to be utilized has been butchered beyond recognition. *See Burlap & Barrel* Br. 41 (citing S. Rep. No. 93-1298, at 87-88 (1974)); *Oregon* Br. 26 (same). The Report did not suggest that Section 122 was enacted only in case the United States returned to a fixed-rate economy, or that the phrase "balance-of-payments deficits" refers only to deficits that put reserve assets at risk in a fixed-exchange-rate monetary system. Rather, in the same paragraph cited by plaintiffs, the Report confirmed that Congress continued to expect balance-of-payments deficits going forward: "In the new era created by the rapid increase in oil prices, it is likely that most oil-consuming countries will face large balance of payments deficits." S. Rep. No. 93-1298, at 87. When the Report stated that "under present circumstances such authority is not likely to be utilized," the "circumstance[]" to which it was referring was "the rapid increase in oil prices" that was plaguing the

economy at the time, not the changed economic system. *Id.* at 87-88. The immediately preceding sentence discussed "two steps necessary to restore equilibrium in the world economy," including a "reduction in the world price of oil." *Id.* at 87. Indeed, the fact that Congress anticipated "large balance of payments deficits" "[i]n the new era" reinforces that Congress did *not* believe that such deficits could exist only in the discarded fixed-rate exchange system. *Id.* at 87-88.

That inference is bolstered by Congress's continued use of the phrase "balance-of-payments deficit" in legislation. In 1982, Congress enacted a finding that "technological innovation creates jobs, increases productivity, competition, and economic growth, and is a valuable counterforce to inflation and the United States balance-of-payments deficit." Small Business Innovation Development Act of 1982, Pub. L. No. 97-219, § 2(a)(1), 96 Stat. 217, 217. That reference would make no sense if, as plaintiffs contend, Congress believed that balance-of-payments deficits cannot exist in a floating-rate system.

The Executive has likewise used the phrase "balance-of-payments deficit," contemporaneously with Section 122's enactment and since, in ways that make clear it does not understand such deficits as limited to the fixed-

rate context. In the year of Section 122's enactment, for example, President Ford at least twice referred to balance-of-payments deficits as a current problem, tying them to trade deficits. *See* Gerald Ford, *Remarks at the Oklahoma State Fair in Oklahoma City*, The Am. Presidency Project (Sep. 19, 1975), https://perma.cc/9VZB-86SJ (noting that the United States "would have had a huge balance of payments deficit" in 1974 had it not exported agricultural products); Gerald Ford, *Message to the Congress Transmitting Final Report on the Balance of Payments Deficit Incurred Under the North Atlantic Treaty*, The Am. Presidency Project (May 27, 1975), https://perma.cc/2LLH-KUF2 (similar). This sort of contemporaneous evidence of how the Executive understood a phrase used by Congress deserves "'great weight'" in statutory interpretation. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 388 (2024). And subsequent Presidents continued to refer to balance-of-payments deficits as current problems. *See, e.g.*, William J. Clinton, *Joint Summit Statement by the Presidents of the United States and Ukraine*, The Am. Presidency Project (Nov. 22, 1994), https://perma.cc/BT56-JAJZ; George H.W. Bush, *Declaration of Cartagena*, The Am. Presidency Project (Feb. 15, 1990), https://perma.cc/29HJ-LW4Y; Ronald Reagan Presidential Libr. & Museum, *Radio Address to the Nation on the Caribbean Basin Initiative* (Dec. 4, 1982), https://perma.cc/

GQ2M-85YB. Such "considered and consistent Executive Branch practice … buttresses the ordinary meaning and natural interpretation of the term … in the statute." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 783 (2025).

In any event, plaintiffs' view of Section 122 as addressing particular concerns in a fixed-exchange rate system does not necessarily mean Congress intended to preclude its application in the floating-exchange rate context. "[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020); *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."). Here, Congress employed a broad term—"balance-of-payments deficit[]"—and there is nothing in the statute's text purporting to limit the scope of that term. That a Senate Report specifically references particular means for measuring a balance-of-payments deficit that appear nowhere in the text of the statute itself does not overcome the ordinary approach by courts to give broad statutory terms their full meaning. Thus, even if plaintiffs were

correct in their characterization of the history and purpose of Section 122 (which they are not), that still would not support construing Section 122 to apply only in the context of a fixed exchange rate, thereby rendering the statute a nullity.

Plaintiffs' interpretation also conflicts with the basic principle, discussed above, that terms of art used in statutes have the meaning ascribed to them in the relevant field of expertise. The Kuwayama article, published the same year that Section 122 was enacted, makes clear that economists did not think the concept of "balance-of-payments deficits" had become vestigial. The article's whole purpose was "to clarify the analytical differences among [the] major balance-of-payments measures and to explain the usefulness of each in application to *present-day* policy questions." Kuwayama, *supra*, at 183 (emphasis added).

Plaintiffs' efforts to cherry-pick from the myriad contemporaneous articles cited by the government cannot withstand scrutiny. For instance, the State plaintiffs selectively quote from one paragraph in the Kuwayama article that discussed merely "[o]ne of the … uses of balance-of-payments measures." *Oregon* Br. 23-24 (quoting Kuwayama, *supra*, at 189). But that paragraph continues and states that "[i]n the present exchange rate regime

of managed floating [rates], balance-of-payments measures are still used to identify disequilibria." Kuwayama, *supra*, at 189. That sentence obviously contradicts plaintiffs' theory. The private plaintiffs' effort to use the Kuwayama article to denigrate certain definitions of balance-of-payments deficits likewise serves only to highlight that Kuwayama preferred using the "current-account balance" to any of those alternative definitions. *Burlap & Barrel* Br. 30 (citing Kuwayama, *supra*, at 188 (gross liquidity balance), 189 (official reserve transaction balance)). Regardless, the Kuwayama article demonstrates that there are multiple economically reasonable "definitions of the balance of payments." Kuwayama, *supra*, at 184.

Plaintiffs' effort to redefine basic balance as solely measuring the "risk to reserve assets" in a fixed-rate economy is likewise meritless. *Oregon* Br. 36. The Kuwayama article from 1975, the same year that Section 122 was enacted, confirms that "the basic balance, as well as other variants of this concept, is just as natural a basis for analysis in the world of floating exchange rates as it was under fixed exchange rates." Kuwayama, *supra*, at 193. The overarching goal of the basic balance is "to isolate stable, underlying patterns and separate them from movements of volatile, short-term capital." *Id.* at 192. While time may shift precisely which components

should be treated as "volatile, short-term capital," *id.*, it does not render that concept devoid of meaning.

Plaintiffs similarly contort the Kemp article in reading it to suggest that balance-of-payments deficits arise only in a fixed-exchange-rate monetary system. Donald S. Kemp, *Balance-of-Payments Concepts – What Do They Really Mean?*, Fed. Rsrv. Bank of St. Louis Rev. 14 (July 1975), https://perma.cc/2AP4-VN8C. The article confirms that balance-of-payments deficits arise under both the old fixed-exchange-rate system, *id.* at 15-16, and "a system of freely floating exchange rates," *id.* at 16-17.

Lastly, while there was certainly a lively debate among economists after the fall of Bretton Woods as to how to define balance-of-payments deficits in a floating rate system, economists did not assume that the new monetary system had rendered the entire concept moribund. For example, a 1976 article by a Federal Reserve economist, on which the private plaintiffs rely (Br. 40), suggested only that "the floating-rate system eliminates some of the undesirable repercussions of a [balance-of-payments] deficit," not that it eliminates the very relevance of the concept. Westerfield, *supra*, at 14. The article explained that, "[a]lthough floating exchange rates make long periods

of payments deficits unlikely, some hefty short-term deficits still may occur." *Id.* at 16.

In short, there is no evidence that Section 122 was understood at the time of its enactment as a "useless law[]," *Bowe v. United States*, 607 U.S. 13, 38 (2026) (quotation marks omitted)—much less the sort of clear evidence that would be needed to overcome the presumption that Congress does not enact such laws.

2. Plaintiffs raise two other meritless statutory arguments. First, they argue that even if the Proclamation establishes a balance-of-payments deficit, it does not identify a "'fundamental international payments problem[]'" warranting tariffs. *Burlap & Barrel* Br. 54-58; *Oregon* Br. 33-36. And second, the private plaintiffs contend (Br. 58) that the exemptions provided in the Proclamation violate Section 122's uniformity and nondiscrimination requirements. These arguments were not addressed by the CIT, *see* Appx46, and in any event they lack merit.

i. Section 122 authorizes the President to impose tariffs "[w]henever fundamental international payments problems require special import measures to restrict imports" for one of three specified reasons: "to deal with large and serious United States balance-of-payments deficits," "to prevent

an imminent and significant depreciation of the dollar in foreign exchange markets," or "to cooperate with other countries in correcting an international balance-of-payments disequilibrium." 19 U.S.C. § 2132(a). Plaintiffs argue that, even if the circumstances identified by the President's Proclamation constitute a "large and serious … balance-of-payments deficit[]," they do not constitute a "fundamental international payments problem[]."

As an initial matter, that argument is beside the point. The President *did* make an express finding that "fundamental international payments problems within the meaning of section 122 exist." 91 Fed. Reg. at 9341. Specifically, the President identified "large and serious balance-of-payments deficits," *id.* at 9339, as "significantly harm[ing] United States national interests" and thus warranting special import measures, *id.* at 9341. Plaintiffs do not explain how these concerns identified by the President fail to demonstrate a fundamental international payments problem.

Nor do plaintiffs identify any persuasive reason why, if the President identified a "large and serious … balance-of-payments deficit[]" within the meaning of the statute, that finding would not on its own suffice to establish a "fundamental international payments problem[]." A balance-of-payments deficit is obviously a "problem." It is obviously "international" in character.

And it concerns "payments," even where it stems from a trade imbalance, because an "import is an international payment." Brief of Trade Scholars in Economics, Politics, and Law as Amicus Curiae in Support of Respondent V.O.S. Selections at 20 n.7, *Learning Res.*, 607 U.S. 229 (No. 24-1287) at *7-10 ("The more a country imports, the greater the international payments problem.").

So any textual rationale for plaintiffs' position would have to be that not every such deficit is "fundamental"—but the word "fundamental," as used here, simply means "relating to essential structure, function, or facts," or "of central importance." *Fundamental*, Webster's New Collegiate Dictionary (8th ed. 1981); *see Fundamental*, The American College Dictionary (Clarence L. Barnart ed., 1970) ("serving as, or being a component part of, a foundation or basis"). Once the President has identified a balance-of-payments deficit, and once he has determined that this deficit is large and serious, then he has necessarily identified an "international payments problem" that is "fundamental"—*i.e.*, important. And there is no basis for a court to review the President's determination of the importance of the problem. *See Dalton*, 511 U.S. at 476 (rejecting that courts may judicially review determinations statutorily committed to Presidential discretion).

The only argument plaintiffs make along these lines (*Burlap & Barrel* Br. 56) is that the Proclamation fails to demonstrate a "fundamental international payments problem[]" because it describes a "chronic commercial imbalance" rather than an "acute payments crisis." But there is no basis to believe that an "international payments problem" can be "fundamental" only if it is "acute" as opposed to "chronic." As noted above, that is not what the word "fundamental" means. There are plenty of issues, such as the national debt, that no one would dispute are "fundamental" concerns even though they have persisted for long periods of time.

In any event, by far the most natural reading of the statute is that the three specified scenarios *are* "fundamental international payments problems"—the three such problems that Congress gave the President authority to combat. In other words, if there is a "balance-of-payments deficit," then there is definitionally a "fundamental international payments problem[]" triggering the President's authority under Section 122.

This reading of Section 122 accords with ordinary parlance. Consider, for example, a rule imposed by a school district providing that whenever significant school behavior problems require special disciplinary measures to address (1) fighting on the playground, (2) talking in class, or (3) littering

in the cafeteria, the principal shall take certain measures. The commonsense understanding of that rule would be that the three specified problems (fighting, talking, and littering) are the kinds of "significant school behavior problems" that the principal may address through special disciplinary measures. So too here. Section 122 thus makes clear that a large and serious balance-of-payments deficit is one of the three forms of "fundamental international payments problems"—specified in § 2132(a)(1), (2), and (3)—that triggers the President's authority to impose tariffs.

That inference is reinforced by the heading of subsection 122(a), which is "Balance-of-payments authority," not "Fundamental international payments problems authority." Trade Act of 1974, Pub. L. No. 93-618, § 122, 88 Stat. 1978, 1987 (1975). Section headings "are tools available for the resolution of a doubt about the meaning of a statute," *Dubin v. United States*, 599 U.S. 110, 121 (2023) (quotation marks omitted), and the import of this one is clear: if a large and serious balance-of-payments deficit exists, then it plainly falls within the ambit of the statute, without the need for any further determination that it constitutes a "fundamental international payments problem[]."

Any contrary conclusion would be difficult to square with Section 122's history. As we have explained, Section 122 was enacted to rectify the lack of express statutory authority for President Nixon's imposition of tariffs to address a large and serious balance-of-payments deficit. In other words, Congress saw the existence of such a deficit as a fundamental problem in and of itself—sufficiently fundamental to warrant giving the President new authority to combat such problems in the future. There is no basis in history or logic to believe that Congress saw only some "large and serious" deficits (but not all large and serious deficits) as "fundamental … problems." And of course, balance-of-payments deficits are inherently "international" in character.

The private plaintiffs err in suggesting (Br. 55) that reading the term "fundamental international payments problem[]" to include a large and serious balance-of payments-deficit would violate the surplusage canon. But the mere existence of some redundancy does not create a surplusage concern, as "[s]ometimes drafters *do* repeat themselves" as part of a "belt-and-suspenders approach," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-177 (2012), and thus "[s]ometimes the better overall reading of the statute contains some redundancy," *Rimini St., Inc. v.*

*Oracle USA, Inc.*, 586 U.S. 334, 346 (2019); *see also, e.g.*, *Fort Stewart Schs. v. Federal Lab. Rels. Auth.*, 495 U.S. 641, 646 (1990) (recognizing that Congress may include further explanation of an umbrella term "out of an abundance of caution"). Here, the government's reading of "fundamental international payments problem[]" as an umbrella term encompassing the three circumstances specified in subsections (a)(1) through (3) of Section 122 comports with logic and common parlance. That there may be some redundancy does not mean the government's reading is implausible under the surplusage canon—especially where, as here, any redundancy merely reflects Congress's intent to avoid ambiguity regarding the specific circumstances in which the President may impose special import measures.

Thus, Section 122's text and history plainly support the inference that Congress intended to authorize the President to impose special import measures to address large and serious balance-of-payments deficits. Plaintiffs' effort to superimpose an additional requirement—an acute payments crisis—that appears nowhere in the text is wrong and would unduly limit the President's ability to address precisely the problems for which Congress enacted Section 122.

ii. The private plaintiffs separately argue (Br. 58) that the Proclamation's exceptions "violate[d] Section 122's uniformity and nondiscrimination requirements." That argument is both jurisdictionally improper and meritless.

Start with jurisdiction. Plaintiffs lack standing to challenge the exceptions because, even if the exceptions were held invalid, that would still not justify the relief plaintiffs seek. It is well established that an invalidated provision of an Executive Branch action is severable from the remainder, such that the remainder can be upheld even if the challenged provision is invalidated, if the Executive "inten[ds]" as much and if "the remainder … could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001). Here, the question of "intent," *id.*, is resolved by the Proclamation's express severability provision, in which the President stated that "[i]f any exception" were "held to be invalid in whole or in part, only that exception or that part of the exception shall be treated as invalid," and that the President "would adopt each exception … in whole or in part, separately, or in any combination," 91 Fed. Reg. at 9343. And there is no basis for a court to second-guess the President's determination that "the remainder" of the Proclamation "could function sensibly without the

stricken provision," *MD/DC/DE Broads. Ass'n*, 236 F.3d at 22. So if the exceptions were invalid, the result would be that importers would need to pay tariffs on the previously excepted products, not (as plaintiffs hope) that the Proclamation as a whole would be invalid. Because a ruling in plaintiffs' favor on this issue would not redress any injury that plaintiffs assert, plaintiffs lack standing to challenge the tariffs on this ground.

In any event, plaintiffs' arguments lack merit. As an initial matter, the President's chosen exceptions to the Section 122 tariffs are not judicially reviewable because Congress left the decision of whether to apply exceptions to the President's judgment. Specifically, Section 122 states that "[i]mport restricting actions proclaimed pursuant to [the statute] shall be of broad and uniform application with respect to product coverage except where the President determines, consistent with the purposes of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy." 19 U.S.C. § 2132(e). The President's exercise of that statutorily specified discretion is not judicially reviewable. *See Dalton*, 511 U.S. at 476 ("How the President chooses to exercise the discretion Congress has granted him is not a matter for [courts to] review."); *see also Motions Sys. Corp. v. Bush*, 437 F.3d 1356, 1360 (Fed. Cir. 2006) (en banc)

(per curiam) ("Judicial review of Presidential action is not available when the statute in question commits the decision to the discretion of the President." (alterations omitted) (quoting *Dalton*, 511 U.S. at 474)); *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1263 (Fed. Cir. 2023) ("[W]e may not second-guess the facts found and measures taken by the President to support his [tariff] adjustment.").

Even if the exemptions were reviewable, the Proclamation establishes that the exceptions imposed by the President are "consistent with the purposes of section 122." 91 Fed. Reg. at 9342. In particular, the Proclamation notes "the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, the avoidance of serious dislocations in the supply of imported goods, or other similar factors" as a basis for imposing such exceptions. *Id.* at 9341. While plaintiffs argue that the Proclamation's explanation is insufficient because it lacks any individualized assessment, they point to no such individualized-reasoning requirement in the statute or otherwise. The President is not subject to the APA and need not provide detailed reasons for his decisions, especially when the statute does not expressly require it. *See Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (finding "questionable" that a statute that "only requires the President to *make* a

finding" also requires the President "to explain that finding with sufficient detail to enable judicial review"); *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part and in the judgment).

There is also no basis for plaintiffs' suggestion that the exceptions are unlawful because they are similar to those under the former IEEPA tariffs. The fact that the President considered certain exceptions from the IEEPA tariffs to be in the Nation's best interests hardly suggests he is wrong to think the same exceptions from the Section 122 tariffs are appropriate to protect "the needs of the United States economy" and are "consistent[] with the purposes of" Section 122, 19 U.S.C. § 2132(e). If anything, the consistency of the President's views about tariff exceptions over time is a point in *favor* of the exceptions.

Equally unavailing is plaintiffs' contention that the Proclamation's exceptions violate the nondiscriminatory treatment clause of 19 U.S.C. § 2132(d)(1). For one, plaintiffs' argument rests on a mischaracterization of the Proclamation's exemptions as "country-specific." *Burlap & Barrel* Br. 58-59. In fact, the Proclamation exempts particular *products* rather than *countries*. That distinction is crucial, as the exemption of particular types of products is governed by § 2132(e), which (as noted above) easily allows the

exceptions the President imposed here. The private plaintiffs do not argue that exceptions made under § 2132(e) must also comply with § 2132(d).

In any event, the exemptions comply with § 2132(d)'s nondiscrimination requirements (to that extent that provision is applicable here). The statute requires that the import-restricting actions it authorizes are applied "consistently with the principle of nondiscriminatory treatment," and defines "nondiscriminatory treatment" as "trade treatment based on normal trade relations (known under international law as most-favored-nation treatment)." 19 U.S.C. §§ 2132(d)(1), 2481(9). That does not mean that actions under Section 122 must apply identically to every country; in fact, the principle of nondiscriminatory treatment in international trade law permits differentiation between unlike articles from different trading partners, is subject to various exceptions, and is thus not absolute.[2] Consistent with this principle, the statute further specifies that "[n]otwithstanding paragraph (1), if the President determines that the purposes of this section will best be

[2] *See, e.g.*, General Agreement on Tariffs and Trade, arts. I, XX, XXI, XXIV, Oct. 30, 1947, 55 U.N.T.S. 194, 196, 262, 266, 268 (GATT) (requiring the GATT Contracting Parties (now WTO Members) to extend preferential tariff concessions granted to one trading partner "immediately and unconditionally" only to "like products" of other trading partners, and permitting deviation from this principle pursuant to various exceptions).

served by action against one or more countries having large or persistent balance-of-payments surpluses, he may exempt all other countries from such action." *Id.* § 2132(d)(2).

## II. The State Plaintiffs That Did Not Pay The Section 122 Tariffs Lack Standing To Challenge Them

The Court need not address the States' cross-appeal if it agrees with the government's interpretation of Section 122. If the Court disagrees with our argument on the merits, however, it should nonetheless affirm the CIT's ruling that the non-importer States lacked standing to bring this suit.

1. To have Article III standing, a plaintiff must prove it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)). "[T]he two key questions in most standing disputes are injury in fact and causation," because the "redressability" inquiry is generally the "'flip side[]'" of the "causation" inquiry: "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380-381 (2024).

"Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *Alliance*, 602 U.S. at 382. But when "a plaintiff challenges the government's unlawful regulation (or lack of regulation) of *someone else*," as is true of the non-importer States here, "standing"—while "not precluded"—"is ordinarily substantially more difficult to establish." *Id.* (quotation marks omitted). That is because, even where unregulated parties have suffered actual injury, they "often … have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *Id.* "The causation requirement precludes" both "*speculative* links … , where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs," and "*attenuated* links … , where the government action is" too "far removed from its distant (even if predictable) ripple effects." *Id.* at 383 (emphases added).

These principles support this Court's repeated holdings that only importers (who actually pay tariffs), and not purchasers of tariffed goods, can challenge the tariffs. In *Rack Room Shoes v. United States*, 718 F.3d 1370 (Fed. Cir. 2013), and *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346 (Fed. Cir.

2010), the Court held that importers could challenge tariffs on the ground that they violated purchasers' equal-protection rights, only because the Court recognized that the purchasers themselves could *not* bring suit. *See Totes-Isotoner*, 594 F.3d at 1352 ("The purchasers have no remedy to challenge the tariff classification."); *Rack Room Shoes*, 718 F.3d at 1375 (similar); *see also Barnes v. United States*, 788 F. Supp. 3d 1309, 1316-1317 (Ct. Int'l Trade 2025) (dismissing for lack of standing tariffs challenge brought by a consumer).

Given the clear standing principles articulated above, the CIT was correct to hold that the non-importer States lacked standing to challenge the Section 122 tariffs. The non-importer States do not contend that they paid the challenged tariffs at any point. Instead, they assert harm from "potential exposure to tariff-related price increases," Appx134, or the prospect "that vendors and suppliers will pursue amendments to existing contracts or will announce price increases and surcharges if they pursue new contracts with the State," Appx172; *see Oregon* Br. 40-46. But these harms are both too speculative and too attenuated from the challenged tariffs to support standing.

The speculative nature of the harms arises from the fact that they do not flow directly from the challenged tariffs. Rather, to the extent they occur, they would "'result[] from the independent action of some third party not

before the court,'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). Nothing about the challenged tariffs requires that importers pass them along to customers like the State plaintiffs; that is an independent choice on the part of the importers. Plaintiffs cannot establish standing based on "a string of speculations" about how they will be harmed. *Trump v. California*, 609 U.S. 1032, 1039 (2026) (per curiam). And because the harm asserted here would flow from the independent actions of third parties, any harm flowing from it cannot be "redress[ed]" by an injunction against the tariffs. *Murthy*, 603 U.S. at 57.

And even if these asserted harms were sufficiently concrete and certain to occur, they would still be too "far removed" from the challenged tariffs—that is, the connection between the tariffs and the harms would be too "attenuated," *Alliance*, 602 U.S. at 383—to support standing. The Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023), is instructive. There, the court of appeals affirmed the district court's holding that Texas had standing to challenge federal immigration-enforcement guidelines based on the State having "incur[red] substantial costs associated with" incarcerating and paroling certain criminal "aliens who would otherwise have been removed pursuant to federal statutory law." *Texas v. United States*,

40 F.4th 205, 216-217 (5th Cir. 2022) (per curiam). But the Supreme Court reversed on the ground that those asserted costs, however concrete and certain, are insufficient to confer standing. *Texas*, 599 U.S. at 675-686. In doing so, the Court described as "attenuated" theories of State standing resting on claims that a federal policy "has produced only" "indirect effects on state revenues or state spending." *Id.* at 680 n.3.

Following *Alliance* and *Texas*, courts have rejected arguments of state standing based on downstream economic harms flowing from federal actions. The Ninth Circuit, for example, held that States lacked standing to challenge a federal action regarding mifepristone, a drug used for abortion, on the theory that the action would lead to increased Medicaid costs for the States. *Washington v. FDA*, 108 F.4th 1163, 1176 (9th Cir. 2024). The court explained that the "alleged uptick in Medicaid costs" was "exactly the kind of 'indirect effect on state spending'" that the Supreme Court's decisions in *Texas* and *Alliance* made clear is insufficient for standing. *Id.* (alterations omitted). The Fourth and Sixth Circuits have likewise recognized that the sort of "boundless theory of standing" proposed by non-importer States here, "in which all peripheral costs imposed on States" by federal actions can allow the States to challenge the actions in federal court, "'would make a mockery

of the constitutional requirement of case or controversy.'" *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (alteration omitted); *see Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 210 (4th Cir. 2025) (similar). That is equally true here.

2. The non-importer States invoke a handful of cases involving the "familiar circumstances where government regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff," *Alliance*, 602 U.S. at 384. "For example," the Supreme Court has explained that "when the government regulates (or under-regulates) a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries to others in the chain, such as certain manufacturers, retailers, suppliers, competitors, or customers." *Id.* Most of plaintiffs' cases presented exactly that sort of direct, commonsensical economic effect. In *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100 (2025), the Supreme Court held that fuel producers could challenge California fuel-economy regulations that—although formally targeted at automakers—were obviously meant to affect how much fuel was sold and burned in the state. *Id.* at 116-117. In *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319 (Fed. Cir. 2008), this Court held that Canadian wheat producers could challenge U.S. government actions that benefited their economic competitors. *Id.*

at 1332-1333. And in *Rubicon Real Estate Holdings, LLC v. City of Pontiac*, 179 F.4th 431 (6th Cir. 2026), *cert. denied*, No. 26-359, 2026 WL 3383917 (U.S. Nov. 9, 2026), the Sixth Circuit held that "interference with a tenant's license needed to operate a business at its landlord's property" would "predictably cause 'downstream' 'economic injuries' to the landlord." *Id.* at 444.[3]

But this case clearly does not involve these sorts of direct, commonsensical economic consequences. Whereas a regulation of fuel-economy standards for automakers directly and obviously affects fuel producers, and an action that advantages one set of companies directly and obviously disadvantages their competitors, imposing tariffs on importers has no such direct or obvious effect on the purchasers of the imported goods. The effect is not obvious because it is by no means clear that importers react to tariffs by passing the costs along to consumers through increased prices; whether importers do so is a hotly contested subject in economics. And even if the effect

[3] In one sentence, plaintiffs also invoke the Ninth Circuit's decision in *Center for Biological Diversity v. EPA*, 168 F.4th 1164 (9th Cir. 2026), which they characterize as reflecting the same principles articulated in the other cases. But that case was quite different; it involved a challenge to nonbinding Environmental Protection Agency recommendations predicated on what the dissent correctly described as a long "chain of inferences." *Id.* at 1184 (Miller, J., dissenting). And its holding was clearly incorrect for the reasons articulated by the dissent.

were more certain to occur, it would be nowhere near as directly connected to the challenged action as in the cases on which plaintiffs rely. Unlike in those cases, there is no "familiar" practice, *Alliance*, 602 U.S. at 384, of allowing federal courts to hear suits based on a federal action's downstream economic consequences on States. As discussed above, the opposite is true.

## CONCLUSION

The CIT's judgment on the merits should be reversed. To the extent the Court reaches the issue, the CIT's ruling that the non-importer States lacked standing should be affirmed.

Respectfully submitted,


JONATHAN D. GUYNN
*Acting Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

BRAD HINSHELWOOD
DANIEL WINIK

*/s/ Sophia Shams*

SOPHIA SHAMS
DOUGLAS C. DREIER
*Attorneys, Appellate Staff*
*Civil Division, Room 7213*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2000*
*sophia.shams@usdoj.gov*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Circuit Rule 28.1(b)(1)(A) because it contains 8,599 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Sophia Shams*
Sophia Shams